# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELSMERE PARK CLUB, L.P.,　　　　　:
a Delaware limited partnership,　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Plaintiff,　　　　　　:　　　Civil Action No. 04-1321
　　　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　　　:　　　**JURY TRIAL DEMANDED**
　　　　　　　　　　　　　　　　　　:
TOWN OF ELSMERE, a Delaware　　　:
municipal corporation, ELLIS　　　　　:
BLOMQUIST, EUGENE BONEKER,　　:
and JOHN GILES,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Defendants.　　　　　:
_____:

## DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Linda Martin Gilchrist (#3973)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
*emcnally@morrisjames.com*
*lgilchrist@morrisjames.com*
Attorneys for Defendants Town of Elsmere,
　　Ellis Blomquist and Eugene Boneker

Dated:  September 1, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii.

NATURE AND STAGE OF PROCEEDINGS ...................................... 1

SUMMARY OF ARGUMENT ........................................................... 3

UNDISPUTED FACTS ...................................................................... 4

    A.    Brief History Of The Elsmere Park Apartments .............................. 4

    B.    The First Condemnations And Evacuations At
          The Apartments .......................................................................... 5

ARGUMENT .................................................................................... 11

I.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    SHOULD BE GRANTED WHEN THE PLAINTIFF CANNOT
    PROVE ITS CASE UNDER THE UNDISPUTED FACTS ................... 11

    A.    Standard For Motion For Summary Judgment ............................... 11

    B.    Due Process Clause And The Deprivation Of Property ................. 12

          1.    Procedural Due Process Generally ...................................... 12

               a.    The Mathews Test And Procedural
                      Due Process ............................................................. 13

               b.    Notice And The *Mullane* Rule ............................... 15

               c.    "Extraordinary Situations" And The
                      *Fuentes* Test .......................................................... 15

               d.    Right To Post-Deprivation Hearing ....................... 18

          2.    Substantive Due Process Generally ..................................... 20

               a.    Failure To Follow Municipal Ordinance
                      Not A Substantive Due Process Violation ............. 22

               b.    Due Process Does Not Create A
                      "Right To Remediate" Prior to Condemnation ...... 25

C.    EPC Has The Burden Of Proving Each Of The Elements
      Of Its Procedural And Substantive Due Process Claims ...............26

II.    THE ACTIONS OF BLOMQUIST, BONEKER AND GILES
       ARE PROTECTED BY THE DOCTRINE OF QUALIFIED
       IMMUNITY..............................................................................................30

CONCLUSION......................................................................................................33

## TABLE OF AUTHORITIES

**Case**                                                                    **Page**

*Alvin v. Suzuki,*
    227 F.3d 107 (3d Cir. 2000)................................................................13,19,20

*Anderson v. Creighton,*
    483 U.S. 635 (1987)...........................................................................30

*Angstadt v. Midd-W. School Dist.,*
    377 F.3d 338 (3d Cir. 2004)..............................................................21

*Armstrong v. Manzo,*
    380 U.S. 545 (1965)...........................................................................12

*Berlinghieri v. Dept. of Motor Vehicles,*
    33 Cal.3d 392 (Cal. 1983).................................................................21

*Bixby v. Pierno,*
    4 Cal.3d 130 (Cal. 1971)...................................................................21

*Boddie v. Connecticut,*
    401 U.S. 371 (1971)...........................................................................18

*Boyanowski v. Capital Area Intermediate Unit,*
    215 F.3d 396 (3d Cir.2000)...............................................................31

*Cafeteria & Restaurant Workers v. McElroy,*
    367 U.S. 886 (1961)...........................................................................13

*Carey v. Piphus,*
    435 U.S. 247 (1978)...........................................................................12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...........................................................................11

*City of New Orleans v. Dukes,*
    427 U.S. 297 (1976)...........................................................................22

*Collins v. Harker Heights,*
    503 U.S. 115 (1992)...........................................................................31

*Concord Communities v. City of Concord,*
    91 Cal.App.4[th] 1407 (Cal. 2001).....................................................21

*Congregation Kol Ami v. Abington Township,*
    309 F.3d 120 (3d Cir. 2002)........................................................21

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1998)...............................................................30,31

*Dusanek v. Hannon,*
    677 F.2d 538 (7th Cir. 1982) ....................................................19

*Elsmere Park Club, L.P. v. Town of Elsmere,*
    771 F.Supp. 646 (D. Del. 1991) ..................................................4

*Fagan v. City of Vineland,*
    22 F.3d 1296 (3d Cir.1994).......................................................31

*Federal Deposit Ins. Corp. v. Mallen,*
    486 U.S. 230 (1988)................................................................16

*Flatford v. City of Monroe,*
    17 F.3d 162 (6th Cir. 1994) ..................................................18,24

*Fuentes v. Shevin,*
    407 U.S. 67 (1972)......................................................12,15,16,18

*GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.,*
    270 F.Supp.2d 476 (D. Del. 2003)...........................................11,12

*Gilbert v. Homar,*
    520 U.S. 924 (1997)................................................................15

*Grayden v. Rhodes,*
    345 F.3d 1225 (11th Cir. 2003) ...........................................16,17,18

*Grimm v. Sweeney,*
    249 F.Supp.2d 571 (E.D. Pa. 2003) ........................................20,31

*Hamdi v. Rumsfeld,*
    124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) ......................................14

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)................................................................30

*In re DaimlerChrysler AB Securities Litig.,*
    269 F.Supp.2d 508 (D. Del. 2003)...........................................11,12

iv

*Independent Enters. v. Pittsburgh Water,*
    103 F.3d 1165 (3d Cir. 1997)............................................................................20

*Joint Anti-Fascist Refugee Committee v. McGrath,*
    341 U.S. 123 (1951)......................................................................................13

*Leamer v. Fauver,*
    288 F.3d 532 (3d Cir.2002)............................................................................31

*MHC Operating Limited Partnership v. City of San Jose,*
    106 Cal.App.4th 204 (Cal. App. 6 Dist. 2003) ...........................................21

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)......................................................................................14

*McGowan v. Maryland,*
    366 U.S. 420 (1961)......................................................................................22

*Miller v. City of Philadelphia,*
    174 F.3d 368 (3d Cir.1999)............................................................................31

*Mullane v. Central Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950)..............................................................................12,13,15

*Nicini v. Morra,*
    212 F.3d 798 (3d Cir.2000)............................................................................31

*Richmond Tenants Org., Inc. v. Kemp,*
    956 F.2d 1300 (4th Cir. 1992) ....................................................................18

*Rochin v. California,*
    342 U.S. 165, 72 S.Ct. 205, 96 L.Ed.183 (1952).......................................30

*Saucier v. Katz,*
    533 U.S. 194 (2001).....................................................................................17

