## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELSMERE PARK CLUB, L.P., a<br>Delaware limited partnership, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1321-SLR |
| | ) | |
| TOWN OF ELSMERE, a Delaware<br>Municipal corporation,<br>ELLIS BLOMQUIST, EUGENE BONEKER,<br>and JOHN GILES, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
## TO THE MOTION FOR SUMMARY JUDGMENT

Dated: September 16, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
Douglas F. Schleicher (Admitted *Pro Hac Vice*)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 552-5504 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*

DEL1 62408-1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................iii

NATURE AND STAGE OF PROCEEDINGS ...............................................1

SUMMARY OF ARUGMENT ...................................................................1

PLAINTIFF'S STATEMENT OF FACTS.....................................................2

     A.     General Background…………………………………………………2

     B.     The Presence of Mold at the Apartments
           Prior to the 2002 Condemnations …………………………….4

     C.     The Town's Condemnation of the Apartments …………………….....6

     D.     Plaintiff's Inspection of the Apartments at the Time of the 2002
           Condemnations …...…………………………………………………9

     E.     Plaintiff's Inspection of the Apartment at the Time of the 2002
           Condemnations……………………………………………………..16

LEGAL ARGUMENT………………………………………………………….20

     A.     Standard of Review for Motion for Summary Judgment ……………….20

     B.     Defendant Town's Motion for Summary Judgment Should be Denied Because
           Plaintiff Was Deprived of Property Without Procedural Due Process, and There
           are Genuine Issues of Material Fact Which Preclude Entry of Such Judgment in
           Its Favor ………………………………………………………………21

           1.     Elements of a Claim Under 42 U.S.C. § 1983 ……………………..21

           2.     Requirements of the Due Process Clause …………………………..22

           3.     Defendants Violated Plaintiff's Procedural Due Process Rights When It
                Condemned the Apartments………………………………………….25

                a.     Defendants Violated Plaintiff's Right to Procedural Due Process
                     By Condemning the Apartments Without Providing Proper Notice
                     to Plaintiff or Affording Plaintiff an     Opportunity for a
                     Hearing.…………………………………………………….25

                b.     No Emergency Existed Justifying the Deprivation of Plaintiff's
                     Property Before Providing an          Opportunity for a
                       Hearing.……………………………………………………….25

        i.       No Emergency Existed at the Apartments..............25

        ii.      Defendants Did Not Believe an Emergency Existed..27

    c.    Defendants Violated Plaintiff's Right to Procedural Due Process
By Failing to Follow the Standards of a
Narrowly Drawn Statute............................................29

    d.    Defendants Violated Plaintiff's Right to Procedural Due Process
By Failing to Use the Least Restrictive Measures to Protect the
Public Interest.....................................................32

    e.    Defendants Violated Plaintiff's Right to Procedural Due Process
By Failing to Provide An Adequate Post-Deprivation Remedy, or
Any Notice of Appeal Rights ...................................32

        i.       The Town's Property Maintenance Code Expressly Created
a "Board of Building Appeals...........................33

        ii.      Plaintiff Properly Filed an Appeal to the Board of Building
Appeals in Accordance with the Town
Code.......................................................34

        iii.    The Town's Board of Adjustment Was Empowered to Hear
Zoning Appeals, Not Property
Maintenance Violations..................................34

        iv.    Plaintiff's attempt to obtain a TRO in Chancery Court does
not relieve the Town from the responsibility of providing
an adequate and meaningful opportunity to be
heard......................................................36

C.    The Individual Defendants' Motion for Summary Judgment Should Be Denied
Because They Do Not Have Qualified Immunity, and There are Genuine Issues of
Material Fact Which Preclude Entry of Such Judgment in Their Favor......39

CONCULSION................................................................40

# TABLE OF AUTHORITIES

Alvin v. Suzuki,
    227 F.3d 107 (3rd Cir. 2000) ...................................................................36

Armstrong v. Manzo,
    380 U.S. 545, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)..................................24

Boddie v. Connecticut,
    401 U.S. 371, Defendant's Opening Brief ("DOB") at 18, n.40 ...................32

Cleveland Board of Education v. Loudermill,
    470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)............................23

Flatford v. City of Monroe,
    17 F.3d 162 (6th Cir. 1994) ...............................................................24, 38

Fuentes v. Shevin,
    407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972)....................23, 29, 32

Grayden v. Rhodes,
    345 F.3d 1225 (11th Cir. 2003) ...........................................................24, 32

Horowitz v. Federal Kemper Life Assurance Co.,
    57 F.3d 300 (3d Cir. 1995)....................................................................21

Insituform Technologies, Inc. v. Insitu, Inc.,
    1999 WL 240347 .................................................................................36

Keim v. County of Bucks,
    275 F. Supp. 2d 628 (E.D. Pa. 2003) ......................................................22

Larkin v. Savage,
    318 F.3d 138 (2nd Cir. 2003)..................................................................22

Leatherman v. Tarrant County,
    507 U.S. 163, A § 1983.........................................................................22

Mathews v. Eldridge,
    424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)...................................22

Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986).............................................................................21

Memphis Light, Gas and Water Division v. Craft,
    436 U.S. 1, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978)....................................22

