3. **Defendants Violated Plaintiff's Procedural Due Process Rights When It Condemned the Apartments**

   a. **Defendants Violated Plaintiff's Right to Procedural Due Process By Condemning the Apartments Without Providing Proper Notice to Plaintiff or Affording Plaintiff an Opportunity for a Hearing**

Defendants condemned the Apartments during October 4-11, 2002. They provided oral notice to Plaintiff of some of these decisions when they were made. All written notices were provided after the decisions were made. In no case was any opportunity for a hearing provided prior to the condemnations.

Unless an emergency existed justifying no pre-deprivation process (it did not), the foregoing actions constitute a violation of Plaintiff's right to procedural due process. Memphis Light, Gas and Water Div. v. Craft, supra, 436 U.S. at 19; Parrat v. Taylor, supra, 451 U.S. at 540.

   b. **No Emergency Existed Justifying the Deprivation of Plaintiff's Property Before Providing an Opportunity for a Hearing**

      i. **No Emergency Existed at the Apartments**

The NYC Guidelines, which have been adopted by the Defendants and the State officials on whom they relied, set forth the applicable standards for mold. (A-86) (B-209). Under the NYC Guidelines, a building-wide evacuation is not indicated except in very limited circumstances. The New York Guidelines state:

> Decisions about removing individuals from an affected area must be based on the results of [a] medical evaluation, and be made on a case-by-case basis. *Except in cases of widespread fungal contamination that are linked to illnesses throughout a building, building-wide evacuation is not indicated.*

Guidelines, p.2 (italics added) (B-209).

In fact, there was not widespread fungal contamination at the Apartments. (B-143) With very limited exceptions, mold was limited to the uninhabited, inaccessible basement apartments. In addition, there is no evidence whatsoever of any illnesses in any buildings. Defendants did not even undertake any medical evaluations of the residents. Accordingly, evacuation of the residents clearly was not required, and no emergency existed.

There was no mold at all in most of the inhabited apartment units. Even in the basement apartments, where no tenants lived and to which people did not have access, many buildings had no or very little mold. Twenty one (over 55%) of the basements were estimated to have 10% or less of the total surface area with visible mold in October 2002. Of these twenty-one basement apartments, five were estimated to have 5%, four with 1% and six had no visible mold growth. (B-139)

Defendants have not rebutted, and cannot rebut, the above evidence, notwithstanding their broad, conclusory statements about mold growth in the basements. Indeed, Defendants have made no claims concerning mold growth in the inhabited apartment units, primarily because they did not inspect these units.

Further, airborne mold was consistent with "background" concentrations in most units. Sovereign Report, (B-145-146). Defendants did not take any tests and have no other evidence to rebut Plaintiff's showing that there was no mold above background concentrations in the air of most of the basement apartments and in most of the residential areas. Defendants have not explained, in response to Mr. Johnson's expert opinion, how air from the basements—if it had mold, which it did not--would have been forced into the inhabited areas of the buildings.

Further, Defendants did not even speak with any residents to determine if they had any symptoms which may arise from exposure to mold.

Grayden, cited by Defendant for the proposition that the presence of mold in the building can constitute an emergency justifying condemnation before a hearing, supports plaintiff's positions not defendants'. In Grayden the landlord was given notice of the mold condition and over three months to remediate it before the municipality condemned the property. This is exactly the relief plaintiff sought in this case. Had plaintiff been given such notice and opportunity to remediate, it would not have needed to filed this lawsuit.

### ii. Despite Their Statements, the Defendants Did Not Believe an Emergency Existed

Even if Defendants believed an emergency existed, as they claim, they would be liable if there were no exigency, and there was none. As the Supreme Court has noted, a § 1983 claim does not have a "state of mind" requirement. Parratt v. Taylor, supra, 451 U.S. at 535.

