

Not Reported in A.2d                                                                                                    Page 1
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

C
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
INSITUFORM TECHNOLOGIES, INC., Plaintiff,
v.
INSITU, INC., Defendant,
and
Midsouth PARTNERS, Nominal Defendant.
No. CIV. A. 17013.

April 19, 1999.

Thomas R. Hunt, Jr., Esquire, S. Mark Hurd, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Thomas J. Goodwin, Esquire, of Krugman & Kailes, Saddle Brook, New Jersey, Attorneys for Plaintiff.

Donald J. Wolfe, Jr., Esquire, Matthew E. Fischer, Esquire, of Potter Anderson & Corroon, Wilmington, Delaware; of Counsel: John S. Stump, Esquire, C. Torrence Armstrong, Esquire, of McGuire, Woods, Battle & Boothe, McLean, Virginia, Attorneys for Defendants.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

*1 Defendant Insitu, Inc. ("Insitu"), with a 42.5% interest, and plaintiff Insituform Technologies, Inc. ("ITI"), with a 42.5% direct interest and a 15% interest held by its wholly-owned subsidiary Insituform Southwest, Inc. ("Southwest"), together comprise two of the partners of nominal defendant Midsouth Partners ("Midsouth" or the "Partnership"). ITI has caused Southwest, the other partner, conditionally to withdraw and terminate the Midsouth Partnership agreement effective upon the occurrence of a condition which may never come to exist. In the wake of this action taken by its wholly-owned subsidiary, ITI has claimed the right to deny Midsouth the ability to use the "Insituform®" process upon which Midsouth's business depends and has begun to compete directly with Midsouth.

Insitu now seeks a temporary restraining order to prohibit ITI from denying Midsouth the right to exploit the "Insituform®" Technology and from otherwise interfering with Midsouth's business until such time as this court or an arbitrator determines whether: 1) Southwest had the right to terminate Midsouth conditionally; and, if so; 2) what effect, if any, such termination had on the right of the remaining partners of Midsouth to continue the business and to continue as a licensee of the Insituform® Technology.

In this opinion, I find that: Insitu has demonstrated a reasonable probability of success on its claim that ITI has breached its contractual and fiduciary obligations to Insitu during the time since Southwest gave notice of its conditional withdrawal and termination and while ITI still remains a partner; that Insitu and Midsouth face imminent, irreparable injury; and that the absence of an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 2
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

injunction will injure Insitu and Midsouth far more than the grant of an injunction will harm ITI. As a result, I grant Insitu's motion but will issue an order in substantially different form than Insitu seeks.

I.
A. *Midsouth*

Midsouth is a Tennessee general partnership formed in 1985 to obtain and hold a license to use the "Insituform® Process" (hereinafter referred to as the "Insituform® Technology" or the "Technology"). The Insituform® process is used to create "pipes within pipes." It involves injecting a fiber tube or liner "impregnated" with thermosetting resin mixture into an existing pipe and hardening it by heat, forming a new rigid pipe within an existing pipe. Compl. ¶ 2. Midsouth had an exclusive right to utilize the Insituform® process in Tennessee and in portions of Kentucky and Mississippi (the "Territory").

Midsouth has three partners. Insitu, a Delaware corporation, owns 42.5%. Insitu is the successor-in-interest of Insituform East, Incorporated ("East"). Compl. ¶ 4.

ITI, a Delaware corporation, also owns 42.5% of Midsouth. ITI acquired its interest in Midsouth from E-Midsouth, Inc., ITI's former wholly-owned subsidiary, which ITI acquired in 1995. ITI is a successor-in-interest to its former wholly-owned subsidiary, Insituform North American Corp. ("INAC").

*2 Southwest owns the remaining 15% of Midsouth. Southwest acquired its interest in Midsouth from Insituform Mid-south Investments ("Insituform Mid-south"), another former wholly-owned subsidiary of ITI.

B. *The Midsouth License and Partnership Agreements*
On December 2, 1985, INAC (ITI's predecessor) and Midsouth executed a sub-license agreement (the "License Agreement"). The License Agreement gave Midsouth the exclusive right to use the Insituform® Technology in the Territory. L.A. § I(A), Schedule A. In exchange, ITI was to receive a royalty of 8% of the gross contract price of all contracts performed by Midsouth using the Insituform® Technology. L.A. § § I(H), IX. Section XIV(B) of the License Agreement provides that the License Agreement may be terminated by ITI [FN1] in certain circumstances. Section XIV(B) states:

> FN1. The License Agreement itself refers to INAC, ITI's predecessor-in-interest. For the sake of relative brevity, I sometimes refer only to ITI.

> *By INAC.* In the event [Midsouth] (i) becomes insolvent or a petition in bankruptcy is filed by or against [Midsouth] and not removed within 90 days thereafter, or a receiver is appointed for [Midsouth]; (ii) fails to pay the minimum Royalties in accordance with Paragraph IX hereof or other Royalties hereunder, or fails to provide computations of Royalties, within fifteen (15) days of when due and such failure shall continue for a period of fifteen (15) days after written notice from INAC to [Midsouth]; (iii) fails to pay when due for other invoiced goods and services, or any other amounts due INAC for any reason and such failure shall continue for a period of fifteen (15) days after written notice from INAC to [Midsouth]; (iv) fails to perform any other material term or condition of this Agreement and fails to correct the same within fifteen (15) days after written notice from INAC to [Midsouth], or if not reasonably capable of correction within such period, fails to commence such correction within such period and thereafter diligently proceeds to make such correction; (v) in the event any Partner withdraws from or seeks dissolution of [Midsouth]; or (vi) in the event [Midsouth]'s net worth falls below $500,000 then in any such event, INAC may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 3
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

declare this Agreement terminated immediately upon written notice to [Midsouth]. Such termination shall not limit or affect any other right or remedy of INAC, including the right to damages resulting from [Midsouth]'s breach.
 L.A. § XIV(B). The License Agreement is governed by Tennessee law.

L.A. § XXI.

The same day the Midsouth Partnership was created via a partnership agreement (the "December 2, 1985 Partnership Agreement"). INAC was not a signatory to that Agreement. Rather, the only signatories were East (Insitu's predecessor), Insituform Mid-south (Southwest's predecessor), and Insituform Southeast, Inc. (the ultimate predecessor of ITI's 42.5% interest).

