## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELSMERE PARK CLUB, L.P.,                :
a Delaware limited partnership,         :
                                        :
                    Plaintiff,          :        Civil Action No. 04-1321 (SLR)
                                        :
          v.                            :
                                        :
TOWN OF ELSMERE, a Delaware             :
municipal corporation, ELLIS            :
BLOMQUIST, EUGENE BONEKER,              :
and JOHN GILES,                         :
                                        :
                    Defendants.         :
_____ :

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
## MOTION *IN LIMINE* TO EXCLUDE THE EXPERT
## REPORT AND TESTIMONY OF DAVID J. WILK

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*

Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist, Eugene Boneker and John Giles

Dated:  September 22, 2005

## TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Nature and Stage of the Proceedings ......................................................1

Statement of Relevant Facts.....................................................................3

Question Presented....................................................................................8

Argument ...................................................................................................9

I.    To be Admissible Evidence and Expert Report Must Meet
      the Tests Set by Daubert and Kumho Tire.........................................9

II.   Wilk's Proposed Testimony is Irrelevant and Should Be
      Barred Under Rule 702, Daubert, and Kumho Tire.........................11

      A.    Wilk's Proposed Testimony Will Not Assist the Trier of Fact...........11

      B.    Wilk's Proffered Opinion is Irrelevant Because it Does Not
            "Fit" the Facts of this Case .................................................13

            i.    Wilk's Valuation is Irrelevant Because it Uses
                  the Wrong Legal Standard .....................................15

            ii.   Wilk's Valuation is Derived from Irrelevant
                  Methodology ...........................................................18

Conclusion ..............................................................................................23

# TABLE OF CITATIONS

**Cases**                                                                 **Page**

Aladdin, Inc. v. Black Hawk County,
    562 N.W. 2d 608 (Iowa 1997) ...................................................17

Boekeloo v. Board of Review of City of Clinton,
    529 N.W. 2d 275 (Iowa, 1995) ...............................................16

B.P. Oil Co., v. Board of Assessment Appeals of Jefferson County,
    633 A.2d 1241 (Pa. Commnw. Ct. 1993) ..............................16

Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc.,
    350 F. Supp. 2d 582 (D. Del. 2004)...................................9, 10

City of New York v. Mobil Oil Corporation,
    783 N.Y.S. 2d 75 (N.Y. Supr. A.D. 2004) ............................17

Commerce Holding Corp. v. Board of Assessors of the Town of Babylon,
    673 N.E. 2d 127 (N.Y. 1996)............................................16, 17

In re Custom Distribution Services, Inc.,
    216 B.R. 136 (Bkrtcy. D.N.J. 1997) .....................................20

In re Custom Distribution Services Inc.,
    224 F.3d 235 (3d Cir. 2000).............................................12, 20

Daubert v. Merrell Dow Pharms., Inc.,
    509 U.S. 579 (1993)..................................................... *passim*

Dept. of Transportation ex rel. People v. Parr,
    633 N.E. 2d 19 (Ill. App. 1994) ...........................................17

Elcock v. Kmart Corp.,
    233 F. 3d 734 (3d Cir. 2000).................................................10

First Capital Life Ins. Co. v. Schneider, Inc.,
    608 A.2d 1082 (Pa. Super. 1992)..........................................12

Inmar Associates, Inc. v. Borough of Carlstadt,
    549 A.2d 38 (N.J. 1988)...................................................12, 16

Izumi Products Company v. Koninklijke Philips Electronics N.V.,
    315 F. Supp. 2d 589 (D. Del. 2004) ......................................10

<u>Kumho Tire Co., Ltd. v. Carmichael</u>,
    526 U.S. 137 (1999)................................................................................9, 10, 11

<u>Northeast Ct. Economic Alliance, Inc. v. ATC Partnership</u>,
    776 A.2d 1068 (Conn. 2001) ..........................................................................17

<u>Noskowiak v. Bobst SA.</u>,
    2005 WL 2146073 (E.D. Wis.) ...................................................................15, 18

<u>In re Paoli R.R. Yard PCB Litigation</u>,
    35 F.3d 717 (3d Cir. 1994)..............................................................10, 13, 14, 18

<u>Redevelopment Agency of the city of Pomona v. Thrifty Oil Co.</u>,
    4 Cal. App. 4th 469 (Cal. App. 1992) ...........................................................17

<u>Schneider ex rel. Estate of Schneider v. Fried</u>,
    320 F. 3d 396 (3d Cir. 2003)...........................................................................10

<u>The Housing Authority of the City of New Brunswick v. Suydam Investors, L.L.C.</u>,
    177 N.J. 2 (N.J. 2003) .....................................................................................17

<u>U.S. v. Downing</u>,
    753 F.2d 1224 (3d Cir. 1985).....................................................................13, 18

