[FN270]. See Wright & Morrissey, supra note 182, at 785.

[FN271]. See Benik v. Hatcher, 750 A.2d 10, 11 (Md. 2000) (referencing an alleged breach of warranty due to violation of local housing codes addressing lead-based paint).

[FN272]. Wright & Morrissey, supra note 184, at 785.

[FN273]. See id.

[FN274]. See id.

[FN275]. See id.

[FN276]. H.R. 5040, 107th Cong. (2002) (unenacted).  The Toxic Mold and Safety Protection Act is also known as the Melina Bill.

[FN277]. H.R. 5040, 107th Cong. § 102 (2002) (unenacted).  The study was to have included information about harmful and/or toxic strains of mold; methods of detecting harmful and/or toxic mold; potential dangers of exposure to mold; information on when mold becomes harmful to human health; and the hazards involved in mold remediation.

[FN278]. H.R. 5040, 107th Cong. § 103 (2002) (unenacted).

[FN279]. Id.

[FN280]. Id.

[FN281]. H.R. 5040, 107th Cong. § 201 (2002) (unenacted).  The EPA, CDC, NIH, and HUD would be required to sponsor public education programs that increase awareness of the dangers of indoor mold growth and toxic mold.

[FN282]. H.R. 5040, 107th Cong. § 202 (2002) (unenacted).

[FN283]. Id.

[FN284]. H.R. 5040, 107th Cong. § 203 (2002) (unenacted).

[FN285]. Id.  These procedures include giving mold information pamphlets to tenants, mold inspections, and abatement of identified indoor mold hazards.

[FN286]. H.R. 5040, 107th Cong. § 204 (2002) (unenacted).

[FN287]. H.R. 5040, 107th Cong. § 206 (2002) (unenacted).

[FN288]. H.R. 5040, 107th Cong. § 301 (2002) (unenacted).

[FN289]. Id.

[FN290]. H.R. 5040, 107th Cong. § 401 (2002) (unenacted).

[FN291]. H.R. 5040, 107th Cong. § 601 (2002) (unenacted).

[FN292]. H.R. 5040, 107th Cong. § 602 (2002) (unenacted).

[FN293]. H.R. 5040, 107th Cong. § 606 (2002) (unenacted).  An amendment would have been added to the Internal Revenue Code of 1986.  The amendment would have allowed for a tax credit of 60% of non-reimbursed mold inspection and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remediation expenses paid or incurred by the taxpayer. H.R. 5040, 107th Cong. § 501 (2002) (unenacted). The tax credit would have been limited to $50,000 annually.

[FN294]. See Environmental Policy Alert, supra note 38, at 26.

[FN295]. Id. ("One EPA source says issuing a specific threshold for harmful mold exposure would place a blanket over individual differences in exposure and also pull the agency into unwanted legal disputes.").

[FN296]. Harkins, supra note 20, at 1132.

[FN297]. Peña-Alfaro, supra note 4, at 576.

[FN298]. This provision includes, but is not limited to, schools and multifamily dwellings. Id.

[FN299]. Harkins, supra note 20, at 1132.

[FN300]. Peña-Alfaro, supra note 4, at 576.

[FN301]. Harkins, supra note 20, at 1133.

[FN302]. Id.

[FN303]. Id.

[FN304]. Task Force on Indoor Air Quality, 2001 Md. Laws ch. 591. The Maryland legislation required that a task force be formed to study and report on indoor air quality. See Final Report, supra note 46. The task force issued the report on July 1, 2002, which includes a discussion of mold. Id.

[FN305]. Id.; A. 3933, 209th Leg. (N.J. 2001) (unenacted).

[FN306]. H.R. 1253, 112th Gen. Assem., 2d Reg. Sess. (Ind. 2002) (unenacted).

[FN307]. Id.

[FN308]. Id.

[FN309]. Id. A similar bill was proposed in New York. S. 896, 2003-2004 Reg. Sess. (N.Y. 2003) (unenacted). The New York proposal focuses on exposure limits and standards for assessment of molds.

[FN310]. See Dick v. Pac. Heights Townhouses, No. SCV-7526, 2002 WL 31117253 (Cal. Ct. App. Sept. 25, 2002) (concerning a plaintiff lessee who sued the lessor alleging that mold in the leased apartment caused certain illnesses).

[FN311]. Blum v. Council Rock Sch. Dist., No. 02-CV-769, 2003 U.S. Dist. LEXIS 3022 (E.D. Pa. Feb. 14, 2003) (referencing an Equal Employment Opportunity Commission determination that school district violated the Americans with Disabilities Act ("ADA") by failing to provide a teacher reasonable accommodations for her disability by forcing her to work in an environment exposed to mold which aggravated her respiratory condition); Terry v. Ottawa County Bd., 783 N.E.2d 959 (Ohio Ct. App. 2002) (concerning employees of a state agency who alleged their office environment was adversely affected by mold).

[FN312]. Martin, 754 N.Y.S.2d 676 (concerning a teacher who alleged that indoor air quality caused her health problems).

[FN313]. Dilello v. Katnik Corp., Nos. B146979, B153414, 2002 WL 31839383 (Cal. App. Dep't Super. Ct. Dec. 19, 2002) (concerning the imposition of liability on a contractor and an architect for mold growth in structure).

[FN314]. See Nakano, supra note 6, at 12.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                          Page 52
56 Ark. L. Rev. 295
(Cite as: 56 Ark. L. Rev. 295)

[FN315]. See Thomas Jackson, Ph.D., MAI & Randall Bell, MAI, The Analysis of Environmental Case Studies, 70 The Appraisal Journal 86 (2002).

[FN316]. See Schukoske, supra note 23, at 538 ("As the market becomes more sensitive to environmental risks, the presence of lead-based paint hazards will negatively affect the appraisal value of property.").

[FN317]. See Sweeney & Taddeo, supra note 3, at 74 (stating that mold may have a chilling effect on real estate transactions similar to that associated with the presence of asbestos).

[FN318]. One commentator notes:
  Concerns about potential adverse health effects from exposure to toxic mold and the effect of those concerns on property and rental values have been growing almost as fast as the menacing fungus has begun eating its way through the walls of thousands of residences, office buildings, hotels and other properties in the United States.
Moerdler, Insider's Outlook, supra note 9, at 30.

[FN319]. See Jeffrey D. Fisher et al., Effects of Asbestos on Commercial Real Estate: A Survey of MAI Appraisers, 61 The Appraisal Journal 587 (1993) (discussing the lack of consensus as to how asbestos affects the market value of commercial property).

[FN320]. These costs would include the actions necessary to prevent its occurrence. They could range from plugging a hole to stopping a drip to major structural modifications to prevent water intrusion. Of course, the material diminishment of value will depend upon the extent of the affected area and projected costs to prevent a reoccurrence of the conditions that facilitated such growth. The quantification of certain potential assessment/remediation costs is presumably a somewhat straightforward calculation.

[FN321]. The potential impact would presumably include difficulty in leasing the structure or tenant demand for rent reduction. See Gary S. Smolker, The Right to Know, Heating, Piping, Air Conditioning 94, 94 (Mar. 1, 2000) (asking whether a commercial building will be more difficult to lease after an indoor air pollution problem occurs). A potential tenant may require concessions prior to agreeing to move into a structure. See Guidry, supra note 80, at 30.

[FN322]. See generally Brennan & Turner, supra note 74 (noting that in elastic rental markets, tenants unhappy with air quality in their leasehold may not renew their lease). The perceived presence of indoor air problems can generate significant concern among structure occupants and/or lessees. See J. David Odom, III & Christine R. Barr, Emotions In The Air: When Building Syndrome Strikes, Risk Mgmt., Nov. 1996, at 37.

[FN323]. A lessee/employer will be concerned about employee absenteeism and/or productivity in the event there is a significant indoor air pollution problem. See Guidry, supra note 80, at 30 ("Employees in sick buildings suffer from low productivity, increased absenteeism, poor morale, and high turnover. Employers are then faced with increased operation costs in the form of sick leave pay and worker compensation costs."). The alleged exposure to mold has triggered an ADA claim by an employee arguing that a reasonable accommodation should have been provided by moving her away from a workplace allegedly harboring mold and triggering respiratory problems. Blum, 2003 U.S. Dist. LEXIS 3022, at *7.

[FN324]. Jackson, supra note 315, at 94 (stating that third-party common-law claims for personal injuries must be considered in a case study valuation analysis).

[FN325]. The appraiser may recognize the need to ensure that the scope of his or her services is clearly understood. Otherwise, a party relying on the appraisal may argue that it should have identified and/or quantified the indoor air pollutants or other environmental issues. See Guidry, supra note 80, at 30 ("If the building is judged to have SBS, plaintiff may claim that the appraiser was negligent and should have discovered the problem during the valuation process.").

[FN326]. A discussion of the factors and elements considered in determining the impacts of environmental contamination on property value is found in Jackson, supra note 315, at 86.

[FN327]. This is a reference to "sick building syndrome." See Reitze & Carof, supra note 10, at 339-41.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN328]. Guidry, supra note 80, at 31-32.

[FN329]. Id. at 30 ("There are many different costs associated with sick buildings. The most obvious is the cost associated with curing an indoor air quality problem.").

[FN330]. Id. (referencing cost associated with curing a sick building).

[FN331]. A discussion of a large commercial property transaction that was delayed because of mold issues is found in Sweeney & Taddeo, supra note 3, at 74.

[FN332]. See, e.g., Levy v. M. Ali Tirgan, No. 76378, 1999 WL 980401, at *1-*2 (Ohio Ct. App. Oct. 28, 1999) (referencing a contract for sale of commercial real estate that contained an environmental contingency clause); U.S. Steel Supply, Inc. v. ALCO Standard Corp., No. 89-C-20241, 1992 WL 229252, at *5-*6 (N.D. Ill. Sept. 9, 1992) (referencing an environmental due diligence period included in asset purchase agreement).

[FN333]. Similar conditional provisions will be found in leasing and lending documents.

[FN334]. The purchaser's failure to definitively include mold as part of the contingency can result in a dispute over whether it is incorporated by the due diligence provisions of the agreement. See Sweeney & Taddeo, supra note 3, at 74 (concerning a buyer who argued that the mold issue was encompassed by due diligence provisions in the purchase agreement).

[FN335]. Id. at 75 (noting the need to ensure that access to the desired portion of the structure is obtained).

[FN336]. Reaching an agreement on the line of demarcation between acceptable and unacceptable conditions may be difficult.

[FN337]. The doctrine of caveat emptor may be an issue when mold is discovered in structures that have been acquired. This is particularly likely when the structure involved is residential in character. In Bryant v. Bulach, the plaintiff acquired a residential structure. Nos. CA2002-01-023, CA2002-06-137, 2003 WL 1689613, at *1 (Ohio Ct. App. Mar. 31, 2003). She subsequently discovered water leaks and mold growth in the basement. Id. Her complaint alleged the seller had an obligation to disclose these problems. Id. The court held that the doctrine of caveat emptor precluded recovery by the purchaser for structural defects in real estate. Id. at * 2. The basis for this conclusion was that reasonable inspection would have discovered the problem, the opportunity to inspect was available and there was no evidence of fraud. Id.; see also Riley v. Hoisington, 80 Ark. App. 346, 96 S.W.3d 743 (2003) (concerning a purchaser of a residential structure who established fraudulent misrepresentation on the part of the purchaser because of false statements in disclosure statement regarding prior flooding). This association of mold with structural flooding and related defects will presumably heighten the interest in identification and disclosure of such issues.

[FN338]. See Weinreb v. Hunter, Inc., No. 96-3242, 1997 Mass. Super. LEXIS 429, at *7-*9 (Mass. Super. Apr. 16, 1997) (holding that the statute begins to run when the person in possession knew or should have known of the presence of indoor contaminants, in this case, asbestos); contra State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co., 834 F. Supp. 1046, 1050-51 (C.D. Ill. 1992) (holding that the statute of limitations begins to run at the time of possession, regardless of knowledge, even though faulty construction created latent leakage, mold, and mildew on the home's floors).

[FN339]. Aas v. Super. Court, 12 P.3d 1125, 1130 (Cal. 2000).

[FN340]. Wash. Courte Condo. Assoc.-Four v. Wash. Golf Corp., 501 N.E.2d 1290, 1292-94 (Ill. App. Ct. 1986).

[FN341]. Wawak v. Stewart, 247 Ark. 1093, 1106, 449 S.W.2d 922, 929 (1970).

[FN342]. Dick, 2002 WL 31117253, at *8-*9. The court found that the mere presence of mold, without evidence of toxicity, was insufficient to establish inhabitability.

[FN343]. See Bullington v. Palangio, 345 Ark. 320, 327, 45 S.W.3d 834, 838 (2001).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                                    Page 54
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN344]. Id. at 328, 45 S.W.3d at 839.

[FN345]. Id. at 329, 45 S.W.3d at 840.

[FN346]. Morris v. Ruse, 77 Ark. App. 11, 13, 69 S.W.3d 876, 881 (2002); see also O'Mara v. Dykema, 328 Ark. 310, 319, 942 S.W.2d 854, 859 (1997) (holding that buyers' drafting of the contract provided them notice they were buying "as is," and they were therefore not entitled to any implied warranties).

[FN347]. Carter v. Quick, 263 Ark. 202, 209, 563 S.W.2d 461, 465 (1978).

[FN348]. This section does not address in any detail the role of the building or property manager in operating the commercial leasehold. Building owners often use managers to operate and/or lease their structures. See Final Report, supra note 46, at 14. Their responsibility for addressing indoor air quality issues will vary depending on the extent and nature of their responsibilities. Id.

[FN349]. See U.S. Steel Supply, Inc., 1992 WL 229252, at *8 (referencing the need for a purchaser of a facility to undertake additional sampling activities to define baseline environmental conditions).

[FN350]. A similar determination might also be undertaken at the conclusion of the lease term.

[FN351]. See Brennan & Turner, supra note 74. The ability to obtain the necessary provisions in the lease is, of course, dependent upon the lessee having sufficient leverage.

[FN352]. See Henning & Berman, supra note 7, at 77 (noting damages in commercial building case involving mold can include a business interruption component).

