does not alter the scope of the clause. [FN263]

In Lexington Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd., [FN264] a Texas court addressed the issue of whether an insurer was liable for mold damage to first and second floor apartments that was caused by leaks in the roof despite the pollution exclusion in the insured's policy. [FN265] The policy at issue provided that the policy did not cover "loss or damage *56 caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy." [FN266] Pollutants, in brief, included liquids, among other things, which once released, "can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, fungi, virus...." [FN267]

The court held that the pollution exclusion effectively excluded fungi in its list of contaminants. [FN268] Because the policy was constructed to exclude damage "that is not only 'caused' but that is 'contributed to or made worse by' any of the defined contaminants or pollutants," the court found the insurer was not liable for damages due to the mold. [FN269]

In 2003 a Louisiana court reached the opposite conclusion. The plaintiff in State Farm Fire and Casualty v. M.L.T. Construction Co. [FN270] worked as a legal secretary in the HH&K building in New Orleans. [FN271] The owner of that building hired a contractor and architect to re-roof the building. [FN272] During the construction, the roof leaked on a number of occasions. [FN273] The rainfall lead to the growth of mold and mildew in the building. [FN274] The plaintiff claimed that the building's mold and mildew aggravated her allergies and asthma. [FN275] She sued a number of defendants, *57 including State Farm. [FN276] State Farm argued that the insurance policy it provided the contractor contained a total pollution exclusion that allowed State Farm to deny coverage for plaintiff's injuries. [FN277]

The pollution exclusion stated, "This insurance does not apply to: 'Bodily injury' or 'property damage' which would not have occurred in whole or in part but for the actual . . . discharge, . . . seepage, . . . or escape of pollutants." [FN278] The exclusion defined pollutants as "any solid, liquid, gaseous, or thermal irritant or contaminant." [FN279]

The Louisiana court utilized a multi-factor test to conclude that coverage for the plaintiff's claims was not excluded by the total pollution exclusion. [FN280] The court held that rainwater and the resulting mold did not fall within the definition of pollution in the State Farm policy. [FN281] The court explained, "[T]he clear purposes of the pollution exclusion clauses are to prevent businesses from escaping responsibility for polluting behavior by procuring insurance to cover such losses and further to encourage businesses to curb polluting activities." [FN282]

In 1990 the Wisconsin Court of Appeals used a different approach, but reached the same conclusion. The insurance companies in Leverence v. U.S. Fid. & Guar. [FN283] argued that the policies' pollution exclusion clauses excluded coverage for mold growth in negligently built homes. [FN284] The exclusion, however, stated, "this exclusion does not apply if such discharge, dispersal, release or *58 escape [of contaminants, pollutants, etc] is sudden or accidental." [FN285]

The court held that "the phrase 'sudden and accidental' means unexpected and unintended." [FN286] The parties did not dispute that the growth of the mold was unexpected and unintended. [FN287] The court, therefore, concluded that the pollution exclusion was inapplicable to the mold claims. [FN288]

## E. Claims Against Insurers

The discovery of mold has generated significant breach of contract litigation. However, insurers' adjustment or handling of the insured mold problem has also been a source of conflict. These conflicts have sometime resulted in bodily injury claims against the insurer. Policy holders sue insurance companies for breach of contract. In Strader v. Grange Mutual Ins. Co., [FN289] for example, the policy holders argued that the insurance company breached its duty to the insured by causing unreasonable delays in repairing a leaking roof, and for failing to correct an existing

moisture problem. [FN290] The insured argued that the insurer's breach of duty resulted in the mold growth that caused an aggravation of the insured's asthma. [FN291] The Strader court held that a tort claim will not lie against an insurer unless the insurer "violated some standard of care that is not part of the defendant's explicit or implied contractual obligations; and . . . that the independent standard of care stems from a particular special relationship between the parties." [FN292] The Oregon court held that the insurer's delayed payment or nonpayment for roof repair and mold damage were breaches of the insurance contract, but did not give rise to a standard of care independent of the contract terms. [FN293]

There are some instances in which bad faith and punitive damage assertions may be made against an insurer. In Anderson v. Allstate Ins. Co., [FN294] Thomas Anderson sued Allstate in a diversity action for breach of the implied *59 covenant of good faith and fair dealing. The claims arose out of Allstate's insurance of Anderson's residence. [FN295] The jury at the trial found that, "Allstate acted maliciously and oppressively in not fully compensating for repairs, particularly including elimination of mold, after a water pipe broke in Anderson's home." [FN296]

In Anderson, a pipe had broken in the attic of Anderson's home causing extensive water, mold, and mildew damage. [FN297] In the process of investigating the claim, Allstate's adjuster reported inconsistencies in the damage reports and repair evaluations, and subsequently referred the claim to Allstate's Special Investigations Unit ("SIU"). [FN298] Throughout the process Allstate maintained that coverage was questionable because of their belief that no one was living in the house at the time of the leak, and that the heat had not been on. [FN299] Allstate failed to resolve these matters and at, first, "undertook to repair in accordance with estimates supplied by Anderson and their adjuster." [FN300] However, in its first offer to Anderson, Allstate included a warning that it would take the money back if it determined that there was no coverage. [FN301] Additionally, "[m]uch later, when more extensive mold damage was discovered, an Allstate adjuster named Hirsch rejected Anderson's offers of evidence of additional required repairs, saying that Anderson had been offered all he was going to get." [FN302]

In affirming the finding of bad faith and the compensatory damage award, the 9th Circuit Court of Appeals stated: "[t]he jury could properly find that Allstate breached its duty of good faith and fair dealing by acting unreasonably when handling Anderson's claim." [FN303] However, the 9th Circuit reversed the punitive damage award stating that "[a] finding of bad faith does not automatically entitle a plaintiff to punitive damages." [FN304] The court found that for punitive damages to be awarded, "[t]he conduct must be such that it could be described as evil, criminal, recklessly indifferent to the rights of the insured, or having a vexatious intention to injure." [FN305]

*60 Determining whether mold is covered under a particular insurance policy is important, but it is also important for insurance companies to remember to exercise good faith in doing so. If the behavior exhibited is egregious enough, the insured could recover not only compensatory damages, but punitive damages as well.

## 1. Arkansas and the Total Pollution Exclusion

Arkansas' appellate courts have not been faced with the issue of whether mold damage is excluded under a total pollution exclusion. The Arkansas Supreme Court has, however, interpreted a total pollution exclusion in another context. In Minerva Enterprises, Inc. v. Bituminous Casualty Corp., [FN306] a tenant in Minerva's mobile home park successfully sued Minerva after the park's septic system backed up into the tenant's mobile home. [FN307] Minerva filed suit against its insurer, Bituminous, for its failure to defend and indemnify Minerva. [FN308] Bituminous argued that the pollution exclusion in Minerva's liability policy allowed Bituminous to deny coverage for the sewage back-up. [FN309]

The supreme court determined that the issue before it was the definition of the word "pollutants," as used in the policy exclusion. [FN310] The exclusion defined pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

The court determined that the exclusion "is intended to prevent persistent polluters from getting insurance coverage for general polluting activities . . . and was never intended to cover those who are not active polluters but merely had caused isolated damage by something that could otherwise be classified as a 'contaminant' or 'waste.'"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                         Page 17
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

[FN311]

The court stated that it was not clear from the language of the policy whether a single back-up of a septic tank is necessarily the kind of **\*61** damage the clause was intended to exclude. The court held that the pollution exclusion was "at least ambiguous" and therefore did not exclude coverage for the sewage back-up. [FN312]

**2. Exposure Via Employment**

An Arkansas case demonstrates that insurers are not alone in liability suits. More frequently, general con-tractors, engineers, architects, homebuilders [FN313] and schools [FN314] are being sued. [FN315] In Crossett School Dist. v. Gourley, [FN316] the Arkansas Court of Appeals heard a case brought by a teacher against her employer school district. [FN317] A new heating and air-conditioning system was installed in Gourley's classroom in the summer of 1989. [FN318] Leaks in the system caused mold to develop which irritated the teacher's pre-existing allergies. [FN319]

In her claim brought before the Workers' Compensation Commission, Gourley was compensated for the occupational disease she developed from exposure to mold. [FN320] The school district argued on appeal that appellee had not proven that her employment increased the risk of developing the occupational disease she contracted. [FN321] The Arkansas Court of Appeals found otherwise, holding that even though the exposure to mold was not particular to the occupation of a teacher, in this case, it was apparent that her exposure to mold was due to her employment, thus increasing her risk. [FN322]

**3. Policy Cancellations/Exclusions**

Some property and casualty policies provide coverage for certain mold-related risks. However, various insurance lines have paid significant mold-related claims over the past few years. [FN323] These claims have often involved residential or commercial structures.

A number of insurance companies have responded to the increase in claims by refusing to issue new policies or canceling existing ones. [FN324] The carriers have also amended certain policies to specifically exclude or **\*62** narrow coverage for various mold risks. [FN325] This is often accomplished by precluding coverage for naturally occurring or uncovered events. [FN326]

Mold has forced both state insurance commissioners and legislatures to address insurance policy cancellations and related issues. The states' efforts have included attempting to preserve the ability of homeowners in some states to obtain policies for their homes. [FN327] They have also set parameters for insurance companies proposing to modify their policies to exclude certain mold risks or otherwise narrow coverage. [FN328]

Even if coverage for mold is available, the cost of the policy premiums is likely to rise. [FN329] The residential market has experienced mold related premium increases in some states. [FN330] Premiums may in some instances vary because of a characteristic of the structure. [FN331] Substantial increases would obviously potentially impact the profitability of residential, commercial and other rental properties.

**4. Mold Endorsements/Environmental Impairment Liability Insurance Policies**

The exclusion of various mold risks from an insured's liability and casualty policy means it will have to determine whether coverage is available from another source. [FN332] Parties seeking coverage might determine if a standard liability or casualty carrier is willing to insert an endorsement into the policy to address mold-related damages. In the alternative, they might seek separate specialty policy coverage. The relevant policies may include environmental impairment liability ("EIL") insurance policies amended to cover mold, or a policy solely focused on mold-related risks. This coverage would presumably be obtained if the risk warrants the additional financial outlay.

EIL policies will typically provide coverage for on-site/off-site remediation and common law bodily injury/property damage claims related to pollution conditions. [FN333] Common types of policies include **\*63** Cleanup Cost Cap, Pollution Liability, and Secured Creditor. [FN334] They are often used to provide the parties

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

greater certainty in quantifying and allocating environmental risks in contaminated real property transactions. Various versions of these policies may be substituted in some instances for a transactional assessment [FN335] or an indemnity [FN336] that would otherwise be required to address a potential environmental risk. [FN337]

The process for issuing an EIL policy differs from the general casualty and liability policies in a key respect. The casualty and liability policies are issued by most companies using similar formats and terms. In contrast, ELI policy terms are not uniform. The terms may vary by transaction and company. [FN338] The final policy terms are often the result of negotiation between the insurance company and insured. [FN339] The policies may be crafted to address the needs of a particular project. [FN340]

The potential applicability of EIL policies to mold should be considered. However, mold exclusions [FN341] have been placed in some of these policies. [FN342] This has been accomplished by a specific reference to the organisms or more generalized exclusion. [FN343] Further, coverage may be limited to contaminants whose presence constitutes non-compliance with environment laws and/or is in excess of background/natural conditions.

Some insurance companies may be willing to expand these policies to cover mold liabilities. [FN344] The removal of the exclusion may require additional underwriting [FN345] and a premium. If so, unlike more standardized, general comprehensive liability policies, companies issuing pollution liability or environmental impairment policies are generally willing to negotiate these terms. [FN346] The policy might be revised to include this risk by addition of terms such as mold or fungus to the definition of "pollutant".

