IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELSMERE PARK CLUB, L.P., a Delaware limited partnership,<br><br>      Plaintiff,<br><br>  v.<br><br>TOWN OF ELSMERE, a Delaware Municipal corporation,<br>ELLIS BLOMQUIST, EUGENE BONEKER, and JOHN GILES,<br><br>      Defendants. | Civil Action No. 04-1321-SLR<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION *IN LIMINE* (*DAUBERT* MOTION) TO EXCLUDE THE AFFIDAVITS, EXPERT REPORTS AND TESTIMONY OF GERALD LLEWELLYN, KEN BELMONT AND GEORGE YOCHER**

Dated: September 23, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 552-5504 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*
*Elsmere Park Club, L.P.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

NATURE AND STAGE OF PROCEEDINGS .....................................................................1

SUMMARY OF THE ARGUMENT .....................................................................................1

STATEMENT OF FACTS RELEVANT TO THIS MOTION..............................................2

Health Concerns Presented By Mold......................................................................................3

The New York City Guidelines ...............................................................................................4

Defendants' Experts Failed to Inspect Occupied Residential Units or Interview Tenants for
Adverse Health Conditions .....................................................................................................5

ARGUMENT............................................................................................................................8

I.   The Opinions of Defendants' Putative Experts Fail to Satisfy the Requirements of
     Reliable Methodology and Are Not Based Upon Sufficient Facts or Data as Mandated by
     F.R.E. 702 and *Daubert*..................................................................................................8

     A.   The Standard of Admissibility of Expert Opinions Under FRE 702
          and *Daubert*............................................................................................................8

     B.   Llewellyn's Testimony is Not the Product of Reliable Principles and Methods....9

     C.   Llewellyn's Testimony is Not Based Upon Sufficient Facts or Data................11

     D.   Belmont and Yocher's Affidavits Also Fail to Satisfy FRE 702's Requirements of
          Being Based on Reliable Methodology and Sufficient Data........................12

CONCLUSION......................................................................................................................12

# TABLE OF AUTHORITIES

## CASES

Bourjaily v. United States,
  483 U.S. 171 (1987)........................................................................................8

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
  43 F.3d 1311 (9th Cir. 1995) .........................................................................9

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
  509 U.S. 579 (1993)..................................................................................8, 12

Kumho Tire Co. v. Carmichael,
  526 U.S. 137 (1999)....................................................................................8, 9

O'Connor v. Commonwealth Edison Co.,
  13 F.3d 1090 (7th Cir. 1994) ........................................................................12

In re Paoli R.R. Yard PCB Litigation,
  35 F.3d 717 (3d Cir. 1994). ( ........................................................................8

## STATUTES

42 U.S.C. § 1983................................................................................................1

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Elsmere Park Club, L.P. ("EPC" or "Plaintiff"), the former owner of the Elsmere Park Apartments (the "Apartments") located in Elsmere, Delaware, commenced this action under 42 U.S.C. § 1983 against Defendants the Town of Elsmere (the "Town"), Ellis Blomquist ("Blomquist"), Eugene Boneker ("Boneker") and John Giles ("Giles") (collectively, the "Defendants") for procedural due process violations concerning the condemnation and forced evacuation of the Apartments in October 2002. On June 10, 2005, the Court approved a stipulation amending the Scheduling Order in certain respects. Under the Amended Order, expert reports were to be submitted on August 15, 2005, rebuttal expert reports were due September 15, 2005 and *Daubert* motions were due September 23, 2005. Plaintiff served three expert reports on August 15, 2005. On September 15, 2005, Defendants served a letter designating the following as their rebuttal expert reports: (1) the Tiffany-Bader Environmental Report[1] and (2) the Affidavits of Dr. Gerald Llewellyn, George Yocher and Ken Belmont.[2] Trial is scheduled to begin January 4, 2006. This brief is filed in support of Plaintiff's Motion *In Limine* (*Daubert* Motion) to Exclude the Affidavits and Testimony of Llewellyn, Yocher and Belmont.

## SUMMARY OF THE ARGUMENT

Plaintiff Elsmere Park Club, L.P. moves to preclude the expert testimony of Llewellyn, Yocher and Belmont due to the speculative nature of their conclusions regarding the alleged need

---

[1] The Tiffany-Bader Environmental Report was previously issued by a different party in an action filed in the Delaware Superior Court that has since been resolved. Tiffany-Bader conducted a 4-building inspection of the 39-building apartment complex several months after they had been condemned.

