## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELSMERE PARK CLUB, L.P.,           :
a Delaware limited partnership,    :
                                   :
                  Plaintiff,       :        Civil Action No. 04-1321 (SLR)
                                   :
         v.                        :
                                   :
TOWN OF ELSMERE, a Delaware        :
municipal corporation, ELLIS       :
BLOMQUIST, EUGENE BONEKER,         :
and JOHN GILES,                    :
                                   :
                  Defendants.      :
                                   :

## SUBSTITUTE COMPENDIUM OF CITATIONS TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DAVID J. WILK

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*

Attorneys for Defendants Town of Elsmere,
   Ellis Blomquist and Eugene Boneker

Dated: September 28, 2005

1291440

# TABLE OF CONTENTS

**CITATION**                                                                    **TAB**

Sue Ann Adams & Trevor E. Phillips, How To Use Comparable Sales to Value
Contaminated Property, 13 No. 4 Envtl. Compliance & Litig. Strategy 1
(September 1997)..................................................................................................1

Robert P. Carver & Anthony W. Crowell, Toxic Tax Assessments: The Ad Valorem
Taxation of Contaminated Property, Real Estate Issues, 10-19 (Fall 1999).......................2

John F. Lakin, Overview of the Problem/Ways to Minimize or Avoid the Risk of Mold
Claims, 13633 NBI-CLE 1 (2004).................................................................................3

Lorraine Lewandrowski, Toxic Blackacre: Appraisal Techniques & Current Trends In
Valuation,, 5 Alb. L.J. Sci. & Tech. 55 (1994) ..................................................................4

Darlene Marsh, Byron Taylor & Andy Raines, The Hazards Of Taxing Contaminated
Properties: Owners Beware!, 37 Tenn. B.J. 21 (May 2001)................................................5

Noskowiak v. Bobst SA.,
          2005 WL 2146073 (E.D. Wis.)...........................................................................6

Peter J. Patchin, Valuation of Contaminated Properties, 56 Appraisal J. 1, 7 (1998) .........7

Peter J. Patchin, Contaminated Properties – Stigma Revisited, 59 Appraisal J. 2, 167
(1991)..................................................................................................................8

Peter J. Patchin, Contaminated Properties and the Sales Comparison Approach, 62
Appraisal J. 3,  402 (1994)........................................................................................9

Walter G. Wright, Jr. & Stephanie M. Irby, The Transactional Challenges Posed by
Mold: Risk Management and Allocations Issues, 56 Ark. L. Rev. 295 (2003)................10

Walter G. Wright, Jr., Stephanie Irby & Hank Bates, Transactional Challenges Posed By
Mold, 13882 NBI-CLE 19 (2004)  ...............................................................................11

# TAB 1



13 No. 4 ENVTCLST 1                                                                                           Page 1
13 NO. 4 Envtl. Compliance & Litig. Strategy 1
**(Publication page references are not available for this document.)**

Environmental Compliance and Litigation Strategy
September, 1997

**A Property Valuation Primer**

HOW TO USE COMPARABLE SALES TO VALUE CONTAMINATED PROPERTY

Sue Ann Adams [FNa]
Trevor E. Phillips [FNa]

Copyright © 1997 The New York Law Publishing Co.; Sue Ann Adams, Trevor E.

Phillips

Part 1 of 2.

The market value of contaminated real estate is often a hotly contested issue in environmental litigation. Of the traditional approaches to real property valuation, the sales comparison approach is the most broad-based and straightforward method. It is the only approach that can be used to value all property types, including both income-producing and non-income-producing properties. When used correctly, the sales comparison approach produces strong market-based evidence to support an estimate of property value. For these reasons, analysts, as well as triers of fact, rely heavily on this approach. Successful environmental litigators should be knowledgeable about some of the issues involved in applying the sales comparison approach in the context of contaminated property, particularly as the approach is used more and more often to value complex sites.

The sales comparison approach has been used effectively in the valuation of residential properties affected by contamination where there are a large number of homogeneous properties that are similarly affected. Historically, because of the lack of market transactions, this approach has not been employed effectively when valuing heterogeneous commercial or industrial properties with complex, site-specific environmental conditions. Today, however, as the risks associated with the transfer and ownership of contaminated properties are better understood and the market for these properties expands, analysts increasingly are able to employ the sales comparison approach. The key to the successful application of this methodology, however, is to proceed with care and attention to detail.

Methodology
In the context of litigation, the valuation of contaminated real estate is often required as one of the key steps in estimating the diminution in market value of real property that may be affected by contamination. Measurement of property value diminution is achieved by subtracting the market value of the subject property in its impaired condition from its market value in the hypothetical unimpaired condition. This is analogous to the "before and after" valuations typically performed in condemnation appraisal. An analyst must, therefore, search for impaired, as well as unimpaired, comparable sales. The basic test of comparability is to satisfy the principle of substitution. That is, property values tend to be set by the amount a buyer would pay for a substitute property of similar utility and

desirability to the subject property.

Once the requisite transactions have been identified, the sales comparison approach requires that the analyst adjust the price of each sale to reflect the differences between that sale and the subject property. Elements of comparison are the key attributes of properties and transactions that influence market value, and they form the framework for systematic adjustments to be made to comparable sales.

The analyst evaluates each element of comparison individually and determines the appropriate adjustment to be made to the comparable sale price. Adjustments will be made upward or downward depending on relative inferiority or superiority, respectively, when compared to the subject property. By carefully assessing the degree to which each sale is comparable to the subject property, and by weighing the relative importance of each element of comparison, the analyst may logically conclude an estimate of value.

Elements of Comparison

Appraisal literature has addressed the elements of comparison associated with "unimpaired" property, but the inclusion of contamination-related elements of comparison adds considerable complexity to the analysis. Both real estate and contamination-related elements of comparison may be grouped into the following categories:

- Market factors: real property rights conveyed, financing terms, conditions of sale and market conditions.

- Physical factors: location, physical characteristics (size, age, construction quality and condition) and use (zoning).

- Economic factors: market rent, operating expenses, lease provisions, tenant mix, occupancy and management.

- Contamination factors: nature of the contamination, extent of the contamination, impact of contamination on the use or utility of the property and on- or off-site sources of contamination.

- Remediation factors: cost and timing of remediation and the nature of remediation techniques (effect on business operations).

- Regulatory factors: regulatory jurisdiction, predictability of regulatory framework and post-closure land use restrictions.

- Liability factors: responsibility for costs associated with remediation, third-party liability, indemnification, representations, warranties and insurance products.

