56 ARLR 295                                                                                   Page 46
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN213]. The New York Department of Health has discussed the scope of visual inspections in a guidance document. The agency notes in relevant part:
  Ventilation systems should be visually checked, particularly for damp filters, but also for damp conditions elsewhere in the system and overall cleanliness. Ceiling tiles, gypsum wallboard (sheetrock), cardboard, paper, and other cellulosic surfaces should be given careful attention during a visual inspection. The use of equipment such as a borescope, to view spaces in ductwork or behind walls, or a moisture meter, to detect moisture in building materials, may be helpful in identifying hidden sources of fungal growth and the extent of water damage.
Guidelines, supra note 189, § 2.1.

[FN214]. The HVAC systems are presumably evaluated as part of the general structure appraisal/inspection activities. The assessing party may need to ensure that the personnel/contractors undertaking this work are sensitive to these aspects of HVAC systems. Further, the assessing party will need the personnel/contractors undertaking the inspection of HVAC systems to share relevant information with those conducting the environmental due diligence. Of course, the same should be true for other potential conditions that can facilitate mold growth such as faulty plumbing, leaking roofs, etc. See Kannerick, supra note 59, at 23 (referencing the inspection of heating and ventilation systems as part of mold management program).

[FN215]. For example, is a wallboard water stain evidence of a historical release (that has since been corrected), or is the release likely to recur?

[FN216]. Field Guide, supra note 161, at 5. The principal fungi sample analysis methods include isolation of fungi by laboratory culture and microscopic examination of fungal cultures and individual fungal spores. Burge & Otten, supra note 102, at 19-8.

[FN217]. Data quality issues associated with environmental sampling are addressed to some extent in A. Dallas Wait, Environmental Forensic Chemistry and Sound Science in the Courtroom, 12 Fordham Envtl. L. J. 293 (2001). For example, the minimum concentrations of viable aerosols in the air that can be detected varies with the type of sampling device utilized. Field Guide, supra note 161, at 43.

[FN218]. Schillinger, supra note 73. The three types of air sampling described by an American Industrial Hygienists publication include: quiescent (samples are collected under normal circumstances), semi-aggressive (dust stirred up in reservoirs to stimulate normal occupant activities), or aggressive (attempt to vigorously disturb reservoirs to establish bio-contaminant source). Field Guide, supra note 160, at 5.

[FN219]. See, e.g., Dilello, 2002 WL 31839383, at *1 (referencing a mold sampling that compared conditions in a structure and the adjacent outside environment); Jensen v. Amgen, Inc., 129 Cal. Rptr. 2d 899, 901 (Cal. Ct. App. 2003) (referencing a sampling which reflected airborne levels of mold that were lower in the building than outside).

[FN220]. Some parties may be reluctant to undertake air sampling in occupied structures. An example might be a lessor. The reluctance may be based on lessee disclosure issues. For example, the lessor might be concerned as to whether there is a common-law duty to provide the results of such sampling to the lessee. In addition, there may be concerns that the lessee will misinterpret the results.

[FN221]. Different types of mold are associated with certain building materials. Also, certain types of mold require larger amounts of water to grow. Therefore, the identification of such spores may indicate that a leak or other source of water is present in the structure. For example, the fungi S. chartarum requires sustained wet wood or other cellulose based material to be present. Field Guide, supra note 161, at 40. Other species may be found in flooding water (Fusarium manilifome) or on damp wood or cellulose (Aspergillus versicolor). Id.

[FN222]. This raises an important question. Should a party gather information about occupant/tenant indoor air quality complaints as part of due diligence? A history of credible occupant/tenant complaints concerning the illnesses allegedly associated with the property's indoor air quality may be an important criterion in determining whether to move beyond the visual inspection. Documents regarding such complaints may be readily available.

[FN223]. For example, see Tiffany & Bader, supra note 129 (noting that because Stachybotrys chartarum does not readily become airborne, swabs, bulk, and spore trap samples may be needed in addition to air samples to adequately characterize the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

structural presence of this mold).

[FN224]. See Springston, supra note 58, at 144.

[FN225]. Id. Fungal concentrations may also vary by season. Schillinger, supra note 73, at 13.

[FN226]. See Chih-Shan Li et al., Fungus Allergens Inside and Outside the Residence of Atopic and Control Children, 50 Archives of Envtl. Health 38, 38 (1995) (referencing studies that found significant seasonal variations of airborne fungus).

[FN227]. See Rosa Codina & Richard F. Lockey, Environmental Asthma: Nine Questions Physicians Ask, Consultant, Jan. 2000, at 66 (noting outdoor mold is the principal allergen associated with asthma in Arizona and Central Australia).

[FN228]. The need to compare inside and outside concentrations may be unique to mold. A similar comparison is obviously not necessary for non-natural substances such as asbestos. Asbestos fibers will not normally be found in the ambient air outside a structure.

[FN229]. Field Guide, supra note 161, at 2 ("A universally accepted premise supported by health professionals is that the primary utility of viable sampling methods, especially those for fungi is the assessment and comparison of the biodiversity of contaminated areas indoors to the biodiversity of uncontaminated areas indoors and to the bio-diversity outdoors."); see also Dilello, 2002 WL 31839383, at *1 (comparing mold concentrations in a structure and the adjacent outside environment); ColumbiaKnit, Inc. v. Affiliated FM Ins. Co., No. CIV. 98-434-HU, 1999 WL 619100 (D. Or. Aug. 4, 1999) (sampling of boxes in building indicated elevated levels of fungal concentrations compared to outside air; Burge & Otten, supra note 102, at 19-12 ("If fungal concentrations indoors are consistently higher than those outdoors, then indoor sources are indicated."); Springston, supra note 58, at 148 ("Since these are not generally accepted guidelines to follow regarding airborne fungi, indoor results must be interpreted with respect to the control samples.").

[FN230]. The placement of sampling points would presumably need to be outside the influence of the structure to ensure they are representative of the area.

[FN231]. See Springston, supra note 58, at 148 ("In general, mechanically ventilated buildings should have indoor fungal counts that are lower than those found outside."); Tulis & Thomann, supra note 149, at 21 (citing proposed guidelines suggesting that concentrations of mold spores in indoor air should be less than one-third of the respective outdoor concentration).

[FN232]. See, e.g., ColumbiaKnit, 1999 WL 619100 (noting that sampling indicated levels of mold species Penicillium was higher in structure than normally found outdoors); Tiffany & Bader, supra note 129, at 9-10 (stating that the presence of Stachybotrys chartarum in a structure as an indication that mold growth is affecting the quality of indoor environments since this mold is not commonly found in the outdoors).

[FN233]. See Springston, supra note 58, at 148 (noting that species found inside the structure should be similar to those found outside).

[FN234]. Id.

[FN235]. The universal presence of mold should be considered when interpreting swab or surface sample results. A discussion of this issue in the context of sampling HVAC surfaces notes in relevant part:
  Accordingly, it is imperative that the mere presence of fungal spores along surfaces of the ventilation system not be incorrectly interpreted as growth. Therefore, the practice of taking swab samples of surfaces, using bulk samples, or exposing contact plates to contaminated surfaces, with subsequent incubation and laboratory analysis, must not be used for evidence of in situ growth. This practice will provide erroneous information, leading to a gross misrepresentation of actual conditions within the HVAC system, thereby often leading to unnecessary concerns and associated costly testing and remediation. Tulis & Thomann, supra note 149, at 21.

[FN236]. "Bulk samples" are collected from visibly moldy surfaces by scraping or cutting. "Surface samples" are usually collected by wiping a measured area with a sterile swab or stripping the suspect area. Guidelines, supra note 189, § 2.2.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN237]. Id.

[FN238]. Henning & Berman, supra note 7, at 80.

[FN239]. See Joe Provey, Fresh Air; Indoor Air, Popular Mechanics, Sept., 2001, at 84.

[FN240]. Guidelines, supra note 189, § 3. The protection of the health of the workers performing the work is included within this objective. Id. Whether conditions at a facility warrant remediation is often determined by the application of standards issued by the government or a credible private organization.

[FN241]. Id.

[FN242]. Id.

[FN243]. Id.

[FN244]. Guidelines, supra note 189, § 3.

[FN245]. See Isolatek Int'l Corp., 752 N.Y.S.2d at 768 (describing the destruction of components of two floors of a building after mold growth reoccurred in previously remediated areas).

[FN246]. See Elementary Sch. Bldg. Comm. v. Placko, No. CV- 020398162S, 2003 WL 971839, at *1 (Conn. Super. Ct. Feb. 21, 2003) (referencing a school destroyed because of presence of mold).

[FN247]. The varying susceptibility of individuals to mold allergens renders the setting of health-based standards a challenge. See Peña-Alfaro, supra note 4, at 565. Federal legislation introduced in the 107th Congress included provisions requiring the establishment of health-based mold standards. See United States Toxic Mold Safety and Protection Act, H.R. 5040, 107th Cong. (2002) (unenacted).

[FN248]. A number of standards or policies have been issued that are relevant to, but not specifically applicable to, mold. An example might be standards issued by ASHRAE. ASHRAE Standard 60-2001 Ventilation for Acceptable Indoor Air Quality specifies minimum acceptable ventilation rates for various buildings. Final Report, supra note 46, at 7. ASHRAE Standard 55-1992 addresses thermal environmental conditions for human occupancy. Id. at 16. Ventilation air plays an important role in removing or diluting indoor air contaminants. Id. For example, Standard 62-2001 recommends twenty cubic feet per minute of outside air per person in an office building. Id. An American Institute of Hygienists Association publication provides guidelines for comparing biodiversity between the structure and outdoor environment. Field Guide, supra note 161, at 58-59. ASHRAE is a professional organization that recommends standards addressing ventilation and associated topics. Heady, supra note 72, at 1044.

[FN249]. Kannerick, supra note 59, at 23; see also Dehmler, supra note 6, at 17 ("Preventing mold growth is the best and most cost-effective way to deal with this problem.").

[FN250]. For example, ensuring that an HVAC's pan does not overflow may be as important as complex environmental controls. Nakano, supra note 6.

[FN251]. See What Features Are in the Learning Environment?, Sch. Plan. & Mgmt., May 1, 2001, at 37.

[FN252]. Heady, supra note 72, at 1056-57 (noting lack of cleaning and maintenance of HVAC system contributes to microbial contamination); see also Guiffrida, supra note 71, at 318 (stating microbiologic contaminants can be controlled through regular cleaning and maintenance of ventilation systems); Final Report, supra note 46, at 9 (noting that insulation of HVAC chilled water pipes can minimize sweating, thereby reducing its possible contribution to mold growth).

