# TAB 11



13882 NBI-CLE 19                                                                                          Page 1
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

Copyright (c) 2004 National Business Institute
**National Business Institute**
**The Mold Challenge in Arkansas**
2004

*19 TRANSACTIONAL CHALLENGES POSED BY MOLD

Walter G. Wright, Jr.
Stephanie Irby
Hank Bates

Copyright © 2004 National Business Institute; Walter G. Wright, Jr.,

Stephanie Irby and Hank Bates

## *21 II. TRANSACTIONAL CHALLENGES POSED BY MOLD. [FN1]

### Walter G. Wright, Jr.

### Stephanie Irby

### Hank Bates

**A. Addressing Structural Mold**

The parties addressing mold in the improved real property transactional context will probably consider at least three questions. They include (1) whether water has or can penetrate the shell of the structure in a manner facilitating the amplification of mold growth; (2) whether abnormal or non-deminimis quantities of mold are growing in the structure producing types or quantifiable amounts of spores not found in the outside ambient air; and (3) whether the mold species present in the structure are believed to potentially adversely affect human health and are present in quantities or concentrations sufficient to do so? The institutionalization of understandable cost-effective processes or procedures to address these questions will be critical.

**1. Assessment of Mold in the Transactional Context**

Environmental assessments have been used by parties for years seeking to identify and/or quantify such issues in the transactional context. [FN2] The perceived presence of some contaminants or conditions in a structure will put in play the possibility that remediation expenditures may need to be incurred. There will often be uncertainty as to the potential costs associated with the structural mold until the scope of their presence is defined. The delineation of the contamination will reduce this uncertainty. [FN3]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Most initial environmental assessments of real property are undertaken in accordance with somewhat similar procedures or protocols. [FN4] The various parties to such transactions generally understand and accept the components of the assessment process. This acceptance is probably a *22 function of the standardization of the procedures, experience and desire to attain certain governmental requirements. [FN5]

There is arguably less standardization or uniformity associated with mold sampling protocols, inspection strategies or remediation measures. [FN6] This is due at least in part to mold's much more recent appearance as a potential transactional environmental impairment. Fewer real property personnel or parties have had significant experience with these activities or techniques. Further, there are no mandatory government standards addressing mold assessment or remediation.

The real property market's unfamiliarity with mold and associated management measures increases the possibility that the organisms will constitute an impediment in some transactions. This has stimulated interest in the standardization and refinement of mold management techniques. [FN7] The development of a degree of comfort with mold will be dependent upon the availability of generally accepted management measures that can quantify and/or otherwise address the issue in a cost-effective manner. Unfortunately, from a transactional perspective, mold has characteristics that may make it a greater challenge to assess or quantify than many environmental issues.

## 2. Assessment Issues

### a. Living Organisms

Mold literally consists of living organisms. Almost any structure can support mold growth if the appropriate conditions are present. As a result, a property cleared by an assessment prior to closing could subsequently develop or redevelop a problem. This distinguishes mold from almost every other environmental condition. For example, an environmental assessment may determine that friable asbestos or an underground heating oil tank is present. Once the material or tank is removed the likelihood the *23 issue will arise again is presumably remote. [FN8] This is not necessarily true for mold.

Since mold is a living organism, human activity [FN9] or intervention need not occur for it to occupy or reoccupy a facility. [FN10] This has ramifications for the assessment/remediation process. The successful assessment and/or remediation of a structure does not mean mold growth will not reoccur. [FN11]

Equally important, seemingly innocuous conditions such as drips or leaks may in certain scenarios facilitate mold growth. Therefore, the permanent elimination of mold in a structure requires that the conditions facilitating such growth be addressed. [FN12] As a result, the assessment must identify relevant structure maintenance or design problems. Their correction will probably be necessary to prevent a reoccurrence.

### b. Absence of Regulatory/Action Standards

There is almost a complete absence of regulatory requirements applicable to mold. [FN13] Consequently, there is a concurrent lack of mandatory bright-line governmental remediation standards or permissible exposure limits [FN14] for mold. [FN15] These standards would be used to determine or measure success in achieving "acceptable" levels of mold. [FN16]

In contrast, standards or limits have been set for many activities or other problematic substances potentially encountered at various facilities. [FN17] Government agencies frequently promulgate these standards pursuant to a rule or through the issuance of a policy. Examples of such standards might include benzene groundwater action levels, polychlorinated biphenyl soil cleanliness standards [FN18] or a crumble test for friable asbestos. [FN19]

*24 Action or cleanup standards can play an important role in addressing environmental issues in the transactional process. [FN20] These benchmarks may be employed to determine the level of environmental and health protection needed to be achieved by remediation or cleanup efforts. [FN21] Consequently, parties in some transactions may use them to determine the acceptability of environmental conditions at a particular property. They may also play a role in the litigation of disputes involving the presence of certain substances. [FN22]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The absence of analogous mold standards poses a problem. Many non-natural environmental contaminants are compared to a zero "benchmark". [FN23] A party generating mold sampling data may not have benchmarks to evaluate the "acceptability" of the results. [FN24] Such simplistic comparisons are difficult for mold since those types of organisms are normally present on a structure surface and in the air of even relatively clean buildings.

### (i.) Establishment of a Baseline

The baseline for comparison of data may be the difference between the sampling results from the structure and the adjacent outdoor environment. [FN25] However, there may not be a consensus as to the types and/or concentrations of molds which constitute a potential threat in the indoor environment. Further, the design of the sampling program needed to make such comparisons can be a complex exercise. There may be disagreements or confusion in determining what constitutes problematic types or amounts of mold and associated spores in a particular structure. Also important, the presence of an *25 abnormal amount or types of molds does not necessarily mean there is a threat to the occupants health. [FN26]

### (ii.) Detection Difficulties

A key component of initial routine environmental assessments has been a visual inspection of the structure or real property. [FN27] Invasive inspection efforts or the sampling of structure air may be necessary if mold is suspected in these areas. A search for mold would also likely include a visual inspection of the structure. Therefore, the initial assessment of a structure will probably focus on the identification of either abnormal mold growth and the conditions that facilitate it. However, a visual inspection will not always identify all problematic concentrations of mold in a structure. The organisms may grow in portions of the structure in which visual inspection is difficult.

### (iii.) Interpreting/Understanding Assessment Results

The combination of uncertainty as to the roster of problem molds and absence of bright-line action levels or standards makes it more difficult to reach definitive conclusions about assessment results. This can be a transactional impediment since the purpose of the assessment is to make a determination as to the "acceptability" of a particular condition. The absence of objective criteria turns the process into a more subjective determination. The inability to easily quantify an environmental issue may tend to magnify its importance in the transactional context.

### (iv.) Common Law Damage Actions

*26 The presence of mold in structures is generating a significant number of third party damage claims. These common law claims often allege property damage and/or bodily injuries. The resolution of these claims tends to be complicated by the previously noted absence of standards or permissible exposure limits. As a result, the potential financial impact associated with these claims tend to be difficult to quantify with any certainty.

### (a.) Assessment Tasks

Most parties involved in the transfer, financing or construction of commercial, industrial, or multi-family residential facilities have in place systematic procedures to identify and quantify to some extent environmental conditions prior to consummation of the transaction. [FN28] The initial assessment procedures utilized in many transactions are found in two American Society of Testing Materials ("ASTM") standards. [FN29]

The two standards are known as the Transaction Screen Process (E-1528) and the Standard Practice for Environmental Site Assessments: Phase I [FN30] Environmental Site Assessment Process (E-1527). [FN31] These activities include site inspections, database searches and/or a review of current/historic uses. The two ASTM environmental assessment standards do not encompass sampling or testing. [FN32]

Initial transactional environmental assessments have rarely included a search for mold. [FN33] Therefore, the party interested in assessing whether objectionable types or concentrations of mold are present has two options. The traditional transactional due *27 diligence efforts can be expanded to address mold. [FN34] In the alternative, a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

separate mold assessment can be undertaken.

Various testing and/or assessment techniques are used to determine whether mold is present in a structure. There is no "standard" protocol or approach for mold sampling or assessment. [FN35] Further, new tests/methods have been and will continue to be developed because of the heightened interest in mold. However, it is unlikely that most initial assessments of a structure in the transactional context will involve actual sampling or invasive testing. [FN36] Instead, some type of initial screening analysis is more likely.

A consensus or generally accepted mold screening protocol does not currently exist. The absence of "standard" initial assessment protocols poses two problems. First, parties seeking to incorporate mold issues into transactional due diligence procedures must determine which tests or assessment methods should be utilized. This can be a complicated question. The ultimate decision will presumably be based on the ability of the test or method to delineate and/or quantify the presence of mold at a cost deemed reasonable by the various parties to the transaction. Second, the absence of a standard format or protocol for the improved real property market can lead to varied findings. [FN37]

An ASTM committee has announced its intention to develop a standard questionnaire for mold screening. [FN38] The questionnaire would establish standard protocols for the visual inspection of mold structures. [FN39] The scope of the committee's task is described as to "define good commercial practice for conducting a transactional screen of a commercial building with respect to the presence of readily observable mold." [FN40] The intent of the protocol *28 is stated to be to allow the user to assess the potential need for further assessment or action beyond what is identified in the standard. [FN41]

The initial screening activities may suggest the need for some type of sampling effort. [FN42] The overall objectives of mold assessment work would likely be twofold. First, the delineation of the location of non-deminimis amounts of mold. Second, to determine if conditions are present in the structure which could facilitate mold growth. [FN43] Each of these two tasks/objectives would probably be addressed by mold due diligence procedures.

Mold testing/assessment techniques might be divided into roughly three categories. They include visual inspection, bulk/surface sampling, and air monitoring. These techniques may be employed individually or in conjunction with each other depending upon the transactional objectives.

**(a.). Visual Inspection**

A visual inspection will include a visual search for signs of mold growth. [FN44] The presence of mold may be evident because of discoloration [FN45] of building or other materials. [FN46] The scope of the visual inspection can vary. For example, some potentially affected areas may not be easily accessible. The organisms may be found in crawl spaces, inside walls and in other interior structural spaces. [FN47] Invasive efforts may be needed to inspect these areas. This may involve the piercing or destruction of walls or other portions of a structure. [FN48] Therefore, visual inspections might be categorized based on whether or not they are invasive. [FN49]

*29 The typical visual inspection will probably not be limited to the identification of mold itself. It will also include the conditions that facilitate mold growth. These could encompass evidence of flooding (or other water intrusion), drips, leakage, HVAC [FN50] problems, and water damaged materials. Whether such conditions are historical in nature and have been corrected or will continue to produce moisture will be important questions. [FN51]

**(b.). Sampling**

Mold may not be identified or located in an initial assessment. However, there may be suspicions in some instances that problematic concentrations are present in less accessible portions of the structure. If so, sampling techniques may be used to determine search for significant growth. The techniques may include a mixture of air and bulk sampling for visible fungi. [FN52]

**i. Air**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A visual inspection may not always provide the information needed to answer certain questions about the fungi conditions in the structure. Sampling activities may be necessary in certain circumstances to generate data to address these questions. The objective of any sampling effort should be to obtain results that are representative of the conditions present in the structure. This goal will dictate the sampling method and number of samples that are utilized. The same data quantity and quality control issues associated with other *30 types of environmental sampling also apply to mold. [FN53]

Mold is normally found in a structure's air. Airborne culturable fungi and total fungal spore concentrations may be sampled in a structure's air. [FN54] The purpose of such sampling will be to determine if atypical types or concentrations/amounts [FN55] are present. [FN56] Such results may be an indication that abnormal or non-baseline amounts of mold are present.

Air sampling may be undertaken for various reasons. It might be deemed necessary if it is suspected a visual inspection missed on-site mold. This might occur if mold is in an inaccessible area of the structure. Further, an assessment of the collected spores may help determine the type of the mold present or its location. [FN57] The results of such sampling may help determine whether invasive sampling is justified.

Air sampling might also be considered if the structure has a history [FN58] of credible occupant complaints regarding indoor air quality concerns. Undertaking such sampling subsequent to a visual inspection may definitively determine whether there is (or is not) a problem. There may also be interest in sampling the air inside severely contaminated structures after remediation. It may be used to determine if mold spores are below baseline levels. *31 Such results may help determine that the remediation was successful.

Air sampling results are usually viewed with some caution. Certain molds do not become airborne unless disturbed. [FN59] Equally important, a discrete air sample is literally a snapshot of the concentration of specific spores in the air in that location at a particular point in time. In other words, the amount of mold spores suspended in the air during the course of the day can fluctuate. [FN60] Mold concentrations can also vary on a seasonal basis. [FN61] Consequently, sampling results from a particular point in time may not be representative of structure conditions.

Mold spores are naturally found in the outside environment. [FN62] Consequently, indoor air sampling results are usually evaluated in conjunction with background ambient air conditions [FN63] in the vicinity of the subject structure. [FN64] The sampling protocol would presumably need to specify that outside ambient air conditions will be simultaneously delineated. [FN65] Because the amount or concentration of mold and associated spores in the environment is constantly changing multiple samples may need to be undertaken to properly characterize the baseline measurement. The objective is to provide a reference point or baseline for comparing inside and outside conditions.

