**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ELSMERE PARK CLUB, L.P.,            :
a Delaware limited partnership,     :
                                    :
                Plaintiff,          :        Civil Action No. 04-1321 (SLR)
                                    :
        v.                          :
                                    :
TOWN OF ELSMERE, a Delaware         :
municipal corporation, ELLIS        :
BLOMQUIST, EUGENE BONEKER,          :
and JOHN GILES,                     :
                                    :
                Defendants.         :
_____   :

**DEFENDANTS' ANSWERING BRIEF IN RESPONSE TO PLAINTIFF'S
MOTION *IN LIMINE* (<u>DAUBERT</u> MOTION) TO EXCLUDE THE AFFIDAVITS,
EXPERT REPORTS AND TESTIMONY OF GERALD LLEWELLYN,
<u>KEN BELMONT AND GEORGE YOCHER</u>**

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*

Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist, Eugene Boneker and John Giles

Dated: October 10, 2005

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................. 1

NATURE AND STAGE OF PROCEEDINGS ............................................................ 3

SUMMARY OF ARGUMENT .................................................................................... 4

STATEMENT OF RELEVANT FACTS ..................................................................... 5

The Background to Condemnation .............................................................................. 5

The Officials of Elsmere Order Condemnation .......................................................... 5

The Opinions of Llewellyn, Yocher and Belmont ...................................................... 8

The New York City Guidelines ................................................................................... 9

ARGUMENT ............................................................................................................... 12

I.      The Methodologies of Llewellyn, Yocher and Belmont Are Reliable
        and Well-Established ........................................................................................ 12

        1.      The Experts' Opinions Were Based Upon the Type of Data on
                Which a Reasonable Expert Would Rely .............................................. 12

                a.  The Guidelines Are Regularly Relied Upon By Experts
                    in the Field ...................................................................................... 13

                b.  Llewellyn, Yocher and Belmont Followed the Guidelines
                    in Forming and Rendering their Opinions ....................................... 13

        2.      Llewellyn, Yocher and Belmont Have "Good Grounds" for
                Their Opinions .................................................................................... 17

        3.      The Affidavits Reflect the Reasonable Probability of The Existence
                of Conditions Discussed Therein and Are Therefore Admissible ......... 23

        4.      Llewellyn's Affidavit Is Soundly Within His Fields of Expertise ......... 23

CONCLUSION ............................................................................................................ 26

## TABLE OF AUTHORITIES

Anderson v. Creighton,
    483 U.S. 635 (1987)................................................................................18

Angstadt v. Midd-W. School Dist.,
    377 F.3d 338 (3d Cir. 2004)...................................................................18

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993).......................................................................... passim

Deluca v. Merrell Dow Pharmaceuticals, Inc.,
    911 F.2d 941 (3d Cir. 1990)...................................................................12

Eclipse Electronics v. Chubb Corp.,
    176 F.Supp.2d 406 (E.D.Pa. 2001) ...........................................19, 20, 21

Elsmere Park Club, L.P. v. Town of Elsmere,
    771 F.Supp. 646 (D. Del. 1991).................................................................5

Hammond v. International Harvester Co.,
    691 F.2d 646 (3d Cir. 1982)...................................................................24

Harlow v. Fitzgerald,
    457 U.S. 800 (1982)................................................................................18

Kannankeril v. Terminix Intern., Inc.,
    128 F.3d 802 (3d Cir. 1997)...................................................................23

Knight v. Otis Elevator Co.,
    596 F.2d 84 (3d Cir. 1979)...............................................................24, 25

Paoli R.R. Yard PCB Litig.,
    916 F.2d 829 (3d Cir. 1990)...................................................................24

Paoli R.R. Yard PCB Litigation,
    35 F.3d 717 (3d Cir. 1994).........................................................13, 23, 24

U.S. v. Brink,
    39 F.3d 419 (3d Cir. 1994).....................................................................12

United States v. Moss,
    963 F.2d 673 (4th Cir. 1992) .................................................................18

**Statutes and Other Authorities**

42 U.S.C. § 1983.................................................................................1, 18, 26

Walter J. Andrews, Lon A. Berk & David C. Ferro,
    Daubert v.Merrell Dow Pharmaceuticals Provides Key Challenge
    To Mold Injury Causation Evidence, SG004 ALI-ABA 19, 28 (Oct. 2001)...17, 18

Federal Rule of Evidence 702.......................................................................................2, 22

Chenise S. Kanemoto, Scientific Expert Admissibility in Mold Exposure Litigation:
    Establishing Reliability of Methodologies in Light of Hawaii's Evidentiary
    Standard, 26 Univ. Hawaii Law Review, f.n. 26 (Winter 2003) ...........................22

3 Christopher B. Mueller & Laird C. Kirkpatrick,
    Federal Evidence, § 350 (2d Ed.1994)................................................................23

29 Charles A. Wright & Victor J. Gold,
    Federal Practice And Procedure: Federal Rules of Evidence § 6264 (1997) ........23

# PRELIMINARY STATEMENT

This is <u>not</u> a toxic mold tort case.  It is an action brought pursuant to 42 U.S.C. §

1983, <u>et. seq.</u>, ("§ 1983") alleging certain constitutional violations.  Plaintiff Elsmere

Park Club ("EPC") has brought this action against the Town of Elsmere ("Elsmere") and

certain of its officials, seeking to impose civil liability on all defendants for the

condemnation and evacuation ("Condemnation") of the Elsmere Park Club Apartments

a/k/a Fenwick Park Apartments (the "Apartments").  In spite of this fact, EPC has,

through its <u>Daubert</u> Motion (the "Motion"), tried to obscure the issues presented in this

litigation.  With its Motion, Plaintiff seeks to exclude the testimony of the Chief

Toxicologist for the State of Delaware, Gerald Llewellyn, Ph.D. ("Llewellyn"), Industrial

Hygienist for the State of Delaware Division of Public Health, Kenneth M. Belmont

("Belmont"), and Environmental Epidemiologist for the State of Delaware Division of

Public Health, George Yocher ("Yocher") (collectively, the "Defense Experts") on the

basis that their testimony is not sufficiently reliable to serve as evidence of the need for

emergency evacuation.