*Smith v. City of Picayune,*
    795 F.2d 482 (5th Cir. 1986) .................................................................22,23

*State of Missouri ex rel. Gore v. Wochner,*
    475 F.Supp. 274 (E.D. No. 1979),
    *aff'd,* 620 F.2d 183 (8th Cir. Mo. 1980) ...................................................23

*Stern v. Tarrant County Hosp. Dist.,*
    778 F.2d 1052 (5th Cir. 1985),
    *cert. denied,* 476 U.S. 1108 (1986).............................................................23

*U.S. v. James Daniel Good Real Property,*
    510 U.S. 43 (1994)........................................................................14

*U.S. v. One Parcel Property Located At 200 Pennsylvania Avenue,*
    *Claymont, Del., With All Appurtenances and Improvements Thereon,*
    786 F.Supp. 400 (D. Del. 1992)....................................................12

*United Artists Theatre Circuit v. Township of Warrington,*
    316 F.3d 392 (3d Cir. 1003)..........................................................31

*Woodwind Estates, Ltd. v. Gretkowski,*
    205 F.3d 118 (3d Cir. 2000) .........................................................20

## Statutes and Other Authorities

22 *Del. C.* § 324 .............................................................................19

22 *Del. C.* § 325 .............................................................................19

31 *Del. C.*  § 4128 ..........................................................................25

31 *Del. C.*  § 4130 .......................................................................25,26

Fed. R. Civ. P. 56(e) .......................................................................11

Orlando, Fla. City Code § 30A.11 .................................................17

Property Maintenance Code of The Town of Elsmere § 109.6. ........17,19

Sheldon H. Nahmond, *Civil Rights and Civil Libertie*
    *Litigation* § 3:36 (4th ed. 2004) ................................................13

## NATURE AND STAGE OF PROCEEDINGS

This is an action by Plaintiff Elsmere Park Club, L.P. ("EPC") against Defendants Town of Elsmere ("Elsmere"), Ellis Blomquist ("Blomquist"), Eugene Boneker ("Boneker") and John Giles ("Giles") for alleged procedural and substantive due process violations regarding the condemnation and evacuation of the Elsmere Park Apartments, a/k/a Fenwick Park Apartments (the "Apartments") in October 2002. The Complaint alleged that Defendants Elsmere, Blomquist, Boneker and Giles wrongfully condemned and evacuated the Apartments thus depriving Plaintiff of its property, did not give EPC an adequate opportunity to be heard regarding the condemnation and evacuation, improperly denied EPC the opportunity to remediate the Apartments before condemnation and evacuation, and violated EPC's right to due process by failing to follow Elsmere's procedures for determining the propriety of the condemnation and evacuation. EPC also alludes to procedural due process failures regarding the timeliness and nature of the notices of condemnation and evacuation received by EPC.

Several related actions have arisen from the condemnation and evacuation of the Apartments, including Plaintiff's failed motion for a temporary restraining order in the Delaware Court of Chancery. The Apartments were condemned and evacuated in the first two weeks of October 2002 pursuant to an emergency order issued after severe and hazardous conditions were discovered by Blomquist.

On January 20, 2005, this Court entered a Rule 16 Schedule Order. That Order, at the request of the parties, was amended on June 10, 2005. Under the Amended Order, a Pre-Trial Conference is scheduled for November 30, 2005 and trial is to commence on January 4, 2006.

Defendants are now moving for summary judgment on EPC's Complaint because EPC cannot prove its due process claims.  Not only did Defendants properly exercise their authority in condemning and evacuating the Apartments, but they received and relied upon the expertise of the Delaware State Department of Public Health in evaluating and acting on the situation present at the Apartments.   Furthermore, EPC clearly had notice and the opportunity to be heard regarding Defendants' emergency order, as evidenced by EPC's motion for temporary restraining order filed and heard within five days after the first buildings were condemned and evacuated, and EPC's deliberate decision not to avail itself of its administrative remedies.

This is the Defendants' Opening Brief in Support of Their Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

A.    A defendant's motion for summary judgment should be granted when the plaintiff cannot prove its case under the undisputed facts.

B.    The actions of Blomquist, Boneker and Giles are protected by qualified immunity.

## UNDISPUTED FACTS[1]

**A.      Brief History Of The Elsmere Park Apartments**

The Elsmere Park Apartments (the "Apartments") were purchased by Plaintiff in 1986. The complex featured 156 garden-style apartments in 39 buildings, wherein each building contained five (5) apartments, including an occupied basement apartment which covered approximately one-half of the lower floor. The other half of each basement contained common laundry facilities for the residents.

In 1989, during Hurricane Hugo, the basements of the Apartments experienced moderate to severe flooding. The basement apartments were evacuated, and due to the Apartments location in a flood plain and the likelihood such flooding would continue to occur, Elsmere decided to prohibit further rental of all 39 living areas contained in the basements of the Apartments.[2] Shortly thereafter, EPC placed plywood over the windows of the apartment units.

In 1996, in response to growing concerns regarding vandalism in the former basement apartments, Elsmere instructed EPC to better secure the empty lower units. EPC removed the carpets, cabinets and other items from the unoccupied basement units, bricked over the windows and old air conditioning openings and sealed the doors leading into the units. (A-229). One year later, in 1997, EPC had the Apartments examined by a structural engineer. Although the engineer found the vacant basement apartments to be in "serviceable to good condition structurally," he recommended EPC evaluate the source of

---

[1]  The facts are contained in the depositions and affidavits set out in the Appendix filed with this brief and cited as "A-__."

[2]  EPC sued Elsmere over this issue, but lost. *See Elsmere Park Club, L.P. v. Town of Elsmere*, 771 F.Supp. 646 (D. Del. 1991).

water leaks found in the basements, seal and repair the leaks, investigate further suspected areas of water damage, and to monitor the buildings for possible water problems or structural movement.  (A-245).

**B.     The First Condemnations And Evacuations At The Apartments**

On or about October 1, 2002, Defendant Ellis Blomquist ("Blomquist"), Elsmere's Code Enforcement Officer, went to the Apartments at the request of Darlene Grocki ("Grocki"), EPC's on-site manager at the Apartments, to conduct a routine pre-rental inspection of an apartment located at 1421 Cypress Avenue.[3]  (A-1).  Upon arrival, Blomquist detected a very strong odor and advised Grocki that the apartment would not be inspected until she identified and remedied the source of the odor.  (A-1).   Grocki then directed Blomquist to 1353 Maple Avenue for another pre-rental inspection, however, upon entering the building, Blomquist detected the same strong odor.  (A-2). He again told Grocki that she must immediately identify and remedy the source of the odor before he could certify the apartment units for occupancy, and that he would return to complete the pre-rental inspections once she advised him that the problem had been rectified.  (A-2).  Shortly thereafter, the source of the odor was traced to the basements of the two buildings.  Since the open, former laundry areas of the basements had already been cleaned and deodorized, it was determined that the odor was emanating from the sealed former basement apartments.  (A-222).