Monell v. Department of Social Services of City of New York,
    436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)................................................21

Pa. Coal Association v. Babbitt,
    63 F.3d 231 (3d Cir. 1995)......................................................................................21

Parrat v. Taylor,
    451 U.S. 527, 101 S. Ct., 1908, 68 L. Ed. 2d 420 (1981).........................22,, 23, 24, 27

Richmond v. Kemp,
    956 F.2d 1300 (4th Cir. 1992) ...............................................................................23, 32

Smith v. Village of Maywood,
    699 F. Supp. 157 (N.D. Ill. 1988) .........................................................................22, 23

United States v. James Daniel Good Real Property,
    510 U.S. 43, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993)..........................................23, 32

## STATUTES AND RULES

42 U.S.C. § 1983.......................................................................................1, 22, 21, 27

Fed. R. Civ. P. 56(c) ...........................................................................................20

10 Del. C. § 4011 ................................................................................................38

22 Del. C. §§324 ..........................................................................................34, 35

31 Del. C. §§ 4101 ..............................................................................................29

31 Del. C. § 4127 ................................................................................................30

1996 BOCA National Building Code ...................................................................33, 35

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Elsmere Park Club L.P., the former owner of the Elsmere Park Apartments in Elsmere, Delaware, commenced this action under 42 U.S.C. § 1983 by filing the Complaint on October 1, 2004. On January 20, 2005, the Court entered a Scheduling Order and set a jury trial to begin on January 4, 2006. Plaintiff filed an Amended Complaint on March 23, 2005. On June 10, 2005, the Court approved a stipulation amending the Scheduling Order in certain respects, but preserving the dispositive motion deadline and trial date. The parties have exchanged written discovery and conducted depositions, while deferring some depositions for a later point. Defendants filed their summary judgment motion on September 1, 2005. This is Plaintiff's answering brief in opposition.

## SUMMARY OF ARGUMENT

1.      Defendants' motion for summary judgment should be denied because the record establishes that Plaintiff was deprived of a substantial property interest without due process of law. Between October 4-11, 2002, the Town failed to provide Plaintiff with adequate notice or an opportunity to be heard before condemning and evacuating the Apartments on account of alleged mold contamination.

2.      Defendants are not entitled to the narrow exception for emergency measures because no legitimate health emergency existed in the Apartments. Defendants were required to, but did not, adhere to the dictates of the statutes and guidelines they had adopted. Defendants were required to, but did not, evaluate and implement less restrictive means of addressing any alleged health concerns without displacing the entire tenant population.

3.    Even assuming, *arguendo*, that Defendants acted under emergency conditions, they failed to provide Plaintiff with a meaningful post-deprivation hearing within a meaningful time period. Plaintiff availed itself of the "process on the books" only to discover that such process did not exist.

4.    The Individual Defendants' motion for summary judgment should be denied because they are not entitled to qualified immunity.

5.    Defendants' summary judgment motion should be denied because extensive factual and expert issues preclude entry of judgment as a matter of law.

## PLAINTIFF'S STATEMENT OF FACTS[2]

While there are a number of undisputed facts, Plaintiff and Defendants diverge significantly on many facts material to resolution of this case. The following is Plaintiff's statement of facts.

### A.    General Background

Elsmere Park Apartments (the "Apartments")[3] has been home to moderate- and low-income residents of Elsmere, Delaware for decades. Plaintiff Elsmere Park Club, L.P. ("Plaintiff") purchased the Apartments in March, 1986. The Apartments were a garden-style apartment complex consisting of 156 residential units in 39 separate buildings, spread out along Maple, Cypress and Sycamore Avenues.

---

[2] The facts are contained in the depositions and affidavits set out in the Appendix filed with this brief and cited as "B-__." The Appendix includes a map of the apartment complex. (B-1). Citations to the Defendants' Appendix (D.I. 45) are listed as "A-__."

[3] Shortly before the condemnations of the Apartments in October 2002, the name was changed to "Fenwick Park Apartments".

Each of the 39 buildings was three stories tall. There were two apartment units on each of the top two floors of the building (four residential units per building). The lowest floor was a below-grade "basement" with windows at ground level. One side of the basement of each building provided laundry facilities, utilities and storage space. Before 1989, the other side of the basement was an apartment unit rented to tenants.[4]

In 1989, Hurricane Hugo caused serious flooding in the greater Wilmington area. The Town condemned all of the basement units at the Apartments after a number of them were inundated with water.[5] The Town passed an ordinance barring further residential occupancy of the basement units.[6] After the hurricane left, Plaintiff cleaned out the basement units, removed all carpeting down to the concrete slab, removed cabinets and damaged drywall, and extracted any remaining water. Plaintiff then dried the basement units. Aff. of Regina O'Neill at 3. (B-2.)

In 1996, the Town directed Plaintiffs to brick over the windows and install plywood barriers across the entryway to the uninhabited, unused basement apartment in each building. Id. (B-4.) Prior to securing the basement units, Plaintiff retained a specialist contractor to prepare them. The work included applying a preventative mildicide treatment to all of the basement surfaces. See CPR invoice dated April 25, 1996, O'Neill Aff., Exh. B. (B-15).