Regardless, the Defendants did not in fact believe an emergency existed. Evidently, Defendants found mold at the complex some time before October 4, since Defendant Blomquist's secretary told Ms. O'Neill on October 3, 2002 that there was "deadly mold" that would result in a sweep of the Apartments. Defendant Blomquist never mentioned this information to Plaintiff. Despite a number of calls from Plaintiff asking that he come back to the complex to re-inspect, Defendant Blomquist waited a few days to return with Mr. Belmont, from the State, ready to condemn. If Defendant Blomquist believed there was an emergency, he would have returned sooner and advised Plaintiff of the conditions. Clearly, he was more concerned with trying to shut down the complex than with fixing the mold conditions. Clearly, if

-27-

he believed there was an emergency, he would have advised Plaintiff sooner of his views, taken action sooner, and allowed Plaintiff to remediate, which he did not do.

The Defendants brazenly announced to Ms. Grocki on October 4, after they had inspected only 2 buildings, that they were going to condemn the buildings, one by one. (B-546-47) The condemnations were not based on facts, but were opportunistically designed to take advantage of the condition of some of the Apartments to shut down the entire complex.

After condemning two of the buildings on Friday, October 4, 2002, Defendants stated they were concerned that the remaining buildings might have similar conditions. (B-641) Notwithstanding their stated belief that immediate action was needed to condemn 1405 and 1421 Cypress, Defendants took no action whatsoever to inspect any of the other buildings over the weekend. (B-644) Inspections did not re-start until Monday afternoon, October 7, but even then, Defendants did not use all of the personnel available to them to inspect what they stated were emergency conditions requiring immediate action. (B-673-675)

Defendant Giles summed up the Defendants' true intent, given the presence of mold in some basements, was to shut down the complex when he confided to Mr. Ruhl during the course of the condemnations, "I got them now". (Deposition of John Ruhl 8/31/05 at 90-91). The actions and statements of the Defendants clearly establishes that they did not believe an emergency existed.

Indeed, the Defendants did not even take a number of common sense actions to obtain information that would have been needed to justify a reasonable belief that an emergency existed. While the Defendants claim they relied on advice from State officials, the Defendants were obliged by common sense to take certain actions to enable them to make proper decisions

-28-

based on the information they were given. Common sense dictates, as Defendant Giles knew, that the inhabited apartment units had to be inspected to determine if an emergency truly existed that required evacuation of the buildings (B-678); the Defendants did not inspect these units. Common sense dictates that the Defendants should have performed air testing to determine if in fact mold from the basements had migrated to the area of real concern, the inhabited apartment units; the Defendants did not take any air tests. Common sense dictates that the Defendants should have investigated further before declaring the existence of an emergency when residents had been exposed to conditions presumably for years and already would have suffered symptoms from exposure to mold if a true danger existed. And common sense, in addition to statutory requirement, dictates that Defendant Blomquist should have asked Dr. Llewellyn if there was any way short of evacuation to protect the residents from the asserted mold dangers; unfortunately, Defendant Blomquist did not ask this question.

As an absolute last resort, Defendants should have temporarily removed residents from the buildings while the Defendants investigated these basic, common sense questions, rather than requiring a permanent, full-scale evacuation of the Apartments without this information.

### c. Defendants Violated Plaintiff's Right to Procedural Due Process By Failing to Follow the Standards of a Narrowly Drawn Statute

As noted above, deprivation of a protected property interest without a prior hearing does not comport with due process unless the government acts pursuant to the standards of a narrowly drawn statute. Fuentes v. Shevin, supra, 407 U.S. at 91. In this case, a number of statutory provisions apply to the Defendants' actions.

The Delaware State Housing Code (the "Housing Code")[17] provides for condemnation actions under the following conditions:

> (a) *In general.* -- When a structure is found by the code official to be unsafe, or when a structure or part thereof is found unfit for human occupancy or use, it may be condemned pursuant to this chapter and may be placarded and vacated.
>
>     \*    \*    \*
>
> (d) *Structure unfit for human occupancy.* – A structure is unfit for human occupancy or use whenever the code official finds that it is unsafe or, because it lacks maintenance and is in extreme disrepair, is unsanitary, vermin- or rat-infested, contains filth and contamination or lacks ventilation, illumination, sanitary or heating facilities or other essential equipment required by this chapter.