A mere twenty-one days later, the predecessors-in-interest of the Midsouth partners executed yet another formal partnership agreement (the "Partnership Agreement"). That Agreement "superceded" the December 2, 1985 Partnership Agreement. P.A. § 18. Section 15 of the December 23, 1985 Partnership Agreement addresses the issues of "termination" and "dissolution" of Midsouth. It states in pertinent part:

*Termination: Dissolution.*
\*3 a. This Partnership may be terminated *at any time* by any partner upon notice in writing delivered to the other partners personally, or by certified mail, return receipt requested, to take effect not earlier than 120 calendar days after the date the notice is sent.
b. Upon the occurrence of any event of default as defined above, or on the violation of any of the provisions of this agreement by any partner, any partner not so violating the agreement, or its legal representatives, may, at its or their option, terminate and dissolve the Partnership immediately by giving a written notice of this intention to the other partner. The Partnership shall be terminated and dissolved at the dates specified in the notice. The notice may be given and served either by personal delivery to the partners to whom it is addressed, or by certified mail, return receipt requested, to the partner's last known regular place of business.
c. (1) In the event of the dissolution of the Partnership, upon the events described in paragraphs a and b above (hereinafter referred to as "events of termination"), the management committee, as reconstituted pursuant to the provisions of Section 13 above, shall have the right to wind up the Partnership business and to dispose of or liquidate the Partnership's assets.
(2) [omitted]
(3) [omitted]
(4) Upon any such dissolution, however, the non-defaulting partner or partners desiring to continue the partnership business shall have the right to do so in the firm name, upon the payment in cash to the withdrawing or defaulting partner of the respective value of its partnership accounts, such payment, net of costs and expenses of enforcing a defaulting partner's obligations and damages incurred by reason of default, to be made within 30 days after the date of dissolution. For this purpose, the value of a withdrawing or defaulting partner's partnership account shall be determined by the accountant then servicing the partnership as of the date of dissolution, in accordance with book values. No value shall be placed upon trade name, goodwill, customer lists or similar intangible assets.
(5) [omitted]...
 P.A. § 15 (emphasis in original). Like the License Agreement, the Partnership Agreement is governed by Tennessee law. P.A. § 17. But unlike the License Agreement, INAC was not a signatory to the Partnership Agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 4
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

### C. *ITI Changes Strategy*

ITI owns and has world-wide rights to the Insituform® Technology. Compl. ¶ 2. Before the early 1990's, ITI's strategy had been to exploit the value of the Insituform® Technology by executing sub-license agreements with other entities who obtained the right to exploit the Technology in particular regions.

In the early 1990's, ITI changed strategic direction and determined that it would be more profitable to exploit the Technology itself as a vertically integrated business. Hartman Aff. Ex. 3A. To accomplish this result, ITI needed to acquire its independent licensees. Therefore, ITI has acquired majority control of all but three of the Insituform® licensees since 1991.

### D. *ITI Obtains A Majority Interest In Midsouth*

**\*4** In 1995, ITI acquired E-Midsouth as a small part of a much larger transaction by which ITI acquired E-Midsouth's ultimate parent, Insituform Mid-America, Inc. As a result of ITI's acquisition of Mid-America and its assets, ITI thereby obtained E-Midsouth's 42.5% interest in Midsouth. Since ITI already owned 15% of Midsouth at that time through Southwest, it putatively obtained majority control of Midsouth.

ITI's predecessor-in-interest, E-Midsouth, however, had neglected to obtain the consent of its other Midsouth partner, Insitu, before being acquired by ITI. P.A. § 12. Insitu invoked the Midsouth Partnership Agreement's arbitration clause to contest ITI's right to control Midsouth.

Insitu's action did not endear it to ITI. During the period leading up to the arbitration, ITI threatened to terminate the Midsouth Partnership and to terminate Midsouth's license to exploit the Insituform® Technology if Insitu managed, through the arbitration or other means, "to achieve management control" of Midsouth. Hartman Aff. Ex. 3B.

The arbitrator ruled against ITI's predecessor-in-interest, E-Midsouth, finding that the Partnership Agreement required Insitu's consent before ITI could acquire E-Midsouth. Therefore, the arbitrator declared that ITI's predecessor-in-interest, E-Midsouth, was a defaulting party under the Partnership Agreement and ordered that Insitu could add an additional representative to Midsouth's management committee. Hartman Aff. Ex. 2. The arbitrator also found that Southwest's predecessor-in-interest was not in default of the Partnership Agreement. *Id.*

The arbitrator's order had the functional effect of ensuring Insitu's continued control of Midsouth. For whatever reason, ITI did not act on its prior threats and Midsouth continued to operate until this calendar year under the management control of Insitu.

### E. *Midsouth's Performance Lags*

During the period since that arbitration, Midsouth's financial performance has been rather poor. During calendar years 1997 and 1998, for example, Midsouth apparently suffered total losses of $1,644,000. Compl. ¶ 9. This contrasts with prior periods of sustained profitability.

It is fair to say that ITI and Insitu disagree about the cause of the decline in Midsouth's earnings. The record makes clear, however, that ITI believes that much of the problem was caused by poor managerial decisions by Insitu. *See, e.g.,* Hartman Aff. Exs. 5, 16A, 16D.

### F. *ITI Offers To Buy Out Insitu*

On February 16, 1999, ITI renewed its efforts to gain control of Midsouth. That

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 5
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

day, ITI offered to buy Insitu's parent corporation, Insituform East, for $2.50 a share. Hartman Aff. Ex. 4. According to the letter making the offer, the price represented a 150% premium over the current market price of East's stock. ITI said it was "prepared and desirous of entering into immediate discussions with [East] to proceed with negotiation and investigations leading to the execution of a definitive all-cash-merger agreement on an expeditious basis." *Id.*

**\*5** On March 2, 1999, ITI reiterated its offer and expressed concern at East's failure to respond. In addition, ITI stated its dissatisfaction with the performance of Midsouth under Insitu's leadership and indicated that it saw "no realistic prospect of improvement" for Midsouth under Insitu's leadership. Hartman Aff. Ex. 5. If East turned down the acquisition offer or otherwise did not respond by March 10, 1999, ITI indicated that it would "proceed on a course designed to protect [ITI's] shareholder's [sic] value by whatever means it deem [ed] appropriate." *Id.*

All of these communications were publicly disclosed by ITI via press releases and Securities and Exchange Commission filings.