<u>Westling v. Country of Mille Lacs</u>,
    512 N.W. 2d 863 (Minn. 1994).......................................................................16

## **Rules and Statutes**

Fed. R. Civ. P. 16........................................................................................................1

Fed. R. Evid. 401 .....................................................................................................11

Fed. R. Evid. 403 .....................................................................................................11

Fed. R. Evid. 702 ...............................................................................................*passim*

Fed. R. Evid. 703 .......................................................................................................9

Fed. R. Evid. 704 .......................................................................................................9

Fed. R. Evid. 705 .......................................................................................................9

Fed. R. Evid. 706 .......................................................................................................9

**Other Authorities**

Sue Ann Adams & Trevor E. Phillips, How To Use Comparable Sales to Value
Contaminated Property, 13 No. 4 Envtl. Compliance & Litig. Strategy 1
(September 1997)..................................................................................................20

Robert P. Carver & Anthony W. Crowell, Toxic Tax Assessments: The Ad Valorem
Taxation of Contaminated Property, Real Estate Issues, 10-19 (Fall 1999)......................16

John F. Lakin, Overview of the Problem/Ways to Minimize or Avoid the Risk
of Mold Claims, 13633 NBI-CLE 1 (2004).........................................................12

Lorraine Lewandrowski, Toxic Blackacre: Appraisal Techniques & Current Trends In
Valuation,, 5 Alb. L.J. Sci. & Tech. 55 (1994).................................................15

Darlene Marsh, Byron Taylor & Andy Raines, The Hazards Of Taxing Contaminated
Properties: Owners Beware!, 37 Tenn. B.J. 21, 22 (May 2001)........................................15

Peter J. Patchin, Valuation of Contaminated Properties, 56 Appraisal J. 1, 7 (1998) .......20

Peter J. Patchin, Contaminated Properties – Stigma Revisited, 59 Appraisal J. 2,167
(1991)...............................................................................................20, 21

Peter J. Patchin, Contaminated Properties and the Sales Comparison Approach, 62
Appraisal J. 3, 402 (1994)...............................................................................20, 21

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[01], p. 702-18 (1988).............11

Walter G. Wright, Jr. & Stephanie M. Irby, The Transactional Challenges Posed By
Mold: Risk Management and Allocation Issues, 56 Ark. L. Rev. 295 (2003) ............19, 20

Walter G. Wright, Jr., Stephanie M. Irby & Hank Bates, Transactional Challenges Posed
By Mold, 13882 NBI-CLE 19 (2004)...............................................................................12

## NATURE AND STAGE OF THE PROCEEDINGS

This is an action by Plaintiff Elsmere Park Club, L.P. ("EPC") against Defendants Town of Elsmere ("Elsmere"), Ellis Blomquist ("Blomquist"), Eugene Boneker ("Boneker") and John Giles ("Giles") for alleged procedural due process violations regarding the condemnation and evacuation (collectively, the "Condemnation") of the Elsmere Park Apartments, a/k/a Fenwick Park Apartments (the "Apartments") in October 2002.

The Complaint alleged that Defendants wrongfully condemned and evacuated the Apartments in violation of EPC's Due Process Rights, when they discovered that the Apartments were in violation of Elsmere's housing code. EPC has alleged that it has sustained "significant damages." (D.I. 1, ¶ 71), because it later sold the vacant apartments for less than what is claims were their fair market value as occupied units.

On January 20, 2005, this Court entered a Fed. R. Civ. 16 Schedule Order. That Order, at the request of the parties, was amended on June 10, 2005. Under the Amended Order, Plaintiffs submitted the reports of their putative experts on August 15, 2005. Among the reports submitted was the report of David J. Wilk ("Wilk") of Greystone Realty Advisors, Inc. ("Greystone"), who purported to opine on the value of the Apartment. Pursuant to the Amended Order, fact discovery in the present action was to be completed by August 22, 2005 and a trial date has been set for January 4, 2006. The primary issues at trial will be: (a) whether the conduct of the Town of Elsmere and its municipal officers violated the due process rights of EPC; and (b) what damages, if any, has EPC suffered as a result of the Condemnation. In support of EPC's claim that it suffered damages as a result of the Condemnation causing an undue drop in the fair market value of the Apartments, EPC proposes to offer at trial the testimony of its

1

putative expert, David Wilk, to opine on the value of the Apartments prior to the Condemnation.

Defendants have herewith filed a Motion *In Limine* to Exclude the Expert Report and Testimony of Wilk and request that this Court preclude at trial any reference to, or admission of evidence regarding Mr. Wilk's report as irrelevant to the determination of EPC's damages. This is the Defendants' Opening Brief in Support of their Motion *In Limine* to Exclude the Report and Testimony of David J. Wilk.