[FN353]. See Reitze & Carof, supra note 10, at 253-54 (noting costs associated with lost productivity due to indoor air pollutants).

[FN354]. See Henning & Berman, supra note 7, at 75-76.

[FN355]. Id. The implied warranty of habitability has been an issue in actions involving other indoor pollutants. Plaintiffs have successfully argued that such indoor contaminants have been deemed a potential threat to the health of the structure's occupants. A number of actions have involved the presence of lead-based paint in a structure. Schukoske, supra note 23, at 530-34; see also Chase v. Pistolese, 739 N.Y.S.2d 250, 253 (N.Y. City Ct. 2002) (holding that the lessor's knowledge that lead-based paint in the apartment would be discovered when the space was repainted breached the implied warranty of habitability).

[FN356]. Lazell v. Stone, No. 01-02-00029-CV, 2003 WL 1090579, at *4-*5 (Tex. App. Mar. 13, 2003) (holding that the presence of asbestos amounted to constructive eviction and entitled the tenant to withhold rent). The doctrine of constructive eviction is addressed in the radon context in Prussman, supra note 170.

[FN357]. Ogust v. 451 Broome St. Corp., 727 N.Y.S.2d 877, 877-78 (N.Y. App. Div. 2001) (holding a landlord was enjoined from collecting rent until water conditions which led to mold were corrected).

[FN358]. The absence of governmental standards could make the determination of whether mold growth constitutes a breach of the lease a subjective determination.

[FN359]. Whether the lessor or lessee is responsible for addressing an indoor contaminant and/or the adequacy of such efforts has been a source of litigation. A common example has been asbestos. See Am. Multi-Cinema, Inc. v. Posel Enters., No. 91-3783, 1992 WL 328891 (E.D. Pa. Oct. 27, 1992) (concerning the adequacy of a lessor's efforts to address asbestos in the leasehold).

[FN360]. These will include HVAC and related equipment. The associated service contracts may be especially important.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN361]. See Ganheart v. Executive House Apartments, 671 So. 2d 525 (La. Ct. App. 1996). The lessee may be entitled to non-pecuniary damages for the failure to repair, including mental anguish, anxiety, and worry. Id. at 529. The Ganheart court noted that a residential lease includes, in addition to the enjoyment of habitable living quarters, the enjoyment of entertaining guests--also a non-pecuniary interest. Id. at 530.

[FN362]. Stroot, 772 A.2d at 797. The failure must be a proximate cause of the unsanitary or unhealthy conditions of the leased premises, resulting in personal injury to the tenant. Id. at 798.

[FN363]. The list of reportable events could presumably include such mundane events as broken windows or abnormal moisture accumulation.

[FN364]. A detailed discussion of both the history and current issues associated with the practice of lenders taking land as collateral is found in Burkhart, supra note 165.

[FN365]. See id. at 297-301.

[FN366]. See Wright & Morrissey, supra note 182, at 772. Prior to making the requested loan, the financing of the acquisition of most commercial and industrial properties is still generally contingent upon a satisfactory environmental audit or assessment. For example, see Levy, 1999 WL 980401, at *1 (discussing the decision of a bank to decline to finance the acquisition of a property because it was not satisfied with the results of the environmental audit). Even if an initial assessment of the proposed collateral is unsatisfactory, further efforts to delineate the conditions at the site (often known as a "Phase 2") may address the lender's concerns. See Brewer v. Better Bus. Brokers & Consultants, Inc., 727 So. 2d 1081 (Fla. Dist. Ct. App. 1999). However, over the past few years, some lenders have increasingly used certain insurance policies in lieu of or as a supplement to the initial assessment. Michael Brick, Commercial Real Estate; No Environmental Study, But the Loan Still Clears, N.Y. Times, Nov. 13, 2002, at 10C. Some policies will reimburse the lender for the balance of the loan if the borrower is in default and contamination is found that is non-compliant with governmental standards. Many policies exclude coverage for indoor contaminants such as asbestos, lead-based paint, and mold. Id.

[FN367]. Jackson, supra note 315, at 93.

[FN368]. Logsdon, supra note 206, at S8 (asking whether a mortgage holder should routinely include indoor air quality in the assessment of the mortgaged property).

[FN369]. See Schukoske, supra note 23, at 538.

[FN370]. See Sweeney & Taddeo, supra note 3, at 75 (noting potential impact of mold on lender's overall portfolio value).

[FN371]. Logsdon, supra note 206, at S8-S9.

[FN372]. Sweeney & Taddeo, supra note 3, at 76 (noting possible concerns among lenders about imposing an additional due diligence cost on borrowers). The question in some instances will be whether indoor air quality issues need to be addressed to satisfy a rating agency evaluating a pool of mortgages that are part of a securitization. Logsdon, supra note 206, at S9; see also Riskier Mortgages are Being Pooled for Securitization, 46 Real Est. Wkly., Feb. 16, 2002, at 25 (noting lenders are eager to find any solution to environmental issues that is acceptable to rating agencies).

[FN373]. In other words, is the real property collateral a commercial facility, residence (multi-family or single family), industrial operation, etc.?

[FN374]. If standards or exposure limits are eventually issued, they might be referenced.

[FN375]. Heady, supra note 72, at 1047-48 (referencing civil actions against architects and builders related to a courthouse's indoor air problems); see also Dillelo, 2002 WL 31839383, at *2 (apportioning 10% of fault to the architect for damages associated with presence of mold in recently constructed house).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                                    Page 56
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN376]. See Payne, supra note 151, at 135 (stating that in older buildings--which are defined as those built more than ten years ago--the building owner is usually the entity to which blame is assigned unless there have been recent renovations or other work).

[FN377]. The term "contractor" is intended to include subcontractors and homebuilders for purposes of this discussion. See, e.g., Tunica-Biloxi Indians, et al. v. Pecot, No. CIV-A-02-1512, 2003 WL 942679, at *1 (W.D. La. Jan. 30, 2003) (concerning subcontractors who sued for mold contamination in newly constructed hotel); Booker v. Real Homes, Inc., No. 04-02-00122-CV, 2003 WL 117987, at *1-*2 (Tex. App. Jan. 15, 2003) (discussing a homebuilder's suit for alleged construction defects in new home causing mold growth). However, the work and/or services provided by some building materials suppliers may also be scrutinized at a particular construction project. Other relevant project parties might include engineers, construction managers, and trades persons such as carpenters, drywallers, and plumbers. See New Orleans Assets, L.L.C. v. Woodward, No. 01-2171, 2003 U.S. Dist LEXIS 3378, at *3 (E.D. La. Feb. 5, 2003) (discussing the suit against a manufacturer of vinyl wall coverings installed in a new building for alleged mildew and leaks); Latest Developments in Mold Exposure Litigation, 17 Nat. Resources & Env't 132, 133 (2002). An HVAC contractor's perspective on mold issues is found in Joint Hearing, supra note 2, at 116-19 (prepared statement of Jim Hussey, Chairman, The Air Conditioning Contractors of America).

[FN378]. Of course, the general contractor is likely to, in turn, allocate such liabilities to the appropriate subcontractors.

[FN379]. The project owner or developer will often be the other relevant party.

[FN380]. A recent article notes: "Whether owners will accept specific riders that allocate the risk of mold conditions remains to be seen, but such riders could be included in contract negotiation discussions with the owner." Dreste et al., supra note 48, at 18. The architect may prefer to use standard form contracts issued by the American Institute of Architects. See Anthony Granato, Architect Liability for Injury to Workers: Is There A Duty to Design A Building That is Safe to Construct?, 21 Ohio N.U. L. Rev. 403 (1994). The architect may have contracts with both the project owner and contractors. Id. at 406-07. Likewise, the general contractor would probably prefer to use standard form construction agreements prepared by the Associated General Contractors ("AGC") of America. See Dreste et al., supra note 48, at 14-15 (discussing the provisions in AGC agreements that may address mold issues).

[FN381]. The key provisions would include indemnities and releases warranties.

[FN382]. This absence of coverage might pose an additional problem. The contractor may be required to carry coverage for such risks as a prerequisite to compete for certain projects.

[FN383]. The architect may actually perform a number of project tasks. An example of the services an architect agreed to provide in regards to the construction of a condominium complex is found in Aldrich v. ADD, Inc., 770 N.E.2d 447 (Mass. 2002). The agreed services were to include:
 (1) review and evaluation of the project, including the preparation of schematic design documents illustrating the scale and relationship of project components; (2) refinement of the building and site design generated in the schematic design phase; (3) preparation of drawings and specifications for construction that fully complied with all applicable federal, state and local laws, ordinances and codes; and (4) administration of the construction contract between Dolphin and the contractor, including site inspection visits.
Id. at 449-50; see also Granato, supra note 380, at 405 (stating that even on projects where architects do not agree to supervise the construction, they agree to produce construction drawings and written specifications for the project). A description of the architect's role in the construction process is found in Kustin, supra note 78, at 121-22.

[FN384]. A discussion of various structural material/design issues relevant to the minimization of indoor air pollution is found in Levin & Teichman, supra note 70, at 52.

[FN385]. See Heady, supra note 72, at 1058 (stating that contractors and designers must maintain a current understanding of available state of the art technology). One author notes that the architects' clients will demand "healthier" buildings. Kustin, supra note 78, at 144-45.

[FN386]. These parties might be the architect, engineer, contractor/subcontractor, trades, etc. One author provides an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                          Page 57
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

example:
  While architects are usually responsible for the coordination of work completed by HVAC system designers and may supervise the installation of such systems, liability for SBS resulting from an HVAC system design should be assigned to the consultant who designed the system, the technical functioning of HVAC systems is beyond the scope of control by architects. Kustin, supra note 78, at 146-47.

[FN387]. Id. at 145 (arguing that architects should not be held accountable for the failure to maintain building HVAC systems).

[FN388]. Architect liability issues are addressed in Constance Frisby Fair, Architect and Engineer Liability, 35 Washburn L.J. 32 (1995). See generally Granato, supra note 380, at 403 (addressing architect liability for workers' injuries); Kustin, supra note 78 (addressing architect liability for indoor air pollution and sick building syndrome).

[FN389]. Cutlip v. Lucky Stores, Inc., 325 A.2d 432, 443 (Md. 1974).

[FN390]. Id.; see also Kustin, supra note 78, at 131 (referencing parties' use of theories such as negligence, breach of contract, implied warranty, and strict liability to hold architects and other building professionals liable for sick building syndrome).

[FN391]. This discussion does not address the ability of an unrelated party (from a contractual standpoint) to maintain a damage action against an architect. Liability has been imposed on architects in certain scenarios despite the absence of privity. Ales-Peratis Foods Int'l, Inc. v. Am. Can Co., 209 Cal. Rptr. 917, 922 (Cal. Ct. App. 1985); A.E. Inv. Corp. v. Link Builders, Inc., 214 N.W.2d 764, 768 (Wis. 1974). The third party's ability to seek damages will usually be dependent on a finding that it was foreseeable they would be injured by the structure design problem. Link Builders, 214 N.W.2d at 768. Privity issues are also addressed in Fair, supra note 388.

[FN392]. See L.L. Bean, Inc. v. United States Mineral Prods. Co., No. CV-98-632, 1999 Me. Super. LEXIS 323, at *2 (Dec. 3, 1999) (discussing suit against an architectural firm for negligence and breach of contract when mold was found in the building's fireproofing material).

[FN393]. Travelers Indem. Co. v. Ewing, 711 F.2d 14, 17 (3d Cir. 1983); Mounds View v. Walijarvi, 263 N.W.2d 420, 424 (Minn. 1978) (stating that an architect has the duty to "exercise such care, skill and diligence as men in that profession ordinarily exercise under like circumstances."); see also Fair, supra note 388, at 35; Granato, supra note 380, at 405.

[FN394]. Paxton v. County of Alameda, 259 P.2d 934, 939 (Cal. Ct. App. 1953).

[FN395]. Cooper v. Jevne, 128 Cal. Rptr. 724, 729 (Cal. Ct. App. 1976).

[FN396]. 706 So. 2d 20, 23 (Fla. Dist. Ct. App. 1997).

[FN397]. Id.

[FN398]. Id. When the courthouse was demolished, two "highly unusual toxic molds" were found. Id. at 25. Over 60% of the exterior walls had mold on them. Id. at 24.

[FN399]. Centex-Rooney, 706 So. 2d at 24.

[FN400]. Id. The county alleged that the building windows were installed improperly, which resulted in much of the mold growth. Id. at 25.

[FN401]. Id. at 24.

[FN402]. Id. at 28.

[FN403]. Bloomburg Mills, Inc. v. Sordoni Constr. Co., Inc., 164 A.2d 201 (Pa. 1960).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN404]. 164 A.2d 201.

[FN405]. Id. at 202.

[FN406]. Id. The plaintiff operated a rayon and nylon weaving mill and the moisture aggravated the weaving process.

[FN407]. Id. at 202-03.

[FN408]. Id. at 203.

[FN409]. Bloomberg Mills, 164 A.2d at 203.

[FN410]. Mounds View, 263 N.W.2d at 423; State v. Gathman-Matotan Architects & Planners, Inc., 653 P.2d 166, 169 (N.M. Ct. App. 1982).

[FN411]. 263 N.W.2d 420.

[FN412]. Mounds View, 263 N.W.2d at 423 (quoting Coombs v. Beede, 36 A. 104 (Me. 1896)).

[FN413]. Id. at 424; Gathman-Matotan, 653 P.2d at 169. The courts compare architects to other professionals, such as doctors and lawyers.

[FN414]. Mounds View, 263 N.W.2d at 424.

[FN415]. Id. at 423 (citing Coombs, 36 A. at 104); Gathman-Matotan, 653 P.2d at 169 (stating that the concept of implied warranty only applies to goods and never to services).

[FN416]. See Fair, supra note 388, at 35-36.

[FN417]. Bednarski v. Cutler Hammer Corp., 711 F. Supp. 823, 826 (M.D. Pa. 1989); Papp v. Rocky Mountain Oil & Minerals, Inc., 769 P.2d 1249, 1255 (Mont. 1989). One court found that it was fair to impose strict liability on manufacturers who have plenty of time to find defects in their products before they are sold, but it is not fair to impose strict liability on an architect who has only one chance to design a defect-free structure. Mounds View, 263 N.W.2d at 425.