## F. Mold as a Potential Material Transactional Issue

### 1. Transactional Impairments

### *64 (i.) Liability Exposure

Mold has generated litigation in a variety of contexts. The potential defendants have include a variety of parties that had or have some relationship with an affected structure. The subject areas have involved products liability, bodily injury, [FN347] property damage, safe workplace, [FN348] workers compensation, [FN349] construction/design defects, [FN350] lessor-lessee and insurance coverage. [FN351]

### (ii.) Structure Value

Environmental issues may affect the value of improved real properties. A few problematic materials or conditions are found inside structures. [FN352] Examples include lead-based paint [FN353] and asbestos. [FN354]

Similarly, the presence of mold in a structure or building could presumably reduce its monetary value in some circumstances. [FN355] The valuation of a structure materially affected by an indoor contaminant can be a challenging calculation. [FN356] The market might discount the value of the structure based on the cost to remove the mold, [FN357] projected effect on rental [FN358]/occupancy [FN359] rates, [FN360] and perceived third-party common law property damage and/or bodily injury liability exposure [FN361]

The identification or quantification of a particular environmental issue or contaminant may be beyond the scope of an appraisal of the value of the structure. The appraiser may disclaim responsibility for identifying or costing certain environmental issues. [FN362] Instead, the appraisal may simply attempt to evaluate the impact of such costs on the value of a structure. [FN363]

The appraisal of structures with potential material amounts of mold will presumably be equally challenging. An author *65 commenting on the role of indoor air pollutants in the structure valuation process noted:

When a commercial building suffers from SBS, [FN364] it affects the application of the three approaches to raise in the following ways:

Sales comparison approach: It will be difficult to find truly comparable properties if the subject exhibits

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SBS. Adjustments for differences in physical condition between healthy and sick buildings may be extremely difficult to quantify.

Cost approach: It will be difficult to estimate accrued depreciation due to indoor air quality problems.

Income approach: SBS affects the operating costs of the structure, thus altering the net operating income (NOI), an integral part of determining value according to the income approach. Furthermore, development of an overall capitalization rate using market extraction will be difficult for properties with SBS. Other less reliable methods for determining $R_o$ will have to be applied.

### (iii.) Assessment/Remediation Costs

The assessment and/or remediation of structural mold will entail some costs. These costs will obviously vary. [FN365] Regardless, material costs must be considered in a particular transaction

### 2. Relevant Real Property Transactions

### (i.) Acquisition/Sale

Whether material amounts of mold or the conditions that facilitate its growth are present will probably increase in importance as an issue in the acquisition of various structures. Potential purchasers will seek to ensure they either avoid acquisition of materially affected structures or *66 that the price is discounted to the extent necessary to take into account the possible effect on value. The seller may need to ensure that the market does not unnecessarily reduce the value of the structure based on perceived risks associated with mold.

### (a.) Environmental Contingency

Contracts for the sale of various types of real properties or structures almost always contain provisions providing the potential purchaser the opportunity to perform an environmental assessment during a due diligence period. [FN366] The document will typically make the consummation of the acquisition dependent upon purchaser's satisfaction with the results of the assessment. [FN367] The potential role of this clause in the context of mold issues may need to be considered.

If the purchaser deems mold a potential material issue, the environmental contingency clause should be revised to ensure it clearly encompasses the organisms and associated growth conditions. [FN368] Equally important is the need to ensure that the purchaser has the authority to undertake the full scope of its desired mold inspection.

Sellers may have a different perspective. They will consider whether mold should constitute a contingency in the transaction. The inclusion of mold in this provision might provide the potential purchaser an unlimited ability to terminate the *67 transaction. The ubiquitous presence of mold and associated spores may make it difficult to limit a purchaser's use of this clause to cancel the transaction unless it is narrowed or limited to some extent. [FN369]

### (b.) Express Warranty

The agreement for the sale of a structure will usually require that the parties expressly warrant various matters. Express warranties in real property transactions are covered by contract and warranty law. [FN370] The increasing interest in mold may result in more detailed warranties which address the presence of objectionable amounts of the organisms and/or the conditions or defects that may facilitate growth.

There may be impediments to the enforcement of warranties addressing these issues. [FN371] Tort liability only applies if an express warranty is breached when property or personal injury damages have resulted. [FN372] Further, the statutes of limitation may pose a challenge when the warranties involve an indoor contaminant. In addition, to recover for damages resulting from indoor contaminants in a real property transaction, one must suffer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                 Page 20
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

more than economic losses. [FN373]

**(c.) Implied Warranty of Habitability**

A key question will be whether the implied warranty of habitability is potentially relevant to the presence of mold in certain structures. The doctrine *68 often arises in the context of the construction of a new home. It requires that the home be constructed in a good workmanlike manner and be fit for human habitation. [FN374] Therefore, the plaintiff must prove that the structure contains construction defects to a degree that renders it uninhabitable. [FN375]

The existence of an express warranty may eliminate an implied warranty in some jurisdictions. [FN376] Implied warranties arise by operation of law, and may not rest solely on an agreement between the buyer and the builder. [FN377] The implied warranty may only be expressly excluded by circumstances sufficient to call the buyer's attention to the fact that no implied warranties exist or that they have been excluded. [FN378] However, if the contract states the property is "as is," the implied warranty of habitability may be waived. [FN379] The general rule is the cost of fixing the defects, rather than the difference in the value, is the property measure of damages for breaches of implied warranty of habitability. [FN380]

**(ii.) Leasing [FN381]**

**(a.) Baseline**

The lessor and lessee will often attempt to establish an environmental "baseline" [FN382] condition for the leasehold at the inception of the lease. [FN383] The parties negotiating the lease of a structure may wish to consider whether the environmental baseline should encompass mold and the conditions that *69 facilitate its growth. The lessor's goal in establishing a baseline may be to preclude a subsequent argument by the lessee that the objectionable conditions existed prior to its occupation of the premises. Similarly, the lessee will want to ensure that it identifies any pre-existing conditions to avoid inadvertently assuming responsibility or being blamed for them.

The fact that mold is naturally present in a structure complicates the establishment of a baseline. The presence of mold as part of the background environment and paucity of definitive standards will make delineating acceptable conditions difficult. Sampling of structure surfaces or air is likely to confirm the presence of some organisms and/or spores. Therefore, determining whether there are abnormal amounts or types of mold would require some complex sampling and analysis. The typical lessor and lessee will probably focus on visual identification of both mold and the conditions that facilitate its growth.

**\*70 (b.) Warranty**

**i. Express**

Mold and the conditions that facilitate its growth might be a component of the warranties that are sought to address indoor air quality. Some potential lessees will demand certain assurances as to the environmental conditions inside the structure. Sophisticated and/or larger lessees such as governmental agencies and commercial operators may attempt to obtain warranty provisions in the lease that specifically address air quality and associated conditions. [FN384] These lessees' objective is to attempt to better ensure that their use of the premises will not be impaired by structural contaminant issues. Such interruptions and/or restricted use of the leasehold can have significant financial consequences.

Mold growth can be exacerbated by the activities of the structure's lessees. The prudent lessor may attempt to more definitively detail the activities that either cannot occur or must be undertaken to prevent material mold growth. It may be particularly important to ensure that any relevant maintenance activities allocated to *71 lessees are undertaken pursuant to a prescribed schedule.

**ii. Implied Warranty of Habitability**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A number of lessees have sought judicial relief because of the alleged presence of mold in their apartments. The basis for such relief may be an allegation that the lessor has breached the implied warranty of habitability. [FN385] The absence of mold action standards will likely make a habitability determination somewhat subjective.

The lessee may argue that such conditions constitute a constructive eviction. [FN386] The remedy sought may include the remediation of the contaminant problem. In addition, the lessee may withhold rent until the condition is fixed. [FN387]

**(iii.) Repair/Maintenance**

The delineation of repair/maintenance responsibilities in the lease agreement will determine whether the lessor or lessee must address objectionable [FN388] amounts of mold and/or the condition/activities that facilitate its growth. The negotiation and allocation of these responsibilities may assume greater importance in the lease. [FN389] The responsibility for certain activities involving *72 cleaning, equipment acquisition, repair and maintenance may assume added importance because of mold concerns. [FN390] These responsibilities are often already addressed in varying detail in many leases.

The burdens placed on the lessee will vary with the type of structure. For example, an apartment lessor might simply include provisions in the lease placing lessees on notice that they are expected to exert common sense efforts to control mold or mildew. These might include the maintenance of appropriate ventilation and humidification to retard mold growth.

A lessee seeking to recover damages associated with structural mold may attempt to determine whether the lessor breached certain lease provisions or was negligent. A lessor can be held liable for the failure to repair the leased premises under a breach of contract theory. [FN391] The failure to repair or excessively deferred maintenance might also in some circumstances result in a finding of negligence, or negligence per se if the appropriate statutory structure is available, against a landlord. [FN392]

**(iv.) Reporting**

Some leases require that the lessee report certain conditions, events or occurrences to the lessor within a specific period of time. The expeditious elimination of visible mold growth will clearly reduce or prevent subsequent remediation *73 expenditures. Likewise, mold growth will only be eliminated when the conditions that facilitate it are corrected. [FN393] The expansion of the lease reporting requirements to encompass these conditions and events might therefore be prudent.

**3. Financing**

**a. Assessment/Inspection**

A financial institution's willingness to loan funds is usually dependent upon the receipt of sufficient collateral. This collateral will often include a mortgage on a structure. The potential impact of environmental issues on the value of the mortgaged property is an issue that lenders have recognized for years. The lender's primary means for addressing this concern has been the environmental assessment of the property or structure prior to consummation of financing. [FN394] The assessment is intended to provide the lender confidence that it understands what environmental risks are associated with the proposed collateral.

Indoor contaminants have not traditionally been key concerns. [FN395] Substances such as lead-based paint and asbestos have been long-standing exceptions. However, lenders will probably increasingly consider whether mold and other indoor air quality issues should be part of an assessment of a structure that is to be collateralized.

The potential impact of mold on the collateralized structure may expand the lender's interest in these issues. This interest is driven by a concern that mold and other indoor contaminant issues might in some circumstances impair the structure's value and cash flow of the mortgage holder. The lender must also be cognizant of *74 the fact

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that mold is as likely to be present in a residential structure as a commercial/industrial facility.

The lender may also face challenges in imposing mold assessment requirements on some of its borrowers. This may require lenders to focus additional attention on some residential properties from an environmental risk management perspective. An important concern is whether imposing such a requirement on a potential borrower will place the financial institution at a competitive disadvantage. [FN396] The answer to this question may vary with the type of structure/property that is to be collateralized. Some structures have occupants or uses that tend to be deemed especially sensitive to mold. These might include hospitals, multifamily residences, etc. [FN397] There may be particular interest in assessing whether there are material mold concerns associated with such properties.

The lender will also recognize that mold is by definition a potentially reoccurring issue. The initial or subsequent determination that neither material amounts of mold nor the conditions that facilitate it are present in the structure is no assurance that material growth is permanently eliminated. Consequently, a lender concerned about mold would need to obtain and periodically utilize the authority in the loan documents to perform subsequent inspections.

**b. Loan Document Language**

The documents used to memorialize a loan involving a structure or real property usually address environmental issues to some degree. Either of these professionals' services might be scrutinized if material mold growth is provide certain warranties or assurances concerning the historical and prospective operation of the facility. **\*75** The documents will include provisions addressing both environmental compliance and the presence/absence of hazardous materials or substances. Corresponding indemnities will provide remedies for the breach of these provisions.

The application of this standard language to mold poses a problem. Mold would not be encompassed by the key loan document environmental provisions. The terms "hazardous substances" or "hazardous materials" would not typically be applicable to mold. Further, neither the federal nor state environmental governmental programs are applicable to these organisms. These terms and programs are often used to compel or prohibit certain borrower activities or actions. The lender may be required to reference mold or the conditions that facilitate its growth or incorporate any applicable guidance or recommended practices. [FN398]

**4. Construction**

A structure or facility must be both designed and constructed. The architect and contractor respectively will perform these functions. Either of these professionals' services might be scrutinized if material mold growth is discovered in the structure. [FN399] This may be more likely in the case of newer structures. [FN400] Architects and contractors [FN401] may therefore need to consider the circumstances in which liability might be imposed on them for damages related to objectionable mold growth.

Mold may pose a relatively greater risk to architects and contractors because their ability to cover such liabilities may be limited. The reason is two-fold. First, in competitive markets the architect or contractor [FN402] may not always have the leverage to allocate some mold risks to the other parties [FN403] to their respective service contracts. [FN404] If so, the desired contractual protections [FN405] may be difficult to obtain.