[2] These Affidavits were originally produced in opposition to Plaintiff's motion for a temporary restraining order in the Delaware Court of Chancery, C.A. No. 19970-NC (Oct. 10, 2002) (the "TRO" proceeding).

to evacuate the Apartments. Their opinions are based on no scientific data whatsoever, much less reliable data. These "affidavits" do not comport with Federal Rule of Evidence 702.

## STATEMENT OF FACTS RELEVANT TO THIS MOTION

Defendants have indicated that they intend to rely upon several affidavits as their rebuttal expert reports, specifically the Affidavits of Llewellyn, Yocher and Belmont. See Letter dated 9/15/05 from E. McNally to D. Eagle serving as Defendants' designation of rebuttal expert reports, attached hereto as Exh. A. Other than these Affidavits and several photographs, Plaintiff is aware of no other underlying documentation that supports the conclusions reached by Defendants' proffered experts.

All three individuals were employed by the Delaware Department of Public Health during the relevant time period. Llewellyn rendered an Affidavit dated October 10, 2002, which sets forth his opinions with respect to the condemnation of the Apartments that occurred in early October 2002. See Aff. of Gerald Llewellyn, Ph.D. dated 10/10/02 (hereinafter "Llewellyn Aff."), attached hereto along with the Affidavits of Ken Belmont and George Yocher as Exh. B. Llewellyn advised the Town of Elsmere that there was a "serious health hazard" caused by mold in the basement units of the Apartments and that it was appropriate to evacuate the residents prior to remediation of the mold condition. Id. at ¶ 2. Llewellyn's Affidavit also concludes: "The illness that <u>may result</u> form the current mold levels that <u>I believe</u> are now in the apartments range from possible fatal developments for new infants to less severe, but still serious illnesses, and worsening health for the sensitive populations." Llewellyn Aff. at ¶ 6 (emphasis added). Llewellyn points to no clinical tests to evaluate the health or sensitivity of any tenants; nor does he provide any scientific data or methodology to support his conclusions.

## Health Concerns Presented By Mold

While there are thousands of different species, molds generally are perceived as not being toxic to normal, healthy individuals. See "Adverse Human Health Effects Associated with Molds in the Indoor Environment," American College of Occupation and Environmental Medicine, October 27, 2002 ("ACOEM Statement"), (B-573, 578-79);[3] (B-142-143); see also "Questions and Answers on *Stachybotrys chartarum* and Other Molds" (hereinafter, "CDC Q&A"), answer to question 3, at http://www.cdc.gov/mold/stachy.htm, website of the Centers for Disease Control and Prevention ("CDC"), answer to questions 1 and 10 (B-317-319). Mold has not been shown to affect individuals who are not sensitive. Id. It is estimated that only 5% of the population would show allergic symptoms as a result of inhaling airborne mold. ACOEM Statement at 2 (B-574). Individuals with special sensitivities who are exposed to mold may experience short-term reactions, such as nasal stuffiness, eye irritation or wheezing. (B-142-43) (B-317) (B-321) (B-573, 578-79). The CDC reports that people at higher risk for these or more severe reactions, such as shortness of breath and possible fever, include infants and the elderly, those with immune suppression, chronic illness or underlying lung disease, pregnant women and workers exposed to large amounts of molds in occupational settings, such as farmers working around moldy hay. Id. (B-317-321)

While there have been claims that certain molds contain toxins and can cause unique or rare conditions such as pulmonary hemorrhage or memory loss, the CDC has found no causal

---

[3] Some citations are made to the Appendix (Volume I = D.I. # 53; Volume II = D.I. # 54) to Plaintiff's Answering Brief in Opposition to the Motion for Summary Judgment and will be designated as "B-___." Similarly, any citations to the Substitute Appendix in Support of Defendants' Opening Brief in Support of Their Motion for Summary Judgment (D.I. # 52) will be designated as "A-___."

link between the presence of mold in the indoor air and these conditions. (B-142); see also CDC Q&A, answer to question 1 (B-317); see also ACOEM Statement (B-573, 578). Indeed, a recent CDC investigation found that a possible association between acute idiopathic pulmonary hemorrhage (found in ten infants in Cleveland, Ohio) to a mold known as *stachybotrys chartarum* had no basis. CDC Q&A at 3, answer to question 8 (B-319).