A Two-Step Analysis

The application of the sales comparison approach to estimate the value of an impaired property is a two-step process. First, adjustments are made to each comparable, relative to the subject, for non-contamination-related elements. The first step typically involves quantitative adjustments that are applied to the elements of comparison in the market, physical and economic categories. These types of adjustments can be observed and measured from an analysis of market data. For example, the analyst can observe a price differential due to the addition of a swimming pool to an otherwise similar home and can draw a conclusion as to the appropriate numerical adjustment needed. To assist in this analysis, the analyst may use an adjustment grid in which numerical adjustments are applied to each element of comparison in order to relate them to the subject property.

Second, the contamination-related elements of comparison are studied. Unlike the traditional real estate-related elements of comparison, the complex and unique impact of the contamination factors on market value makes a quantitative analysis difficult. Adjusting comparable sale prices for differences attributable to contamination, remediation, regulatory and liability factors requires research and understanding of environmental issues that are not addressed in typical real estate appraisals. A complete environmental history of both the subject property and each comparable sale is required, as well as knowledge of the provisions in the purchase and sale agreements that may have addressed the contamination issues associated with each transaction. As such, a qualitative analysis of the contamination factors is usually more appropriate, with the analyst concluding that contamination-related elements of comparison for each sale are superior, inferior or similar to the subject property. This provides the analyst with a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13 No. 4 ENVTCLST 1                                                                                           Page 3
13 NO. 4 Envtl. Compliance & Litig. Strategy 1
**(Publication page references are not available for this document.)**

basis for bracketing the probable range of value for the subject property.

Whether comparable sales analysis techniques are applied to unimpaired or impaired real estate, the basics remain the same: Use the most recent sales that are comparable in terms of property type, location, size and physical condition (including environmental condition) and make supportable adjustments. Conceptually, the sales comparison approach is relatively simple to understand. Nevertheless, considerable attention to detail and thorough research are required for analysts to estimate a credible indication of market value. n

Next month: A walk-through of a property valuation and a discussion of pitfalls.

FNa.Sue Ann Adams is a manager in the Property Value Diminution Practice of Coopers & Lybrand L.L.P. in Phoenix. Telephone: (602) 280-1925. Trevor E. Phillips is a senior associate with the professional services firm. Telephone: (602) 280-1924.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

# Toxic Tax Assessments: the Ad Valorem Taxation of Contaminated Property

*by Robert P. Carver, Esq. & Anthony W. Crowell, Esq.*

In tax assessment review proceedings involving contaminated property, taxpayers typically contend that property value is substantially impaired or erased by the presence of environmental contamination. Some taxpayers contend contaminated property has no value even when it is fully usable and the taxpayer is liable for the cleanup. These cases present courts with difficult and competing questions of law, equity, and public policy concerning the interplay of *ad valorem* taxation and sound environmental policy. Consequently, the legal premise of *ad valorem* taxation, which is to assess taxes against property at a certain rate upon its value, and the public policy concerning environmental cleanup, namely that the polluter pays, are often seemingly at odds.

Here, the authors review and analyze the reasoning of the courts when addressing these issues in the leading tax assessment review cases involving contaminated property nationwide. The manuscript first addresses issues affecting the marketability of contaminated property in the face of environmental liability statutes. Next, it reviews the methodologies adopted by the courts in adjudicating claims of assessment overvaluation. Finally, it considers the effect of the usability of contaminated property; the cleanup obligation of owners and purchasers of contaminated property; and the public policy concerns of taxing authorities on the outcome in tax assessment review litigation.

## ENVIRONMENTAL LIABILITY AND THE REAL ESTATE MARKET

The impact of environmental liability statutes on the marketability and profitability of contaminated property is central to taxpayer

**ABOUT THE AUTHORS**

**Robert P. Carver, Esq.,** and **Anthony W. Crowell, Esq.,** *are attorneys at the New York City Law Department and are adjunct faculty members of Brooklyn Law School and Baruch College of the City University of New York. (Note: Any views or opinions expressed in this article belong exclusively to the authors and do not reflect the views or opinions of the City of New York.)*

**Copyright © 1999. All rights reserved.**

arguments for assessment reductions. It is generally accepted in the legal and appraisal communities that environmental contamination may affect property value. The threat of liability for cleanup imposed on contaminated property owners by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA)[1] and its state counterparts, clean up costs, issues of indemnification, and the stigma associated with the actual or perceived risks involved with owning or using contaminated property all yield this conclusion.

CERCLA, commonly known as the Superfund law, is the principal federal statute designed to protect the public and environment from the release of hazardous substances, and to ensure that hazardous substances are cleaned up. Congressional intent behind CERCLA is rooted in the "polluter pays" principle which dictates that: 1). contaminated property which threatens public health and safety be restored to an environmentally acceptable condition; and 2). any parties benefitting from or even involved with the use of hazardous substances that ultimately contaminate property should bear the cost of cleanup, starting though not necessarily ending with the owner or operator of the contaminated property.

CERCLA's liability scheme is strict, joint, several, and retroactive. This means that the entire chain of property owners, including both current and former owners, and other potentially responsible parties, such as lending institutions, other investors, and even transporters who carried hazardous substances to property that is contaminated, may be liable for costs associated with restoring that property to an environmentally acceptable state. CERCLA imposes liability on the current owner of contaminated property regardless of whether the owner caused the contamination. And potential liability remains with former owners who sell contaminated property, even in cases where a purchaser agrees to assume the risk of cleanup liability. Thus, acceptance of liability by one party cannot absolve others of potential liability especially in cases where cleanup costs exceed the financial capabilities of the party assuming the risk.

Two decades of experience under CERCLA have proved that it has a stigmatizing effect on property both before and after cleanup of contamination. In economic terms, stigma is a reduction in value caused by the risk inherent in owning a contaminated property. Thus, the level of risk involved in acquiring or even selling a contaminated

or formerly contaminated property — including the uncertainties of liability, as well as often unknown cleanup and transaction costs, increased underwriting costs, litigation costs, indemnification, and ultimately the threat of bankruptcy — may outweigh any potential economic benefit of the transaction. Consequently, CERCLA may dramatically affect the marketability and profitability of contaminated property.

Indeed, real estate investors and lending institutions are apprehensive about such purchases and often demand extensive and costly site investigation before investment. And despite recent lender liability reforms enacted by Congress, lenders remain concerned about underwriting contaminated properties because they view those properties as having questionable collateral value even when the property is fully usable.[2] Lenders fear they may be held liable for cleanup in cases of foreclosure. Moreover, some owners of contaminated property, in an effort to avoid public detection of contamination and liability, may decide not to sell their properties at all, sometimes even opting to mothball them. Consequently, the interplay of impaired marketability of contaminated property, with the statutory scheme that obligates specific parties to clean up contamination, has made the adjudication of claims of overassessment particularly vexing.