[FN253]. John R. Hall, Educating Business about Mold, Air Conditioning, Heating & Refrigeration News, July 1, 2002, at 1.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                          Page 49
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN254]. Dolnick, supra note 107, at 16.

[FN255]. For example, the American Society of Safety Engineers commented on proposed federal legislation: "Much of the evidence indicated that the primary cause of mold is moisture being trapped in buildings, the result of either existing construction standards not being followed or construction standards not being adequate to prevent mold." See Letter from Mark D. Hansen, P.E., CSP, President, American Society of Safety Engineers, to Honorable John Conyers, Jr., U.S. House of Representatives, Comments on the "United States Toxic Mold Safety and Protection Act" (H.R. 5040) (Aug. 23, 2002).

[FN256]. An example of a local governmental control might be a town ordinance addressing the construction of structures in a flood zone. See Farnsworth v. Horrigan, No. CV 950373914S, 1999 WL 49393, at *1 (Conn. Super. Ct. Jan. 22, 1999) (concerning an allegation that a violation of a town ordinance related to building in a flood zone contributed to a building's water damage); see also Mondelli, 631 N.W.2d at 846 (concerning a homeowner who alleged violations of city building code caused mold contamination in structure).

[FN257]. See ASTM Standards, E 2112 Enhanced Exterior Building Installations, Standardization News, Dec. 2002, at 20 (developing a consensus standard for integration of external wall components to better ensure continuity of building envelope).

[FN258]. The paper in gypsum wallboard provides nourishment for mold such as Stachybotrys. See Dolnick, supra note 107, at 14.

[FN259]. A 2002 article cited research in the building materials industry: "He notes that the gypsum industry is working on developing new mold-resistant or moisture resistant gypsum and drywall products, but he doesn't see them coming out any time soon." See Tulacz, supra note 8, at 60.

[FN260]. See Guenther, supra note 144 (discussing the need to avoid using porous materials on air stream surfaces of plenums and ducts where moisture can support growth of fungi).

[FN261]. One area of inquiry is the moisture performance of various wall configurations. See U.S. Dep't of Commerce, Technology Administration, A Computer Analysis of Wall Constructions in the Moisture Control Handbook (NISTIR 5627) (May 1995).

[FN262]. See H.E. Barney Burroughs, Filtration: An Investment in IAQ, Heating, Piping, Air Conditioning, Aug. 1997, at 55 (stating source control is the preferred technique to achieve and maintain an acceptable indoor air environment).

[FN263]. B. Checket-Hanks, IAQ at the Rooftop Level, Air Conditioning, Heating & Refrigeration News, Jan. 28, 2002, at 9 (referencing study of effectiveness of Ultraviolet C ("UVC") lamps on a fungal contamination in Tulsa, Oklahoma office building). This discussion of active technologies is not intended to be exhaustive. Various systems designed to address indoor air pollutants include, but are not limited to, ozone purification, ozone generators, and duct encapsulation. Heady, supra note 72, at 1061-62.

[FN264]. See Burroughs, supra note 262, at 55.

[FN265]. See id. An example is the high energy particulate arrestor. This device was developed over fifty years ago as part of the Manhattan Project. It was designed to control very small particles. See id.

[FN266]. Heady, supra note 72, at 1061-62.

[FN267]. See Burroughs, supra note 262, at 55. However, this statement does not include filtration that is a component of ventilation systems. Tulis & Thomann, supra note 149, at 21. Some percentage of fungal spores are removed by these filtration systems. Id.

[FN268]. See Burroughs, supra note 262, at 56-57.

[FN269]. Id. (referencing mini plant filters, electric media, and active particle fabrics).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                  Page 50
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN270]. See Wright & Morrissey, supra note 182, at 785.

[FN271]. See Benik v. Hatcher, 750 A.2d 10, 11 (Md. 2000) (referencing an alleged breach of warranty due to violation of local housing codes addressing lead-based paint).

[FN272]. Wright & Morrissey, supra note 184, at 785.

[FN273]. See id.

[FN274]. See id.

[FN275]. See id.

[FN276]. H.R. 5040, 107th Cong. (2002) (unenacted). The Toxic Mold and Safety Protection Act is also known as the Melina Bill.

[FN277]. H.R. 5040, 107th Cong. § 102 (2002) (unenacted). The study was to have included information about harmful and/or toxic strains of mold; methods of detecting harmful and/or toxic mold; potential dangers of exposure to mold; information on when mold becomes harmful to human health; and the hazards involved in mold remediation.

[FN278]. H.R. 5040, 107th Cong. § 103 (2002) (unenacted).

[FN279]. Id.

[FN280]. Id.

[FN281]. H.R. 5040, 107th Cong. § 201 (2002) (unenacted). The EPA, CDC, NIH, and HUD would be required to sponsor public education programs that increase awareness of the dangers of indoor mold growth and toxic mold.

[FN282]. H.R. 5040, 107th Cong. § 202 (2002) (unenacted).

[FN283]. Id.

[FN284]. H.R. 5040, 107th Cong. § 203 (2002) (unenacted).

[FN285]. Id. These procedures include giving mold information pamphlets to tenants, mold inspections, and abatement of identified indoor mold hazards.

[FN286]. H.R. 5040, 107th Cong. § 204 (2002) (unenacted).

[FN287]. H.R. 5040, 107th Cong. § 206 (2002) (unenacted).

[FN288]. H.R. 5040, 107th Cong. § 301 (2002) (unenacted).

[FN289]. Id.

[FN290]. H.R. 5040, 107th Cong. § 401 (2002) (unenacted).

[FN291]. H.R. 5040, 107th Cong. § 601 (2002) (unenacted).

[FN292]. H.R. 5040, 107th Cong. § 602 (2002) (unenacted).

[FN293]. H.R. 5040, 107th Cong. § 606 (2002) (unenacted). An amendment would have been added to the Internal Revenue Code of 1986. The amendment would have allowed for a tax credit of 60% of non-reimbursed mold inspection and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remediation expenses paid or incurred by the taxpayer. H.R. 5040, 107th Cong. § 501 (2002) (unenacted). The tax credit would have been limited to $50,000 annually.

[FN294]. See Environmental Policy Alert, supra note 38, at 26.

[FN295]. Id. ("One EPA source says issuing a specific threshold for harmful mold exposure would place a blanket over individual differences in exposure and also pull the agency into unwanted legal disputes.").

[FN296]. Harkins, supra note 20, at 1132.

[FN297]. Peña-Alfaro, supra note 4, at 576.

[FN298]. This provision includes, but is not limited to, schools and multifamily dwellings. Id.

[FN299]. Harkins, supra note 20, at 1132.

[FN300]. Peña-Alfaro, supra note 4, at 576.

[FN301]. Harkins, supra note 20, at 1133.

[FN302]. Id.

[FN303]. Id.

[FN304]. Task Force on Indoor Air Quality, 2001 Md. Laws ch. 591. The Maryland legislation required that a task force be formed to study and report on indoor air quality. See Final Report, supra note 46. The task force issued the report on July 1, 2002, which includes a discussion of mold. Id.

[FN305]. Id.; A. 3933, 209th Leg. (N.J. 2001) (unenacted).

[FN306]. H.R. 1253, 112th Gen. Assem., 2d Reg. Sess. (Ind. 2002) (unenacted).

[FN307]. Id.

[FN308]. Id.

[FN309]. Id. A similar bill was proposed in New York. S. 896, 2003-2004 Reg. Sess. (N.Y. 2003) (unenacted). The New York proposal focuses on exposure limits and standards for assessment of molds.

[FN310]. See Dick v. Pac. Heights Townhouses, No. SCV-7526, 2002 WL 31117253 (Cal. Ct. App. Sept. 25, 2002) (concerning a plaintiff lessee who sued the lessor alleging that mold in the leased apartment caused certain illnesses).

[FN311]. Blum v. Council Rock Sch. Dist., No. 02-CV-769, 2003 U.S. Dist. LEXIS 3022 (E.D. Pa. Feb. 14, 2003) (referencing an Equal Employment Opportunity Commission determination that school district violated the Americans with Disabilities Act ("ADA") by failing to provide a teacher reasonable accommodations for her disability by forcing her to work in an environment exposed to mold which aggravated her respiratory condition); Terry v. Ottawa County Bd., 783 N.E.2d 959 (Ohio Ct. App. 2002) (concerning employees of a state agency who alleged their office environment was adversely affected by mold).

[FN312]. Martin, 754 N.Y.S.2d 676 (concerning a teacher who alleged that indoor air quality caused her health problems).

[FN313]. Dilello v. Katnik Corp., Nos. B146979, B153414, 2002 WL 31839383 (Cal. App. Dep't Super. Ct. Dec. 19, 2002) (concerning the imposition of liability on a contractor and an architect for mold growth in structure).

[FN314]. See Nakano, supra note 6, at 12.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN315]. See Thomas Jackson, Ph.D., MAI & Randall Bell, MAI, The Analysis of Environmental Case Studies, 70 The Appraisal Journal 86 (2002).

[FN316]. See Schukoske, supra note 23, at 538 ("As the market becomes more sensitive to environmental risks, the presence of lead-based paint hazards will negatively affect the appraisal value of property.").

[FN317]. See Sweeney & Taddeo, supra note 3, at 74 (stating that mold may have a chilling effect on real estate transactions similar to that associated with the presence of asbestos).

[FN318]. One commentator notes:
  Concerns about potential adverse health effects from exposure to toxic mold and the effect of those concerns on property and rental values have been growing almost as fast as the menacing fungus has begun eating its way through the walls of thousands of residences, office buildings, hotels and other properties in the United States.
Moerdler, Insider's Outlook, supra note 9, at 30.

[FN319]. See Jeffrey D. Fisher et al., Effects of Asbestos on Commercial Real Estate: A Survey of MAI Appraisers, 61 The Appraisal Journal 587 (1993) (discussing the lack of consensus as to how asbestos affects the market value of commercial property).

[FN320]. These costs would include the actions necessary to prevent its occurrence. They could range from plugging a hole to stopping a drip to major structural modifications to prevent water intrusion. Of course, the material diminishment of value will depend upon the extent of the affected area and projected costs to prevent a reoccurrence of the conditions that facilitated such growth. The quantification of certain potential assessment/remediation costs is presumably a somewhat straightforward calculation.