*32 The outdoor ambient air baseline and indoor conditions may be evaluated in various ways. For example, the aggregate amount or concentration of mold spores may be compared. [FN66] Likewise, the uniformity of the types [FN67] and amount of mold in the outdoor and indoor environments may be assessed. [FN68] An outdoor baseline will normally contain a mixture of various species of mold spores. There will be a qualitatively similar diversity of airborne mold spores in the indoor and outdoor air. The predominance of a particular species in an indoor sample may indicate colony growth in the structure. [FN69]

## ii. Bulk/Surface

The identification of more than deminimis [FN70] mold in a structure during the visual inspection may be a confirmation that there are potentially objectionable conditions present. However, the parties should still determine whether such a result constitutes a material issue in the context of a particular transaction. Bulk [FN71] and surface sampling would likely be undertaken to more definitively delineate impacted areas and/or the type of organisms present. [FN72] These sampling methods may be used to determine whether contamination is present on various building materials. The techniques could involve the extraction of spores, wiping or swabbing, or vacuuming.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*33** The parties involved in a transactional assessment will often respond to identified environmental conditions by cooperating in addressing the problem. Specifically, the parties to the transaction could work to eliminate both the objectionable types or amounts of mold and conditions facilitating its growth. Bulk or surface sampling may be used to determine the cost and method of remediation. It might also be used to confirm successful completion of remediation of affected areas.

**c. Remediation**

The removal of structural mold is wasted effort unless the conditions that facilitated its growth are addressed. Nevertheless, perceived problematic amounts of mold may be identified and targeted for remediation The objective in remediating mold and its spores is not to sterilize the structure. Mold is naturally found in both the indoor and outdoor environments. This makes the removal of all mold or its spores a practical impossibility. [FN73]

**(i.) Methods**

The goal of mold remediation has been described as the removal or cleaning of contaminated materials in a way that prevents the emission of fungi and dust contaminated with fungi from leaving a work area and impacting and entering an occupied area. [FN74] The remediation of some structurally sound materials may involve various cleaning methods. [FN75] The removal method may often simply include the use of detergent solutions. [FN76] Some porous materials may be contaminated to such an extent they cannot be cleaned. [FN77] The level of expertise and personnel protection **\*34** to perform remediation may vary with the size of the affected area. [FN78]

The removal of problematic concentrations of structural mold cannot be cost-effectively accomplished in some instances. The destruction of portions of a structure have sometimes been undertaken to ensure the permanent elimination of mold in a particular part of the building. [FN79] Whole structures have even apparently been destroyed in a few instances to address the presence of mold. [FN80]

**(ii.) Standards/Exposure Limits**

The vacuum of governmental benchmarks addressing mold has not been filled by standards recommended or issued by private organizations. [FN81] Some organizations have policies or recommended practices of some sort related to mold [FN82] or the conditions that facilitate their growth.

**d. Prevention**

The expense associated with the prevention of an environmental problem is typically less than the cost to correct it. Mold is no different. [FN83] The conditions necessary for growth will usually be present in a structure occupied by significant amounts of mold. Thus, the elimination or prevention of one or more of these growth conditions may better ensure the absence of abnormal types or amounts of mold in a structure. The failure to do so means growth could reoccur.

The prevention of the conditions that facilitate mold growth may be addressed to a great extent by various existing maintenance/operational practices and/or active fungal control systems. Also relevant are a number of standards/specifications **\*35** applicable to the structure and/or material/ equipment components. Maintenance/design provisions may be implemented through industry codes and/or enforceable governmental standards.

**(i.) Maintenance/Operational Practices**

Mold prevention includes the employment of proper maintenance/operational practices. Such practices are not necessarily exotic or complicated. [FN84] They may encompass fairly simple practices or equipment such as: (i) operation of the HVAC system the appropriate amount of time and within a certain temperature range; [FN85] (ii) cleaning and maintenance of HVAC systems; [FN86] (iii) use and maintenance of adequate ventilation in homes and other structures; [FN87] and (iv) inspection and maintenance of the components of the structure envelope.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### (ii.) Building/Equipment/Material Specifications

Better adherence to relevant building, equipment and material standards is increasingly viewed as important in the prevention of objectionable mold growth. [FN88] The standards may be a part of industry recommended practices or local [FN89] or state controls.

The interest in mold growth and the indoor environment has been reflected in some recent building, equipment and material standards. These standards have ranged from the optimum method for integration of windows/doors into the structure [FN90] to the improvement of building materials such as gypsum [FN91] and drywall. [FN92] There is also interest in HVAC and related equipment. [FN93] These standards may be driven to some extent by research into the *36 environmental conditions inside a structure and methods or practices to improve it. [FN94]

### (iii.) Active Systems

Eliminating both growth conditions and objectionable mold colonies are the primary means of addressing the aggregate effect of the organisms. [FN95] However, active systems have also been developed to address mold and other indoor air pollutants. A relatively recent example is the employment of ultraviolet light fixtures to reduce fungal contamination in air handling units. [FN96]

Not all active systems are of recent vintage. Some systems have been used for years. For example, air filtration systems have to some extent addressed indoor air quality. [FN97] These might include electronic air cleaners used to remove airborne particles and collect them on electronically grounded plates. [FN98] This supposed disinterest has been stated to be derived from confusion concerning filtration performance, absence of clear filter test standards, and a failure to consider the life cycle costs of filtration. However, the role of filtration may increase as new techniques become available. [FN99]

### B. Current/Proposed Governmental Programs/Requirements

Governmental standards can play an important role in the allocation of the risks or responsibilities associated with potential environmental concerns in a given transaction. Federal, state and/or local [FN100] environmental regulations or requirements are often cited or incorporated by reference in transactional *37 documents. The standards may be placed in or referenced by certain warranties, covenants, indemnities, and other provisions used in transactional documents to address environmental issues. [FN101] They may be used to delineate whether a warrant/covenants has been violated or an indemnity is applicable. [FN102]

Neither the federal nor the state governments have developed mandatory standards applicable to the presence of mold in structures. Instead, the governmental efforts have focused on research and guidance, although unsuccessful steps were taken in 2002 to enact federal mold legislation. However, legislative activity focused on mold in various states has arguably heightened interest in the issue.

### 1. Federal

Legislation was introduced in the 107th Congress that would have focused the federal government on mold issues for the first time. The Toxic Mold Safety and Protection Act of 2002 ("Act") [FN103] would have tasked certain federal agencies with conducting research on the impact of mold on human health. It would have also required the development of guidelines for the investigation and remediation of mold.

The Act is language directed the Centers for Disease Control ("CDC"), EPA, and National Institute of Health ("NIH") to perform a comprehensive study of the health effects of indoor mold. [FN104] The EPA would then set standards in accordance with the studies. [FN105] They would include standards for mold inspection and remediation, certification of mold inspectors and remediators, and for air ventilation and/or air-conditioning systems. [FN106] The Department of Housing and Urban Development ("HUD") would have then been required to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

establish guidelines identifying construction conditions that contribute to indoor mold growth and recommend means for eliminating these conditions. [FN107]

The Act would have imposed specific obligations on certain property owners. Owners of rental property would be required to perform *38 annual inspections in accordance with set standards and to notify the occupants of the property of the inspection results. [FN108] The Secretary of HUD and the Administrator of EPA would then have been directed to promulgate regulations for the disclosure of mold hazards in housing which is offered for sale or lease. [FN109] These regulations would require that a house be inspected for mold before it is sold or leased and that the results of the inspection be clearly and accurately disclosed to the purchaser or lessee. [FN110]

Inspection requirements for public housing were also established by the Act. [FN111] HUD would have been required to promulgate procedures to eliminate the hazards of indoor mold in existing public housing. [FN112] The agency was also charged by the Act with setting and imposing standards ensuring new public housing is built in compliance with the standards set forth in the Act. [FN113]

The Act would have further imposed new obligations on federal agencies that provide financial assistance for residential properties by requiring the performance of an indoor/toxic mold inspection prior to any federal agency making, insuring or guaranteeing a mortgage or loan for residential properties. [FN114] It included an amendment to the National Cooperative Research and Production Act of 1993. [FN115] Also addressed were standards for building products designed to retard the development of mold. [FN116] EPA was directed to provide grants to State and local governments to cover the costs of remediating mold growth in government buildings. [FN117]

The Federal Emergency Management Agency ("FEMA") was required by the Act to establish and carry out a national toxic mold insurance program. [FN118] Residential properties designed for one to four families must be given priority in the program. [FN119] The agency was also *39 required to establish a National Toxic Mold Hazard Insurance Fund in the United States Treasury. [FN120]

Some aspects of this proposed federal legislation have been criticized. There has been a particular concern about the provision requiring the establishment of minimum levels of exposure to mold. The opponents argued that additional research is needed to address the scientific uncertainties associated with the health effects of mold. [FN121] The challenge of setting standards that take into account individual sensitivities to mold has been cited as a practical impediment to this requirement. [FN122]

## 2. State

California became the first state to enact comprehensive mold legislation when the Toxic Mold Protection Act was signed into law in October 2001. The California legislation required the Department of Health Services to form a task force to aid [FN123] it in creating statewide mold standards. The task force must research and develop permissible mold exposure levels. The California law also requires that property owners disclose the known presence of mold to potential or current residents if the mold is in excess of the standards that are eventually developed. The state enacted a second law requiring the California Department of Health to develop programs for the education and training of mold-related issues.

Several other states have considered or enacted toxic mold legislation, including Indiana, New York, Maryland, [FN124] and New Jersey. [FN125] Legislation considered by Indiana provides an example of a state's efforts to address mold in a less comprehensive [FN126] manner than California. The legislation would have directed the state's Department of Health to convene a task force to advise it on the development of toxic mold standards. [FN127] It also directed the department to develop recommendations for indoor mold exposure limits. [FN128] The facilities for *40 which exposure limits would be established include hospitals, nursing homes, child care facilities, and elementary and high schools. [FN129]

## C. Confidentiality/Ethics Issues

Some owners, operators or managers will undertake internal audits or assessments of their structures to identify and/or quantify mold issues. If so, they may have an interest in maintaining the confidentiality of the results. This

13882 NBI-CLE 19                                                                                    Page 9
13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

has been a concern for years of parties performing internal environmental assessments. Companies performing environmental audits [FN130] or assessments have recognized that undertaking these activities can pose certain risks.

One of the key concerns is that audits are by design intended to assess a facility's compliance status with respect to relevant federal and/or state environmental regulatory programs. In other words, their objective is to identify potential violations. Many companies and facilities fear that the audit results might be disclosed [FN131] or acquired by governmental agencies or other parties. [FN132]

The general absence of governmental regulatory requirements applicable to mold probably minimizes this particular auditing risk. Instead, the principal concern will likely be the need to protect such results and/or supporting documents from potential litigants in subsequent common law actions alleging damages. The attorney/client, work-product and/or self-evaluation privileges may only have limited usefulness in maintaining the confidentiality of audit or assessment documents. [FN133]

**1. Attorney-Client Privilege**

Arkansas Rule of Evidence 502(b) states "a client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself . . . and his lawyer." The Arkansas Supreme Court has stated that the purpose of the privilege is "to secure subjective freedom of mind for the client in seeking legal advice." [FN134]

*41 No Arkansas case has examined the applicability of the attorney-client privilege to an environmental audit or self-assessment for mold. Other jurisdictions addressing the question apply the formalities of the privilege rather strictly. In In re Grand Jury Matter, [FN135] a Pennsylvania District Court was faced with the question of whether a party could lawfully assert the attorney-client privilege and ignore a subpoena requesting waste handling records. The defendant in the matter claimed that the subpoena should be quashed because their attorney had hired a consultant to aid in compliance assurance. The court rejected this contention, instead finding that the communications must concern legal advice and could not be merely in the realm of consulting services. Instrumental in the decision was a finding that the consultant was working more directly for the company than the attorney. [FN136]

More recently, a New York District Court further restricted the application of the attorney-client privilege in the environmental context. In United States Postal Service v. Phelps Dodge Refining Corp., [FN137] the court refused to allow a company to invoke the attorney-client privilege with respect to documents created by an engineering firm hired to do environmental studies.