The Motion is flawed for the very reason it is brought—the Defense Experts are

not being proffered to testify as to the best remediation plan for the Apartments.  This is

because the claim at bar does not require proof that there existed sufficiently hazardous

conditions to mandate the immediate evacuation of the Apartments.  Rather, the relevant

inquiries under § 1983 are twofold.  First, as to the individual defendants, the salient

inquiry is whether, at the time of the Condemnation, the individual defendants had an

objectively reasonable basis for their conduct.  Second, as to the Town itself, the question

is simply whether Elsmere's Municipal Code's condemnation provisions have a rational

basis. Thus, it is not necessary for Defendants to prove that the course of action they pursued was the ultimately "correct" action, only that they behaved reasonably in relying upon the recommendations of Delaware's Chief Toxicologist, Environmental Epidemiologist and Industrial Hygienist. As evidence of the reasonableness of their conduct, the Defendants respectfully submit that the Condemnations fell along an accepted continuum of remedial and curative conduct in light of all relevant considerations. The Defense Experts' testimony will shed light on those considerations and are thus helpful to the triers of fact, pursuant to Federal Rule of Evidence 702. To that end, their testimony is proffered as evidence of the fact that there exists a wide range of reasonable responses to extensive mold and asbestos contamination—from the minimalist approach advocated by EPC's putative expert, Larry W. Johnson, to the more comprehensive responses recommended by Llewellyn, Belmont and Yocher.

The only relevant inquiry under Daubert is whether the testimony of the Defense Experts is reliable evidence of propositions for which they are proffered. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Defendants submit that they are. For that reason, and for the reasons set forth herein, the testimony of the Defense Experts is admissible evidence and Plaintiff's Motion must, therefore, be denied.

## NATURE AND STAGE OF PROCEEDINGS

Defendants hereby incorporate their statement of the nature and stage of the proceedings set forth in their Opening Brief in Support of Their Motion *In Limine* to Exclude the Report and Testimony of David J. Wilk. (D.I. 56). In addition, Plaintiff has filed a Motion *In Limine* To Exclude the Affidavits, Expert Reports and Testimony of Gerald Llewellyn, Ken Belmont and George Yocher (the "Motion").

This is the Defendants' Answering Brief in Opposition to the Motion.

## SUMMARY OF ARGUMENT

The Defense Experts will offer reliable evidence that the Condemnation was one reasonable response in a broad spectrum of reasonable responses to pervasive mold and other environmental contamination.  Therefore, their testimony is admissible.

## STATEMENT OF RELEVANT FACTS

### The Background to Condemnation

The Apartments at issue in this case were purchased by Plaintiff in 1986. The complex featured 156 garden-style apartments in 39 buildings, including an occupied basement apartment which covered approximately one-half of the lower floor. (D.I. 44 at 4).[1] In 1989, during Hurricane Hugo, the basements of the Apartments experienced moderate to severe flooding. Id. The basement apartments were evacuated, and Elsmere decided to prohibit further rental of all 39 living areas contained in the basements of the Apartments. Id.[2] Shortly thereafter, EPC placed plywood over the windows of the apartment units. Id. This turn of events led to the pervasive mold growth that ultimately precipitated the Condemnations.

### The Officials of Elsmere Order Condemnation

On or about October 1, 2002, Defendant Ellis Blomquist ("Blomquist"), Elsmere's Code Enforcement Officer, went to the Apartments at the request of Darlene Grocki ("Grocki"), EPC's on-site manager at the Apartments, to conduct a routine pre-rental inspection of an apartment located at 1421 Cypress Avenue. (D.I. 52 at A-1)

---

[1] References herein to "D.I. ___, at ___" refer to documents previously filed with this Court. D.I. 44 is Defendants' Opening Brief in Support of Their Motion for Summary Judgment. D.I. 52 is Defendants' Appendix in support of their Motion for Summary Judgment. D.I. 53 Volume 1 is Appendix to Plaintiff's Answering Brief in Opposition to the Motion for Summary Judgment. D.I. 54 Volume 2 is Appendix to Plaintiff's Answering Brief in Opposition to the Motion for Summary Judgment. D.I. 64 is Plaintiff's Opening Brief in Support of its Motion In Limine (Daubert Motion) to Exclude the Affidavits, Expert Reports and Testimony of Gerald Llewellyn, Ken Belmont and George Yocher. D.I. 66 is Appendix to Defendants' Reply Brief in Support of their Motion for Summary Judgment.

[2] EPC sued Elsmere over this issue, but lost. See Elsmere Park Club, L.P. v. Town of Elsmere, 771 F.Supp. 646 (D. Del. 1991).

Upon arrival, Blomquist detected a very strong odor and advised Grocki that the apartment would not be inspected until she identified and remedied the source of the odor. (D.I. 52 at A-1).   Grocki then directed Blomquist to 1353 Maple Avenue for another pre-rental inspection, however, upon entering the building, Blomquist detected the same strong odor.  (D.I. 52 at A-2).  He again told Grocki that she must immediately identify and remedy the source of the odor before he could certify the apartment units for occupancy, and that he would return to complete the pre-rental inspections once she advised him that the problem had been rectified.  (D.I. 52 at A-2).  Shortly thereafter, the source of the odor was traced to the basements of the two buildings.