On or about Friday, October 4, 2002, Blomquist returned to the Apartments at Grocki's request to complete the pre-rental inspections at 1421 Cypress and 1353 Maple and to inspect the basements.  (A-2).  Accompanying Blomquist was Kenneth Belmont

_____

[3]   Under Elsmere's municipal code, all apartment units must be inspected by a code enforcement officer prior to occupancy to determine if the unit is code compliant.

("Belmont"), an Industrial Hygienist with the State of Delaware Division of Public Health ("State"). (A-2). Belmont had been contacted earlier by Blomquist to assist in the inspection of an unrelated apartment complex in Elsmere. Since Belmont was already in the area, Blomquist asked him to accompany him to the Apartments in order to obtain Belmont's insight into the possible source of the odor Blomquist had detected during the earlier inspections. (A-214).

After arriving at the Apartments, Blomquist and Belmont were taken to the basement of 1421 Cypress Avenue by John Ruhl ("Ruhl"), maintenance supervisor at the Apartments. (A-2). Upon entering the former basement apartment, Blomquist and Belmont detected extensive mold growth, evidence of raw sewage, and other serious code violations. (A-2). Ruhl then directed them to the basement at 1405 Cypress Avenue, a building not visited during the October 1, 2002 pre-rental inspections, where they discovered even more extensive mold, raw sewage, a steady leak of hot water into the basement from the apartment unit above, two inches of water on the floor and high humidity. (A-23).

After finding such serious conditions in the two basements, Belmont contacted Gerald Llewellyn, Ph.D. ("Llewellyn"), Chief Toxicologist at the State. (A-3). Llewellyn advised Belmont and Blomquist that the conditions in the basements posed a serious health threat to the occupants of the buildings because of the likely migration of the mold spores from the basements into the apartments above through various openings such as pipe chases and ventilation ducts. (A-135-36). The State, including Llewellyn and Belmont, advised Blomquist that it was their recommendation that the two buildings be condemned and vacated immediately. (A-135). Blomquist informed Grocki of that

determination, posted the buildings accordingly, and evacuated the residents.  (A-3).

Grocki then immediately contacted Regina O'Neill ("O'Neill"), Property Manager at

EPC, and Elliott Leibowitz ("Leibowitz"), Owner of EPC, to inform them of the result of

the inspections, the recommendation of the State that the two buildings be condemned

and vacated, and the actual condemnation and evacuation of the buildings by Elsmere and

Blomquist.  (A-224; A-230).  O'Neill and Leibowitz told Grocki to close the on-site

management office, and they would come to the Apartments on the following Monday to

handle the problem.[4]  (A-223-34).  Simultaneously, Blomquist contacted Defendant

Eugene Boneker ("Boneker"), Town Manager of Elsmere, to inform him of the results of

the inspection and the recommendation of the State that the two buildings be condemned

and evacuated. (A-219).  Boneker contacted Defendant John Giles ("Giles") to inform

him of what was transpiring at the Apartments. [5]  (A-219).

On or about Saturday, October 5, 2002, a meeting was held at Elsmere's Town

Hall that was attended by Blomquist, Boneker, Giles, Grocki, Ruhl, various Elsmere

officials, and Elsmere's Town Solicitor, Edward M. McNally.  At the meeting, the

participants discussed the conditions discovered in the basements of the two buildings at

the Apartments, what could be done to remediate the conditions, and the fact that

remediation could not take place while the buildings were occupied.  At the meeting,

Grocki stated the management of the Apartments must have been "dumb and blind" to

---

[4]  In fact, Grocki stayed in constant, almost hourly, contact with O'Neill and Leibowitz
during this time.  (A-281).

[5]  In October 2002, Boneker had been the Town Manager of Elsmere for only a few
weeks.  Giles, the former Town Manager and Chief of Police of Elsmere, was serving as
an advisor to Boneker and Elsmere during this period at the request of the Elsmere City
Council.

not have been aware of the problems in the basements.[6] (A-4; A-225-26). Blomquist, Boneker, Giles, Llewellyn and the other Elsmere officials agreed to inspect all of the remaining basements at the Apartments to determine if they also contained mold.

On or about Monday, October 7, 2002, the inspections of the remaining 37 basements resumed. (A-4). Blomquist was joined by Belmont, Llewellyn and George Yocher ("Yocher"), Environmental Epidemiologist of the State, and they systematically inspected the remaining basements over the next several days, stopping only during the time EPC's motion for temporary restraining order was filed and heard by the Court of Chancery. (A-217). Representatives of EPC, including O'Neill, were also present. Each day, Blomquist provided notice to EPC through its representatives of the buildings that had been inspected and condemned and each building was properly posted with a condemnation notice.

On October 10, 2002, the Court of Chancery heard EPC's motion for temporary restraining order. At the hearing, in response to EPC's argument that Defendants' notice was inadequate, the Court implied that the contemporaneous oral notice and the written notices provided on October 9, 2002 were constitutionally sufficient. (A-208). The Court also found that the under the relevant statute, no "particular form or statement of words, level of detail" was required to be contained in the notice given. (A-206). In its concluding colloquy, the Court stated that it was clear "that there's sufficient or ample evidence of a substantial penetration and infiltration of mold into these buildings."

---

[6]    Attendance at this meeting was one of Grocki's last official acts as on-site manager of the Apartments. On Monday, October 7, 2002, Grocki was fired by O'Neill because Grocki had not followed O'Neill's directions to close the on-site management office on October 4th.

(A-207).  The Court also stated that the failure to give written notice at the time of the

condemnations did not constitute a violation of the relevant statute since sufficient oral

notice of Defendants' actions was given.  (A-208).  Lastly, the Court held that the

evidence supported "the conclusion that the invocation of emergency powers was

justified by the city."  (A-209).

Eventually, all of the basements, except the one located in 1410 Cypress Avenue,[7]

were found to contain elevated levels of mold and were condemned.  Numerous

basements also contained standing water, including water in bathtubs and other fixtures

that had not been removed, old and/or fresh human waste product, exposed electrical

wiring, substantial structural rot, broken asbestos tiles, and other serious code violations.

(A-5-6).  In addition, some occupied apartment units were found to contain evidence of

mold infestation.  (A-6).  During the entire inspection process, Blomquist, Boneker, Giles

and Elsmere thoroughly discussed the results of the inspections with the State, including

Llewellyn, Belmont and Yocher, and only upon the specific recommendations of the

State did Defendants condemn 38 of the 39 buildings at the Apartments.