The Town has had rocky relations with Plaintiff since the time it purchased the Apartments. Shortly after Plaintiff purchased the Apartments, a cross was burned on the lawn of the Apartments; many residents of the Apartments were African-American and Mexican. Deposition of Elliot Leibowitz at 136-138. (B-594.) At one time, the Town ticketed and towed

---

[4] The basement unit in one building, 1410 Cypress, has been used for years as the office for the Apartments.
[5] Elsmere Park Club v. Town of Elsmere, 771 F.Supp. 646, 647 (1991).
[6] Id. at 648.

any car found at the Apartments with out-of-state license plates because it wanted to get rid of

Mexican "mushroom pickers", many of whom lived at the Apartments. (B-594). The Town

even proposed an ordinance permitting the arrest of anyone suspected of being an illegal alien,

although it was voted down after a public outcry. (B-594). The Town Manager, Defendant John

Giles, candidly admitted that he did not want the Apartments in the Town. (B-587.)

### B.    The Presence of Mold at the Apartments Prior to the 2002 Condemnations

From 1989 to 2002, the Town inspected the Apartments on numerous occasions every

year. The Town inspected apartment units whenever they were rented to new tenants. (B-600-

606.) If the property was acceptable, the Town allowed the new tenants to move in. (B-600-

601.) The Town was supposed to do a general inspection for matters involving safety concerns

or code violations. (B-607).

The Town also inspected the Apartments at other times, such as during comprehensive

maintenance code investigations. (B-2-8.) The Town always was detailed and vigorous in its

inspections. (B-2-8.) The Town never cited the Apartments for mold, and never even noted the

presence of mold in its comprehensive inspections. (B-2-8.) Independent third-party

professionals, such as those representing the property mortgagee, also inspected the Apartments

during this time period and not one of them identified mold as a problem. (B-371-373.)

Defendants removed the plywood entryway barriers to clean or inspect the basements

with some regularity. (B-5) (B-569). In May 1997, Plaintiff commissioned a structural

-4-

inspection of all 39 of the basement units by Klas C. Haglid, P.E. Mr. Haglid noted the presence of water damage, but did not find any mold growth despite specifically looking for it. (B149)

From October 1998 through March 1999, the Town performed a series of thorough maintenance code inspections, during which the Town identified possible code violations in great detail. (B-7). The inspections covered all aspects of the Apartments, including the basements of each building. After defendants addressed the alleged violations, the Town re-inspected the building in question, sometimes more than once, and at times identified new problems it found. However, at no time during these multiple inspections did the Town's representatives identify the presence of mold growth in the basement or other units of any of the buildings. Id.

Following Mr. Haglid's structural inspection of all of the basement units in 1997, and the Town's own intensive enforcement effort concluding in March 1999, there were several independent, isolated water events throughout the Apartments. For example, all of the basement units were inspected in September 1999 after Hurricane Floyd affected the greater Wilmington area. About 26 basement units and laundry areas suffered from minor flooding or sewer backups related to the storm. (B-5-6). Accordingly, Plaintiff again retained a professional to drain, dry and apply mildicide to the surface areas of the basements. Id.

Plaintiff was also advised on various occasions of the possibility of water releases in buildings, such as when water utility meters indicated a significant increase in water usage at individual buildings, (B-6), or New Castle County sewer main backups. When notified of these events, Plaintiff inspected the basement units and other apartment areas for leaks or other

-5-

explanation and had the leaks or other causes fixed. Id. Once identified, those leaks were

repaired in-house or by outside contractors, and a preventive mildicide was applied as

appropriate. See, e.g., Roto-Rooter invoice dated May 4, 2000, attached to O'Neill Aff. as

O'Neill Aff., Exh. E (B-24); Fabricare invoice dated May 8, 2001, attached as O'Neill Aff., Exh.

M (B-63).

Based on the inspections listed above, on most occasions, Plaintiff was not advised of the

presence of any mold. (B-67). On a few occasions when Plaintiff was notified of possible mold

conditions by a contractor of theirs, the conditions were promptly and fully addressed by

professionals. Id. Plaintiff was not advised of any possible mold condition that was not

remediated promptly at any time prior to October 2002. Id.

C.    **Health Concerns Presented by Mold**

Molds are spores which are present everywhere around us—indoors and in the outside

air. Molds can enter buildings through windows and doors, heating or cooling systems or by

attaching themselves to virtually anything, such as people, pets and clothing. "Questions and

Answers on *Stachybotrys chartarum* and Other Molds" (hereinafter, "CDC Q&A"), answer to

question 3, at http://www.cdc.gov/mold/stachy.htm, website of the Centers for Disease Control

and Prevention ("CDC") (B-317).

Molds grow when there is excessive moisture and nutrients. Moisture can come from

flooding, roof leaks, burst pipes, or air conditioner leaks. Nutrients include paper products,

cardboard, ceiling tiles, drywall, carpet and other building materials. See id., answers to questions 2 and 3.