31 Del. C. § 4127.

The Housing Code provides for emergency action as follows:

> (a) *In general.* – Whenever a code official finds that an emergency exists on any premises, or in any structure or part thereof or on any defective equipment which requires immediate action to protect the public's health and safety or that of the occupants thereof, the code official may, with proper notice and service in accordance with § 4128 of this title, issue an order reciting the existence of such an emergency and requiring the vacating of the premises or such action taken as the code official deems necessary to meet such emergency. Notwithstanding other provisions of this chapter, such order shall be effective immediately, and the premises or equipment involved shall be placarded immediately upon service of the order.

31 Del. C. § 4130.

Section 4104 of the Housing Code provides:

---

[17] The Delaware State Housing Code, 31 Del. C. §§ 4101 et seq. (the "Housing Code"), applies to all municipalities and counties within the State except those which have enacted a code containing minimum standards that are "equal to or exceed" the standards of the Housing Code, "as determined by the Housing Director." See 31 Del. C. § 4105(e). Plaintiff is aware of no such determination with respect to the Town of Elsmere, and the Town itself cites to the Housing Code as the applicable standard in its brief in support of its motion for summary judgment. Therefore, the Housing Code applies with full force in conjunction with the Town Code of Elsmere.

> The entire chapter shall be liberally interpreted so as to minimize displacement of persons whose dwelling units may deviate from this chapter's specifications but do not pose an imminent threat to the health, safety and general welfare of the occupants and other persons. Additionally, this chapter is to be liberally interpreted so as to minimize hardships to persons that inhabit or own dwelling units which deviate from this chapter's specifications but do not pose an imminent threat to the health, safety and general welfare of the occupants and other persons.

31 Del. C. § 4104.

Finally, as noted above, the NYC Guidelines state that:

> Decisions about removing individuals from an affected area must be based on the results of [a] medical evaluation, and be made on a case-by-case basis. *Except in cases of widespread fungal contamination that are linked to illnesses throughout a building, building-wide evacuation is not indicated.*

Guidelines, p.2 (italics added).

As previously discussed, the Defendants failed to follow the dictates of the NYC Guidelines. These Guidelines provide clear parameters to prevent the arbitrary exercise of authority, especially where there is no opportunity afforded for a hearing before property is taken. Following these Guidelines is especially important when dealing with mold because there are no other accepted standards delimiting what is safe or "sanitary", and therefore there is no other way to reign in the potential for arbitrary actions and abuse, such as occurred in this case. Fuentes v. Shevin, supra, 407 U.S. at 91; Flatford v. City of Monroe, supra, 17 F.3d at 169.

Further, the Defendants did absolutely nothing whatsoever to minimize the displacement of or hardship to the residents of the Apartments, as required by the Housing Code. The Defendants failed to interview residents to see if they had any symptoms related to mold or any special susceptibility to it. Defendant Blomquist failed to ask Dr. Llewellyn if anything could be

-31-

PHIL1 639190-3

done short of evacuating the residents, when in fact actions could have been taken so that, at most, an overnight stay off-site would have been required. The Defendants failed to use plastic sheeting to encapsulate the basements and prevent any concern regarding mold migrating from the basements to the inhabited apartments. The Defendants failed to remove the residents temporarily so they could obtain more information to determine if a permanent, full-scale evacuation was needed (it was not).

Since the Defendants failed to act pursuant to the statutes guiding their actions, they violated the requirements of procedural due process. Id.