       G. *ITI Attempts To Terminate Midsouth And The License Agreement*
On March 10, 1999, ITI concluded that Insitu had not responded in a substantive manner and withdrew its acquisition offer.

The next day ITI's wholly-owned subsidiary Southwest notified Insitu that:
> In accordance with Section 15(a) of the Partnership Agreement, [Southwest] hereby terminates the Partnership Agreement effective, *the later of* (x) the 120 days after the date hereof, or (y) the date on which the Chancery Court of Delaware has issued a declaration confirming that [ITI] is within its rights to terminate the Sub-License Agreement dated December 2, 1985 with the Partnership.

Hartman Aff. Ex. 7 (emphasis added). Southwest's termination letter was signed by Robert E. Kelley, who serves as ITI's General Counsel. ITI had Southwest send the withdrawal letter because Southwest, unlike ITI, was not in default of the Partnership Agreement. ITI itself did not send a withdrawal letter.

On the same day, ITI sent Midsouth a letter purporting to terminate "immediately" the License Agreement on the ground that Southwest was "terminating the Partnership." Compl. Ex. C. In particular, the letter demanded that Midsouth cease any use of the Insituform® Technology. *Id.* Then, ITI filed a complaint in this court seeking a declaratory judgment that it "is within its rights to terminate the License Agreement upon termination of Midsouth, or in the event of any partner seeking to dissolve Midsouth, in each case in accordance with the terms of the License Agreement." Compl. ¶ 19.

By another letter that day to Midsouth, ITI enclosed a copy of the complaint in this action and advised Midsouth that during the pendency of this action and:
> [E]ffective immediately, [ITI] intends to enter the Territory [defined in the License Agreement], either in its own name or through other means during the pendency of the Proceedings, to bid upon and undertake projects for Insituform Process work. Until resolution of the Proceedings, [ITI] intends to deposit 42.5% of the net profits arising from work undertaken by or on behalf of [ITI] in the Territory into an interest-bearing account ....

Hurd Aff. Ex. 2.

       H. *ITI Publicizes Its Actions And Undertakes To Compete With Midsouth*
**\*6** Insitu replied to ITI on March 17, 1999. In that communication, Insitu took the position that ITI had not properly terminated the License Agreement or the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                     Page 6
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

Partnership and that its actions in purporting to do so constituted breaches of those Agreements and of ITI's fiduciary obligations to its Midsouth partners.

That same day, ITI reiterated to Midsouth that ITI intended to bid on projects "within Midsouth's former licensed territory." Hartman Aff. Ex. 11A. In the letter, ITI claimed that its purported termination of the License Agreement had ended Midsouth's right to bid on new projects using the Insituform® Technology. *Id.* ITI indicated its willingness to "consider" issuing Midsouth a "limited, temporary and non-exclusive license" so as to permit Midsouth to finish certain pending projects. *Id.* Thereafter, ITI issued a press release containing the text of its letter to Midsouth.

In the wake of these communications, Insitu again stated its position that the License Agreement remained in full force and effect and that ITI was in breach of its contractual and fiduciary obligations to its Midsouth partners. Hurd Aff. Ex. 4. "Since [in its view] the License ha[d] not been terminated," Insitu said "there is no need for a temporary license" and that Midsouth would continue to bid projects using the Insituform® Technology. *Id.* Insitu called upon ITI to refrain from competing with Midsouth in its Territory and indicated that it would seek to enforce its rights under the Agreements. *Id.* On April 1, 1999, Insitu invoked the arbitration clause of the Partnership Agreement by filing a claim with the American Arbitration Association and giving notice to ITI and Southwest. Hurd Aff. Ex. 6.

Insitu's warnings and demand for arbitration were unavailing. During March and early April, ITI:
• bid on projects in direct competition with Midsouth, Slusher Aff. ¶ ¶ 2-3, Erikson Aff. ¶ ¶ 1-6, and told Midsouth that ITI had "pulled" Midsouth's license and would be bidding projects directly, Matill Aff. ¶ 2;
• informed Midsouth's creditors that ITI would not permit "any further future use of its credit on behalf of Midsouth," Hartman Aff. Ex. 10A;
• refused Midsouth's request to bid certain projects on which, pursuant to the Partnership Agreement, Midsouth could not bid without ITI's consent, Hartman Aff. Ex. 13; and
• denied Midsouth technical assistance pursuant to the License Agreement, Mattil Aff. ¶ 5.
On April 8, 1999, for example, ITI outbid Midsouth to win a project for the City of Cookeville, Tennessee. Slusher Aff. ¶ 2. Absent the ITI bid, it is likely that Midsouth, the second lowest bidder, would have been awarded the contract. *Id.* ¶ 3.

II. *Legal Analysis*

In examining an application for a temporary restraining order three factors are critical: "the imminence and significance of plaintiffs['] claim of irreparable injury; the probable merits of plaintiffs['] claim; and the risks to defendant in the event a restraining order were issued and it ultimately were determined that the restraining order was improvidently issued." Newman v. Warren, Del. Ch., 684 A.2d 1239, 1244 (1996).

*7 In circumstances where the TRO application is presented in a clearly emergent context in which the applicant has had little opportunity to develop evidence in support of its position on the merits and the court therefore has an extremely unreliable record from which to assess the merits, a "colorable claim" on the merits is sufficient if the applicant makes a sufficiently strong showing on the other two factors. See, e.g., Cottle v. Carr, Del. Ch., C .A. No. 9612, 1988 WL 10415, at *3, Allen, C. (Feb. 9, 1988). Where, however, the applicant has had the opportunity to develop evidence and present a record from which the court may "responsibly make a more informed judgment concerning the merits," this court "has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stated the elements of the equitable test is something akin to the traditional preliminary injunction formulation." *Newman,* 684 A.2d at 1244.

In this case, the more traditional preliminary injunction standard requiring a "reasonable probability of success on the merits," *Hecco Ventures v. Sea-Land Corp.,* Del. Ch., C.A. No. 8486, 1986 WL 5840, at *3, Jacobs, V.C., (May 19, 1986), is the more appropriate. Insitu has been aware of ITI's position on the merits since March 11; has known of ITI's view that Midsouth was prohibited from using the Technology on new projects at latest as of March 17, 1999, Hartman Aff. Ex. 11A; has already answered the complaint; was involved in the negotiation of the contracts at issue and controls evidence bearing on their meaning; and has presented affidavits and documentary evidence in support of its motion. Although I do not believe that Insitu unreasonably delayed seeking relief from this court so as to disqualify it from obtaining relief, [FN2] I do believe its decision to delay application brings with it the cost of being required to make a strong showing on the merits if it is to prevail on this motion. *Cf. Cottle,* 1988 WL 10415, at *6 n. 5 (indicating that the relative ease of obtaining a TRO compared to a preliminary injunction may tempt applicants to delay their application and that the doctrine of laches is properly invoked to address such tactical delay).