## STATEMENT OF RELEVANT FACTS

In its Amended Complaint, EPC alleges, *inter alia*, damages as a result of the Condemnation in that they were effectively compelled to sell the Apartments at an artificially depressed price. EPC claims that the damages they have suffered are equal to the difference between the fair market value of the Apartments prior to the Condemnation and the price received from the post-Condemnation sale of the Apartments to a third-party buyer for $4.1 million.[1] In support of the first part of that calculation—the fair market value of the Apartments prior to the Condemnation—EPC proffers the appraisal opinion of David Wilk, who valued the Apartments at $5.2 million. (A. 142, 193).[2]

Wilk's valuation of the Apartments was made assuming the Apartments were unaffected by environmental hazards. This is stated unequivocally in the introduction to Wilk's report. Wilk states, "Due to the retrospective valuation date, we are aware of a dispute concerning the presence of environmental hazards as of the date of valuation. However, for the purpose of our analysis and valuation, we were requested to estimate the value of the property assuming it was unaffected by any such condition as of the date of valuation." (A. 142, emphasis added). Therein lies the fundamental problem with Wilk's valuation. The failure to include in his calculations the pivotal fact of the Apartments' contamination with mold, raw sewage and asbestos, renders Wilk's valuation incorrect and irrelevant to the damages calculation.

---

[1] Defendants do not accept the implicit argument Plaintiff makes that it was "forced" to sell the Apartments below fair market value. Not only was the sale itself unforced, but the timing of the sale was entirely volitional as well. Plaintiff could have mitigated its alleged damages by remediating the properties and renting out the repaired units afterward, thus demanding a higher price from a buyer.

[2] References herein to "A.___" are to Defendants' Appendix, filed herewith.

3

The environmental problems at the apartments were very serious, however. Dr. Llewellyn testified about the Apartments that he had "been working with mold and mold toxins since 1967. And I've never encountered this much mold in any one area." (Transcript of hearing before Vice Chancellor Lamb in Elsmere Park Club L.P. v. Town of Elsmere. Del. Ch. C.A. 19970 (October 10, 2002)) (A. 138). The Court of Chancery concluded: "…there is wide spread penetration and infiltration of mold" in the apartments." (Id.) (A.139). All of the officials from the State of Delaware that investigated the conditions at the Apartments concluded that evacuation of the apartments was "appropriate." (Affidavit of Gerald Llewellyn, October 10, 2002.) (A.135). The photographs of the mold infestation confirm its extent. (See Affidavit of Ellis Blomquist, October 10, 2002.) (A.1).

Indeed, even EPC admits that the apartments required extensive remediation to correct the mold and other environmental problems that existed at the Apartments. For example, EPC's environmental consultant gave it a "preliminary" estimate of $271,000 to do just the removal of the visible mold and he testified that: (1) there were extensive other repairs needed, and; (2) there may be hidden mold that would increase his estimate. (Larry W. Johnson Deposition Transcript, September 14, 2005.) (A.217-219).

Most telling, the buyer of the Apartments has now spent over $900,000 to do the remediation that Wilk was told to ignore in his valuation. (See Affidavit of Liza H. Sherman at Exhibit A) (A.227-232). Even so, the Apartments are far from complete remediation. The significance of this high remediation cost is particularly apparent after considering that Wilk decided the Apartments in good condition were worth $5.1 million.

In particular, Wilk utilized the three traditional approaches to real estate valuation: the "cost approach," the "sales comparison approach" and the "income approach." (A. 172). Wilk states that he only gave weight to the latter two types of analysis. (A. 193).

In applying the "sales comparison" method, Wilk examined the sales of five other apartment complexes in New Castle County, Delaware. The units chosen for comparison were selected "on the basis of their general similarities with the subject in terms of use, location, and <u>other physical characteristics</u>." (A. 173, emphasis added). Wilk notes in his report that an examination of the physical characteristics of a given property considers the "appeal, quality of construction, location and other factors which affect prices in the market." (A. 173). Although Wilk purports to have compared the physical characteristics of both the Apartments and the comparable units selected for purposes of valuation, that statement is plainly untrue based on EPC's directive to Wilk to consider the Apartments in the absence of the existing environmental hazards. Although it is widely held that the sales comparison method is a poor valuation tool for contaminated properties, even if that method were appropriate, Wilk applied the method incorrectly because he was prevented from taking into account the true physical condition of the Apartments.

In applying the "income capitalization" method, Wilk estimated the present value of future benefits of ownership of the Apartments to "derive an indication of the amount that a prudent, informed purchaser-investor would pay for the right to receive them as of the valuation date. This approach requires an estimation of the net operating income of a property." (A. 184). Wilk then converted the net operating income ("NOI") to a value

indication by both the "direct capitalization" and "discounted cash flow" ("DCF") methods. (A. 184).