[FN418]. Papp, 769 P.2d at 1256.

[FN419]. See Heller v. Cadral Corp., 406 N.E.2d 88, 89 (Ill. App. Ct. 1980).

[FN420]. Bednarski, 711 F. Supp. at 826; Blagg v. Fred Hunt Co., 272 Ark. 185, 190, 612 S.W.2d 321, 324 (1981).

[FN421]. Blagg, 272 Ark. at 190, 612 S.W.2d at 324.

[FN422]. Sime v. Tvenge Assoc. Architects & Planners, 488 N.W.2d 606, 611 (N.D. 1992).

[FN423]. Gathman-Matotan, 653 P.2d at 170.

[FN424]. See Sime, 488 N.W.2d at 611.

[FN425]. See New Orleans Assets, L.L.C., 2003 U.S. Dist. LEXIS 3378 (concerning parties, that included contractors, who were sued by building owners for mildew and leaks in new structure).

[FN426]. See generally Bischoff, supra note 21 (discussing homebuilder involvement in mold litigation).

[FN427]. See Heady, supra note 72, at 1056-57 (stating that an improperly designed or fitted HVAC system can contribute to

56 ARLR 295                                                                                     Page 59
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

poor indoor air quality).

[FN428]. Dolnick, supra note 107, at 16 (discussing how prevention of mold growth requires a strong commitment to building in accordance with plans and specifications).

[FN429]. See Ruquet, supra note 39, at 25 (noting that some contractor insurance policies contain mold-related exclusions for structures constructed with stucco-type finishes because of moisture retention issues).

[FN430]. Alternatively, one author asks whether the contractor could take a proactive role and seek the modifications to the project necessary to remedy such problems. Heady, supra note 72, at 1058. Both the other project professionals and the owner would have to be convinced of the need for such changes. The President of the Associated General Contractors of America noted the necessity of securing concurrence by the design professionals: "Will architects and engineers be amenable to changes in design and building materials to lessen the chances of mold?" Larry C. Gaskins, Don't Let Mold Make You Fold, Constructor, Feb. 2003, at 3.

[FN431]. The contractors would need to ensure that the party had the means to cover this potential liability. For example, it would presumably be important to verify that a subcontractor assuming certain responsibilities has adequate insurance coverage. See Ruquet, supra note 39, at 25.

[FN432]. A possible source of such information may be environmental assessments or audits of the structure that have already been generated by the project lender, purchaser, or other parties.

[FN433]. A prudent contractor may therefore seek the disclosure of such information prior to the initiation of the project. The contractor might also, in lieu of such disclosures, require that the owner or other relevant party provide warranties regarding such matters. The parties might also ensure that these potential issues are addressed through the change in condition provisions of the construction contract.

[FN434]. See Heady, supra note 72, at 1056 (noting excessive moisture and associated microbial contamination can be the result of improper drying during the construction process).

[FN435]. A risk manager for a subcontractor notes: "I personally recall one project manager in Northern California who despite the fact the roof had been left off the building through two very wet winters, was surprised that the installed sheet rock began turning green and black." Dolnick, supra note 107, at 14.

[FN436]. Tulacz, supra note 12, at 60 ("You can't begin installing interior finishing systems without enclosing the building, but sometimes you have to work carefully with the general contractor on scheduling to make this happen . . . .").

[FN437]. See Post, supra note 112, at 32.
 Construction mistakes can be easily covered up only to rear their heads later in the form of mold growth. Consider this common scenario: The contractor, in a rush to avoid late penalties, installs mold friendly gypsum board before the building is enclosed. It rains, the board gets wet and doesn't dry before it is painted. Down the line there is a mold problem.
 Id.
 A related problem is the need to ensure that building materials stored on-site prior to use in construction are protected from rainfall. An author notes: "Another scenario: A board, fiberglass insulation or any porous material on site. It gets rained on and is installed that way and covered up. Down the line there is a mold problem." Id.; see also Andrew J. Streifel, A Holistic Approach to Indoor Air Quality in Health Care, Heating, Piping, Air Conditioning, Oct. 1998, at 69 (noting that a contractor's failure to protect certain structural components during construction caused water damage that facilitated mold growth).

[FN438]. See New Orleans Assets, 2003 U.S. Dist. LEXIS 3381, at *5 (alleging that a building subcontractor installed wet drywall in a building causing mildew growth).

[FN439]. The education of project personnel has also been stated to be important in preventing the growth problem of mold during construction. Dreste et al., supra note 48, at 14. Planning for the appropriate response to the discovery of mold during construction is also deemed important. Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN440]. See Joint Hearing, supra note 2, at 55 (regarding the prepared statement of Gerald M. Howard, Executive Vice President, National Association of Home Builders and noting that builders, trade contractors, property owners, and managers are being sued for property damage and personal injuries related to mold).

[FN441]. The President of the Associated General Contractors of America, Larry Gaskins, noted: "Some projects for instance, will need to go up more slowly, to ensure proper drying and ventilation of all components. Will owners interested in avoiding tenant lawsuits be amenable to these delays?" Gaskins, supra note 430, at 3. A recent article notes that the contractor may wish to include in the construction agreement a provision that shifts certain responsibilities or liabilities to the owner for damages that arise from the inability to undertake appropriate measures to protect the construction site because of an accelerated schedule. Dreste et al., supra note 48, at 16.

[FN442]. Hodgson, Russ, Andrews, Woods & Goodyear, LLP v. Isolatek Int'l Corp., 752 N.Y.S.2d 472, 473 (N.Y. App. Div. 2002) (concerning mold discovered during renovation of two floors of a building).

[FN443]. Dolnick, supra note 107, at 16 (noting that construction project mold problems can cause delays).

[FN444]. Id.; see also Dreste et al., supra note 48, at 14 (noting contractors should consider contract language that allocates risk for mold conditions to those entities in the best position to control the risk).

[FN445]. A 2003 article provides a detailed discussion of how the discovery of mold at a construction site might be addressed by certain form documents issued by the Associated General Contractors of America. Dreste et al., supra note 48, at 14-15. The discussion includes an assessment of whether mold fits within the defined term "hazardous materials" and the rights of the contractor to cease work if such defined substances are discovered at the construction site. It also discusses how these form agreements allocate responsibility for any necessary testing/remediation. Delay costs and indemnity obligations are also explained. Id.

[FN446]. A contractor pollution liability policy may be used by some contractors to address various pollutant events associated with construction activities. See Trader, supra note 37, at 13 (noting that the emergence of mold as a potential environmental exposure has been cited as additional inducement for contractors to procure Contractor Pollution Liability Coverage).

[FN447]. See Dilello, 2002 WL 31839383, at *2 (apportioning 90% of fault to contractor for alleged negligent construction that resulted in mold growth).

[FN448]. Examples include the seepage of water through doors, windows, roofs, and curtain walls. The contractor's role in placing a structure addition into a flood zone has also been the subject of an action. See Booker, 2003 WL 117987, at *1-*2 (concerning allegations that construction defects allowed water seepage around doors and windows causing mold); see also Farnsworth v. Horrigan, No. CV 950373914S, 1999 WL 49393 (Conn. Super. Ct. Jan. 22, 1999); Heady, supra note 72, at 1056.

[FN449]. See Dreste et al., supra note 48, at 16 (citing language imposing obligation for operation and maintenance responsibilities upon owner).

[FN450]. See Foster v. Denton Indep. Sch. Dist., 73 S.W.3d 454 (Tex. Ct. App. 2002) (alleging that a company that installed HVAC equipment was liable for a mold-related bodily injury).

[FN451]. Centex-Rooney, 706 So. 2d at 25. The county was able to prove that the breach of the construction management agreement was a proximate cause of the damages incurred. Id.

[FN452]. Id.

[FN453]. Wawak v. Stewart, 247 Ark. 1093, 1094, 449 S.W.2d 922, 923 (1970).

[FN454]. Id. at 1095, 449 S.W.2d at 923.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                              Page 61
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN455]. Mondelli v. Kendall Homes Corp., 631 N.W.2d 846, 853 (Neb. 2001). Because the plaintiffs in Mondelli claimed, and were able to establish, a breach of the warranty to construct the home in a workmanlike manner, the decision establishes an ability to sue under both contract and negligence theory. Id. at 862.

[FN456]. Theis v. Heuer, 280 N.E.2d 300, 306 (Ind. 1972) (citing William Lloyd Prosser, The Law of Torts 693-95 (3d ed. 1964)).

[FN457]. McDonough v. Whalen, 313 N.E.2d 435, 439 (Mass. 1974).

[FN458]. Centex-Rooney, 706 So. 2d at 20.

[FN459]. See supra notes 9-16 and accompanying text.

[FN460]. 631 N.W.2d 846.

[FN461]. Id. at 851.

[FN462]. Id.

[FN463]. Id. The inside of the wall was covered with mud and toadstools. Id.

[FN464]. Mondelli, 631 N.W.2d at 851.

[FN465]. Id. at 851-52.

[FN466]. Id. at 852. Later, Mondelli was diagnosed with asthma. Her doctor stated that mold growth was a common cause of asthma. Id.

[FN467]. Id.

[FN468]. Mondelli, 631 N.W.2d at 852. Various standards and codes are applicable to the construction of facilities and structures. They may be promulgated by either governmental agencies or private organizations. Some are likely applicable to various conditions or activities that directly or indirectly facilitate mold growth. Id.

[FN469]. Id. at 862.

[FN470]. See id. at 852; Centex-Rooney, 706 So. 2d at 25. The injury may affect someone who is not in privity with the contractor, as long as it is foreseeable that that person might be injured. Suneson v. Holloway Constr. Co., 337 Ark. 571, 582, 992 S.W.2d 79, 85 (1999).

[FN471]. Woodward v. Chirco Constr. Co., Inc., 687 P.2d 1269, 1270 (Ariz. 1984).

[FN472]. Id.

[FN473]. Columbia W. Corp. v. Vela, 592 P.2d 1294, 1299 (Ariz. Ct. App. 1979).

[FN474]. Cosmopolitan Homes, Inc. v. Weller, 663 P.2d 1041, 1045 (Colo. 1983).

[FN475]. Blagg, 272 Ark. at 186-87, 612 S.W.2d at 322.

[FN476]. Ark. Code Ann. § 16-56-112(a) (2002). For example, Arkansas limits this time period to five years. The purpose of the statute of limitations is to protect members of the construction industry from being sued many years after they build a structure. See Rogers v. Mallory, 328 Ark. 116, 120, 941 S.W.2d 421, 422 (1997).

[FN477]. Mondelli, 631 N.W.2d at 853.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN478]. Blagg, 272 Ark. at 188-89, 612 S.W.2d at 323.

[FN479]. Alaskan Oil, Inc. v. Cent. Flying Serv., Inc., 975 F.2d 553, 554 (8th Cir. 1992).

[FN480]. E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 868 (1986); Berkeley Pump Co. v. Reed-Joseph Land Co., 279 Ark. 384, 391, 653 S.W.2d 128, 131 (1983). In 1981, the Arkansas Supreme Court decided a case in which a homeowner sued a builder for strict liability. Blagg, 272 Ark. at 186, 612 S.W.2d at 322. The plaintiffs began to smell strong odors and fumes from formaldehyde soon after they moved into their home. Id. They determined that the smell came from the carpet and its pad. Id. The judge dismissed at trial the plaintiff's claim of strict liability. On appeal, the court held that a house was a product for purposes of considering strict liability, and reversed the trial court's decision. Id. at 190, 612 S.W.2d at 324. In this case, the court found that a homebuilder could be held liable through strict liability for lack of workmanship if the plaintiff could prove that the house was unreasonably dangerous. Id.

[FN481]. This discussion does not identify every potential risk management measure. For example, many real property market participants attempt to segregate potential liabilities associated with a structure or other facility in a separate legal entity provided by statute or common law. A key concern for a purchaser or developer of a particular property or facility is the likelihood that assets or funds may be put at risk beyond what is invested in the property or enterprise. See George W. Dent, Jr., Limited Liability in Environmental Law, 26 Wake Forest L. Rev. 151, 165 (1991) ("Limited liability spreads risks among risk-averse participants: shareholders risk their investment while creditors shoulder the remaining risk."). A few of the available entities include corporations, limited partnerships, limited liability companies, and limited liability partnerships. Various considerations apply to the choice of entity, including tax, organizational, and other issues. The issue that is addressed is the ability of the entity to segregate the new enterprise's liabilities from the business or individual that established it. This concept is known as limited liability. The principle of limited liability shields an owner from responsibility for the debts (including debts arising from tortuous conduct) of the company. The ability of various non-corporate entities to segregate liabilities is discussed in Emily A. Lackey, Comment, Piercing the Veil of Limited Liability in the Non-Corporate Setting, 55 Ark. L. Rev. 553 (2002); see also Browning-Ferris Indus. of Ill., Inc., v. Ter Maat, 195 F.3d 953 (7th Cir. 1999). In discussing the rationale for limited liability, the Browning-Ferris court noted:
   That it is the principle of limited liability and it serves the important social purpose of encouraging investment by individuals who are risk averse and therefore will not invest (or will insist on a much higher return) in an enterprise if by doing so they expose their entire wealth to the hazards of litigation.
   195 F.3d at 959.

[FN482]. See generally Julavits, supra note 13 (referencing increased insurance costs resulting from the presence of mold and the subsequent decrease in property values).

[FN483]. Other benefits of the assessment of environmental issues in the transactional context include: (1) ensuring "environmental risks associated with the property are addressed in advance of the purchase and allocated under the contract"; (2) "timely incorporation of environmental risk allocation into the parties' business arrangement"; (3) it establishes a "baseline of information on current conditions" of the property. See Steven L. Humphreys, Getting the Deal Done: A Survival Guide to Environmental Problem-Solving in Brownfields Transactions, 11 Fordham Envtl. L.J. 799, 806-07 (2000).