**\*76** Second, insurance is often used to cover the risks that these professionals have been allocated or forced to retain. Whether insurance is a viable option in the case of mold risks associated with the performance of these services is uncertain. Various risks related to mold have been or may eventually be excluded from the insurance coverage maintained by these two groups. The failure to procure a policy would leave this exposure uncovered. [FN406]

**a. Design**

The interest in mold likely means that the architect's ability to design [FN407] a structure that minimizes the conditions that facilitate its growth has assumed greater importance. The ability of building material to resist

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                     Page 23
13882 NBI-CLE 19
(Cite as: 13882 NBI-CLE 19)

fungal growth should be added to the criteria for selection. This will presumably include both the structure's ability to resist water intrusion and maintain appropriate air circulation/humidity. [FN408] The architect may also need to ensure that to the extent possible the provided services include state of the art technology. [FN409]

Design professionals may need to better understand the responsibilities they have been allocated in the project contractual agreements in regard to mold and other indoor pollutants. It may be important for all the construction professionals [FN410] to identify and allocate responsibility for the materials and systems related to indoor contaminant issues. However, the architect may at a minimum need to ensure that the relevant agreements clearly shift liability to the owners if they fail to maintain relevant equipment or the structure. [FN411]

The standard for design liability has evolved over the past one hundred years. [FN412] Until the twentieth century, architects were only deemed liable for design mistakes if they committed fraud *77 and collusion. [FN413] Some courts have more recently imposed liability based on negligence, products liability, as well as breach of an implied warranty for fitness. [FN414] A plaintiff [FN415] may attempt to use these and other cause of actions against the design professional if objectionable amounts of mold are subsequently discovered in a structure. [FN416]

**(i.) Negligence**

Architects may be liable for damages if they fail to exercise the ordinary amount of care that prudent design professionals would exercise, and such lack of care is the proximate cause of an injury. [FN417] This cause of action is based on negligence. The standard of care used to judge the design services is the care ordinarily exercised by members of the profession who practice in the same physical area. [FN418]

The potential liability of the architect to an unrelated party (from a transactional perspective) is a common question. The answer will often involve the extent to which the transaction was intended to affect the plaintiff, whether the defendant could foresee harm to the plaintiff, the probability that the plaintiff suffered the injury, the "closeness of the connection" between the defendant's action and the plaintiff's injury, and the policy of preventing this problem in the future. [FN419]

Few cases have addressed design issues in the context of indoor air pollution. Mold was involved to some extent in Centex-Rooney Construction Co. v. Martin County. [FN420] The architecture firm's sole contractual task was to design a new courthouse for Martin County, *78 Florida. [FN421] Shortly after completion of construction of the courthouse, employees began to complain about wall leaks, mold growth, and excessive humidity. [FN422] A subsequent investigation concluded that the building's heating and ventilation system were deficient in certain respects. [FN423] The county decided to vacate the building due to the mold and filed suit four years after its completion. [FN424] The architectural firm, along with a concrete sub-contractor, settled the lawsuit prior to trial for $2,750,000. [FN425] The appellate court upheld a jury's verdict of $14 million against the other defendants. [FN426]

An older Pennsylvania decision involved allegations that the roof plans prepared by an architect caused condensation build up. [FN427] In Bloomsburg Mills, Inc. v. Sordoni Construction Co., Inc., the plaintiff claimed that the design plans submitted for the roof contained "an improper vapor seal, faulty drain flushings, and fiberglass insulation material inadequate for the use intended." [FN428] The chosen insulation allegedly became saturated and inefficient causing condensation to accumulate. [FN429]

The court held that the architectural firm could be found liable for negligence because it allegedly knew that the material would absorb and retain moisture through testing. [FN430] An officer of the weaving mill had approved the architects' plans. [FN431] However, the firm was not excused from exercising ordinary and reasonable skill in providing adequate plans. [FN432]

**(ii.) Implied Warranty**

*79 A majority of decisions have held that an architect does not impliedly warrant design services. [FN433] The court in Mounds View v. Walijarvi noted:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                          Page 24
13882 NBI-CLE 19
(Cite as: 13882 NBI-CLE 19)

"The undertaking of an architect implies that he possesses skill and ability, including taste, sufficient to enable him to perform the required services at least ordinarily and reasonably well; and that he will exercise and apply in the given case his skill and ability, his judgement and taste, reasonably and without neglect. But the undertaking does not imply or warrant a satisfactory result." [FN434]

Doctors cannot promise that every operation will be a success, just as lawyers can never be certain that every will they draft will be without defect. [FN435] Architects can never be certain that their design will interact with "natural forces as anticipated." [FN436] Architects warrant only that they will use the amount of skill and effort that his profession customarily demands in other similar cases. [FN437]

**(iii.) Strict Liability**

The application of strict liability to architectural services is occasionally considered by the courts. [FN438] The decisive question seems to be whether the home or other structure is a "product." [FN439] If the structure is the alleged product, most courts do not impose strict liability on the architect unless the building was mass-produced or prefabricated. [FN440] These courts have found that a house or *80 other structure is not a product. [FN441] Some jurisdictions hold that a structure such as a house is a product when considering whether the defendant can be subjected to strict liability. [FN442] For example, the Arkansas Supreme Court held that "the word 'product' is as applicable to a house as to an automobile." [FN443]

Strict liability theories of recovery are generally inapplicable to persons who only render professional services. [FN444] This theory of liability was developed to protect buyers of products not in privity with the manufacturer. It was not developed to be used against professionals who cannot spread the economic risks among their customers. [FN445]

Architects will rarely be held strictly liable in tort in relation to the professional services they provide. However, some jurisdictions suggest that an architectural firm could be strictly liable if an "architectural design or ventilation system" was standardized or mass marketed. [FN446] Thus, if the designs are not for prepared for mass production of the same structure, the architect cannot be held strictly liable due to those designs.

**b. Physical Construction**

The construction process has been a target for those seeking to recover alleged damages related to the presence of mold in structures. [FN447] This magnifies the importance of the contractors', subcontractors', and/or home-builders' [FN448] ability to both protect the structure components during construction and erect the facility in accordance with the applicable designs and specifications. The *81 construction and/or placement of the building envelope and HVAC systems [FN449] will presumably be of particular importance. [FN450]

The construction professional may need to identify and avoid projects or structures that are more likely to involve material mold issues. This determination might be based on whether the project will involve equipment, materials, [FN451] or designs that tend to generate significant mold claims. [FN452] The contractor may need to consider whether the other parties are willing to address the perceived deficiencies. [FN453] If not, there may need to be a determination as to whether the benefits outweigh the risks to participate in the project.

Equally important, the contractor may find it useful to determine whether a structure slated for renovation has any preexisting mold concerns. [FN454] This may make it important to establish and document whether material mold growth or the conditions that facilitate it are present in a structure prior to an expansion or renovation. [FN455] If so, the project may either need to be avoided, or ensure that appropriate measures are undertaken to eliminate the problem. Similarly, the contractor may find it useful to document the absence of problematic organisms or conditions at the point the structure is completed.

A structure may be particularly vulnerable to moisture intrusion during construction. [FN456] Mold growth may be facilitated in the absence of protective measures. [FN457] Many interior building components cannot be installed until the structure is enclosed. [FN458] Otherwise, if installed prematurely, the building interior might be impacted by enough moisture to facilitate mold growth. [FN459] The failure to protect building materials or the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

project site prior to installation can pose similar problems. [FN460]

　　**\*82** The protection of structure components from moisture during construction requires coordination by the contractor and subcontractors. [FN461] The objective will be the timing of the phases of the project as necessary to maximize the protection of the portions of the structure vulnerable to moisture damage. [FN462] The conflicting goals of meeting construction milestones and prevention of water intrusion can generate tension between the owner, contractor and subcontractors. [FN463]

　　Contractors will occasionally have to address mold discovered during structure renovation or remodeling. [FN464] The measures needed to remedy the problem could increase project costs and/or delay construction. [FN465] A prudent contractor will therefore consider how this issue will be handled in the construction contract.

　　The construction contract should allocate among the parties responsibility for incurring any necessary additional costs associated with mold. [FN466] Whether any resulting delays will be excused may also need to be addressed. This may require a clear understanding of how the discovery of mold would be addressed in various contract provisions such as the notice of differing site conditions clause. [FN467] The ability of either the owner or contractor to cover this risk during structure construction or renovation will be in part dependent upon whether the builder's risk insurance excludes mold claims. [FN468]

　　The discovery of mold after the construction of the structure has also generated claims against contractors. [FN469] These claims may be premised on an allegation that the mold is present because of a construction defect. The facilitating conditions often involve the alleged improper entry into or release of water in a **\*83** structure. [FN470] The contractor will need to ensure that responsibility for problems related to deferred/improper maintenance or repairs are clearly placed upon the structure owner.

　　Certain types of equipment and materials have been deemed responsible for supporting mold growth in some circumstances. An example is the alleged role of the HVAC equipment [FN471] in dispersing and/or facilitating mold growth. As a consequence, the universe of construction-related parties that are possible targets in mold litigation have included subcontractors, building equipment material installers and/or suppliers.

### (i.) Negligence

　　Liability has been imposed upon the general contractor or construction manager for failure to supervise construction activity. [FN472] Damages can be significant, including the cost of repairs according to the original contract, relocation costs, financing costs, and engineering and architectural fees incurred in the repairs. [FN473] The potential application of various liability theories to the contractor's work on a structure will ultimately determine under what circumstances liability for objectionable mold growth may be imposed.

　　The doctrine of caveat emptor has traditionally applied to the sale of homes and other structures. [FN474] Some jurisdictions would not allow the purchaser of a home to recover from the contactor or builder even if the house collapsed because of a defective foundation. [FN475] However, this doctrine has been eroded to some extent.

　　Recovery under a theory of negligence can arise in a variety of forms. It includes negligent construction, **\*84** failure to supervise or inspect construction, and a failure to instruct subcontractors on appropriate industry and code standards. [FN476] Some decisions have held building contractors to the "general standard of reasonable care for the protection of anyone who might foreseeably be endangered by their negligence, even after acceptance of the work." [FN477] These decisions potentially extend the contractor's liability to third parties regardless of whether they are in privity. [FN478]

　　A number of decisions have involved allegations that contractor negligence was responsible for mold related problems. County employees allegedly injured by mold were allowed to bring suit against the contractor that constructed the courthouse. [FN479] The action was predicated on whether the contractor had taken reasonable care to protect the plaintiff county employees

　　In Mondelli v. Kendell Homes Corporation, [FN480] a contractor was held liable for negligence when he

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                    Page 26
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

was retained to construct a house. Rainwater was found entering the basement subsequent to construction. [FN481] The structure's insulation was later found to be dripping wet and to have retained a foul odor. [FN482] The problem was mold. [FN483]

The plaintiff alleged that water leaked through the house facilitating mold and fungi growth in the insulation. [FN484] She also claimed that the mold caused health problems, including nasal congestion, headaches, shortness of breath, and serious coughing. [FN485] A doctor suggested that the plaintiff and her family move out of their home due to *85 these health problems. [FN486] The plaintiff also claimed that the contractor negligently weatherproofed the exterior walls, negligently installed the flashing, and negligently applied the mortar to the bricks, all of which led to the mold growth. [FN487]

A partial basis for the imposition of liability was a finding that the contractor did not adhere to industry standards and the Uniform Building Code. [FN488] The Supreme Court of Nebraska upheld the contractor's liability on appeal. [FN489] This decision also allowed the plaintiff to pursue causes of action against the contractor despite the absence of privity. [FN490]

**(ii.) Implied Warranties**

The discovery of an alleged structural deficiency may generate a claim that the contractor impliedly warranted the work. Some jurisdictions hold that the "implied warranty of habitability and workmanlike performance is imposed by law." [FN491] An allegation that a contractor negligently constructed a building can generate an action for breach of implied warranty of habitability and performance for the contractor's breach of the duty of care. [FN492] The argument is made that a contractor building a new home impliedly warrants that it was built in workmanlike manner and is habitable. [FN493]

It is argued that an implied warranty arises out of a contractual relationship between the contractor and the buyer. [FN494] This warranty is said to extend to any subsequent purchasers of the structure. [FN495] There are impediments to this argument however. A number of states limit by statute *86 the time in which a home owner or subsequent owner of the home has to bring a cause of action against the contractor. [FN496]

The discovery of mold may lead the owner to assert that the contractor breached an implied warranty associated with the structure. [FN497] The assertion of such a claim may be circumscribed by the terms of the contract between the contractor and structure owner. The contractor may specifically identify and disclaim such warranties in the contract document.