### The New York City Guidelines

The Guidelines on Assessment and Remediation of Fungi in Indoor Environments, issued by the New York City Department of Health & Mental Hygiene (the "NYC Guidelines") (B-209-225) (also included with Ken Belmont's Affidavit, attached hereto as Exh. B), comprise one of the few accepted standards in the industry. See, Sovereign Report[4] at 4 (B-143). The Notices of Condemnation that were issued in this case identify the NYC Guidelines as the operative regulatory standard for the Town's actions. See, e.g. Notice of Condemnation dated October 9, 2002 (A-86). Ken Belmont, Llewellyn's colleague at the Department of Public Health, states in his affidavit that Defendants' experts purported to apply the NYC Guidelines.[5]

Significantly, the NYC Guidelines state that evacuation is not called for during mold remediation except in very special circumstances:

> Except in cases of widespread fungal contamination <u>that are linked to illnesses</u> throughout a building, a building-wide evacuation is not indicated.

---

[4] The "Sovereign Report" refers to the expert report submitted by Larry W. Johnson, PE, CIH as updated on August 31, 2004. The Sovereign Report has been made part of the record beginning at B-139 (See Plaintiff's Appendix Volume I, D.I. # 53).

[5] See Belmont Affidavit dated 10/10/02 at ¶ 6 ("We apply the NYC Guidelines as a minimum in mold investigations, and [the Guidelines] are attached hereto as Exhibit A.")

-4-

NYC Guidelines, Section 1.3, paragraph 2 (B-215) (emphasis added). In addition, the NYC Guidelines state that "A trained occupational/environmental health practitioner should base decisions about medical removals ... on the results of a clinical assessment." Id. Therefore, a decision to vacate a residence due to the presence of mold can be made only after consultation with a professional, such as a physician, and must be made on an individual, case-by-case basis. CDC Q&A, (B-317), answer to question 5; see also, Sovereign Report (B-145).

### Defendants' Experts Failed to Inspect Occupied Residential Units or Interview Tenants for Adverse Health Conditions

Prior to the condemnation and eviction at issue in this case, neither the Defendants nor the State officials entered any of the occupied residential units of the buildings to see if mold was present or to take any air samples in the units to see if any mold had become airborne. Blomquist Deposition 11/9/04 ("Blomquist Depo. I ") at 169, 201-02 (B-651, 665-666).[6] Nobody interviewed any residents to determine if they had experienced any symptoms related to the presence of mold in the basements, or asked EPC if any tenants had complained of symptoms related to mold, although Defendants claim that mold had been present in the buildings for years and years. Id. at 112, 173-74 (B-638, 655-56).

Ellis Blomquist, the Town's Code Enforcement Officer, conducted all of the inspections of the Apartments. After Defendant Blomquist and Mr. Belmont inspected and condemned two buildings based on mold found in the basements on Friday, October 4, 2002, Blomquist returned to inspect additional buildings on Monday, October 7, 2002, along with Dr. Llewellyn and Mr. Belmont. They inspected approximately 10 basement units out of 38. Id. at 160 (B-648). They did not inspect any occupied apartments. Id. at 173-74 (B-665-66). They did not take any air

---

[6] Ellis Blomquist was the Town's Code Enforcement Officer.

samples. Id. at 173 (B-655). At the end of the day, however, they decided to condemn all of the buildings. Id. at 188-89 (B-658-59).

On Tuesday, October 8, 2002, Defendant Blomquist returned to inspect eleven additional buildings, along with Dr. Llewellyn and Mr. Belmont. Id. at 199 (B-663). They did not go into any occupied apartments to inspect or take air samples. Id. at 201-02 (B-665-66). In the early evening of October 8, 2002, Defendant Blomquist, in consultation with Defendants Boneker and Giles, condemned all of the additional buildings. Id. at 204-05 (B-668-69). Moreover, during the course of the next few days, Defendant Town, acting by and through Defendant Blomquist, inspected the remaining buildings at the Apartments. During these inspections, they did not inspect any occupied apartments or take any air samples. Id. at 169, 204-05 (B-651, 668-69).

Blomquist conceded after issuing Notices that mold in the basements was the basis of the condemnation orders, and that neither the conditions in the occupied apartment units (which he did not visit) nor any other conditions were the basis for condemning any of the buildings. (B-607-609) Dr. Llewellyn eventually acknowledged that the perceived emergency could have been addressed by placing plastic sheeting around the basement units and removing any mold from the rest of the buildings. (Deposition of Dr. Llewellyn taken 11/16/04 ("Llewellyn Depo.") at 95-96) (B-700-701).