## ASSESSMENT REVIEW LITIGATION IN THE COURTS

Although the courts have not decided such cases with uniformity, it appears that most if not all courts that have considered the question hold that environmental contamination affects, or at least may affect, property value. Taxpayer challenges to assessments on contaminated property are on the rise, but there are relatively few reported decisions, and those focus on limited legal and policy issues addressing very specific sets of facts. In all the reported decisions reviewed, the taxpayers made one or both of the following arguments: that cleanup costs must be deducted from the value of their property or that their property has no value at all on account of its unmarketability. Some courts have accepted these arguments, while others have rejected them squarely.

The review of the reported decisions below is aimed at providing the real estate community and taxing authorities with an analysis of the practical effects that case law may have on methodologies used to value contaminated property for the purpose of *ad valorem* taxation. Consideration is given to whether

**Copyright © 1999. All rights reserved.**

these methodologies are mandated by law, or are simply acceptable approaches to value, under the facts of the case, when posited by credible experts. This review looks behind the decisions to discern which facts might be said to dictate the results in the litigation of a tax assessment of a contaminated property, including the cost, timing, and probability of environmental cleanup; the usability of the property in its contaminated condition; the liability, or potential liability, for cleanup of buyers, sellers, and other parties; the stigma associated with a property upon cleanup; and tax and environmental policy.

*California:* In *Firestone Tire and Rubber Co. v. County of Monterey* (1990),[3] the soil and groundwater were contaminated from chemical spills at the taxpayer's tire manufacturing plant. Soon after the valuation date, the taxpayer closed the plant for reasons unrelated to the contamination. Then the state health authorities apparently prohibited the taxpayer from selling or using the property until it was cleaned.

The court upheld the property's assessment on the ground that a purchaser of the property on the valuation date would not have been aware of the contamination. Accordingly, the court declined to address whether the cleanup expense would be an appropriate measure of value diminution. The court, however, rejected the taxing authority's contention that the value of the property would be unaffected by contamination on account of the taxpayer's liability for cleanup.

Thereafter, *Dominguez Energy, L.P. v. County of Los Angeles* (1997),[4] addressed the treatment of expenses for environmental cleanup. The taxpayer had a property interest in an oil and gas lease and performed and scheduled ongoing remediation of oil contamination, despite no requirement to remediate until a later date.

In valuing the taxpayer's property interest, the taxing authority took the cleanup cost as an expense in the income approach to value, but hypothetically postponed the remediation by allocating the expense to the latest possible date. This approach diminished the effect of the expenses on the present value of the taxpayer's property interest. The court rejected this approach. Under a standard of prudent property management, the court found that the cleanup costs should have been considered when actually spent by the taxpayer. Additionally, the court noted that it would be poor public

*Taxpayer challenges to assessments on contaminated property are on the rise, but there are relatively few reported decisions, and those focus on limited legal and policy issues addressing very specific sets of facts. In all the reported decisions reviewed, the taxpayers made one or both of the following arguments: that cleanup costs must be deducted from the value of their property or that their property has no value at all on account of its unmarketability. Some courts have accepted these arguments, while others have rejected them squarely.*

policy to adopt a valuation methodology based on imprudent management of environmental cleanup which risked public responsibility for the cleanup.

*Iowa:* In *Boekeloo v. Bd. of Review of City of Clinton* (1995),[5] the state's highest court rejected the taxpayers' contention that their fully operational tavern was unmarketable on account of groundwater contamination and without value. No government agency required that the taxpayers remediate the contamination, and the cleanup cost was unknown. The court found that the taxpayers failed to meet their burden of proof, since the testimony of the taxpayer's real estate agents suggested that if the cleanup cost were known, the property could in fact be sold.

*Massachusetts:* In *Reliable Electronic Finishing Co., Inc. v. Bd. of Assessors of Canton* (1991),[6] a chemical spill, from the failure of a secondary containment system, contaminated the taxpayer's property. The taxpayer assumed liability for the cleanup in a consent judgment and had begun some environmental remediation. The state's highest court upheld the assessment on the ground that the taxpayer failed to meet its burden of proof. There was no evidence of the contaminated condition of the property on the valuation date, the anticipated cost of cleanup, or how the contamination would affect the property's value.

The Massachusetts court noted that had the taxpayer established the effects of "proven environmental damage" on value, neither the owner's

Copyright © 1999. All rights reserved.

liability under the consent judgment, nor the owner's culpability, would be relevant factors in determining value for tax assessment purposes.

**Michigan:** In *Community Consultants, Inc. v. Bedford Township* (1985),[7] the property whose assessment was at issue was a vacant parcel formerly operated as a domestic refuse and industrial waste landfill. The property could not be put to any other use because of the presence of hazardous waste. It was contaminated by PCBs and lead and was ranked one of the state's top three most dangerous environmental contamination sites. The Michigan Tax Tribunal determined that the appropriate way to value the property was through a market approach, but there was no ascertainable market by which value could be examined or extrapolated because of a lack of comparable sales.

The taxpayer contended that the property was unmarketable. The taxing authority conceded, and the Tax Tribunal found, that it could not conceive of any knowledgeable, prospective buyer who would purchase the property. Moreover, the Tribunal determined that the cost of remediating the site "exceeds even the most optimistic value of an uncontaminated site of similar size, location, and zoning." Consequently, the Tribunal found that the property had only nominal value, and established a bright-line rule that a nominal value must obtain in cases where former hazardous waste disposal sites remain contaminated on any given valuation date, and cannot be used for any lawful purpose. The Tribunal made clear, however, that this rule should not be construed as an indeterminate exemption for such properties, nor did it apply to hazardous waste disposal sites in current lawful operation.

In *Comerica Bank-Detroit v. Metamora Township* (1989),[8] on the default of the taxing authority, the Tax Tribunal determined that certain agricultural land, which supported crops, had nominal value because of stigma that resulted from uncertainties surrounding the site's contaminated status. The groundwater had been contaminated by some three thousand barrels dumped by unknown parties that leaked PCBs and other toxic substances.

The Tax Tribunal considered the property's inclusion on Michigan's priority list of contaminated sites, which is the state's analog to the federal Superfund National Priorities List. It also considered evidence that cleanup costs would amount to $1.3 million, and that the taxpayer had already spent $393,000 on a cleanup effort. Those factors,

the Tribunal found, coupled with "the many unanswered questions pertaining to liability, containment, and future uncertainties involving [the] property, situated as it is within the shroud of toxicity, stereotype it as untouchable even for speculative purpose." Finding the property "uncommonly tainted with stigma certain to adversely affect its marketability," the Tribunal valued the parcels at issue at only $100.

In *Sweepster, Inc. v. Township of Scio* (1996),[9] a fully-usable, 47-acre industrial site suffered from groundwater contamination, forcing the closure of one drinking well and the commencement of construction of another. The former owner, Chrysler Corporation, paid for bottled drinking water at the site, as well as the drilling of the new well, pursuant to an indemnity clause in the purchase agreement for the property between Chrysler and the taxpayer.