[FN321]. The potential impact would presumably include difficulty in leasing the structure or tenant demand for rent reduction. See Gary S. Smolker, The Right to Know, Heating, Piping, Air Conditioning 94, 94 (Mar. 1, 2000) (asking whether a commercial building will be more difficult to lease after an indoor air pollution problem occurs). A potential tenant may require concessions prior to agreeing to move into a structure. See Guidry, supra note 80, at 30.

[FN322]. See generally Brennan & Turner, supra note 74 (noting that in elastic rental markets, tenants unhappy with air quality in their leasehold may not renew their lease). The perceived presence of indoor air problems can generate significant concern among structure occupants and/or lessees. See J. David Odom, III & Christine R. Barr, Emotions In The Air: When Building Syndrome Strikes, Risk Mgmt., Nov. 1996, at 37.

[FN323]. A lessee/employer will be concerned about employee absenteeism and/or productivity in the event there is a significant indoor air pollution problem. See Guidry, supra note 80, at 30 ("Employees in sick buildings suffer from low productivity, increased absenteeism, poor morale, and high turnover. Employers are then faced with increased operation costs in the form of sick leave pay and worker compensation costs."). The alleged exposure to mold has triggered an ADA claim by an employee arguing that a reasonable accommodation should have been provided by moving her away from a workplace allegedly harboring mold and triggering respiratory problems. Blum, 2003 U.S. Dist. LEXIS 3022, at *7.

[FN324]. Jackson, supra note 315, at 94 (stating that third-party common-law claims for personal injuries must be considered in a case study valuation analysis).

[FN325]. The appraiser may recognize the need to ensure that the scope of his or her services is clearly understood. Otherwise, a party relying on the appraisal may argue that it should have identified and/or quantified the indoor air pollutants or other environmental issues. See Guidry, supra note 80, at 30 ("If the building is judged to have SBS, plaintiff may claim that the appraiser was negligent and should have discovered the problem during the valuation process.").

[FN326]. A discussion of the factors and elements considered in determining the impacts of environmental contamination on property value is found in Jackson, supra note 315, at 86.

[FN327]. This is a reference to "sick building syndrome." See Reitze & Carof, supra note 10, at 339-41.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                                    Page 53
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN328]. Guidry, supra note 80, at 31-32.

[FN329]. Id. at 30 ("There are many different costs associated with sick buildings. The most obvious is the cost associated with curing an indoor air quality problem.").

[FN330]. Id. (referencing cost associated with curing a sick building).

[FN331]. A discussion of a large commercial property transaction that was delayed because of mold issues is found in Sweeney & Taddeo, supra note 3, at 74.

[FN332]. See, e.g., Levy v. M. Ali Tirgan, No. 76378, 1999 WL 980401, at *1-*2 (Ohio Ct. App. Oct. 28, 1999) (referencing a contract for sale of commercial real estate that contained an environmental contingency clause); U.S. Steel Supply, Inc. v. ALCO Standard Corp., No. 89-C-20241, 1992 WL 229252, at *5-*6 (N.D. Ill. Sept. 9, 1992) (referencing an environmental due diligence period included in asset purchase agreement).

[FN333]. Similar conditional provisions will be found in leasing and lending documents.

[FN334]. The purchaser's failure to definitively include mold as part of the contingency can result in a dispute over whether it is incorporated by the due diligence provisions of the agreement. See Sweeney & Taddeo, supra note 3, at 74 (concerning a buyer who argued that the mold issue was encompassed by due diligence provisions in the purchase agreement).

[FN335]. Id. at 75 (noting the need to ensure that access to the desired portion of the structure is obtained).

[FN336]. Reaching an agreement on the line of demarcation between acceptable and unacceptable conditions may be difficult.

[FN337]. The doctrine of caveat emptor may be an issue when mold is discovered in structures that have been acquired. This is particularly likely when the structure involved is residential in character. In Bryant v. Bulach, the plaintiff acquired a residential structure. Nos. CA2002-01-023, CA2002-06-137, 2003 WL 1689613, at *1 (Ohio Ct. App. Mar. 31, 2003). She subsequently discovered water leaks and mold growth in the basement. Id. Her complaint alleged the seller had an obligation to disclose these problems. Id. The court held that the doctrine of caveat emptor precluded recovery by the purchaser for structural defects in real estate. Id. at * 2. The basis for this conclusion was that reasonable inspection would have discovered the problem, the opportunity to inspect was available and there was no evidence of fraud. Id.; see also Riley v. Hoisington, 80 Ark. App. 346, 96 S.W.3d 743 (2003) (concerning a purchaser of a residential structure who established fraudulent misrepresentation on the part of the purchaser because of false statements in disclosure statement regarding prior flooding). This association of mold with structural flooding and related defects will presumably heighten the interest in identification and disclosure of such issues.

[FN338]. See Weinreb v. Hunter, Inc., No. 96-3242, 1997 Mass. Super. LEXIS 429, at *7-*9 (Mass. Super. Apr. 16, 1997) (holding that the statute begins to run when the person in possession knew or should have known of the presence of indoor contaminants, in this case, asbestos); contra State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co., 834 F. Supp. 1046, 1050-51 (C.D. Ill. 1992) (holding that the statute of limitations begins to run at the time of possession, regardless of knowledge, even though faulty construction created latent leakage, mold, and mildew on the home's floors).

[FN339]. Aas v. Super. Court, 12 P.3d 1125, 1130 (Cal. 2000).

[FN340]. Wash. Courte Condo. Assoc.-Four v. Wash. Golf Corp., 501 N.E.2d 1290, 1292-94 (Ill. App. Ct. 1986).

[FN341]. Wawak v. Stewart, 247 Ark. 1093, 1106, 449 S.W.2d 922, 929 (1970).

[FN342]. Dick, 2002 WL 31117253, at *8-*9. The court found that the mere presence of mold, without evidence of toxicity, was insufficient to establish inhabitability.

[FN343]. See Bullington v. Palangio, 345 Ark. 320, 327, 45 S.W.3d 834, 838 (2001).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN344]. Id. at 328, 45 S.W.3d at 839.

[FN345]. Id. at 329, 45 S.W.3d at 840.

[FN346]. Morris v. Ruse, 77 Ark. App. 11, 13, 69 S.W.3d 876, 881 (2002); see also O'Mara v. Dykema, 328 Ark. 310, 319, 942 S.W.2d 854, 859 (1997) (holding that buyers' drafting of the contract provided them notice they were buying "as is," and they were therefore not entitled to any implied warranties).

[FN347]. Carter v. Quick, 263 Ark. 202, 209, 563 S.W.2d 461, 465 (1978).

[FN348]. This section does not address in any detail the role of the building or property manager in operating the commercial leasehold. Building owners often use managers to operate and/or lease their structures. See Final Report, supra note 46, at 14. Their responsibility for addressing indoor air quality issues will vary depending on the extent and nature of their responsibilities. Id.

[FN349]. See U.S. Steel Supply, Inc., 1992 WL 229252, at *8 (referencing the need for a purchaser of a facility to undertake additional sampling activities to define baseline environmental conditions).

[FN350]. A similar determination might also be undertaken at the conclusion of the lease term.

[FN351]. See Brennan & Turner, supra note 74. The ability to obtain the necessary provisions in the lease is, of course, dependent upon the lessee having sufficient leverage.

[FN352]. See Henning & Berman, supra note 7, at 77 (noting damages in commercial building case involving mold can include a business interruption component).

[FN353]. See Reitze & Carof, supra note 10, at 253-54 (noting costs associated with lost productivity due to indoor air pollutants).

[FN354]. See Henning & Berman, supra note 7, at 75-76.

[FN355]. Id. The implied warranty of habitability has been an issue in actions involving other indoor pollutants. Plaintiffs have successfully argued that such indoor contaminants have been deemed a potential threat to the health of the structure's occupants. A number of actions have involved the presence of lead-based paint in a structure. Schukoske, supra note 23, at 530-34; see also Chase v. Pistolese, 739 N.Y.S.2d 250, 253 (N.Y. City Ct. 2002) (holding that the lessor's knowledge that lead-based paint in the apartment would be discovered when the space was repainted breached the implied warranty of habitability).

[FN356]. Lazell v. Stone, No. 01-02-00029-CV, 2003 WL 1090579, at *4-*5 (Tex. App. Mar. 13, 2003) (holding that the presence of asbestos amounted to constructive eviction and entitled the tenant to withhold rent). The doctrine of constructive eviction is addressed in the radon context in Prussman, supra note 170.

[FN357]. Ogust v. 451 Broome St. Corp., 727 N.Y.S.2d 877, 877-78 (N.Y. App. Div. 2001) (holding a landlord was enjoined from collecting rent until water conditions which led to mold were corrected).

[FN358]. The absence of governmental standards could make the determination of whether mold growth constitutes a breach of the lease a subjective determination.

[FN359]. Whether the lessor or lessee is responsible for addressing an indoor contaminant and/or the adequacy of such efforts has been a source of litigation. A common example has been asbestos. See Am. Multi-Cinema, Inc. v. Posel Enters., No. 91-3783, 1992 WL 328891 (E.D. Pa. Oct. 27, 1992) (concerning the adequacy of a lessor's efforts to address asbestos in the leasehold).

[FN360]. These will include HVAC and related equipment. The associated service contracts may be especially important.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN361]. See Ganheart v. Executive House Apartments, 671 So. 2d 525 (La. Ct. App. 1996). The lessee may be entitled to non-pecuniary damages for the failure to repair, including mental anguish, anxiety, and worry. Id. at 529. The Ganheart court noted that a residential lease includes, in addition to the enjoyment of habitable living quarters, the enjoyment of entertaining guests--also a non-pecuniary interest. Id. at 530.

[FN362]. Stroot, 772 A.2d at 797. The failure must be a proximate cause of the unsanitary or unhealthy conditions of the leased premises, resulting in personal injury to the tenant. Id. at 798.

[FN363]. The list of reportable events could presumably include such mundane events as broken windows or abnormal moisture accumulation.

[FN364]. A detailed discussion of both the history and current issues associated with the practice of lenders taking land as collateral is found in Burkhart, supra note 165.

[FN365]. See id. at 297-301.