Several courts have found the attorney-client privilege to exist for documents created by an environmental consultant. In Arizona ex rel. Corbin v. Ybarra, [FN138] a corporate attorney retained a consultant to investigate possible violations of the state Hazardous Waste Management Act. The court found that under these circumstances, the consultant was part of the attorney's investigative staff and the report prepared following the investigation was for internal use and subject to the attorney-client privilege. Also, in Olen Properties Corp. v. Sheldahl, Inc., [FN139] a court determined an environmental audit was prepared so as to obtain legal advice and was therefore protected by the attorney-client privilege. [FN140]

**\*42 2. Self-Critical Analysis Privilege**

A few jurisdictions have found that confidentiality is provided by a "self-critical analysis" privilege. In Reichhold Chemicals, Inc. v. Textron, Inc., [FN141] a Florida District court found that a self-critical analysis privilege existed for environmental audits unless the party opposing the privilege could show extraordinary circumstances or need. A federal district court in Georgia applying the state's common law found that documents or files prepared by a company to evaluate its compliance with environmental laws were encompassed by a self-critical analysis privilege. [FN142] The court in United States v. Dexter [FN143] found that this privilege would obstruct enforcement and disallowed its use.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Even jurisdictions that recognize the privilege significantly restrict its applicability. Further, a federal district court in Arkansas has stated that the Eighth Circuit Court of Appeals does not recognize the self-critical analysis privilege. [FN144] The court noted that the audit contained the only information about the facility's releases and patterns/practices. [FN145] The court held that access to the data was necessary to assess a continuing risk from those releases to plaintiffs and the public. [FN146]

**3. Work-Product Privilege**

The attorney work-product exception provides slightly different protection than the attorney-client privilege. The Arkansas Supreme Court has stated that "[w]ork product is not the same as a privilege that protects the sanctity of confidential communications; the attorney-client privilege and the work-product rule the principles upon which they are based, while susceptible to confusion, are separate and distinct." [FN147] The federal rule governing attorney work-product states:

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for a *43 trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. [FN148]

Issues frequently arise as to what is "in anticipation of litigation." [FN149] The work-product rule might not provide protection for audits that are prepared for compliance assurance and not in contemplation of imminent litigation.

The perceived inadequacies or practical problems related to the use of the three common law doctrines triggered an effort several years ago to enact statutory privileges to better ensure the maintenance of the confidentiality of environmental audits. Specifically, many states developed statutory privileges for environmental compliance audits. [FN150] The state statutes use terms such as "environmental audit" to define the protected activities. Such terms arguably encompass voluntary efforts to address indoor environmental issues and protect public health. As a result, the mold assessment activities would seem to fit within the scope of these programs' protections.

An Arkansas statute provides an example. The state allows a facility [FN151] to conduct a voluntary "environmental audit" report which is privileged, if the statutory provisions are followed. The "environmental audit report" is the set of documents developed as a result of the audit. [FN152] Providing the audit to a purchaser or lender does not void the privilege. [FN153]

**D. Insurance**

Many potential structural liabilities are addressed through the procurement of insurance. The types of policies used to cover these risks will vary with the party seeking coverage. A building manager or lessor may need a policy that *44 addresses operational risks. The lender may have a different perspective. It may use insurance to cover known or unknown risks related to the mortgaged property. Likewise, the architect or contractor may have to cover the exposure uniquely associated with their services. The different parties' need for coverage of mold risks will similarly vary.

The usefulness of an insurance policy is dependent upon the scope of the coverage, breadth of exclusions, and cost. Parties to transactions involving the transfer of structures will often consider whether insurance can satisfy any or all of the allocated risks. The initial question will be whether standard liability or casualty policies provide needed coverage to address the liabilities associated with mold. [FN154] If not, endorsements addressing mold or more specialized policies that cover these specific risks or conditions may need to be considered. [FN155]

**1. Standard Policies**

**a. Coverage Issues**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The liability exposure associated with structural mold has generated interest in what coverage (if any) is provided by general liability or casualty policies. [FN156] The coverage provided varies [FN157] as a function of policy language. [FN158] However, the courts have been increasingly asked to determine whether different policy provisions encompass mold. [FN159] The answer to the coverage question depends upon the answer to two underlying questions: (1) Did the mold result from a covered peril? and (2) Is there express exclusionary language that even if it did result from a covered peril? [FN160] Such issues are highlighted by a sampling of several recent decisions.

### (i.) Mold as a "Loss" and a "Cause of Loss"

The Arizona Court of Appeals in Liristis v. American Family Mutual Ins. Co. found that an insurer was not entitled to summary judgment on the issue of mold *45 coverage. [FN161] The plaintiffs insureds filed a claim for water damage that occurred after their roof was damaged by fire [FN162] and also had their home tested for mold. [FN163] Mold was present, and their claim for "contamination caused by mold" was denied by their insurer. [FN164]

The relevant policy language stated, "[w]e do not cover loss to the property...resulting directly or indirectly from or caused by one or more of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss." [FN165] The list that followed labeled "Other Causes of Loss" included mold, presumably excluding mold damage. [FN166] The court interpreted the language to mean that mold could be both a loss and a cause of a loss. [FN167] Finding that the mold in plaintiffs' home was the actual loss, the court then held that "mold damage caused by a covered event is covered under the American Family policy in this case." [FN168] The court went on to note that a loss that was merely caused by mold would have been excluded. [FN169]

### (ii.) Occurrence Based Coverage

Liberty Mutual Fire Ins. Co. v. Ravannack [FN170] presented a Louisiana federal district court with a question of policy interpretation in a mold-related injury case. [FN171] The insureds filed a complaint against several defendants, including their homebuilder, a subcontractor who did plaster work, those companies' insurers, and their own insurer to recover money for damages and injuries due to alleged defective construction resulting in structural damage and wood decay. [FN172] Because of the decay, *46 plaintiffs claimed that mold developed to which the Ravannack's children were continuously exposed. [FN173]

When suit was filed, GAINSCO, the subcontractor's insurer filed a motion for summary judgment claiming that it did not provide coverage at the time the Ravannacks' injuries occurred. [FN174] The subcontractor's Commercial General Liability ("CGL") policy provided coverage for bodily injury or property damage to which the insurance policy applied. [FN175] The policy stated: "This insurance applies to 'bodily injury' or 'property damage' only if (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' and (2) the 'bodily injury' or 'property damage' occurs during the policy period." [FN176] "Occurrence" was defined by the policy as "'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" [FN177]

Therefore, the motion for summary judgment, and the question of coverage, hinged on the timing of the occurrence of the injury. [FN178] The court determined that the policy's definition of "occurrence" encompassed coverage during the time the GAINSCO policy was in effect under the clear meaning of the contract. [FN179] Because there was a possibility for coverage under the GAINSCO policy, the court denied its motion for summary judgment and allowed the case to go to trial. [FN180]

In Allstate v. Hicks, [FN181] the Texas Court of Appeals reached a somewhat different determination. In Allstate, the owners of a home sued the former owner claiming *47 property damage and personal injury resulting from exposure to mold, which they alleged had developed in the house as a result of defects in the plumbing. [FN182] The former owner "tendered defense of the claims against him to Allstate under the

liability coverage of his homeowners insurance policy in effect at the time of his sale of the house" to the plaintiffs." [FN183] Allstate subsequently denied that the policy covered the plaintiffs claims [FN184] and additionally, that the plaintiffs "did not allege bodily injury or property damage caused by an occurrence." [FN185]

The Allstate policy in question defined an "occurrence" as "an accident, including exposure to conditions, which results in bodily injury or property damage during the policy period." [FN186] The court stated that "if a petition does not allege facts within the scope of coverage, an insurer under a liability policy is not required to defend a suit against its insured." [FN187] The court then rejected the defendants argument that the plaintiffs "could have been exposed to mold during the policy period." [FN188] The court explained this determination by stating "we do not read the Duddings' petition as alleging that they were exposed to mold during the policy period." [FN189]

The court found this even though the petition neither alleged when the plaintiffs were exposed to the mold nor when the injuries from the mold manifested themselves, [FN190] and it was entirely possible that the plaintiffs were exposed to the mold during the policy period. Therefore, Allstates motion seeking a judicial declaration that it owed it insured neither a duty to defend nor a duty to *48 indemnify him with respect to the plaintiffs' mold claims was granted by the appeals court. [FN191]

**(iii.) Notice Requirements**

Depending on the language incorporated in an insurance policy, it may be imperative to provide "prompt" notice to the insurer after a loss has been discovered. [FN192] Whether notice is "prompt" is generally a question of fact, evaluated under a standard of reasonableness. [FN193] Notice of a mold claim may, however, be considered unreasonable as a matter of law if the facts of the case are undisputed and the notice is somehow delayed and not excused. [FN194]

Notice must be given after mold damage becomes "manifest" or "apparent." [FN195] Apparent does not necessarily mean discovered; "just because something is unknown to an individual does not render it, in an objective sense, unapparent." [FN196] Generally, "the date of occurrence is when the damage is capable of being easily perceived, recognized, and understood." [FN197] But, "an insured cannot fail to discover an obvious defect through sheer indolence...and later decree such defect apparent on the date it was discovered." [FN198]

Failure to give notice of manifest mold damage for over a year was unreasonable, and would serve as a bar to coverage. [FN199] Additionally, where manifestation of damages occurs prior to inception of contracts for property insurance, coverage is barred. [FN200]

Leverence v. U.S. Fidelity & Guaranty, [FN201] another homeowner case, produced an outcome similar to Ravannack. Almost 800 occupants who lived in pre-*49 manufactured homes sought damages from the manufacturer, Tri-State Homes, Inc. (Tri-State) and its insurers for "bodily injuries and for the cost of repairs required due to their bodily injuries or illnesses." [FN202]

Plaintiffs alleged that the excessive moisture in their homes was due to defective design and faulty construction practices. [FN203] The Tri-State's CGL policy required it to give notice of an "occurrence" "as soon as practicable." [FN204] As in most CGL policies, "occurrence" was defined as "an accident or happening or event or continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage...during the policy period." [FN205] The court held that because the occupants did not connect their health problems with the excessive humidity, Tri-State was not on notice and thus could not give notice to its insurers for potential claims. [FN206] That being so, summary judgment for the insurer as to the notice-of-the-occurrence requirement was denied. [FN207]

The homeowners also claimed property damage due to repairs necessary to cure health problems. Although their claim was denied, they were not completely precluded from recovery. [FN208] Their Home Insurance policy contained a pollution exclusion that stated the policy did not apply to: "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water *50 course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental." [FN209] The court concluded that the growth of mold was undisputedly "unexpected and unintended," fitting into the "sudden or accidental" language of the policy, and denied summary judgment for the insurers. [FN210]

**(iv.) Covered Perils**

In Blaine Construction Corporation v. Insurance Company of North America, plaintiff construction company used an exception to the faulty workmanship exclusion in its builder's all-risk property damage policy to establish a claim. That exception provided coverage for damage or loss "ensuing" from an insured peril. No coverage, however, would be provided for costs incurred from correcting faulty workmanship itself. [FN211]

The policy at issue contained three clauses of interest. First, the "perils insured against" clause stated, "'[t]his policy insures against ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE to property insured including general coverage...except as excluded.'" [FN212] Next, the Perils Excluded section provided: "[t]his policy does not insure loss or damage caused directly or indirectly by any Peril excluded. Such loss or damage is excluded whether contributed to, in whole or in part, by any excluded Peril." [FN213] Finally, the policy excluded twenty named perils including "...faulty workmanship or faulty materials, unless loss or damage from an insured Peril ensues and *51 then only for such ensuing loss or damage." [FN214] Plaintiffs' policy, however, did not contain a general water damage exclusion. [FN215]

When the insulation's vapor barrier began to accumulate condensation, forming mold, the building owner determined that Blaine would have to remove the water-soaked insulation. [FN216] The cost to Blaine was allegedly $315,000. [FN217] Defendant denied his claim. [FN218] The trial court held that the exclusionary clause in plaintiff's policy unambiguously precluded its recovery and granted summary judgment for the defendant. [FN219] Upon de novo review, the Sixth Circuit court reversed holding the faulty workmanship exclusion did not bar plaintiff from recovery since water, a covered peril, is what caused the damage and that was the reason plaintiff sought indemnity. [FN220]

In Shelter Mutual Ins. Co. v. Maples, [FN221] the Eighth Circuit remanded to the district court the issue of whether a frozen pipe, a covered peril, was the "dominant and efficient cause" of the claimed loss. [FN222] In Maples, a broken pipe filled the insured's basement with four to six inches of water. [FN223] The water caused only minimal structural damage, but the resulting humidity caused mold to form on the interior surfaces of the home. [FN224] The mold made the home uninhabitable and necessitated its demolition. [FN225] The policy clearly excluded losses resulting from mold. [FN226] The Eighth Circuit instructed the district court to make further findings of fact to determine if the excluded peril (mold) or the covered peril (frozen pipe) was the dominant cause of the loss. [FN227]

*52 In some states, such as Arizona, an insurer can effectively exclude losses resulting from concurrent or sequential causes by including a "concurrent causation lead-in clause." [FN228] Arizona law recognizes these clauses because Arizona does not recognize the "efficient proximate cause" rule. [FN229] The efficient proximate cause rule dictates that an insurer must cover a loss when a covered peril is the proximate cause of the loss even if subsequent or concurrent events are specifically excluded from coverage. [FN230] An Arizona insurer can exclude coverage for mold damage resulting from a plumbing leak by including a concurrent causation clause. [FN231]

In states that do recognize the efficient proximate cause rule, insurers can only avoid paying a claim if the efficient proximate cause of the loss is an excluded peril. [FN232] If the predominant cause of the loss is a covered peril, the loss is covered even though other independent forces in the chain of events are excluded from coverage. [FN233] The determination of the efficient proximate cause of loss is a question of fact for the factfinder. [FN234]