On or about Friday, October 4, 2002, Blomquist returned to the Apartments at Grocki's request to complete the pre-rental inspections at 1421 Cypress and 1353 Maple and to inspect the basements.  (D.I. 52 at A-2).  Accompanying Blomquist was Kenneth Belmont.  Blomquist asked Belmont to accompany him to the Apartments in order to obtain Belmont's insight into the possible source of the odor Blomquist had detected during the earlier inspections.  (D.I. 52 at A-2).

After arriving at the Apartments, Blomquist and Belmont were taken to the basement of 1421 Cypress Avenue by John Ruhl ("Ruhl"), maintenance supervisor at the Apartments.  (D.I. 52 at A-2).  Upon entering the former basement apartment, Blomquist and Belmont detected extensive mold growth, evidence of raw sewage, and other serious code violations.  (D.I. 52 at A-2).  Ruhl then directed them to the basement at 1405 Cypress Avenue, a building not visited during the October 1, 2002 pre-rental inspections, where they discovered even more extensive mold, raw sewage, a steady leak of hot water

into the basement from the apartment unit above, two inches of water on the floor and high humidity.  (D.I. 52 at A-3).

 After finding such serious conditions in the two basements, Belmont contacted Gerald Llewellyn.  Llewellyn advised Belmont and Blomquist that the conditions in the basements posed a serious health threat to the occupants of the buildings because of the likely migration of the mold spores from the basements into the apartments above through various openings such as pipe chases and ventilation ducts.  (D.I. 52 at A-135-36).  The State, including Llewellyn and Belmont, advised Blomquist that it was their recommendation that the two buildings be condemned and vacated immediately.  (D.I. 52 at A-135).  In reliance upon the expertise of Llewellyn and Belmont, Blomquist informed Grocki of that determination, posted as condemned the buildings that had already been inspected, and evacuated the residents.

 On Monday, October 7, 2002, the inspections of the remaining 37 basements resumed.  (D.I. 52 at A-4).  Blomquist was joined by Belmont, Llewellyn and George Yocher, and together they systematically inspected the remaining basements over the next several days, stopping only during the time EPC's motion for temporary restraining order was filed and heard by the Court of Chancery.  (D.I. 52 at A-217).

 Eventually, all of the basements, except the one located in 1410 Cypress Avenue,[3] were found to contain elevated levels of mold and were condemned. Numerous basements also contained standing water, including water in bathtubs and other fixtures that had not been removed, old and/or fresh human waste product, exposed

---

[3]    The basement of 1410 Cypress contained the on-site management office of the Apartments, and it did not contain the mold and raw sewage found in the other basement areas.

electrical wiring, substantial structural rot, broken asbestos tiles, and other serious code violations. (D.I. 52 at A-5-6). In addition, some occupied apartment units were found to contain evidence of mold infestation. (D.I. 52 at A-6). During the entire inspection process, Blomquist, Boneker, Giles and Elsmere thoroughly discussed the results of the inspections with the State, including Llewellyn, Belmont and Yocher, and only upon the specific recommendations of these State officials did Defendants condemn 38 of the 39 buildings at the Apartments.

The Opinions of Llewellyn, Yocher and Belmont

In performing their duties as employees of the State of Delaware, Llewellyn, Yocher and Belmont performed certain testing. In addition to the visual inspections of the premises, the Defense Experts performed "grab tests" at the Apartments. (Ch. Ct. Tr., D.I. 66 at C-49). The grab tests revealed levels of mold were higher within the apartments than in the outdoors, where air sampling is performed as a control measure. According to the Plaintiff's own expert, that result is conclusive evidence of the migration of mold spores into the inhabited spaces. (Johnson Depo. Tr., D.I. 66 at C-392). Furthermore, Dr. Llewellyn personally discussed with several tenants the medical complications that they and their families suffered, that the tenants believed were a result of the extensive growth of mold, including "upper respiratory conditions." (Llewellyn Depo. Tr. at 109:2-110:14, D.I. 66 at C-175). The Condemnation was advised by the Experts and others based upon their review of all relevant factors and in accordance with the relevant industry standards. It reflects the unanimous belief by experts in the field of public health that the conditions at the Apartments indicated a need for immediate evacuation.

In its Motion, EPC alleges that the Affidavits of Llewellyn, Belmont, and Yocher are not based upon the "good grounds" required by Daubert and its progeny. The Motion draws this conclusion on an incorrect predicate. EPC states conclusorily that the testimony of the defense experts lacks "good grounds" for the simple reason that the Defense Experts failed to comply with the Guidelines on Assessment and Remediation of Fungi in Indoor Environments, issued by the New York City Department of Health & Mental Hygiene (the "Guidelines").