Shortly after the condemnations and the unsuccessful attempt to obtain a

temporary restraining order, EPC decided to sell the Apartments.  (A-232).  At no time

after the condemnations did EPC consider keeping and remediating the Apartments.  (A-

232).  In preparation for the sale of the Apartments, EPC met with The Kislak Company

("Kislak"), a real estate broker that EPC had dealt with in the past.  (A-233).  EPC and

Kislak discussed the condition and financials of the Apartments, and determined the fair

---

[7]    The basement of 1410 Cypress contained the on-site management office of the
Apartments, and it did not contain the mold and raw sewage found in the other basement
areas.

market value of the Apartments to be $4 million.[8] (A-233). After the Apartments were listed for sale, EPC received several bids and shortly thereafter, entered into a sale agreement with one buyer for $3.9 million. Although that buyer eventually did not perform under the contract, another buyer was located and EPC entered into another sale agreement for the same price. This second sale agreement was consummated, and the Apartments were sold in April 2003 for $3.9 million. (A-233-33A).

Contemporaneous with EPC's decision to sell the Apartments, EPC began to pursue the administrative remedies available to challenge Elsmere's condemnation and evacuation orders. (A-247-48). EPC notified Elsmere that it intended to file an appeal with the appropriate administrative board, and the parties began to discuss the process by which that appeal would be handled. (A-247-54). However, in or about December 2002, EPC initiated discussions with Elsmere regarding a possible stay of any administrative proceedings. (A-255-56). On or about January 16, 2003, the parties entered into an agreement to stay EPC's pursuit of an appellate administrative review of Elsmere's condemnation orders. (A-257).

---

[8]  EPC admits that the environmental issues at the Apartments negatively impacted the fair market value. (A-233a)("I think that if the environmental issue was there and the building was full, the property would have been sold for an amount less than it would have been worth had the environmental problem not been there.")

## ARGUMENT

I.   **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
     SHOULD BE GRANTED WHEN THE PLAINTIFF CANNOT
     PROVE ITS CASE UNDER THE UNDISPUTED FACTS**

    A.   **Standard For Motion For Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that the party moving for summary judgment must show that no genuine material issues of fact exist, and that it is entitled to judgment as a matter of law.[9]  A court cannot decide disputed issues of fact, but instead must assess whether any factual issues exist, and resolve any ambiguities or inferences against the moving party.[10]

If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere conclusory allegations or denials.[11]  "Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment."[12]  Therefore, a defendant is entitled to summary judgment where the plaintiff has failed to establish the existence of an essential element to its case and on which it will bear the burden of proof at trial.  No genuine issue of material fact exists in such a case because

---

[9]   *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F.Supp.2d 476, 479 (D. Del. 2003); *In re DaimlerChrysler AB Securities Litig.*, 269 F.Supp.2d 508, 512-13 (D. Del. 2003).

[10]   *GB Biosciences Corp.*, 270 F.Supp.2d at 479; *In re DaimlerChrysler*, 269 F.Supp.2d at 512-13.

[11]   Fed. R. Civ. P. 56(e); *GB Biosciences Corp.*, 270 F.Supp.2d at 479; *In re DaimlerChrysler*, 269 F.Supp.2d at 512-13. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[12]   *GB Biosciences Corp.*, 270 F.Supp.2d at 479; *In re DaimlerChrysler*, 269 F.Supp.2d at 512-13.

the complete failure of proof of an essential element of plaintiff's case necessarily renders all other facts immaterial.[13]

Here the undisputed facts are: (1) EPC had repeated, ample notice of the inspections of the Apartments, their failures to pass inspection and the exact reasons why they failed to meet the health code and presented serious health threats justifying evacuation, (2) EPC not only had a statutory right to a prompt hearing on the evacuation orders, but sought and obtained an immediate judicial review of those orders, and (3) EPC had no constitutional right to remediate the conditions at the Apartments before their evacuation.

**B.    Due Process Clause and the Deprivation of Property**

**1.    Procedural Due Process Generally**

"Procedural due process rules are meant to protect persons not from the deprivation, but from the *mistaken or unjustified* deprivation of life, liberty, or property."[14] In addition, due process requires both notice and an opportunity to be heard.[15] "It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'"[16]

---

[13] *GB Biosciences Corp.*, 270 F.Supp.2d at 479; *In re DaimlerChrysler*, 269 F.Supp.2d at 512-13; *U.S. v. One Parcel Property Located At 200 Pennsylvania Avenue, Claymont, Del., With All Appurtenances and Improvements Thereon*, 786 F.Supp. 400 (D. Del. 1992).

[14] *Carey v. Piphus*, 435 U.S. 247, 259 (1978) (emphasis added).

[15] *See, e.g., Fuentes v. Shevin*, 407 U.S. 67, 80 (1972); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).

[16] *Fuentes*, 407 U.S. at 80 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

To maintain an action for procedural due process violations, a plaintiff must first identify a life, liberty, or property interest that has been infringed upon by the alleged violation.[17]  Once the protected interest allegedly deprived has been identified, the procedural due process question shifts its focus to the kind of notice and hearing required to permit the deprivation of such interest.[18]  When considering what notice is appropriate to satisfy due process requirements, the U.S. Supreme Court has found that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[19]  Thus, EPC must prove that they did not receive any notice of the condemnations and did not have any opportunity to formally challenge the condemnations before some type of judicial or quasi-judicial body.

### a.    *The Mathews Test and Procedural Due Process*

The Supreme Court has consistently held that "'due process,' unlike some legal rules, is not a technical concept with a fixed content unrelated to time, place and circumstances."[20]  In addressing this doctrine, the Court announced a balancing test in

---

[17]    Sheldon H. Nahmond, *Civil Rights and Civil Liberties Litigation* § 3:36 (4th ed. 2004).

[18]    *Id.  See also Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (explaining that in procedural due process cases, the Third Circuit asks (1) what is the protected interest, and (2) was the person afforded due process).

[19]    *Mullane*, 339 U.S. at 314.

[20]    *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162-163 (1951) (J. Franfurter concurring)).

13

*Mathews v. Eldridge*,[21] wherein it was found that in determining whether procedural due process has been satisfied, a court must consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional, or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[22]

Of the *Mathews* test, the Court recently stated it "contemplates a judicious balancing of these concerns, through an analysis of 'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"[23]

Under the *Mathews* test, identification of the private interest in this case – EPC's unrestricted use of the property and ability to receive rents from the units – is rather straightforward.[24] What EPC cannot establish is facts that prove the process used by Defendants was inadequate and resulted in an increased risk of erroneous deprivation, and that Defendants should have had additional procedural safeguards in place.[25]

---

[21]   424 U.S. 319 (1976).

[22]   *Id.* at 335.