While there are thousands of different species, molds generally are perceived as not being toxic to normal, healthy individuals. See "Adverse Human Health Effects Associated with Molds in the Indoor Environment," American College of Occupation and Environmental Medicine, October 27, 2002 ("ACOEM Statement"), (B-573, 578-79); (B-142-143); see also CDC Q&A, (B-318-319), answer to questions 1 and 10. Mold has not been shown to affect individuals who are not sensitive. Id. It is estimated that only 5% of the population would show allergic symptoms as a result of inhaling airborne mold. ACOEM Statement at 2. Individuals with special sensitivities who are exposed to mold may experience short-term reactions, such as nasal stuffiness, eye irritation or wheezing. (B-142-143); (B-317) (B-321) (B-573, 578-79). The CDC reports that people at higher risk for these or more severe reactions, such as shortness of breath and possible fever, include infants and the elderly, those with immune suppression, chronic illness or underlying lung disease, pregnant women and workers exposed to large amounts of molds in occupational settings, such as farmers working around moldy hay. Id. (B-317-321).

While there have been claims that certain molds contain toxins and can cause unique or rare conditions such as pulmonary hemorrhage or memory loss, the CDC has found no causal link between the presence of mold in the indoor air and these conditions. (B-142); see also CDC Q&A, (B-317) answer to question 1; see also (B-573, 578). Indeed, a recent CDC investigation found that a possible association between acute idiopathic pulmonary hemorrhage (found in ten infants in Cleveland, Ohio) to a mold known as *stachybotrys chartarum* had no basis. Id. at 3, answer to question 8.

There are no governmental regulatory standards defining what constitutes safe amounts of mold. CDC Q&A at 5 (B-317), answer to question 15. Indeed, since the "susceptibility of individuals can vary greatly either because of the amount or type of mold," sampling and culturing are not reliable for determining health risks. CDC Q&A at 4-5 (B-317), answer to question 14. In addition, indoor air sample results which show the presence of mold in types and concentrations also found in the outside air in contemporaneous testing (i.e., "background" conditions) do not, by themselves, precipitate the need for further investigation or remediation. See (B-145, 146).

Since individual responses vary, if mold growth is visible, the CDC recommends removal or remediation of the mold as a precaution, in addition to removing the water source. CDC Q&A, (B-317), answer to questions 13-14. While bleaches and mildicides are effective, see, e.g., CDC Q&A at 3-4, answer to questions 11 and 13, (B-317)they cannot be guaranteed to prevent against future mold growth if there is a future water-release event.

Removal of mold, however, is different from removal of people from buildings they live or work in. The Guidelines on Assessment and Remediation of Fungi in Indoor Environments, issued by the New York City Department of Health & Mental Hygiene (the "NYC Guidelines") (B-209-225), one of the few accepted standards in the industry, see, Sovereign Report, (B-143), states that evacuation is not called for during mold remediation except in very special circumstances:

> Except in cases of widespread fungal contamination that are linked to illnesses throughout a building, a building-wide evacuation is not indicated.

NYC Guidelines, (B-215) Section 1.3, paragraph 2. In addition, the NYC Guidelines state that

"A trained occupational/environmental health practitioner should base decisions about medical

removals ... on the results of a clinical assessment." Id. Therefore, a decision to vacate a

residence due to the presence of mold can be made only after consultation with a professional,

such as a physician, and must be made on an individual, case-by-case basis. CDC Q&A, (B-

317), answer to question 5; see also, Sovereign Report, (B-145).

### D.    The Town's Condemnation of the Apartments

In the beginning of October, 2002, Defendant Ellis Blomquist, the Town's Code

Enforcement Officer, went to the Apartments for a pre-rental inspection of two apartment units.

(B-545). Upon entering one building with John Ruhl, maintenance supervisor for the

Apartments, Defendant Blomquist immediately stated that he wanted to inspect the closed-off

basement apartment. (B-585) Soapy water was in the former kitchen area, due to an open clean-

out cap. (B-585) Mr. Blomquist told Mr. Ruhl to fix the problem, and he would return to

inspect the upstairs unit. (B-585) The problem was fixed in an hour or two. (B-585) Defendant

Blomquist also may have inspected a second unit that day on Cypress Avenue. (B-51)

Plaintiff called Defendant Blomquist a number of times in the next few days to ask him to

return to inspect the apartments which were up for rental, because Plaintiff wanted to be able to

rent them. (B-331-333, 346) However, Defendant Blomquist did not return phone calls for a

few days, let alone return to the Apartments. Id. Finally, on Thursday, October 3, 2002, Ms.

O'Neill got through to Defendant Blomquist's secretary, who explained that the Town had

determined that there was "deadly mold" at the buildings, and that the Town was going to do a

total inspection "sweep" of the Apartments. (B-334-35) Defendant Town had not told Plaintiff

before this conversation of its belief that deadly mold was present in the buildings at the complex.

The next day, late on Friday afternoon, October 4, 2002, Defendant Blomquist returned to the Apartments, ostensibly for a re-inspection of the units up for rental. Unbeknownst to Plaintiff, Defendant Blomquist brought with him Ken Belmont, from the Delaware Division of Public Health. Defendant Blomquist has testified that he brought Mr. Belmont because Mr. Belmont happened to be with him on another site visit and Defendant Blomquist wanted to obtain Mr. Belmont's views concerning a smell Defendant Blomquist had noted during his earlier visit. (B-618) Defendant Blomquist did not mention mold as the reason for bringing Mr. Belmont. Defendant Blomquist had never brought a State inspector with him before to inspect a building. (B-620) Defendant Blomquist himself did not see a need to investigate the smell himself during his prior inspection. (B-614-615)

Defendant Blomquist and Mr. Belmont went to the uninhabited, unused basement apartments at 1405 and 1421 Cypress Avenue, finding steam coming out of the basement of, and puddled water in, 1405 Cypress, and a significant amount of mold on the walls of both basements.