### d. Defendants Violated Plaintiff's Right to Procedural Due Process By Failing to Use the Least Restrictive Measures to Protect the Public Interest

The Defendants failed to use the least restrictive measures to protect the public interest. As explained by Mr. Johnson, the concerns expressed by the Defendants could have been fully addressed by a number of less restrictive means. As Dr. Llewellyn conceded, plastic sheeting could have been used to encapsulate the basements and prevent the residents from any mold exposure. This type of encapsulation is commonplace in asbestos and other similar remedial projects, is easy and quick to install and can be operated for long periods of time in an economical way. (B-65-68) The Defendants could have removed the residents temporarily to allow for testing and medical assessments to determine if their concerns were legitimate, rather than ordering a full-scale permanent evacuation. See Grayden v. Rhodes, supra, 345 F.3d at 1237-38 (failure to provide pre-deprivation notice when feasible which enhanced likelihood that residents would secure alternate long-term housing even though they might prefer to remain temporarily in housing limbo and secure short-term housing violated requirements of procedural due process).

By failing to use the least restrictive means to address the asserted emergency, the Defendants violated Plaintiff's right to procedural due process. United States v. James Daniel Good Real Property, supra, 510 U.S. at 62; Richmond v. Kemp, supra, 956 F.2d at 1308.

### e. Defendants Violated Plaintiff's Right to Procedural Due Process By Failing to Provide An Adequate Post-Deprivation Remedy, or Any Notice of Appeal Rights

The Town failed to provide Plaintiff with an avenue for meaningful post-deprivation relief, a clear violation of Plaintiff's due process rights.[18] Even in emergency situations due process requires an adequate post-deprivation hearing.[19] But the administrative body that was expressly authorized by the Town Code to hear condemnation issues did not even exist in October 2002. The Town Code in effect at the time clearly provided that appeals concerning property maintenance code violations were required to be heard by the "Board of Building Appeals." The Town did not have a Board of Building Appeals in October 2002. Consequently, the Plaintiff was not presented with a meaningful opportunity to be heard.

#### i. The Town's Property Maintenance Code Expressly Created a "Board of Building Appeals"

Pursuant to Town Ordinance 329 and 330, the 1996 versions of the BOCA National Property Maintenance Code ("BNPMC") and the BOCA National Building Code ("BNBC")[20] were adopted into the Elsmere Town Code and were in effect during the relevant period in

---

[18] See, e.g., Fuentes, 407 U.S. at 90-91; Boddie v. Connecticut, 401 U.S. 371, 378-79 (1971); Defendant's Opening Brief ("DOB") (D.I. 44) at 18, n.40.
[19] See id.
[20] These model codes were published by Building Officials & Code Administrators International, Inc..

October 2002.[21] Town Ordinance 330 specifically amended section PM-111.0 ("Means of Appeal")[22] of the BNPMC to include the following:

> PM-111.1  Any person affected by any notice which has been issued pursuant to this Ordinance may appeal the decision of the Code Official to [the] **Board of Building Appeals**, pursuant to Section 121.0 of the BOCA National Building Code in effect, as amended.[23]

Defendants issued the belated Notices of Condemnation in this case pursuant to the Property Maintenance Code, and therefore triggered this Section. (A-86-87)

### ii.   Plaintiff Properly Filed an Appeal to the Board of Building Appeals in Accordance with the Town Code

Upon receipt of the condemnation orders, Plaintiff appealed the orders to the Town's Board of Building Appeals in accordance with § PM-111.1 of the Town's Property Maintenance Code.[24] In subsequent correspondence, the Town revealed that no Board of Building Appeals existed.[25]

### iii.   The Town's Board of Adjustment Was Empowered to Hear Zoning Appeals, Not Property Maintenance Violations

The Town relies on the "Emergency Measures" section of the Town's Property Maintenance Code and cites PM § 109.6 for the rule that any person affected by an emergency measure may petition to the "appeals board."[26] The "appeals board" that was specifically