> FN2. In so concluding, I have considered and rejected ITI's argument that Insitu so unreasonably delayed its application as to disqualify it from eligibility for any injunctive relief at all. Insitu moved for a TRO within one month of the March 11 termination letters it received from ITI and Southwest. During that period, a great deal of back and forth ensued between the parties to clarify their respective positions. Upon definitively learning that ITI intended to deny Midsouth the right to use the Technology and that ITI was actively competing with Midsouth, Insitu moved diligently to bring this motion before me. In so finding, I note that ITI's complaint in this court and its communications to Insitu regarding the effect of Southwest's withdrawal from the Partnership may have contributed to some confusion on Insitu's part. The complaint, for example, can be read as implying that ITI did not intend to actually terminate the License Agreement until this court declared that it had the right to do so. The reason for this is that Southwest's termination of the Partnership was made "effective immediately upon the later of 120 calendar days from the date of such notice or upon issuance of a ruling from this Court declaring that, upon termination of Midsouth, [ITI] has the right to terminate the License Agreement as a consequence of [the] termination of Midsouth or, alternatively, of the attempt by a partner to dissolve Midsouth." Compl. ¶ 15. Although other communications from ITI to Insitu make clear that ITI was treating the License Agreement as having been terminated as of March 11, I think Insitu was justified in being somewhat confused by ITI's approach.

With that in mind, I turn to the merits.

### A. *The Merits of The Parties' Claims*

In examining the merits, I believe it is analytically important to acknowledge that ITI's duties and rights at any time depend in large measure on whether it is a partner in Midsouth. That is, the long-term right of ITI to terminate the License Agreement and withdraw from the Partnership Agreement may be different from its right to exploit the Insituform® Technology in the Territory during such time as ITI remains a partner in Midsouth.

Hence, I examine first whether Insitu has a reasonable probability of success on its contention that ITI was not free to terminate the License Agreement by causing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

Southwest to withdraw conditionally from Midsouth. Then I examine whether Insitu has a reasonable probability of success on its claim that ITI cannot exploit the Insituform® Technology in the Territory while it remains a partner.

   1. *ITI's Right to Terminate The License Agreement And To Cause Southwest To Withdraw*
**\*8** Both the License Agreement and the Partnership Agreement are governed by Tennessee law. Like Delaware law, Tennessee law requires that a court "interpret and enforce contracts as they are written...." *Petty v. Sloan*, Tenn.Supr., 277 S.W.2d 355, 359 (1955). The Tennessee Code provides that a written contract is "*prima facie* evidence that the contract contains the true intention of the parties, and shall be enforced as written." Tenn.Code Ann. § 47-50-112.

ITI takes the position that the License Agreement is absolutely clear that if "any Partner" of Midsouth--- including ITI and its wholly-owned subsidiary Southwest--- " seeks dissolution of [Midsouth]," then ITI has the right to declare the License Agreement "terminated immediately." L.A. § XIV(B). Since Southwest is a "Partner" and sought, albeit conditionally on terms favorable to itself, "dissolution" of Midsouth on March 11, then ITI, it contends, was within its rights to terminate immediately the License Agreement.

After a careful consideration of the limited record before me, I believe that such a straightforward interpretation of the License Agreement most likely would, upon final examination of a full record bearing on the intentions of the drafters of the two Agreements, be found to be the correct one. [FN3]

> FN3. In addressing the merits, I have treated the conditional termination of the Partnership by Southwest as if it was caused by ITI and no differently than if it was done by ITI itself. Southwest is a wholly-owned subsidiary of ITI and it is apparent from the documentary evidence submitted to me that it was executing a strategy determined by ITI when it sought conditionally to withdraw and terminate the Partnership.

There are several reasons for this conclusion. The most important is that the language of the License Agreement is, on its face, unambiguous. Read plainly, § XIV(B) clearly gives ITI the right to terminate the License Agreement when "any Partner ... seeks dissolution of [Midsouth]." Insitu would have me read § XIV(B) as if it is written "when any Partner *not owned or controlled by ITI* ... seeks dissolution of [Midsouth]." Such a reading is not consistent with the terms of the contract. *Lunn Real Estate Invs., Inc v. Boiler Supply Co., Inc.*, Tenn. Ct.App., 1998 WL 221112, at \*4 (1998) (to determine parties' intent the court must look to the "material contained in the four corners of the document itself" and give the words and phrases their ordinary and usual meaning).

Furthermore, reading § XIV(B) as permitting ITI to withdraw from the License Agreement at its election by causing its corporate affiliate which is a partner in Midsouth to withdraw does not create a gross imbalance in the relationship between ITI and Midsouth. Under § XIV(A), Midsouth had the right to rescind the license agreement at any time, provided that such termination would not be effective for two calendar quarters.

Insitu urges me to eschew a plain reading of the License Agreement on the grounds that the License Agreement must be read in concert with the later executed Partnership Agreement. In particular, Insitu argues that four provisions of the Partnership Agreement must color any reading of § XIV(B) of the License Agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 9
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

The first such provision is § 18 of the Partnership Agreement which provides that:
> *Entire Agreement.* Except to the extent specifically provided herein, this Agreement shall completely and fully supercede all other prior agreements, both written and oral, by and between, [Insitu's predecessor East], [Southwest's predecessor Insituform Midsouth Investments] and [ITI's predecessor INAC] relating to the Partnership or the business and affairs of the Partnership. The parties to this Agreement shall hereafter have no rights under such prior agreements but shall look solely to this agreement for definitions and termination of all their respective rights, liabilities and responsibilities relating to the Partnership and the affairs and business of the Partnership.