Wilk states that the "direct capitalization" inquiry "includes a provision for recapture of the investment and should reflect all factors that influence the value of the property, such as tenant quality, property condition, neighborhood change, market trends, interest rates and inflation." (A. 184, emphasis added). In comparison, Wilk applied the DCF method by examining the operating cash flows expected from the Apartments and the anticipated proceeds at the end of a specified holding period and discounted the sum of both to their present values. As Wilk observed, both the DCF and direct capitalization methods take into consideration operating expenses. (A. 185, 191). Among the operating expenses Wilk accounts for are real estate taxes, payroll, repairs and maintenance, utilities, management fees, insurance, and other considerations. (A. 186.) He fails, however, to account for the costs of remediation, local and state penalties, litigation, the attendant difficulty and increased cost of obtaining insurance (particularly a policy that covers mold remediation). EPC received a "preliminary" estimate of just the cost of mold remediation of over $271,000 and EPC's environmental consultant has testified the actual remediation costs would exceed this preliminary estimate. The estimate, for example, did not include asbestos tile removal, any removal of mold contamination hidden from the consultants' visual inspection in their costs. (See A. 184-187). Thus, Wilk's estimate of operating expenses is inadequate. Because the data used in Wilk's calculations is incomplete, Wilk's result through both the direct capitalization method and the DCF method are incorrect.

Based upon the application of two inapposite valuation techniques and irretrievably flawed methodology, Wilk rendered the opinion that the property, in its "clean" state had a fair market value of $5,200,000 (A. 142, 192). EPC seeks to introduce Wilk's valuation as evidence of the fair market value of the Apartments prior to their sale for $4.1 million. For the reasons set forth herein, Wilk's valuation is irrelevant to the calculation of damages in the instant proceeding and must therefore be excluded.

**<u>Question Presented</u>**

Should the Court exclude the opinion of Plaintiffs' valuation expert, David Wilk, under Fed. R. Evid. 702 when Wilk's opinion was patently rendered in response to an irrelevant query regarding the value of the Apartments in the absence of environmental hazards whose presence is uncontested?

## ARGUMENT

### I.    TO BE ADMISSIBLE EVIDENCE AN EXPERT REPORT MUST MEET THE TESTS SET BY <u>DAUBERT</u> AND <u>KUMHO TIRE</u>

Wilk's expert report and testimony should be precluded because the valuation does not meet the requirements of Rule 702 or the Supreme Court's pronouncements in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999). Wilk's valuation is not useful to the determination of the issues in this case because it applies the incorrect legal standard and does not bear on the pertinent inquiry in this matter. Moreover, the valuation is the product of flawed and impertinent methodology. Defendants respectfully submit that it is irrelevant whether Wilk's report gives the correct answer to the query it poses because the question itself is inapposite to the facts in issue. Accordingly, Wilk's valuation report and testimony should be precluded from consideration in the instant proceeding.

In addition to the general provisions of Federal Rules of Evidence that bear on all matters of admissibility of evidence, the rules that pertain specifically to the admissibility of expert testimony are Rules 702, 703, 704, 705 and 706. Federal Rule 702 governs testimony by experts and states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This Rule "obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." <u>Chemipal Ltd. v. Slim-Fast Nutritional</u>

Foods Intern., Inc.,, 350 F. Supp. 2d 582, 587 (D. Del. 2004) (citing Daubert, 509 U.S. at

589).[3]  As the Court in Kumho Tire made clear, this gate-keeping function is not limited

to testimony of a scientific nature but applies to all manner of expert opinion.  See

Kumho Tire, 526 U.S. at 147-49.

   The Third Circuit has construed this precedent and Rule 702 "as embodying

'three distinct substantive restrictions on the admission of expert testimony:

qualifications, reliability, and fit.'" Izumi Products Company v. Koninklijke Philips

Electronics N.V., 315 F.Supp.2d 589, 600 (D. Del. 2004), citing Elcock v. Kmart Corp.,

233 F.3d 734, 741 (3d Cir. 2000). See also Schneider ex rel. Estate of Schneider v. Fried,

320 F.3d 396 (3d Cir. 2003), and In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741-

743 (3d Cir. 1994) ("Paoli II"). For the reasons set forth herein, Wilk's proposed

testimony is irrelevant to the calculation of EPC's damages and thus fails to meet the

third prong of the trilogy of prerequisites to admissibility.

---

[3] In Daubert, the United States Supreme Court set forth the following non-exclusive
factors to guide trial courts in making this preliminary reliability assessment: (1) whether
the expert's methodology has been tested; (2) whether the expert's theory or technique has
been subjected to peer review and publication; (3) whether the technique has a known or
potential rate of error; and (4) whether the technique has been generally accepted in the
proper scientific community. See Daubert, 509 U.S. at 593-94.