[FN484]. See Springston, supra note 58, at 144 (stating that the growth and production of new spores can occur within twenty-four hours of the presence of the necessary conditions).

[FN485]. For example, a purchaser may discover material concentrations of mold during the assessment of a structure. The seller may agree to eliminate prior to closing. The purchaser may find it prudent to confirm the success of the remediation prior to closing on the property. See Sweeney & Taddeo, supra note 3, at 75 (stating a buyer should confirm success of seller mold remediation efforts).

[FN486]. W. Edward Carlton, Mold Litigation Continues to Grow, For the Def., Aug. 2002, at 28 (stating that a number of mold remediation personnel have entered the business with no experience).

[FN487]. Sweeney & Taddeo, supra note 3, at 78 (noting the need to use a certified industrial hygienist with experience in assessing mold).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                   Page 63
56 Ark. L. Rev. 295
(Cite as: 56 Ark. L. Rev. 295)

[FN488]. Carlton, supra note 486, at 28. There are presumably other reasons to use skilled contractors. For example, the removal of mold can expose the remediation personnel to potential health hazards for which protective measures should be undertaken in some circumstances.

[FN489]. For example, the Ohio Environmental Protection Agency certifies the professionals' issuance of "no further action" environmental remediation letters as part of the state's "brownfield" program. See Robertson, supra note 182, at 48-64.

[FN490]. A description of the requirements to become a "certified professional" in the Ohio brownfield program is found in id. at 54-57. Colorado's brownfield program requires participants to use a "qualified professional." Id. at 58-60.

[FN491]. Guidelines, supra note 189, at 3. The New York City Department of Health & Mental Hygiene states that microscopic identification of the spores/colonies requires considerable expertise. Id. It states that such services are not routinely available from commercial laboratories. Id.

[FN492]. Id. at 2. The structure's HVAC and plumbing will also need to be addressed. Id.

[FN493]. See Plainfield-Union Water Co. v. C.I.R., 39 T.C. 333, 338 (1962). Repairs are ordinary and necessary business expenses which may be deducted against current income. See also Income Tax Reg. § § 1.162-4.

[FN494]. See Plainfield-Union, 39 T.C. at 338. Improvements are capital expenditures which may only be recovered through depreciation deductions over the asset's useful life. See 26 U.S.C. § 267 (1999).

[FN495]. 1994-1 C.B. 35, available at 1994 WL 234887 (IRS RRU).

[FN496]. See id. Revenue Ruling 94-38 held that "[c]osts incurred to clean up land and to treat groundwater that a taxpayer contaminated with hazardous waste from its business were deductible by the taxpayer as ordinary and necessary business expenses under section 162 of the Internal Revenue Code." See id. This ruling does not address whether such expenditures would be deductible by the taxpayer if the property had been contaminated prior to the taxpayer's ownership.

[FN497]. See Tech. Adv. Mem., 92-40-004, available at 1992 WL 247127 (Oct. 2, 1992).

[FN498]. See id. The ruling stated that since the equipment was manufactured with asbestos, it was impossible to value the asset prior to the existence of asbestos or prior to the condition necessitating the expenditure. See id.

[FN499]. 108 T.C. 265 (1997).

[FN500]. See id. at 285. Expenses incurred as part of a plan of rehabilitation or improvement must be capitalized even though the same expenses if incurred separately would be deductible as ordinary and necessary. See id.

[FN501]. See id. at 284-85. The tax court stated that it did not find that the expenditures for asbestos removal materially increased the value of the building so as to require them to be capitalized. See id. at 284.

[FN502]. See H.R. 5040, 107th Cong. (2002). The bill was introduced by Congressman John Conyers, Jr. from Michigan in 2002.

[FN503]. Id. A deduction reduces the tax base. However, a credit reduces the tax liability as computed. Id.

[FN504]. Id. The credit will also be limited to the taxpayer's taxable income (i.e., this is not a refundable credit). Id.

[FN505]. See Schukoske, supra note 23.

[FN506]. The full term is "polychlorinated biphenyls."

[FN507]. Saltz, supra note 52, at 486-89 (examining the allocation of insurable risks in commercial leases).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN508]. See generally Sweeney & Taddeo, supra note 3 (suggesting that parties to a transaction should specifically address mold issues to avoid subsequent disputes).

[FN509]. See Henning & Berman, supra note 7, at 86 (noting the need for a defendant's counsel in a mold claim to evaluate whether the relevant contracts provide the opportunity to shift the risk).

[FN510]. The identified concerns will become the operating basis for the parties' negotiations and dictate the form of contractual protections.

[FN511]. See Dreste et al., supra note 48, at 14 ("[C]ontractors should consider contract language that would allocate the risk for mold conditions to those entities in the best position to control the risk.").

[FN512]. For example, when the real property market is increasing in value, a potential purchaser may be more willing to accept various conditions. See Jackson, supra note 315, at 89.

[FN513]. An extensive number of articles have addressed environmental auditing and assessment techniques and/or the various issues associated with them. See, e.g., Brooks M. Beard, The New Environmental Federalism: Can The EPA's Voluntary Audit Policy Survive?, 17 Va. Envtl. L.J. 1, 27 (1997); Miri Berlin, Environmental Auditing: Entering the Eco-Information Highway, 6 N.Y.U. Envtl. L.J. 618, 637 (1998); Donald A. Carr & William L. Thomas, Devising a Compliance Strategy Under the ISO 14000 International Environmental Management Standards, 15 Pace Envtl. L. Rev. 85, 97-98 (1997); David A. Dana, The Perverse Incentive of Environmental Audit Immunity, 81 Iowa L. Rev. 969, 976 (1996); Michael Ray Harris, Promoting Corporate Self-Compliance: An Examination of the Debate Over Legal Protection for Environmental Audits, 23 Ecology L.Q. 663, 711-20 (1996); Terrell E. Hunt & Timothy A. Wilkins, Environmental Audits and Enforcement Policy 16 Harv. Envtl. L. Rev. 365 (1992); Timothy T. Jones et al., Environmental Compliance Audits: The Arkansas Experience, 21 U. Ark. Little Rock L. Rev. 191 (1999); Lisa Koven, The Environmental Self-Audit Evidentiary Privilege, 45 UCLA L. Rev. 1167, 1190 (1998); Dara B. Less, Incentives for Self-Policing: The Need for a Rule, 2 Envtl. Law. 773 (1996); Kirk F. Marty, Moving Beyond the Body Count and Toward Compliance: Legislative Options for Encouraging Environmental Self-Analysis, 20 Vt. L. Rev. 495, 499-500 (1995); David Sorenson, The U.S. Environmental Protection Agency's Recent Environmental Auditing Policy and Potential Conflicts with State-Created Environmental Audit Privilege, 9 Tul. Envtl. L.J. 505 (1996); Rena I. Steinzor, Reinventing Environmental Regulation: The Dangerous Journey From Command to Self-Control, 22 Harv. Envtl. L. Rev. 103, 110 n.25 (1998); John-Mark Stensvaag, The Fine Print of State Environmental Audit Privileges, 16 UCLA J. Envtl. L. & Pol'y. 69 (1997-98); James M. Weaver et. al., State Environmental Audit Laws Advance Goals of Cleaner Environment, 11 Nat. Resources & Env't. 6, 9 (1997).

[FN514]. Two authors contrast financial auditing with environmental audits by stating: "In addition, unlike the case of the results of financial audits, even public companies often regard environmental data obtained through an internal audit as non-public information." George Van Cleve & Keith W. Holman, Promise and Reality in the Enforcement of the Amended Clean Air Act Part II: Federal Enforceability and Environmental Auditing, 27 Envtl. L. Rep. 10151, 10158 (1997).

[FN515]. A related risk is that by definition company or facility management are provided knowledge of the existence of violations of federal environmental programs. The federal and some state environmental statutes provide that criminal penalties may be imposed in certain circumstances in the case of knowing violations. See Andrew J. Turner, Mens Rea in Environmental Crime Prosecutions: Ignoratia Juris and the White Collar Criminal, 23 Colum. J. Envtl. L. 217 (1998). Once such violations are identified, facility management may have been provided "knowledge" of the violations. Consequently, the failure to address such noncompliance risks the imposition of criminal penalties. Company or facility management should therefore be prepared prior to undertaking the audit to remedy any violation that is discovered. One early commentator opined it may be unwise for a company to undertake an environmental audit if it does not intend to act on the results. See Phillip Reed, Environmental Audits and Confidentiality: Can What You Know Hurt You as Much As What You Don't Know?, 13 Envtl. L. Rep. 10303 (1983).

[FN516]. See James W. Moorman & Laurence S. Kirsch, Environmental Compliance Assessments: Why Do Them, How to Do Them and How Not to Do Them, 26 Wake Forest L. Rev. 97, 117 (1991).

[FN517]. Various versions of such legislation are found in states such as Alaska, Arkansas, Colorado, Illinois, Indiana,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Kansas, Kentucky, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, Ohio, Oregon, South Carolina, South Dakota, Texas, Utah, Virginia, and Wyoming. Douglas P. McLeod & Kirk F. Marty, Can You Afford to Perform an Environmental Audit?, Presentation at the Air and Waste Management Association's 91st Annual Meeting (June 1998).

[FN518]. Section 8-1-303 of the Arkansas Code describes the scope of the privilege:
    In order to encourage owners and operators of facilities and persons conducting other activities regulated under this chapter, or its federal counterparts or extensions, both to conduct voluntary internal environmental audits of their compliance programs and management systems and to assess and improve compliance with statutory and regulatory requirements, an environmental audit privilege is created to protect the confidentiality of communications relating to voluntary internal environmental audits.
Ark. Code Ann. § 8-1-303(a) (2002)

[FN519]. Ark. Code Ann. § 8-1-302(4) (2002). The term environmental audit report is broadly defined to include:
    A.   Field notes, records of observations, findings, opinions, suggestions, conclusions, drafts, memoranda, drawings, photographs, computer-generated or electronically recorded information, maps, charts, graphs, and surveys collected or developed for the primary purpose of preparing an environmental audit;
Ark. Code Ann. § 8-1-302(4)(A). The potentially protected material clearly encompasses a number of documents in addition to the actual audit report itself. It is therefore important for facilities to recognize that in states such as Arkansas where information (i.e., sampling data, etc.) or documents (i.e., employee interviews, etc.) are initially generated, the required statutory procedures to provide them confidentiality should be followed to ensure protection for these materials. Ark. Code Ann. § 8-1-302(4)(A).
    B.   An audit report prepared by the auditor that includes: (i.) The scope of the audit; (ii.) The information gained in the audit; (iii.) Conclusions and recommendations, (iv.) Exhibits and appendices;
    C.   Memoranda and documents analyzing a portion of or all of the audit report and discussing implementation issues; and
    D.   An implementation plan that addresses correcting past compliance, improving current compliance, and preventing future noncompliance.
See Ark. Code Ann § 8-1-302 (4)(B)-(D).

[FN520]. Ark. Code Ann. § 8-1-304 (2002).

[FN521]. See Moerdler, Insider's Outlook, supra note 9 (referencing need to consider mold in documenting acquisitions, leases, loans, and other real estate transactions).

[FN522]. See Humphreys, supra note 483, at 802.

[FN523]. For example, a construction contract will allocate the insurance requirements among the contractor and subcontractors. Dehlmer, supra note 6, at 17.

[FN524]. See Liristis v. Am. Family Mut. Ins. Co., 61 P.3d 22 (Ariz. Ct. App. 2002) (as amended and redesignated Dec. 26, 2002) (concerning a dispute as to whether homeowner's insurance policy covered certain damages associated with mold).

[FN525]. Relevant examples are the specialty policies developed to cover various environmental risks. See Ann M. Waeger & Jack Fersko, Current Insurance Products for Insuring Against Environmental Risks, The Prac. Real Est. Law. 9, 10 (1999).

[FN526]. See Moerdler, Florida Mold Legislation, supra note 9, at 2 (referencing fifty Florida insurance companies asking state insurance regulators to approve mold exclusion endorsements). The Deputy Director of the Florida Department of Insurance, Steve Roddenberry, noted that most Florida insurance policies will cover mold damage only when it is caused by a covered peril such as a hurricane or windstorm. Roddenberry also noted: "If mold results from sudden, accidental change of water, then its remediation is covered within policy limits. But if mold develops from construction defects or a homeowners negligent maintenance, it's not the insurer's responsibility." Id.

[FN527]. Even if coverage is provided, the absence of standards or exposure limits complicates the scope of the remedial obligation. See Trader, supra note 37, at 13 ("Clean up of typical pollution losses is subject to specific standards. Given the lack of clean-up standards for mold, CPL, policies need to be amended to provide coverage for remedial and clean-up costs that are not subject to specific standards.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                    Page 66
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN528]. See Ins. Co. of N. Am. v. Snyder Moving & Storage, Inc., No. CV-98-01278-HRH, 2002 WL 31748606, at *1-*2 (9th Cir. Dec. 6, 2002) (referencing Comprehensive Transportation and Storage Liability Policy which covers post-flood rust, mold, and mildew under certain circumstances).

[FN529]. These questions are not limited to mold. The insurance coverage applicable to various other indoor air pollutants have been addressed by the courts. See generally Bick & Youngblood, supra note 84 (discussing various types of "pollution exclusions" in insurance policies and their treatment by the courts).

[FN530]. In pollution exclusions, the end of the clause often contains language providing that the exclusion does not apply to discharges of pollutants if it was "sudden or accidental." See Harkins, supra note 20, at 1129. Courts often interpret these words to mean "unexpected and unintended," thus not precluding coverage for the insured. Id.

[FN531]. 61 P.3d 22.

[FN532]. The covered peril was the fire for which a claim was originally filed. Id. at 23.

[FN533]. Id.

[FN534]. Id. at 24.

[FN535]. Id.

[FN536]. Liristis, 61 P.3d at 24.

[FN537]. Id.

[FN538]. Id. at 26.

[FN539]. Id. at 25.

[FN540]. Id.

[FN541]. No. CIV.A.00-1209-T4, 2002 WL 441334 (E.D. La. Mar. 15, 2002).

[FN542]. Id. at *1.

[FN543]. Id.