**(iii.) Strict Liability**

A products liability cause of action is sometimes asserted if residential structural problems are identified. The success of such a claim may depend in part on whether or not the jurisdiction defines a home, or other structure, as a 'product.' [FN498] The plaintiff must often prove that the structure is "unreasonably dangerous."

The majority of courts do limit the scope of this action by holding that strict liability does not apply if the damages are to the "product." [FN499] This limitation may impact some actions involving structural mold. If the mold only damaged the structure itself, as opposed to occupants, strict liability may not apply. However some jurisdictions hold that the law permits recovery under strict liability even when the only damages are to the product itself. [FN500]

**G. Management/Allocation Of Risk/Responsibility**

A variety of risk management measures may be employed by real property market participants to address mold liabilities. [FN501] Their use will be driven by *87 factors such as cost, availability, and the parties leverage in a particular transaction.

**1. Assessment/Remediation**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

There are arguably negative connotations associated with structural mold. The presence of non-deminimis amounts of these organisms in a given structure may adversely affect its value. Mold might therefore in certain instances constitute a material transactional issue. However, the likelihood that mold is present in significant quantities and the cost to address it may not always be grounded in reality. The purpose of the assessment or inspection is to attempt to quantify to some extent or eliminate this perceived risk. [FN502] If problematic concentrations are discovered, one or more parties may determine to remediate it.

### a. Assessment/Inspection

Few commercial, governmental, office, or multi-family properties are acquired or financed without being assessed to identify and/or quantify any associated environmental issues. The lender or lessor will have an interest in ensuring that the value of the mortgaged structure or leasehold respectively is maintained. The parties have therefore traditionally retained the contractual authority to initially assess the environmental conditions and perform additional assessments on a periodic basis. These due diligence activities may be undertaken at various points in a transaction. The transactional stages might include the time periods prior to acquisition/financing/construction, during a lease or loan term or before foreclosure.

The expansion of assessment programs to address mold and the conditions that facilitate its growth poses a challenge. Mold can begin growth and propagate rapidly if the necessary conditions are present. In other words, significant mold growth can occur **88 between even frequent inspections or assessments. Therefore, the permanent elimination of growth conditions can be critical. [FN503]

### b. Qualification/Certification Issues

The expanding interest in mold assessment and remediation will likely stimulate a concurrent demand for personnel to provide such services. Some of the companies or individuals providing mold assessment remediation services will be new to the field. [FN504] The demand for these services will be driven to a great extent by the participants in the real property transaction market. Many of these parties will be unfamiliar with mold assessment/remediation issues. [FN505] They may not be in a position to judge whether the providers of such services have made prudent assessment/remediation recommendations. As a result, there is some interest in establishing competency standards for those offering such services. [FN506] However, such an undertaking requires an organization or agency [FN507] to both establish the relevant competency criteria [FN508] and manage the certification process.

The skills, education or expertise required to address mold may vary with the type of activity. There are some mold assessment activities involving sampling [FN509] and/or analysis that require specialized education/expertise in the relevant methodologies. The assessment and/or remediation activities might involve aspects of toxicology, industrial hygiene, and structural engineering (i.e., indoor movement of air/water). [FN510]

### 2. Tax Treatment of Assessment/Remediation Costs

The aggregate amount of monies that are and will be spent to perform mold assessment and/or remediation activities is significant. In some instances, the costs may be material in the context of a particular structure. The possible tax treatment of these costs is therefore of interest.

### *89 a. Deductibility

The Internal Revenue Service ("IRS") has not addressed the deductibility of such costs. Expenses associated with mold remediation will either be classified as repairs or improvements. "Repairs" are deductible business expenses which restore property to its previous state and do not increase the property's value or make the property more useful or longer lived. [FN511] "Improvements" are capital expenditures which materially increase the value, longevity, or utility of the property compared to its previous value, longevity, or utility. [FN512]

The test for determining whether expenditures increase the value of the property is found in Revenue Ruling 94-38. [FN513] The value of the property is compared to the status of the asset after the expenditure with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

status of the asset before the condition arose that necessitated the expenditure (i.e., before the structure was contaminated with mold). [FN514]

The IRS has ruled that expenditures to remove and replace asbestos insulation in manufacturing equipment were required to be capitalized because such expenditures were improvements, not repairs. [FN515] The ruling concluded that the expenditures increased the value of the equipment over its value to the taxpayer before the replacement by reducing or eliminating the human health risks associated with asbestos. [FN516] In Northwest Corp. & Subsidiaries v. Commissioner, [FN517] the Tax Court held that the costs of removing asbestos materials must be capitalized because they were part of a general plan of rehabilitation and renovation that improved the building. [FN518] However, if asbestos remediation is made apart from remodeling or renovation, Northwest Corp. suggests that such costs would be currently deductible. [FN519]

*90 There is arguably a difference between mold and asbestos. Asbestos was a part included in the original asset while mold was not. Mold occurs after the asset's creation. Mold remediation merely restores property to its original condition. Asbestos abatement is something more than merely restoring the property to its original condition because the asbestos was part of the original asset. Thus, mold remediation expenditures do not produce improvements to a structure beyond its original state.

Mold remediation expenditures do not result in improvements that increase the value of the property because the property was merely restored to its approximate condition before it was contaminated by the mold. In addition, mold remediation expenditures do not prolong the life of the asset. These expenditures merely restore the property to its original useful life. Mold remediation expenditures do not adapt the property to a new or different use. Accordingly, mold remediation expenditures are arguably currently deductible.

### b. Credits

The United States Toxic Mold Safety and Protection Act, would have authorized tax credits for inspection and/or remediation of mold hazards. [FN520] The proposed credit would be equal to an amount up to 60% of mold inspection and/or remediation expenses incurred during the taxable year. [FN521] However, this proposed credit would be limited to $50,000. [FN522] If the bill is passed, the taxpayer would not be able to receive a double benefit from its mold inspection and/or remediation expenses (i.e., the taxpayer could not deduct the mold inspection and/or remediation expenses from its taxable income and then claim a credit for the same expenses).

### *91 3. Contractual Allocation of Risk/Responsibility

Mold has probably not until recently been deemed a potentially material real property transactional issue. Therefore, the organism was probably rarely specifically identified in the environmental liability allocation provisions of the structural transactional documents. Instead, materials or substances specifically listed in transaction documents have often included lead-based paint, asbestos, PCB [FN523] containing transformers, and petroleum underground storage tanks. These agreements will usually include clauses addressing compliance with applicable environmental laws and/or prohibiting certain activities involving hazardous materials, substances or wastes.

The agreements used to document the sale, lease, financing, design, and construction of structures will contain provisions intended to allocate various potential liabilities and risks among the parties. [FN524] Likewise, the parties have the opportunity to identify the responsibilities associated with the assessment, remediation or prevention of mold growth. These agreements can assign responsibility for any corresponding regulatory and common law liabilities that may arise. If they fail to do so, more general provisions in the agreements may impose these responsibilities. However, reliance on such general provisions may make it difficult to predict how more specific liabilities and responsibilities will be allocated.

The use of contractual verbiage to address mold liabilities/risks are governed by some common principles/concerns. First, the parties should recognize that multiple parties are likely to be targeted in the event of a mold claim. The agreement drafted may govern to some extent how responsibility for mold claims are allocated between the parties. Second, the value of the warranty, indemnity or related provisions is dependent upon the future financial viability of the party providing it. Third, the *92 identification of potential environmental issues (including

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                          Page 29
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

mold) through an assessment will enable the parties to specifically allocate such risks. [FN525] Fourth, there may be some benefit in allocating the risks to the parties in the best position to control them. [FN526] Fifth, as always, a party's ability to obtain desired provisions will depend on its leverage and market conditions. [FN527]

**(a.) Warranties**

Identified or potential risks are often allocated between the parties in the transactional documents. This should be equally true for mold. The potential liabilities associated with these organisms may be identified and allocated. [FN528] An insurance policy may be used to cover a particular environmental issue for a fixed amount by the party allocated the risk.

**(i.) Compliance with Laws**

The parties will need to recognize that few governmental requirements are applicable to mold. Therefore, a clause mandating compliance with governmental laws may not pick up mold or the conditions that facilitate its growth. Instead, a reference to problematic conditions or required maintenance practice may be necessary. Defining problematic conditions will be difficult because of the pervasive nature of the organism

**(ii.) Insurance**

The parties to a transaction often rely on insurance to address significant liabilities associated with a structure. The contract may specify both the type of insurance that is required and the parties that must obtain it. [FN529]

**(iii.) Complaints/Investigations**

*93 A purchase will often require that the seller either make various disclosures and/or warrant the absence of such events or activities. These might include prior tenant and/or structure occupant complaints concerning the environment inside the structure. Disclosures related to mold might include indoor air pollution/mold complaints and prior remediation/sampling activities.

**b. Insurance**

Many potential structural liabilities are addressed through the procurement of insurance. The types of policies used to cover these risks will vary with the party seeking coverage. A building manager or lessor may need a policy that addresses operational risks. The lender may have a different perspective. It may use insurance to cover known or unknown risks related to the mortgaged property. Likewise, the architect or contractor may have to cover the exposure uniquely associated with their services. The different parties' need for coverage of mold risks will similarly vary.

The usefulness of an insurance policy is dependent upon the scope of the coverage, breadth of exclusions, and cost. Parties to transactions involving the transfer of structures will often consider whether insurance can satisfy any or all of the allocated risks. The initial question will be whether standard liability or casualty policies provide needed coverage to address the liabilities associated with mold. [FN530] If not, endorsements addressing mold or more specialized policies that cover these specific risks or conditions may need to be considered. [FN531]

**\*133 NBI**TM

**NATIONAL BUSINESS INSTITUTE**

Phone: 800-930-6182 Fax: 715-835-1405

www.nbi-sems.com

**Notes**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN1]. A substantial portion of this paper is based on the article by Walter G. Wright, Jr. and Stephanie M. Irby, The Transactional Challenges Posed by Mold: Risk Management and Allocations Issues, 56 ARK L. REV. 295 (2003).

[FN2]. Environmental assessments are addressed in Ram Sundor & Bean Grossman, The Importance of Due Diligence In Commercial Transactions; Avoiding CERCLA Liability, Fordham Envtl. L.J. 351, (1996); Eric Rothenberg et al., Environmental Issues in Business Transactions under U.S. Law, 5 Wis. Envtl. L.J. 121 (1998); and Colleen E. Henry and Mark S. Hacker, Comment, The Importance of Identifying and Allocating Environmental Liabilities in the Sale or Purchase of Assets, 10 Vill. Envtl. L.J. 91 (1999).

[FN3]. Id.

[FN4]. One author notes: "Many financial institutions, particularly large national banking institutions, have adopted environmental site assessment procedures which must be followed in connection with the making of loans on commercial and industrial property. These procedures are detailed and compliance should provide a fair degree of comfort that the "all appropriate inquiry" requirement has been satisfied." The secondary mortgage market has required that environmental risk programs be established by lenders from which it buys mortgages. Ann M. Burkhart Lenders and Land, 64 MO. L. REV. 249 (Spring 1999).

[FN5]. An important example is the innocent landowner provision of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). See 42 U.S.C, et seq. 9601. The 2001 amendments to CERCLA clarified what type of due diligence is necessary to qualify for this liability exemption. See Brownfield's Revitalization and Environmental Restoration Act of 2001, Pub. L. No. 107-18, 1145 Stat. 2325 (2002). The amendments require EPA to specify the investigation that must be undertaken prior to the acquisition of the property. Id. These amendments are discussed in Andrew S. Levine, The Brownfields Revitalization and Environmental Restoration Act of 2001: The Benefits and the Limitations, 13 VILL. ENVTL. L.J. 217 (2002); Jeffrey Kedish, Restoring Inactive and Abandoned Mine Sites: A Guide to Managing Environmental Liabilities, 17 J. ENVTL. L. & LITIG. 257 (Spring 2002).

[FN6]. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003, at 12 (discussion of absence of mold screening formats and baselines).