The Apartments were a garden-style apartment complex consisting of 156 residential units in 39 separate buildings. Although Llewellyn, Yocher and Belmont's advised the Town that it was appropriate to order the evacuation of almost *every* unit[7] at the Apartments, Llewellyn

---

[7] Out of 39 buildings, the only building at the Apartments that was not condemned in October 2002 was the one that housed the management office in the basement unit.

-6-

failed to inspect most of the residential apartment units. While he stated that he personally went to "more than a dozen," clearly that did not include an inspection of a number close to the majority of the apartments units. See Llewellyn Depo. at 54, Attached hereto as Exhibit C. Even if the "more than a dozen" that Llewellyn inspected amounted to fifteen (15) apartment units, this amount would only consist of less than ten percent (10%) of the 156 total apartments units. Moreover, based on Blomquist's testimony, the record indicates that they only inspected a few *vacant* apartments and did not conduct air sampling in any (vacant or occupied) residential units. Id. at 169, 173-74, 201-02 (B-651, B- 655-56, B-665-66).

Furthermore, Llewellyn has provided no credentials for evaluating the air flow of mold spores within the Apartments and he in fact has none. Llewellyn also fails to explain how his professional experience caused him to reach his conclusions, why that experience is a sufficient basis for his opinion, and how that experience is reliably applied to the facts.

# ARGUMENT

I. **The Opinions of Defendants' Putative Experts Fail to Satisfy the Requirements of Reliable Methodology and Are Not Based Upon Sufficient Facts or Data as Mandated by F.R.E. 702 and *Daubert***

   A. **The Standard of Admissibility of Expert Opinions Under FRE 702 and *Daubert***

The Federal Rules of Evidence control the admissibility of evidence and provide as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FRE 702.

The trial judge is the gatekeeper responsible for excluding unreliable expert witness testimony, particularly in jury trials such as the present case. Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). A proponent of a particular expert must show that his or her expert's testimony meets the admissibility requirements of FRE 702 by a preponderance of the evidence. See Bourjaily v. United States, 483 U.S. 171 (1987). The Third Circuit has found that *"any* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."* In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994). (emphasis in original).

Although FRE 702 allows testimony in conjunction with skill, training, knowledge or education, such expert must still be subjected to the trial court's gatekeeper function in

determining reliability. "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." Kuhmo Tire Co., 526 U.S. at 156. However, it is incumbent upon the expert that she reliably explain how her experience influences her opinion. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." F.R.E. 702, Advisory Committee Notes to the 2000 Amendments. As a gatekeeper, the trial court cannot just stop at "taking the expert's word for it". See Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.").

### B.     Llewellyn's Testimony is Not the Product of Reliable Principles and Methods

Llewellyn apparently relies upon his experience in making all of his conclusions and opinions, because we have no other scientific data. However, he fails to explain how his professional experience leads to his conclusions, why that experience is sufficient basis for his opinion, and how that experience is reliably applied to the facts. Under Daubert, bare conclusions are insufficient. See F.R.E. 702, Advisory Committee Notes to the 2000 Amendments ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.")

Despite asserting that the NYC Guidelines governed the Town's response to the presence of mold, the putative State experts recommended immediate evacuation of the Apartments

contrary to the dictates of the NYC Guidelines. Section 1.3 of the NYC Guidelines states that evacuation is not called for during mold remediation except in very special circumstances:

> Except in cases of widespread fungal contamination that are linked to illnesses throughout a building, a building-wide evacuation is not indicated.

NYC Guidelines, Section 1.3, ¶ 2 (B-215)  In addition, the NYC Guidelines state that "A trained occupational/environmental health practitioner should base decisions about medical removals ... on the results of a clinical assessment." Id.  Therefore, a decision to vacate a residence due to the presence of mold can be made only after consultation with a professional, such as a physician, and must be made on an individual, case-by-case basis.  CDC Q&A, (B-317), answer to question 5; see also, Sovereign Report, (B-145).  Consequently, the only reliable methodology proffered by Defendants was not followed.  If the NYC Guidelines were only "minimal" standards, what other methodology did Llewellyn, Yocher and Belmont follow?  None exists.