The taxpayer contended the property had zero value, based on an environmental engineer's testimony that it might cost from $10 million to $20 million to clean up the site, although no amount could be determined with certainty unless further study was done. The taxpayer's value of the property, as if unaffected by contamination, ranged from only $2 million to $3.3 million.

The Tax Tribunal rejected the taxpayer's analysis and affirmed a lower tribunal's adoption of the taxing authority's analysis, which valued the property as follows. From the actual sale price of the property with the indemnity agreement in place, the cost of subsequent improvements to the property was added, and a 10 percent reduction in value for stigma was deducted. The tribunal found that the indemnity clause, which guaranteed cleanup, prohibited any reduction from the purchase price paid by the taxpayer. Any risks of present or future contamination, it reasoned, were reflected by the purchase price.

**Minnesota:** In *Almor Corp. v. County of Hennepin* (1997),[10] the taxpayer's soil and groundwater were contaminated by wastewater that migrated from a nearby tar plant. The state's highest court rejected a deduction of the cleanup cost from the value of the taxpayer's property to account for the contamination. The court reasoned that no cleanup had been taken or planned, there was no legal requirement to remediate contamination, and a third party was paying for monitoring on the taxpayer's property. The court did, however, approve the lower court's deduction from value for stigma, using the sales

**Copyright © 1999. All rights reserved.**

comparison approach to value, and a heightened capitalization rate when using the income approach to value.

However, in *Westling v. County of Mille Lacs* (*Westling III*, 1996),[11] the same court approved the tax court's finding of zero value for property, contaminated by the taxpayer, who used a degreasing chemical in the re-manufacturing of automotive parts. The property was on the state Superfund list and the taxpayer was named a responsible party liable for cleanup by the state Pollution Control Agency. To value the property as of 1992 and 1993, which earned a substantial income, experts for both the taxpayer and taxing authority took a deduction from value for stigma and cleanup costs. The trial court found the taxpayer's deduction, which exceeded the property's value, to be credible, and the high court affirmed.

Previously, in *Westling v. County of Mille Lacs* (*Westling I*, 1994),[12] the high court of Minnesota reversed the tax court's finding of only nominal value for the same property, as of 1991, grounded on testimony that contaminated property was neither marketable nor mortgageable. The high court held that the tax court determination of nominal value was against the weight of the evidence because the property was purchased recently by the taxpayers with money lent by banks for that purchase; the property's continued commercial use generated an annual rental income; the presence of a market for the property was never tested since the taxpayers made no effort to sell the property; and the taxpayers were partly responsible for the property's contamination. The court remanded the case to the tax court to consider these factors, as well as traditional appraisal techniques modified to account for the effects of environmental contamination on value.

On remand the tax court considered but gave little or no weight to the factors itemized by the high court, and adopted the taxing authority's expert's valuation analysis.[13] That analysis deducted the present value of the cost to cure, as well as a 20 percent discount for stigma, from the value of the property as if unaffected by contamination. The resulting values warranted an assessment reduction, but were substantially greater than the nominal values previously found by the tax court. The taxpayer offered no alternative valuation methodology.

***New Hampshire:*** In *re Great Lakes Container Corp.* (1985),[14] presented the high court of New Hampshire with the question of whether a former barrel reconditioning plant that was contaminated with hazardous waste, unusable and the subject of litigation to determine liability for cleanup, was entitled to an assessment reduction. The taxpayer contended that the presence of the contaminants, the pending lawsuit and the threat of liability to a future owner, rendered the property unsalable and thus untaxable. The taxpayer proffered an appraisal report that found zero value for the property and claimed that the circumstances did not allow for the application of conventional methodologies for determining value.

The court held that the contaminated property did not have zero value for several reasons. First, the taxpayer made no good faith attempt to sell the property below its assessed value; in fact, the taxpayer marketed the property for an amount in excess of the assessed value. And second, because the property would be cleaned up in the future, as a result of the litigation, the property had the prospect of some future benefit. In response to the taxpayer's contention that potential liability for cleanup effectively precluded any sale of the property, the court found that the taxpayer could have sold the property with title transfer deferred until after any court ordered cleanup was completed, thus freeing a future owner from potential liability. The taxpayer offered no proof of the present value of the property upon the judicial determination of liability for cleanup. Consequently, the court found the taxpayer's evidence insufficient to find that the assessment was excessive.

***New Jersey:*** The first challenge to a tax assessment of contaminated property to reach a state's highest court was in New Jersey. In *Inmar Associates v. Borough of Carlstadt* (1988),[15] two industrial properties were subject to government imposed requirements for environmental cleanup—in one instance, CERCLA, and in the other, a state statute (ECRA), that conditioned the sale of property upon environmental cleanup.

To better understand the high court's determination, a review of the procedural history of the case is in order. The trial court disallowed a deduction of the cleanup cost from value on both properties. For the Superfund site subject to CERCLA, the trial court found that "no firm or fixed obligation" for cleanup had been incurred. For the property subject to ECRA (a usable asphalt plant), the trial court found the taxpayer's proof of the cost of compliance with ECRA—mere estimates by the

Copyright © 1999. All rights reserved.

taxpayer- corporation's real estate director — to be insufficient to establish the effect of compliance on value. The state's intermediate appellate court upheld the lower court's disallowance of assessment reductions on, among other things, public policy grounds: to allow an abatement of taxes through a reduced assessment, it reasoned, would contravene the statutory scheme requiring the cleanup of contaminated property.

The state's highest court rejected the appellate court's public policy rationale, reversed and remanded for reconsideration the determination regarding the Superfund site, and affirmed the determination regarding the asphalt plant disallowing an assessment reduction. The court acknowledged that federal and state environmental law may affect the value of contaminated property, but rejected a dollar-for-dollar deduction of the cost to cure from value as a matter of law. Instead, the court left to the appraisal community the measure of whatever "adjustment" to value was necessary to account for the cost of cleanup in the face of environmental regulation. The court further directed that "normal assessment techniques" were to be employed to value properties in use, since they have value to their owners, notwithstanding any legal prohibition of their sale.

Subsequently, in *University Plaza Realty Corp. v. Hackensack* (1993),[16] the state's intermediate appellate court approved a dollar-for-dollar deduction of the cost of asbestos abatement from the value of an office building. The court distinguished this case from *Inmar* on the ground that the asbestos abatement was discretionary, subject only to market forces, and not legally mandated.

**New York:** In *Commerce Holding Corp. v. Bd. of Assessors of the Town of Babylon* (1996),[17] the soil and groundwater were contaminated by the metal plating operations of a former tenant in the taxpayer's industrial building, which was fully operational. The property was designated a Superfund cleanup site, and the taxpayer entered into a consent order with the Environmental Protection Agency to remediate the contamination.