[FN366]. See Wright & Morrissey, supra note 182, at 772. Prior to making the requested loan, the financing of the acquisition of most commercial and industrial properties is still generally contingent upon a satisfactory environmental audit or assessment. For example, see Levy, 1999 WL 980401, at *1 (discussing the decision of a bank to decline to finance the acquisition of a property because it was not satisfied with the results of the environmental audit). Even if an initial assessment of the proposed collateral is unsatisfactory, further efforts to delineate the conditions at the site (often known as a "Phase 2") may address the lender's concerns. See Brewer v. Better Bus. Brokers & Consultants, Inc., 727 So. 2d 1081 (Fla. Dist. Ct. App. 1999). However, over the past few years, some lenders have increasingly used certain insurance policies in lieu of or as a supplement to the initial assessment. Michael Brick, Commercial Real Estate; No Environmental Study, But the Loan Still Clears, N.Y. Times, Nov. 13, 2002, at 10C. Some policies will reimburse the lender for the balance of the loan if the borrower is in default and contamination is found that is non-compliant with governmental standards. Many policies exclude coverage for indoor contaminants such as asbestos, lead-based paint, and mold. Id.

[FN367]. Jackson, supra note 315, at 93.

[FN368]. Logsdon, supra note 206, at S8 (asking whether a mortgage holder should routinely include indoor air quality in the assessment of the mortgaged property).

[FN369]. See Schukoske, supra note 23, at 538.

[FN370]. See Sweeney & Taddeo, supra note 3, at 75 (noting potential impact of mold on lender's overall portfolio value).

[FN371]. Logsdon, supra note 206, at S8-S9.

[FN372]. Sweeney & Taddeo, supra note 3, at 76 (noting possible concerns among lenders about imposing an additional due diligence cost on borrowers). The question in some instances will be whether indoor air quality issues need to be addressed to satisfy a rating agency evaluating a pool of mortgages that are part of a securitization. Logsdon, supra note 206, at S9; see also Riskier Mortgages are Being Pooled for Securitization, 46 Real Est. Wkly., Feb. 16, 2002, at 25 (noting lenders are eager to find any solution to environmental issues that is acceptable to rating agencies).

[FN373]. In other words, is the real property collateral a commercial facility, residence (multi-family or single family), industrial operation, etc.?

[FN374]. If standards or exposure limits are eventually issued, they might be referenced.

[FN375]. Heady, supra note 72, at 1047-48 (referencing civil actions against architects and builders related to a courthouse's indoor air problems); see also Dillelo, 2002 WL 31839383, at *2 (apportioning 10% of fault to the architect for damages associated with presence of mold in recently constructed house).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                              Page 56
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN376]. See Payne, supra note 151, at 135 (stating that in older buildings--which are defined as those built more than ten years ago--the building owner is usually the entity to which blame is assigned unless there have been recent renovations or other work).

[FN377]. The term "contractor" is intended to include subcontractors and homebuilders for purposes of this discussion. See, e.g., Tunica-Biloxi Indians, et al. v. Pecot, No. CIV-A-02-1512, 2003 WL 942679, at *1 (W.D. La. Jan. 30, 2003) (concerning subcontractors who sued for mold contamination in newly constructed hotel); Booker v. Real Homes, Inc., No. 04-02-00122-CV, 2003 WL 117987, at *1-*2 (Tex. App. Jan. 15, 2003) (discussing a homebuilder's suit for alleged construction defects in new home causing mold growth). However, the work and/or services provided by some building materials suppliers may also be scrutinized at a particular construction project. Other relevant project parties might include engineers, construction managers, and trades persons such as carpenters, drywallers, and plumbers. See New Orleans Assets, L.L.C. v. Woodward, No. 01-2171, 2003 U.S. Dist LEXIS 3378, at *3 (E.D. La. Feb. 5, 2003) (discussing the suit against a manufacturer of vinyl wall coverings installed in a new building for alleged mildew and leaks); Latest Developments in Mold Exposure Litigation, 17 Nat. Resources & Env't 132, 133 (2002). An HVAC contractor's perspective on mold issues is found in Joint Hearing, supra note 2, at 116-19 (prepared statement of Jim Hussey, Chairman, The Air Conditioning Contractors of America).

[FN378]. Of course, the general contractor is likely to, in turn, allocate such liabilities to the appropriate subcontractors.

[FN379]. The project owner or developer will often be the other relevant party.

[FN380]. A recent article notes: "Whether owners will accept specific riders that allocate the risk of mold conditions remains to be seen, but such riders could be included in contract negotiation discussions with the owner." Dreste et al., supra note 48, at 18. The architect may prefer to use standard form contracts issued by the American Institute of Architects. See Anthony Granato, Architect Liability for Injury to Workers: Is There A Duty to Design A Building That is Safe to Construct?, 21 Ohio N.U. L. Rev. 403 (1994). The architect may have contracts with both the project owner and contractors. Id. at 406-07. Likewise, the general contractor would probably prefer to use standard form construction agreements prepared by the Associated General Contractors ("AGC") of America. See Dreste et al., supra note 48, at 14-15 (discussing the provisions in AGC agreements that may address mold issues).

[FN381]. The key provisions would include indemnities and releases warranties.

[FN382]. This absence of coverage might pose an additional problem. The contractor may be required to carry coverage for such risks as a prerequisite to compete for certain projects.

[FN383]. The architect may actually perform a number of project tasks. An example of the services an architect agreed to provide in regards to the construction of a condominium complex is found in Aldrich v. ADD, Inc., 770 N.E.2d 447 (Mass. 2002). The agreed services were to include:
  (1) review and evaluation of the project, including the preparation of schematic design documents illustrating the scale and relationship of project components; (2) refinement of the building and site design generated in the schematic design phase; (3) preparation of drawings and specifications for construction that fully complied with all applicable federal, state and local laws, ordinances and codes; and (4) administration of the construction contract between Dolphin and the contractor, including site inspection visits.
Id. at 449-50; see also Granato, supra note 380, at 405 (stating that even on projects where architects do not agree to supervise the construction, they agree to produce construction drawings and written specifications for the project). A description of the architect's role in the construction process is found in Kustin, supra note 78, at 121-22.

[FN384]. A discussion of various structural material/design issues relevant to the minimization of indoor air pollution is found in Levin & Teichman, supra note 70, at 52.

[FN385]. See Heady, supra note 72, at 1058 (stating that contractors and designers must maintain a current understanding of available state of the art technology). One author notes that the architects' clients will demand "healthier" buildings. Kustin, supra note 78, at 144-45.

[FN386]. These parties might be the architect, engineer, contractor/subcontractor, trades, etc. One author provides an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

example:
  While architects are usually responsible for the coordination of work completed by HVAC system designers and may supervise the installation of such systems, liability for SBS resulting from an HVAC system design should be assigned to the consultant who designed the system, the technical functioning of HVAC systems is beyond the scope of control by architects. Kustin, supra note 78, at 146-47.

[FN387]. Id. at 145 (arguing that architects should not be held accountable for the failure to maintain building HVAC systems).

[FN388]. Architect liability issues are addressed in Constance Frisby Fair, Architect and Engineer Liability, 35 Washburn L.J. 32 (1995). See generally Granato, supra note 380, at 403 (addressing architect liability for workers' injuries); Kustin, supra note 78 (addressing architect liability for indoor air pollution and sick building syndrome).

[FN389]. Cutlip v. Lucky Stores, Inc., 325 A.2d 432, 443 (Md. 1974).

[FN390]. Id.; see also Kustin, supra note 78, at 131 (referencing parties' use of theories such as negligence, breach of contract, implied warranty, and strict liability to hold architects and other building professionals liable for sick building syndrome).

[FN391]. This discussion does not address the ability of an unrelated party (from a contractual standpoint) to maintain a damage action against an architect. Liability has been imposed on architects in certain scenarios despite the absence of privity. Ales-Peratis Foods Int'l, Inc. v. Am. Can Co., 209 Cal. Rptr. 917, 922 (Cal. Ct. App. 1985); A.E. Inv. Corp. v. Link Builders, Inc., 214 N.W.2d 764, 768 (Wis. 1974). The third party's ability to seek damages will usually be dependent on a finding that it was foreseeable they would be injured by the structure design problem. Link Builders, 214 N.W.2d at 768. Privity issues are also addressed in Fair, supra note 388.

[FN392]. See L.L. Bean, Inc. v. United States Mineral Prods. Co., No. CV-98-632, 1999 Me. Super. LEXIS 323, at *2 (Dec. 3, 1999) (discussing suit against an architectural firm for negligence and breach of contract when mold was found in the building's fireproofing material).

[FN393]. Travelers Indem. Co. v. Ewing, 711 F.2d 14, 17 (3d Cir. 1983); Mounds View v. Walijarvi, 263 N.W.2d 420, 424 (Minn. 1978) (stating that an architect has the duty to "exercise such care, skill and diligence as men in that profession ordinarily exercise under like circumstances."); see also Fair, supra note 388, at 35; Granato, supra note 380, at 405.

[FN394]. Paxton v. County of Alameda, 259 P.2d 934, 939 (Cal. Ct. App. 1953).

[FN395]. Cooper v. Jevne, 128 Cal. Rptr. 724, 729 (Cal. Ct. App. 1976).

[FN396]. 706 So. 2d 20, 23 (Fla. Dist. Ct. App. 1997).

[FN397]. Id.

[FN398]. Id. When the courthouse was demolished, two "highly unusual toxic molds" were found. Id. at 25. Over 60% of the exterior walls had mold on them. Id. at 24.

[FN399]. Centex-Rooney, 706 So. 2d at 24.

[FN400]. Id. The county alleged that the building windows were installed improperly, which resulted in much of the mold growth. Id. at 25.

[FN401]. Id. at 24.

[FN402]. Id. at 28.

[FN403]. Bloomburg Mills, Inc. v. Sordoni Constr. Co., Inc., 164 A.2d 201 (Pa. 1960).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                 Page 58
56 Ark. L. Rev. 295
(Cite as: 56 Ark. L. Rev. 295)

[FN404]. 164 A.2d 201.

[FN405]. Id. at 202.

[FN406]. Id. The plaintiff operated a rayon and nylon weaving mill and the moisture aggravated the weaving process.

[FN407]. Id. at 202-03.

[FN408]. Id. at 203.

[FN409]. Bloomberg Mills, 164 A.2d at 203.

[FN410]. Mounds View, 263 N.W.2d at 423; State v. Gathman-Matotan Architects & Planners, Inc., 653 P.2d 166, 169 (N.M. Ct. App. 1982).

[FN411]. 263 N.W.2d 420.

[FN412]. Mounds View, 263 N.W.2d at 423 (quoting Coombs v. Beede, 36 A. 104 (Me. 1896)).

[FN413]. Id. at 424; Gathman-Matotan, 653 P.2d at 169.  The courts compare architects to other professionals, such as doctors and lawyers.

[FN414]. Mounds View, 263 N.W.2d at 424.