Texas courts recognize the doctrine of concurrent causes. [FN235] That doctrine provides that when covered and excluded perils combine to cause a loss, the insured may recover only for the portion of the loss caused by the covered peril. [FN236] The burden of demonstrating the damage caused solely by the covered peril is on the insured. [FN237] In Fiess v. State Farm Lloyds, [FN238] Plaintiffs failed to meet the

burden of segregating the damages caused by pre-existing *53 water leaks (covered peril) and mold growth (excluded peril). [FN239]

**(v.) Ensuing Loss**

The insured in Fiess argued that the ensuing loss clause in the State Farm policy should cover the mold resulting from the leaking pipes. [FN240] The relevant portions of the insurance policy in that case stated, "We [State Farm] do not cover loss caused by: rust, rot, mold, or other fungi." [FN241] The ensuing loss provision provided, "We do cover ensuing loss caused by collapse of building or any part of the building, water damage or breakage of glass which is part of the building if the loss would otherwise be covered under the policy." [FN242]

The Fiesses argued that the mold damage was an ensuing loss from the covered peril of water damage. [FN243] According to the court, however, the Fiesses interpretation of their insurance policy "reverse[d] the causation required by that exception." [FN244] The court held that the ensuing loss clause provides coverage for covered perils resulting from excluded perils. [FN245] According to the Fiess court, the insured is only covered for water damage resulting from mold, not vice-versa as Plaintiffs contended. [FN246] The court held that State Farm could deny coverage for the mold damage. [FN247]

One Texas court has reached the opposite conclusion regarding coverage for mold damage under ensuing loss clauses. In Home Ins. Co. v. McClain, [FN248] the Court of Appeals of Texas analyzed an insurance policy with terms almost identical to those in Fiess. [FN249] Home *54 Insurance argued that the ensuing loss provision in the insured's policy covered only water damage resulting from mold or fungus damage. [FN250] The court disagreed and wrote in an unpublished opinion that the mold damage was a consequence of water leakage, and was therefore covered under the ensuing loss provision of the insured's policy. [FN251]

Additionally, in Flores v. Allstate Tex. Lloyd's Co., [FN252] a Federal District Court from the same district as Fiess expressly declined to follow the holding of the Fiess court. [FN253] In a footnote, the court in Flores stated: "[t]his court declines to follow the reasoning of Fiess v. State Farm Lloyds, in which the court concluded that the Texas HO-B policies exclude mold damage completely, regardless of the cause, and that mold coverage is also not included under the "ensuing loss" provision when it is caused by water damage." [FN254] The court in Flores held: "mold damage to the dwelling is covered as a distinct loss if it ensues from an otherwise covered loss under the policy." [FN255]

**(vi.) Pollution Exclusions**

Prior to 1985, most insurance contracts contained "qualified pollution exclusions." That year, however, many insurers replaced the qualified pollution exclusion with the "absolute" or "total" pollution exclusion. [FN256] The total pollution exclusion has sparked controversy and in many cases, led to inconsistent results.

Many courts have pronounced the exclusion unambiguous and applied it broadly, even to incidents that are not classic environmental pollution. [FN257] Other courts *55 have found the clause to be ambiguous as applied to personal injury claims arising out of a more direct contract with a substance that may fall into the exclusions broad definition of "pollutant." [FN258]

Courts following the latter approach have done so for a variety of reasons: because terms such as "dispersal," "discharge," "irritant," or "contaminant" are terms of art in environmental law; [FN259] because the general purpose of the clause is to shield insurers from the costs of environmental cleanups; [FN260] or because a literal reading of the provision could yield absurd results, thus requiring the application of a limiting principle. [FN261]

The absolute or total pollution exclusions do not include much of the language previously utilized in the qualified pollution exclusions. For example, the total pollution exclusion does not include the clause "into or upon the land, the atmosphere or any water course or body of water." This has generated yet another controversy over whether the deletion of this language makes a difference. Some courts have held that the omission expands the scope of the exclusion beyond classic environmental pollution. [FN262] Others have rejected the distinction, concluding it

does not alter the scope of the clause. [FN263]

In Lexington Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd., [FN264] a Texas court addressed the issue of whether an insurer was liable for mold damage to first and second floor apartments that was caused by leaks in the roof despite the pollution exclusion in the insured's policy. [FN265] The policy at issue provided that the policy did not cover "loss or damage *56 caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy." [FN266] Pollutants, in brief, included liquids, among other things, which once released, "can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, fungi, virus...." [FN267]

The court held that the pollution exclusion effectively excluded fungi in its list of contaminants. [FN268] Because the policy was constructed to exclude damage "that is not only 'caused' but that is 'contributed to or made worse by' any of the defined contaminants or pollutants," the court found the insurer was not liable for damages due to the mold. [FN269]

In 2003 a Louisiana court reached the opposite conclusion. The plaintiff in State Farm Fire and Casualty v. M.L.T. Construction Co. [FN270] worked as a legal secretary in the HH&K building in New Orleans. [FN271] The owner of that building hired a contractor and architect to re-roof the building. [FN272] During the construction, the roof leaked on a number of occasions. [FN273] The rainfall lead to the growth of mold and mildew in the building. [FN274] The plaintiff claimed that the building's mold and mildew aggravated her allergies and asthma. [FN275] She sued a number of defendants, *57 including State Farm. [FN276] State Farm argued that the insurance policy it provided the contractor contained a total pollution exclusion that allowed State Farm to deny coverage for plaintiff's injuries. [FN277]

The pollution exclusion stated, "This insurance does not apply to: 'Bodily injury' or 'property damage' which would not have occurred in whole or in part but for the actual . . . discharge, . . . seepage, . . . or escape of pollutants." [FN278] The exclusion defined pollutants as "any solid, liquid, gaseous, or thermal irritant or contaminant." [FN279]

The Louisiana court utilized a multi-factor test to conclude that coverage for the plaintiff's claims was not excluded by the total pollution exclusion. [FN280] The court held that rainwater and the resulting mold did not fall within the definition of pollution in the State Farm policy. [FN281] The court explained, "[T]he clear purposes of the pollution exclusion clauses are to prevent businesses from escaping responsibility for polluting behavior by procuring insurance to cover such losses and further to encourage businesses to curb polluting activities." [FN282]

In 1990 the Wisconsin Court of Appeals used a different approach, but reached the same conclusion. The insurance companies in Leverence v. U.S. Fid. & Guar. [FN283] argued that the policies' pollution exclusion clauses excluded coverage for mold growth in negligently built homes. [FN284] The exclusion, however, stated, "this exclusion does not apply if such discharge, dispersal, release or *58 escape [of contaminants, pollutants, etc] is sudden or accidental." [FN285]

The court held that "the phrase 'sudden and accidental' means unexpected and unintended." [FN286] The parties did not dispute that the growth of the mold was unexpected and unintended. [FN287] The court, therefore, concluded that the pollution exclusion was inapplicable to the mold claims. [FN288]

## E. Claims Against Insurers

The discovery of mold has generated significant breach of contract litigation. However, insurers' adjustment or handling of the insured mold problem has also been a source of conflict. These conflicts have sometime resulted in bodily injury claims against the insurer. Policy holders sue insurance companies for breach of contract. In Strader v. Grange Mutual Ins. Co., [FN289] for example, the policy holders argued that the insurance company breached its duty to the insured by causing unreasonable delays in repairing a leaking roof, and for failing to correct an existing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moisture problem. [FN290] The insured argued that the insurer's breach of duty resulted in the mold growth that caused an aggravation of the insured's asthma. [FN291] The Strader court held that a tort claim will not lie against an insurer unless the insurer "violated some standard of care that is not part of the defendant's explicit or implied contractual obligations; and . . . that the independent standard of care stems from a particular special relationship between the parties." [FN292] The Oregon court held that the insurer's delayed payment or nonpayment for roof repair and mold damage were breaches of the insurance contract, but did not give rise to a standard of care independent of the contract terms. [FN293]

There are some instances in which bad faith and punitive damage assertions may be made against an insurer. In Anderson v. Allstate Ins. Co., [FN294] Thomas Anderson sued Allstate in a diversity action for breach of the implied *59 covenant of good faith and fair dealing. The claims arose out of Allstate's insurance of Anderson's residence. [FN295] The jury at the trial found that, "Allstate acted maliciously and oppressively in not fully compensating for repairs, particularly including elimination of mold, after a water pipe broke in Anderson's home." [FN296]

In Anderson, a pipe had broken in the attic of Anderson's home causing extensive water, mold, and mildew damage. [FN297] In the process of investigating the claim, Allstate's adjuster reported inconsistencies in the damage reports and repair evaluations, and subsequently referred the claim to Allstate's Special Investigations Unit ("SIU"). [FN298] Throughout the process Allstate maintained that coverage was questionable because of their belief that no one was living in the house at the time of the leak, and that the heat had not been on. [FN299] Allstate failed to resolve these matters and, at first, "undertook to repair in accordance with estimates supplied by Anderson and their adjuster." [FN300] However, in its first offer to Anderson, Allstate included a warning that it would take the money back if it determined that there was no coverage. [FN301] Additionally, "[m]uch later, when more extensive mold damage was discovered, an Allstate adjuster named Hirsch rejected Anderson's offers of evidence of additional required repairs, saying that Anderson had been offered all he was going to get." [FN302]

In affirming the finding of bad faith and the compensatory damage award, the 9th Circuit Court of Appeals stated: "[t]he jury could properly find that Allstate breached its duty of good faith and fair dealing by acting unreasonably when handling Anderson's claim." [FN303] However, the 9th Circuit reversed the punitive damage award stating that "[a] finding of bad faith does not automatically entitle a plaintiff to punitive damages." [FN304] The court found that for punitive damages to be awarded, "[t]he conduct must be such that it could be described as evil, criminal, recklessly indifferent to the rights of the insured, or having a vexatious intention to injure." [FN305]

*60 Determining whether mold is covered under a particular insurance policy is important, but it is also important for insurance companies to remember to exercise good faith in doing so. If the behavior exhibited is egregious enough, the insured could recover not only compensatory damages, but punitive damages as well.

**1. Arkansas and the Total Pollution Exclusion**

Arkansas' appellate courts have not been faced with the issue of whether mold damage is excluded under a total pollution exclusion. The Arkansas Supreme Court has, however, interpreted a total pollution exclusion in another context. In Minerva Enterprises, Inc. v. Bituminous Casualty Corp., [FN306] a tenant in Minerva's mobile home park successfully sued Minerva after the park's septic system backed up into the tenant's mobile home. [FN307] Minerva filed suit against its insurer, Bituminous, for its failure to defend and indemnify Minerva. [FN308] Bituminous argued that the pollution exclusion in Minerva's liability policy allowed Bituminous to deny coverage for the sewage back-up. [FN309]

The supreme court determined that the issue before it was the definition of the word "pollutants," as used in the policy exclusion. [FN310] The exclusion defined pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

The court determined that the exclusion "is intended to prevent persistent polluters from getting insurance coverage for general polluting activities . . . and was never intended to cover those who are not active polluters but merely had caused isolated damage by something that could otherwise be classified as a 'contaminant' or 'waste.'"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN311]

The court stated that it was not clear from the language of the policy whether a single back-up of a septic tank is necessarily the kind of *61 damage the clause was intended to exclude. The court held that the pollution exclusion was "at least ambiguous" and therefore did not exclude coverage for the sewage back-up. [FN312]

**2. Exposure Via Employment**

An Arkansas case demonstrates that insurers are not alone in liability suits. More frequently, general con-tractors, engineers, architects, homebuilders [FN313] and schools [FN314] are being sued. [FN315] In Crossett School Dist. v. Gourley, [FN316] the Arkansas Court of Appeals heard a case brought by a teacher against her employer school district. [FN317] A new heating and air-conditioning system was installed in Gourley's classroom in the summer of 1989. [FN318] Leaks in the system caused mold to develop which irritated the teacher's pre-existing allergies. [FN319]

In her claim brought before the Workers' Compensation Commission, Gourley was compensated for the occupational disease she developed from exposure to mold. [FN320] The school district argued on appeal that appellee had not proven that her employment increased the risk of developing the occupational disease she contracted. [FN321] The Arkansas Court of Appeals found otherwise, holding that even though the exposure to mold was not particular to the occupation of a teacher, in this case, it was apparent that her exposure to mold was due to her employment, thus increasing her risk. [FN322]

**3. Policy Cancellations/Exclusions**

Some property and casualty policies provide coverage for certain mold-related risks. However, various insurance lines have paid significant mold-related claims over the past few years. [FN323] These claims have often involved residential or commercial structures.

A number of insurance companies have responded to the increase in claims by refusing to issue new policies or canceling existing ones. [FN324] The carriers have also amended certain policies to specifically exclude or *62 narrow coverage for various mold risks. [FN325] This is often accomplished by precluding coverage for naturally occurring or uncovered events. [FN326]

Mold has forced both state insurance commissioners and legislatures to address insurance policy cancellations and related issues. The states' efforts have included attempting to preserve the ability of homeowners in some states to obtain policies for their homes. [FN327] They have also set parameters for insurance companies proposing to modify their policies to exclude certain mold risks or otherwise narrow coverage. [FN328]

Even if coverage for mold is available, the cost of the policy premiums is likely to rise. [FN329] The residential market has experienced mold related premium increases in some states. [FN330] Premiums may in some instances vary because of a characteristic of the structure. [FN331] Substantial increases would obviously potentially impact the profitability of residential, commercial and other rental properties.