<u>The New York City Guidelines</u>

The Guidelines were drafted in April 2000 and revised in January 2002. Dr. Llewellyn was among fewer than two dozen experts consulted who contributed to the revisions of the Guidelines. (See Llewellyn Depo. Tr. at 19:10-23; 99:10-100:12, D.I. 66 at C-85; C-165-166; D.I. 64 at Exh. B, Guidelines at § 1). He was joined by representatives from the National Institute for Occupational Health and Safety, a division of the national Centers for Disease Control and Prevention ("CDC"), the Harvard School of Public Health and other preeminent experts in the field of environmental and occupational disease epidemiology. (D.I. 64 at Exh. B, Guidelines, Introductory Comments at p. 3 of 16). The Guidelines set forth principles and policies for environmental evaluation and intervention in cases of mold growth, and were set forth in light of certain established facts about mold. First, there is an indication of a connection between exposures to Stachybotrys chartarum (toxic black mold) and pulmonary hemorrhage (bleeding in the lungs) and hemosiderosis (toxic iron levels) in infants. (The New York Dept. of Health, Bureau of Environmental Investigation Circular "The Facts About Mold") (D.I. 64 at Exh. B, Facts About Mold at p.2). Less severe symptoms of

exposure to mold include fatigue, respiratory ailments and eye irritation, as well as runny

nose, eye irritation, cough, congestion and aggravation of asthma. (D.I. 64 at Exh. B,

Facts About Mold at p. 1). In addition to infants, other persons at the highest risk for

complications due to mold exposure are "people with immune suppression, asthma,

hypersensitivity pneumonitis, severe allergies, sinusitis, or other chronic inflammatory

lung diseases." (D.I. 64 at Exh. B, Guidelines at p. 6 of 16). Dr. Llewellyn testified at

deposition that he was aware that several tenants had been suffering health complications

as a result of their exposure to mold. (Llewellyn Depo. Tr. at 109:2–110:14, D.I. 66 at C-

175-176). At the public meetings held to address the concerns of the tenants, Dr.

Llewellyn personally responded to questions of tenants regarding their health concerns

relating to the presence of mold. (Llewellyn Depo. Tr. at 109: 5-9, D.I. 66 at C-175). In

addition, a team of nurses tried to locate children who lived in the apartments to

determine their unique reactions to the mold contamination and confirmed that, among

those located, some had already demonstrated signs of respiratory illness as a result of the

pervasive mold contamination. (Llewellyn Depo. Tr. at 109:22 -110:14, D.I. 66 at C-

175-176).

 The testing performed at the Apartments and the visual inspections thereof

indicated the presence of *Stachybotrys chartarum*. Other molds found in high

concentrations included *Aspergillus* and *Penicillum*, both of which can produce "potent

mycotoxins, some of which are identical to [*Stachybotrys chartarum*]. Mycotoxins are

fungal metabolites that have been identified as toxic agents." (D.I. 64 at Exh. B,

Guidelines at p. 1 of 16).

Because of the exigent need for remediation upon discovery of mold growth, the Guidelines recommend that remediation personnel employ the "simplest and most expedient remediation that is reasonable." (D.I. 64 at Exh. B, Guidelines at p. 2 of 16). The Guidelines make clear that the "listed remediation methods are not meant to exclude other similarly effective methods." (D.I. 64 at Exh. B, Guidelines at p. 8 of 16). The methods to be employed in remediation depend upon the extent of the contamination. The smallest range, 10 square feet or less, requires the lowest level of precaution, although respiratory protection and vacating those in high-risk groups are both indicated. (D.I. 64 at Exh. B, Guidelines at p. 9 of 16). There are four levels of remediation for wallboard surfaces afflicted with mold, and two separate levels for contamination present in HVAC systems. Logically, the more extensive and pervasive the mold growth, the more dramatic and comprehensive the remediation measures.

As set forth below, the Defense Experts applied the Guidelines in determining that the extraordinary proliferation of mold at the Apartments required the Condemnation; under the circumstances, a "wholesale" evacuation was the simplest and most expedient method by which to protect the tenants from further complications arising from mold exposure and to remediate the apartments in full. Accordingly, the Defense Experts adhered to the principles set forth in the Guidelines.

**ARGUMENT**

I.    **The Methodologies of Llewellyn, Yocher and Belmont Are Reliable and Well-Established**

Plaintiff contends that the Defense Experts' testimony must be excluded, despite the extensive training and experience of Llewellyn, Belmont and Yocher, for several flawed reasons. Some of the reasons advanced by Plaintiff are wrong as a matter of fact, others incorrect as a matter of law. All are, however, flawed, and Plaintiff's Motion should be dismissed accordingly.

1.    The Experts' Opinions Were Based Upon the Type of Data on Which a Reasonable Expert Would Rely

Daubert indicates that the inquiry as to whether a particular scientific technique or method is reliable is a flexible one. Daubert, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."). Further, "[t]he decision whether to admit expert testimony is within the broad discretion of the trial court, and a court generally does not abuse its discretion where the expert bases its opinion on the type of data a reasonable expert in the field would use in rendering an opinion on the subject at issue." U.S. v. Brink, 39 F.3d 419, 427 (3d Cir. 1994); citing Deluca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 955 (3d Cir. 1990) (citations omitted). Despite the flexible requirements of Daubert, Plaintiff asserts that the Defense Experts have, in fact not adhered to the Guidelines in formulating their opinions and contends that the methodology utilized by the Defense Experts is unreliable because it calls into play the judgment and experience of the Defense Experts in its application. Plaintiff is incorrect.

a.     The Guidelines Are Regularly Relied Upon By Experts in the Field

The opinions expressed in the Affidavits were formulated as a result of the methodology set forth in the Guidelines.  Plaintiff concedes that the Guidelines "comprise one of the few accepted standards in the industry."  (D.I. 64 at 4; see also D.I. 53 at 1).  Plaintiff's expert, Larry W. Johnson, concurs.  (D.I. 64 at 4, citing D.I. 53 at B-13).   Accordingly, there is no dispute that the methods employed by the Defense Experts are grounded in established scientific principles of the sort regularly relied upon by experts in the field.  See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741-743 (3d Cir. 1994) ("Paoli II").  Accordingly, if the Defense Experts used the Guidelines in formulating their opinions, Plaintiff concedes that their findings and the testimony based thereon are admissible.

b.     Llewellyn, Yocher and Belmont Followed the Guidelines in
         Forming and Rendering their Opinions

Plaintiff alleges that the Defense Experts' testimony is not reliable because, "the only reliable methodology proffered by Defendants was not followed." (D.I. 64 at 10).  Plaintiff claims that the Guidelines required Llewellyn, Belmont and Yocher to interview tenants regarding their health and to inspect areas in which tenants were residing for mold prior to recommending the Condemnation of the Apartments.  (Id. at 10-12).  This argument fails as a matter of law, but, significantly, also fails as a matter of fact.