[23]   *Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004).

[24]   *See, e.g. U.S. v. James Daniel Good Real Property*, 510 U.S. 43, 53-54 (1994)(finding government seizure of real property deprived owner of collecting rents and freely using the property).

[25]   *Mathews*, 424 U.S. at 335. Under *Mathews*, the additional procedures are then weighed against the burden they will have on the state.

### b.    *Notice and the Mullane Rule*

The type and substance of the notice required for condemnation was analyzed in

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).  In *Mullane*, the

U.S. Supreme Court analyzed extensively what comprises adequate notice under the Due

Process Clause.  The Court held that, if feasible, notice must be reasonably calculated to

inform parties of proceedings which may directly and adversely affect their legally

protected interests.  The Court also observed, however, the impossibility of setting up a

rigid formula as to the kind of notice that must be given and found that notice required

will vary with circumstances and conditions.  "At a bare minimum, legal notice must

inform one of the antagonist's pressed demands and apprise one of the result consequent

on default."[26]

Under *Mullane*, a plaintiff must be afforded an opportunity to be heard regarding

the deprivation, and under the *Matthews* test, the exact process due can vary depending

on the circumstances and rights involved and the Supreme Court, as noted below, has

explicitly rejected the argument that the due process clause always requires a pre-

deprivation hearing.[27]

### c.    *"Extraordinary Situations" and the Fuentes Test*

Although both the notice and the opportunity to be heard generally should come

before the deprivation of the private interest, the U.S. Supreme Court has recognized that

a post-deprivation hearing satisfies dues process if there is a need to act quickly.[28]

---

[26]   *Mullane*, 339 U.S. at 314.

[27]   *See Gilbert v. Homar*, 520 U.S. 924, 930-31 (1997).

[28]   *Fuentes*, 407 U.S. at 90-91.

According to the *Fuentes* Court, cases involving extraordinary situations are marked by three characteristics:

> First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.[29]

In *Grayden v. Rhodes*,[30] a case factually similar to the instant case, the Eleventh Circuit found that the emergency evacuation of tenants from a dangerous apartment building amounted to an "extraordinary situation" under *Fuentes*.[31] In *Grayden*, the City of Orlando condemned an apartment complex because of a variety of problems "including collapsed ceilings, major leaks, constant mold and mildew, water leakage from light fixtures, and roach and other insect infestations."[32] Two weeks prior to a scheduled hearing regarding the apartment complex before the City of Orlando Code Enforcement Board ("Orlando Board"), city officials posted condemnation notices on each apartment door and the main door of each building in the complex. The notices, signed by the chief of Orlando's Code Enforcement Bureau, informed the residents that

---

[29] *Id.* at 91. *Accord Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988)("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.").
[30] 345 F.3d 1225 (11th Cir. 2003).

[31] *Id.* at 1236-37.

[32] *Id.* at 1228 n.2.

they had less than 36 hours to vacate the premises.[33]  Although the notices did not inform

the tenants of their right to a hearing, and no hearing was held before the condemnations

and evacuations took place, the Orlando City Code provided for a post-deprivation

hearing.[34]

    The tenants in the apartment complex brought a Section 1983 action against the

City of Orlando, the Orlando Board, and the chief code enforcement officer, alleging

violations of the due process clause.  The code enforcement officer moved for summary

judgment under the theory of qualified immunity; however, the district court found

although he was entitled to qualified immunity as to pre-deprivation due process, the

doctrine did not apply to post-deprivation due process.[35]  An appeal ensued.

    Upon appeal, the Eleventh Circuit found that "the emergency evacuation of

tenants from a dangerous and potentially life-threatening structure qualifies as an

'extraordinary situation'" under the *Fuentes* test.[36]  "As a consequence, when such

exigent circumstances exist, tenants can be evicted from a building reasonably judged to

---

[33]  *Id*. at 1228.

[34]  The language of Orlando's provision for a post-deprivation hearing is practically
identical to Elsmere's provision.  *Compare* Orlando, Fla. City Code § 30A.11, *quoted in*
*Grayden*, 345 F.3d at 1228, *with* Property Maintenance Code of The Town of Elsmere §
109.6.

[35]  *Id*. at 1230.  It should be noted that although *Grayden* is primarily a qualified
immunity case, it is also instructive regarding the due process violation question.  The
U.S. Supreme Court's two-step qualified immunity analysis requires a reviewing court to
first ask whether the official's actions violated the Constitution.  *See Saucier v. Katz*, 533
U.S. 194 (2001).  Therefore, the Eleventh Circuit had to determine whether a pre-
deprivation hearing was required before the condemnation and evacuations.

[36]  *Id*. at 1237.

be unfit for human occupancy without a pre-deprivation hearing."[37]  Once the court found

there was an extraordinary situation, it factored that interest into the *Mathews* test, and

balanced the municipality's interest in protecting citizen's against the right of the tenants

to their apartments.  The court found that "[w]hen the immediate safety of tenants is

placed in jeopardy by hazardous and possibly life-threatening living conditions, a city's

interest in protecting its citizens outweighs the tenants' interest in enjoying uninterrupted

occupancy at their residence of choice."[38]  Thus, such exigent circumstances allow for a

governmental entity to act before a pre-deprivation hearing can be had.

### d.    *Right to Post-Deprivation Hearing*

When the government deprives a person of property, the individual has a right to

be heard at a meaningful time and in a meaningful manner.[39]  Even if there are

extraordinary circumstances that prevent a pre-deprivation hearing, due process requires

the opportunity for a party to be heard in a post-deprivation hearing.[40]

The Property Maintenance Code of the Town of Elsmere ("Property Code")

allows for just such a hearing.  In the "Emergency Measures" section, the Property Code

provides: "Any person ordered to take emergency measures shall comply with such order

---

[37]    *Id.  Accord Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994)("Protecting
citizens from an immediate risk of serious bodily harm falls squarely within those
'extraordinary situations' contemplated in *Fuentes*.").  *See also Richmond Tenants Org.,
Inc. v. Kemp*, 956 F.2d 1300, 1307 (4th Cir. 1992)(finding that prior to an eviction, a pre-
deprivation hearing is required if there *are not* exigent circumstances (emphasis added)).

[38]    *Grayden*, 345 F.3d at 1237; *see also Flatford*, 17 F.3d at 167-168.

[39]    *Fuentes*, 407 U.S. at 80.

[40]    *See, e.g., Fuentes*, 407 U.S. at 90-91; *Boddie v. Connecticut*, 401 U.S. 371, 378-79
(1971); *Grayden*, 345 F.3d at 1232.

forthwith. Any affected person shall thereafter, upon petition directed to the appeals board, be afforded a hearing as described in this code."[41] This code section complies with 22 *Del. C.* § 324, which provides:

> Appeals to the board of adjustment may be taken by any person aggrieved or by any officer, department, board or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time as provided by the rules of the board by filing with the officer from whom the appeal is taken and with the board a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall forthwith transmit to the board all the papers constituting the record upon which the action appealed from was taken.