After inspecting the two units, Belmont told Defendant Blomquist that there was a significant amount of mold that presented an unhealthy environment to the building occupants. (B-623) Defendant Blomquist reported what he had observed to Defendants Boneker and Giles, and discussed how to proceed. (B-626-629) Mr. Belmont called his superior, Dr. Gerald Llewellyn, (B-634) Dr. Llewellyn concluded and told Mr. Belmont that the basements presented

-10-

a serious danger to the inhabitants of the buildings. (B-626-629)   Mr. Belmont reported his

conversation with Dr. Llewellyn to Defendant Blomquist shortly thereafter. (B-634-635)

Immediately after his consultations with Mr. Belmont and Defendants Giles[12] and

Boneker, Defendant Blomquist condemned the buildings at 1405 and 1421 Cypress Avenue.  He

directed Plaintiff's management to nail shut numerous doors and display large red

"CONDEMNED" signs on these two buildings, and he evicted all of the residents of the eight

upper level apartments in the two buildings, against their wishes.  The remainder of the evening,

the evicted tenants scrambled around to find alternative housing.  Defendants did not issue any

condemnation notice to Plaintiff at that time.

At that time, Defendants informed Darlene Grocki, Plaintiff's resident manager, that

Defendants were going to condemn the different buildings at the complex, one by one.  (B-547)

At that time, Defendants had not inspected any other buildings in the complex.

Prior to the condemnation and eviction, neither the Defendants nor the State entered any

of the residential units of the buildings to see if mold was present or to take any air samples in

the units to see if any mold had become airborne and migrated there.  (B-665-666).  Neither the

Defendants nor the State interviewed any residents to determine if they had experienced any

symptoms related to the presence of mold in the basements, or asked Plaintiff if any tenants had

complained of symptoms related to mold which presumably had been present in the buildings for

years and years.  (B-638)  Had Defendants done any of these things, they would have concluded

that no emergency existed and that there was no basis to evacuate and condemn the buildings.  In

particular, Defendant Blomquist did not explain how the danger could have been emergent or

---

[12] The Town Council had authorized Defendant Giles to oversee Town activities, such as the Town's response to the mold conditions.  (B-589)

required evacuation if the residents had lived with the conditions for a long period of time without apparent ill effect.

Plaintiff retained its own expert and immediately attempted to test and remedy the situation. In particular, Plaintiff requested of the Town several times on October 4, 2002 and over the weekend that the Town promptly issue the appropriate licenses and permits to allow Plaintiff's contractors to seal off and abate the basement areas and address the Town's concerns. The Town repeatedly denied Plaintiff's requests. (B-344, 346, 348)

The next day, on Saturday, October 5, 2002, the Town issued a "News Release" to the "News Media" detailing the inspection and subsequent condemnation of 2 apartment buildings owned by Plaintiff. The "News Release" also detailed how seven families were "evacuated" due to a "mold condition . . . that created . . . a substantial risk to the health of the occupants of those buildings." This statement created a false hysteria because there was not a substantial risk to the occupants of the buildings and the Town's concerns could have been easily and promptly addressed.

The Defendants stated that they were concerned that conditions similar to what they observed at 1405 and 1421 Cypress existed at the other buildings in the complex. (B-641) However, the Defendants took no actions whatsoever to investigate additional buildings at the complex over the weekend or until Monday afternoon. (B-644)

Even after the weekend, on Monday, October 7, 2002, Regina O'Neill and a representative from CPR Services (a company that specializes in basement mold remediation) sought on behalf of Plainitff to obtain a permit from the Town to begin immediate remediation of

-12-

the two buildings that had been condemned on Friday, October 4, 2002. The Town denied Plaintiff's request. (B-333, 346, 355, 356)

On Monday, October 7, 2002, Defendant Blomquist returned to inspect additional buildings, along with Dr. Llewellyn and Mr. Belmont. They inspected approximately 10 basement units. (B-648) They did not inspect any occupied apartments. (B-665-66) They did not take any air samples. [Blomq., 173] At the end of the day they decided to condemn all of the buildings. (B-658-59)

On the evening of October 7, 2002, the Town held an "informational" meeting regarding the condemnation, the eviction of tenants and its ongoing investigation. At the meeting, portions of which were broadcast locally on television that evening and the next morning, officials spoke of the dangers of mold. (B-662) Again, this information was inaccurate and misleading because the Town had not done sufficient investigation to determine if the mold would be dangerous to anyone in the Apartments, and in fact it was not.