---

[21] See Town Ordinance 329 (B-389-93), effective Oct. 10, 1996, amending Chapter 76 of the Town Code (B-412) and adopting the 1996 BOCA National Building Code ("BNBC") (B-401-408) as amended; Town Ordinance 330 (B-384-88), effective Oct. 10, 1996, amending Chapter 171 of the Town Code (B-404-411) and adopting the 1996 BOCA National Property Maintenance Code ("BNPMC") (B-394-400) as amended.
[22] Specific sections of the BNPMC as adopted by the Town are referred to as "PM-394-400."
[23] (B-386) (Emphasis added.)
[24] See Letter dated 10/29/02 from D. Eagle to E. McNally and Board of Building Appeals (B-419-20)
[25] See Letters dated: 11/8/02 from D. Eagle to E. McNally (B-421-22), 11/11/02 from E. McNally to D. Eagle (B-423), 11/13/02 from D. Eagle to E. McNally (B-425-26), and dated 11/18/02 from A. Moen to D. Eagle (B-429-30).
[26] DOB at 18-19, n.41, (D.I. 44) citing Town of Elsmere Property Maintenance Code § 109.6. Although the Town cites and relies on the "Emergency Measures" section of the Property Code, the Town refused to allow Plaintiff's representatives to enter the Apartments and begin immediate remediation even though such a course of conduct is expressly permitted by that section of the Town Code. See PM § 109.1 ( "It shall be unlawful for any person to enter

-34-

established by Town Ordinance 330 in order to hear property maintenance issues was the "Board of Building Appeals," which did not exist. The Town then asserts that PM § 109.6 complies with two state statutes, 22 Del. C. §§324 and 325.[27]

The Town's reliance on its Board of Adjustment and those two statutes is misplaced.[28] As of October 2002, the Town's Board of Adjustment was empowered to hear zoning matters instead of appeals of property maintenance violations,[29] and it appears in the section of the Town Code that pertains only to zoning.[30] Likewise, 22 Del. C. §§324 and 325 are found in a chapter entitled "Municipal *Zoning* Regulations" and they also relate solely to zoning appeals and not property maintenance code violations.[31]

On the other hand, the Town's Property Maintenance Code as amended by Town Ordinance 330 specifically granted the authority to review condemnation decisions to the Board of Building Appeals. Moreover, under the Town Code an appeal to the Board of Adjustment must be referred to the Town Planning Commission for up to thirty days of review because Chapter 225 and the Board of Adjustment address zoning and land use matters.[32] Such a mandatory review by the Planning Commission clearly shows that the Board of Adjustment's power is limited to zoning matters and does not encompass appeals of condemnation orders. There is no need to refer condemnation orders to the Planning Commission.

---

such structure *except for* the purpose of securing the structure, *making required repairs, removing the hazardous condition* or of demolishing the same." (emphasis added) (B-399)).
[27] DOB (D.I. 44) at 19.
[28] See id..
[29] See Town Code at "§ 225-40 Board of Adjustment" (B-415-18)
[30] See Town Code, Chapter 225 entitled "Zoning" (B-413-14). The state statutes relied upon by the town also concern zoning and not property maintenance appeals. See, infra.
[31] Within Title 22 ("Municipalities") of the Delaware Code, sections 324 and 325 are found in Chapter 3, which is entitled "Municipal *Zoning* Regulations." (emphasis added)
[32] See Town Code at §225-40(G): "Whenever an appeal is taken pursuant to this chapter, the Board of Adjustment shall refer the matter to the Town Planning Commission, and the Board shall not make a recommendation on an appeal until the Commission's report is received or thirty (30) days have passed since referral to the Commission." (emphasis added).

-35-

Notably, after the events in question, the Town amended its Town Code in 2003 and expanded the authority of the Board of Adjustment by allowing it to hear property maintenance violations.[33] This 2003 change to the Town Code recognizing that Plaintiff had no ability to appeal the condemnation orders in 2002. Having failed to follow the administrative procedures set forth in its own Town Code, the Town provided the Plaintiff with no avenue of appeal and certainly not the "meaningful opportunity to be heard" that is required by law.[34, 35]

### iv.  Plaintiff's Attempt to Obtain a TRO in Chancery Court Does Not Relieve the Town From the Responsibility of Providing an Adequate and Meaningful Opportunity to be Heard.