*9 P.A. § 18. Insitu contends that this provision of the Partnership Agreement somehow modifies the License Agreement. I do not understand how that can be so. To the extent that Insitu contends that § 18 should be read as "superceding" the License Agreement, then that Agreement was superceded over a decade ago. Yet, the parties to the License Agreement have been operating under it during that entire period as if it was in full force and effect and, indeed, Insitu insists that the License Agreement is still operative. Section 18 is more easily read as a typical integration clause that extinguishes any rights the Midsouth partners claimed under the previous December 2, 1985 agreement governing the Partnership. Furthermore, had the Partnership Agreement been intended to revoke or modify the License Agreement entered into twenty-one days prior (on the same day the December 2, 1985 Partnership Agreement was executed), one would expect that the Partnership Agreement would explicitly state that it had that effect and that INAC, the party with which Midsouth signed the License Agreement, would have executed the Partnership Agreement (or at least the part thereof modifying or superceding the License Agreement).

Insitu also argues that §§ 1, 12, and 15(c)(4) of the Partnership Agreement modify ITI's right to terminate the License Agreement. Section 1 of the Partnership Agreement sets forth the purpose of the Partnership:
> [Midsouth] shall be established to obtain and hold a license for the use of the Insituform Process in the [Territory] to perform underground pipe rehabilitation services for the public for profit.

P.A. § 1. Section 12 of the Partnership Agreement bars any of the partners from doing "any act detrimental to the best interests of the Partnership, or which would make it impossible to carry on the ordinary business of the Partnership, without the written consent of all partners." P.A. § 12. Since Midsouth was formed for the exclusive purpose of operating as an Insituform® licensee in the Territory, Insitu claims that § 12 is best read as prohibiting a Midsouth partner from doing any act whatsoever "which would make it impossible" for Midsouth to carry on its business as an Insituform® licensee in the Territory.

Insitu also argues that the single-purpose nature of Midsouth must guide interpretation of § 15(c)(4) of the Partnership Agreement. That subsection gives, in the event a partner has sought dissolution, any "partners desiring to continue the partnership business" the "right to do so in the firm name" by paying the exiting partners the value of their partnership interests in accordance with the provisions of the subsection. P.A. § 15(c)(4).

Taken together, Insitu contends that §§ 1, 12, and 15(c)(4) preclude ITI from exercising its otherwise plain right under the License Agreement to terminate that contract if "any Partner" of Midsouth seeks dissolution. The Insitu argument has a certain first-blush appeal because termination of the License Agreement does literally "make it impossible" for Midsouth to carry on its business--- which requires it to hold an Insituform® license. The termination of the License

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 10
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

Agreement also makes it impossible as a practical matter for the non-withdrawing Midsouth partners to carry on the business of "Midsouth Insituform" in the firm name. Thus, Insitu claims that ITI has breached §§ 12 and 15(c)(4) of the Partnership Agreement by terminating the License Agreement.

*10 Upon closer inspection, this argument begins to lose much of its appeal. The Partnership Agreement gives any of the partners, not just ITI and Southwest, the right to withdraw "*at any time* " after 120 days without cause. P.A. § 15(a) (emphasis in original). Insitu in essence asks that this right be read as not applying to ITI to the extent that by so withdrawing (or causing one of its affiliates to withdraw), that withdrawal triggers the termination clause of the License Agreement. That is, Insitu asks that the withdrawal provision of the Partnership Agreement be read as allowing any partner other than ITI to walk away "*at any time* " after 120 days without restriction, but as imposing a continued obligation on ITI to continue to license the Technology to the Partnership if it, or a partner affiliated with it, walks away.

It seems improbable that ITI's predecessor INAC would have put itself in such a vulnerable position. If such were the intention of the drafters, I would think they would have stated so explicitly. I believe that is especially so since the Partnership Agreement was not signed by INAC. It is difficult for me to conceive that the Partnership Agreement was intended, *sub silentio,* to diminish in a substantial manner the termination rights of INAC under the separate License Agreement.

Similarly, I find it extremely doubtful that § 12 was intended to apply to a partner which simply exercises its right to withdraw in accordance with § 15 of the Partnership Agreement. Such a reading of § 12 would create a litigable issue any time a partner with particular expertise or capabilities walked away since such a walk away could be construed as "detrimental to the best interests of the Partnership." [FN4]

> FN4. Insitu also suggests that ITI's termination of the License Agreement constitutes a breach of its fiduciary duties to its Midsouth partners. Although Tennessee law recognizes that partners owe each other fiduciary duties, *Am. Center-Nashville Ltd. v. Smith*, Tenn. Ct.App., 1992 WL 361352, at *7 (1992) ("Partners owe a fiduciary duty to each other in all matters relating to the partnership."), I find it unlikely that Insitu will prevail in arbitration on this particular fiduciary duty claim in the event that it fails on its contractual claim. The Partnership Agreement clearly gave ITI and Southwest the right to withdraw after 120 days' notice. To the extent that such a withdrawal is violative of Insitu's rights, it seems likely that the arbitrator will have to examine whether the particular nature and timing of Southwest's conditional withdrawal this year constituted a breach of the Agreement's implied covenant of good faith and fair dealing. *L.I.C. Corp. v. Baskin-Robbins Ice Cream Co.*, Tenn. Ct.App., 1993 WL 2796, at *2 (1993) (implied covenant of good faith and fair dealing is to be read into all contracts). If the withdrawal did not violate an express term of the contract and the implied covenant did not prohibit the withdrawal, there seems little room left for analysis of the withdrawal under fiduciary principles. *See Am. Center-Nashville Ltd.*, 1992 WL 361352, at *7 (where a sophisticated limited partner knowingly entered into contracts with general partners and the general partners subsequently took action to the detriment of the limited partner in accordance with those contracts, the limited partner could not state a claim for breach of fiduciary duty). In so finding, I expressly limit myself to commenting on ITI's simple right to terminate, not its conduct

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 11
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

during the period before which Southwest's conditional withdrawal and termination of the Partnership becomes effective, which I discuss *infra*.

Finally, it is unlikely that § 15(c)(4) was intended to have the substantive significance Insitu attaches to it. Rather than creating an affirmative right of any partner of Midsouth to continue to operate the business as an Insituform® licensee regardless of ITI's desires, § 15(c)(4) is better read as a standard form clause of a general partnership agreement that enables a surviving partner to continue the business without filing for a new business license, obtaining a new tax identification number, staking a new claim to the firm's name, and doing all the other ministerial work required to begin a new venture. 59A Am.Jur.2d *Partnership* § 892 (1987) ("Dissolution of a partnership does not cause the liquidation of the firm if there is an agreement among the partners stating that it does not do so..."); 4/15/99 Wolfe Ltr. Ex. B; *see also* L.A. § XIV(C) (upon termination of License Agreement, Midsouth has sixty days to drop the "Insituform" part of its name). Absent the inclusion of § 15(c)(4) in the Partnership Agreement, the remaining partners would have to start the business from scratch. Had § 15(c)(4) been intended to modify INAC's termination rights under the License Agreement, I believe that the drafters would have so stated and that INAC would have executed the Partnership Agreement.