## II.    WILK'S PROPOSED TESTIMONY IS IRRELEVANT AND SHOULD BE BARRED UNDER RULE 702, <u>DAUBERT</u>, AND <u>KUMHO TIRE</u>

Wilk's proposed testimony is inadmissible under Fed. R. Evid. 702 and the Supreme Court's decisions in <u>Daubert</u> and <u>Kumho Tire</u> because it lacks relevance to the issue at bar.  The Federal Rules of Evidence define "relevant" evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.[4]  Relevant evidence is evidence that helps "the trier of fact to understand the evidence or to determine a fact in issue." <u>Daubert</u>, 509 U.S. at 591. For the reasons set forth below, Wilk's testimony is irrelevant and does not assist the trier of fact in either respect.

### A.    Wilk's Proposed Testimony Will Not Assist the Trier of Fact

Plaintiff purports to submit Wilk's valuation as evidence of their damages claim. Under Rule 702, expert testimony is admissible only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." <u>Daubert</u>, 509 U.S. at 591 (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[01], p. 702-18 (1988)). Thus, in order for Wilk's valuation to be

---

[4] Even if proposed testimony is deemed relevant, it is still subject to exclusion under Rule 403. <u>Daubert</u>, 509 U.S. at 579. Pursuant to Fed. R. Evid. 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

admitted, EPC bears the burden of demonstrating that his valuation bears on a fact at issue. Plaintiff can not meet this burden.

The issue of damages in the instant proceeding is a function of the fair market value of the property at the time of valuation. The fair market value of a property bearing environmental hazards will reflect the presence of those hazards in the price a reasonable seller would be willing to pay. Any reasonable purchaser would take into account the physical integrity of the property it aims to buy, including, most certainly, the presence of mold and other contaminants, as well as, at a minimum, the attendant costs of remediation. See In re Custom Distribution Services Inc., 224 F.3d 235, 246 (3d Cir. 2000), citing Inmar Associates, Inc. v. Borough of Carlstadt, 549 A.2d 38, 41-42 (NJ 1988) ("…environmental contamination has an impact on property valuation."); First Capital Life Ins. Co. v. Schneider, Inc., 608 A.2d 1082, 1086 (Pa. Super. 1992)("… certainly real estate which is environmentally clean has a greater market value than if it were environmentally contaminated."); Walter G. Wright, Jr., Stephanie Irby & Hank Bates, Transactional Challenges Posed By Mold, 13882 NBI-CLE 19, 64 (2004) ("[T]he presence of mold in a structure or building could presumably reduce its monetary value in some circumstances."); John F. Lakin, Overview of the Problem/Ways to Minimize or Avoid the Risk of Mold Claims, 13633 NBI-CLE 1, 9 (2004) ("Due diligence should be used prior to purchasing any property to insure that there is no potential exposure to the owner for purchasing a contaminated environment.").

By contrast, Wilk's opinion incomprehensibly omits any consideration whatsoever of the fact of contamination with mold or the presence of other hazardous conditions.  By virtue of the failure of Wilk to account for the presence of environmental

hazards in his valuation, his expert report does not reflect any relevant measure of the pre-Condemnation value of the Apartments. Accordingly, Wilk's report does not bear on the damages calculation in issue and is therefore not helpful to the trier of fact.

**B.      Wilk's Proffered Opinion Is Irrelevant Because it Does Not "Fit" The Facts of This Case**

"Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Paoli II, 35 F.3d at 743 (emphasis omitted), citing Daubert, 509 U.S. at 591-592. Admissibility depends in part on "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." U.S. v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985). See Daubert, 509 U.S. at 591-92 (explicitly adopting the "fit" requirement of Downing). Thus, it is insufficient that an expert's opinion is simply scientifically sound; it must also bear a connection to the inquiry before the finder of fact. Wilk's opinion bears no such connection.[5]

The Third Circuit has elaborated on the "fit" requirement of the admissibility test for an expert's opinion. In Paoli II, the Third Circuit refused to admit expert testimony regarding the increased risk of cancer to animals after exposure to a particular chemical as evidence of an increased risk in humans. The court found that, "animal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in humans. Daubert explains that, ''[f]it' is not always

---

[5] Defendants do not take a position for purposes of this Motion regarding whether Wilk correctly performed the valuation of the Apartments in the fictional construct of his creation, where there is an absence of environmental hazards. It is clear, however, that his methodology was severely lacking to render an accurate valuation of the Apartments in their actual, contaminated condition.

obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." <u>Paoli II</u>, 35 F.3d at 743, <u>citing</u> <u>Daubert</u> 509 U.S. at 591.[6]

The Court in <u>Paoli II</u> continued, "Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. For example, in order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves." <u>Paoli II</u>, 35 F.3d at 743, <u>citing</u> <u>Daubert</u> 509 U.S. at 591.