[FN544]. Id. at *3.

[FN545]. Id.

[FN546]. Liberty Mut., 2002 WL 441334, at *3.

[FN547]. Id.

[FN548]. Id.

[FN549]. Id.

[FN550]. Id. at *11.

[FN551]. Liberty Mut., 2002 WL 441334, at *5.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN552]. 462 N.W.2d 218 (Wis. Ct. App. 1990).

[FN553]. Id. at 222.

[FN554]. Id.

[FN555]. Id. at 223.

[FN556]. Id.

[FN557]. Leverence, 462 N.W.2d at 224.

[FN558]. Id.

[FN559]. Id. at 225-26.

[FN560]. Id. at 232.

[FN561]. Id.

[FN562]. 171 F.3d 343 (6th Cir. 1999).

[FN563]. Id. at 345.

[FN564]. Id. at 346.

[FN565]. Id.

[FN566]. Id.

[FN567]. Blaine Constr. Corp., 171 F.3d at 346.

[FN568]. Id.

[FN569]. Id.

[FN570]. Id.

[FN571]. Id. at 345.

[FN572]. Blaine Constr. Corp., 171 F.3d at 353.

[FN573]. No. CIV.A. 399CV1623D, 2002 WL 356756 (N.D. Tex. Mar. 5, 2002).

[FN574]. Id. at *1.

[FN575]. Id. at *2.

[FN576]. Id. at *3.

[FN577]. Id.

[FN578]. Lexington Ins. Co., 2002 WL 356756, at *3. The court also considered an exclusion based on maintenance of the roof, which was required in the policy. Id. at *4. The court precluded recovery on this basis as well because it found the roof was not properly cared for. Id. at *5.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                          Page 68
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN579]. See Bischoff, supra note 21, at 684.

[FN580]. Id.  Schools have been a prime target for toxic mold litigation because of the increasing use of modular buildings which contain material upon which mold feeds.  Id.

[FN581]. See Henning & Berman, supra note 7, at 75.

[FN582]. 50 Ark. App. 1, 899 S.W.2d 482 (1995).

[FN583]. Id. at 1-2, 899 S.W.2d at 483.

[FN584]. Id. at 1, 899 S.W.2d at 483.

[FN585]. Id. at 1-2, 899 S.W.2d at 483.  The parties stipulated that the presence of this mold in the appellee's classroom caused her sinus difficulties which required several surgeries.  Id. at 2, 899 S.W.2d at 483.

[FN586]. Crossett Sch. Dist., 50 Ark. App. at 1, 899 S.W.2d at 483.  Section 11-9-601(c)(1) of the Arkansas Code defines an "occupational disease" as a disease that results in disability or death and arises out of or in the course of the employment or occupation.  See Ark. Code Ann. § 11-9-601(e)(1) (2002); Crossett Sch. Dist., 50 Ark. App. at 1, 899 S.W.2d at 483.

[FN587]. Crossett Sch. Dist., 50 Ark. App. at 2, 899 S.W.2d at 483.

[FN588]. Id. at 3-4, 889 S.W.2d at 484.

[FN589]. For example, one author notes that Farmers Insurance Company's mold-related claims jumped from 150 in 1999 to 12,000 in 2001.  Trader, supra note 37, at 12.

[FN590]. Joint Hearing, supra note 2, at 76 (referring to the prepared statement of Gordon Stewart, President, Insurance Information Institute).

[FN591]. Homeowner policies have a particular focus.  See Harkins, supra note 20, at 1131.  Texas homeowners have had greater difficulty obtaining such insurance since State Farm, Progressive, Farmers, and Allstate have stopped issuing new homeowners' policies in the state.  See id. at 1130.

[FN592]. See Julavits, supra note 13, at 1 (referencing several insurance companies' decisions to temporarily cease issuing homeowner policies in Texas because of a large number of claims involving mold); Moerdler, Florida Mold Legislation, supra note 9 (referencing insertion of mold exclusions into insurance policies); Pena-Alfaro, supra note 4, at 548 (referencing Texas Insurance Commissioner's contemplation in 2001 of reducing mold claims by altering policy coverage); Trader, supra note 37, at 13 (noting rapidly growing number of mold exclusions in commercial general liability policies); Andrew Wood, Insurance: Chemical Firms Tough it Out in a Hard Market, Chemical Wk., Oct. 2, 2002, at 19 (referencing the recent exclusion of risks such as mold from traditional liability policies).

[FN593]. Some homeowner insurance policies now include language stating coverage is not provided for "continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more."  See Carlton, supra note 486, at 28.  A commercial policy exclusion might bar reimbursement for "loss or damage caused by or resulting from . . . rust, corrosion fungus, decay, detrimental, hidden or latent defect, or any quality in property that causes it to damage or destroy itself."  Id.

[FN594]. Id. (discussing efforts in Texas to ensure homeowners continued access to policies for their homes).

[FN595]. See Memorandum from Arkansas Insurance Dep't to All Licensed Property and/or Casualty Insurers, Trade Associations, National Association of Insurance Commissioners, and other Interested Parties, Conditions for Obtaining Approval of Mold Exclusions--Bulletin No. 10-2002 (Apr. 22, 2002).  The Arkansas Insurance Department ("Department") stated that Arkansas homeowner insurance policies provide coverage for mold if it is a direct result of a covered loss.  Id. The Department noted its intention to keep this type of coverage in place.  Id.  Other states have allowed property and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

casualty insurers to limit coverage for liability stemming from mold.  For example, New Jersey requires Insurance Service Organization ("ISO") member insurers to provide minimum aggregate coverages and optional increased limits for all property and liability coverages except for losses caused by fire or lightning.  See N.J. Ins. Dept. Bulletin No. 01-14. Specifically, New Jersey requires ISO member insurers to provide property coverage of $10,000, on an aggregate basis, with optional increased limits of $25,000 and $50,000. See id.  Those members are also required to provide liability coverage in the amount of $50,000, on an aggregate basis, with an optional increased limit of $100,000. See id.  Insurers who are not ISO members may request both to provide options to purchase higher liability options and to provide stricter exclusions. Maryland requires a minimum aggregate property coverage for mold and remediation of $15,000 and does not allow insurers to charge an additional deductible for mold loss. See Maryland Insurance Administration, Findings and Decision Relating to Mold Limitations for Property and Casualty Insurance (Mar. 18, 2003).  With regard to liability coverage, Maryland prohibits insurers from excluding coverage for mold but allows insurers to limit coverage to an aggregate of $50,000. See id.

[FN596]. See Joint Hearing, supra note 2, at 55 (referencing prepared statement of Gerald M. Howard, Executive Vice President, National Association of Home Builders) (stating that adverse market conditions have caused liability coverage to become more expensive).

[FN597]. For example, California experienced a 25% increase in premiums.  Carlton, supra note 486, at 29.

[FN598]. See Ruquet, supra note 39, at 25 (noting that some contractor insurance carriers may place exclusions on buildings with stucco finishes because of alleged moisture issues).

[FN599]. See Julavits, supra note 13, at 1 ("The increased premium will translate into lower property values, because a property's value is determined by the income it produces," Mr. Hendrick said.  "If you have a greater exposure, the income and the property value go down.  And a lower property value between the parties in a transaction.").

[FN600]. See Trader, supra note 37, at 13 (stating that the addition of mold to existing pollution risks may motivate more contractors to obtain the necessary policies to cover their liabilities).

[FN601]. Various aspects of these policies are discussed in Efflandt, supra note 50, at 57-58 (discussing recent availability of insurance policies to address certain environmental risks that would be allocated between the parties in a transaction).  See Susan Neuman, Environmental Insurance; Tailored to Fit: Sophisticated Insurance Tools Make Property Protection Easier, 15 Envtl. Compliance & Litig., No. 12, 3 (2002).  Additional underwriting experience with these risks and liberalized clean-up standards have presumably facilitated the expanded availability of these products.

[FN602]. See Jack Fersko & Ann M. Waeger, Using Environmental Insurance in Commercial Real Estate Transactions, 17 Prob. & Prop. 30, 31 (2003).

[FN603]. See Peter B. Meyer & Kristen R. Yount, Environmental Insurance and Public Sector Brownfields Programs: Factors Affecting Pursuit of Insurance as a Redevelopment Tool, Northern Kentucky University/University of Louisville 8-9 (Nov. 1999) (providing an overview of three policies).

[FN604]. Humphreys, supra note 483, at 802.

[FN605]. See News Briefs, Nat'l Real Est. Investor, July 2000, at 68  (stating four Wall Street agencies now approve the use of environmental insurance to underwrite commercial mortgage-backed securities transactions in lieu of a Phase I environmental assessment).

[FN606]. See Humphreys, supra note 483, at 802 (noting insurance may enable the purchaser "to obtain financing without necessarily having to provide the lender with an environmental indemnity from a credit-worthy entity").

[FN607]. The possibility these policies might enhance the valuation of commercial mortgage-backed securities in the pool process is discussed in Joseph Boren, Filling the Gap: Environmental Protection for Lenders, 12 Risk & Ins., Sept. 16, 2001, at 35; see also Lynn Goch, Sealing the Deal, 100 Best's Rev., Mar. 1, 2000, at 77 (stating, "secured creditor environmental policies are becoming a more common method of protecting investors in securities that are backed by pools of commercial mortgages").  However, see Brick, supra note 366, at 10C ("Debt rating agencies have put up significant resistance to the use

of these insurance policies, and banks have been forced to listen because their loans usually become truly profitable only if they can be resold to investors as packages of commercial mortgage-backed securities.").

[FN608]. Trader, supra note 37, at 13 (noting insurance companies providing pollution liability coverage use their own forms).

[FN609]. The application process for such policies places a particular emphasis on the disclosure of known pre-existing conditions. For example, in Goldenberg Development Corp. v. Reliance Insurance Co., a developer purchased a policy intended to cover the cost of unforeseen remediation that might be required at a development site. No. 00-CV-3055, 2001 WL 872944, at *1 (E.D. Pa. May 15, 2001). The developer subsequently discovered various buried materials it characterized as solid waste. Id. at *4. The insurance company denied the claims on the basis that the "known conditions" exclusion in the policy applied. Id. This exclusion barred coverage for pollution conditions existing at the inception of the policy which were reported to the developer with responsibility for environmental affairs, unless all material facts relating to the pollution conditions were disclosed to the insurance company prior to the inception of the policy. Id. The dispute centered on certain developer reports referencing the conditions that were not provided to the insurance company. Id. at *1-*2. The developer argued that the information in such reports was referenced in other reports that had been provided to the insurance company. Goldenberg, 2001 WL 872944, at *2; see also Goch, supra note 607 (noting that environmental insurance policies can be tailored to fit a specific transaction).

[FN610]. See Meyer & Yount, supra note 603, at 25. These products can be relatively complicated. The report notes: "While they are thus more useful now, they are also quite complex. Although there are standard, 'off-the-shelf' policies available, many policies are heavily 'manuscripted' or tailored. This means that expertise is required to select the coverages that will protect against the risks attendant on particular projects." Id.

[FN611]. The policies may also exclude lead-based paint and asbestos in addition to mold. See Brick, supra note 366, at 10C.

[FN612]. See Fersko & Waeger, supra note 602, at 34. These commentators noted: "claims against general liability and first-party property damage policies are on such a rise and have resulted in staggering verdicts in favor of insureds, certain insurers issuing environmental insurance policies have begun automatically including exclusions for mold in their premium indication for each new policy." Id. at 35; see also Carlton, supra note 486, at 29 (noting some insurers have introduced clearer and more absolute exclusionary language in their policies). Some EIL insurance carriers may offer a mold "buyback." Jakubovitz, infra note 613, at 11. The buyback may have limits. One author describes a scenario in a construction contract stating:
  For example, one of the microbial matter coverage endorsements which provides mold coverage with a sublimit, also adds an additional exclusion to the policy for 'Failure to Maintain and Construction Defects.' For an insured in the construction business, a large portion of the mold cases stem from construction defect claims. The primary reason a builder, contractor, or any trade in the business purchases this mold coverage is for protection from these risks. This additional language, in effect, negates the additional protection the policyholder requires.
Id. at 12.

[FN613]. Rachel Jakubovitz, Mold: What About Environmental Impairment Liability (EIL) Coverage?, 4 Toxic Torts and Envtl. Litig. Committee Newsl., July 2002, at 11.

[FN614]. Fersko & Waeger, supra note 602, at 34; see also Ruquet, supra note 39, at 25 (noting that contractors may be able to add mold coverage to its standard policy at an additional cost).

[FN615]. An author notes the underwriting may include type of property, type of past and present operations, maintenance and repair review, and needed coverage. Jakubovitz, supra note 613, at 12.

[FN616]. Id.

[FN617]. One commentator notes: "In contrast, insurance companies providing pollution liability coverage use their own forms and as a result, discussion of this coverage must be generalized." Trader, supra note 37, at 13.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                    Page 71
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN618]. See id. (noting possibility of obtaining coverage for mold in contractor pollution liability policy by negotiating for inclusion of "mold" in policy's definition of term "pollutant").

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 11

Westlaw.

13882 NBI-CLE 19                                                                                      Page 1
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

Copyright (c) 2004 National Business Institute
**National Business Institute**
**The Mold Challenge in Arkansas**
2004

**\*19 TRANSACTIONAL CHALLENGES POSED BY MOLD**

Walter G. Wright, Jr.
Stephanie Irby
Hank Bates

Copyright © 2004 National Business Institute; Walter G. Wright, Jr.,

Stephanie Irby and Hank Bates

**\*21 II. TRANSACTIONAL CHALLENGES POSED BY MOLD. [FN1]**

**Walter G. Wright, Jr.**

**Stephanie Irby**

**Hank Bates**

**A. Addressing Structural Mold**

The parties addressing mold in the improved real property transactional context will probably consider at least three questions. They include (1) whether water has or can penetrate the shell of the structure in a manner facilitating the amplification of mold growth; (2) whether abnormal or non-deminimis quantities of mold are growing in the structure producing types or quantifiable amounts of spores not found in the outside ambient air; and (3) whether the mold species present in the structure are believed to potentially adversely affect human health and are present in quantities or concentrations sufficient to do so? The institutionalization of understandable cost-effective processes or procedures to address these questions will be critical.