[FN7]. For example, an American Society of Testing Materials ("ASTM") committee is developing a mold screening standard for buildings. This screening standard will presumably enable the user to determine whether more extensive efforts involving sampling might be needed. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003, at 12. ASTM is a private standard-setting organization that has developed several standard practice guides for environmental site assessments for commercial real estate. The organization develops standards through various committees comprised of representatives with different interests. See Jody Freeman, The Private Role in Public Governance, 75 N.Y.U. L. REV. 543, 642 (June 2002). The ASTM organization has a central staff to monitor the work and an appeals process to ensure compliance with the organization's procedures. Id.

[FN8]. Affirmative action by someone would be required for these materials or equipment to be reinstalled. The chances of a party intentionally violating a transactional covenant and placing friable asbestos or a heating oil tank on the property is unlikely.

[FN9]. Most environmental contaminants or conditions are created by or generated as a result of human activity. However, there are other natural "contaminants". Another example is radon gas. Radon gas is a potential indoor environmental pollutant that is a naturally occurring gas. See generally Carolyn Marie Shuko, Note and Comment: Radon Gas: Contractor Liability for an Indoor Health Hazard, 12 Am. J. L. and Med. 241 (1986). It is found in the subsurface in rocks such as granite, shale and limestone. Id at 242. See also Anne Rickard Jackomitz, Comment: Radon's Radioactive Ramifications: How Federal and State Governments Should Address the Problem, 6 B.C. Env'tl. Aff. L. Rev. 329 (1998); Jeanne Prussman. Comment: The Radon Riddle: Landlord Liability for a Natural Hazard, 18 B.C. Env'tl. Aff. L. Rev. 715 (Summer 1991).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                                    Page 31
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

[FN10]. See Tulacz supra note 10 ("But mold isn't something you introduce into a building, and it isn't something you can remove once and then it's gone for good.")

[FN11]. For example, see Hodgson, Russ, Andrews, Woods and Goodyear, LLP v. Isolatek International Corporation, et al., 2002 N.Y. App. Div. LEXIS 13122 (2002). Mold was found in waterproofing on two floors of a building being renovated. Id. at *3. Remedial measures were undertaken to eliminate the mold. However, mold was subsequently discovered in the previously remediated areas of the building. Id at *4.

[FN12]. An engineer notes: "You've got to get rid of the cause. If you don't, and you get rid of only the amplification site, I guarantee that within six weeks, you'll have the mold growth back." Post supra note 113.

[FN13]. The absence of governmental regulatory requirements differentiates mold in the transactional context from many other environmental issues. For example, a potential purchaser or lessee would not need to be as concerned about the possibility that certain environmental statutes might impose responsibility on them for contamination that is present at the time of the acquisition or lease of the structure. Also, transactional environmental assessments pose a risk to the facility owner or operator because they may identify environmental conditions or regulatory violations that governmental programs require to be reported to an agency. See Arnold W. Reitze & Lee O. Hoffman, Self-Reporting and Self-Monitoring Requirements Under Environmental Laws, 1 ENVTL. LAW. 681 (1995); James R. Arnold, Disclosure of Environmental Liabilities to Governmental Agencies and Third Parties, CA47 ALI-ABA 381 (1995); and Arnold W. Reitze & Steve Schell, Reporting Requirements for Non- Routine Hazardous Pollutant Releases Under Federal Environmental Laws, 5 ENVTL. LAW. 1 (1998). The absence of applicable governmental requirements means the assessment of mold will not typically trigger such self-executing governmental mandates. Instead, the principal legal concerns associated with structural mold are common law liabilities.

[FN14]. This term generally refers to the concentration of a substance in the air to which exposure over a particular period of time causes adverse health effects.

[FN15]. See Mondelli v. Kendell Homes Corporation et al., 262 Neb. 263, 631 N.W. 2d 846 (2002) (plaintiff's expert witness notes absence of state regulations and industry standards concerning indoor air quality).

[FN16]. Schillinger supra note 76. The measures might include culturable fungi, total fungal spore counts and fungal volatile organic compound concentrations. Id.

[FN17]. For example, federal standards of closure criteria have been promulgated for hazardous waste management facilities at 40 C.F.R. § § 264.110-.120 (closure standards and procedures for hazardous waste treatment, storage and disposal facilities); petroleum underground storage tanks at 40 C.F.R. § 280.66 (corrective action plan requirements); and polychlorinated bi-phenyl ("PCB") at 40 C.F.R. § 761.1 - .398 (PCB regulations).

[FN18]. 40 C.F.R. § § 264.110 - .120 (PCB regulations). See generally, James A. Vroman, Disposal and Remediation Under the PCB Mega Rule, 29 Envtl. L. Rptr. 10459 (1999).

[FN19]. Certain federal Clean Air Act regulations impose certain management standards on asbestos if it is "friable". See 40 C.F.R. § 141. These regulations classify asbestos as friable if it will crumble by hand when dry. Id.

[FN20]. This has not always been true. Over a decade ago EPA and most states provided little guidance as to the appropriate cleanup criteria or action levels for various types of properties (industrial, commercial, residential, etc.) unless they were engaged in certain activities (e.g., hazardous waste management, see 40 C.F.R. § § 264.110 -.120) (closure standards and procedures for certain hazardous waste treatment, storage and disposal facilities), petroleum UST, see 40 C.F.R. § 280.66 (corrective action plan requirements), or contained a substance (e.g., polychlorinated biphenyls) ["PCBs"] 40 C.F.R. § 761.1 - .398 (1999) (PCB regulations). The regulations addressing PCBs were the subject of extensive revisions in 1998. Disposal of Polychlorinated Biphenyls (PCBs), Final Rule, 63 Fed. Reg. 35383 (June 29, 1998). The PCB rule regulations include cleanup standards for various surfaces such as steel pipe, iron plating, etc. See generally, James A Vroman, Disposal and Remediation Under the PCB Mega Rule, 29 ENVTL. L. RPTR. 10459 (1999) (friable asbestos, etc.) addressed by a regulatory program. In recent years various

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

federal and state programs have begun using risk-based corrective action or remediation standards which tailor cleanup levels according to site-specific factors. The standards may be found in a statute, regulation or policy. See generally, U.S. Gen. Accounting Office, Superfunds -- How States Establish and Apply Environmental Standards When Cleaning Up Sites (Pub. No. GAO/RCED -96-70FS (1996)). The various programs often take into account factors such as to what extend the site is accessible and/or the future land use. Memorandum from Elliott P. Laws, Assistant Administrator, United States Environmental Protection Agency, to Directors of Waste Management Division, et al. Land Use in the CERCLA Remedy Selection Process (OSWER Directive No. 9355.1-04) (May 25, 1995). See also Laurie DeBrie Thanheiser, The Allure of a Lure: Proposed Federal Land Use Restriction Easements in Remediation of Contaminated Property, 24 B.C. ENVTL. AFF. L. REV. 271 (1997) (role of institutional controls and land use restrictions in CERCLA program). Typically, superimposed upon these various procedures or site specific analyses is a requirement that the resulting standards be protective of human health and the environment. Note that risk-based standards are not universally favored. For example, see Victor B. Flatt, Essay: "He Should at His Peril Keep It There..." How the Common Law Tells Us that Risk Based Corrective Action is Wrong, 76 NOTRE DAME L. REV. 341 (Jan. 2001).

[FN21]. Walter G. Wright, Jr. and Travis J. Morrissey, Arkansas Facility Real Property Redevelopment in the Year 2000: Tools Available to Resolve Environmental Issues, 52 Ark. L. Rev. 751, 785 (2000). See also Heidi Gorovitz Robertson, Legislative Innovation in State Brownsfields Redevelopment Programs, 16 J. ENVTL. L. & LITIG. 1 (Spring, 2001) (describing various state approaches for setting cleanup standards based on criteria such as proposed future property uses).

[FN22]. For example, a court referenced a report which compared the number of spores in the house were compared to the adjacent outdoor environment. See Benjamin Diletto et al. v. Katnik Corporation, 2002 Cal. App. Unpub. LEXIS 11814 (2002). See also Mondelli v. Kendell Home Corporation et al., 262 Neb. 263, 631 N. W. 2d 946 (2001) (plaintiff's expert in damage action opines that the indoor air quality concentration for total mold spores should be 25% of outside concentration during the summer). The absence of standards might also pose a problem for the insurance underwriting and claims process. Underwriters use standards to establish the risks related to properties. Standards may also be used by the insurance company in determining the adequacy of remediation. Such standards might better enable the adjuster or claims processor to determine whether health risks to the policy holder have been eliminated.

[FN23]. Sampling for biological contaminants in the indoor or outdoor environment is not as straight forward as sampling for chemical agents that are not of biological origin.

[FN24]. See Mondelli v. Kendall Home Corporation et al., 262 Neb. 263, 631 N.W. 2d 846 (2001) (reference to absence of governmental or industry indoor air quality standards). The absence of standards had also been stated to increase remediation costs. Absence of standards may lead to remediation efforts that may be beyond reasonable.

[FN25]. An example of such an analysis is a report referenced in Benjamin Diletto et al. v. Katnik Corporation, 2002 Cal. App. Unpub. LEXIS 11814* 3 (2002) ("In this case, however, interior mold levels were 2000 percent to 5000 percent of the levels found outdoors.").

[FN26]. See Zack Mansdorf, 55 Indoor Air Quality: A Modern-Day Dilemma, No. 3, March, 1993 at 11 (stating that the presence of higher indoor populations of microorganisms than outdoors does not mean an occupant will become ill).

[FN27]. Guidelines on Assessment and Remediation of Fungi in Indoor Environments, New York City Department of Health & Mental Hygiene at 2.1 (2001) [hereinafter "New York Report"] (noting visual inspection is the most important initial step in identifying a possible contamination problem).

[FN28]. These private party environmental due diligence activities arguably support government enforcement by driving properties toward greater environmental compliance or cleanliness. One author notes in the lender context: "In an attempt to avoid such liability, lenders now slap the burdens of conducting environmental inspections of lands offered as collateral and of requiring borrowers to correct any environmental violations before a loan will be made. In these ways, government has conscripted lenders to enforce the environmental laws, as well as to help fund

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

environmental cleanups."

[FN29]. Mattison & Widmanny supra note 54 at 10366.

[FN30]. The term "Phase I" is often used to denote an initial environmental assessment. For example, see South Industrial Leasing, LLC v. Ingersoll-Rand Company, No. 02 4528, 2003 U.S. Dist. LEXIS 1393 (Jan. 31, 2003) *7 (reference to "Phase I Environmental Survey" prepared by seller in the context of sale of an industrial facility). An assessment will only be considered "ASTM" if it includes the tasks specified in that standard. The standard was established in 1992. Telephone Interview with Thomas P. Jones, Pollution Management, Inc. (Nov. 7, 2002). This may be particularly important if the structure will be a single or multi-family residential facility. Id. The New Standard in Environmental Assessments: Phase I Environmental Site Assessment, Management 84 AMC Journal 54 (Oct. 1, 2002)

[FN31]. Mattison & Widmanny supra note 54 at 10366.

[FN32]. Id.

[FN33]. Telephone interview with Thomas P. Jones, Pollution Management, Inc. (Nov. 7, 2002). See also Sweeney supra note 5 at 77 (noting the identification of mold is not typically encompassed by a Phase I Environmental Site Assessment).

[FN34]. Assessments are often expanded to include other indoor contaminant such as asbestos, lead-based paint, and radon.

[FN35]. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003 at 12.

[FN36]. Structure owners or managers do not always undertake assessment activities in a systematic manner.

[FN37]. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003, at 12.

[FN38]. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003, at 12.

[FN39]. The protocol would be denominated in the "Standard Practice for Transactional Screening Readily Observable Mold in Commercial Buildings." Id.

[FN40]. Id.

[FN41]. Id.

[FN42]. See Michael Logsdon, The Securitization Advantage of Indoor Air Quality Assessment, 43 Real Estate Weekly, May 21, 1997 at 58. The article notes:

"The scope of this investigation need not include expensive and time-consuming sampling. In fact, a time and cost effective IAQ screening program can easily be appended to the already required Phase I Environmental Site Assessment (EAS) or Property Conditions Survey (PCS) scope of work.

Such a screening program should consist of two simple parts. First, a trained environmental or engineering professional should conduct a visual assessment for obvious indicators such as evidence of moisture damage, stained surfaces, poor HVAC maintenance, etc. During the course of this assessment, limited field measurements of temperature, humidity, carbon monoxide, and carbon dioxide can be taken. The assessor can then complete a checklist developed to flag noticeable IAQ problem indicators and reports of previous incidents of building-related illness.