When Llewellyn, Yocher and Belmont opined that all the tenants at the Apartments should be evicted due to the alleged health hazard from mold exposure, they had not linked the alleged mold contamination in the basements to any illness throughout the Apartments, even though such a step is listed in the NYC Guidelines before a building wide evacuation is indicated.  They did not interview any tenants to discover actual health conditions to isolate any special class of tenants such as pregnant women, infants, or the elderly.  Moreover, they did not inspect inhabited areas for mold – only basement and vacant units.  Instead of conducting any clinical analysis to evaluate the health of tenants on a case-by-case basis, Defendants and their experts ordered the immediate and total evacuation of the Apartments.  Consequently, Defendants' experts failed to implement a reliable methodology because they failed to properly follow the very guidelines that they declared to be applicable.

-10-

In his Affidavit, Llewellyn opines that, as of October 10, 2002, "the mold spores probably have migrated to the apartments." See Llewellyn Aff. at ¶3(c) (emphasis added). No air sampling was conducted to support this conclusion, and Llewellyn has no expertise in the dynamics of mold infiltration due to air flow.

Llewellyn apparently bases this opinion concerning the spread of mold into the living areas on his observations that: "The buildings have only one entrance and air circulation flows from the basement up the stairs and also through the opening from the pipe, and wire chases, and air ducts that run from the basement apartments. As a result, the mold spores are free to travel from the basements to the apartments already and will continue to do so until the mold and other contaminants are removed. Thus, sealing the basements, even if possible, will not cure the contamination problem. Contamination and exposure have already occurred." Llewellyn Aff. at ¶ 4. Once again, Llewellyn offers no scientific data to support his conclusory allegation that "contamination and exposure have already occurred." Llewellyn's report does not explain how he has any expertise in evaluating air flow and building dynamics in support of his conclusion that contamination of the living areas had already occurred.

C.   **Llewellyn's Testimony is Not Based Upon Sufficient Facts or Data.**

The conclusions reached in Llewellyn's affidavit are speculative. That "contamination and exposure have already occurred" is an assumption. Llewellyn acknowledged himself that mold spores have "probably" migrated. Llewellyn Aff. at ¶3(c). He did not visit all of the apartments; he did not conduct air sampling in the basements or the apartments in order to quantify the amount of mold contamination that actually infiltrated the living areas. He utterly

failed to identify any health issues or link them to the presence of mold at the Apartments. In fact, he did not interview residents for symptoms related to mold conditions or sensitivities.

An expert's use of undisclosed, subjective methodology without reference to any objective support for the opinion, is properly excluded. "Proposed testimony must be supported by appropriate validation – i.e. 'good grounds,' based on what is known. O'Connor v. Commonwealth Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994) (citing Daubert, 113 S. Ct. at 2795). Llewellyn's opinions are not supported by "good grounds."

### D. Belmont and Yocher's Affidavits Also Fail to Satisfy FRE 702's Requirements of Being Based on Reliable Methodology and Sufficient Data

For the same reasons as set forth above, Yocher and Belmont, who are Llewellyn's subordinates, also failed to follow the NYC Guidelines that were identified in the Town's Notices of Condemnations. They also did not conduct any scientific testing to support their conclusions; nor did they interview tenants to link any health issues to the presence of mold. In addition, they failed to actually visit and inspect the occupied apartments, yet still recommended the complete evacuation of all tenants. Their failure to inspect certain apartments before declaring a serious health hazard and recommending evacuation clearly demonstrates that their opinions are not based on sufficient facts or data. Furthermore, their opinions are not based on any identifiable or reliable scientific methodology. Consequently, their conclusions and opinions should be excluded for failure to meet the admissibility standards set forth in FRE 702.

### CONCLUSION

It is highly prejudicial to the Plaintiff to proffer these state officials as "experts" without establishing their scientific methods. The opinions of the Defendants' experts are not founded on any scientific evidence and they should not be presented to a jury. These State officials are

likely to have a profound effect on the jury, especially where Llewellyn is the chief toxicologist with the Division of Public Health of the State of Delaware and Yocher and Belmont are also State officials within that Division. Without reliable methodology or sufficient factual basis, their opinions are inadmissible under Daubert and its progeny. It is important to rigorously apply the standards mandated by FRE 702 and Daubert to ensure that the jury is not unduly influenced.

For all the foregoing reasons, Plaintiff's Motion *in Limine* (*Daubert* Motion) to Exclude the Affidavits, Expert Reports and Testimony of Gerald Llewellyn, George Yocher and Ken Belmont should be granted.

Respectfully submitted,

Dated: September 23, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

By: _____
David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 552-5504 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*