The state's highest court upheld a lower court's deduction of the present value of the remaining cost to cure the contamination from the value of the property in an uncontaminated state. The court rejected the taxing authority's contentions that public policy considerations and the presence of the consent order precluded such a deduction as a matter of law.

While prescribing no particular methodology to value environmentally contaminated property, the court approved the use of cleanup costs to quantify the diminution in value attributed to contamination. Additionally, the court set forth the following factors to be considered in valuing contaminated property:

> The property's status as a Superfund site, the extent of the contamination, the estimated cleanup costs, the present use of the property, the ability to obtain financing and indemnification in connection with the purchase of the property, potential liability to third parties, and the stigma remaining after cleanup.

The court indicated, however, that property capable of productive use should not have a negative value.

**North Carolina:** In *Appeal of Camel City Laundry Co.* (1996),[18] the taxpayer's soil and groundwater were contaminated by a prior owner's coal gasification operation. An appellate court rejected a deduction of the present value of the cost to cure from value. That analysis resulted in a zero value, which the court held to be legal error when a property is usable. The court approved the taxing authority's value-in-use approach, which consisted of discounting the unimpaired value of the property for stigma and non-liquidity, through a heightened capitalization rate in the income approach, and also subtracted from value the present value of remediation costs that were amortized over 25 years, which was the useful life of the building on the property.

**Ohio:** In *Vogelgesang v. CECOS Int'l., Inc.* (1993),[19] the groundwater was contaminated at the taxpayer's hazardous waste facility. There was a history of intervention by federal and state environmental authorities at the site, including a consent order under which the taxpayer was required to build structures designed to prevent groundwater contamination. The costs of building these structures were incurred after the valuation date. Additionally, after the valuation date, the taxpayer closed the facility, lost its operating permits, and entered into another consent order under which the taxpayer would permanently close the facility and retain liability for closure and post-closure costs.

The court rejected the taxpayer's negative value conclusion. The court found that the appeals board below properly declined to deduct from value all the remediation and related closure costs, and costs

**Copyright © 1999. All rights reserved.**

of compliance with the consent orders, in the absence of evidence of the effect of these costs on value, or evidence of the amount or timing of the costs.

*Pennsylvania:* In *B.P. Oil Co. v. Bd. of Assessment Appeals of Jefferson County* (1993),[20] the soil and groundwater at a truck stop were contaminated by fuel leaks from underground storage tanks. The lower court upheld the taxing authority's assessment of the property, finding that the taxpayer failed to meet its burden of proof. An appellate court reversed and remanded the case for a new trial. The appellate court held that the taxpayer did meet its initial burden of overcoming the presumptive validity of the assessment through unrebutted expert testimony establishing i). the existence of contamination; ii). the cost and duration of cleanup; and iii). a negative impact on value equal to the cost to cure the contamination.

Earlier, in *Monroe County Bd. of Assessment Appeals v. Miller* (1990),[21] an appellate court affirmed a lower court's finding of a nominal value for property contaminated with benzene. The taxpayer's appraiser testified that the contamination rendered the property unmarketable. The appraiser's testimony was not only unrebutted by the taxing authority, but also corroborated by the taxpayer, who testified that she was forced to abandon her residence on the property, and could neither sell nor even list the property for sale.

*Washington:* In *Weyerhaeuser Co. v. Easter* (1995),[22] a paper mill required pollution control equipment to continue to operate in compliance with federal and state environmental standards. The mill also contained asbestos and PCBs, which the taxpayer undertook to remediate voluntarily.

The state's highest court held that the anticipated cost of the pollution control equipment represented an item of curable functional obsolescence to be deducted as part of the cost approach to value. The court also allowed a deduction from value of the present value of anticipated remediation costs for the asbestos and PCBs, upon proof of a business necessity for such remediation.

The court set forth the following three factors to be proven by the taxpayer before a claim for pollution control expenses, as a deduction from value, could be considered: 1). the existence of contamination; 2). the existence of a requirement for cleanup; and 3). a reasonably certain estimate of

> *Historically, the lack of marketability has not precluded the assessment of property for ad valorem taxation. . . . Specialty property remains subject to taxation even though there are no buyers for the property. The assessment of specialty property appears to apply the general rule that the market value standard for ad valorem taxation applies only when the property, in fact, has a market value. Absent a market for the property, other tests of value must be used.*

the costs of cleanup, including a formal plan and timetable.

The Washington Board of Tax Appeals had occasion to apply the *Weyerhaeuser* test to determine the value of a shipping terminal in *Salmon Bay Terminals v. Noble* (1996).[23] The terminal, a former plywood manufacturing facility, was contaminated at the time of its purchase by the taxpayer in 1989. The taxpayer negotiated a purchase price that reflected the contaminated condition. Thereafter, pursuant to a consent decree with the Washington Department of Ecology, the taxpayer entered into an environmental agreement with the seller to remediate the contamination.

The Board found that, consistent with *Weyerhaeuser,* the taxing authority was required to consider the environmental contamination in determining value, and had properly done so in valuing the property at issue. The Board adopted the taxing authority's valuation as of 1992, which relied on the 1989 purchase price. To that amount, the cost of capital improvements subsequently undertaken were added, as was the estimated cost of cleanup, which presumably had been undertaken as well.

Previously, in *Fjetland v. Brown* (1990),[24] the Board was presented with a challenge to the assessment of vacant land, used formerly as a log sorting yard, that was contaminated with arsenic, lead, copper, and zinc associated with that former use. The property was designated a Superfund site, was not in use, and would require 10 to 15 years to

Copyright © 1999. All rights reserved.

restore to an environmentally acceptable state at a cost well in excess of the taxing authority's estimate of the property's value in an uncontaminated state. The owner contended that the property was unmarketable and had no value.

The Board found that parties responsible for cleanup other than the owner had been identified and would pay for most if not all of the cleanup. Relying on the principle of anticipation — that value is created by the expectation of benefits to be derived in the future — the Board found that the property could derive income from future use upon cleanup by the responsible parties, and accordingly, had some value in the present. Thus, the court determined the present value of the property by applying a 10 percent discount rate (sufficient to account for the risks and stigma associated with the contamination), for a 15-year period, to an agreed upon future value as if clean. Since that present value was greater than the assessment at issue, the taxpayer failed to sustain its burden of proof and the assessment was upheld.

## THE EFFECT OF USABILITY, LIABILITY, AND ENVIRONMENTAL POLICY ON THE OUTCOME IN ASSESSMENT REVIEW LITIGATION

*Usability:* Is contaminated property capable of productive use really worth nothing? The case of usable but non-marketable contaminated property presents courts with a dilemma. When the cost of environmental cleanup exceeds the value of the property upon cleanup, a taxpayer may legitimately claim that the property has no market value, which is the usual standard of value for *ad valorem* taxation. If a property is not assessable for taxation, however, it evades responsibility for contribution to the pubic fisc for its impact on public health and the public safety services that the municipality provides, including the police and fire protection that directly benefit the property.