[FN415]. Id. at 423 (citing Coombs, 36 A. at 104); Gathman-Matotan, 653 P.2d at 169 (stating that the concept of implied warranty only applies to goods and never to services).

[FN416]. See Fair, supra note 388, at 35-36.

[FN417]. Bednarski v. Cutler Hammer Corp., 711 F. Supp. 823, 826 (M.D. Pa. 1989); Papp v. Rocky Mountain Oil & Minerals, Inc., 769 P.2d 1249, 1255 (Mont. 1989).  One court found that it was fair to impose strict liability on manufacturers who have plenty of time to find defects in their products before they are sold, but it is not fair to impose strict liability on an architect who has only one chance to design a defect-free structure.  Mounds View, 263 N.W.2d at 425.

[FN418]. Papp, 769 P.2d at 1256.

[FN419]. See Heller v. Cadral Corp., 406 N.E.2d 88, 89 (Ill. App. Ct. 1980).

[FN420]. Bednarski, 711 F. Supp. at 826; Blagg v. Fred Hunt Co., 272 Ark. 185, 190, 612 S.W.2d 321, 324 (1981).

[FN421]. Blagg, 272 Ark. at 190, 612 S.W.2d at 324.

[FN422]. Sime v. Tvenge Assoc. Architects & Planners, 488 N.W.2d 606, 611 (N.D. 1992).

[FN423]. Gathman-Matotan, 653 P.2d at 170.

[FN424]. See Sime, 488 N.W.2d at 611.

[FN425]. See New Orleans Assets, L.L.C., 2003 U.S. Dist. LEXIS 3378  (concerning parties, that included contractors, who were sued by building owners for mildew and leaks in new structure).

[FN426]. See generally Bischoff, supra note 21 (discussing homebuilder involvement in mold litigation).

[FN427]. See Heady, supra note 72, at 1056-57 (stating that an improperly designed or fitted HVAC system can contribute to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

poor indoor air quality).

[FN428]. Dolnick, supra note 107, at 16 (discussing how prevention of mold growth requires a strong commitment to building in accordance with plans and specifications).

[FN429]. See Ruquet, supra note 39, at 25 (noting that some contractor insurance policies contain mold-related exclusions for structures constructed with stucco-type finishes because of moisture retention issues).

[FN430]. Alternatively, one author asks whether the contractor could take a proactive role and seek the modifications to the project necessary to remedy such problems. Heady, supra note 72, at 1058. Both the other project professionals and the owner would have to be convinced of the need for such changes. The President of the Associated General Contractors of America noted the necessity of securing concurrence by the design professionals: "Will architects and engineers be amenable to changes in design and building materials to lessen the chances of mold?" Larry C. Gaskins, Don't Let Mold Make You Fold, Constructor, Feb. 2003, at 3.

[FN431]. The contractors would need to ensure that the party had the means to cover this potential liability. For example, it would presumably be important to verify that a subcontractor assuming certain responsibilities has adequate insurance coverage. See Ruquet, supra note 39, at 25.

[FN432]. A possible source of such information may be environmental assessments or audits of the structure that have already been generated by the project lender, purchaser, or other parties.

[FN433]. A prudent contractor may therefore seek the disclosure of such information prior to the initiation of the project. The contractor might also, in lieu of such disclosures, require that the owner or other relevant party provide warranties regarding such matters. The parties might also ensure that these potential issues are addressed through the change in condition provisions of the construction contract.

[FN434]. See Heady, supra note 72, at 1056 (noting excessive moisture and associated microbial contamination can be the result of improper drying during the construction process).

[FN435]. A risk manager for a subcontractor notes: "I personally recall one project manager in Northern California who despite the fact the roof had been left off the building through two very wet winters, was surprised that the installed sheet rock began turning green and black." Dolnick, supra note 107, at 14.

[FN436]. Tulacz, supra note 12, at 60 ("You can't begin installing interior finishing systems without enclosing the building, but sometimes you have to work carefully with the general contractor on scheduling to make this happen . . . .").

[FN437]. See Post, supra note 112, at 32.
 Construction mistakes can be easily covered up only to rear their heads later in the form of mold growth. Consider this common scenario: The contractor, in a rush to avoid late penalties, installs mold friendly gypsum board before the building is enclosed. It rains, the board gets wet and doesn't dry before it is painted. Down the line there is a mold problem.
Id.
 A related problem is the need to ensure that building materials stored on-site prior to use in construction are protected from rainfall. An author notes: "Another scenario: A board, fiberglass insulation or any porous material on site. It gets rained on and is installed that way and covered up. Down the line there is a mold problem." Id.; see also Andrew J. Streifel, A Holistic Approach to Indoor Air Quality in Health Care, Heating, Piping, Air Conditioning, Oct. 1998, at 69 (noting that a contractor's failure to protect certain structural components during construction caused water damage that facilitated mold growth).

[FN438]. See New Orleans Assets, 2003 U.S. Dist. LEXIS 3381, at *5 (alleging that a building subcontractor installed wet drywall in a building causing mildew growth).

[FN439]. The education of project personnel has also been stated to be important in preventing the growth problem of mold during construction. Dreste et al., supra note 48, at 14. Planning for the appropriate response to the discovery of mold during construction is also deemed important. Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN440]. See Joint Hearing, supra note 2, at 55 (regarding the prepared statement of Gerald M. Howard, Executive Vice President, National Association of Home Builders and noting that builders, trade contractors, property owners, and managers are being sued for property damage and personal injuries related to mold).

[FN441]. The President of the Associated General Contractors of America, Larry Gaskins, noted: "Some projects for instance, will need to go up more slowly, to ensure proper drying and ventilation of all components. Will owners interested in avoiding tenant lawsuits be amenable to these delays?" Gaskins, supra note 430, at 3. A recent article notes that the contractor may wish to include in the construction agreement a provision that shifts certain responsibilities or liabilities to the owner for damages that arise from the inability to undertake appropriate measures to protect the construction site because of an accelerated schedule. Dreste et al., supra note 48, at 16.

[FN442]. Hodgson, Russ, Andrews, Woods & Goodyear, LLP v. Isolatek Int'l Corp., 752 N.Y.S.2d 472, 473 (N.Y. App. Div. 2002) (concerning mold discovered during renovation of two floors of a building).

[FN443]. Dolnick, supra note 107, at 16 (noting that construction project mold problems can cause delays).

[FN444]. Id.; see also Dreste et al., supra note 48, at 14 (noting contractors should consider contract language that allocates risk for mold conditions to those entities in the best position to control the risk).

[FN445]. A 2003 article provides a detailed discussion of how the discovery of mold at a construction site might be addressed by certain form documents issued by the Associated General Contractors of America. Dreste et al., supra note 48, at 14-15. The discussion includes an assessment of whether mold fits within the defined term "hazardous materials" and the rights of the contractor to cease work if such defined substances are discovered at the construction site. It also discusses how these form agreements allocate responsibility for any necessary testing/remediation. Delay costs and indemnity obligations are also explained. Id.

[FN446]. A contractor pollution liability policy may be used by some contractors to address various pollutant events associated with construction activities. See Trader, supra note 37, at 13 (noting that the emergence of mold as a potential environmental exposure has been cited as additional inducement for contractors to procure Contractor Pollution Liability Coverage).

[FN447]. See Dilello, 2002 WL 31839383, at *2 (apportioning 90% of fault to contractor for alleged negligent construction that resulted in mold growth).

[FN448]. Examples include the seepage of water through doors, windows, roofs, and curtain walls. The contractor's role in placing a structure addition into a flood zone has also been the subject of an action. See Booker, 2003 WL 117987, at *1-*2 (concerning allegations that construction defects allowed water seepage around doors and windows causing mold); see also Farnsworth v. Horrigan, No. CV 950373914S, 1999 WL 49393 (Conn. Super. Ct. Jan. 22, 1999); Heady, supra note 72, at 1056.

[FN449]. See Dreste et al., supra note 48, at 16 (citing language imposing obligation for operation and maintenance responsibilities upon owner).

[FN450]. See Foster v. Denton Indep. Sch. Dist., 73 S.W.3d 454 (Tex. Ct. App. 2002) (alleging that a company that installed HVAC equipment was liable for a mold-related bodily injury).

[FN451]. Centex-Rooney, 706 So. 2d at 25. The county was able to prove that the breach of the construction management agreement was a proximate cause of the damages incurred. Id.

[FN452]. Id.

[FN453]. Wawak v. Stewart, 247 Ark. 1093, 1094, 449 S.W.2d 922, 923 (1970).

[FN454]. Id. at 1095, 449 S.W.2d at 923.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                    Page 61
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN455]. Mondelli v. Kendall Homes Corp., 631 N.W.2d 846, 853 (Neb. 2001). Because the plaintiffs in Mondelli claimed, and were able to establish, a breach of the warranty to construct the home in a workmanlike manner, the decision establishes an ability to sue under both contract and negligence theory. Id. at 862.

[FN456]. Theis v. Heuer, 280 N.E.2d 300, 306 (Ind. 1972) (citing William Lloyd Prosser, The Law of Torts 693-95 (3d ed. 1964)).

[FN457]. McDonough v. Whalen, 313 N.E.2d 435, 439 (Mass. 1974).

[FN458]. Centex-Rooney, 706 So. 2d at 20.

[FN459]. See supra notes 9-16 and accompanying text.

[FN460]. 631 N.W.2d 846.

[FN461]. Id. at 851.

[FN462]. Id.

[FN463]. Id. The inside of the wall was covered with mud and toadstools. Id.

[FN464]. Mondelli, 631 N.W.2d at 851.

[FN465]. Id. at 851-52.

[FN466]. Id. at 852. Later, Mondelli was diagnosed with asthma. Her doctor stated that mold growth was a common cause of asthma. Id.

[FN467]. Id.

[FN468]. Mondelli, 631 N.W.2d at 852. Various standards and codes are applicable to the construction of facilities and structures. They may be promulgated by either governmental agencies or private organizations. Some are likely applicable to various conditions or activities that directly or indirectly facilitate mold growth. Id.

[FN469]. Id. at 862.

[FN470]. See id. at 852; Centex-Rooney, 706 So. 2d at 25. The injury may affect someone who is not in privity with the contractor, as long as it is foreseeable that that person might be injured. Suneson v. Holloway Constr. Co., 337 Ark. 571, 582, 992 S.W.2d 79, 85 (1999).

[FN471]. Woodward v. Chirco Constr. Co., Inc., 687 P.2d 1269, 1270 (Ariz. 1984).

[FN472]. Id.