**4. Mold Endorsements/Environmental Impairment Liability Insurance Policies**

The exclusion of various mold risks from an insured's liability and casualty policy means it will have to determine whether coverage is available from another source. [FN332] Parties seeking coverage might determine if a standard liability or casualty carrier is willing to insert an endorsement into the policy to address mold-related damages. In the alternative, they might seek separate specialty policy coverage. The relevant policies may include environmental impairment liability ("EIL") insurance policies amended to cover mold, or a policy solely focused on mold-related risks. This coverage would presumably be obtained if the risk warrants the additional financial outlay.

EIL policies will typically provide coverage for on-site/off-site remediation and common law bodily injury/property damage claims related to pollution conditions. [FN333] Common types of policies include *63 Cleanup Cost Cap, Pollution Liability, and Secured Creditor. [FN334] They are often used to provide the parties

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

greater certainty in quantifying and allocating environmental risks in contaminated real property transactions. Various versions of these policies may be substituted in some instances for a transactional assessment [FN335] or an indemnity [FN336] that would otherwise be required to address a potential environmental risk. [FN337]

The process for issuing an EIL policy differs from the general casualty and liability policies in a key respect. The casualty and liability policies are issued by most companies using similar formats and terms. In contrast, ELI policy terms are not uniform. The terms may vary by transaction and company. [FN338] The final policy terms are often the result of negotiation between the insurance company and insured. [FN339] The policies may be crafted to address the needs of a particular project. [FN340]

The potential applicability of EIL policies to mold should be considered. However, mold exclusions [FN341] have been placed in some of these policies. [FN342] This has been accomplished by a specific reference to the organisms or more generalized exclusion. [FN343] Further, coverage may be limited to contaminants whose presence constitutes non-compliance with environment laws and/or is in excess of background/natural conditions.

Some insurance companies may be willing to expand these policies to cover mold liabilities. [FN344] The removal of the exclusion may require additional underwriting [FN345] and a premium. If so, unlike more standardized, general comprehensive liability policies, companies issuing pollution liability or environmental impairment policies are generally willing to negotiate these terms. [FN346] The policy might be revised to include this risk by addition of terms such as mold or fungus to the definition of "pollutant".

**F. Mold as a Potential Material Transactional Issue**

**1. Transactional Impairments**

**\*64 (i.) Liability Exposure**

Mold has generated litigation in a variety of contexts. The potential defendants have include a variety of parties that had or have some relationship with an affected structure. The subject areas have involved products liability, bodily injury, [FN347] property damage, safe workplace, [FN348] workers compensation, [FN349] construction/design defects, [FN350] lessor-lessee and insurance coverage. [FN351]

**(ii.) Structure Value**

Environmental issues may affect the value of improved real properties. A few problematic materials or conditions are found inside structures. [FN352] Examples include lead-based paint [FN353] and asbestos. [FN354]

Similarly, the presence of mold in a structure or building could presumably reduce its monetary value in some circumstances. [FN355] The valuation of a structure materially affected by an indoor contaminant can be a challenging calculation. [FN356] The market might discount the value of the structure based on the cost to remove the mold, [FN357] projected effect on rental [FN358]/occupancy [FN359] rates, [FN360] and perceived third-party common law property damage and/or bodily injury liability exposure [FN361]

The identification or quantification of a particular environmental issue or contaminant may be beyond the scope of an appraisal of the value of the structure. The appraiser may disclaim responsibility for identifying or costing certain environmental issues. [FN362] Instead, the appraisal may simply attempt to evaluate the impact of such costs on the value of a structure. [FN363]

The appraisal of structures with potential material amounts of mold will presumably be equally challenging. An author \*65 commenting on the role of indoor air pollutants in the structure valuation process noted:

When a commercial building suffers from SBS, [FN364] it affects the application of the three approaches to raise in the following ways:

Sales comparison approach: It will be difficult to find truly comparable properties if the subject exhibits

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SBS. Adjustments for differences in physical condition between healthy and sick buildings may be extremely difficult to quantify.

Cost approach: It will be difficult to estimate accrued depreciation due to indoor air quality problems.

Income approach: SBS affects the operating costs of the structure, thus altering the net operating income (NOI), an integral part of determining value according to the income approach. Furthermore, development of an overall capitalization rate using market extraction will be difficult for properties with SBS. Other less reliable methods for determining $R_o$ will have to be applied.

**(iii.) Assessment/Remediation Costs**

The assessment and/or remediation of structural mold will entail some costs. These costs will obviously vary. [FN365] Regardless, material costs must be considered in a particular transaction

**2. Relevant Real Property Transactions**

**(i.) Acquisition/Sale**

Whether material amounts of mold or the conditions that facilitate its growth are present will probably increase in importance as an issue in the acquisition of various structures. Potential purchasers will seek to ensure they either avoid acquisition of materially affected structures or *66 that the price is discounted to the extent necessary to take into account the possible effect on value. The seller may need to ensure that the market does not unnecessarily reduce the value of the structure based on perceived risks associated with mold.

**(a.) Environmental Contingency**

Contracts for the sale of various types of real properties or structures almost always contain provisions providing the potential purchaser the opportunity to perform an environmental assessment during a due diligence period. [FN366] The document will typically make the consummation of the acquisition dependent upon purchaser's satisfaction with the results of the assessment. [FN367] The potential role of this clause in the context of mold issues may need to be considered.

If the purchaser deems mold a potential material issue, the environmental contingency clause should be revised to ensure it clearly encompasses the organisms and associated growth conditions. [FN368] Equally important is the need to ensure that the purchaser has the authority to undertake the full scope of its desired mold inspection.

Sellers may have a different perspective. They will consider whether mold should constitute a contingency in the transaction. The inclusion of mold in this provision might provide the potential purchaser an unlimited ability to terminate the *67 transaction. The ubiquitous presence of mold and associated spores may make it difficult to limit a purchaser's use of this clause to cancel the transaction unless it is narrowed or limited to some extent. [FN369]

**(b.) Express Warranty**

The agreement for the sale of a structure will usually require that the parties expressly warrant various matters. Express warranties in real property transactions are covered by contract and warranty law. [FN370] The increasing interest in mold may result in more detailed warranties which address the presence of objectionable amounts of the organisms and/or the conditions or defects that may facilitate growth.

There may be impediments to the enforcement of warranties addressing these issues. [FN371] Tort liability only applies if an express warranty is breached when property or personal injury damages have resulted. [FN372] Further, the statutes of limitation may pose a challenge when the warranties involve an indoor contaminant. In addition, to recover for damages resulting from indoor contaminants in a real property transaction, one must suffer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13882 NBI-CLE 19
**(Cite as: 13882 NBI-CLE 19)**

more than economic losses. [FN373]

**(c.) Implied Warranty of Habitability**

  A key question will be whether the implied warranty of habitability is potentially relevant to the presence of mold in certain structures. The doctrine *68 often arises in the context of the construction of a new home. It requires that the home be constructed in a good workmanlike manner and be fit for human habitation. [FN374] Therefore, the plaintiff must prove that the structure contains construction defects to a degree that renders it uninhabitable. [FN375]

  The existence of an express warranty may eliminate an implied warranty in some jurisdictions. [FN376] Implied warranties arise by operation of law, and may not rest solely on an agreement between the buyer and the builder. [FN377] The implied warranty may only be expressly excluded by circumstances sufficient to call the buyer's attention to the fact that no implied warranties exist or that they have been excluded. [FN378] However, if the contract states the property is "as is," the implied warranty of habitability may be waived. [FN379] The general rule is the cost of fixing the defects, rather than the difference in the value, is the property measure of damages for breaches of implied warranty of habitability. [FN380]

**(ii.) Leasing [FN381]**

**(a.) Baseline**

  The lessor and lessee will often attempt to establish an environmental "baseline" [FN382] condition for the leasehold at the inception of the lease. [FN383] The parties negotiating the lease of a structure may wish to consider whether the environmental baseline should encompass mold and the conditions that *69 facilitate its growth. The lessor's goal in establishing a baseline may be to preclude a subsequent argument by the lessee that the objectionable conditions existed prior to its occupation of the premises. Similarly, the lessee will want to ensure that it identifies any pre-existing conditions to avoid inadvertently assuming responsibility or being blamed for them.

  The fact that mold is naturally present in a structure complicates the establishment of a baseline. The presence of mold as part of the background environment and paucity of definitive standards will make delineating acceptable conditions difficult. Sampling of structure surfaces or air is likely to confirm the presence of some organisms and/or spores. Therefore, determining whether there are abnormal amounts or types of mold would require some complex sampling and analysis. The typical lessor and lessee will probably focus on visual identification of both mold and the conditions that facilitate its growth.

**\*70 (b.) Warranty**

**i. Express**

  Mold and the conditions that facilitate its growth might be a component of the warranties that are sought to address indoor air quality. Some potential lessees will demand certain assurances as to the environmental conditions inside the structure. Sophisticated and/or larger lessees such as governmental agencies and commercial operators may attempt to obtain warranty provisions in the lease that specifically address air quality and associated conditions. [FN384] These lessees' objective is to attempt to better ensure that their use of the premises will not be impaired by structural contaminant issues. Such interruptions and/or restricted use of the leasehold can have significant financial consequences.

  Mold growth can be exacerbated by the activities of the structure's lessees. The prudent lessor may attempt to more definitively detail the activities that either cannot occur or must be undertaken to prevent material mold growth. It may be particularly important to ensure that any relevant maintenance activities allocated to *71 lessees are undertaken pursuant to a prescribed schedule.

**ii. Implied Warranty of Habitability**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A number of lessees have sought judicial relief because of the alleged presence of mold in their apartments. The basis for such relief may be an allegation that the lessor has breached the implied warranty of habitability. [FN385] The absence of mold action standards will likely make a habitability determination somewhat subjective.

The lessee may argue that such conditions constitute a constructive eviction. [FN386] The remedy sought may include the remediation of the contaminant problem. In addition, the lessee may withhold rent until the condition is fixed. [FN387]

### (iii.) Repair/Maintenance

The delineation of repair/maintenance responsibilities in the lease agreement will determine whether the lessor or lessee must address objectionable [FN388] amounts of mold and/or the condition/activities that facilitate its growth. The negotiation and allocation of these responsibilities may assume greater importance in the lease. [FN389] The responsibility for certain activities involving *72 cleaning, equipment acquisition, repair and maintenance may assume added importance because of mold concerns. [FN390] These responsibilities are often already addressed in varying detail in many leases.

The burdens placed on the lessee will vary with the type of structure. For example, an apartment lessor might simply include provisions in the lease placing lessees on notice that they are expected to exert common sense efforts to control mold or mildew. These might include the maintenance of appropriate ventilation and humidification to retard mold growth.

A lessee seeking to recover damages associated with structural mold may attempt to determine whether the lessor breached certain lease provisions or was negligent. A lessor can be held liable for the failure to repair the leased premises under a breach of contract theory. [FN391] The failure to repair or excessively deferred maintenance might also in some circumstances result in a finding of negligence, or negligence per se if the appropriate statutory structure is available, against a landlord. [FN392]

### (iv.) Reporting

Some leases require that the lessee report certain conditions, events or occurrences to the lessor within a specific period of time. The expeditious elimination of visible mold growth will clearly reduce or prevent subsequent remediation *73 expenditures. Likewise, mold growth will only be eliminated when the conditions that facilitate it are corrected. [FN393] The expansion of the lease reporting requirements to encompass these conditions and events might therefore be prudent.

### 3. Financing

### a. Assessment/Inspection

A financial institution's willingness to loan funds is usually dependent upon the receipt of sufficient collateral. This collateral will often include a mortgage on a structure. The potential impact of environmental issues on the value of the mortgaged property is an issue that lenders have recognized for years. The lender's primary means for addressing this concern has been the environmental assessment of the property or structure prior to consummation of financing. [FN394] The assessment is intended to provide the lender confidence that it understands what environmental risks are associated with the proposed collateral.

Indoor contaminants have not traditionally been key concerns. [FN395] Substances such as lead-based paint and asbestos have been long-standing exceptions. However, lenders will probably increasingly consider whether mold and other indoor air quality issues should be part of an assessment of a structure that is to be collateralized.

The potential impact of mold on the collateralized structure may expand the lender's interest in these issues. This interest is driven by a concern that mold and other indoor contaminant issues might in some circumstances impair the structure's value and cash flow of the mortgage holder. The lender must also be cognizant of *74 the fact

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that mold is as likely to be present in a residential structure as a commercial/industrial facility.