It should be noted that not only did Llewellyn, Yocher and Belmont follow the Guidelines, but Dr. Llewellyn advised the New York City Department of Health with respect the most current version of the Guidelines.  It is, therefore, fair to assume that if there is any uncertainty with respect to the application of any given provision within the Guidelines to the facts at hand, Dr. Llewellyn is uniquely qualified to opine on the import

or effect thereof. As set forth herein, the Guidelines do, in fact, support to the positions of the Defense Experts with respect to both their respective affidavits and in recommending the Condemnation.

Dr. Llewellyn stated in his affidavit that he disagreed with the opinions set forth in the Affidavit of Matthew Banka ("Banka"). First, Dr. Llewellyn disagreed with Banka's assessment that the mold growth was in a "small or in an isolated part of the basements." (Llewellyn Aff., ¶ 2, D.I. 52 at A-135). Rather, Dr. Llewellyn found that "the mold is much more extensive." No clinical evaluation of this statement is necessary.[4] An examination of the basements—or even a review of photographs of the basements—makes clear that the mold growth was, indeed, extensive. According to the Guidelines, "A visual inspection is the most important initial step in identifying a possible contamination problem. The extent of any water damage and mold growth should be visually assessed." (D.I. 64 at Exh. B, Guidelines, § 2.1). Llewellyn personally inspected the basements of the Apartments. (Llewellyn Aff., ¶ 1, D.I. 53 at A-135). From that visual inspection, Llewellyn determined that mold covered every wall surface and every ceiling surface in the basements. As set forth in the Guidelines, the extent of mold growth is not an observation in need of corroboration in a laboratory; the extensive growth of mold was plainly apparent upon visual inspection. (See Blomquist Aff., D.I. 53 at A-1). Accordingly, Llewellyn complied with the procedure set forth in the Guidelines in rendering the opinion that mold contamination was extensive.

_____

[4] See also Ch. Ct. Tr. At 40:3-9, D.I. 66 at C-40, where the Chancery Court observed that, "The photographs [of the Apartments] are vivid and disgusting, they depict extensive mold penetration ..."

Further, in his affidavit, Dr. Lllewelyn disagreed with Banka's assessment that mold "will not be present in the individual apartments," finding instead that "mold spores have probably migrated to the apartments." (Llewellyn Aff., ¶ 2, D.I. 53 at A-135).  This conclusion was drawn based upon the air sampling that was performed at the Apartments, which indicated a higher level of mold concentration within the apartments than in the air outdoors.  The significance of this fact was confirmed by Plaintiff's mold expert, Larry W. Johnson, who testified at deposition that the higher levels of mold within an apartment than in the outdoor environment indicated mold spore migration.  (Johnson Depo. Tr. at 24:14-21, D.I. 66 at C-392).  The Guidelines again support this conclusion. The New York City Department of Health, Bureau of Environmental Investigations' circular "Facts About Mold" states, "[w]hen moldy material becomes damaged or disturbed, spores (reproductive bodies similar to seeds) can be released into the air." (D.I. 64 at Exh. B, Facts About Mold at p. 1) (See also D.I. 66 at C-26, where Counsel for EPC states, "...by the simple fact of taking out the wallboard with the mold, you're shaking it up and allowing it to become airborne and mobilizing it.")

Finally, Dr. Llewellyn also refuted Banka's conclusion that "mold may be removed without presenting an increased health threat to the apartment occupants," finding instead that "the mold is so extensive that its removal will present an increased hazard." (Llewellyn Aff., ¶ 2, D.I. 53 at A-136).  Again, the Guidelines support Dr. Llewellyn's finding.  Although the extent of the hazard posed and the persons who may be affected thereby remains subject to scholarly debate among mycologists, toxicologists and epidemiologists, it remains widely agreed that, at a minimum, infants, the elderly and

persons with compromised immune systems may suffer serious risks to their health. (See D.I. 64 at Exh. B, Guidelines §1.1.2, §1.3, §3.1.c, §3.2.c, §3.3.c, §3.4.c).

Thus, as a matter of fact, Dr. Llewellyn's Affidavit meets the Guidelines and, according to Plaintiff, satisfies the requirements of Daubert. The same is true of the Affidavit of Belmont. Belmont, after setting forth the multiple bases for his conclusions, attests to two conclusions. First, that there is a likelihood that "unseen conditions" exist in the second and third floor wall cavities. (Belmont Aff., ¶7, D.I. 64 at Exh. B).[5] Second, Belmont opines that these spaces will require additional evaluation by a professional remediation firm. (Belmont Aff., ¶7, D.I. 64 at Exh. B). As in Llewellyn's Affidavit, Belmont states that, "[d]isturbance of the mold in an uncontrolled manner will cause migration, mold generation and cross contamination throughout the facility." (Belmont Aff. at ¶7, D.I. 64 at Exh. B). This conclusion is, again, supported by the Guidelines. (D.I. 64 at Exh. B, Facts About Mold at p. 1). Belmont's opinion that the condition is one which requires additional evaluation by remediation experts is attendant to Mr. Belmont's professional experience and not of a type that requires scientific support. Moreover, it is a conclusion agreed upon by Plaintiff. (See First Amended Complaint, D.I. 22, ¶ 19, 42; see also Ch. Ct. Tr., D.I. 66 at C-26).