Section 325 of Title 22 of the Delaware State Code also provides:

> An appeal stays all proceedings in furtherance of the action appealed from, unless the officer from whom the appeal is taken certifies to the board of adjustment after the notice of appeal has been filed with him that, by reason of facts stated in the certificate, a stay would in his opinion cause imminent peril to life or property. In such case proceedings shall not be stayed otherwise than by a restraining order which may be granted by the board or by a court having jurisdiction on application on notice to the officer from whom the appeal is taken and on due cause shown.

However, EPC did not apply for such a hearing before the Board of Adjustment.

The Third Circuit has found:

> In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them."[42]

---

[41]  Town of Elsmere Property Maintenance Code § 109.6.

[42]  *Alvin*, 227 F.3d at 116 (quoting *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982)).

Furthermore, "[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants."[43]

Here, EPC clearly took advantage of its opportunity to be heard in a post-deprivation hearing as demonstrated by its motion for temporary restraining order filed and heard in the Court of Chancery. In addition, due to the timing of the Chancery Court action before all of the inspections and condemnations were completed, EPC also had an opportunity to be heard *before* some of the buildings were condemned and evacuated. Even after EPC's unsuccessful Chancery Court action, EPC could have pursued an administrative appeal before Elsmere's Board of Adjustment; however, EPC agreed to stay such an appeal before it even filed its petition and EPC has yet to take advantage of that avenue for another post-deprivation hearing. Under *Alvin*, since EPC has decided not to pursue its available administrative remedy as outlined in Elsmere's Property Code, EPC cannot now come to the federal courts to have the condemnation and evacuation order reviewed.

### 2.    <u>Substantive Due Process Generally</u>

"To succeed in a substantive due process claim under Section 1983, 'a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies."[44] Whether an administrative

---

[43]  *Id.*

[44]  *Woodwind Estates, Ltd. v. Gretkowski*, 205 F.3d 118, 123 (3d Cir. 2000); *Independent Enters. V. Pittsburgh Water*, 103 F.3d 1165, 1179 n.12 (3d Cir. 1997), *cited in Grimm v. Sweeney*, 249 F.Supp.2d 571, 608 (E.D. Pa. 2003).

decision substantially affects a vested fundamental right is determined on a case-by-case basis.[45] "When determining what rights are fundamental for administrative review purposes, the court must determine if the right fundamentally affects the life situation of the individual to require independent review or whether it merely impacts an area of economic privilege in a less than fundamental manner."[46]

Where the ordinance in question does not burden a fundamental right nor involve the classification of a suspect class, the Third Circuit will review the governmental action under a rational basis standard.[47]  Under rational basis review, an ordinance will withstand an equal protection challenge if it is "reasonable, not arbitrary, and bears a rational relationship to a (permissible) state objective."[48]  In the case of land use ordinances, the Third Circuit has held:

> Like other economic and social legislation, land use ordinances that do not classify by race, alienage, or national origin, will survive an attack based on the Equal Protection Clause if the law is 'reasonable, not arbitrary' and bears a 'rational relationship to a (permissible) state objective.' However, land use regulations must possess a legitimate interest in promoting the public health, safety, morals, and the general welfare of its citizens in order to pass scrutiny. Land use ordinances will be deemed 'irrational' when a plaintiff demonstrates either that the sate interest is illegitimate (an ends-focus) or that the chosen classification is not rationally related to the interest (a means-focus).

---

[45]   *MHC Operating Limited Partnership v. City of San Jose*, 106 Cal.App.4th 204 (Cal. App. 6 Dist. 2003), *citing Bixby v. Pierno*, 4 Cal.3d 130, 144 (Cal. 1971).

[46]   *Concord Communities v. City of Concord*, 91 Cal.App.4th 1407, 1413-1414 (Cal. 2001), *citing Berlinghieri v. Dept. of Motor Vehicles*, 33 Cal.3d 392, 395-398 (Cal. 1983)

[47]   *Angstadt v. Midd-W. School Dist.*, 377 F.3d 338, 344 (3d Cir. 2004).

[48]   *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 133 (3d Cir. 2002) (internal quotation omitted).

Moreover, the Supreme Court has held that the constitutionality of ordinances should be presumed,[49] and an ordinance should not be set aside if any state of facts reasonably maybe conceived to justify it.[50]  Thus, since municipal ordinances are generally subject to a rational basis review, the showing of a legitimate government interest is sufficient to survive the court's review.

### a.    *Failure to Follow Municipal Ordinance Not a Substantive Due Process Violation*

EPC alleges that Defendants violated EPC's substantive due process rights by failing to follow Elsmere's municipal code in determining whether the Apartments needed to be condemned and evacuated.  Assuming, *arguendo*, that Defendants failed to follow the municipal code, the relevant inquiry is whether that failure rises to the level of a due process violation.  Defendants assert that it does not.

In *Smith v. City of Picayune*,[51] a landowner brought an action challenging the City's zoning determination as violating established state law and plaintiff's federal constitutional rights, thus claiming the city's action was a violation of procedural and substantive due process.  The United States District Court of the Southern District of Mississippi entered judgment against landowner, and landowner appealed.

The Fifth Circuit held, *inter alia*, that failure to follow state law in zoning property, in itself, did not violate the landowner's rights to due process or equal

---

[49]  *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

[50]  *McGowan v. Maryland*, 366 U.S. 420, 425-26 (1961).

[51]  795 F.2d 482 (5th Cir. 1986).

protection. As to the substantive due process claim, the court surmised that plaintiff was implicitly contending that the City's failure to follow the procedure set forth in its own ordinance and required by state law was *per se* arbitrary and irrational, thus a violation of substantive due process. The court noted that this type of claim was not allowed under the reasoning articulated in *Stern v. Tarrant County Hosp. Dist.*,[52] wherein the court held:

> The guarantees of the fourteenth amendment . . . its promise of protection from arbitrary or irrational state action, are guarantees that turn on federal constitutional standards of . . . rationality rather than on state standards. Converting alleged violations of state law into federal . . . due process claims improperly bootstraps state law into the Constitution.[53]

Thus, the *Smith* court found plaintiff's substantive due process claim to be without merit.

Under *Smith*, the alleged failure of Defendants to comport with the Elsmere municipal code – even if true – is not, *per se*, a violation of substantive due process unless the conduct was itself in derogation of a constitutional right held by EPC. Stated differently, "[R]ights created by state law are not properly the subject of a claim brought pursuant to 42 U.S.C. § 1983, unless the violation of those rights also infringes upon some federally protected rights."[54] Therefore, EPC's claim to § 1983 protection for Defendant's alleged failure to abide by the municipal code is not proper and should be ignored.