On Tuesday, October 8, 2002, Defendant Blomquist returned to inspect eleven additional buildings, along with Dr. Llewellyn and Mr. Belmont. (B-663) They did not go into any occupied apartments to inspect or take air samples. (B-665-66) In the early evening of October 8, 2002, Defendant Blomquist, in consultation with Defendants Boneker and Giles, condemned all of the additional buildings. (B-668-69)

During the course of the next few days, Defendant Town, acting by and through Defendant Blomquist, inspected the remaining buildings at the Apartments. During these inspections, they did not inspect any occupied apartments or take any air samples. (B-651, 668-69) Eventually, Defendant Town, acting by and through Defendants Blomquist, Boneker, and

-13-

Giles, condemned all of the buildings and evicted all of the tenants at the Apartments, except for the building at 1410 Cypress Avenue, which housed the rental office.

Defendant Blomquist did not issue the Notices of Condemnation until after the buildings in question had been posted as condemned and the tenants evicted thereby depriving Plaintiff of proper notice of the Town's unlawful actions before Plaintiff's property was confiscated. The Notices identify the NYC Guidelines as the operative regulatory standard for the Town's actions. (A-86.) Defendant Blomquist conceded after issuance of the Notices that mold in the basements was the basis of the orders, and that neither the conditions in the occupied apartment units (which he did not visit) nor the other conditions he says he found were the basis for condemning any of the buildings. (B-607-609)

Defendant Blomquist never asked the State, at any point during the condemnations, if there was anything the Town could do to address the mold conditions short of evacuating the tenants. (Deposition of Dr. Llewellyn at 98) Dr. Llewellyn later acknowledged that the perceived emergency could have been addressed by placing plastic sheeting around the basement units and removing any mold from the rest of the buildings. (Deposition of Dr. Llewellyn at 95-96). While Dr. Llewellyn believed that temporary removal of occupants would have been required to clean the non-basement areas, Mr. Larry Johnson, Plaintiff's expert certified industrial hygienist and a principal of Sovereign Environmental Group, Inc. ("Sovereign"), notes that removal of the tenants would not have been necessary in most cases and that, at most, an overnight stay off-site would have allowed sufficient time for the sheeting to be put in place and to clean the apartments in the manner suggested by Dr. Llewellyn.

After it issued the Notices of Condemnation were issued, the Defendant Town continued
to require Plaintiffs to remediate the condemned Apartments before they could be reinhabited,
but the Town did not permit Plaintiff or its contractors access to the Apartments to do so. (B-
333, 346, 355-56). In fact, Plaintiff and its contractors tried on multiple occasions to be given
access to the Apartments to assess and remediate the conditions. Defendants said that Plaintiff
could not have access until the Town had inspected all of the Apartments, and that remediation
could not occur until the Town issued a permit for the work and Plaintiff had developed a
remediation plan approved by the State. [13]This requirement resulted in multiple submissions
which the State and Town eventually approved in February, 2003.[14] As a result of Defendants'
actions, residents were prevented from living in the Apartments and were forced to find housing
elsewhere. Defendant Town helped the tenants find alternate housing, and everyone found a new
home by October 14, 2002.

Plaintiff knew that once the tenants were evicted and left they would not return. After the
condemnation process had started, Plaintiff filed a motion for a temporary restraining order to
stop the condemnations and to overturn the orders that had been issued to that point. In the
hearing on October 10, 2002 (the "TRO Hearing"), the Court of Chancery ruled that it would not
engage in prior restraint and stop the Town from inspecting properties and taking such action as
it thought appropriate. In addition, the Court ruled that, with no evidence of the condition of the
Apartments from Plaintiff (who had been denied access to the buildings), it could not find that
Plaintiff had carried its burden to show irreparable harm, inadequacy of a remedy at law, a
balance of equities in its favor, and likelihood of success on the merits of its claim that the Town
had taken Plaintiff's property without just compensation or interfered with its contract rights in

---

[13] See Notices of Condem, A-87; Town's Answer to Chancery Civil Action No. 19970-NC (B-559)
[14] Deposition of John Giles, Exhibits 8-15.

-15-

its initial failure to issue written notices of condemnation, leaving those merits issues for another day. (A-145-212)

Plaintiff later sought to file an administrative appeal of the condemnation notices to preserve its rights, despite the fact that such an appeal would be utterly ineffective in returning its tenants. After filing the appeal with the Board of Appeals, Plaintiff learned that this body, required by ordinance to hear such an appeal, did not exist, and that there were no rules for any such appeal. Indeed, the Town has changed the jurisdictional ordinance since 2002 to provide for an existing body, the Board of Adjustments, to hear such appeals in the future. Town Ordinance 420. As a result of this futility, Plaintiff abandoned its administrative filing.

Without tenants, the value of the Apartments was greatly reduced. Plaintiff sold the Apartments in April, 2003 for an amount substantially less than the value it should have had had the Defendants not violated Plaintiff's rights.

### E.    Plaintiff's Inspection of the Apartments at the Time of the 2002 Condemnations

In October 2002, shortly after the apartments were condemned and vacated, defendants retained Mr. Johnson, the certified industrial hygienist, to conduct a comprehensive, thorough investigation of the Apartments. Mr. Johnson inspected every unit of every apartment building, including the basements and common areas, and took air samples at each unit of each building.