Defendant claims that the Plaintiff took advantage of its opportunity to be heard in a post-deprivation hearing when Plaintiff sought a temporary restraining order ("TRO") in the Delaware Court of Chancery. However, the TRO proceeding was not a "full hearing" on the merits of the Town's condemnation decisions.[36] The TRO application was heard under a clearly emergent context in which the Plaintiff had little opportunity to develop evidence in support of its position

---

[33] See Town Ordinance 420 (B-679) . In September 2003, the Town amended its Town Code by deleting references to the BOCA Codes and adopting the "International Property Maintenance Code," 2000 Edition, as published by the International Code Council, Inc. Significantly, the 2003 amendments to the Town's Property Maintenance Code also included replacing the "Board of Building Appeals" under PM –111.1 (as adopted by Town Ordinance 330) with reference to the "Board of Adjustment." (B-689)

[34] See Fuentes, supra.

[35] The Town also cites Alvin v. Suzuki, 227 F.3d 107 (3rd Cir. 2000) for the rule that "[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." DOB at 20, quoting Alvin, 227 F.3d at 116. But here the "process on the books" was the Board of Building Appeals, not the Board of Adjustment. Plaintiff properly filed an appeal to the Board of Building Appeals in accordance with the Town Code, but this administrative body did not even exist, except on the books. Accordingly, the Plaintiff's decision to stay the administrative appeal before the Town's Board of Adjustment does not preclude this federal suit for damages because an appeal to the Board of Adjustment was not the "process on the books."

[36] The transcript from the TRO reveals the expedited nature of that proceeding. Vice Chancellor Lamb's statements on the record also indicate that the TRO was not a "full hearing." See TRO Transcript, October 10, 2002 Defs.' App. (A-145-212) at 30-31 ("what kind of relief do you want with respect to those buildings that have already been condemned? bearing in mind . . . if you're asking for a temporary restraining order to maintain the status quo *until I can conduct a full hearing*, which could be a week or two weeks or something like that.") (emphasis added) (A-176-77). Indeed, Plaintiff was prevented from accessing its already condemned Apartments prior to the TRO Hearing [TRO Transcript p. 53]. (B-333-34, B-536) the limited affidavits it was able to put together for the TRO Hearing were not based on personal knowledge. [TRO Transcript, p. 52]

-36-

and the Chancery Court had a very unreliable record from which to assess the merits.[37] In addition, the TRO proceeding did not involve substantial live testimony, a full opportunity for cross-examination of witnesses, or a substantial and meaningful opportunity to present all the facts.[38]

Further, at the TRO proceeding, Plaintiff sought, in part, an order of prior restraint preventing the Defendant Town from condemning buildings before it inspected them and developed relevant facts—i.e., before there was anything to judge. Here, Plaintiff seeks compensation because it was not provided with notice and an opportunity for a hearing to challenge a plan to issue condemnation orders after the Town gathered its facts and identified the actions it planned to take and why. As to buildings already condemned, the damage largely had been done once tenants were evacuated, since they were unlikely to return, and a TRO would have been almost empty relief compared to the relief that would have been available had Plaintiff been given notice and an opportunity to be heard in advance of the deprivation.

Also, Plaintiff's claims and the applicable legal standard at the TRO Hearing were different than they would have been at a proper hearing. At the TRO Hearing, Plaintiff was required to persuade the Court to change the status quo, rather than maintain it, as to the condemnation orders which the Defendant Town already had issued. The standards applicable at the TRO Hearing also required the Plaintiff to show irreparable harm if the condemnation orders

---

[37] See Insituform Technologies, Inc. v. Insitu, Inc., 1999 WL 240347 at *6, Strine, V.C. (Del. Ch. April 19, 1999) ("In examining an application for a temporary restraining order three factors are critical: "the imminence and significance of plaintiffs['] claim of irreparable injury; the probable merits of plaintiffs['] claim; and the risks to defendant in the event a restraining order were issued and it ultimately were determined that the restraining order was improvidently issued." [ ] In circumstances where the TRO application is presented in a clearly emergent context in which the applicant has had little opportunity to develop evidence in support of its position on the merits and the court therefore has an extremely unreliable record from which to assess the merits, a "colorable claim" on the merits is sufficient if the applicant makes a sufficiently strong showing on the other two factors.") (internal citations omitted).