**\*11** Thus, I conclude that Insitu has not shown a reasonable probability of success on the merits of its claim that ITI did not have the right to terminate the License Agreement. In so finding, I am not insensitive to the fact that this reading of the License Agreement--- that ITI is essentially free to terminate the License Agreement once it "seeks dissolution" of Midsouth upon concluding it can thereafter make more money by exploiting the Technology in the Territory itself--- can be seen as tolerating harsh results.

Yet, the License Agreement and the Partnership Agreement appear to authorize just such a scenario. Those Agreements also gave the other Midsouth partners the right to walk away from those Agreements in two calendar quarters and 120 days, respectively, at any time if they wished to abandon the enterprise and thereafter start a new business in the pipe repair field using a different technology.

The Agreements were drafted by sophisticated parties with the capacity to negotiate contracts to protect their rights. According to one of the officers of Insitu's parent, East, who was involved in negotiating the Agreements, § XIV(B) of the License Agreement is a "kick-out clause, basically meaning that ... if [ITI] withdraws, there's no license anymore." Hurd Aff. Ex. 7. Based on the record before me, it appears likely that the Midsouth partners chose to deal with ITI on that basis and to take the risk that ITI would someday walk away and exploit the Technology on its own. [FN5] *Petty,* 277 S.W.2d at 359 (The court must "interpret and enforce contracts as they are written, not withstanding they may contain terms which may be thought harsh and unjust.").

> FN5. In so concluding, I have considered Insitu's argument that ITI's "default" in coming into E-Midsouth's 42.5% interest in Midsouth as part of a much larger transaction disables it from withdrawing or causing Southwest to withdraw. Although ITI's default position gave Insitu the right to control Midsouth and certain other options, *see* P.A. § 13(b), I do not think that position rendered ITI perpetual partners of Midsouth. Nor does the lawyer for East who helped draft the Partnership Agreement. Hurd Aff. Ex. 7 at 71-74.

Thus, Insitu has not made a sufficient showing on the merits regarding this aspect of its claim to justify this court's use of its injunctive powers over ITI in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

time period before the arbitration can be held. Nor has Insitu convinced me that the question of whether ITI had the right to terminate the License Agreement is likely arbitrable. Insitu claims that under the arbitration clause of the Partnership Agreement the License Agreement termination dispute raises a "question arising out of or relating to [the] Partnership Agreement or the breach thereof." P.A. § 14(a). There is a fundamental problem with this argument. The License Agreement does not contain an arbitration clause. INAC signed the License Agreement. It did not sign the Partnership Agreement. [FN6] For purposes of disputes arising under the License Agreement, ITI stands in the shoes of INAC, its predecessor. Given these circumstances, I see little likelihood that upon a final determination of arbitrability I will conclude that INAC *sub silentio* agreed that disputes arising under the License Agreement would be resolved pursuant to the dispute resolution clause of an Agreement, the Partnership Agreement, it did not execute. [FN7]

> FN6. Or the earlier December 2, 1985 Partnership Agreement executed the same day as the License Agreement.
>
> FN7. ITI has moved for summary judgment on the claims asserted in its complaint. At this time, I am not convinced that the record is adequate to rule on that motion, nor am I persuaded that the arbitrator's ruling on Insitu's claim has no bearing on ITI's right to terminate. In the latter respect, I refer to the possibility that the arbitrator might find that ITI acted wrongfully in causing Southwest conditionally to terminate the Partnership. ITI has not convinced me that in those circumstances the finding of the arbitrator that ITI wrongfully caused the occurrence of the condition in § XIV(B)(v) triggering its right to terminate the License Agreement would not bear importantly on the resolution of its claim in this court. As such, I deny ITI's motion.

2. *ITI's Right To Exploit The Insituform® Technology In The Territory While It Is Still a Partner in Midsouth*

**\*12** Although I find that Insitu has not made a sufficient showing on the merits regarding ITI's right in the long-term to terminate the License Agreement and to withdraw from Midsouth, I believe there is more merit to Insitu's contention that the Partnership Agreement's provisions place limits on ITI's activities during the period after Southwest gave notice that it conditionally intended to withdraw and terminate the Partnership and before its withdrawal and termination become effective.

In this case, Southwest does not seek to terminate Midsouth until the *later* of 120 days from March 11, 1999 or the date of a favorable ruling on ITI's complaint by this court--- the latter condition being one which may never occur. Southwest's withdrawal can only be read as not yet effective, as expressly conditional, and as equivocal. That is because by its own (rather awkward) terms Southwest's act of withdrawal and the subsequent termination will not occur at all if this action is resolved in Insitu's favor. *See* ITI Br. at 1-2 (confirming that Southwest's withdrawal is conditional on a prior ruling by this court in favor of ITI). Thus, Southwest has reserved to itself the right to continue as a partner if I rule for Insitu. For its part, ITI has taken no formal action under the Partnership Agreement to withdraw.

The Partnership Agreement expressly precludes a partner in ITI or Southwest's position from terminating the Partnership on less than 120 days notice. P.A. § 15(a). The only circumstance in which an earlier termination can occur is if a non-defaulting partner seeks immediate termination upon default or breach of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 13
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

Partnership Agreement by another partner. P.A. § 15(b). The differences between § 15(a) and § 15(b) of the Partnership Agreement suggest to me that the partners bargained that their fiduciary and contractual obligations to one another could not be terminated without cause immediately. [FN8] Rather, such relations would persist for at least 120 days after notice. I do not believe that this timing restriction can be read as toothless in the context of the relations at stake. It is clear from both the Partnership Agreement and the License Agreement that timing issues of this sort which could affect the competitive positions of the contracting parties were critical. In the License Agreement, for example, INAC bargained for the right to be able to terminate that Agreement immediately if a triggering condition in § XIV(B) existed. Yet, INAC bargained to obtain two calendar quarters before Midsouth could terminate the License Agreement and cease meeting its contractual obligations thereunder. L.A. § XIV(A). As between themselves, the Midsouth partners appear to have bargained for a 120 day notice period before which a partner could not, except in cases where the other partners were in breach or default, terminate the business. [FN9]