Here, Wilk's proffered opinion simply does not "fit" the damages issues to be decided by the Court.  The correct measure of EPC's alleged damages is the difference between the fair market value of the Apartments pre-Condemnation and their value post-Condemnation, taking into account <u>all</u> relevant factors, (including the presence of environmental hazards on the property).  Thus, no matter how sound, how thorough, how comprehensive or how scientifically valid Wilk's analysis may be for other, unrelated purposes, it is irrelevant and inadmissible for purposes of this case.

---

[6] <u>Daubert</u> used the following analogy to convey the notion of 'fit' or relevance: "The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. <u>Daubert</u> 509 U.S. at 591-592.

### i. Wilk's Valuation is Irrelevant Because it Uses the Wrong Legal Standard

In order to "fit" the facts of a given case, an expert report must be predicated on the correct legal standard for the issue on which the report purports to bear. "Testimony based on the incorrect legal standard may confuse the jury, and may be proscribed by the Court pursuant to Rule 403 of the Federal Rules of Evidence…[expert] testimony should not be a source of confusion by invoking a legal standard, which entails a different set of issues than those operative in the present controversy." <u>Noskowiak v. Bobst SA</u> 2005 WL 2146073, *5 (E.D.Wis. Sept. 2, 2005)(citations omitted). In <u>Noskowiak</u>, plaintiff brought a products liability suit based upon the defective design of a printing press. Plaintiff sought to introduce the expert testimony on the subject of the risk of the design versus the utility of the design. The court granted the defendants' motion *in limine* to exclude the expert's testimony because the expert's opinion was premised on an incorrect legal standard. Defendants argued that the relevant inquiry was, in fact, not a risk/utility analysis but an examination of "consumer expectation." <u>Id.</u> at *4.

There is universal recognition that the valuation of properties encumbered with environmental hazards must take into account those hazards. <u>C.f.</u> Darlene Marsh, Byron Taylor & Andy Raines, <u>The Hazards Of Taxing Contaminated Properties: Owners Beware!</u>, 37 Tenn. B.J. 21, 22 (May, 2001) ("Property appraisers have historically utilized one of the three traditional valuation methodologies…However, none of these methods result in accurate valuations of contaminated properties since there are many factors depressing values, which none of these approaches takes into account."); Lorraine Lewandrowski, <u>Toxic Blackacre: Appraisal Techniques & Current Trends In Valuation</u>, 5 Alb. L.J. Sci. & Tech. 55 (1994) ("Considerable market data is usually necessary in order

to apply each of the three classical appraisal techniques...Therefore, these approaches may face severe limitations when applied to contaminated site evaluation."); See also Robert P. Carver & Anthony W. Crowell, Toxic Tax Assessments: The Ad Valorem Taxation of Contaminated Property, Real Estate Issues, 10-19 (Fall 1999).

Despite the lack of uniformity in determining which method best captures the many considerations associated with the valuation of contaminated properties, all court-sanctioned valuations require an accounting, in some form or other, for the presence of environmental hazards. See, e.g., Boekeloo v. Board of Review of City of Clinton, 529 N.W.2d 275, 278 (Iowa, 1995)(Holding that an "assessor must consider the contamination of...property as a factor in his valuation of the property")("Courts have only recently begun to deal with the impact of contamination on the valuation of property for tax assessment purposes. Those courts which have faced this issue have usually acknowledged that environmental contamination has an adverse effect on property values or have concluded that the assessor must at least consider the effect of contamination on the fair market value of the property...."). See also Inmar Assocs., Inc., 549 A.2d at 41 (recognizing that contamination is a factor which must be considered in performing valuation); B.P. Oil Co., Inc. v. Board of Assessment Appeals of Jefferson County, 633 A.2d 1241, 1243 (Pa. Commonw. Ct.1993) (Holding that failure to account for environmental contamination in a tax assessment was reversible error); Westling v. County of Mille Lacs, 512 N.W.2d 863, 866 (Minn.1994)(traditional appraisal methods much be modified to reflect environmental contamination on a property); Commerce Holding Corp. v. Board of Assessors of the Town of Babylon, 673 N.E.2d 127, (N.Y.

16

1996) (recognizing factors of contaminated site that must be considered in performing valuation).