**1. Assessment of Mold in the Transactional Context**

Environmental assessments have been used by parties for years seeking to identify and/or quantify such issues in the transactional context. [FN2] The perceived presence of some contaminants or conditions in a structure will put in play the possibility that remediation expenditures may need to be incurred. There will often be uncertainty as to the potential costs associated with the structural mold until the scope of their presence is defined. The delineation of the contamination will reduce this uncertainty. [FN3]

Most initial environmental assessments of real property are undertaken in accordance with somewhat similar procedures or protocols. [FN4] The various parties to such transactions generally understand and accept the components of the assessment process. This acceptance is probably a *22 function of the standardization of the procedures, experience and desire to attain certain governmental requirements. [FN5]

There is arguably less standardization or uniformity associated with mold sampling protocols, inspection strategies or remediation measures. [FN6] This is due at least in part to mold's much more recent appearance as a potential transactional environmental impairment. Fewer real property personnel or parties have had significant experience with these activities or techniques. Further, there are no mandatory government standards addressing mold assessment or remediation.

The real property market's unfamiliarity with mold and associated management measures increases the possibility that the organisms will constitute an impediment in some transactions. This has stimulated interest in the standardization and refinement of mold management techniques. [FN7] The development of a degree of comfort with mold will be dependent upon the availability of generally accepted management measures that can quantify and/or otherwise address the issue in a cost-effective manner. Unfortunately, from a transactional perspective, mold has characteristics that may make it a greater challenge to assess or quantify than many environmental issues.

## 2. Assessment Issues

### a. Living Organisms

Mold literally consists of living organisms. Almost any structure can support mold growth if the appropriate conditions are present. As a result, a property cleared by an assessment prior to closing could subsequently develop or redevelop a problem. This distinguishes mold from almost every other environmental condition. For example, an environmental assessment may determine that friable asbestos or an underground heating oil tank is present. Once the material or tank is removed the likelihood the *23 issue will arise again is presumably remote. [FN8] This is not necessarily true for mold.

Since mold is a living organism, human activity [FN9] or intervention need not occur for it to occupy or reoccupy a facility. [FN10] This has ramifications for the assessment/remediation process. The successful assessment and/or remediation of a structure does not mean mold growth will not reoccur. [FN11]

Equally important, seemingly innocuous conditions such as drips or leaks may in certain scenarios facilitate mold growth. Therefore, the permanent elimination of mold in a structure requires that the conditions facilitating such growth be addressed. [FN12] As a result, the assessment must identify relevant structure maintenance or design problems. Their correction will probably be necessary to prevent a reoccurrence.

### b. Absence of Regulatory/Action Standards

There is almost a complete absence of regulatory requirements applicable to mold. [FN13] Consequently, there is a concurrent lack of mandatory bright-line governmental remediation standards or permissible exposure limits [FN14] for mold. [FN15] These standards would be used to determine or measure success in achieving "acceptable" levels of mold. [FN16]

In contrast, standards or limits have been set for many activities or other problematic substances potentially encountered at various facilities. [FN17] Government agencies frequently promulgate these standards pursuant to a rule or through the issuance of a policy. Examples of such standards might include benzene groundwater action levels, polychlorinated biphenyl soil cleanliness standards [FN18] or a crumble test for friable asbestos. [FN19]

*24 Action or cleanup standards can play an important role in addressing environmental issues in the transactional process. [FN20] These benchmarks may be employed to determine the level of environmental and health protection need to be achieved by remediation or cleanup efforts. [FN21] Consequently, parties in some transactions may use them to determine the acceptability of environmental conditions at a particular property. They may also play a role in the litigation of disputes involving the presence of certain substances. [FN22]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The absence of analogous mold standards poses a problem. Many non-natural environmental contaminants are compared to a zero "benchmark". [FN23] A party generating mold sampling data may not have benchmarks to evaluate the "acceptability" of the results. [FN24] Such simplistic comparisons are difficult for mold since those types of organisms are normally present on a structure surface and in the air of even relatively clean buildings.

**(i.) Establishment of a Baseline**

The baseline for comparison of data may be the difference between the sampling results from the structure and the adjacent outdoor environment. [FN25] However, there may not be a consensus as to the types and/or concentrations of molds which constitute a potential threat in the indoor environment. Further, the design of the sampling program needed to make such comparisons can be a complex exercise. There may be disagreements or confusion in determining what constitutes problematic types or amounts of mold and associated spores in a particular structure. Also important, the presence of an *25 abnormal amount or types of molds does not necessarily mean there is a threat to the occupants health. [FN26]

**(ii.) Detection Difficulties**

A key component of initial routine environmental assessments has been a visual inspection of the structure or real property. [FN27] Invasive inspection efforts or the sampling of structure air may be necessary if mold is suspected in these areas. A search for mold would also likely include a visual inspection of the structure. Therefore, the initial assessment of a structure will probably focus on the identification of either abnormal mold growth and the conditions that facilitate it. However, a visual inspection will not always identify all problematic concentrations of mold in a structure. The organisms may grow in portions of the structure in which visual inspection is difficult.

**(iii.) Interpreting/Understanding Assessment Results**

The combination of uncertainty as to the roster of problem molds and absence of bright-line action levels or standards makes it more difficult to reach definitive conclusions about assessment results. This can be a transactional impediment since the purpose of the assessment is to make a determination as to the "acceptability" of a particular condition. The absence of objective criteria turns the process into a more subjective determination. The inability to easily quantify an environmental issue may tend to magnify its importance in the transactional context.

**(iv.) Common Law Damage Actions**

*26 The presence of mold in structures is generating a significant number of third party damage claims. These common law claims often allege property damage and/or bodily injuries. The resolution of these claims tends to be complicated by the previously noted absence of standards or permissible exposure limits. As a result, the potential financial impact associated with these claims tend to be difficult to quantify with any certainty.

**(a.) Assessment Tasks**

Most parties involved in the transfer, financing or construction of commercial, industrial, or multi-family residential facilities have in place systematic procedures to identify and quantify to some extent environmental conditions prior to consummation of the transaction. [FN28] The initial assessment procedures utilized in many transactions are found in two American Society of Testing Materials ("ASTM") standards. [FN29]

The two standards are known as the Transaction Screen Process (E-1528) and the Standard Practice for Environmental Site Assessments: Phase I [FN30] Environmental Site Assessment Process (E-1527). [FN31] These activities include site inspections, database searches and/or a review of current/historic uses. The two ASTM environmental assessment standards do not encompass sampling or testing. [FN32]

Initial transactional environmental assessments have rarely included a search for mold. [FN33] Therefore, the party interested in assessing whether objectionable types or concentrations of mold are present has two options. The traditional transactional due *27 diligence efforts can be expanded to address mold. [FN34] In the alternative, a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                        Page 4
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

separate mold assessment can be undertaken.

Various testing and/or assessment techniques are used to determine whether mold is present in a structure. There is no "standard" protocol or approach for mold sampling or assessment. [FN35] Further, new tests/methods have been and will continue to be developed because of the heightened interest in mold. However, it is unlikely that most initial assessments of a structure in the transactional context will involve actual sampling or invasive testing. [FN36] Instead, some type of initial screening analysis is more likely.

A consensus or generally accepted mold screening protocol does not currently exist. The absence of "standard" initial assessment protocols poses two problems. First, parties seeking to incorporate mold issues into transactional due diligence procedures must determine which tests or assessment methods should be utilized. This can be a complicated question. The ultimate decision will presumably be based on the ability of the test or method to delineate and/or quantify the presence of mold at a cost deemed reasonable by the various parties to the transaction. Second, the absence of a standard format or protocol for the improved real property market can lead to varied findings. [FN37]

An ASTM committee has announced its intention to develop a standard questionnaire for mold screening. [FN38] The questionnaire would establish standard protocols for the visual inspection of mold structures. [FN39] The scope of the committee's task is described as to "define good commercial practice for conducting a transactional screen of a commercial building with respect to the presence of readily observable mold." [FN40] The intent of the protocol *28 is stated to be to allow the user to assess the potential need for further assessment or action beyond what is identified in the standard. [FN41]

The initial screening activities may suggest the need for some type of sampling effort. [FN42] The overall objectives of mold assessment work would likely be twofold. First, the delineation of the location of non-deminimis amounts of mold. Second, to determine if conditions are present in the structure which could facilitate mold growth. [FN43] Each of these two tasks/objectives would probably be addressed by mold due diligence procedures.

Mold testing/assessment techniques might be divided into roughly three categories. They include visual inspection, bulk/surface sampling, and air monitoring. These techniques may be employed individually or in conjunction with each other depending upon the transactional objectives.

**(a.). Visual Inspection**

A visual inspection will include a visual search for signs of mold growth. [FN44] The presence of mold may be evident because of discoloration [FN45] of building or other materials. [FN46] The scope of the visual inspection can vary. For example, some potentially affected areas may not be easily accessible. The organisms may be found in crawl spaces, inside walls and in other interior structural spaces. [FN47] Invasive efforts may be needed to inspect these areas. This may involve the piercing or destruction of walls or other portions of a structure. [FN48] Therefore, visual inspections might be categorized based on whether or not they are invasive. [FN49]

*29 The typical visual inspection will probably not be limited to the identification of mold itself. It will also include the conditions that facilitate mold growth. These could encompass evidence of flooding (or other water intrusion), drips, leakage, HVAC [FN50] problems, and water damaged materials. Whether such conditions are historical in nature and have been corrected or will continue to produce moisture will be important questions. [FN51]

**(b.). Sampling**

Mold may not be identified or located in an initial assessment. However, there may be suspicions in some instances that problematic concentrations are present in less accessible portions of the structure. If so, sampling techniques may be used to determine search for significant growth. The techniques may include a mixture of air and bulk sampling for visible fungi. [FN52]

**i. Air**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A visual inspection may not always provide the information needed to answer certain questions about the fungi conditions in the structure. Sampling activities may be necessary in certain circumstances to generate data to address these questions. The objective of any sampling effort should be to obtain results that are representative of the conditions present in the structure. This goal will dictate the sampling method and number of samples that are utilized. The same data quantity and quality control issues associated with other *30 types of environmental sampling also apply to mold. [FN53]

Mold is normally found in a structure's air. Airborne culturable fungi and total fungal spore concentrations may be sampled in a structure's air. [FN54] The purpose of such sampling will be to determine if atypical types or concentrations/amounts [FN55] are present. [FN56] Such results may be an indication that abnormal or non-baseline amounts of mold are present.

Air sampling may be undertaken for various reasons. It might be deemed necessary if it is suspected a visual inspection missed on-site mold. This might occur if mold is in an inaccessible area of the structure. Further, an assessment of the collected spores may help determine the type of the mold present or its location. [FN57] The results of such sampling may help determine whether invasive sampling is justified.

Air sampling might also be considered if the structure has a history [FN58] of credible occupant complaints regarding indoor air quality concerns. Undertaking such sampling subsequent to a visual inspection may definitively determine whether there is (or is not) a problem. There may also be interest in sampling the air inside severely contaminated structures after remediation. It may be used to determine if mold spores are below baseline levels. *31 Such results may help determine that the remediation was successful.

Air sampling results are usually viewed with some caution. Certain molds do not become airborne unless disturbed. [FN59] Equally important, a discrete air sample is literally a snapshot of the concentration of specific spores in the air in that location at a particular point in time. In other words, the amount of mold spores suspended in the air during the course of the day can fluctuate. [FN60] Mold concentrations can also vary on a seasonal basis. [FN61] Consequently, sampling results from a particular point in time may not be representative of structure conditions.

Mold spores are naturally found in the outside environment. [FN62] Consequently, indoor air sampling results are usually evaluated in conjunction with background ambient air conditions [FN63] in the vicinity of the subject structure. [FN64] The sampling protocol would presumably need to specify that outside ambient air conditions will be simultaneously delineated. [FN65] Because the amount or concentration of mold and associated spores in the environment is constantly changing multiple samples may need to be undertaken to properly characterize the baseline measurement. The objective is to provide a reference point or baseline for comparing inside and outside conditions.

*32 The outdoor ambient air baseline and indoor conditions may be evaluated in various ways. For example, the aggregate amount or concentration of mold spores may be compared. [FN66] Likewise, the uniformity of the types [FN67] and amount of mold in the outdoor and indoor environments may be assessed. [FN68] An outdoor baseline will normally contain a mixture of various species of mold spores. There will be a qualitatively similar diversity of airborne mold spores in the indoor and outdoor air. The predominance of a particular species in an indoor sample may indicate colony growth in the structure. [FN69]

**ii. Bulk/Surface**

The identification of more than deminimis [FN70] mold in a structure during the visual inspection may be a confirmation that there are potentially objectionable conditions present. However, the parties should still determine whether such a result constitutes a material issue in the context of a particular transaction. Bulk [FN71] and surface sampling would likely be undertaken to more definitively delineate impacted areas and/or the type of organisms present. [FN72] These sampling methods may be used to determine whether contamination is present on various building materials. The techniques could involve the extraction of spores, wiping or swabbing, or vacuuming.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                 Page 6
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

**\*33** The parties involved in a transactional assessment will often respond to identified environmental conditions by cooperating in addressing the problem. Specifically, the parties to the transaction could work to eliminate both the objectionable types or amounts of mold and conditions facilitating its growth. Bulk or surface sampling may be used to determine the cost and method of remediation. It might also be used to confirm successful completion of remediation of affected areas.