Once gathered, this data should be sufficient to enable a qualified consultant to determine if potential risk exists."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19                                                                                    Page 34
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

Id.

[FN43]. These conditions might include flooding, leaks, drips, HVAC problems, etc.

[FN44]. The sense of smell may also be used to detect a mold problem. Certain odors may be an indication of the presence of significant amounts of mold. For example, see Meredith Miller v. Lakeside Village Condominium Association, Inc., 1 Cal. App. 4th 1611, 2 Cal. Rptr. 2d 796 (1991) (musty smell in condominium unit led to search for mold). Various molds emit low molecular weight compounds. Daniel Karpea, What Occupants Smell When They Say, 'My building Stinks!' 15 Air Conditioning, Heating & Refrigeration News, (April 12, 1999) at 46. These emissions may be generated in sufficient quantity to produce objectionable smells in structures. Id.

[FN45]. The colors can include white, orange, green, brown, and black. Id.

[FN46]. Pena-Alfaro supra note 6 at 551. See Report of the Microbial Growth Task Force, American Industrial Hygiene Association at 18 (May 2001) [hereinafter "Growth Task Force"]. Areas that may receive particular attention include the floor and corners of the building.

[FN47]. Mold may begin to grow within a wall if the source of moisture is leakage through the building envelope.

[FN48]. This type of inspection is sometimes denominated "destructive testing." See Thompson v. Fireman's Fund Insurance Company, 2002 Cal. App. Unpub. LEXIS 6511 (2002). It may involve breaking open walls. Id.

[FN49]. The New York Department of Health has discussed the scope of visual inspections in a guidance document. The agency notes in relevant part:

Ventilation systems should be visually checked, particularly for damp filter but also for damp conditions elsewhere in the system and overall cleanliness. Ceiling tiles, gypsum wallboard (sheetrock), cardboard, paper, and other cellulosic surfaces should be given careful attention during a visual inspection. The use of equipment such as a boroscope, to view spaces in ductwork or behind walls, or a moisture meter, to detect moisture in building materials, may be helpful in identifying hidden sources of fungal growth and the extent of water damage. Id.

[FN50]. The HVAC systems are presumably evaluated as part of the general structure appraisal/inspection activities. The assessing party may need to ensure that the personnel/contractors undertaking this work are sensitive to these aspects of these systems. Further, the assessing party will need the personnel/contractors undertaking the inspection of HVAC systems to share relevant information with those conducting the environmental due diligence. Of course, the same should be true for other potential conditions that can facilitate mold growth such as faulty plumbing, leaking roofs, etc. See also A Growing Problem, 22 New Orleans City Business, Dec. 3, 2001 at 23 (reference to inspection of heating and ventilation systems as part of mold management program).

[FN51]. For example, is a wallboard water stain evidence of a historical release (that has since been corrected) or is the release likely to recur?

[FN52]. The principal fungi sample analysis methods include isolation of fungi by laboratory culture and microscopic examination of fungal cultures and individual fungal spores.

[FN53]. Data quality issues associated with environmental sampling are addressed to some extent in A. Dallas Wait, Environmental Forensic Chemistry and Sound Science in the Classroom, 12 FORDHAM ENVTL. LAW J. 293 (Spring, 2001). For example, minimum concentrations of viable aerosols in the air that can be detected varies with the type of sample device utilized.

[FN54]. The three types of air sampling described by an American Industrial Hygienists publication include: quiescent (samples are collected under normal circumstances), semi-aggressive (dust stirred up in reservoirs to stimulate normal occupant activities) or aggressive (attempt to vigorously disturb reservoirs to establish bio-contaminant source).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN55]. For example, see Benjamin Diletto et al. v. Katnik Corporation, 2002 Cal. App. Unpub. LEXIS 11814 (2002) (reference to mold sampling that compared conditions in a structure and the adjacent outside environment); Jensen v. Amgen, Inc., B153798, 2003 Cal. App. LEXIS 155 (Feb. 3, 2003) *2 -*3 (reference to sampling which reflected airborne levels of mold that were lower in the building than outside).

[FN56]. Some parties may be reluctant to undertake air sampling in occupied structures. An example might be a lessor. The reluctance may be based on lessee disclosure issues. For example, the lessor might be concerned as to whether there is a common law duty to provide the results of such sampling to the lessee. In addition, there may be concerns that the lessee will misinterpret the results.

[FN57]. Different types of mold are associated with certain building materials. Also, certain types of mold require larger amounts of water to grow. Therefore, the identification of such spores may indicate that a leak or other source of water is present in the structure. For example, the fungi S. chartarum requires sustained wet wood or other cellulose based material to be present. Field Guide supra note 162 at 40. Other species may be found in flooding water (Fusarium manilifome) or on damp wood or cellulose (Aspergillus versicolor). Id.

[FN58]. This raises an important question. Does or should a party gather information about occupant/tenant indoor air quality complaints as part of due diligence? A history of occupant/tenant complaints concerning the illnesses allegedly associated with the property's indoor air quality may be an important criterion in determining whether to move beyond the visual inspection. Documents regarding such complaints maybe readily available.

[FN59]. Because Stachybotrys chartarum does not readily become airborne, swabs, bulk, and spore trap samples may be needed in addition to air samples to adequately characterize the structural presence of this mold.

[FN60]. Id. Fungal concentrations may also vary by season.

[FN61]. See Chih-Shan Li, et al., Fungus Allergens Inside and Outside the Residence of Atopic and Cotrol Children, 50 ARCHIVES OF ENV'TL. HEALTH, Jan. 1995 at 38 (referencing studies that found significant seasonal variations of airborne fungus).

[FN62]. For example, see Rosa Codina & Richard F. Lockey, Environmental Asthma: Nine Questions Physicians Ask, 40 Consultant 66 (Jan. 1, 2002) (noting outdoor mold is the principal allergen associated with asthma in Arizona and Central Australia).

[FN63]. The need to compare inside and outside concentrations may be unique to mold. A similar comparison is obviously not necessary for non-natural substances such as asbestos. Asbestos fibers will not normally be found in the ambient air outside a structure.

[FN64]. "A universally accepted premise supported by health professionals is that the primary utility of viable sampling methods, especially those for fungi is the assessment and comparison of the bio-diversity of contaminated areas indoors to the biodiversity of uncontaminated areas indoors and to the bio-diversity outdoors". See also Benjamin Diletto et al. v. Katnik Corporation, 2002 Cal. App. Unpub. LEXIS 11814 (2002) (comparison of mold concentrations in a structure and the adjacent outside environment); "Since these are not generally accepted guidelines to follow regarding airborne fungi, indoor results must be interpreted with respect to the control samples." and Columbia Knit, Inc. v. Affiliated FM Insurance Co., Civ. No. 98-434-HU, 1999 U.S. Dist. (Aug. 4, 1999) (sampling of boxes in building indicated elevated levels of fungal concentrations compared to outside air); Bioaerosols supra note 103 at 19-12 ("If fungal concentrations indoors are consistently higher than those outdoors, then indoor sources are indicated.").

[FN65]. The placement of sampling points would presumably need to be outside the influence of the structure to ensure they are representative of the area.

[FN66]. Jerry J. Tulis & Wayne R. Thomann, Fungal Contamination and Growth in Heating-Cooling Systems, 201 AIR CONDITIONING,. HEATING & REFRIGERATION NEWS, Aug. 11, 1997 at 21 (citing proposed guidelines suggesting that concentrations of mold spores in indoor air should be less than one-third of the respective outdoor

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19
13882 NBI-CLE 19                                                                                  Page 36
(Cite as: 13882 NBI-CLE 19)

concentration).

[FN67]. For example, see Columbia Knit, Inc. v. Affiliated FM Insurance Co., Civ. No. 98-434-HU, 1999 U. S. Dist. LEXIS 66873, (Aug. 4, 1999) *3 (sampling indicated levels of mold species Penicillium was higher in structure than normally found outdoors); Tiffany & Bader supra note 130 (stating that the presence of Stachybotrys chartarum in a structure is an indication that mold growth is affecting the quality of indoor environments since this mold is not commonly found in the outdoors).

[FN68]. See Springston supra note 60 (noting that species found inside the structure should be similar to those found outside).

[FN69]. Id.

[FN70]. The universal presence of mold should be considered in interpreting swab or surface sample results. A discussion of this issue in the context of sampling HVAC surfaces notes in relevant part: "Accordingly, it is imperative that the mere presence of fungal spores along surfaces of the ventilation system not be incorrectly interpreted as growth. Therefore, the practice of taking swab samples of surfaces, using bulk samples, or exposing contact plates to contaminated surfaces, with subsequent incubation and laboratory analysis, must not be used for evidence of in situ growth. This practice will provide erroneous information, leading to a gross misrepresentation of actual conditions within the HVAC system, thereby often leading to unnecessary concerns and associated costly testing and remediation."

[FN71]. "Bulk samples" are collected from visibly moldy surfaces by scraping or cutting. "Surface samples" are usually collected by wiping a measured area with a sterile swab or stripping the suspect area.

[FN72]. Id.

[FN73]. See Joe Provy, Fresh Air; Indoor Air, 178 Popular Mechanics, Sept. 1, 2001, at 84.

[FN74]. The protection of the health of the workers performing the work is included within this objective. Id. Whether conditions at a facility warrant remediation is often determined by the application of standards issued by the government or a credible private organization.

[FN75]. Id.

[FN76]. Id.

[FN77]. Id.

[FN78]. Id.

[FN79]. See Hodgson, Russ, Andrews, Woods and Goodyear, LLP v. Isolatek International Corporation, et al., 2002 N.Y. App. Div. LEXIS 13122 (2002) (destruction of components of two floors of a building after mold growth reoccurred in previously remediated areas).

[FN80]. See Elementary School Building Committee of the Town of Fairfield v. Kenneth Placko, et al., No. CV-0203981625, 2003 Conn. Super. LEXIS 474 *1 (Feb. 21, 2003) (reference to school destroyed because of presence of mold).

[FN81]. The varying susceptibility of individuals to mold allergens renders the setting of health-based standards a challenge See Pena-Alfaro supra note 6 at 565. Federal legislation introduced in the 107th Congress included provisions requiring the establishment of health-based mold standards. See United States Toxic Mold Safety and Protection Act of 2002, H.R. 5040.

[FN82]. A number of standards or policies have been issued that are relevant to, but not specifically applicable to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mold. An example might be standards issued by ASHRAE. ASHRAE Standard 60-2001 Ventilation for Acceptable Indoor Air Quality specifies minimum acceptable ventilation rates for various buildings. ASHRAE Standard 55-1992 addresses thermal environmental conditions for human occupancy. Id. at 16. Ventilation air plays an important role in removing or diluting indoor air contaminants. Id. For example, Standard 62-2001 recommends 20 cubic feet per minute of outside air per person in an office building. Id. An American Institute of Hygienists Association publication provides guidelines for comparing biodiversity between the structure and outdoor environment. Field Guide supra note 162 at 58-59. ASHRAE is a professional organization that recommends standards addressing ventilation and associated topics.

[FN83]. A Growing Problem, New Orleans City Business, Dec. 3, 2001 at 23. See also Dehmler supra note 8 at 17. ("Preventing mold growth is the best and most cost - effective way to deal with this problem.").

[FN84]. For example, ensuring that an HVAC's pan does not overflow may be as important as complex environmental controls. Nakano supra note 8.

[FN85]. See What Features Are in the Learning Environment? School Planning and Management, May 1, 2001 at 37.

[FN86]. Lack of cleaning and maintenance of HVAC system contributes to microbial contamination. Microbiologic contaminants can be controlled through regular cleaning and maintenance of ventilation systems. Insulation of HVAC chilled water pipes can minimize sweating reducing its possible contribution to mold growth..

[FN87]. John R. Hall, Educating Business about Mold, 216 Air Conditioning, Heating & Refrigeration News, July 1, 2002 at 1.