Furthermore, taxing authorities may argue that if a property's value is rendered nominal by virtue of the cost of environmental remediation, the tax abatement resulting from a zero assessment would, in essence, reward the worst polluters most, and penalize careful taxpayers who keep their property free of contamination. Careful taxpayers are not only ineligible for such a "polluter's abatement" of taxes, but are burdened by additional taxes to compensate the municipal treasury for tax revenue lost from the contaminated property.

As described above, the high courts of Iowa and New York, and a North Carolina appellate court, have rejected a zero assessment of contaminated property that is in use, while the high court of Minnesota has approved such a zero assessment. Arguably, the New Jersey and Ohio courts would reject a zero assessment as well, but perhaps not the Pennsylvania courts. The majority that rejects a zero assessment seems to have the better argument.

Historically, the lack of marketability has not precluded the assessment of property for *ad valorem* taxation. For instance, specialty property, which by definition has no market, remains subject to taxation even though there are no buyers for the property. The assessment of specialty property appears to apply the general rule that the market value standard for *ad valorem* taxation applies only when the property, in fact, has a market value.[25] Absent a market for the property, other tests of value must be used.

One such test, promulgated by the International Association of Assessing Officers (IAAO), cited by the North Carolina Court of Appeals, considers a contaminated property's value in use, in contrast to its market value, or value in exchange:

[t]here is a tendency to discount [the unencumbered] value based on costs related to remediating or isolating the environmental contamination. Fully deducting the costs may overstate the decline in value, because the value in use concept would then be ignored. Value in use suggests that a property which is still in use, or which can be used in the near future, has a value to the owner. This would be true even if the cost to cure environmental problems exceeds the nominal, unencumbered value.[26]

A value in use methodology sanctioned by the IAAO, and used by the taxing authority's expert at trial in *Appeal of Camel City Laundry Co.,* was approved by the North Carolina court, notwithstanding the market value standard for taxation enunciated in the state statutes. The New Jersey high court said it would approve a value in use approach as well.

Indeed, assessing some tax on a usable property better comports with the design of the real property tax, which provides that each taxpayer contribute equitably to the public fisc. A contrary result seems patently unfair.

---

*Toxic Tax Assessments: The Ad Valorem Taxation of Contaminated Property*    17

**Copyright © 1999. All rights reserved.**

*Liability:* Does liability for cleanup affect the value of contaminated property? The various statutes that govern remediation of contamination often cast a wide net holding multiple parties responsible for cleanup. When a responsible party is solvent, the cleanup cost itself should not lower a contaminated property's value, since a purchaser would not expect to bear that cost in its entirety. However, the value of contaminated property may still be affected by the contamination. Certainly no rational purchaser would pay full price and "buy" a lawsuit against a responsible party, particularly when the purchaser, as a new owner, might also become a responsible party by operation of law. Nevertheless, no rational seller of contaminated property, who is a responsible party, would both sell the property discounted by the cost to cure and also expect to pay for the remediation. Clearly, liability for environmental remediation would affect the amount that willing buyers and sellers would agree to as the sales price for contaminated property, and therefore affect value.

In fact, some environmental statutes preclude the sale of contaminated property altogether. Taxpayers may argue that contaminated property subject to such a statute has no value whatsoever; and taxing authorities, in contrast, may argue that the value of such property is unaffected by contamination, since the property may only be sold upon cure.

But should a tax assessment be affected by the liabilities of particular individuals? The courts have a split of opinion. As described above, the high court of Massachusetts rejected outright consideration of the owner's liability for cleanup in determining the assessment of contaminated property. Similarly, an appellate court in California rejected a taxing authority's contention that the owner's liability for cleanup precluded consideration of the contamination in the valuation of the property.

In the same vein, the high court of Washington approved a deduction of the cost of pollution control equipment from value even though the property owner assumed liability for such costs in a consent order. In essence, this deduction nullified the practical effect of the consent order — the allocation of responsibility for cleanup costs — in the marketplace. Similarly, the high court of New York approved a deduction of environmental cleanup costs from value in the face of a consent order under which the owner assumed liability for cleanup; but added that the ability to obtain indemnification in connection with a sale of the property was at least a factor to be considered in determining a tax assessment.

In contrast, the high court of New Hampshire, and the Washington Board of Tax Appeals, have held that when, as a practical matter, the cost of environmental cleanup would not run with the land, a deduction of the cost to cure from value would be unwarranted. These tribunals have upheld assessments that approximated the present value of the contaminated property's value upon remediation by the parties that would pay for the remediation. And the Michigan Tax Tribunal rejected a deduction from value of cleanup costs when the taxpayer had the benefit of an indemnity from the former owner of the contaminated property. There, however, the value found by the tribunal was based on the sale price of the property with the indemnity in place.

Courts have good cause for their reluctance to allow liability for cleanup by particular parties to dictate the value of contaminated property. The real property tax, after all, is assessed on the property, and not on individuals. Ordinarily, value for taxation is based on an objective standard; it is not the value of the property in the hands of any particular taxpayer, or the value of a particular taxpayer's interest in the property. On the other hand, it would be incongruous for courts to ignore the reality of indemnities and liabilities in the marketplace, which lift market values, while approving of zero or nominal values on the ground that property is unmarketable.

*Environmental Policy:* Should environmental policy override pure appraisal theory? Taxing authorities may argue that reductions in the assessed value of contaminated property that reflect cleanup costs, effectively enable property owners responsible for cleanup to shift the cost of their cleanup obligation to other taxpayers, contrary to the intent of environmental liability statutes to make polluters and other private parties—and not the community—pay for cleanup. In cases where taxpayers seek a nominal or zero tax assessment, which effectively exempts them from taxation, such a result seems perverse, since contaminated property likely poses increased risks to public health as well as an added burden on a taxing authority's public safety resources, such as fire, police, emergency planning and response, and environmental services. Such assessment reductions could be viewed as a reward to owners of contaminated property, some of whom may have caused the

Copyright © 1999. All rights reserved.

contamination. Assessment reductions may also be viewed as a penalty to the public forced to bear these additional burdens. They especially penalize those taxpayers who take responsible measures and make investments to keep their property free from contamination.