[FN473]. Columbia W. Corp. v. Vela, 592 P.2d 1294, 1299 (Ariz. Ct. App. 1979).

[FN474]. Cosmopolitan Homes, Inc. v. Weller, 663 P.2d 1041, 1045 (Colo. 1983).

[FN475]. Blagg, 272 Ark. at 186-87, 612 S.W.2d at 322.

[FN476]. Ark. Code Ann. § 16-56-112(a) (2002). For example, Arkansas limits this time period to five years. The purpose of the statute of limitations is to protect members of the construction industry from being sued many years after they build a structure. See Rogers v. Mallory, 328 Ark. 116, 120, 941 S.W.2d 421, 422 (1997).

[FN477]. Mondelli, 631 N.W.2d at 853.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295
56 Ark. L. Rev. 295
(Cite as: 56 Ark. L. Rev. 295)

[FN478]. Blagg, 272 Ark. at 188-89, 612 S.W.2d at 323.

[FN479]. Alaskan Oil, Inc. v. Cent. Flying Serv., Inc., 975 F.2d 553, 554 (8th Cir. 1992).

[FN480]. E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 868 (1986); Berkeley Pump Co. v. Reed-Joseph Land Co., 279 Ark. 384, 391, 653 S.W.2d 128, 131 (1983). In 1981, the Arkansas Supreme Court decided a case in which a homeowner sued a builder for strict liability. Blagg, 272 Ark. at 186, 612 S.W.2d at 322. The plaintiffs began to smell strong odors and fumes from formaldehyde soon after they moved into their home. Id. They determined that the smell came from the carpet and its pad. Id. The judge dismissed at trial the plaintiff's claim of strict liability. On appeal, the court held that a house was a product for purposes of considering strict liability, and reversed the trial court's decision. Id. at 190, 612 S.W.2d at 324. In this case, the court found that a homebuilder could be held liable through strict liability for lack of workmanship if the plaintiff could prove that the house was unreasonably dangerous. Id.

[FN481]. This discussion does not identify every potential risk management measure. For example, many real property market participants attempt to segregate potential liabilities associated with a structure or other facility in a separate legal entity provided by statute or common law. A key concern for a purchaser or developer of a particular property or facility is the likelihood that assets or funds may be put at risk beyond what is invested in the property or enterprise. See George W. Dent, Jr., Limited Liability in Environmental Law, 26 Wake Forest L. Rev. 151, 165 (1991) ("Limited liability spreads risks among risk-averse participants: shareholders risk their investment while creditors shoulder the remaining risk."). A few of the available entities include corporations, limited partnerships, limited liability companies, and limited liability partnerships. Various considerations apply to the choice of entity, including tax, organizational, and other issues. The issue that is addressed is the ability of the entity to segregate the new enterprise's liabilities from the business or individual that established it. This concept is known as limited liability. The principle of limited liability shields an owner from responsibility for the debts (including debts arising from tortuous conduct) of the company. The ability of various non-corporate entities to segregate liabilities is discussed in Emily A. Lackey, Comment, Piercing the Veil of Limited Liability in the Non-Corporate Setting, 55 Ark. L. Rev. 553 (2002); see also Browning-Ferris Indus. of Ill., Inc., v. Ter Maat, 195 F.3d 953 (7th Cir. 1999). In discussing the rationale for limited liability, the Browning-Ferris court noted:
  That it is the principle of limited liability and it serves the important social purpose of encouraging investment by individuals who are risk averse and therefore will not invest (or will insist on a much higher return) in an enterprise if by doing so they expose their entire wealth to the hazards of litigation.
195 F.3d at 959.

[FN482]. See generally Julavits, supra note 13 (referencing increased insurance costs resulting from the presence of mold and the subsequent decrease in property values).

[FN483]. Other benefits of the assessment of environmental issues in the transactional context include: (1) ensuring "environmental risks associated with the property are addressed in advance of the purchase and allocated under the contract"; (2) "timely incorporation of environmental risk allocation into the parties' business arrangement"; (3) it establishes a "baseline of information on current conditions" of the property. See Steven L. Humphreys, Getting the Deal Done: A Survival Guide to Environmental Problem-Solving in Brownfields Transactions, 11 Fordham Envtl. L.J. 799, 806-07 (2000).

[FN484]. See Springston, supra note 58, at 144 (stating that the growth and production of new spores can occur within twenty-four hours of the presence of the necessary conditions).

[FN485]. For example, a purchaser may discover material concentrations of mold during the assessment of a structure. The seller may agree to eliminate prior to closing. The purchaser may find it prudent to confirm the success of the remediation prior to closing on the property. See Sweeney & Taddeo, supra note 3, at 75 (stating a buyer should confirm success of seller mold remediation efforts).

[FN486]. W. Edward Carlton, Mold Litigation Continues to Grow, For the Def., Aug. 2002, at 28 (stating that a number of mold remediation personnel have entered the business with no experience).

[FN487]. Sweeney & Taddeo, supra note 3, at 78 (noting the need to use a certified industrial hygienist with experience in assessing mold).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

Page 63

[FN488]. Carlton, supra note 486, at 28. There are presumably other reasons to use skilled contractors. For example, the removal of mold can expose the remediation personnel to potential health hazards for which protective measures should be undertaken in some circumstances.

[FN489]. For example, the Ohio Environmental Protection Agency certifies the professionals' issuance of "no further action" environmental remediation letters as part of the state's "brownfield" program. See Robertson, supra note 182, at 48-64.

[FN490]. A description of the requirements to become a "certified professional" in the Ohio brownfield program is found in id. at 54-57. Colorado's brownfield program requires participants to use a "qualified professional." Id. at 58-60.

[FN491]. Guidelines, supra note 189, at 3. The New York City Department of Health & Mental Hygiene states that microscopic identification of the spores/colonies requires considerable expertise. Id. It states that such services are not routinely available from commercial laboratories. Id.

[FN492]. Id. at 2. The structure's HVAC and plumbing will also need to be addressed. Id.

[FN493]. See Plainfield-Union Water Co. v. C.I.R., 39 T.C. 333, 338 (1962). Repairs are ordinary and necessary business expenses which may be deducted against current income. See also Income Tax Reg. § § 1.162-4.

[FN494]. See Plainfield-Union, 39 T.C. at 338. Improvements are capital expenditures which may only be recovered through depreciation deductions over the asset's useful life. See 26 U.S.C. § 267 (1999).

[FN495]. 1994-1 C.B. 35, available at 1994 WL 234887 (IRS RRU).

[FN496]. See id. Revenue Ruling 94-38 held that "[c]osts incurred to clean up land and to treat groundwater that a taxpayer contaminated with hazardous waste from its business were deductible by the taxpayer as ordinary and necessary business expenses under section 162 of the Internal Revenue Code." See id. This ruling does not address whether such expenditures would be deductible by the taxpayer if the property had been contaminated prior to the taxpayer's ownership.

[FN497]. See Tech. Adv. Mem., 92-40-004, available at 1992 WL 247127 (Oct. 2, 1992).

[FN498]. See id. The ruling stated that since the equipment was manufactured with asbestos, it was impossible to value the asset prior to the existence of asbestos or prior to the condition necessitating the expenditure. See id.

[FN499]. 108 T.C. 265 (1997).

[FN500]. See id. at 285. Expenses incurred as part of a plan of rehabilitation or improvement must be capitalized even though the same expenses if incurred separately would be deductible as ordinary and necessary. See id.

[FN501]. See id. at 284-85. The tax court stated that it did not find that the expenditures for asbestos removal materially increased the value of the building so as to require them to be capitalized. See id. at 284.

[FN502]. See H.R. 5040, 107th Cong. (2002). The bill was introduced by Congressman John Conyers, Jr. from Michigan in 2002.

[FN503]. Id. A deduction reduces the tax base. However, a credit reduces the tax liability as computed. Id.

[FN504]. Id. The credit will also be limited to the taxpayer's taxable income (i.e., this is not a refundable credit). Id.

[FN505]. See Schukoske, supra note 23.

[FN506]. The full term is "polychlorinated biphenyls."

[FN507]. Saltz, supra note 52, at 486-89 (examining the allocation of insurable risks in commercial leases).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN508]. See generally Sweeney & Taddeo, supra note 3 (suggesting that parties to a transaction should specifically address mold issues to avoid subsequent disputes).

[FN509]. See Henning & Berman, supra note 7, at 86 (noting the need for a defendant's counsel in a mold claim to evaluate whether the relevant contracts provide the opportunity to shift the risk).

[FN510]. The identified concerns will become the operating basis for the parties' negotiations and dictate the form of contractual protections.

[FN511]. See Dreste et al., supra note 48, at 14 ("[C]ontractors should consider contract language that would allocate the risk for mold conditions to those entities in the best position to control the risk.").

[FN512]. For example, when the real property market is increasing in value, a potential purchaser may be more willing to accept various conditions. See Jackson, supra note 315, at 89.

[FN513]. An extensive number of articles have addressed environmental auditing and assessment techniques and/or the various issues associated with them. See, e.g., Brooks M. Beard, the New Environmental Federalism: Can The EPA's Voluntary Audit Policy Survive?, 17 Va. Envtl. L.J. 1, 27 (1997); Miri Berlin, Environmental Auditing: Entering the Eco-Information Highway, 6 N.Y.U. Envtl. L.J. 618, 637 (1998); Donald A. Carr & William L. Thomas, Devising a Compliance Strategy Under the ISO 14000 International Environmental Management Standards, 15 Pace Envtl. L. Rev. 85, 97-98 (1997); David A. Dana, The Perverse Incentive of Environmental Audit Immunity, 81 Iowa L. Rev. 969, 976 (1996); Michael Ray Harris, Promoting Corporate Self-Compliance: An Examination of the Debate Over Legal Protection for Environmental Audits, 23 Ecology L.Q. 663, 711-20 (1996); Terrell E. Hunt & Timothy A. Wilkins, Environmental Audits and Enforcement Policy 16 Harv. Envtl. L. Rev. 365 (1992); Timothy T. Jones et al., Environmental Compliance Audits: The Arkansas Experience, 21 U. Ark. Little Rock L. Rev. 191 (1999); Lisa Koven, The Environmental Self-Audit Evidentiary Privilege, 45 UCLA L. Rev. 1167, 1190 (1998); Dara B. Less, Incentives for Self-Policing: The Need for a Rule, 2 Envtl. Law. 773 (1996); Kirk F. Marty, Moving Beyond the Body Count and Toward Compliance: Legislative Options for Encouraging Environmental Self-Analysis, 20 Vt. L. Rev. 495, 499-500 (1995); David Sorenson, The U.S. Environmental Protection Agency's Recent Environmental Auditing Policy and Potential Conflicts with State-Created Environmental Audit Privilege, 9 Tul. Envtl. L.J. 505 (1996); Rena I. Steinzor, Reinventing Environmental Regulation: The Dangerous Journey From Command to Self-Control, 22 Harv. Envtl. L. Rev. 103, 110 n.25 (1998); John-Mark Stensvaag, The Fine Print of State Environmental Audit Privileges, 16 UCLA J. Envtl. L. & Pol'y. 69 (1997-98); James M. Weaver et. al., State Environmental Audit Laws Advance Goals of Cleaner Environment, 11 Nat. Resources & Env't. 6, 9 (1997).