The lender may also face challenges in imposing mold assessment requirements on some of its borrowers. This may require lenders to focus additional attention on some residential properties from an environmental risk management perspective. An important concern is whether imposing such a requirement on a potential borrower will place the financial institution at a competitive disadvantage. [FN396] The answer to this question may vary with the type of structure/property that is to be collateralized. Some structures have occupants or uses that tend to be deemed especially sensitive to mold. These might include hospitals, multifamily residences, etc. [FN397] There may be particular interest in assessing whether there are material mold concerns associated with such properties.

The lender will also recognize that mold is by definition a potentially reoccurring issue. The initial or subsequent determination that neither material amounts of mold nor the conditions that facilitate it are present in the structure is no assurance that material growth is permanently eliminated. Consequently, a lender concerned about mold would need to obtain and periodically utilize the authority in the loan documents to perform subsequent inspections.

**b. Loan Document Language**

The documents used to memorialize a loan involving a structure or real property usually address environmental issues to some degree. The mortgages or deed of trusts will typically require that the borrower provide certain warranties or assurances concerning the historical and prospective operation of the facility. *75 The documents will include provisions addressing both environmental compliance and the presence/absence of hazardous materials or substances. Corresponding indemnities will provide remedies for the breach of these provisions.

The application of this standard language to mold poses a problem. Mold would not be encompassed by the key loan document environmental provisions. The terms "hazardous substances" or "hazardous materials" would not typically be applicable to mold. Further, neither the federal nor state environmental governmental programs are applicable to these organisms. These terms and programs are often used to compel or prohibit certain borrower activities or actions. The lender may be required to reference mold or the conditions that facilitate its growth or incorporate any applicable guidance or recommended practices. [FN398]

**4. Construction**

A structure or facility must be both designed and constructed. The architect and contractor respectively will perform these functions. Either of these professionals' services might be scrutinized if material mold growth is discovered in the structure. [FN399] This may be more likely in the case of newer structures. [FN400] Architects and contractors [FN401] may therefore need to consider the circumstances in which liability might be imposed on them for damages related to objectionable mold growth.

Mold may pose a relatively greater risk to architects and contractors because their ability to cover such liabilities may be limited. The reason is two-fold. First, in competitive markets the architect or contractor [FN402] may not always have the leverage to allocate some mold risks to the other parties [FN403] to their respective service contracts. [FN404] If so, the desired contractual protections [FN405] may be difficult to obtain.

*76 Second, insurance is often used to cover the risks that these professionals have been allocated or forced to retain. Whether insurance is a viable option in the case of mold risks associated with the performance of these services is uncertain. Various risks related to mold have been or may eventually be excluded from the insurance coverage maintained by these two groups. The failure to procure a policy would leave this exposure uncovered. [FN406]

**a. Design**

The interest in mold likely means that the architect's ability to design [FN407] a structure that minimizes the conditions that facilitate its growth has assumed greater importance. The ability of building material to resist

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fungal growth should be added to the criteria for selection. This will presumably include both the structure's ability to resist water intrusion and maintain appropriate air circulation/humidity. [FN408] The architect may also need to ensure that to the extent possible the provided services include state of the art technology. [FN409]

Design professionals may need to better understand the responsibilities they have been allocated in the project contractual agreements in regard to mold and other indoor pollutants. It may be important for all the construction professionals [FN410] to identify and allocate responsibility for the materials and systems related to indoor contaminant issues. However, the architect may at a minimum need to ensure that the relevant agreements clearly shift liability to the owners if they fail to maintain relevant equipment or the structure. [FN411]

The standard for design liability has evolved over the past one hundred years. [FN412] Until the twentieth century, architects were only deemed liable for design mistakes if they committed fraud *77 and collusion. [FN413] Some courts have more recently imposed liability based on negligence, products liability, as well as breach of an implied warranty for fitness. [FN414] A plaintiff [FN415] may attempt to use these and other cause of actions against the design professional if objectionable amounts of mold are subsequently discovered in a structure. [FN416]

### (i.) Negligence

Architects may be liable for damages if they fail to exercise the ordinary amount of care that prudent design professionals would exercise, and such lack of care is the proximate cause of an injury. [FN417] This cause of action is based on negligence. The standard of care used to judge the design services is the care ordinarily exercised by members of the profession who practice in the same physical area. [FN418]

The potential liability of the architect to an unrelated party (from a transactional perspective) is a common question. The answer will often involve the extent to which the transaction was intended to affect the plaintiff, whether the defendant could foresee harm to the plaintiff, the probability that the plaintiff suffered the injury, the "closeness of the connection" between the defendant's action and the plaintiff's injury, and the policy of preventing this problem in the future. [FN419]

Few cases have addressed design issues in the context of indoor air pollution. Mold was involved to some extent in Centex-Rooney Construction Co. v. Martin County. [FN420] The architecture firm's sole contractual task was to design a new courthouse for Martin County, *78 Florida. [FN421] Shortly after completion of construction of the courthouse, employees began to complain about wall leaks, mold growth, and excessive humidity. [FN422] A subsequent investigation concluded that the building's heating and ventilation system were deficient in certain respects. [FN423] The county decided to vacate the building due to the mold and filed suit four years after its completion. [FN424] The architectural firm, along with a concrete sub-contractor, settled the lawsuit prior to trial for $2,750,000. [FN425] The appellate court upheld a jury's verdict of $14 million against the other defendants. [FN426]

An older Pennsylvania decision involved allegations that the roof plans prepared by an architect caused condensation build up. [FN427] In Bloomsburg Mills, Inc. v. Sordoni Construction Co., Inc., the plaintiff claimed that the design plans submitted for the roof contained "an improper vapor seal, faulty drain flushings, and fiberglass insulation material inadequate for the use intended." [FN428] The chosen insulation allegedly became saturated and inefficient causing condensation to accumulate. [FN429]

The court held that the architectural firm could be found liable for negligence because it allegedly knew that the material would absorb and retain moisture through testing. [FN430] An officer of the weaving mill had approved the architects' plans. [FN431] However, the firm was not excused from exercising ordinary and reasonable skill in providing adequate plans. [FN432]

### (ii.) Implied Warranty

*79 A majority of decisions have held that an architect does not impliedly warrant design services. [FN433] The court in Mounds View v. Walijarvi noted:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"The undertaking of an architect implies that he possesses skill and ability, including taste, sufficient to enable him to perform the required services at least ordinarily and reasonably well; and that he will exercise and apply in the given case his skill and ability, his judgement and taste, reasonably and without neglect. But the undertaking does not imply or warrant a satisfactory result." [FN434]

Doctors cannot promise that every operation will be a success, just as lawyers can never be certain that every will they draft will be without defect. [FN435] Architects can never be certain that their design will interact with "natural forces as anticipated." [FN436] Architects warrant only that they will use the amount of skill and effort that his profession customarily demands in other similar cases. [FN437]

**(iii.) Strict Liability**

The application of strict liability to architectural services is occasionally considered by the courts. [FN438] The decisive question seems to be whether the home or other structure is a "product." [FN439] If the structure is the alleged product, most courts do not impose strict liability on the architect unless the building was mass-produced or prefabricated. [FN440] These courts have found that a house or **\*80** other structure is not a product. [FN441] Some jurisdictions hold that a structure such as a house is a product when considering whether the defendant can be subjected to strict liability. [FN442] For example, the Arkansas Supreme Court held that "the word 'product' is as applicable to a house as to an automobile." [FN443]

Strict liability theories of recovery are generally inapplicable to persons who only render professional services. [FN444] This theory of liability was developed to protect buyers of products not in privity with the manufacturer. It was not developed to be used against professionals who cannot spread the economic risks among their customers. [FN445]

Architects will rarely be held strictly liable in tort in relation to the professional services they provide. However, some jurisdictions suggest that an architectural firm could be strictly liable if an "architectural design or ventilation system" was standardized or mass marketed. [FN446] Thus, if the designs are not for prepared for mass production of the same structure, the architect cannot be held strictly liable due to those designs.

**b. Physical Construction**

The construction process has been a target for those seeking to recover alleged damages related to the presence of mold in structures. [FN447] This magnifies the importance of the contractors', subcontractors', and/or home-builders' [FN448] ability to both protect the structure components during construction and erect the facility in accordance with the applicable designs and specifications. The **\*81** construction and/or placement of the building envelope and HVAC systems [FN449] will presumably be of particular importance. [FN450]

The construction professional may need to identify and avoid projects or structures that are more likely to involve material mold issues. This determination might be based on whether the project will involve equipment, materials, [FN451] or designs that tend to generate significant mold claims. [FN452] The contractor may need to consider whether the other parties are willing to address the perceived deficiencies. [FN453] If not, there may need to be a determination as to whether the benefits outweigh the risks to participate in the project.

Equally important, the contractor may find it useful to determine whether a structure slated for renovation has any preexisting mold concerns. [FN454] This may make it important to establish and document whether material mold growth or the conditions that facilitate it are present in a structure prior to an expansion or renovation. [FN455] If so, the project may either need to be avoided, or ensure that appropriate measures are undertaken to eliminate the problem. Similarly, the contractor may find it useful to document the absence of problematic organisms or conditions at the point the structure is completed.

A structure may be particularly vulnerable to moisture intrusion during construction. [FN456] Mold growth may be facilitated in the absence of protective measures. [FN457] Many interior building components cannot be installed until the structure is enclosed. [FN458] Otherwise, if installed prematurely, the building interior might be impacted by enough moisture to facilitate mold growth. [FN459] The failure to protect building materials or the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

project site prior to installation can pose similar problems. [FN460]

*82 The protection of structure components from moisture during construction requires coordination by the contractor and subcontractors. [FN461] The objective will be the timing of the phases of the project as necessary to maximize the protection of the portions of the structure vulnerable to moisture damage. [FN462] The conflicting goals of meeting construction milestones and prevention of water intrusion can generate tension between the owner, contractor and subcontractors. [FN463]

Contractors will occasionally have to address mold discovered during structure renovation or remodeling. [FN464] The measures needed to remedy the problem could increase project costs and/or delay construction. [FN465] A prudent contractor will therefore consider how this issue will be handled in the construction contract.

The construction contract should allocate among the parties responsibility for incurring any necessary additional costs associated with mold. [FN466] Whether any resulting delays will be excused may also need to be addressed. This may require a clear understanding of how the discovery of mold would be addressed in various contract provisions such as the notice of differing site conditions clause. [FN467] The ability of either the owner or contractor to cover this risk during structure construction or renovation will be in part dependent upon whether the builder's risk insurance excludes mold claims. [FN468]

The discovery of mold after the construction of the structure has also generated claims against contractors. [FN469] These claims may be premised on an allegation that the mold is present because of a construction defect. The facilitating conditions often involve the alleged improper entry into or release of water in a *83 structure. [FN470] The contractor will need to ensure that responsibility for problems related to deferred/improper maintenance or repairs are clearly placed upon the structure owner.

Certain types of equipment and materials have been deemed responsible for supporting mold growth in some circumstances. An example is the alleged role of the HVAC equipment [FN471] in dispersing and/or facilitating mold growth. As a consequence, the universe of construction-related parties that are possible targets in mold litigation have included subcontractors, building equipment material installers and/or suppliers.

(i.) Negligence

Liability has been imposed upon the general contractor or construction manager for failure to supervise construction activity. [FN472] Damages can be significant, including the cost of repairs according to the original contract, relocation costs, financing costs, and engineering and architectural fees incurred in the repairs. [FN473] The potential application of various liability theories to the contractor's work on a structure will ultimately determine under what circumstances liability for objectionable mold growth may be imposed.

The doctrine of caveat emptor has traditionally applied to the sale of homes and other structures. [FN474] Some jurisdictions would not allow the purchaser of a home to recover from the contactor or builder even if the house collapsed because of a defective foundation. [FN475] However, this doctrine has been eroded to some extent.

Recovery under a theory of negligence can arise in a variety of forms. It includes negligent construction, *84 failure to supervise or inspect construction, and a failure to instruct subcontractors on appropriate industry and code standards. [FN476] Some decisions have held building contractors to the "general standard of reasonable care for the protection of anyone who might foreseeably be endangered by their negligence, even after acceptance of the work." [FN477] These decisions potentially extend the contractor's liability to third parties regardless of whether they are in privity. [FN478]

A number of decisions have involved allegations that contractor negligence was responsible for mold related problems. County employees allegedly injured by mold were allowed to bring suit against the contractor that constructed the courthouse. [FN479] The action was predicated on whether the contractor had taken reasonable care to protect the plaintiff county employees

In Mondelli v. Kendell Homes Corporation, [FN480] a contractor was held liable for negligence when he

was retained to construct a house. Rainwater was found entering the basement subsequent to construction. [FN481] The structure's insulation was later found to be dripping wet and to have retained a foul odor. [FN482] The problem was mold. [FN483]

The plaintiff alleged that water leaked through the house facilitating mold and fungi growth in the insulation. [FN484] She also claimed that the mold caused health problems, including nasal congestion, headaches, shortness of breath, and serious coughing. [FN485] A doctor suggested that the plaintiff and her family move out of their home due to *85 these health problems. [FN486] The plaintiff also claimed that the contractor negligently weatherproofed the exterior walls, negligently installed the flashing, and negligently applied the mortar to the bricks, all of which led to the mold growth. [FN487]

A partial basis for the imposition of liability was a finding that the contractor did not adhere to industry standards and the Uniform Building Code. [FN488] The Supreme Court of Nebraska upheld the contractor's liability on appeal. [FN489] This decision also allowed the plaintiff to pursue causes of action against the contractor despite the absence of privity. [FN490]

**(ii.) Implied Warranties**

The discovery of an alleged structural deficiency may generate a claim that the contractor impliedly warranted the work. Some jurisdictions hold that the "implied warranty of habitability and workmanlike performance is imposed by law." [FN491] An allegation that a contractor negligently constructed a building can generate an action for breach of implied warranty of habitability and performance for the contractor's breach of the duty of care. [FN492] The argument is made that a contractor building a new home impliedly warrants that it was built in workmanlike manner and is habitable. [FN493]

It is argued that an implied warranty arises out of a contractual relationship between the contractor and the buyer. [FN494] This warranty is said to extend to any subsequent purchasers of the structure. [FN495] There are impediments to this argument however. A number of states limit by statute *86 the time in which a home owner or subsequent owner of the home has to bring a cause of action against the contractor. [FN496]

The discovery of mold may lead the owner to assert that the contractor breached an implied warranty associated with the structure. [FN497] The assertion of such a claim may be circumscribed by the terms of the contract between the contractor and structure owner. The contractor may specifically identify and disclaim such warranties in the contract document.