Likewise, Mr. Yocher stated in his Affidavit that the design of the apartments "allows air movement through wall cavities, through pipe runs, common vents for kitchen exhaust and the common hallway." (Yocher Aff. ¶ 5, D.I. 64 at Exh. B). Yocher then opined that because of the nature of the ventilation, "it will be very difficult to isolate any

---

[5] This same assessment was made in the Chancery Court ruling on the motion for a temporary restraining order. The Court of Chancery concluded: "One suspects that mold has in many ways penetrated from the basement to the apartments above, at least to the interior of the walls above." (D.I. 66 at C-40).

apartment from the basement area." (Yocher Aff. ¶ 8, D.I. 64 at Exh. B).  These

conclusions find support in the Guidelines' recommended remediation procedures, which

describe extensive and complex measures required in order to effectively segregate a

contaminated area.  (See D.I. 64 at Exh. B, Guidelines, §3.1, § 3.2, §3.3, § 3.4, § 3.5.2).

Thus, Yocher has set forth the bases for his conclusion, which conclusions are supported

in full by the well-established science underlie the Guidelines.

      2.     Llewellyn, Yocher and Belmont Have "Good Grounds" for Their
                Opinions

Not only did the Defense Experts rely upon the industry standard in formulating

and rendering their opinions, but that adherence to that standard comprises the "good

grounds" required under Daubert.  However, although is it clear that the Guidelines lend

support to the conclusions set forth by Llewellyn, Yocher and Belmont, their testimony

would be admissible as a matter of law even if they did not.  The Guidelines state, in their

introduction, that "This document is not a legal mandate and should be used as a

guideline."  (D.I. 64 at Exh. B, Guidelines at p. 3 of 16).  The Guidelines also state that

"The listed remediation methods are not meant to exclude other similarly effective

methods." (D.I. 64 at Exh. B, Guidelines, at p. 4 of 16).

It is in this context that the difference between the basis for the Motion and the

theory that underlies the Complaint become paramount.  If this was a toxic mold tort case,

a plaintiff would bear the burden of showing general causation (that the mold on-site has

been shown to cause the injury the plaintiff sustained) and specific causation (that

plaintiff was exposed to a toxic dose of mold through the misfeasance of a defendant).

Walter J. Andrews, Lon A. Berk & David C. Ferro, Daubert v. Merrell Dow

Pharmaceuticals Provides Key Challenge To Mold Injury Causation Evidence, SG004

ALI-ABA 19, 28 (Oct. 2001). Defendant does not submit the Defense Experts' testimony in support of allegations of damages arising from the presence of mold.

The inquiries in a 42 U.S.C. § 1983 case, such as this one, are dramatically different from those of a tort claim. The Defendants do not bear the burden of proving the gravity of the proliferation of mold or the correctness of the gauge employed by the Experts in assessing the need for emergency condemnation and evacuation. The individual defendants need only prove that their reliance upon the recommendation of the State of Delaware officials was objectively reasonable; the Town of Elsmere needs only show that the ordinance pursuant to which the Condemnation was effected had a rational basis. C.f. Angstadt v. Midd-W. School Dist., 377 F.3d 338, 344 (3d Cir. 2004); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Anderson v. Creighton, 483 U.S. 635, 639 (1987); United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992). Accordingly, the Defense Experts' testimony is presented as evidence that the Defendants' reliance on the recommendations in favor of Condemnations by the Experts was reasonable. In furtherance of this point, the Affidavits reflect the considerations of the Experts in rendering their opinions that the Condemnation was indicated in light of the conditions at the Apartments and that their recommendations were reasonable given those conditions.

Under Daubert, a court need not agree with the conclusion reached by an expert. Daubert, 509 U.S. at 594. Rather, the inquiry is whether the expert's opinion is relevant and whether it is based upon "good grounds." Id. at 590. Their testimony meets both requirements.

Plaintiff argues that the Defense Experts' testimony must be excluded because their opinions "are not based on any identifiable or reliable scientific methodology." (D.I.

64 at 12). This is again incorrect. In fact, the Defense Experts' opinions were grounded in well-established, widely-recognized scientific principles, the merits of which are conceded even by Plaintiff. (D.I. 64 at 4, stating that the Guidelines "comprise one of the few accepted standards in the industry."). Plaintiff further argues that "Llewellyn offers no scientific data to support his conclusory allegation that 'contamination and exposure have already occurred.'" (D.I. 64 at 11). As to Belmont and Yocher, Plaintiff argues that their "failure to inspect certain apartments before declaring a serious health hazard and recommending evacuation clearly demonstrates that their opinions are not based on sufficient facts or data." (D.I. 64 at 12). Although the Experts did not inspect each of the 156 apartments to determine the extent of mold contamination in each, the Experts <u>did</u> investigate the loci of contamination and rendered their opinions and their Affidavits based upon their personal findings. The fact that the Experts did not examine each unit is irrelevant; the Experts are not required, as a matter of law, to personally investigate the locations about which they opine.