---

[52] 778 F.2d 1052 (5th Cir. 1985), *cert. denied*, 476 U.S. 1108 (1986).

[53] *Smith*, 795 F.2d at 487-88, n.1 (quoting *Stern*).

[54] *State of Missouri ex rel. Gore v. Wochner*, 475 F.Supp. 274 (E.D. No. 1979), *aff'd*, 620 F.2d 183 (8th Cir. Mo. 1980)("It is the opinion of the Court that the alleged violations of any rights that might arise exclusively by virtue of the procedures provided by city charter, ordinances and regulations thereunder for failure to comply with said procedures do not rise to the level of a federal Constitutional violation.").

Similarly, in *Flatford v. City of Monroe*,[55] the Sixth Circuit examined the question of alleged substantive due process violations and the evacuation of tenants from an apartment complex.  In *Flatford*, the tenants were evicted for a variety of reasons, including wood-rot, exposed electrical wiring, and the presence of combustibles.[56]  The City's Director of Building and Safety believed these conditions posed an immediate risk of electrocution and fire.[57]  Tenant plaintiffs brought a § 1983 action, and argued, in part, that exigent circumstances did not exist and the City's actions were improper.  In particular, plaintiffs asserted that the dangerous conditions in the building as a whole and in other apartments were not present in *their* apartment.

The Sixth Circuit found that "[t]he dispositive issue, therefore, is whether [the Director of Building and Safety's] conclusion that an emergency situation existed was an objectively unreasonable decision in light of the information he then possessed, construing the evidence in a light most favorable to the Flatfords."[58]  The court determined that the record contained facts that would allow a reasonable building inspector to conclude there was imminent danger.[59]  Furthermore, even if the inspector was ultimately found to be wrong, he was still protected by qualified immunity.[60]

---

[55]  17 F.3d 162 (6th Cir. 1994).

[56]  *Id.* at 165.

[57]  *Id.*

[58]  *Id.* at 167.

[59]  *Id.*

[60]  *Id.*  The application of the doctrine of qualified immunity to Defendants Blomquist, Boneker and Giles is discussed *infra*.

24

Here, in order to sustain its claim of a substantive due process violation, EPC must prove facts that show no reasonable building inspector would have believed exigent circumstances existed at the Apartments that would cause them to be condemned and vacated, and that Blomquist – and to a lesser degree Boneker and Giles – were unreasonable in their assessment of the situation as an emergency. EPC cannot prove this claim. As noted above, Defendants consulted closely with the State – particularly Llewellyn, Belmont and Yocher – in assessing the conditions found at the Apartments. All three experts from the State concurred in the determination that excessive and dangerous levels of mold, as well as other hazardous conditions, were present at the Apartments, and that immediate condemnation of the buildings and evacuation of the tenants was in order. EPC cannot reasonably argue that three experts from the State, who are unrelated to Defendants, would all agree in the recommendation that the Apartments needed to be condemned and evacuated unless their assessment of the situation as an "emergency" was wholly irrational.

### b. Due Process Does Not Create a "Right to Remediate" Prior to Condemnation

EPC further alleges that its due process rights were violated because it was not given an opportunity to cure the defects in the building prior to the condemnation and evacuation of the Apartments. (Complaint ¶ 64, 75). Although EPC is apparently alleging that Defendants violated the Due Process Clause by failing to give EPC an opportunity to remediate the Apartments as permitted by the Delaware Code,[61] there is

---

[61] Although 31 *Del. C.* § 4128 requires a governmental official to issue a correction order providing an opportunity to cure, 31 *Del. C.* § 4130 allows Elsmere to condemn a building and evict residents prior to corrective action taking place. Section 4130 provides:

not any right – constitutional or otherwise – to remediate a hazardous building prior to its

emergency condemnation. Indeed, the purpose of condemnation is to force otherwise

negligent property owners to make timely repairs for the good of public health and to

protect tenants and others from the perils therein.

## C.    EPC Has The Burden Of Proving Each Of The Elements Of Its Procedural And Substantive Due Process Claims

EPC alleges that the condemnation and evacuation of the Apartments by

Defendants resulted in the violation of EPC's procedural and substantive due process

rights because: (1) EPC was not afforded any opportunity for a hearing before the

condemnation and evacuation, (2) EPC was not allowed to cure the deficiencies in the

Apartments before the condemnation and evacuation, (3) Elsmere did not follow its own

procedures in determining the propriety of the condemnation and evacuation, (4) EPC

was not afforded an opportunity to offer any evidence in opposition to the determination

to condemn and evacuate the Apartments, and (5) EPC did not receive proper and timely

notice of the condemnation and evacuation. In short, EPC alleges that it was deprived of

its private interest in the Apartments, i.e. free use of the property and the ability to

---

Whenever a code official finds that an emergency exists on any premises, or in any structure or part thereof or on any defective equipment which requires immediate action to protect the public's health and safety or that of the occupants thereof, the code official may, with property notice and service in accordance with § 4128 of this title, issue an order reciting the existence of such an emergency and requiring the vacating of the premises or such action taken as the code official deems necessary to meet such emergency. Notwithstanding other provisions of this chapter, such order shall be effective immediately, and the premises or equipment involved shall be placarded immediately upon service of the order.

receive rents from the units, without notice or an opportunity to be heard regarding the deprivation.

To avoid summary judgment, EPC must show that there are facts that support its claim of procedural and substantive due process violations by Defendants. Specifically, in order for EPC to prevail on its claims, it must prove that Defendants had absolutely no basis for the emergency condemnation and evacuation of the Apartments, the ordinances relied upon by Defendants provided EPC an unfettered right to repair the deficiencies in the Apartments before they were condemned and evacuated, Defendants departed from the emergency condemnation and evacuation procedures provided in the State and Town Codes, EPC was never afforded an opportunity to challenge the condemnation and evacuation, and EPC did not receive at least contemporaneous notice of the condemnation and evacuation of the Apartments.

Thus, EPC must prove not only that it suffered a deprivation of its property that was "mistaken or unjustified," but that (1) the condemnation was not necessary to secure an important interest of Elsmere or a general public interest, (2) there was no special need for Defendants to take very prompt action, and (3) Elsmere did not strictly control the legitimate authority of its Code Enforcement office and allowed persons other than the proper government officials to determine that it was necessary to condemn and evacuate the Apartments. EPC must then prove that its private property interest outweighed Elsmere's interest in protecting the tenants in the Apartments from arguably hazardous living conditions. In addition, EPC must establish facts that they suffered an erroneous deprivation due to a flawed process, the flawed process denied them an opportunity to

challenge Elsmere's condemnation orders, and that such a deprivation would not have occurred if additional procedures or safeguards had been put in place by Defendants.