Mr. Johnson reached the following conclusions: (1) most apartment units in which residents lived had no mold growth and no mold in the air whatsoever (B-145-146)); localized occurrences within the few inhabited units themselves with mold caused the mold's presence (B-65-66); and remediation of these units should be easily performed. (B-65-66)

-16-

Regarding the uninhabited basements, a number of the former basement apartments had no mold growth whatsoever (sample pictures are in the Plaintiff's Appendix). (B-442-534.) Mold was found in widely varying degrees in the other basement units. (B-165-168.) Twenty one (over 55%) of the basements were estimated to have 10% or less of the total surface area with visible mold in October 2002. Of these twenty one basement apartments, five were estimated to have 5%, four with 1% and six had no visible mold growth. Air testing showed that most building basement units did not have elevated levels of mold in the air. (B-65)

To the extent mold was present in basement units at the Apartments, it resulted from a number of separate, isolated water damage events, such as leakage from a corroded iron sewer drain line into 1407 Maple Avenue, and a hot water pipe leak in 1405 Cypress Avenue in 2002. Sovereign Report at 2, 7-8. (B-141, 146-47) (B-7, 51-57). Mr. Johnson concludes that these events since the Fall of 1999 account for most, if not all, of the mold found in the basements. (Mr. Johnson notes that Plaintiff addressed flooding from Hurricane Floyd in 1999 by hiring a remediation contractor, see Sovereign Report (B-141-42).

Mr. Johnson concludes that the evacuations ordered by the Town in October, 2002 were unnecessary and unjustified. Sovereign Report (B-141-143) (B-215). There was no imminent hazard to the residents of the Apartments and, even with the presence of visible mold growth and other conditions in certain basement apartments, there was not a danger to the residents that constituted an emergency. (B-65-66.)

There was minimal mold in the apartment units where people lived. Further, airborne mold was consistent with "background" concentrations in most units. Sovereign Report, (B-145-146).

-17-

To the extent mold was present in basement units, it would not migrate to the areas of the Apartments used by the residents. (B-65-68.) Further, mold in the basement could not affect residents unless a number of different factors were present, and many of the factors were not present. To be of concern to residents, all of the following conditions would have to be met:

1.     Mold growth would have to be present in the basement.

2.     The mold growth would have to be shaken up to be released to the air.

3.     There would have to be a pathway for mold in the air to travel into residential areas of the Apartments.

4.     There would have to be a force causing air from the basement to travel along the pathway to residents in the Apartments.

5.     The residents in affected units would have to be susceptible to mold.

Mr. Johnson found that these conditions were not satisfied. In particular, he found that there was no or minimal mold growth in many basement units; that there were no airborne mold spores above background levels in all but a few basement units; there was no force, such as forced air heating, to move airborne mold spores from any basement unit to residential areas within the Apartments; that mold spores were not present above background levels in the air of residential areas except for a few units attributable to residential activities in those units and not to the condition of the basements; and that there was no evidence that residents in the Apartments were susceptible to the mold, despite the fact that it may have been present for some period of time. (B-65-66.) In fact, many residents had lived at the Apartments for a number of years, but prior to the time of the condemnation and eviction, there were only one or two isolated

-18-

complaints by residents relating to the presence of mold in the Apartments or mold-related symptoms.

Without regard to the source of mold in the residential units, Mr. Johnson found that the vast majority of these units (over 70%) had minimal potential for exposure to mold, including those units with no visible mold or with mold concentrations comparable to that found in the ambient air (at "background" or naturally occurring levels). Sovereign Report, (B-141, 145, 146). Mr. Johnson found that fewer than ten percent (10%) of the units should be temporarily vacated during remediation, solely due to logistical reasons, since access to important parts of the unit (such as the bathroom or kitchen) would be blocked for more than one day due to remedial work. Id. Mr. Johnson did not find that vacating these apartments was required for health reasons, or at any time other than during remediation. Id. The remainder of the apartments, constituting fewer than twenty percent (20%) of the total, required evaluation on an individual-by-individual basis for possible vacation by those susceptible to molds during the remediation process only, based on consultation with a physician. Id. Mr. Johnson did not find that anyone needed to be vacated from these apartments for health reasons at any time other than during remediation. Id.

Even if all five factors had been present in every building, the basement conditions could have been contained and the Town's concerns could have been addressed without evacuating residents and condemning the Apartments. (B-65-68.) A standard method of protection used in similar situations uses a negative pressure enclosure, which breaks all pathways between mold in the basement and the residential areas. Id. The enclosure prevents any potential exposure of residents without the need for evacuation. Id. The enclosures can be put together in a few hours and operate for months. Id. Once contained, the basements could be properly assessed to

-19-

determine the appropriate methods for abatement to remove mold, asbestos and other hazardous materials and to clean the basements. Id. Further, to the extent any upper level apartments needed minor remediation and/or cleaning, this could have been done in one or two days. Id. Temporary relocation of residents might have been necessary for logistical reasons (e.g., taking the only bathroom out of service for a day) for some or all of fourteen apartments units. Id. Thus, at most all that was required was at most an overnight stay in a hotel.  Id.