[38] See TRO Transcript, October 10, 2002 (A-145-212)

were not rescinded or stayed, that the balance of equities weighed in favor of overturning the orders and that it had no adequate remedy at law for the stated injuries. [See eg TRO Transciprt at 57] These are all significant burdens Plaintiff would not have had to address in a proper, timely hearing to review a notice of intent to condemn.

Substantively, at the TRO Hearing, the Court ruled on a different set of facts and legal claims than those presented here. The basis of Plaintiff's complaint in Chancery Court was that Plaintiff had not received written notice of the condemnations and had not been apprised of the facts and regulations on which the Town's actions were based. Plaintiff alleged that there was an unlawful taking of property because the Defendant Town failed to provide written notice of the condemnation actions; that Defendant Town tortiously interfered with Plaintiff's contracts and business relationships; and for injunctive relief.[39] Plaintiff is pursuing other, different claims in this case. The Court did not rule on the claim that the Defendant Town's actions were not consistent with statutory mandates in that there was not a real emergency which supported the condemnation orders, or that the NYC Guidelines had not been followed. [TRO Trans, p. 55-7] Plaintiff had the burden at the TRO hearing to show a violation of the constitution or other legal right due to the lack of condemnation notices, rather than simply showing the condemnations were not proper, as would have happened in an appropriate due process hearing.

Further, since there are no other State remedies available to Plaintiff, Defendants have deprived Plaintiff of the opportunity for a meaningful hearing, in violation of the Due Process Clause.[40]  Parratt v. Taylor, supra, 451 U.S. at 541.

---

[39] See Complaint (B-548-556).
[40] Defendants are likely immune under State law for any potential tort claim Plaintiff otherwise might wish to assert in this case to vindicate its rights. 10 Del. C. § 4011.

### C.  The Individual Defendants' Motion for Summary Judgment Should Be Denied Because They Do Not Have Qualified Immunity, and There are Genuine Issues of Material Fact Which Preclude Entry of Such Judgment in Their Favor

The defense of qualified immunity protects government officials from civil damages in their performance of discretionary functions if their actions are reasonable in light of legal rules which are clearly established at the time of their conduct. Flatford, supra, 17 F.3d at 166. As established above, the individual Defendants did not have a reasonable, good faith belief that an emergency existed. Rather, they intended to use the existence of mold at some of the Apartments as an opportunity to shut down the complex.

Defendants found mold at the complex some time before October 4. Even though Defendant Blomquist's secretary conveyed to Ms. O'Neill this finding when she stated that there was "deadly mold" that would result in a sweep of the Apartments, Defendant Blomquist never mentioned this information to Plaintiff, simply showing up on a later date with an unexpected companion, Mr. Belmont, from the State. Clearly, the Defendants were more concerned with trying to shut down the complex than with fixing the mold conditions. If remediation had been the true focus, Defendant Blomquist would have alerted Plaintiff promptly upon identifying his concerns so that swift action could be taken in response, and the Defendants would have allowed Plaintiff's contractors access to the basements, which Plaintiff immediately and repeatedly sought. The Defendants admitted to Darlene Grocki, the Plaintiff's resident manager, after only two buildings had been inspected, that they intended to condemn the buildings, one by one. (B-546-47) Defendant Giles concisely identified Defendants' goal when he confided, "I got them now". Deposition of John Ruhl at 90-91. Defendants simply did not believe a true emergency existed, and they do not fit within the parameters required to enjoy qualified immunity in this case.

PHIL1 639190-3

## CONCLUSION

For the reasons set forth above, there are disputed issues of material fact and Defendants Motion for Summary Judgment should be denied.

Dated: September 16, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

By: *[signature: Patrick A. Costello]*

David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
Douglas F. Schleicher
   (Admitted *Pro Hac Vice*)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 552-5504 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*