> FN8. An unequivocal withdrawal by a partner in a partnership without an agreement prohibiting immediate dissolution might well free that withdrawing partner to compete with the partnership for new business so long as the withdrawing partner does not usurp for itself opportunities properly belonging to the partnership. 68 C.J.S. *Partnership* § 322(b) (1998). In this case, however, Southwest and ITI have hedged their bets and have not unequivocally withdrawn, but rather have reserved their rights to continue as partners. Coupled with the express terms of the Partnership Agreement prohibiting termination except upon 120 days prior notice, 68 C.J.S. Partnership, § § 304(c), 305 (1998) (provisions in the partnership agreement take precedence over the statute and may specify when dissolution shall become effective upon a partner's withdrawal), Southwest's and ITI's conduct seems unlikely to be found sufficient to have freed them to compete with Midsouth yet.

> FN9. Perhaps due to the necessary haste of briefing and the lack of clarity of the Partnership Agreement, the parties have not shed much light on the usage of the terms "termination" and "dissolution" in § 15 of the Partnership Agreement. These terms appear to be used rather erratically, adding to the difficulty of discerning the drafters' intentions. However, under partnership law "dissolution" typically does not end the partnership. 68 C.J.S. *Partnership* § 302 (1998). Rather, the termination of a partnership is a three-step process: dissolution, winding up, and then termination. *Id.* Here, Southwest seeks to withdraw and begin this process only if it wins this litigation.

Given that it appears that this notice period was intended to have substantive effect, I find it quite troubling that Southwest and ITI have conditioned their withdrawal on a ruling by this court in their favor and have reserved the right to continue as partners in Midsouth. In these circumstances, it is difficult for me to conceive of how ITI and Southwest can disclaim their fiduciary and contractual responsibilities as partners in Midsouth.

\*13 Thus, I believe it is likely that the arbitrator will find that ITI remains a fiduciary of its fellow partners and bound by § 12 of the Partnership Agreement. Tenn.Code Ann. § 61-1-120 (partners owe fiduciary duties to each other). While I cannot find on this record that ITI's fiduciary duties and § 12 prevent it from terminating the License Agreement during such period, there is a difference between ITI's contractual rights as a licensor and its duties as partner of Insitu. ITI's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

right to terminate the License Agreement and its right to exploit the Insituform® Technology in the Territory for its exclusive benefit during such time as it remains a partner in Midsouth are distinct, not identical.

As long as ITI is a partner in Midsouth, its obligations to its fellow partners are meaningful and substantial. For example, ITI has a duty under the Partnership Agreement to assist the Partnership in "fully complet[ing] and perform[ing]" all contracts and obligations "outstanding and unperformed ... for the advantage and profit of ... the Partnership." P.A. § 15(d)(2). Although this provision cannot be read as requiring ITI to continue the License Agreement on an exclusive basis, it does create an obligation on ITI's part to ensure that Midsouth can complete its contracts. Yet, it appears that ITI has haggled with the Partnership even over its right to complete existing work. Hartman Aff. Ex. 11A (ITI will "consider" granting the Partnership a "limited, temporary and non-exclusive license" to permit Midsouth to finish existing contracts). ITI's grudging and stand-offish approach to the completion of existing Partnership contracts seems likely to be found to be inconsistent with § 12 of the Partnership Agreement and with its fiduciary duties.

Similarly, ITI's quick-strike invasion of Midsouth's Territory, in the wake of East's refusal to accept ITI's acquisition proposal, is likely to be found inconsistent with § 12 of the Partnership Agreement and with ITI's fiduciary duties. It is true that the Partnership Agreement does not contain a provision prohibiting a partner who withdraws from competing with the Partnership after withdrawal. Yet, it is difficult to read § 12 of the Partnership as permitting a withdrawing partner to compete unfairly with the Partnership during the period before which the Partner's right to terminate becomes effective. It is even more difficult to read § 12 as tolerating such behavior by partners who have not unequivocally given notice of their intention to withdraw and terminate the Partnership, but who claim to have reserved the right to continue as partners.

It would have been one thing had ITI simply terminated Midsouth's ability to compete for new projects using the Insituform® Technology during the period before Southwest's purported withdrawal becomes--- if it ever will---effective. It was quite another for ITI to disable the Partnership from competing for new business during that period, while simultaneously, under a new name, seeking new business for itself within the Partnership's Territory and from the Partnership's customers. Had ITI simply done the former, each of the partners to Midsouth would have been on a level playing field and would have been able to use the period to decide how best to redeploy the investments they had sunk into the Partnership.

*14 By executing the latter strategy--- the timing and execution of which it solely controlled--- ITI may well be found by the arbitrator to have wrongfully advantaged itself at the expense of its partners in breach of the bargained-for-notice period in § 15(a), § 12, and its fiduciary duties. It is true that in the long-term Insitu can still seek to continue the Partnership as a pipe repair business using different technology. But in the short-term, Insitu finds itself in the disadvantageous and precarious position of scrambling to do so, while ITI immediately exploits a Territory it well knows through its involvement in the Partnership and by using the Insituform®)) Technology it owns. That ITI has coupled its competition with Midsouth with communications about its actions and intentions to Midsouth creditors, customers, and the financial markets has no doubt made Insitu's position even more difficult. Coming during a time when ITI is contractually prohibited from doing any act "detrimental" to the Partnership and when it owes fiduciary duties of good faith and loyalty to Insitu, ITI's conduct is highly suspect. Thus, I find that Insitu has a reasonable probability of success of convincing the arbitrator that ITI's strategy of exploiting the Insituform®

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                         Page 15
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

Technology for itself in the Territory before it has withdrawn as a partner is in breach of its fiduciary and contractual obligations. [FN10]

>   FN10. For precision's sake, it is important to note that I have commented on the Partnership Agreement only insofar as it relevant to ITI's claim for injunctive relief. Whether or not ITI has breached the Partnership Agreement or any fiduciary obligations it owes to its partners in Midsouth under Tennessee law will ultimately be determined *de novo* by the arbitrator based on a more well-developed record.