In addition, Northeast Ct. Economic Alliance, Inc. v. ATC Partnership, 776 A.2d 1068, 1081 (Conn. 2001), held that evidence of environmental contamination could not, as a matter of law, be excluded from a condemnation proceeding. In ATC Partnership, a landowner challenged the amount of compensation he received in an eminent domain proceeding. The lower court excluded evidence of environmental contamination and remediation costs in reviewing the valuation of the property. The Supreme Court of Connecticut reversed and remanded that decision, finding that evidence of both contamination and remediation were relevant to the valuation of the property. The Connecticut Supreme Court held that the fact of environmental hazards on a given property must be included in assessing the fair market value of the property. ATC Partnership, 776 A.2d at 1083.[7] See also Redevelopment Agency of the City of Pomona v. Thrifty Oil Co., 4 Cal.App.4th 469, 473-474 (Cal.App. 1992)(holding that in an eminent domain proceeding, the subjects of contamination and remediation costs were

_____

[7] The Connecticut Supreme Court expressly disagreed with the holdings of Aladdin, Inc. v. Black Hawk County, 562 N.W. 2d 608, 615 (Iowa 1997), and Dept. of Transportation ex rel. People v. Parr, 633 N.E.2d 19 (Ill. App. 1994), both holding that remediation costs must be excluded in a determination of fair market value in an eminent domain proceeding. The ATC Partnership court found it inherently illogical that the costs of remediation have "no effect" on a property's fair market value, as argued by the defendants and set forth in Parr. Aladdin, Parr, and even ATC Partnership can be distinguished from the instant matter because they involved governmental takings through eminent domain. Finding "fairness" to be paramount in eminent domain cases, both cases found that the government had to give the condemnee the benefit of all reasonable doubts regarding the value of their property and value it based on its "highest and best use." See also The Housing Authority of the City of New Brunswick v. Suydam Investors, L.L.C., 177 N.J. 2, 7 (N.J. 2003), City of New York v. Mobil Oil Corporation, 783 N.Y.S.2d 75 (N.Y. A.D. 2004) (simultaneously imposing costs of remediation and reducing the amount of compensation for a condemnee was a double-taking).

properly before the triers of fact since it was a "characteristic of the property which would affect its value.").

Thus, it is apparent that Wilk's valuation of the Apartments in the absence of consideration of the presence of the environmental conditions that gave rise to the condemnation at issue was erroneous as a matter of law. Accordingly, Wilk's valuation is not relevant to the case at bar and should be excluded on the grounds that it is not helpful to the trier of fact under Federal Rule of Evidence 401 and that the risk of confusion to the trier of fact outweighs its probative value pursuant to Federal Rule of Evidence 403.

### ii.    Wilk's Valuation Is Derived From Irrelevant Methodology

Wilk's valuation is also flawed because of his reliance on irrelevant methodology in the conduct of his valuation. The court in Noskowiak observed that where a putative expert applies the wrong legal standard in endeavoring to review the relevant facts, that misapprehension undoubtedly colors his conduct in conducting his review of the pertinent facts. Noskowiak, 2005 WL 2146073 at *7. That is plainly the case here.

Because Wilk was charged by Plaintiff with performing an irrelevant analysis based upon an incorrect legal standard, he applied incorrect and irrelevant methods to his valuation.[8]  It has been widely held that the traditional methods of valuation—those

---

[8] This criticism of Wilk's methodology bears equally on the Daubert factors of both relevance and reliability. The Third Circuit has set forth several factors that a district court should consider when determining whether proposed expert testimony is reliable: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses. Daubert, supra, and Downing, supra. See also Paoli II. Elsmere contends that Wilk's methodology was not merely unreliable, however; it was patently incorrect. Wilk may have reached the correct answer through his

identified by Wilk in his report—are inadequate when determining the value of a
contaminated property, at least without some modification to account for the unique
considerations inherent to such a property. There are a number of different methods Wilk
may have appropriately relied upon to render his valuation of the Apartments during the
relevant period in light of the presence of environmental hazards.  Wilk utilized none of
them. Instead, Wilk employed only the three traditional valuation approaches—the Cost
Approach, the Sales Comparison Approach, and the Income Capitalization Approach,
with emphasis on the latter two.

The Sales Comparison approach in a building that is encumbered with
environmental toxins, including mold, is widely disfavored because it is difficult, if not
impossible, to find comparably affected properties in most instances and because
adjustments for differences in physical condition between "healthy" and "sick" buildings
are extremely difficult to quantify. Walter G. Wright, Jr., & Stephanie M. Irby, The
Transactional Challenges Posed By Mold: Risk Management and Allocation Issues, 56
Ark. L. Rev. 295, 347 (2003).  If this method is used, however, the person performing the
valuation should include in their calculation factors which Wilk ignored: namely,
contamination factors (nature of the contamination, extent of the contamination, impact
of contamination on the use or utility of the property and on- or off-site sources of
contamination), remediation factors (cost and timing of remediation and effect of
remediation techniques on business operations), regulatory factors (regulatory
jurisdiction, predictability of regulatory framework and post-closure land use

---

methods, but he was answering an irrelevant question. Regardless, the discussion of
whether Wilk's methods were irrelevant or unreliable is academic as Wilk's opinion must
meet both prerequisites, or it is inadmissible. See Fed. R. Evid. 702.  Through either
mode of analysis, Wilk's opinion is inadmissible.

restrictions), and liability factors (responsibility for costs associated with remediation, third-party liability, indemnification, representations, warranties and insurance products). Sue Ann Adams & Trevor E. Phillips, How To Use Comparable Sales To Value Contaminated Property, 13 No. 4 Envtl. Compliance & Litig. Strategy 1 (September 1997). In the absence of those considerations, the method is unreliable and produces an irrelevant result.