**c. Remediation**

The removal of structural mold is wasted effort unless the conditions that facilitated its growth are addressed. Nevertheless, perceived problematic amounts of mold may be identified and targeted for remediation The objective in remediating mold and its spores is not to sterilize the structure. Mold is naturally found in both the indoor and outdoor environments. This makes the removal of all mold or its spores a practical impossibility. [FN73]

**(i.) Methods**

The goal of mold remediation has been described as the removal or cleaning of contaminated materials in a way that prevents the emission of fungi and dust contaminated with fungi from leaving a work area and impacting and entering an occupied area. [FN74] The remediation of some structurally sound materials may involve various cleaning methods. [FN75] The removal method may often simply include the use of detergent solutions. [FN76] Some porous materials may be contaminated to such an extent they cannot be cleaned. [FN77] The level of expertise and personnel protection **\*34** to perform remediation may vary with the size of the affected area. [FN78]

The removal of problematic concentrations of structural mold cannot be cost-effectively accomplished in some instances. The destruction of portions of a structure have sometimes been undertaken to ensure the permanent elimination of mold in a particular part of the building. [FN79] Whole structures have even apparently been destroyed in a few instances to address the presence of mold. [FN80]

**(ii.) Standards/Exposure Limits**

The vacuum of governmental benchmarks addressing mold has not been filled by standards recommended or issued by private organizations. [FN81] Some organizations have policies or recommended practices of some sort related to mold [FN82] or the conditions that facilitate their growth.

**d. Prevention**

The expense associated with the prevention of an environmental problem is typically less than the cost to correct it. Mold is no different. [FN83] The conditions necessary for growth will usually be present in a structure occupied by significant amounts of mold. Thus, the elimination or prevention of one or more of these growth conditions may better ensure the absence of abnormal types or amounts of mold in a structure. The failure to do so means growth could reoccur.

The prevention of the conditions that facilitate mold growth may be addressed to a great extent by various existing maintenance/operational practices and/or active fungal control systems. Also relevant are a number of standards/specifications **\*35** applicable to the structure and/or material/ equipment components. Maintenance/design provisions may be implemented through industry codes and/or enforceable governmental standards.

**(i.) Maintenance/Operational Practices**

Mold prevention includes the employment of proper maintenance/operational practices. Such practices are not necessarily exotic or complicated. [FN84] They may encompass fairly simple practices or equipment such as: (i) operation of the HVAC system the appropriate amount of time and within a certain temperature range; [FN85] (ii) cleaning and maintenance of HVAC systems; [FN86] (iii) use and maintenance of adequate ventilation in homes and other structures; [FN87] and (iv) inspection and maintenance of the components of the structure envelope.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                      Page 7
13882 NBI-CLE 19
(Cite as: 13882 NBI-CLE 19)

**(ii.) Building/Equipment/Material Specifications**

Better adherence to relevant building, equipment and material standards is increasingly viewed as important in the prevention of objectionable mold growth. [FN88] The standards may be a part of industry recommended practices or local [FN89] or state controls.

The interest in mold growth and the indoor environment has been reflected in some recent building, equipment and material standards. These standards have ranged from the optimum method for integration of windows/doors into the structure [FN90] to the improvement of building materials such as gypsum [FN91] and drywall. [FN92] There is also interest in HVAC and related equipment. [FN93] These standards may be driven to some extent by research into the *36 environmental conditions inside a structure and methods or practices to improve it. [FN94]

**(iii.) Active Systems**

Eliminating both growth conditions and objectionable mold colonies are the primary means of addressing the aggregate effect of the organisms. [FN95] However, active systems have also been developed to address mold and other indoor air pollutants. A relatively recent example is the employment of ultraviolet light fixtures to reduce fungal contamination in air handling units. [FN96]

Not all active systems are of recent vintage. Some systems have been used for years. For example, air filtration systems have to some extent addressed indoor air quality. [FN97] These might include electronic air cleaners used to remove airborne particles and collect them on electronically grounded plates.

Filtration has not been used extensively to improve indoor air quality in commercial buildings. [FN98] This supposed disinterest has been stated to be derived from confusion concerning filtration performance, absence of clear filter test standards, and a failure to consider the life cycle costs of filtration. However, the role of filtration may increase as new techniques become available. [FN99]

**B. Current/Proposed Governmental Programs/Requirements**

Governmental standards can play an important role in the allocation of the risks or responsibilities associated with potential environmental concerns in a given transaction. Federal, state and/or local [FN100] environmental regulations or requirements are often cited or incorporated by reference in transactional *37 documents. The standards may be placed in or referenced by certain warranties, covenants, indemnities, and other provisions used in transactional documents to address environmental issues. [FN101] They may be used to delineate whether a warrant/covenants has been violated or an indemnity is applicable. [FN102]

Neither the federal nor the state governments have developed mandatory standards applicable to the presence of mold in structures. Instead, the governmental efforts have focused on research and guidance, although unsuccessful steps were taken in 2002 to enact federal mold legislation. However, legislative activity focused on mold in various states has arguably heightened interest in the issue.

**1. Federal**

Legislation was introduced in the 107th Congress that would have focused the federal government on mold issues for the first time. The Toxic Mold Safety and Protection Act of 2002 ("Act") [FN103] would have tasked certain federal agencies with conducting research on the impact of mold on human health. It would have also required the development of guidelines for the investigation and remediation of mold.

The Act is language directed the Centers for Disease Control ("CDC"), EPA, and National Institute of Health ("NIH") to perform a comprehensive study of the health effects of indoor mold. [FN104] The EPA would then set standards in accordance with the studies. [FN105] They would include standards for mold inspection and remediation, certification of mold inspectors and remediators, and for air ventilation and/or air-conditioning systems. [FN106] The Department of Housing and Urban Development ("HUD") would have then been required to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

establish guidelines identifying construction conditions that contribute to indoor mold growth and recommend means for eliminating these conditions. [FN107]

The Act would have imposed specific obligations on certain property owners. Owners of rental property would be required to perform *38 annual inspections in accordance with set standards and to notify the occupants of the property of the inspection results. [FN108] The Secretary of HUD and the Administrator of EPA would then have been directed to promulgate regulations for the disclosure of mold hazards in housing which is offered for sale or lease. [FN109] These regulations would require that a house be inspected for mold before it is sold or leased and that the results of the inspection clearly and accurately disclosed to the purchaser or lessee. [FN110]

Inspection requirements for public housing were also established by the Act. [FN111] HUD would have been required to promulgate procedures to eliminate the hazards of indoor mold in existing public housing. [FN112] The agency was also charged by the Act with setting and imposing standards ensuring new public housing is built in compliance with the standards set forth in the Act. [FN113]

The Act would have further imposed new obligations on federal agencies that provide financial assistance for residential properties by requiring the performance of an indoor/toxic mold inspection prior to any federal agency making, insuring or guarantying a mortgage or loan for residential properties. [FN114] It included an amendment to the National Cooperative Research and Production Act of 1993. [FN115] Also addressed were standards for building products designed to retard the development of mold. [FN116] EPA was directed to provide grants to State and local governments to cover the costs of remediating mold growth in government buildings. [FN117]

The Federal Emergency Management Agency ("FEMA") was required by the Act to establish and carry out a national toxic mold insurance program. [FN118] Residential properties designed for one to four families must be given priority in the program. [FN119] The agency was also *39 required to establish a National Toxic Mold Hazard Insurance Fund in the United States Treasury. [FN120]

Some aspects of this proposed federal legislation have been criticized. There has been a particular concern about the provision requiring the establishment of minimum levels of exposure to mold. The opponents argued that additional research is needed to address the scientific uncertainties associated with the health effects of mold. [FN121] The challenge of setting standards that take into account individual sensitivities to mold has been cited as a practical impediment to this requirement. [FN122]

**2. State**

California became the first state to enact comprehensive mold legislation when the Toxic Mold Protection Act was signed into law in October 2001. The California legislation required the Department of Health Services to form a task force to aid [FN123] it in creating statewide mold standards. The task force must research and develop permissible mold exposure levels. The California law also requires that property owners disclose the known presence of mold to potential or current residents if the mold is in excess of the standards that are eventually developed. The state enacted a second law requiring the California Department of Health to develop programs for the education and training of mold-related issues.

Several other states have considered or enacted toxic mold legislation, including Indiana, New York, Maryland, [FN124] and New Jersey. [FN125] Legislation considered by Indiana provides an example of a state's efforts to address mold in a less comprehensive [FN126] manner than California. The legislation would have directed the state's Department of Health to convene a task force to advise it on the development of toxic mold standards. [FN127] It also directed the department to develop recommendations for indoor mold exposure limits. [FN128] The facilities for *40 which exposure limits would be established include hospitals, nursing homes, child care facilities, and elementary and high schools. [FN129]

**C. Confidentiality/Ethics Issues**

Some owners, operators or managers will undertake internal audits or assessments of their structures to identify and/or quantify mold issues. If so, they may have an interest in maintaining the confidentiality of the results. This

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

has been a concern for years of parties performing internal environmental assessments. Companies performing environmental audits [FN130] or assessments have recognized that undertaking these activities can pose certain risks.

One of the key concerns is that audits are by design intended to assess a facility's compliance status with respect to relevant federal and/or state environmental regulatory programs. In other words, their objective is to identify potential violations. Many companies and facilities fear that the audit results might be disclosed [FN131] or acquired by governmental agencies or other parties. [FN132]

The general absence of governmental regulatory requirements applicable to mold probably minimizes this particular auditing risk. Instead, the principal concern will likely be the need to protect such results and/or supporting documents from potential litigants in subsequent common law actions alleging damages. The attorney/client, work-product and/or self-evaluation privileges may only have limited usefulness in maintaining the confidentiality of audit or assessment documents. [FN133]

## 1. Attorney-Client Privilege

Arkansas Rule of Evidence 502(b) states "a client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself . . . and his lawyer." The Arkansas Supreme Court has stated that the purpose of the privilege is "to secure subjective freedom of mind for the client in seeking legal advice." [FN134]

*41 No Arkansas case has examined the applicability of the attorney-client privilege to an environmental audit or self-assessment for mold. Other jurisdictions addressing the question apply the formalities of the privilege rather strictly. In In re Grand Jury Matter, [FN135] a Pennsylvania District Court was faced with the question of whether a party could lawfully assert the attorney-client privilege and ignore a subpoena requesting waste handling records. The defendant in the matter claimed that the subpoena should be quashed because their attorney had hired a consultant to aid in compliance assurance. The court rejected this contention, instead finding that the communications must concern legal advice and could not be merely in the realm of consulting services. Instrumental in the decision was a finding that the consultant was working more directly for the company than the attorney. [FN136]

More recently, a New York District Court further restricted the application of the attorney-client privilege in the environmental context. In United States Postal Service v. Phelps Dodge Refining Corp., [FN137] the court refused to allow a company to invoke the attorney-client privilege with respect to documents created by an engineering firm hired to do environmental studies.

Several courts have found the attorney-client privilege to exist for documents created by an environmental consultant. In Arizona ex rel. Corbin v. Ybarra, [FN138] a corporate attorney retained a consultant to investigate possible violations of the state Hazardous Waste Management Act. The court found that under these circumstances, the consultant was part of the attorney's investigative staff and the report prepared following the investigation was for internal use and subject to the attorney-client privilege. Also, in Olen Properties Corp. v. Sheldahl, Inc., [FN139] a court determined an environmental audit was prepared so as to obtain legal advice and was therefore protected by the attorney-client privilege. [FN140]

## *42 2. Self-Critical Analysis Privilege

A few jurisdictions have found that confidentiality is provided by a "self-critical analysis" privilege. In Reichhold Chemicals, Inc. v. Textron, Inc., [FN141] a Florida District court found that a self-critical analysis privilege existed for environmental audits unless the party opposing the privilege could show extraordinary circumstances or need. A federal district court in Georgia applying the state's common law found that documents or files prepared by a company to evaluate its compliance with environmental laws were encompassed by a self-critical analysis privilege. [FN142] The court in United States v. Dexter [FN143] found that this privilege would obstruct enforcement and disallowed its use.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Even jurisdictions that recognize the privilege significantly restrict its applicability. Further, a federal district court in Arkansas has stated that the Eighth Circuit Court of Appeals does not recognize the self-critical analysis privilege. [FN144] The court noted that the audit contained the only information about the facility's releases and patterns/practices. [FN145] The court held that access to the data was necessary to assess a continuing risk from those releases to plaintiffs and the public. [FN146]

### 3. Work-Product Privilege

The attorney work-product exception provides slightly different protection than the attorney-client privilege. The Arkansas Supreme Court has stated that "[w]ork product is not the same as a privilege that protects the sanctity of confidential communications; the attorney-client privilege and the work-product rule the principles upon which they are based, while susceptible to confusion, are separate and distinct." [FN147] The federal rule governing attorney work-product states:

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for a *43 trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. [FN148]

Issues frequently arise as to what is "in anticipation of litigation." [FN149] The work-product rule might not provide protection for audits that are prepared for compliance assurance and not in contemplation of imminent litigation.

The perceived inadequacies or practical problems related to the use of the three common law doctrines triggered an effort several years ago to enact statutory privileges to better ensure the maintenance of the confidentiality of environmental audits. Specifically, many states developed statutory privileges for environmental compliance audits. [FN150] The state statutes use terms such as "environmental audit" to define the protected activities. Such terms arguably encompass voluntary efforts to address indoor environmental issues and protect public health. As a result, the mold assessment activities would seem to fit within the scope of these programs' protections.

An Arkansas statute provides an example. The state allows a facility [FN151] to conduct a voluntary "environmental audit" report which is privileged, if the statutory provisions are followed. The "environmental audit report" is the set of documents developed as a result of the audit. [FN152] Providing the audit to a purchaser or lender does not void the privilege. [FN153]

### D. Insurance

Many potential structural liabilities are addressed through the procurement of insurance. The types of policies used to cover these risks will vary with the party seeking coverage. A building manager or lessor may need a policy that *44 addresses operational risks. The lender may have a different perspective. It may use insurance to cover known or unknown risks related to the mortgaged property. Likewise, the architect or contractor may have to cover the exposure uniquely associated with their services. The different parties' need for coverage of mold risks will similarly vary.

The usefulness of an insurance policy is dependent upon the scope of the coverage, breadth of exclusions, and cost. Parties to transactions involving the transfer of structures will often consider whether insurance can satisfy any or all of the allocated risks. The initial question will be whether standard liability or casualty policies provide needed coverage to address the liabilities associated with mold. [FN154] If not, endorsements addressing mold or more specialized policies that cover these specific risks or conditions may need to be considered. [FN155]

### 1. Standard Policies

### a. Coverage Issues

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The liability exposure associated with structural mold has generated interest in what coverage (if any) is provided by general liability or casualty policies. [FN156] The coverage provided varies [FN157] as a function of policy language. [FN158] However, the courts have been increasingly asked to determine whether different policy provisions encompass mold. [FN159] The answer to the coverage question depends upon the answer to two underlying questions: (1) Did the mold result from a covered peril? and (2) Is there express exclusionary language that even if it did result from a covered peril? [FN160] Such issues are highlighted by a sampling of several recent decisions.