[FN88]. For example, the American Society of Safety Engineers noted in commenting on proposed federal legislation: "Much of the evidence indicated that the primary cause of mold is moisture being trapped in buildings, the result of either existing construction standards not being followed or construction standards not being adequate to prevent mold." See Letter to The Honorable John Conyers, Jr., U.S. House of Representatives, from Mark D. Hansen, P.E., CSP, President, American Society of Safety Engineers, Comments on the "United States Toxic Mold Safety and Protection Act" (H.R. 5040) (Aug. 23, 2002).

[FN89]. An example of a local governmental control might be a town ordinance addressing the construction of structures in a flood zone. See David Farnsworth, et al. v. Thomas H Harrigan, No. CV 950373, 1999 Conn. Super. LEXIS 144 (Conn. Jan. 22, 1999) (allegation that violation of town ordinance related to building in flood zone contributed to building water damage). See also Mondelli v. Kendell Home Corporation, et al., 262 Neb. 263, 631 N.W.2d 846 (2001) (homeowner cites violations of city building code as a cause of mold contamination in structure).

[FN90]. See ASTM Standards, E 2112 Enhanced Exterior Building Installations, Standardization, December 2002 at 20 (development of consensus standard for integration of external wall components to better ensure continuity of building envelope).

[FN91]. The paper in gypsum wallboard provides nourishment for mold such as stachybotrys. See Dolnick supra note 108 at 14.

[FN92]. A 2002 article cited research in the building materials industry: "He notes that the gypsum industry is working on developing new mold-resistant or moisture resistant gypsum and drywall products, but he doesn't see them coming out any time soon."

[FN93]. The need to avoid using porous materials on air stream surfaces of plenums and ducts where moisture can support growth of fungi.

[FN94]. An example of such work includes the moisture performance of various wall configurations See U.S. DEP'T OF COMMERCE, TECHNOLOGY ADMINISTRATION, A COMPUTER ANALYSIS OF WALL

CONSTRUC-TIONS IN THE MOISTURE CONTROL HANDBOOK, (NISTIR 5627) (May 1995).

[FN95]. See H.E. Barney Burroughs, Filtration: An Investment in IAQ, 69 Heating, Piping, Air Conditioning, (Aug. 1997) at 55 (stating source control is the preferred technique to achieve and maintain an acceptable indoor air environment).

[FN96]. B. Checket-Hanks, IAQ at the Rooftop Level, 215 Air Conditioning, Heating & Refrigeration News, No. 5, Jan. 28, 2002 at 9. (referencing study of effectiveness of UVC unit on fungal contamination in Tulsa, Oklahoma office building). This discussion of active technologies is not intended to be exhaustive. Various systems designed to address indoor air pollutants include, but are not limited to, ozone purification, ozone generators and duct encapsulation.

[FN97]. An example is the high energy particulate arrestor. This device was developed over fifty years as part of the Manhattan project. It was designed to control very small particles. See Burroughs, supra note 264 at 55.

[FN98]. However, this statement does not include filtration that is a component of ventilation systems. Some percentage of fungal spores are removed by these filtration systems. Id.

[FN99]. Id. (referencing mini plant filters, electric media, and active particle fabrics).

[FN100]. For example, see Benik v. Brandon Hatcher, 358 Md. 507, 750 A.2d 10 (2000) (reference to alleged breach of warranty due to violation of local housing codes addressing lead-based paint).

[FN101]. Id.

[FN102]. Id.

[FN103]. HR 5040, 107th Cong. (2002). The Toxic Mold and Safety Protection Act is also known as the Melina Bill.

[FN104]. HR 5040, 107th Cong. § 102 (2002). The study was to have included information about harmful and/or toxic strains of mold; methods of detecting harmful and/or toxic mold; potential dangers of exposure to mold; information on when mold becomes harmful to human health; and the hazards involved in mold remediation.

[FN105]. HR 5040, 107th Cong. § 103 (2002).

[FN106]. Id.

[FN107]. Id.

[FN108]. HR 5040, 107th Cong. § 201 (2002). The EPA, CDC, NIH, and HUD would be required to sponsor public education programs that increase awareness of the dangers of indoor mold growth and toxic mold.

[FN109]. HR 5040, 107th Cong. § 202 (2002).

[FN110]. Id.

[FN111]. HR 5040, 107th Cong. (2002).

[FN112]. HR 5040, 107th Cong. § 203 (2002). These procedures include giving mold information pamphlets to tenants, mold inspections, and abatement of identified indoor mold hazards.

[FN113]. HR 5040 107th Cong. § 204 (2002).

[FN114]. HR 5040 107th Cong. § 206 (2002).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN115]. HR 5040 107th Cong. § 301 (2002).

[FN116]. Id.

[FN117]. HR 5040 107th Cong. § 401 (2002).

[FN118]. HR 5040 107th Cong. § 601 (2002).

[FN119]. HR 5040 107th Cong. § 602 (2002).

[FN120]. HR 5040 107th Cong. § 606 (2002). An amendment would have been added to the Internal Revenue Code of 1986. The amendment allowed for a tax credit of 60 percent of non-reimbursed mold inspection and remediation expenses paid or incurred by the taxpayer. HR 5040 107th Cong. § 501 (2002). The tax credit is limited to $50,000 annually.

[FN121]. See Democratic Push for EPA Mold Exposure Rules Draw GOP Fire, Inside EPA Environmental Policy Alert, Vol. XIX, No. 16, Aug. 7, 2002 at 26.

[FN122]. Id. ("One EPA source says issuing a specific threshold for harmful mold exposure would place a blanket over individual differences in exposure and also pull the agency into unwanted legal disputes.").

[FN123]. This provision includes, but is not limited to, schools and multifamily dwellings.

[FN124]. Task Force on Indoor Air Quality, 2001 Md. Laws ch. 591; 5 Res. 77, 204th Leg. The Maryland legislation required that a task force be formed to study and report on indoor air quality. The task force issued the report on July 1, 2002. It includes a discussion of mold. Id.

[FN125]. Id.

[FN126]. H.R. 1253, 112th Gen. Assem., 2d Reg. Sess. (Ind. 2002) (unenacted).

[FN127]. Id.

[FN128]. Id.

[FN129]. Id. A similar bill was proposed in New York. S.896, 2003-2004 Reg. Sess. (N.Y. 2003) (unenacted). The New York proposal focuses on exposure limits and standards for assessment of molds. Id.

[FN130]. An extensive number of articles have addressed environmental auditing and assessment techniques and/or the various issues associated with them. See, e.g., Michael Ray Harris, Promoting Corporate Self-Compliance: An Examination of the Debate Over Legal Protection for Environmental Audits, 23 ECOLOGY L. Q. 713 (1996); Donald A Carr & William L. Thomas, Devising a Compliance Strategy Under the ISO 14000 International Environmental Management Standards, 15 PACE ENV'TL. L. REV. 86-87 (1997); James M. Weaver, et. al., State Environmental Audit Laws Advance Goals of Cleaner Environment, 11 NAT. RESOURCES & ENV'TL. 9 (1997); Dara B. Less, Incentives for Self-Policing: The Need for a Rule, 2 ENV'TL. LAW. 773 (1996); David Sorenson, The U.S. Environmental Protection Agency's Recent Environmental Auditing Policy and Potential Conflicts with State-Created Environmental Audit Privilege, 9 TUL. ENV'TL. L.J. 505 (1996); Lisa Koven, The Environmental Self-Audit Evidentiary Privilege, 45 UCLA L. REV. 1190 (1998); Miri Berlin, Environmental Auditing: Entering the Eco-Information Highway, 6 N.Y.U. ENV'TL. L.J. 637 (1998); Brooks M. Beard, The New Environmental Federalism: Can The EPA's Voluntary Audit Policy Survive?, 17 VA. ENV'TL. L.J. 27 (1997); David A. Danna, The Perverse Incentive of Environmental Audit Immunity, 81 IOWA L. REV. 976 (1996); Rena I. Steinzor, Reinventing Environmental Regulation: The Dangerous Journey From Command to Self-Control, 22 HARV. ENV'TL. L. REV. 165 (1998); Kirk F. Marty, Moving Beyond the Body Count and Toward Compliance: Legislative Options for Encouraging Environmental Self-Analysis, 20 VT. L. REV. 499-500 (1995); Terrell E. Hunt & Timothy A. Wilkins, Environmental Audits and Enforcement Policy 16 HARV. ENV'TL. L. REV. 365 (1992);

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Timothy T. Jones, Walter G. Wright, Jr. & Mary Ellen Ternes, Environmental Compliance Audits: The Arkansas Experience, 21 U. ARK. LITTLE ROCK L. REV. 191 (1999) Stensvaag, The Fine Print of State Environmental Audit Privileges, 16 UCLA J. ENV'TL. L. & POL'Y. 69 (1998).

[FN131]. Two authors contrast financial auditing with environmental audits by stating: "In addition, unlike the case of the results of financial audits, even public companies often regard environmental data obtained through an internal audit as non-public information." George Van Cleve & Keith W. Holman, Promise and Reality in the Enforcement of the Amended Clean Air Act II: Federal Enforceability and Environmental Auditing, 27 ENVTL. L. REP. 10151, 10158 (1997).

[FN132]. A related risk is that by definition company or facility management are provided knowledge of the existence of violations of federal environmental programs. The federal and some state environmental statutes provide that criminal penalties may be imposed in certain circumstances in the case of knowing violations. See Andrew J. Turner, Mens Rea in Environmental Crime Prosecutions: Ignoratia Juris and the White Collar Criminal, 23 COL. J. OF ENV'TL. L. 217 (1998). Once such violations are identified facility management may have been provided "knowledge" of the violations. Consequently, the failure to address such noncompliance risks the imposition of criminal penalties. Company or facility management should therefore be prepared prior to undertaking the audit to remedy any violation that is discovered. One early commentator opined it may be unwise for a company to undertake an environmental audit if it does not intend to act on the results. See Phillip Reed, Environmental Audits and Confidentiality: Can What you Know Hurt You as Much As What You Don't Know?, 13 ENVTL. L. REP. 10303 (1983).

[FN133]. See generally, James W. Moorman & Laverne S. Kirsch, Environmental Compliance Assessments: Why Do Them, How to Do Them and How Not To Do Them, 26 WAKE FORREST L. REV. 97 (1991).

[FN134]. Arkansas Natl. Bank v. Cleburne Co. Bank, 258 Ark. 329, 331, 525 S.W.2d 82 (1975). The Seventh Circuit Court of Appeals has stated that the privilege can be invoked: (1) Where legal advice of any kind is sought, (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or the legal advisor, (8) except the protection be waived. United States v. Lawless, 709 F.2d 485, 487 (7th Cir. 1983) (citing 8 JOHN HENRY WIGMORE, EVIDENCE § 2292).

[FN135]. 147 F.R.D. 82 (E.D. Pa. 1992).

[FN136]. In 1989 a federal district court rejected the application of the attorney-client privilege because the company failed to demonstrate that its in-house counsel was acting in a legal capacity. United States v. Chevron, No. CIV-88-6681, 1989 U.S. Dist. LEXIS 12267, at *17 (E.D. Pa. Oct. 16, 1989).

[FN137]. 853 F. Supp. 156 (E.D.N.Y. 1994).

[FN138]. 777 P.2d 686 (Ariz. 1989).

[FN139]. No. CV 91-646-WDK, 1994 WL 212135 at *20 (C.D. Cal. Sept. 16, 1993).

[FN140]. Cetain procedures may enhance the possibility of the applicability of the privilege. Two authors suggest the following if an outside environmental consultant is retained to conduct an audit:

The consultant should report directly to counsel for purposes of protecting the information gathered as privileged, and to control the type of record being assembled. All draft and final reports should be submitted to outside counsel for review and distribution. Distribution of such reports should be limited within the company on a need-to-know basis, and confidential materials should be labeled and segregated from nonprivileged materials.

Mary Ellen Kris & Gail L. Vannelli, Today's Criminal Environmental Enforcement Program: Why You May be Vulnerable and Why You Should Guard Against Prosecution Through an Environmental Audit, 16 COL. J. OF ENVTL. L. at 248 (1991).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN141]. 157 F.R.D 522 (N.D. Fla. 1994); See also, CPC Int'l, Inc. v. Hartford Accident & Indem. Co., 620 A.2d 462 (N.J. 1992), which found a privilege. The self-critical analysis privilege is also recognized in a variety of other consulting contexts. See generally, Tharp v. Sivyer Steel Corp., 149 F.R.D. 177 (S.D. Iowa 1993); Banks v. Lockheed-Georgia Co., 53 F.R.D. 283 (N.D. Ga. 1971); Bredice v. Doctors Hospital, Inc. 50 F.R.D. 249 (D.D.C. 1970).