A number of courts, including the high courts of New York and New Jersey, have considered these questions of environmental and tax policy and rejected them. While finding that they have some intellectual appeal, these courts have nonetheless held that public policy concerns cannot subordinate statutory and state constitutional requirements to assess property at its "full" or "true" value. Notwithstanding these results in the courts, however, state legislatures may still elect to tax owners of contaminated property whose assessments have been reduced. In Minnesota, for instance, the legislature enacted a novel "contamination tax" based on the amount of value reduction received on account of the presence of contamination.[27]

## NOTES & REFERENCES

1. 42 U.S.C. §§ 9601 *et seq.*
2. See Asset Conservation, Lender Liability, and Deposit Insurance Protection Act of 1996 (42 U.S.C. §§ 6991(b), 9601, 9607)
3. 272 Cal. Rptr. 745 (Cal. Ct. App. 1990)
4. 65 Cal. Rptr. 2d 766 (Cal. Ct. App. 1997)
5. 529 N.W.2d 275 (Iowa 1995)
6. 573 N.E.2d 959 (Mass. 1991)
7. 1985 Mich. Tax LEXIS 10
8. 1989 Mich. Tax LEXIS 12
9. 1996 Mich. Tax LEXIS 26
10. 566 N.W.2d 696 (Minn. 1997)
11. 543 N.W.2d 91 (Minn. 1996)
12. 512 N.W.2d 863 (Minn. 1994)
13. 1994 Minn. Tax LEXIS 19
14. 489 A.2d 134 (N.H. 1985)
15. 549 A.2d 38 (N.J. 1988)
16. 624 A.2d 1000 (N.J. App. Div. 1993), *cert. den.* 634 A.2d 527 (N.J. 1993)
17. 673 N.E.2d 127 (N.Y. 1996)
18. 472 S.E.2d 402 (N.C. App. 1996)
19. 619 N.E.2d 1072 (Ohio App. 1993)
20. 633 A.2d 1241 (Pa. Commw. 1993)
21. 570 A.2d 1386 (Pa. Commw. 1990)
22. 894 P.2d 1290 (Wash. 1995)
23. 1996 Wash. Tax LEXIS 477
24. 1990 Wash. Tax LEXIS 146
25. 1 Bonbright, *The Valuation of Property*, p. 472 (1937, 1965 reprint)
26. *Appeal of Camel City Laundry Co.*, 472 S.E.2d 402, 407 (N.C. App. 1996), citing the IAAO "Standard on the Valuation of Property Affected by Environmental Contamination", Clause 4.1 (1992).
27. Minn. Stat. §§ 270.91 - .98 (1996); see *Westling v. County of Mille Lacs*, 581 N.W.2d 815 (Minn. 1998) (upholding constitutionality of contamination tax), *cert. denied* 119 S. Ct. 872 (1999)

**Copyright © 1999. All rights reserved.**

# TAB 3

Westlaw.

13633 NBI-CLE 1                                                        Page 1
13633 NBI-CLE 1
**(Cite as: 13633 NBI-CLE 1)**

Copyright (c) 2004 National Business Institute
**National Business Institute**
**The Mold Challenge in Florida**
2004

**\*1** OVERVIEW OF THE PROBLEM/WAYS TO MINIMIZE OR AVOID THE RISK OF MOLD CLAIMS

John F. Lakin, Esquire
Barnes Walker, Chartered
3119 Manatee Avenue West

Bradenton, Florida 34205

(941) 741-8224

e-mail: jlakin@barneswalker.com

Copyright © 2004 National Business Institute; John F. Lakin

**\*2** Mold claims continue to rise, not only in the State of Florida, but nationwide. The "M word" is taking on a whole new meaning in terms of the level of claims and lawsuits currently being filed nationwide.

This paper will provide an overview of the problem and also ways to minimize and avoid the risk of mold claims.

### OVERVIEW OF THE PROBLEM

**A. Mold - What is it?**

Mold is a natural recurring living organism. Mold helps break down dead organic material. It also helps produce products such as beer, wine, bread, cheese, penicillin and other medicines.

Unfortunately, many people are allergic to mold spores and reactions to mold spores can become serious in terms of compromising individuals respiratory health and other physical manifestations associated with exposure to mold. Mold has existed for over four hundred million years. Over a hundred thousand species identified, with approximately a thousand found in the United States. The common forms of mold in the United States are Stachybotrys, Cladosporium, Penicillium and Aspergillus. Of course, the sole source of mold is water. In order to colonize, mold needs water as a source and also the lack of ventilation in a trapped **\*3** environment, such as within drywall or carpet. Growth will continue when mold is not quickly removed.

**B. Causes of the Problem**

A great deal of media attention, as well as large legal verdicts, have resulted in mold being in the forefront recently. Some would argue that there has been "hysteria" by homeowners, and others would argue that there are viable complaints relative to property and personal injury claims.

13633 NBI-CLE 1
(Cite as: 13633 NBI-CLE 1)

Businesses and workers in a contaminated environment continue to claim property damage and personal injuries as a result of being exposed to a contaminated environment. Unfortunately, there are continuing debates in the scientific community as to what, if any, physical manifestations are directly caused by mold exposure and what long term effects result from significant exposure.

The media, trial lawyers, regulators, state officials and others continue to try to deal with the growing problem of mold. The biggest problem facing the homeowner or business owner is realizing that the property is contaminated, finding the source of the mold and taking the correct remediation actions to resolve the problem. While a large majority of the claims filed are for property damage, personal injury claims are on the rise.

The only mycrotoxin producing mold is Stachybotrys and long term exposure can cause significant health effects. Many clients complain of the following health effects to mold exposure:

- Burning eyes          • Pulmonary hemorrhage

- Headache              • Liver damage

- Nausea                • Central nervous system damage

- Nose bleeds           • Brain damage

- Allergic Reactions    • Cancer

- Asthma                • Death

- Exhaustion            • Sinus infections

- Cognitive disorder


**\*4** In California case involving Ed McMahon, an autopsy clearly showed that the McMahon's dog died directly from the exposure to toxic mold. There are very few cases that have been reported where toxic mold in a home environment caused significant long term health problems. Most of the complaints seem to be common reactions by parties when immune systems are some way compromised. Unfortunately, there are no current standards or consensus on the health affects, nor are there any standards relative to testing, assessment or remediation in the home or work place.

## C. Parties Who Can Be Affected

There will continue to be debates in this arena as to how parties are affected by mold. Normally, homeowners and employees working in a contaminated environment file claims.

## D. Types of Claims That Can be Brought

A great number of property claims are being sought at this time relative to contaminated properties. Once the water source is determined, the parties are able to retain the services of a microbiologist, industrial hygienist, or air quality expert to inspect the property. Once an assessment occurs, and after conducting a protocol with a licensed contractor or a certified mold remediation specialist, removal of drywall, studs, and other property damaged by the mold should occur. Following this remediation and removal the propery can be restored to a healthy environment.

The majority of claims regarding mold, contrary to the public's belief, fall in the area of property damage. Once a property has received an air quality testing, and significant mold spores have been detected clearly illustrating colonization of mold, a protocol should be **\*5** developed by a microbiologist or an industrial hygienist. An estimate is determined by a licensed contractor as to what the extent of the restoration work will be and the extent of the property damage loss.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13633 NBI-CLE 1                                                                      Page 3
13633 NBI-CLE 1
**(Cite as: 13633 NBI-CLE 1)**

The collateral issue that arises in most property damage claims is Alternative Living Expenses (ALE). ALE results in client's incurring expenses as a result of living at an alternative property. Depending on the extent of the property damage, a client could be displaced from one month to a year while work is completed.