[FN514]. Two authors contrast financial auditing with environmental audits by stating: "In addition, unlike the case of the results of financial audits, even public companies often regard environmental data obtained through an internal audit as non-public information." George Van Cleve & Keith W. Holman, Promise and Reality in the Enforcement of the Amended Clean Air Act Part II: Federal Enforceability and Environmental Auditing, 27 Envtl. L. Rep. 10151, 10158 (1997).

[FN515]. A related risk is that by definition company or facility management are provided knowledge of the existence of violations of federal environmental programs. The federal and some state environmental statutes provide that criminal penalties may be imposed in certain circumstances in the case of knowing violations. See Andrew J. Turner, Mens Rea in Environmental Crime Prosecutions: Ignoratia Juris and the White Collar Criminal, 23 Colum. J. Envtl. L. 217 (1998). Once such violations are identified, facility management may have been provided "knowledge" of the violations. Consequently, the failure to address such noncompliance risks the imposition of criminal penalties. Company or facility management should therefore be prepared prior to undertaking the audit to remedy any violation that is discovered. One early commentator opined it may be unwise for a company to undertake an environmental audit if it does not intend to act on the results. See Phillip Reed, Environmental Audits and Confidentiality: Can What You Know Hurt You as Much As What You Don't Know?, 13 Envtl. L. Rep. 10303 (1983).

[FN516]. See James W. Moorman & Laurence S. Kirsch, Environmental Compliance Assessments: Why Do Them, How to Do Them and How Not to Do Them, 26 Wake Forest L. Rev. 97, 117 (1991).

[FN517]. Various versions of such legislation are found in states such as Alaska, Arkansas, Colorado, Illinois, Indiana,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                            Page 65
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

Kansas, Kentucky, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, Ohio, Oregon, South Carolina, South Dakota, Texas, Utah, Virginia, and Wyoming. Douglas P. McLeod & Kirk F. Marty, Can You Afford to Perform an Environmental Audit?, Presentation at the Air and Waste Management Association's 91st Annual Meeting (June 1998).

[FN518]. Section 8-1-303 of the Arkansas Code describes the scope of the privilege:
  In order to encourage owners and operators of facilities and persons conducting other activities regulated under this chapter, or its federal counterparts or extensions, both to conduct voluntary internal environmental audits of their compliance programs and management systems and to assess and improve compliance with statutory and regulatory requirements, an environmental audit privilege is created to protect the confidentiality of communications relating to voluntary internal environmental audits.
Ark. Code Ann. § 8-1-303(a) (2002)

[FN519]. Ark. Code Ann. § 8-1-302(4) (2002). The term environmental audit report is broadly defined to include:
  A. Field notes, records of observations, findings, opinions, suggestions, conclusions, drafts, memoranda, drawings, photographs, computer-generated or electronically recorded information, maps, charts, graphs, and surveys collected or developed for the primary purpose of preparing an environmental audit;
Ark. Code Ann. § 8-1-302(4)(A). The potentially protected material clearly encompasses a number of documents in addition to the actual audit report itself. It is therefore important for facilities to recognize that in states such as Arkansas where information (i.e., sampling data, etc.) or documents (i.e., employee interviews, etc.) are initially generated, the required statutory procedures to provide them confidentiality should be followed to ensure protection for these materials. Ark. Code Ann. § 8-1-302(4)(A).
  B. An audit report prepared by the auditor that includes: (i.) The scope of the audit; (ii.) The information gained in the audit; (iii.) Conclusions and recommendations, (iv.) Exhibits and appendices;
  C. Memoranda and documents analyzing a portion of or all of the audit report and discussing implementation issues; and
  D. An implementation plan that addresses correcting past compliance, improving current compliance, and preventing future noncompliance.
See Ark. Code Ann § 8-1-302 (4)(B)-(D).

[FN520]. Ark. Code Ann. § 8-1-304 (2002).

[FN521]. See Moerdler, Insider's Outlook, supra note 9 (referencing need to consider mold in documenting acquisitions, leases, loans, and other real estate transactions).

[FN522]. See Humphreys, supra note 483, at 802.

[FN523]. For example, a construction contract will allocate the insurance requirements among the contractor and subcontractors. Dehlmer, supra note 6, at 17.

[FN524]. See Liristis v. Am. Family Mut. Ins. Co., 61 P.3d 22 (Ariz. Ct. App. 2002) (as amended and redesignated Dec. 26, 2002) (concerning a dispute as to whether homeowner's insurance policy covered certain damages associated with mold).

[FN525]. Relevant examples are the specialty policies developed to cover various environmental risks. See Ann M. Waeger & Jack Fersko, Current Insurance Products for Insuring Against Environmental Risks, The Prac. Real Est. Law. 9, 10 (1999).

[FN526]. See Moerdler, Florida Mold Legislation, supra note 9, at 2 (referencing fifty Florida insurance companies asking state insurance regulators to approve mold exclusion endorsements). The Deputy Director of the Florida Department of Insurance, Steve Roddenberry, noted that most Florida insurance policies will cover mold damage only when it is caused by a covered peril such as a hurricane or windstorm. Roddenberry also noted: "If mold results from sudden, accidental change of water, then its remediation is covered within policy limits. But if mold develops from construction defects or a homeowners negligent maintenance, it's not the insurer's responsibility." Id.

[FN527]. Even if coverage is provided, the absence of standards or exposure limits complicates the scope of the remedial obligation. See Trader, supra note 37, at 13 ("Clean up of typical pollution losses is subject to specific standards. Given the lack of clean-up standards for mold, CPL, policies need to be amended to provide coverage for remedial and clean-up costs that are not subject to specific standards.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN528]. See Ins. Co. of N. Am. v. Snyder Moving & Storage, Inc., No. CV-98-01278-HRH, 2002 WL 31748606, at *1-*2 (9th Cir. Dec. 6, 2002) (referencing Comprehensive Transportation and Storage Liability Policy which covers post-flood rust, mold, and mildew under certain circumstances).

[FN529]. These questions are not limited to mold. The insurance coverage applicable to various other indoor air pollutants have been addressed by the courts. See generally Bick & Youngblood, supra note 84 (discussing various types of "pollution exclusions" in insurance policies and their treatment by the courts).

[FN530]. In pollution exclusions, the end of the clause often contains language providing that the exclusion does not apply to discharges of pollutants if it was "sudden or accidental." See Harkins, supra note 20, at 1129. Courts often interpret these words to mean "unexpected and unintended," thus not precluding coverage for the insured. Id.

[FN531]. 61 P.3d 22.

[FN532]. The covered peril was the fire for which a claim was originally filed. Id. at 23.

[FN533]. Id.

[FN534]. Id. at 24.

[FN535]. Id.

[FN536]. Liristis, 61 P.3d at 24.

[FN537]. Id.

[FN538]. Id. at 26.

[FN539]. Id. at 25.

[FN540]. Id.

[FN541]. No. CIV.A.00-1209-T4, 2002 WL 441334 (E.D. La. Mar. 15, 2002).

[FN542]. Id. at *1.

[FN543]. Id.

[FN544]. Id. at *3.

[FN545]. Id.

[FN546]. Liberty Mut., 2002 WL 441334, at *3.

[FN547]. Id.

[FN548]. Id.

[FN549]. Id.

[FN550]. Id. at *11.

[FN551]. Liberty Mut., 2002 WL 441334, at *5.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                           Page 67
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN552]. 462 N.W.2d 218 (Wis. Ct. App. 1990).

[FN553]. Id. at 222.

[FN554]. Id.

[FN555]. Id. at 223.

[FN556]. Id.

[FN557]. Leverence, 462 N.W.2d at 224.

[FN558]. Id.

[FN559]. Id. at 225-26.

[FN560]. Id. at 232.

[FN561]. Id.

[FN562]. 171 F.3d 343 (6th Cir. 1999).

[FN563]. Id. at 345.

[FN564]. Id. at 346.

[FN565]. Id.

[FN566]. Id.

[FN567]. Blaine Constr. Corp., 171 F.3d at 346.

[FN568]. Id.

[FN569]. Id.

[FN570]. Id.

[FN571]. Id. at 345.

[FN572]. Blaine Constr. Corp., 171 F.3d at 353.

[FN573]. No. CIV.A. 399CV1623D, 2002 WL 356756 (N.D. Tex. Mar. 5, 2002).

[FN574]. Id. at *1.

[FN575]. Id. at *2.

[FN576]. Id. at *3.

[FN577]. Id.

[FN578]. Lexington Ins. Co., 2002 WL 356756, at *3. The court also considered an exclusion based on maintenance of the roof, which was required in the policy. Id. at *4. The court precluded recovery on this basis as well because it found the roof was not properly cared for. Id. at *5.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN579]. See Bischoff, supra note 21, at 684.

[FN580]. Id.  Schools have been a prime target for toxic mold litigation because of the increasing use of modular buildings which contain material upon which mold feeds. Id.

[FN581]. See Henning & Berman, supra note 7, at 75.

[FN582]. 50 Ark. App. 1, 899 S.W.2d 482 (1995).

[FN583]. Id. at 1-2, 899 S.W.2d at 483.

[FN584]. Id. at 1, 899 S.W.2d at 483.

[FN585]. Id. at 1-2, 899 S.W.2d at 483.  The parties stipulated that the presence of this mold in the appellee's classroom caused her sinus difficulties which required several surgeries. Id. at 2, 899 S.W.2d at 483.

[FN586]. Crossett Sch. Dist., 50 Ark. App. at 1, 899 S.W.2d at 483.  Section 11-9-601(c)(1) of the Arkansas Code defines an "occupational disease" as a disease that results in disability or death and arises out of or in the course of the employment or occupation.  See Ark. Code Ann. § 11-9- 601(c)(1) (2002); Crossett Sch. Dist., 50 Ark. App. at 1, 899 S.W.2d at 483.