**(iii.) Strict Liability**

A products liability cause of action is sometimes asserted if residential structural problems are identified. The success of such a claim may depend in part on whether or not the jurisdiction defines a home, or other structure, as a 'product.' [FN498] The plaintiff must often prove that the structure is "unreasonably dangerous."

The majority of courts do limit the scope of this action by holding that strict liability does not apply if the damages are to the "product." [FN499] This limitation may impact some actions involving structural mold. If the mold only damaged the structure itself, as opposed to occupants, strict liability may not apply. However some jurisdictions hold that the law permits recovery under strict liability even when the only damages are to the product itself. [FN500]

**G. Management/Allocation Of Risk/Responsibility**

A variety of risk management measures may be employed by real property market participants to address mold liabilities. [FN501] Their use will be driven by *87 factors such as cost, availability, and the parties leverage in a particular transaction.

**1. Assessment/Remediation**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

There are arguably negative connotations associated with structural mold. The presence of non-deminimis amounts of these organisms in a given structure may adversely affect its value. Mold might therefore in certain instances constitute a material transactional issue. However, the likelihood that mold is present in significant quantities and the cost to address it may not always be grounded in reality. The purpose of the assessment or inspection is to attempt to quantify to some extent or eliminate this perceived risk. [FN502] If problematic concentrations are discovered, one or more parties may determine to remediate it.

**a. Assessment/Inspection**

Few commercial, governmental, office, or multi-family properties are acquired or financed without being assessed to identify and/or quantify any associated environmental issues. The lender or lessor will have an interest in ensuring that the value of the mortgaged structure or leasehold respectively is maintained. The parties have therefore traditionally retained the contractual authority to initially assess the environmental conditions and perform additional assessments on a periodic basis. These due diligence activities may be undertaken at various points in a transaction. The transactional stages might include the time periods prior to acquisition/financing/construction, during a lease or loan term or before foreclosure.

The expansion of assessment programs to address mold and the conditions that facilitate its growth poses a challenge. Mold can begin growth and propagate rapidly if the necessary conditions are present. In other words, significant mold growth can occur *88 between even frequent inspections or assessments. Therefore, the permanent elimination of growth conditions can be critical. [FN503]

**b. Qualification/Certification Issues**

The expanding interest in mold assessment and remediation will likely stimulate a concurrent demand for personnel to provide such services. Some of the companies or individuals providing mold assessment remediation services will be new to the field. [FN504] The demand for these services will be driven to a great extent by the participants in the real property transaction market. Many of these parties will be unfamiliar with mold assessment/remediation issues. [FN505] They may not be in a position to judge whether the providers of such services have made prudent assessment/remediation recommendations. As a result, there is some interest in establishing competency standards for those offering such services. [FN506] However, such an undertaking requires an organization or agency [FN507] to both establish the relevant competency criteria [FN508] and manage the certification process.

The skills, education or expertise required to address mold may vary with the type of activity. There are some mold assessment activities involving sampling [FN509] and/or analysis that require specialized education/expertise in the relevant methodologies. The assessment and/or remediation activities might involve aspects of toxicology, industrial hygiene, and structural engineering (i.e., indoor movement of air/water). [FN510]

**2. Tax Treatment of Assessment/Remediation Costs**

The aggregate amount of monies that are and will be spent to perform mold assessment and/or remediation activities is significant. In some instances, the costs may be material in the context of a particular structure. The possible tax treatment of these costs is therefore of interest.

**\*89 a. Deductibility**

The Internal Revenue Service ("IRS") has not addressed the deductibility of such costs. Expenses associated with mold remediation will either be classified as repairs or improvements. "Repairs" are deductible business expenses which restore property to its previous state and do not increase the property's value or make the property more useful or longer lived. [FN511] "Improvements" are capital expenditures which materially increase the value, longevity, or utility of the property compared to its previous value, longevity, or utility. [FN512]

The test for determining whether expenditures increase the value of the property is found in <u>Revenue Ruling 94-38</u>. [FN513] The value of the property is compared to the status of the asset after the expenditure with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

status of the asset before the condition arose that necessitated the expenditure (i.e., before the structure was contaminated with mold). [FN514]

The IRS has ruled that expenditures to remove and replace asbestos insulation in manufacturing equipment were required to be capitalized because such expenditures were improvements, not repairs. [FN515] The ruling concluded that the expenditures increased the value of the equipment over its value to the taxpayer before the replacement by reducing or eliminating the human health risks associated with asbestos. [FN516] In Northwest Corp. & Subsidiaries v. Commissioner, [FN517] the Tax Court held that the costs of removing asbestos materials must be capitalized because they were part of a general plan of rehabilitation and renovation that improved the building. [FN518] However, if asbestos remediation is made apart from remodeling or renovation, Northwest Corp. suggests that such costs would be currently deductible. [FN519]

*90 There is arguably a difference between mold and asbestos. Asbestos was a part included in the original asset while mold was not. Mold occurs after the asset's creation. Mold remediation merely restores property to its original condition. Asbestos abatement is something more than merely restoring the property to its original condition because the asbestos was part of the original asset. Thus, mold remediation expenditures do not produce improvements to a structure beyond its original state.

Mold remediation expenditures do not result in improvements that increase the value of the property because the property was merely restored to its approximate condition before it was contaminated by the mold. In addition, mold remediation expenditures do not prolong the life of the asset. These expenditures merely restore the property to its original useful life. Mold remediation expenditures do not adapt the property to a new or different use. Accordingly, mold remediation expenditures are arguably currently deductible.

**b. Credits**

The United States Toxic Mold Safety and Protection Act, would have authorized tax credits for inspection and/or remediation of mold hazards. [FN520] The proposed credit would be equal to an amount up to 60% of mold inspection and/or remediation expenses incurred during the taxable year. [FN521] However, this proposed credit would be limited to $50,000. [FN522] If the bill is passed, the taxpayer would not be able to receive a double benefit from its mold inspection and/or remediation expenses (i.e., the taxpayer could not deduct the mold inspection and/or remediation expenses from its taxable income and then claim a credit for the same expenses).

**\*91 3. Contractual Allocation of Risk/Responsibility**

Mold has probably not until recently been deemed a potentially material real property transactional issue. Therefore, the organism was probably rarely specifically identified in the environmental liability allocation provisions of the structural transactional documents. Instead, materials or substances specifically listed in transaction documents have often included lead-based paint, asbestos, PCB [FN523] containing transformers, and petroleum underground storage tanks. These agreements will usually include clauses addressing compliance with applicable environmental laws and/or prohibiting certain activities involving hazardous materials, substances or wastes.

The agreements used to document the sale, lease, financing, design, and construction of structures will contain provisions intended to allocate various potential liabilities and risks among the parties. [FN524] Likewise, the parties have the opportunity to identify the responsibilities associated with the assessment, remediation or prevention of mold growth. These agreements can assign responsibility for any corresponding regulatory and common law liabilities that may arise. If they fail to do so, more general provisions in the agreements may impose these responsibilities. However, reliance on such general provisions may make it difficult to predict how more specific liabilities and responsibilities will be allocated.

The use of contractual verbiage to address mold liabilities/risks are governed by some common principles/concerns. First, the parties should recognize that multiple parties are likely to be targeted in the event of a mold claim. The agreement drafted may govern to some extent how responsibility for mold claims are allocated between the parties. Second, the value of the warranty, indemnity or related provisions is dependent upon the future financial viability of the party providing it. Third, the **\*92** identification of potential environmental issues (including

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mold) through an assessment will enable the parties to specifically allocate such risks. [FN525] Fourth, there may be some benefit in allocating the risks to the parties in the best position to control them. [FN526] Fifth, as always, a party's ability to obtain desired provisions will depend on its leverage and market conditions. [FN527]

### (a.) Warranties

Identified or potential risks are often allocated between the parties in the transactional documents. This should be equally true for mold. The potential liabilities associated with these organisms may be identified and allocated. [FN528] An insurance policy may be used to cover a particular environmental issue for a fixed amount by the party allocated the risk.

### (i.) Compliance with Laws

The parties will need to recognize that few governmental requirements are applicable to mold. Therefore, a clause mandating compliance with governmental laws may not pick up mold or the conditions that facilitate its growth. Instead, a reference to problematic conditions or required maintenance practice may be necessary. Defining problematic conditions will be difficult because of the pervasive nature of the organism

### (ii.) Insurance

The parties to a transaction often rely on insurance to address significant liabilities associated with a structure. The contract may specify both the type of insurance that is required and the parties that must obtain it. [FN529]

### (iii.) Complaints/Investigations

*93 A purchase will often require that the seller either make various disclosures and/or warrant the absence of such events or activities. These might include prior tenant and/or structure occupant complaints concerning the environment inside the structure. Disclosures related to mold might include indoor air pollution/mold complaints and prior remediation/sampling activities.

### b. Insurance

Many potential structural liabilities are addressed through the procurement of insurance. The types of policies used to cover these risks will vary with the party seeking coverage. A building manager or lessor may need a policy that addresses operational risks. The lender may have a different perspective. It may use insurance to cover known or unknown risks related to the mortgaged property. Likewise, the architect or contractor may have to cover the exposure uniquely associated with their services. The different parties' need for coverage of mold risks will similarly vary.

The usefulness of an insurance policy is dependent upon the scope of the coverage, breadth of exclusions, and cost. Parties to transactions involving the transfer of structures will often consider whether insurance can satisfy any or all of the allocated risks. The initial question will be whether standard liability or casualty policies provide needed coverage to address the liabilities associated with mold. [FN530] If not, endorsements addressing mold or more specialized policies that cover these specific risks or conditions may need to be considered. [FN531]

*133 NBI$_{TM}$

**NATIONAL BUSINESS INSTITUTE**

Phone: 800-930-6182 Fax: 715-835-1405

www.nbi-sems.com

**Notes**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

---

[FN1]. A substantial portion of this paper is based on the article by Walter G. Wright, Jr. and Stephanie M. Irby, The Transactional Challenges Posed by Mold: Risk Management and Allocations Issues, 56 ARK L. REV. 295 (2003).

[FN2]. Environmental assessments are addressed in Ram Sundor & Bean Grossman, The Importance of Due Diligence In Commercial Transactions; Avoiding CERCLA Liability, Fordham Envtl. L.J. 351, (1996); Eric Rothenberg et al., Environmental Issues in Business Transactions under U.S. Law, 5 Wis. Envtl. L.J. 121 (1998); and Colleen E. Henry and Mark S. Hacker, Comment, The Importance of Identifying and Allocating Environmental Liabilities in the Sale or Purchase of Assets, 10 Vill. Envtl. L.J. 91 (1999).

[FN3]. Id.

[FN4]. One author notes: "Many financial institutions, particularly large national banking institutions, have adopted environmental site assessment procedures which must be followed in connection with the making of loans on commercial and industrial property. These procedures are detailed and compliance should provide a fair degree of comfort that the "all appropriate inquiry" requirement has been satisfied." The secondary mortgage market has required that environmental risk programs be established by lenders from which it buys mortgages. Ann M. Burkhart Lenders and Land, 64 MO. L. REV. 249 (Spring 1999).

[FN5]. An important example is the innocent landowner provision of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). See 42 U.S.C, et seq. 9601. The 2001 amendments to CERCLA clarified what type of due diligence is necessary to qualify for this liability exemption. See Brownfield's Revitalization and Environmental Restoration Act of 2001, Pub. L. No. 107-18, 1145 Stat. 2325 (2002). The amendments require EPA to specify the investigation that must be undertaken prior to the acquisition of the property. Id. These amendments are discussed in Andrew S. Levine, The Brownfields Revitalization and Environmental Restoration Act of 2001: The Benefits and the Limitations, 13 VILL. ENVTL. L.J. 217 (2002); Jeffrey Kedish, Restoring Inactive and Abandoned Mine Sites: A Guide to Managing Environmental Liabilities, 17 J. ENVTL. L. & LITIG. 257 (Spring 2002).