This principle was applied in <u>Eclipse Electronics v. Chubb Corp.</u>, 176 F.Supp.2d 406 (E.D.Pa. 2001). In that case, plaintiffs brought an action alleging that its insurer refused in bad faith to pay for loss of inventory of electronic connectors. Plaintiff proffered the testimony of their expert, an engineer, to testify that when electronic connectors are subject to humidity and exposure to certain gases, those connectors will become damaged. The putative expert further opined that the entire inventory of Plaintiff's connectors were ruined by humidity and gases, and as a result had no value on the market. Defendants filed a motion *in limine* to exclude the testimony of Plaintiff's expert under <u>Daubert</u>.

The court found the expert's opinion to be admissible under the <u>Daubert</u> factors, despite recognizing that the expert's testimony was not "based on his own observations and the limited testing he conducted that all of the connectors suffered actual damage or would fail to perform," but, rather, on general, widely-applied scientific principles that imparted sufficient reliability to the expert's testimony when applied to the facts at hand. <u>Eclipse</u>, 176 F.Supp.2d at 409.  The <u>Eclipse</u> court opined that an expert need not "'reinvent the wheel' and start his inquiry from square one in order to be deemed qualified under <u>Daubert</u>." <u>Id.</u> at 412.

The court engaged in the 8-part analysis set forth in <u>Daubert</u>.[6] Under the first inquiry, the court found the expert's hypothesis (that certain conditions cause deterioration of electronic connectors) was not only testable, but had in fact been tested in a well-established study known as the "Battelle Study." Further, the court found that the method was subject to peer review as the Battelle Study had been adopted as an industry standard by at multiple organizations, and had been extensively reviewed and accepted by experts in the field of electronic connectors.  The court found that the Battelle Study had a satisfactory potential rate of error in that, "[i]f the system failed in any significant way, its use would be discontinued, not promulgated as an industry-wide standard." <u>Eclipse</u>, 176 F. Supp.2d at 410.  The opinion was based upon, "clearly articulated standards" which controlled the methodology employed by the expert, and the court

---

[6] The non-exclusive factors of reliability considered pursuant to <u>Daubert</u> include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

found the methodology to bear a reliable relationship to the inquiry at hand because, "[y]ears of research have provided a scientifically valid framework for estimating the effects of the environment on electronic connectors," id., "involved extensive testing of the effects of environmental conditions on connectors." Id. at 412. The court noted the putative experts recognized achievement in the subject matter at hand, and found that his "reputation as one of the leading experts in the field enhances his ability to reliably testify." Id. at 410. Finally, the court denied the motion to exclude Eclipse's expert, finding that the methodology's, "use by manufacturers like IBM, Dell, Compaq, and AT&T illustrate that it was not created for purposes of this litigation and is an every day part of the electronics industry." Id.

Like the Battelle Study, the Guidelines have attained acceptance in the mold remediation industry as a reliable and valid standard. The Guidelines are not, however, as Plaintiff asserts, rigid in their application. As suggested by their name, they are merely guidelines. They supply well-established parameters within which the professional applying those guidelines has an appropriate measure of latitude. Indeed, the Guidelines themselves explicitly recognize that procedures other than those spelled out therein may be indicated. (See D.I. 64 at Exh. B, Guidelines at p. 8 of 16, stating that, "[t]he listed remediation methods are not meant to exclude other similarly effective methods."). That is where the expertise of the person applying the Guidelines comes into play.

Eclipse is relevant to the case at bar. Llewellyn, Yocher and Belmont have each set forth the relevant facts they considered, ascertained in conformity with the procedures set forth in the Guidelines. The facts they set forth guided the formulation of their respective opinions. The standards the Experts applied are well-established, well-

regarded scientific methods, intuited from the days of hoary antiquity[7] and definitively established through modern science in the present day.  The validity of the science which underlies the Guidelines is evinced by the recognition and adoption of those principles in the Guidelines by the leading team of experts in that field.

The fact that the Experts observed conditions that they recognized, in their professional experience, as giving rise to the conditions described in their respective Affidavits is evidence of their reliability.  The testimony of Llewellyn, Yocher and Belmont are admissible because that they do precisely what Daubert contemplates: they rely upon solid scientific grounds to make expert conclusions, based upon their familiarity with the relevant science, their experience in the field and the application of both to the facts at hand.

Thus, Llewellyn, Yocher and Belmont all have "good grounds" for their opinions and, accordingly, may testify pursuant to the liberal admissibility standards of Daubert and Federal Rule of Evidence 702.

---

[7] There are purported references to toxic black mold, Stachybotrys, recorded in the book of Leviticus: "[The priest] is to examine the mildew on the walls, and if it has greenish or reddish depressions that appear to be deeper than the surface of the wall, the priest shall go out the doorway of the house and close it up for seven days. On the seventh day the priest shall return to inspect the house. If the mildew has spread on the walls, he is to order that the contaminated stones be torn out and thrown into an unclean place outside the town. Leviticus 14:37-40 (New International Version)." Chenise S. Kanemoto, Scientific Expert Admissibility in Mold Exposure Litigation: Establishing Reliability of Methodologies in Light of Hawaii's Evidentiary Standard, 26 Univ. Hawaii Law Review 99, f.n. 26 (Winter 2003).

3.   The Affidavits Reflect the Reasonable Probability of The Existence of
Conditions Discussed Therein and Are Therefore Admissible

Plaintiff's objection to the Defense Experts' testimony centers in part on its

assertion that the conclusions in the Affidavits are "speculative." In fact, Plaintiff's

assertion is untrue. Under Daubert the Supreme Court recognized that, "[o]f course, it

would be unreasonable to conclude that the subject of scientific testimony must be

'known' to a certainty; arguably, there are no certainties in science." Daubert, 509 U.S. at

590. In this case, the opinions of the Experts are rendered on the basis of reasonable

probability; absolute certainty is not required. This does not preclude their admission as

evidence, but rather goes to the weight they are to be afforded by the trier of fact.

Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 809 (3d Cir. 1997), citing Paoli II,

35 F.3d at 741. See also 29 Charles A. Wright & Victor J. Gold, Federal Practice and

Procedure: Federal Rules of Evidence § 6264 (1997) (noting that although courts "will

reject expert testimony where it is based on rank speculation," they generally will "defer

to the jury's ability to weigh the evidence where an expert's opinion is equivocal"); 3

Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence, § 350 (2d Ed.1994)

("The fact that an expert cannot be categorical, and admits some uncertainty in his

conclusions, does not mean that his testimony fails the helpfulness requirement.").

4.   Llewellyn's Affidavit Is Soundly Within His Fields of Expertise

The final substantive contention of Plaintiff with respect to the Affidavits is that

Llewellyn's Affidavit "does not explain how he has any expertise in evaluating air flow

and building dynamics in support of his conclusion that contamination of the living areas

had already occurred." (D.I. 64 at 11). In fact, Dr. Llewellyn, attendant to his extensive

experience as a Chief Toxicologist with the Division of Public Health of the State of

23

Delaware, has observed the impact of air flow mechanisms on the spread of toxic particles. Llewellyn's qualifications to make such an observation are conceded by Plaintiff, whose <u>own</u> expert, Larry W. Johnson, recognized the Guidelines as "one of the few accepted standard in the industry." (D.I. 64 at 4). The import of the fact that Dr. Llewellyn was a contributor to the revised Guidelines can not be ignored.

Regardless, however, the requirement that a witness proffered to testify to specialized knowledge must be an expert is interpreted liberally. <u>Paoli II</u>, 35 F.3d at 741, <u>citing</u> <u>In re Paoli R.R. Yard PCB Litig.</u>, 916 F.2d 829, 855 (3d Cir. 1990) ("Paoli I"). The Third Circuit has held that, "a broad range of knowledge, skills, and training qualify an expert as such." <u>Id</u>. In <u>Paoli I</u>, the Third Circuit ruled that the District Court had abused its discretion in excluding the opinions of proffered by certain expects because "exclusion was not the proper remedy 'simply because the experts did not have the degree or training which the district court apparently thought would be most appropriate.'" <u>Paoli II</u>, 35 F.3d at 741, <u>citing</u> <u>Paoli I</u>, 916 F.2d at 856. In <u>Paoli II</u>, the Third Circuit elaborated on this holding; "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts. We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." <u>Paoli II</u> 35 F.3d at 741, <u>citing</u> <u>Hammond v. International Harvester Co.</u>, 691 F.2d 646, 652-53 (3d Cir. 1982) (holding that an engineer, whose only qualifications were sales experience in the field of automotive and agricultural equipment and teaching high school automobile repair, nevertheless could testify in a products liability action involving tractors); <u>See also</u> <u>Knight v. Otis Elevator Co.</u>, 596 F.2d 84, 87-88 (3d Cir. 1979) (holding that an expert could testify that

unguarded elevator buttons constituted a design defect despite expert's lack of specific background in design and manufacture of elevators).

Here, the knowledge and qualifications of Dr. Lllewellyn cannot be—and are not—denied. Even Plaintiff recognizes the moment of the Dr. Llewellyn's qualifications, as it notes that his credentials are "likely to have a profound effect on the jury." (D.I. 64 at 13). Rightly so. Dr. Llewellyn is a well-regarded expert in his field, and his opinion reflects his unique and prolific knowledge. Thus, Plaintiff's argument that the testimony of Dr. Llewellyn should be precluded because of purported lack of knowledge of "air flow and building dynamics" is simply unavailing.

## **CONCLUSION**

The opinions offered by Defendants' Experts are based on good grounds, and express the learned opinions of the leading experts in the State of Delaware on an issue of law narrowly targeted to the substance of a 42 U.S.C. § 1983 cause of action—the range of acceptable responses to the presence of vast mold and other environmental contamination.  Plaintiff has moved to exclude the Defense Expert testimony on grounds not related to the purpose for which they are proffered and that are both legally and factually flawed.  Hence, the Motion should be dismissed in its entirety.


MORRIS, JAMES, HITCHENS & WILLIAMS LLP



Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
 (302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*

Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist, Eugene Boneker and John Giles


Dated:  October 10, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2005, I electronically filed Defendants'

Answering Brief in Response to Plaintiff's Motion In Limine (Daubert Motion) to

Exclude the Affidavits, Expert Reports and Testimony of Gerald Llewellyn, Ken

Belmont and George Yocher, with the Clerk of Court using CM/ECF which will send

notification of such filing to the following:

        David S. Eagle, Esquire
        Klehr, Harrison, Harvey,
        Branzburg & Ellers LLP
        919 Market Street, Suite 1000
        Wilmington, DE  19801
        Attorneys for Plaintiff Elsmere Park Club, L.P.

                      _____
        Edward M. McNally (#614)
        Liza H. Sherman (#4124)
        Morris, James, Hitchens & Williams LLP
        222 Delaware Avenue, 10th Floor
        Wilmington, DE 19801
        (302) 888-6800
        emcnally@morrisjames.com
        lsherman@morrisjames.com
        Attorneys for Defendants Town of Elsmere,
           Ellis Blomquist and Eugene Bonekar