EPC cannot prove its claims. Under the reasoning articulated in *Fuentes* and *Mathews,* the condemnation and evacuation of the Apartments was an emergency that constituted an "extraordinary situation." The undisputed facts establish that Elsmere not only had an important governmental interest in protecting the public health of its citizens, but that due to the numerous serious code violations found in the basements of the Apartments, Defendants were compelled to promptly act to secure that governmental interest. In addition, the facts show that before condemning the Apartments, Defendants demonstrated an abundance of caution by consulting with the State, including Llewellyn, Belmont and Yocher, before determining it was necessary to exercise Defendants' legitimate authority to condemn and evacuate the Apartments. There are no facts that prove EPC's unrestricted use of the property and its ability to receive rents from the Apartments outweighed Elsmere's interest in safeguarding the public health of the tenants of the Apartments.

The undisputed facts also establish that not only did EPC receive timely notice of the inspections and condemnations of the Apartments, but it had ample opportunity to challenge the condemnation orders, as demonstrated by EPC's filing of its motion for temporary restraining order with the Court of Chancery within a few days of the first condemnations. Furthermore, EPC deliberately chose not to pursue the administrative remedies available to it, as demonstrated by its agreement to stay its pursuit of an appeal before the appropriate administrative body.

Thus, as in *Fuentes*, the conditions at the Apartments constituted exigent circumstances that allowed Defendants to promptly condemn and evacuate the Apartments without a pre-deprivation hearing. Protecting the tenants of the Apartments from an arguably immediate risk of serious bodily harm qualifies as an "extraordinary situation" as contemplated in *Fuentes*. Although Defendants acted promptly to secure Elsmere's governmental interest in protecting the health of the tenants, timely notice was provided to EPC and EPC had a formal opportunity to be heard regarding the condemnation and evacuation of the Apartments. Therefore, it should be determined that Defendants actions were proper and did not result in any violations of procedural due process.

II.    **THE ACTIONS OF BLOMQUIST, BONEKER AND GILES ARE PROTECTED BY THE DOCTRINE OF QUALIFIED IMMUNITY**

Government officials who perform discretionary functions have a qualified immunity from liability for civil damages as long as their conduct does not violate a "clearly established" constitutional or statutory right.[62]  The test of liability is settled. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[63]

When a defendant invokes the defense of qualified immunity to a charge of violating an individual's due process rights, the test applied is whether the defendant official has acted in a manner that shocks the conscience.  In *County of Sacramento v. Lewis*,[64] the Supreme Court explained the standard that applies when a plaintiff alleges that an action taken by an executive branch official violated substantive due process. The Court observed that "the core of the concept" of due process is "protection against arbitrary action" and that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"[65]  After noting its long history of speaking of "the cognizable level of executive abuse of power as that which shocks the conscience,"[66] the Court stated that the standard for determining whether a party's due process rights have

---

[62]    *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[63]    *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[64]    523 U.S. 833 (1998).

[65]    *Id.* at 845-46 (citation omitted).

[66]    *Id.* at 846, 118 S.Ct. 1708 (citing *Rochin v. California*, 342 U.S. 165 (1952)).

been violated is whether an official's actions in depriving a plaintiff of a protected property "were so arbitrary or egregious as to shock the conscience."[67]

The Third Circuit has repeatedly acknowledged that executive action violates due process only when it shocks the conscience and that standard is not easily met.[68] In *Grimm v. Sweeney*,[69] a case comparable to the instant matter in Elsmere, the corporate owner of certain rental properties brought a § 1983 action against the fire chief and fire marshal for the Borough of Norristown alleging, among other causes of action, that the citations and condemnation orders issued by the defendants constituted Fourteenth Amendment due process violations.  Plaintiffs filed an action seeking both damages and injunctive relief stemming from the condemnation of a property damaged by fire, and citations issued by the defendants to permit residents to remain on the condemned premises.  In light of the extraordinary recalcitrance of plaintiff in complying with the condemnation orders, and in the absence of any evidence of outrageous or even troubling

---

[67] *Lewis*, 523 U.S. at 846-47; *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992) (the substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."). *See also Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir.1994) (en banc) ("[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'"); *United Artists Theatre Circuit v. Township of Warrington*, 316 F.3d 392, 400-01 (3d Cir. 1003)(applying the "shocks the conscience" standard in land-use cases).

[68] *See, e.g., Leamer v. Fauver*, 288 F.3d 532, 546 (3d Cir.2002); *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 400 (3d Cir.2000); *Nicini v. Morra*, 212 F.3d 798, 809 (3d Cir.2000) (en banc); *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir.1999).

[69] 249 F.Supp. 571 (E.D. Pa. 2003).

conduct by the defendants, the Third Circuit summarily dismissed the due process claim.[70]

Similarly, this court should find that by performing an authorized function based upon an earnest and objectively reasonable belief that a public health risk existed, Blomquist, Boneker and Giles did not engage in conduct that was "arbitrary," "egregious," or that "shocks the conscience." Thus, Blomquist, Boneker and Giles should be afforded qualified immunity against EPC's substantive due process claims.

Finally, the Delaware Court of Chancery saw the evidence of mold infestation, heard the testimony of Dr. Llewellyn and considered whether to block the evacuation orders. It concluded there was ample evidence of a health threat to the Apartment occupants, that State law permitted the evacuation orders and concluded that these same defendants' conduct appeared justified. After that judicial review, this Court should not hold that Defendants' actions shocked the conscience.

---

[70] *See id.*

## CONCLUSION

For the reasons set forth in this brief, the Defendants respectfully request that the

Court grant their motion for summary judgment.


MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Linda Martin Gilchrist (#3973)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
*emcnally@morrisjames.com*
*lgilchrist@morrisjames.com*
Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist and Eugene Boneker


Dated: September 1, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2005, I electronically filed Defendants'

Opening Brief In Support Of Their Motion For Summary Judgment with the Clerk of

Court using CM/ECF, which will send notification of such filing to the following:

> David S. Eagle, Esquire
> Klehr, Harrison, Harvey,
> Branzburg & Ellers LLP
> 919 Market Street, Suite 1000
> Wilmington, DE  19801
> Attorneys for Plaintiff Elsmere Park Club, L.P.

> Edward M. McNally (#614)
> Linda Martin Gilchrist (#3973)
> Morris, James, Hitchens & Williams LLP
> 222 Delaware Avenue, 10th Floor
> Wilmington, DE 19801
> (302) 888-6800
> emcnally@morrisjames.com
> lgilchrist@morrisjames.com
> Attorneys for Defendant