## LEGAL ARGUMENT

### A.   Standard of Review for Motion for Summary Judgment

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).  If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

**B.     Defendant Town's Motion for Summary Judgment Should be Denied Because Plaintiff Was Deprived of Property Without Procedural Due Process, and There are Genuine Issues of Material Fact Which Preclude Entry of Such Judgment in Its Favor[15]**

**1.     Elements of a Claim Under 42 U.S.C. § 1983**

Plaintiff's claim arises under 42 U.S.C. § 1983, which provides:

> Any person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

Municipalities and other local government units are included within those "persons" to whom this law applies. Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690-91 (1978). Local governmental officials also are "persons" under this statute. Id. A municipal violation of the Constitution's procedural due process requirements states a claim under Section 1983. See, e.g., Larkin v. Savage, 318 F.3d 138 (2nd Cir. 2003); Keim v. County of Bucks, 275 F. Supp.2d 628, 633 (E.D. Pa. 2003). Further, "...municipalities do not enjoy immunity from suit – either absolute or qualified under § 1983." Leatherman v. Tarrant County, 507 US 163, 166 (1993).

The right of a landlord to have tenants inhabit and pay rent for leased property is a property interest which is protected under the Due Process Clause of the Constitution. Smith v. Village of Maywood, 699 F. Supp. 157, 160 (N.D. Ill. 1988)

**2.     Requirements of the Due Process Clause**

---

[15] Plaintiff does not assert in this case a claim for deprivation of substantive due process rights.

Due process normally requires notice and opportunity for some type of hearing prior to a deprivation of liberty or property.  Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 19 (1978); Parrat v. Taylor, 451 U.S. 527, 540 (1981).  The Supreme Court has directed that in determining what process is due in a particular case, a court must weigh several matters:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

The root requirement is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest…".  Gentry v. Lee's Summit, Missouri, City of, 10 F.3d 1340, 1344 (8th Cir. 1993) citing Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542 (1985).

In limited, special situations, a post-deprivation hearing will suffice if:

> …the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process…[is] coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking….

Parratt v. Taylor, supra, at 539.  However, (1) the emergency action must be directly necessary to secure an important governmental or general public interest; (2) there must be a special need for the very prompt action; and (3) the State actor must be a governmental official responsible for

-22-

determining, under the standards of a narrowly drawn statute, that the deprivation was necessary and justified in the particular instance. Fuentes v. Shevin, 407 U.S. 67, 91 (1972).

The municipality must establish the existence of an emergency to justify the deprivation of a protected right before a hearing is offered. See Gentry v. Lee's Summit, supra, 10 F.3d at 1345 (procedural due process violated where city could not identify exigency requiring seizure of property before notice and hearing); Smith v. Village of Maywood, supra, 699 F. Supp. at 159 (municipality denied apartment owner procedural due process where evidence did not show existence of emergency to justify boarding up rental units without notice and opportunity to be heard).

To establish exigent circumstances, the government must show that less restrictive measures would not have sufficed to protect the government's interests. United States v. James Daniel Good Real Property, 510 U.S. 43, 62 (1993); Richmond v. Kemp, 956 F.2d 1300, 1308 (4th Cir. 1992).

Further, to satisfy the requirements of due process, there must be an opportunity for a meaningful post-deprivation hearing, Parrat, supra, at 541, and the hearing "must be granted at a meaningful time and in a meaningful manner." Id. at 540, quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965). A case cited by Defendants, Grayden v. Rhodes, 345 F.3d 1225 (11th Cir. 2003), is instructive regarding a meaningful post-deprivation hearing (although very distinct from this case concerning the justification for no pre-deprivation process). In Grayden, a code enforcement officer condemned an apartment complex and forced the plaintiff tenants to relocate without prior notice or an opportunity for a hearing. The Eleventh Circuit ruled that the officer was qualifiedly immune from suit because he could not have been expected to know whether or

-23-

not the appellate board actually had the ability to review or reverse his condemnation order and thereby provide a meaningful opportunity for review. 345 F.3d at 1246. Subsequently, the district court determined that the city had in fact violated plaintiffs' rights to procedural due process and ordered the code to be changed to provide the enforcement board with the authority to reverse or modify the code officer's order.[16]

In this case, similar to Grayden, there was no appeal board to hear Plaintiff's appeal of the Notices of Condemnation, as will be established below. Accordingly, Plaintiff had no meaningful post-deprivation opportunity for review. See Grayden v. Rhodes, supra, 345 F.3d at 1250 (since board has no authority to reverse condemnation decision, there is nothing to appeal and no meaningful opportunity to be heard (dissent)).

In Flatford v. City of Monroe, 17 F.3d 162 (6th Cir. 1994), the Court emphasized that meaningful post-deprivation process is critical to ensure that municipal power is not abused:

> ...the requirement of an immediate and meaningful postdeprivation process becomes even more important in view of the license which qualified immunity essentially allows public officials when they make judgments affecting the health and safety of our citizens under perceived exigent circumstances. ... [T]he opportunity of an administrative hearing assures that fairness will quickly prevail and that constitutional rights, if mistakenly curtailed, will be immediately restored. Without the assurance of immediate review, qualified immunity may be wrongly perceived as an open invitation for public officials to ignore fundamental rights without any fear of censure.

Id. at 169.

---

[16] Grayden v. City of Orlando, Case No. 6:00-cv-888-Orl-22DAB (M.D. Fla.) 9/23/04.

-24-