                B. *Is Midsouth Threatened With Imminent, Irreparable Harm?*

I find that Insitu has sustained its burden to demonstrate that Midsouth and it face imminent, irreparable harm as a result of ITI's actions.

By a multitude of measures, ITI has made it virtually impossible for Midsouth to operate in accordance with the purposes set forth in the Partnership Agreement. Any customer from whom Midsouth now seeks business does so with full knowledge that ITI takes the position that Midsouth has no right to use the Technology. Potential Midsouth customers, who have operations and interests of their own to which they must attend, will undoubtedly be reluctant to deal with a vendor at war with one of its owners. Existing Midsouth customers will no doubt need reassurance. The prospect of Midsouth obtaining additional credit during this period is quite bleak.

Although ITI contends that a future award of monetary damages can make Midsouth whole and that its decision to escrow 42.5% of the proceeds from any contracts won by ITI in the Territory until this action and the arbitration are concluded obviates any risk of irreparable harm, I do not believe that to be the case. The actions of ITI are likely to shake the confidence of Midsouth's customers, creditors, and employees in a manner that will not be fully captured by any future win-loss analysis of Midsouth's and ITI's respective records in securing new contracts during the period from March 11, 1999 until a court or an arbitrator determines whether ITI had the right to terminate the License Agreement.

**\*15** Midsouth is now operating under a dark cloud formed and seeded by ITI. Many of its customers, creditors, and employees may flee before the rain. In that eventuality, it will be very difficult to fashion monetary relief sufficient to restore Midsouth to the position it was in before ITI purported to terminate the License Agreement and the Partnership. *Roso-Lino Beverage Distrib., Inc. v. Coca Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125-127 (2d Cir.1984) (termination of plaintiffs' beverage distributorship after 11 years threatened irreparable harm which would not be fully remedied by monetary relief); *Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.*, 475 F.Supp. 1282, 1294 (E.D.N.Y.1979) ("loss or destruction of a going business constitutes irreparable harm"); *Dickinson Medical Group v. Foote*, Del. Ch., C.A. No. 834, 1984 WL 8208, at \*3, Brown, C. (May 10, 1984) (when former employee took customer list and could have caused her former employer to lose business, the former employer was threatened by immediate irreparable harm).

Likewise, it will be difficult to assess how much harm was done to Insitu by ITI's invasion of the Territory while still a partner of Midsouth. The competitive advantage ITI received over Insitu by getting such a timing jump will be real, but not easily reduced to quantification. It will not be difficult to count up the contracts ITI wins. But it will be difficult, if not impossible, to assess and quantify the long-term marketing and customer relations advantages ITI secured for itself, arguably improperly and at Insitu's expense.

                C. *In Whose Direction Does The Balance of Hardships Tilt?*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 16
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

The balance of hardships favors Insitu.

If ITI is enjoined from exploiting the Insituform® Technology in the Territory until such time as this case and the related arbitration are concluded, ITI will simply have to live with a restriction on competing with its own partners until the Partnership ends. I do not think that this burden is substantial in comparison to the irreparable injury Insitu and Midsouth will suffer in the absence of an injunction, especially since it is ITI's aggressive strategy that brought about the exigencies Insitu and Midsouth now confront and since Southwest conditioned its withdrawal upon a prior favorable ruling by this court on ITI's claim. Moreover, ITI can, if it chooses, mitigate any harm by assisting, rather than impeding, Midsouth in obtaining new business in the Territory during the period during which an injunction is in place.

That being said, I am not insensitive to ITI's position and the reality of the poisoned relationships among the Midsouth partners. I am also cognizant of the fact that ITI will likely be found to have the right to terminate the License Agreement and to withdraw from Midsouth in the long-run.

As a result, the nature of the TRO that will be granted will reflect that reality. In accordance with my prior reasoning, the TRO will, at Insitu's election, either provide: i) that ITI shall not exploit the Insituform® Technology in the Territory until the TRO expires and shall escrow 42.5% of the proceeds of any contract ITI has won or wins in the Territory as a result of bids it submitted or submits before the entry of the TRO; or ii) that ITI shall not deny Midsouth the right to exploit the Insituform® Technology on a non-exclusive basis in bidding on new business in the Territory until the TRO expires and that ITI shall escrow 42.5% of the proceeds of any contract ITI has won or wins in the Territory as a result of bids it submitted or submits before the entry and during the pendency of the TRO. [FN11] In addition, ITI must also consent if Insitu chooses the latter form of order. In either case, the TRO shall provide that ITI shall provide technical support to Midsouth in accordance with the License Agreement. If the latter form of TRO is elected by Insitu and consented to by ITI, that technical assistance shall extend to new projects for which Midsouth seeks technical assistance in bidding or performing.

> FN11. The nature of this order will thus deal with ITI's concern that I might enjoin ITI from working on a major municipal project it has just won in direct competition with Midsouth and which will not go to Midsouth if ITI is disqualified. ITI Br. at 31-32. In lieu of enjoining ITI from completing the project, ITI will simply have to escrow 42.5% of the project proceeds for the benefit of Insitu in the event that Insitu prevails in arbitration or convinces this court that the License Agreement was not validly terminated by ITI.

*16 I recognize that neither order creates an economically efficient course by which to proceed. My hope is that ITI and Insitu, which I am sure are operated by profit-maximizing businesspersons interested in doing what is rational in business terms, will work together to protect their mutual interests during the period an order is in place.

The disputes among the partners obviously need final resolution, sooner rather than later. Therefore, to limit any harm to ITI, I will also condition my order on Insitu's willingness to seek expedited treatment of its arbitration claim. For my part, I will commit to adjudicating ITI's claim on a very prompt schedule. Before setting a schedule, however, I want to consider with the parties how best to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 17
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

proceed in view of the fact that ITI's claim may or may not be arbitrable and, if not, whether it is advisable to permit the arbitration to go forward to completion first. Finally, I would note that I have held Insitu to the same standard it would have to meet to obtain a preliminary injunction. As such, I request that ITI advise Insitu and the court as to whether it will consent to the entry of a preliminary injunction along the lines I have described or whether the court needs to set a schedule for a hearing on a preliminary injunction.

III.

For the foregoing reasons, Insitu's motion for a temporary restraining order is granted and ITI's motion for summary judgment is denied. Insitu shall, upon notice to ITI, submit an order in conformity with this opinion. The parties shall also set up an office conference to determine a schedule for the procession of this litigation.

Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.