Furthermore, the Income Capitalization approach is also disfavored because the presence of those hazards affects the operating costs of the structure, thus altering the net operating income. Wright, supra., The Transactional Challenges Posed By Mold: Risk Management and Allocation Issues, 56 Ark. L. Rev. at 347. In order for this method to produce a relevant result, the valuation must account for the attendant costs associated with a contaminated property such as the costs of remediation, penalties, litigation, increased insurance costs, etc. In re Custom Distribution Services, Inc., 216 B.R. 136 (Bkrtcy.D.N.J.,1997), affirmed in part, reversed on other grounds at In re Custom Distribution Services Inc., 224 F.3d 235 (3d Cir. 2000). Wilk's report accounts for none of these factors.

Peter J. Patchin, a leading authority on valuation of contaminated properties developed the seminal approach to the valuation of contaminated properties. See Peter J. Patchin, Valuation of Contaminated Properties, 56 Appraisal J. 1 at 7-16 (Jan. 1988) ("Patchin I"); Peter J. Patchin, Contaminated Properties—Stigma Revisited, 59 Appraisal J. 2 at 167-172 (April 1991)("Patchin II"); Peter J. Patchin, Contaminated Properties and the Sales Comparison Approach, 62 Appraisal J. 3 at 402-409 (July 1994) ("Patchin III"). Patchin observed that every valuation method, regardless of the overarching "approach"

pursuant to which that method is applied, must account for the following factors: clean-up costs, the availability of indemnities, equity yield rates and risk premiums, and the costs of financing. Patchin I at 10-15. Patchin also noted the affect of "stigma" as it applies to the valuation of contaminated property and observed that property value can be reduced by the perception that a contamination hazard exists "whether the market perception is rational or not." Patchin II, at 168. According to Patchin, the factors that contribute to "stigma" include the fear of hidden clean-up costs prior to remediation, "market resistance" in fearing the remediation was incomplete or inadequate which would lower a property's value, and the so-called "trouble factor" for a potential buyer who would not otherwise be encumbered with the chore of remediation. Patchin II at 168-169. Other concerns identified by Patchin include the fear of public liability (the perceived threat of third-party litigation against a future owner) and the lack of mortgageability (the perceived threat of the inability to obtain financing, either for the sale of a property or its future financing). Patchin II at 169-170. Again, because of the failure to account for the environmental hazards at the Apartments, Wilk has not evaluated the stigma attached to the Apartments, or any related consideration.

In Patchin's most recent publication on the subject of valuation of contaminated properties, he observed an overall reduction of value in the range of 20.9% to 93.7% owing to environmental contamination in commercial and industrial properties, with wide variations depending upon other enumerated factors. Patchin III at 408. Because Wilk has completely disregarded the presence of environmental hazards on the premises, he has also failed to quantify the appropriate reduction in the value of the Apartments stemming from the conditions thereof. Thus, his valuation is artificially inflated.

Based upon the foregoing, Wilk's failure to consider the condition of the Apartments, including the presence of environmental hazards, is a fatal defect which renders his valuation both unreliable and irrelevant. Accordingly, it should be excluded from evidence.

## CONCLUSION

As the foregoing demonstrates, Wilk's methodology is irrelevant, premised upon the incorrect legal standard, ignores the leading methodology regarding valuation of properties bearing environmental hazards, and does not "fit" with the facts of this case. Defendants therefore respectfully request that the Court grant its Motion and exclude Wilk's expert report and testimony at trial.


MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
 (302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*

Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist, Eugene Boneker and John Giles


Dated:  September 22, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of September, 2005, I electronically filed the foregoing document, **DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DAVID J. WILK,** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

      David S. Eagle, Esquire
      Patrick A. Costello, Esquire
      Klehr, Harrison, Harvey, Branzburg & Ellers LLP
      919 Market Street, Suite 100
      Wilmington, DE 19801-3062

                MORRIS, JAMES, HITCHENS & WILLIAMS LLP

                Edward M. McNally (#614)
                Liza H. Sherman (#4124)
                222 Delaware Avenue, 10th Floor
                Wilmington, Delaware 19801
                (302) 888-6800
                Attorneys for Defendants