**(i.) Mold as a "Loss" and a "Cause of Loss"**

The Arizona Court of Appeals in Liristis v. American Family Mutual Ins. Co. found that an insurer was not entitled to summary judgment on the issue of mold *45 coverage. [FN161] The plaintiffs insureds filed a claim for water damage that occurred after their roof was damaged by fire [FN162] and also had their home tested for mold. [FN163] Mold was present, and their claim for "contamination caused by mold" was denied by their insurer. [FN164]

The relevant policy language stated, "[w]e do not cover loss to the property...resulting directly or indirectly from or caused by one or more of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss." [FN165] The list that followed labeled "Other Causes of Loss" included mold, presumably excluding mold damage. [FN166] The court interpreted the language to mean that mold could be both a loss and a cause of a loss. [FN167] Finding that the mold in plaintiffs' home was the actual loss, the court then held that "mold damage caused by a covered event is covered under the American Family policy in this case." [FN168] The court went on to note that a loss that was merely caused by mold would have been excluded. [FN169]

**(ii.) Occurrence Based Coverage**

Liberty Mutual Fire Ins. Co. v. Ravannack [FN170] presented a Louisiana federal district court with a question of policy interpretation in a mold-related injury case. [FN171] The insureds filed a complaint against several defendants, including their homebuilder, a subcontractor who did plaster work, those companies' insurers, and their own insurer to recover money for damages and injuries due to alleged defective construction resulting in structural damage and wood decay. [FN172] Because of the decay, *46 plaintiffs claimed that mold developed to which the Ravannack's children were continuously exposed. [FN173]

When suit was filed, GAINSCO, the subcontractor's insurer filed a motion for summary judgment claiming that it did not provide coverage at the time the Ravannacks' injuries occurred. [FN174] The subcontractor's Commercial General Liability ("CGL") policy provided coverage for bodily injury or property damage to which the insurance policy applied. [FN175] The policy stated: "This insurance applies to 'bodily injury' or 'property damage' only if (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' and (2) the 'bodily injury' or 'property damage' occurs during the policy period." [FN176] "Occurrence" was defined by the policy as "'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" [FN177]

Therefore, the motion for summary judgment, and the question of coverage, hinged on the timing of the occurrence of the injury. [FN178] The court determined that the policy's definition of "occurrence" encompassed coverage during the time the GAINSCO policy was in effect under the clear meaning of the contract. [FN179] Because there was a possibility for coverage under the GAINSCO policy, the court denied its motion for summary judgment and allowed the case to go to trial. [FN180]

In Allstate v. Hicks, [FN181] the Texas Court of Appeals reached a somewhat different determination. In Allstate, the owners of a home sued the former owner claiming *47 property damage and personal injury resulting from exposure to mold, which they alleged had developed in the house as a result of defects in the plumbing. [FN182] The former owner "tendered defense of the claims against him to Allstate under the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

liability coverage of his homeowners insurance policy in effect at the time of his sale of the house" to the plaintiffs." [FN183] Allstate subsequently denied that the policy covered the plaintiffs claims [FN184] and additionally, that the plaintiffs "did not allege bodily injury or property damage caused by an occurrence." [FN185]

The Allstate policy in question defined an "occurrence" as "an accident, including exposure to conditions, which results in bodily injury or property damage during the policy period." [FN186] The court stated that "if a petition does not allege facts within the scope of coverage, an insurer under a liability policy is not required to defend a suit against its insured." [FN187] The court then rejected the defendants argument that the plaintiffs "could have been exposed to mold during the policy period." [FN188] The court explained this determination by stating "we do not read the Duddings' petition as alleging that they were exposed to mold during the policy period." [FN189]

The court found this even though the petition neither alleged when the plaintiffs were exposed to the mold nor when the injuries from the mold manifested themselves, [FN190] and it was entirely possible that the plaintiffs were exposed to the mold during the policy period. Therefore, Allstates motion seeking a judicial declaration that it owed it insured neither a duty to defend nor a duty to **\*48** indemnify him with respect to the plaintiffs' mold claims was granted by the appeals court. [FN191]

**(iii.) Notice Requirements**

Depending on the language incorporated in an insurance policy, it may be imperative to provide "prompt" notice to the insurer after a loss has been discovered. [FN192] Whether notice is "prompt" is generally a question of fact, evaluated under a standard of reasonableness. [FN193] Notice of a mold claim may, however, be considered unreasonable as a matter of law if the facts of the case are undisputed and the notice is somehow delayed and not excused. [FN194]

Notice must be given after mold damage becomes "manifest" or "apparent." [FN195] Apparent does not necessarily mean discovered; "just because something is unknown to an individual does not render it, in an objective sense, unapparent." [FN196] Generally, "the date of occurrence is when the damage is capable of being easily perceived, recognized, and understood." [FN197] But, "an insured cannot fail to discover an obvious defect through sheer indolence...and later decree such defect apparent on the date it was discovered." [FN198]

Failure to give notice of manifest mold damage for over a year was unreasonable, and would serve as a bar to coverage. [FN199] Additionally, where manifestation of damages occurs prior to inception of contracts for property insurance, coverage is barred. [FN200]

Leverence v. U.S. Fidelity & Guaranty, [FN201] another homeowner case, produced an outcome similar to Ravannack. Almost 800 occupants who lived in pre-**\*49** manufactured homes sought damages from the manufacturer, Tri-State Homes, Inc. (Tri-State) and its insurers for "bodily injuries and for the cost of repairs required due to their bodily injuries or illnesses." [FN202]

Plaintiffs alleged that the excessive moisture in their homes was due to defective design and faulty construction practices. [FN203] The Tri-State's CGL policy required it to give notice of an "occurrence" "as soon as practicable." [FN204] As in most CGL policies, "occurrence" was defined as "an accident or happening or event or continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage...during the policy period." [FN205] The court held that because the occupants did not connect their health problems with the excessive humidity, Tri-State was not on notice and thus could not give notice to its insurers for potential claims. [FN206] That being so, summary judgment for the insurer as to the notice-of-the-occurrence requirement was denied. [FN207]

The homeowners also claimed property damage due to repairs necessary to cure health problems. Although their claim was denied, they were not completely precluded from recovery. [FN208] Their Home Insurance policy contained a pollution exclusion that stated the policy did not apply to: "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                          Page 13
13882 NBI-CLE 19
(Cite as: 13882 NBI-CLE 19)

gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water *50 course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental." [FN209] The court concluded that the growth of mold was undisputedly "unexpected and unintended," fitting into the "sudden or accidental" language of the policy, and denied summary judgment for the insurers. [FN210]

**(iv.) Covered Perils**

In Blaine Construction Corporation v. Insurance Company of North America, plaintiff construction company used an exception to the faulty workmanship exclusion in its builder's all-risk property damage policy to establish a claim. That exception provided coverage for damage or loss "ensuing" from an insured peril. No coverage, however, would be provided for costs incurred from correcting faulty workmanship itself. [FN211]

The policy at issue contained three clauses of interest. First, the "perils insured against" clause stated, "'[t]his policy insures against ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE to property insured including general coverage...except as excluded.'" [FN212] Next, the Perils Excluded section provided: "[t]his policy does not insure loss or damage caused directly or indirectly by any Peril excluded. Such loss or damage is excluded whether contributed to, in whole or in part, by any excluded Peril." [FN213] Finally, the policy excluded twenty named perils including "...faulty workmanship or faulty materials, unless loss or damage from an insured Peril ensues and *51 then only for such ensuing loss or damage." [FN214] Plaintiffs' policy, however, did not contain a general water damage exclusion. [FN215]

When the insulation's vapor barrier began to accumulate condensation, forming mold, the building owner determined that Blaine would have to remove the water-soaked insulation. [FN216] The cost to Blaine was allegedly $315,000. [FN217] Defendant denied his claim. [FN218] The trial court held that the exclusionary clause in plaintiff's policy unambiguously precluded its recovery and granted summary judgment for the defendant. [FN219] Upon de novo review, the Sixth Circuit court reversed holding the faulty workmanship exclusion did not bar plaintiff from recovery since water, a covered peril, is what caused the damage and that was the reason plaintiff sought indemnity. [FN220]

In Shelter Mutual Ins. Co. v. Maples, [FN221] the Eighth Circuit remanded to the district court the issue of whether a frozen pipe, a covered peril, was the "dominant and efficient cause" of the claimed loss. [FN222] In Maples, a broken pipe filled the insured's basement with four to six inches of water. [FN223] The water caused only minimal structural damage, but the resulting humidity caused mold to form on the interior surfaces of the home. [FN224] The mold made the home uninhabitable and necessitated its demolition. [FN225] The policy clearly excluded losses resulting from mold. [FN226] The Eighth Circuit instructed the district court to make further findings of fact to determine if the excluded peril (mold) or the covered peril (frozen pipe) was the dominant cause of the loss. [FN227]

*52 In some states, such as Arizona, an insurer can effectively exclude losses resulting from concurrent or sequential causes by including a "concurrent causation lead-in clause." [FN228] Arizona law recognizes these clauses because Arizona does not recognize the "efficient proximate cause" rule. [FN229] The efficient proximate cause rule dictates that an insurer must cover a loss when a covered peril is the proximate cause of the loss even if subsequent or concurrent events are specifically excluded from coverage. [FN230] An Arizona insurer can exclude coverage for mold damage resulting from a plumbing leak by including a concurrent causation clause. [FN231]

In states that do recognize the efficient proximate cause rule, insurers can only avoid paying a claim if the efficient proximate cause of the loss is an excluded peril. [FN232] If the predominant cause of the loss is a covered peril, the loss is covered even though other independent forces in the chain of events are excluded from coverage. [FN233] The determination of the efficient proximate cause of loss is a question of fact for the factfinder. [FN234]

Texas courts recognize the doctrine of concurrent causes. [FN235] That doctrine provides that when covered and excluded perils combine to cause a loss, the insured may recover only for the portion of the loss caused by the covered peril. [FN236] The burden of demonstrating the damage caused solely by the covered peril is on the insured. [FN237] In Fiess v. State Farm Lloyds, [FN238] Plaintiffs failed to meet the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

burden of segregating the damages caused by pre-existing *53 water leaks (covered peril) and mold growth (excluded peril). [FN239]

**(v.) Ensuing Loss**

The insured in Fiess argued that the ensuing loss clause in the State Farm policy should cover the mold resulting from the leaking pipes. [FN240] The relevant portions of the insurance policy in that case stated, "We [State Farm] do not cover loss caused by: rust, rot, mold, or other fungi." [FN241] The ensuing loss provision provided, "We do cover ensuing loss caused by collapse of building or any part of the building, water damage or breakage of glass which is part of the building if the loss would otherwise be covered under the policy." [FN242]

The Fiesses argued that the mold damage was an ensuing loss from the covered peril of water damage. [FN243] According to the court, however, the Fiesses interpretation of their insurance policy "reverse[d] the causation required by that exception." [FN244] The court held that the ensuing loss clause provides coverage for covered perils resulting from excluded perils. [FN245] According to the Fiess court, the insured is only covered for water damage resulting from mold, not vice-versa as Plaintiffs contended. [FN246] The court held that State Farm could deny coverage for the mold damage. [FN247]

One Texas court has reached the opposite conclusion regarding coverage for mold damage under ensuing loss clauses. In Home Ins. Co. v. McClain, [FN248] the Court of Appeals of Texas analyzed an insurance policy with terms almost identical to those in Fiess. [FN249] Home *54 Insurance argued that the ensuing loss provision in the insured's policy covered only water damage resulting from mold or fungus damage. [FN250] The court disagreed and wrote in an unpublished opinion that the mold damage was a consequence of water leakage, and was therefore covered under the ensuing loss provision of the insured's policy. [FN251]

Additionally, in Flores v. Allstate Tex. Lloyd's Co., [FN252] a Federal District Court from the same district as Fiess expressly declined to follow the holding of the Fiess court. [FN253] In a footnote, the court in Flores stated: "[t]his court declines to follow the reasoning of Fiess v. State Farm Lloyds, in which the court concluded that the Texas HO-B policies exclude mold damage completely, regardless of the cause, and that mold coverage is also not included under the "ensuing loss" provision when it is caused by water damage." [FN254] The court in Flores held: "mold damage to the dwelling is covered as a distinct loss if it ensues from an otherwise covered loss under the policy." [FN255]

**(vi.) Pollution Exclusions**

Prior to 1985, most insurance contracts contained "qualified pollution exclusions." That year, however, many insurers replaced the qualified pollution exclusion with the "absolute" or "total" pollution exclusion. [FN256] The total pollution exclusion has sparked controversy and in many cases, led to inconsistent results.

Many courts have pronounced the exclusion unambiguous and applied it broadly, even to incidents that are not classic environmental pollution. [FN257] Other courts *55 have found the clause to be ambiguous as applied to personal injury claims arising out of a more direct contract with a substance that may fall into the exclusions broad definition of "pollutant." [FN258]

Courts following the latter approach have done so for a variety of reasons: because terms such as "dispersal," "discharge," "irritant," or "contaminant" are terms of art in environmental law; [FN259] because the general purpose of the clause is to shield insurers from the costs of environmental cleanups; [FN260] or because a literal reading of the provision could yield absurd results, thus requiring the application of a limiting principle. [FN261]

The absolute or total pollution exclusions do not include much of the language previously utilized in the qualified pollution exclusions. For example, the total pollution exclusion does not include the clause "into or upon the land, the atmosphere or any water course or body of water." This has generated yet another controversy over whether the deletion of this language makes a difference. Some courts have held that the omission expands the scope of the exclusion beyond classic environmental pollution. [FN262] Others have rejected the distinction, concluding it