[FN142]. See Joiner v. Hercules, Inc., 169 F.R.D. 695, 698-99 (S.D. Ga. 1996).

[FN143]. 132 F.R.D. 8, 9-10 (D. Conn. 1990).

[FN144]. See Carr v. El Dorado Chemical Co., No. 96-1081, 1997 U.S. Dist. LEXIS 5752 (W.D. Ark. April 14, 1997). The court addressed a motion to compel production of an environmental audit. In the opinion the court summarized the restrictions to this privilege as:

  (1) [T]he privilege typically extends only to subjective impressions and opinions contained in a written report, not objective facts (citing Webb v. Westinghouse Electric Corp., 81 F.R.D. 431, 434 (E.D. Pa. 1978)).

  (2) [T]he privilege makes sense only when the protected information 'must be of a type whose flow would be curtailed if discovery was allowed.' (quoting Dowling v. American Hawaii Cruises, Inc., 971 F.2d 423, 425-26 (9th Cir. 1992)).

  (3) [T]he privilege arguably may not apply when the materials are relevant to the investigation of a federal regulatory agency (citing Federal Trade Commission v. TRW, Inc., 620 F.2d 207, 210-11 (D.C. Cir. 1980)).

  (4) '[N]o material should be privileged unless it was prepared with the expectation that it would be kept confidential, and has in fact been kept confidential.' (quoting Dowling, 971 F.2d at 426).

[FN145]. See id. at 25.

[FN146]. See id. This decision is one of several discussed in a 1998 United States House of Representatives hearing. See The Federal-State Relationship: A Look Into EPA Regulatory Efforts: Hearing Before the Subcommittee on Oversight and Investigations of te House Committee on Commerce, 105th Cong. 56 (1996).

[FN147]. Parker v. Southern Farm Bureau Ins. Co., 326 Ark. 1073, 935 S.W.2d 556 (1996).

[FN148]. Fed. R. Civ. P. 26(b)(3).

[FN149]. See Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 604 (8th Cir. 1977). In an unrelated context, the EPA itself asserted both the attorney-client and work-product privileges in a successful attempt to prevent disclosure under the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq., of various documents it generated related to four Michigan Superfund sites. See Chemcentral/Grand Rapids Corporation v. United States Environmental Protection Agency, No. 91-C-4380, 1992 WL 281322, at *5 (N.D. Ill. Oct. 6, 1992). The Comprehensive Response Compensation and Liability Act of "Superfund" is found at 42 U.S.C. § 9601 et seq. In Chemcentral the court found that various EPA documents fit within either the attorney-client or work-product privileges and therefore met the deliberative process exemption of the FOIA. This exemption protects communications between the federal agencies and outside consultants or other persons whose opinions or recommendations are part of the agency's own deliberative process. See Dow Jones & Co., Inc. v. Dept. of Justice, 917 F.2d 571, 574-75 (D.C. Cir. 1990). In addressing the work-product privilege the Chemcentral court found that the documents at issue did not simply involve collecting background information regarding the four Michigan Superfund sites. The court also cited the fact that the EPA office labeled the documents "Enforcement Confidential" or "Attorney-client Privileged."

[FN150]. Various versions of such legislation are found in states such as Alaska, Arkansas, Colorado, Illinois, Indiana, Kansas, Kentucky, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, Ohio, Oregon,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

South Carolina, South Dakota, Texas, Utah, Virginia and Wyoming. Douglas P. McLeod & Kirk F. Marty, Can You Afford to Perform an Environmental Audit?, Presentation at the Air and Waste Management Association's 91st Annual Meeting (June 1998).

[FN151]. Ark. Code. Ann. § 8-1-303(a) describes the scope of the privilege:

In order to encourage owners and operators of facilities and persons conducting other activities regulated under this chapter, or its federal counterparts or extensions, both to conduct voluntary internal environmental audits of their compliance programs and management systems and to assess and improve compliance with statutory and regulatory requirements, an environmental audit privilege is created to protect the confidentiality of communications relative to voluntary internal environmental audits.

[FN152]. Ark. Code Ann. § 8-1-302(4). The term environmental audit report is broadly defined to include:

1. Field notes, records of observations, finds, opinions, suggestions, conclusions, drafts, memoranda, drawings, photographs, computer-generated or electronically recorded information, maps, charts, graphs, and surveys collected or developed for the primary purpose of preparing an environmental audit;

Ark. Code Ann. § 8-1-302(4)(A). The potentially protected material clearly encompasses a number of documents in addition to the actual audit report itself. It is therefore important for facilities to recognize that in states such as Arkansas information (i.e. sampling data, etc.) or documents (i.e., employee interviews, etc.) are initially generated the required statutory procedures to provide them confidentiality should be followed to ensure protection for these materials. See id.

2. An audit report prepared by the auditor that includes: (a.) the scope of the audit; (b.) the information gained in the audit; (c.) conclusions and recommendations, (d.) exhibits and appendices;

See Ark. Code. Ann § 8-1-302 (4)(B).

3. Memoranda and documents analyzing a portion of or all of the audit report and discussing implementation issues; and

See Ark. Code. Ann § 8-1-302 (4)(C).

4. An implementation plan that addresses correcting past compliance, improving current compliance, and preventing future noncompliance.

See Ark. Code. Ann. § 8-1-302 (4)(D).

[FN153]. Ark. Code Ann. § 8-1-304.

[FN154]. See Carla Liristis, et al. v. American Family Mutual Insurance Company, 1 CA-CV00-0539, 2002 Ariz. App. LEXIS 203 (June 27, 2002) (dispute as to whether homeowner's insurance policy covered certain damages associated with mold).

[FN155]. Relevant examples are the specialty policies developed to cover various environmental risks. See Ann M. Waeger & Jack Fersko, Current Insurance Products for Insuring Against Environment Risks, The Practical Real Estate Lawyer (Sept. 1999).

[FN156]. See Florida May Be The Next Hotbed for Mold Legislation, 9 Industrial Environment, Vol. 13 (Sept. 2002) (reference to 50 Florida insurance companies asking state insurance regulators to approve mold exclusion endorsements). The Deputy Director of Florida Department of Insurance noted that most Florida insurance policies will cover mold damage only when it is caused by a covered peril such as a hurricane or windstorm. Mr. Roddenberry also noted: "If mold results from sudden, accidental change of water, then its remediation is covered within policy limits", Roddenberry complained. "But if mold develops from construction defects or a homeowners

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

negligent maintenance, it's not the insurer's responsibility." Id.

[FN157]. Even if coverage is provided, the absence of standards or exposure limits complicates the scope of the remedial obligation. See Trader surpa note 39 at 13 ("Cleanup of typical pollution losses is subject to specific standards. Given the lack of cleanup standards for CPL, policies need to be amended to provide coverage for remedial and cleanup costs that are not subject to specific standards.").

[FN158]. For example, see Insurance Company of North America v. Snyder Moving and Storage, Inc. of Phoenix, 2000 U.S. App. LEXIS 25173 (Dec. 6, 2002) (reference to Comprehensive Transportation and Storage Liability Policy which covers post-flood rust, mold and mildew under certain circumstances).

[FN159]. These questions are not limited to mold. The insurance coverage applicable to various other indoor air pollutants have been addressed by the courts. See Thomas K. Bick & Lisa G. Youngblood, The Pollution Exclusions Saga Continues: Does it Apply to Indoor Releases?, 5 S.C. ENV'TL. L.J. 119 (Spring 1997).

[FN160]. In pollution exclusions, the end of the clause often contains language providing that the exclusion does not apply to discharges of pollutants if it was "sudden or accidental." See Harkins supra note 22 at 1120. Courts often interpret these words also to mean "unexpected and unintended", thus not precluding coverage for the insured. Id.

[FN161]. Liristis v. American Family Mutual Ins. Co., 2002 Ariz. App. LEXIS 203, No. 1 CA-CV 00-0539 (June 27, 2002). The covered peril was the fire for which a claim was originally filed.

[FN162]. Id. at *3.

[FN163]. Id. at *4.

[FN164]. Id. at *4.

[FN165]. Id. at *5.

[FN166]. Id. at *6.

[FN167]. Id. at *9.

[FN168]. Liristis, 2002 Ariz. App. LEXIS 203, at *10, No. 1 CA-CV 00-0539 (June 27, 2002).

[FN169]. Id.

[FN170]. No. CIV.A.00-1209-T4, 2002 U.S. Dist. LEXIS 5167 (E.D. La. March 15, 2002).

[FN171]. Id. at *5.

[FN172]. Id. at *4.

[FN173]. Id. at *11.

[FN174]. Id. at *8-9.

[FN175]. Id. at *9.

[FN176]. Liberty Mutual Fire Ins. Co. v. Ravannack, No. CIV.A.00-1209-T4, 2002 U.S. Dist. LEXIS 5167, at *9 (E.D. La. March 15, 2002).

[FN177]. Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

Page 44

[FN178]. Id. at 10-11.

[FN179]. Id. at 11.

[FN180]. Id. at 14.

[FN181]. No. 07-02-0399-CV, 2003 Tex. App. LEXIS 7915.

[FN182]. Id. at *3.

[FN183]. Id. at *4.

[FN184]. Id.

[FN185]. Id. at *10.

[FN186]. Id.

[FN187]. Id. at *7.

[FN188]. Id. at *14.

[FN189]. Id. at *16.

[FN190]. Id.

[FN191]. Id. at *23

[FN192]. See Generally; Flores, 2003 U.S. Dist. LEXIS 13403.

[FN193]. Flores, 2003 U.S. Dist. LEXIS 13403 at *11,

[FN194]. See, e.g., Highlands Ins. Co. v. Employers' Surplus Lines Ins. Co., 491 F.Supp. 169, 171 n.1 (E.D. La. 1980).

[FN195]. Id. at *12. See also; American Home Assurance Co. v. Unitramp, Ltd., 146 F.3d 311, 313 (5th Cir. 1998).

[FN196]. Id.

[FN197]. Id. at *13.

[FN198]. Id.

[FN199]. Walter J. Andrews. Lon A. Beck & William A. Schreiner, Jr., Missouri Federal Court: Manifestation Trigger, Late Notice Bar Coverage For Water Intrusion Damage, (Shaw Pittman, L.L.P. Washington, D.C.), September 2003, Number 35.

[FN200]. Id. (Although Hammons denied knowing of the manifested damages, the court found that there was substantial evidence to the contrary, and held that the claimed losses were actually losses-in-progress at the time the insurance contracts incepted).

[FN201]. 158 Wis.2d 64, 462 N.W.2d 218 (Wisc. App. 1990).

[FN202]. Id. at 72, 462 N.W.2d at 222.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN203]. Id., 462 N.W.2d at 222.

[FN204]. Id. at 74, 462 N.W.2d at 223.

[FN205]. Id. at 75, 462 N.W.2d at 223.

[FN206]. Id. at 77, 462 N.W.2d at 224.

[FN207]. Leverence, 158 Wis.2d at 77-78, 462 N.W.2d at 224.

[FN208]. Id. at 80-82, 96-97, 462 N.W.2d at 225-26.

[FN209]. Id. at 97, 462 N.W.2d at 232.

[FN210]. Id.

[FN211]. Blaine Construction Corp. v. Ins. Co. of N. America, 171 F.3d. 343, 345 (1999).

[FN212]. Id. at 346,

[FN213]. Id.

[FN214]. Id.

[FN215]. Id.

[FN216]. Id. at 347.

[FN217]. Id.

[FN218]. Id.

[FN219]. Id. at 345.

[FN220]. Id. at 353.

[FN221]. 309 F.3d 1068 (8th Cir. 2002).

[FN222]. Id. at 1071.

[FN223]. Id. at 1070.

[FN224]. Id.

[FN225]. Id.

[FN226]. Id.

[FN227]. Maples, 309 F.3d at 1071.

[FN228]. Cooper v. American Family Mut. Ins. Co., 184 F. Supp. 2d 960 (D. Ariz. 2002).

[FN229]. Id. at 963.

[FN230]. Id. at 962.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.