Additional damages occur where the property has a diminution of value. Thus, a claim for this diminution of value is necessary.

Diminution of market value in a property clearly allows a homeowner to bring a claim for the loss of actual cash value. See, American Reliance Insurance Company v. Perez, 689 So. 2d 290 (Fla. 3d DCA 1997). A homeowner does have the legal right to recover the diminution of value where the property damages have resulted in the diminution of fair market value. See, U.S. Steel Corp. v. Benefield, 352 So. 2d 892, 894-95 (Fla. 2d DCA 1977).

Additionally, damaged property can sometimes carry "stigma" damages, even after repairs have been made, especially in cases involving construction defects, mold damage and/or termite infestation.

So-called diminution of value and/or stigma damages result if properly presented to the jury, with substantial evidence, can indicate that the cost of repair was substantially greater than the diminution of value. See, Orkin Exterminating Company, Inc. v. DelGuidice, 790 So. 2d 1158 (Fla. 5th DCA 2001). The Fifth Circuit reversed a jury award of $300,000 against a pest company, the court went on to note that stigma and diminution damages would be recoverable when evidence is presented that the cost of repairs is substantially greater than the diminution of *6 value and stigma damages are recoverable in Florida when the element of diminution in market when reparation is either impracticable or exceeds the overall diminution in value.

Additionally, property owners can also seek the payment for code upgrades, loss of use, debris removal, waste remediation and loss of use of personal property relative to mold claims.

**E. Importance of Proactive Detection and Management of Water Instrusion and  Mold**

Clearly, either homeowners, building managers and others have a duty to inspect their property and to mitigate damages. It is vitally important in the mold context that parties who smell an odor, seek avenues to investigate any potential mold or mildew within the property. Due diligence should be used to inspect properties and look for avenues to immediately address any potential mold damage. It is likely within forty-eight (48) hours of a water intrusion that the parties potentially will incur substantial damages if immediate steps are not taken to remediate the problem.

**F. How Real is the Problem?**

Mold is very real to parties that are affected by living in a contaminated environment. Clearly, displacement of a family, due to a contaminated environment, causes much stress and anxiety.

Additionally, many people are affected by living in a contaminated environment, which compromises their physical health. This will continue to be a real problem, which the public will have to address, and clearly due to the tremendous increase of claims, the problem will continue to grow.

### *7 WAYS TO MINIMIZE OR AVOID THE RISK OF MOLD CLAIMS

**A. Quality Control During Design and Construction Phases**

It is vitally important in the early stages of construction and design, that qualified licensed contractors understand the potential problems they face in the event that they engage in negligent construction tactics. Each phase of the construction should be carefully monitored to ensure that there be no future water intrusion into the property. Only qualified experts, including engineers, architects and contractors should work diligently to ensure that no defects occur at any stage of the construction that would result in potential claims.

**B. Development Management Protocol and Standards for Routine  Inspection/Monitoring**

Many major developers have now set in place management protocol and standards relating to routine inspection and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

monitoring, providing guidelines to construction workers. This protocol will insure that no future problems will develop in the construction of a residential/commercial property. Particular attention should be paid to HVAC system, the heating and ventilation and air conditioning system, should be properly developed and tested to insure there are no potential air quality problems with the home. Once constructed the property's indoor quality experts should inspect the property, prior to a CO, to insure that the air quality does not contain any potential toxins.

**C. Documentation Procedures to Identify Liability for Mold Claims Caused by** Tenants Due to Action/Inaction

Any complaints by a commercial tenant and/or residential tenant should clearly be identified and documented by property owners. Property owners should take steps to properly **\*8** investigate complaints by tenants of a contaminated indoor environment that can potentially lead to litigation.

If any tenant is complaining of exposure to potential toxins, the property owner should immediately retain an indoor quality expert to inspect the property and also engage in destructive testing to insure that there is no colonization of mold within the property. The property owner should also inspect the HVAC system and any alleged source of contamination to insure that there is no major mold issues that may develop into protractive litigation.

Documentation should be maintained indicating that the property owner is routinely checking the property to insure that there is no potential poor ventilation, which will lead to potential claims.

**D. Implement Periodic Investigation of Existing Assets/Buildings**

It is vitally important that the property owner periodically investigate and inspect the property to insure that no sources of mold are developing. The United States Environmental Protection Agency has classed or reported physical problems related to indoor air quality into two categories. First category, is sick building or tight building syndrome, and the second category is building related illness. By implementing periodic investigations of the property, it is very likely that a property owner can avoid any claims of sick building or building related illnesses when the property owner takes proactive steps to resolve potential problems.

Using the sick building syndrome claim, multiple parties complain of discomfort or health affects rather than one party. Rather than relying on the EPA or other governmental agencies to control indoor quality, it is vital that individual property owners in the commercial and residential arena take steps to insure that inspections of the property are done on an annual basis.

**\*9** If tenants are complaining of potential indoor breathing problems, it is important to not ignore such allegations, but to take steps to inspect the property and investigate the allegations of the tenant.

**E. Conduct Separate Water Intrusion/Mold Inspections as Part of Pre-** Acquisitions Due Diligence Process

Real property owners clearly have duties to investigate matters brought to their attention. The property owner's obligations are as follows:

• Investigate latent hazards

• Warranties to occupants of land or buildings

• Maintain premises

• Remediate

Failure of a property owner to conduct water intrusion investigations and mold inspection prior to acquiring property can only lead to potential exposure for mold claims. Due diligence should be used prior to purchasing any property to insure that there is no potential exposure to the owner for purchasing a contaminated environment.

Many claims are started against real estate agents, home inspectors and others in the real estate business who turn a blind

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13633 NBI-CLE 1                                                                                              Page 5
13633 NBI-CLE 1
**(Cite as: 13633 NBI-CLE 1)**

eye to an environment that they know, or reasonably should know, is contaminated. The real property owner is under the same due diligence obligation. It is vitally important to take prior action and inspect for any water intrusion or mold prior to buying a property.

### F. Investigate Availability of Insurance Coverage for Mold for All Existing  Assets

Finally, it is becoming increasingly difficult to obtain insurance as it relates to mold. It is likely that the insurance industry will not insure properties, commercial or residential, for mold *10 related claims in the near future. If a party does receive insurance covering mold issues the premium will be high. Hence, prior to purchasing a commercial/residential property, it is important that all avenues are investigated to seek coverage for any potential water intrusion issue.

Most policies will provide coverage for sudden and accidental losses and not latent defects. Accordingly, it is important that any property owner seeks all possible coverages to protect them from personal liability in the event a mold claim is filed.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.