[FN587]. Crossett Sch. Dist., 50 Ark. App. at 2, 899 S.W.2d at 483.

[FN588]. Id. at 3-4, 889 S.W.2d at 484.

[FN589]. For example, one author notes that Farmers Insurance Company's mold-related claims jumped from 150 in 1999 to 12,000 in 2001. Trader, supra note 37, at 12.

[FN590]. Joint Hearing, supra note 2, at 76 (referring to the prepared statement of Gordon Stewart, President, Insurance Information Institute).

[FN591]. Homeowner policies have a particular focus. See Harkins, supra note 20, at 1131.  Texas homeowners have had greater difficulty obtaining such insurance since State Farm, Progressive, Farmers, and Allstate have stopped issuing new homeowners' policies in the state. See id. at 1130.

[FN592]. See Julavits, supra note 13, at 1 (referencing several insurance companies' decisions to temporarily cease issuing homeowner policies in Texas because of a large number of claims involving mold); Moerdler, Florida Mold Legislation, supra note 9 (referencing insertion of mold exclusions into insurance policies); Pena-Alfaro, supra note 4, at 548 (referencing Texas Insurance Commissioner's contemplation in 2001 of reducing mold claims by altering policy coverage); Trader, supra note 37, at 13 (noting rapidly growing number of mold exclusions in commercial general liability policies); Andrew Wood, Insurance: Chemical Firms Tough it Out in a Hard Market, Chemical Wk., Oct. 2, 2002, at 19 (referencing the recent exclusion of risks such as mold from traditional liability policies).

[FN593]. Some homeowner insurance policies now include language stating coverage is not provided for "continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more." See Carlton, supra note 486, at 28.  A commercial policy exclusion might bar reimbursement for "loss or damage caused by or resulting from . . . rust, corrosion fungus, decay, detrimental, hidden or latent defect, or any quality in property that causes it to damage or destroy itself." Id.

[FN594]. Id. (discussing efforts in Texas to ensure homeowners continued access to policies for their homes).

[FN595]. See Memorandum from Arkansas Insurance Dep't to All Licensed Property and/or Casualty Insurers, Trade Associations, National Association of Insurance Commissioners, and other Interested Parties, Conditions for Obtaining Approval of Mold Exclusions--Bulletin No. 10-2002 (Apr. 22, 2002).  The Arkansas Insurance Department ("Department") stated that Arkansas homeowner insurance policies provide coverage for mold if it is a direct result of a covered loss. Id. The Department noted its intention to keep this type of coverage in place. Id.  Other states have allowed property and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

casualty insurers to limit coverage for liability stemming from mold. For example, New Jersey requires Insurance Service Organization ("ISO") member insurers to provide minimum aggregate coverages and optional increased limits for all property and liability coverages except for losses caused by fire or lightning. See N.J. Ins. Dept. Bulletin No. 01-14. Specifically, New Jersey requires ISO member insurers to provide property coverage of $10,000, on an aggregate basis, with optional increased limits of $25,000 and $50,000. See id. Those members are also required to provide liability coverage in the amount of $50,000, on an aggregate basis, with an optional increased limit of $100,000. See id. Insurers who are not ISO members may request both to provide options to purchase higher liability options and to provide stricter exclusions. Maryland requires a minimum aggregate property coverage for mold and remediation of $15,000 and does not allow insurers to charge an additional deductible for mold loss. See Maryland Insurance Administration, Findings and Decision Relating to Mold Limitations for Property and Casualty Insurance (Mar. 18, 2003). With regard to liability coverage, Maryland prohibits insurers from excluding coverage for mold but allows insurers to limit coverage to an aggregate of $50,000. See id.

[FN596]. See Joint Hearing, supra note 2, at 55 (referencing prepared statement of Gerald M. Howard, Executive Vice President, National Association of Home Builders) (stating that adverse market conditions have caused liability coverage to become more expensive).

[FN597]. For example, California experienced a 25% increase in premiums. Carlton, supra note 486, at 29.

[FN598]. See Ruquet, supra note 39, at 25 (noting that some contractor insurance carriers may place exclusions on buildings with stucco finishes because of alleged moisture issues).

[FN599]. See Julavits, supra note 13, at 1 ("The increased premium will translate into lower property values, because a property's value is determined by the income it produces," Mr. Hendrick said. "If you have a greater exposure, the income and the property value go down. And a lower property value between the parties in a transaction.").

[FN600]. See Trader, supra note 37, at 13 (stating that the addition of mold to existing pollution risks may motivate more contractors to obtain the necessary policies to cover their liabilities).

[FN601]. Various aspects of these policies are discussed in Efflandt, supra note 50, at 57-58 (discussing recent availability of insurance policies to address certain environmental risks that would be allocated between the parties in a transaction). See Susan Neuman, Environmental Insurance; Tailored to Fit: Sophisticated Insurance Tools Make Property Protection Easier, 15 Envtl. Compliance & Litig., No. 12, 3 (2002). Additional underwriting experience with these risks and liberalized clean-up standards have presumably facilitated the expanded availability of these products.

[FN602]. See Jack Fersko & Ann M. Waeger, Using Environmental Insurance in Commercial Real Estate Transactions, 17 Prob. & Prop. 30, 31 (2003).

[FN603]. See Peter B. Meyer & Kristen R. Yount, Environmental Insurance and Public Sector Brownfields Programs: Factors Affecting Pursuit of Insurance as a Redevelopment Tool, Northern Kentucky University/University of Louisville 8-9 (Nov. 1999) (providing an overview of three policies).

[FN604]. Humphreys, supra note 483, at 802.

[FN605]. See News Briefs, Nat'l Real Est. Investor, July 2000, at 68 (stating four Wall Street agencies now approve the use of environmental insurance to underwrite commercial mortgage-backed securities transactions in lieu of a Phase I environmental assessment).

[FN606]. See Humphreys, supra note 483, at 802 (noting insurance may enable the purchaser "to obtain financing without necessarily having to provide the lender with an environmental indemnity from a credit-worthy entity").

[FN607]. The possibility these policies might enhance the valuation of commercial mortgage-backed securities in the pool process is discussed in Joseph Boren, Filling the Gap: Environmental Protection for Lenders, 12 Risk & Ins., Sept. 16, 2001, at 35; see also Lynn Goch, Sealing the Deal, 100 Best's Rev., Mar. 1, 2000, at 77 (stating, "secured creditor environmental policies are becoming a more common method of protecting investors in securities that are backed by pools of commercial mortgages"). However, see Brick, supra note 366, at 10C ("Debt rating agencies have put up significant resistance to the use

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                                          Page 70
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

of these insurance policies, and banks have been forced to listen because their loans usually become truly profitable only if they can be resold to investors as packages of commercial mortgage-backed securities.").

[FN608]. Trader, supra note 37, at 13 (noting insurance companies providing pollution liability coverage use their own forms).

[FN609]. The application process for such policies places a particular emphasis on the disclosure of known pre-existing conditions. For example, in Goldenberg Development Corp. v. Reliance Insurance Co., a developer purchased a policy intended to cover the cost of unforeseen remediation that might be required at a development site. No. 00-CV-3055, 2001 WL 872944, at *1 (E.D. Pa. May 15, 2001). The developer subsequently discovered various buried materials it characterized as solid waste. Id. at *4. The insurance company denied the claims on the basis that the "known conditions" exclusion in the policy applied. Id. This exclusion barred coverage for pollution conditions existing at the inception of the policy which were reported to the developer with responsibility for environmental affairs, unless all material facts relating to the pollution conditions were disclosed to the insurance company prior to the inception of the policy. Id. The dispute centered on certain developer reports referencing the conditions that were not provided to the insurance company. Id. at *1-*2. The developer argued that the information in such reports was referenced in other reports that had been provided to the insurance company. Goldenberg, 2001 WL 872944, at *2; see also Goch, supra note 607 (noting that environmental insurance policies can be tailored to fit a specific transaction).

[FN610]. See Meyer & Yount, supra note 603, at 25. These products can be relatively complicated. The report notes: "While they are thus more useful now, they are also quite complex. Although there are standard, 'off-the-shelf' policies available, many policies are heavily 'manuscripted' or tailored. This means that expertise is required to select the coverages that will protect against the risks attendant on particular projects." Id.

[FN611]. The policies may also exclude lead-based paint and asbestos in addition to mold. See Brick, supra note 366, at 10C.

[FN612]. See Fersko & Waeger, supra note 602, at 34. These commentators noted: "claims against general liability and first-party property damage policies are on such a rise and have resulted in staggering verdicts in favor of insureds, certain insurers issuing environmental insurance policies have begun automatically including exclusions for mold in their premium indication for each new policy." Id. at 35; see also Carlton, supra note 486, at 29 (noting some insurers have introduced clearer and more absolute exclusionary language in their policies). Some EIL insurance carriers may offer a mold "buyback." Jakubovitz, infra note 613, at 11. The buyback may have limits. One author describes a scenario in a construction contract stating:

   For example, one of the microbial matter coverage endorsements which provides mold coverage with a sublimit, also adds an additional exclusion to the policy for 'Failure to Maintain and Construction Defects.' For an insured in the construction business, a large portion of the mold cases stem from construction defect claims. The primary reason a builder, contractor, or any trade in the business purchases this mold coverage is for protection from these risks. This additional language, in effect, negates the additional protection the policyholder requires.
Id. at 12.

[FN613]. Rachel Jakubovitz, Mold: What About Environmental Impairment Liability (EIL) Coverage?, 4 Toxic Torts and Envtl. Litig. Committee Newsl., July 2002, at 11.

[FN614]. Fersko & Waeger, supra note 602, at 34; see also Ruquet, supra note 39, at 25 (noting that contractors may be able to add mold coverage to its standard policy at an additional cost).

[FN615]. An author notes the underwriting may include type of property, type of past and present operations, maintenance and repair review, and needed coverage. Jakubovitz, supra note 613, at 12.

[FN616]. Id.

[FN617]. One commentator notes: "In contrast, insurance companies providing pollution liability coverage use their own forms and as a result, discussion of this coverage must be generalized." Trader, supra note 37, at 13.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 ARLR 295                                                                   Page 71
56 Ark. L. Rev. 295
**(Cite as: 56 Ark. L. Rev. 295)**

[FN618]. See id. (noting possibility of obtaining coverage for mold in contractor pollution liability policy by negotiating for inclusion of "mold" in policy's definition of term "pollutant").

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.