[FN6]. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003, at 12 (discussion of absence of mold screening formats and baselines).

[FN7]. For example, an American Society of Testing Materials ("ASTM") committee is developing a mold screening standard for buildings. This screening standard will presumably enable the user to determine whether more extensive efforts involving sampling might be needed. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003, at 12. ASTM is a private standard-setting organization that has developed several standard practice guides for environmental site assessments for commercial real estate. The organization develops standards through various committees comprised of representatives with different interests. See Jody Freeman, The Private Role in Public Governance, 75 N.Y.U. L. REV. 543, 642 (June 2002). The ASTM organization has a central staff to monitor the work and an appeals process to ensure compliance with the organization's procedures. Id.

[FN8]. Affirmative action by someone would be required for these materials or equipment to be reinstalled. The chances of a party intentionally violating a transactional covenant and placing friable asbestos or a heating oil tank on the property is unlikely.

[FN9]. Most environmental contaminants or conditions are created by or generated as a result of human activity. However, there are other natural "contaminants". Another example is radon gas. Radon gas is a potential indoor environmental pollutant that is a naturally occurring gas. See generally Carolyn Marie Shuko, Note and Comment: Radon Gas: Contractor Liability for an Indoor Health Hazard, 12 Am. J. L. and Med. 241 (1986). It is found in the subsurface in rocks such as granite, shale and limestone. Id at 242. See also Anne Rickard Jackomitz, Comment: Radon's Radioactive Ramifications: How Federal and State Governments Should Address the Problem, 6 B.C. Env'tl. Aff. L. Rev. 329 (1998); Jeanne Prussman. Comment: The Radon Riddle: Landlord Liability for a Natural Hazard, 18 B.C. Env'tl. Aff. L. Rev. 715 (Summer 1991).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN10]. See Tulacz supra note 10 ("But mold isn't something you introduce into a building, and it isn't something you can remove once and then it's gone for good.")

[FN11]. For example, see Hodgson, Russ, Andrews, Woods and Goodyear, LLP v. Isolatek International Corporation, et al., 2002 N.Y. App. Div. LEXIS 13122 (2002). Mold was found in waterproofing on two floors of a building being renovated. Id. at *3. Remedial measures were undertaken to eliminate the mold. However, mold was subsequently discovered in the previously remediated areas of the building. Id at *4.

[FN12]. An engineer notes: "You've got to get rid of the cause. If you don't, and you get rid of only the amplification site, I guarantee that within six weeks, you'll have the mold growth back." Post supra note 113.

[FN13]. The absence of governmental regulatory requirements differentiates mold in the transactional context from many other environmental issues. For example, a potential purchaser or lessee would not need to be as concerned about the possibility that certain environmental statutes might impose responsibility on them for contamination that is present at the time of the acquisition or lease of the structure. Also, transactional environmental assessments pose a risk to the facility owner or operator because they may identify environmental conditions or regulatory violations that governmental programs require be reported to an agency. See Arnold W. Reitze & Lee O. Hoffman, Self-Reporting and Self-Monitoring Requirements Under Environmental Laws, 1 ENVTL. LAW. 681 (1995); James R. Arnold, Disclosure of Environmental Liabilities to Governmental Agencies and Third Parties, CA47 ALI-ABA 381 (1995); and Arnold W. Reitze & Steve Schell, Reporting Requirements for Non- Routine Hazardous Pollutant Releases Under Federal Environmental Laws, 5 ENVTL. LAW. 1 (1998). The absence of applicable governmental requirements means the assessment of mold will not typically trigger such self-executing governmental mandates. Instead, the principal legal concerns associated with structural mold are common law liabilities.

[FN14]. This term generally refers to the concentration of a substance in the air to which exposure over a particular period of time causes adverse health effects.

[FN15]. See Mondelli v. Kendell Homes Corporation et al., 262 Neb. 263, 631 N.W. 2d 846 (2002) (plaintiff's expert witness notes absence of state regulations and industry standards concerning indoor air quality).

[FN16]. Schillinger supra note 76. The measures might include culturable fungi, total fungal spore counts and fungal volatile organic compound concentrations. Id.

[FN17]. For example, federal standards of closure criteria have been promulgated for hazardous waste management facilities at 40 C.F.R. § § 264.110-.120 (closure standards and procedures for hazardous waste treatment, storage and disposal facilities); petroleum underground storage tanks at 40 C.F.R. § 280.66 (corrective action plan requirements); and polychlorinated bi-phenyl ("PCB") at 40 C.F.R. § 761.1 - .398 (PCB regulations).

[FN18]. 40 C.F.R. § § 264.110 - .120 (PCB regulations). See generally, James A. Vroman, Disposal and Remediation Under the PCB Mega Rule, 29 Envtl. L. Rptr. 10459 (1999).

[FN19]. Certain federal Clean Air Act regulations impose certain management standards on asbestos if it is "friable". See 40 C.F.R. § 141. These regulations classify asbestos as friable if it will crumble by hand when dry. Id.

[FN20]. This has not always been true. Over a decade ago EPA and most states provided little guidance as to the appropriate cleanup criteria or action levels for various types of properties (industrial, commercial, residential, etc.) unless they were engaged in certain activities (e.g., hazardous waste management, see 40 C.F.R. § § 264.110 -.120) (closure standards and procedures for certain hazardous waste treatment, storage and disposal facilities), petroleum UST, see 40 C.F.R. § 280.66 (corrective action plan requirements), or contained a substance (e.g., polychlorinated biphenyls) ["PCBs"] 40 C.F.R. § 761.1 - .398 (1999) (PCB regulations). The regulations addressing PCBs were the subject of extensive revisions in 1998. Disposal of Polychlorinated Biphenyls (PCBs), Final Rule, 63 Fed. Reg. 35383 (June 29, 1998). The PCB rule regulations include cleanup standards for various surfaces such as steel pipe, iron plating, etc. See generally, James A Vroman, Disposal and Remediation Under the PCB Mega Rule, 29 ENVTL. L. RPTR. 10459 (1999) (friable asbestos, etc.) addressed by a regulatory program. In recent years various

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

federal and state programs have begun using risk-based corrective action or remediation standards which tailor cleanup levels according to site-specific factors. The standards may be found in a statute, regulation or policy. See generally, U.S. Gen. Accounting Office, Superfunds -- How States Establish and Apply Environmental Standards When Cleaning Up Sites (Pub. No. GAO/RCED -96-70FS (1996)). The various programs often take into account factors such as to what extend the site is accessible and/or the future land use. Memorandum from Elliott P. Laws, Assistant Administrator, United States Environmental Protection Agency, to Directors of Waste Management Division, et al. Land Use in the CERCLA Remedy Selection Process (OSWER Directive No. 9355.1-04) (May 25, 1995). See also Laurie DeBrie Thanheiser, The Allure of a Lure: Proposed Federal Land Use Restriction Easements in Remediation of Contaminated Property, 24 B.C. ENVTL. AFF. L. REV. 271 (1997) (role of institutional controls and land use restrictions in CERCLA program). Typically, superimposed upon these various procedures or site specific analyses is a requirement that the resulting standards be protective of human health and the environment. Note that risk-based standards are not universally favored. For example, see Victor B. Flatt, Essay: "He Should at His Peril Keep It There..." How the Common Law Tells Us that Risk Based Corrective Action is Wrong, 76 NOTRE DAME L. REV. 341 (Jan. 2001).

[FN21]. Walter G. Wright, Jr. and Travis J. Morrissey, Arkansas Facility Real Property Redevelopment in the Year 2000: Tools Available to Resolve Environmental Issues, 52 Ark. L. Rev. 751, 785 (2000). See also Heidi Gorovitz Robertson, Legislative Innovation in State Brownsfields Redevelopment Programs, 16 J. ENVTL. L. & LITIG. 1 (Spring, 2001) (describing various state approaches for setting cleanup standards based on criteria such as proposed future property uses).

[FN22]. For example, a court referenced a report which compared the number of spores in the house were compared to the adjacent outdoor environment. See Benjamin Diletto et al. v. Katnik Corporation, 2002 Cal. App. Unpub. LEXIS 11814 (2002). See also Mondelli v. Kendell Home Corporation et al., 262 Neb. 263, 631 N. W. 2d 946 (2001) (plaintiff's expert in damage action opines that the indoor air quality concentration for total mold spores should be 25% of outside concentration during the summer). The absence of standards might also pose a problem for the insurance underwriting and claims process. Underwriters use standards to establish the risks related to properties. Standards may also be used by the insurance company in determining the adequacy of remediation. Such standards might better enable the adjuster or claims processor to determine whether health risks to the policy holder have been eliminated.

[FN23]. Sampling for biological contaminants in the indoor or outdoor environment is not as straight forward as sampling for chemical agents that are not of biological origin.

[FN24]. See Mondelli v. Kendall Home Corporation et al., 262 Neb. 263, 631 N.W. 2d 846 (2001) (reference to absence of governmental or industry indoor air quality standards). The absence of standards had also been stated to increase remediation costs. Absence of standards may lead to remediation efforts that may be beyond reasonable.

[FN25]. An example of such an analysis is a report referenced in Benjamin Diletto et al. v. Katnik Corporation, 2002 Cal. App. Unpub. LEXIS 11814* 3 (2002) ("In this case, however, interior mold levels were 2000 percent to 5000 percent of the levels found outdoors.").

[FN26]. See Zack Mansdorf, 55 Indoor Air Quality: A Modern-Day Dilemma, No. 3, March, 1993 at 11 (stating that the presence of higher indoor populations of microorganisms than outdoors does not mean an occupant will become ill).

[FN27]. Guidelines on Assessment and Remediation of Fungi in Indoor Environments, New York City Department of Health & Mental Hygiene at 2.1 (2001) [hereinafter "New York Report"] (noting visual inspection is the most important initial step in identifying a possible contamination problem).

[FN28]. These private party environmental due diligence activities arguably support government enforcement by driving properties toward greater environmental compliance or cleanliness. One author notes in the lender context: "In an attempt to avoid such liability, lenders now slap the burdens of conducting environmental inspections of lands offered as collateral and of requiring borrowers to correct any environmental violations before a loan will be made. In these ways, government has conscripted lenders to enforce the environmental laws, as well as to help fund

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

environmental cleanups."

[FN29]. Mattison & Widmanny supra note 54 at 10366.

[FN30]. The term "Phase I" is often used to denote an initial environmental assessment. For example, see South Industrial Leasing, LLC v. Ingersoll-Rand Company, No. 02 4528, 2003 U.S. Dist. LEXIS 1393 (Jan. 31, 2003) *7 (reference to "Phase I Environmental Survey" prepared by seller in the context of sale of an industrial facility). An assessment will only be considered "ASTM" if it includes the tasks specified in that standard. The standard was established in 1992. Telephone Interview with Thomas P. Jones, Pollution Management, Inc. (Nov. 7, 2002). This may be particularly important if the structure will be a single or multi-family residential facility. Id. The New Standard in Environmental Assessments: Phase I Environmental Site Assessment, Management 84 AMC Journal 54 (Oct. 1, 2002)

[FN31]. Mattison & Widmanny supra note 54 at 10366.

[FN32]. Id.

[FN33]. Telephone interview with Thomas P. Jones, Pollution Management, Inc. (Nov. 7, 2002). See also Sweeney supra note 5 at 77 (noting the identification of mold is not typically encompassed by a Phase I Environmental Site Assessment).

[FN34]. Assessments are often expanded to include other indoor contaminant such as asbestos, lead-based paint, and radon.

[FN35]. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003 at 12.

[FN36]. Structure owners or managers do not always undertake assessment activities in a systematic manner.

[FN37]. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003, at 12.

[FN38]. See Committee Will Mold a Standard Questionnaire, Standardization, Jan. 2003, at 12.

[FN39]. The protocol would be denominated in the "Standard Practice for Transactional Screening Readily Observable Mold in Commercial Buildings." Id.

[FN40]. Id.

[FN41]. Id.

[FN42]. See Michael Logsdon, The Securitization Advantage of Indoor Air Quality Assessment, 43 Real Estate Weekly, May 21, 1997 at 58. The article notes:

"The scope of this investigation need not include expensive and time-consuming sampling. In fact, a time and cost effective IAQ screening program can easily be appended to the already required Phase I Environmental Site Assessment (EAS) or Property Conditions Survey (PCS) scope of work.

Such a screening program should consist of two simple parts. First, a trained environmental or engineering professional should conduct a visual assessment for obvious indicators such as evidence of moisture damage, stained surfaces, poor HVAC maintenance, etc. During the course of this assessment, limited field measurements of temperature, humidity, carbon monoxide, and carbon dioxide can be taken. The assessor can then complete a checklist developed to flag noticeable IAQ problem indicators and reports of previous incidents of building-related illness.

Once gathered, this data should be sufficient to enable a qualified consultant to determine if potential risk exists."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.