# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELSMERE PARK CLUB, L.P., a<br>Delaware limited partnership,<br><br>                Plaintiff,<br><br>        v.<br><br>TOWN OF ELSMERE, a Delaware<br>Municipal corporation,<br>ELLIS BLOMQUIST, EUGENE BONEKER,<br>and JOHN GILES,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 04-1321-SLR<br>)<br>)<br>)<br>)<br>)   **JURY TRIAL DEMANDED**<br>)<br>) |

### APPENDIX TO
### PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
### DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORT
### AND TESTIMONY OF DAVID J. WILK
### AND PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO STRIKE
### EXHIBIT A ATTACHED TO THE 9/22/05 AFFIDAVIT OF LIZA H. SHERMAN

Dated: October 14, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP


David S. Eagle (Bar No. 3387)
Patrick A. Costello (Bar No. 4535)
Douglas F. Schleicher (Admitted *Pro Hac Vice*)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 552-5504 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

| DOCUMENT | PAGE |
|---|---|
| Plaintiff's Mold Remediation Plan   November 2002 | D-1 |
| Correspondence between Plaintiff and Town of Elsmere re: Approval of Plaintiff's Mold Remediation Plan | D-26 |
| Larry Johnson, PE, CIH Supplemental Report 10/3/2005 | D-41 |
| Real Estate Settlement Sheet for the Sale of the Apartments | D-44 |
| Email dated 10/14/05 from D. Eagle to Defendants' Counsel In Compliance with Local Rule 7.1.1 | D-49 |
| Transcript of Judge Jan R. Jurden's Bench Ruling Denying Class Certification in Manuel v. Elsmere Park Club, L.P., et al., C.A. No. 02C-10-212 (JRJ) (Del. Super. Ct. April 16, 2004) | D-50 |

RT ENVIRONMENTAL

1.                    **PRELIMINARY COST ESTIMATE**

2.                         **MOLD REMEDIATION**

3.    **OVERVIEW**

The Fenwick Park Apartments are located in the Town of Elsmere, Delaware. The complex consists of 38 apartment buildings with four apartments per building. As originally constructed, each building also contained a fifth apartment that was partially below grade. A flood in 1989, an possibly an earlier flood in 1966, flooded these basement apartments. The Town prevented habitation of all of these partially sub-grade units after the 1989 flood. Later, in approximately 1996, the Town required the owner to seal the windows of the basement apartments with masonry and to fasten plywood over the doors of these apartments.

In addition to the water damage from the floods, there have been a number of other instances of routine water damage from roof and window leaks, air conditioner condensate damage and plumbing leaks. A number of the plumbing leaks appear to have damaged the basements.

Building management reports that inspections in the mid-1990s, and again in the late 1990s, addressed concerns regarding existing water damage. Accordingly, it is possible that all impacts presently observed in the buildings are attributable to damage that has occurred in the last few years.



DEPOSITION EXHIBIT
#17
8-17-05

702810210- 11/25/2002

## Water & Moisture Damage

Whenever building materials become water-damaged and go untreated, the possibility of mold growth on or within the materials is high. The current, accepted means of dealing with water-damaged building materials is to remove and replace damaged wallboard and to clean and dry any other materials such as carpet, wood structural members, masonry and non-porous furnishings within 24 to 48 hours.

## 4.    BUILDING ASSESSMENTS

An initial assessment of each building was conducted to determine its fitness for occupancy, the need for maintenance, the need for mold remediation and the potential for occupant exposure to elevated airborne mold spores.

## Visual Inspections

Air monitoring, visual inspections and photo documentation were conducted on all apartments and in the former basement apartments. The visual inspection was used to determine the extent of surface water damage or area covered by surface mold contamination. This information was used to determine the means by which the damage would be remedied. The mold-damaged areas were ranked for remediation using the New York City Department of Health Guidelines on Assessment and Remediation of Fungi in Indoor Environments.

## Individual Building Histories

Maintenance records have been reviewed to ascertain where water damage, other than the two floods mentioned, might have impacted the building materials in any of the apartments. As noted above, additional sources of water damage include roof leaks, plumbing leaks and air conditioner condensate.

D0002

702810210- 11/25/2002

EPA  001698

## 5.    REMEDIATION

Based on the work completed, we have assumed that all buildings will have the basements remediated.  In addition to the mold remediation, we have assumed that each basement will also have the vinyl asbestos tile (VAT) removed as a result of the water damage.  (These assumptions are subject to modification if additional investigation establishes no water damage to the drywall and or floors from the prior floods, leaks, etc.)  There could be a reduction in the cost of remediation by awarding the work to one contractor who can complete both the mold remediation and the asbestos abatement work.

Additional remediation is recommended in a limited number of above-grade apartment units, based on observed water damage or air sampling results.  The remediation will consist either of (i) HEPA vacuuming in units with no observed water damage but air sampling results which exceed results from outside the unit and which indicate a potential source in the basement or (ii) limited removal and replacement of wallboard with apparent water damage.  In the latter case, after removal and prior to replacement of wallboard, the area behind the drywall will be inspected to determine whether any additional impacts are present, and if so, the appropriate response.  Any damage behind the wallboard is not known at present, and therefore is not included in this cost estimate.  One building had a mold type which is associated with a wood source rather than a drywall source.  The wood in that building will be investigated during remediation to determine potential impacts to the wood.  In addition, certain bathrooms and kitchens have mold damage.  All buildings will be subject to clearance sampling.  Additional physical inspections and/or remediation may be needed if clearance is not achieved.  The additional cost of this is not included below.  A list of the buildings and apartments are listed in Attachment I.

D0003

11/25/2002  17:05.   6102650587                RT ENVIRONMENTAL                PAGE  05

A preliminary cost estimate, based on what has been learned to date is as follows:

| | |
|---|---|
| -Basements(ACM & Mold)-38 | $152,200 |
| -Bathrooms(Mold)-29 | 28,800 |
| -Kitchens(Mold)-6 | 5,600 |
| | Subtotal: $186,600 |
| -Inspection, Monitoring & Reporting | $44,600 |
| **TOTAL ESTIMATE** | **$ 231,200** |

Note carefully that the above do not include restoration costs for replacement of building components after remediation is completed nor any structural repairs found to be needed when walls or ceilings are opened up. In addition, it is essential that all spaces continue to be heated and maintained without water leakage, otherwise, costs will increase due to expanded remedial requirements.

D0004

EPA  001700

# ATTACHMENT 1
## LIST OF BUILDINGS AND APARTMENTS

D0005

EPA  001701

| STREET | APARTMENT(s) THAT NEED REMEDIATED BUILDING # & UNIT(s) |
|---|---|
| CYPRESS | 1400 basement, unit 4 |
| | 1401 basement, unit 4 |
| | 1402 basement |
| | 1403 basement |
| | 1404 basement |
| | 1405 basement, unit 2 & 5 |
| | 1406 basement |
| | 1407 basement |
| | 1408 basement, unit 2,3,4 & 5 |
| | 1409 basement |
| | 1411 basement, unit 5 |
| | 1413 basement, unit 5 |
| | 1415 basement |
| | 1417 basement |
| | 1419 basement |
| | 1421 basement |
| | 1423 basement |
| | |
| MAPLE | 1349 basement, unit 3 |
| | 1351 basement |
| | 1353 basement, unit 2,3,4 & 5 |
| | 1355 basement, unit 2,3,4,& 5 |
| | 1357 basement, unit 2 |
| | 1401 basement |
| | 1403 basement |
| | 1405 basement, unit 4 |
| | 1407 basement, unit 4 |
| | 1409 basement |
| | 1501 basement |
| | 1503 basement |
| | 1505 basement |
| | 1507 basement |
| | 1509 basement |
| | 1511 basement, unit 2 & 3 |
| | |
| SYCAMORE | 1400 basement |
| | 1401 basement, unit 3 |
| | 1403 basement, unit 2 |
| | 1405 basement |
| | 1407 basement, unit 5 |

D0006

11/25/2002  17:06    5102650587           RT ENVIRONMENTAL                    PAGE  08

# Elsmere Park Apartments



D0007

EPA  001703

11/25/2002 17:08    6102650687    RT ENVIRONMENTAL    PAGE 01

# RT Environmental Services, Inc.

## TELECOMMUNICATION COVER SHEET

PROJECT # _2628-02_

TOTAL NUMBER OF PAGES: _17_ INCLUDING THIS COVER SHEET.

TO: _Doug Schleicher Esq_

COMPANY: _____

LOCATION: _____

FAX PHONE#: _215-568-6603_

FROM: _CDW_

DATE: _6/25_    TIME OF TRANSMISSION: _____

---

____ ORIGINAL WILL FOLLOW VIA:
____ — U.S. MAIL
____ — OVERNIGHT PACKAGE
____ — HAND DELIVERY

____ ORIGINAL WILL NOT FOLLOW

THESE ARE TRANSMITTED AS CHECKED BELOW
____ FOR APPROVAL
____ FOR YOUR USE ____ FOR BIDS DUE
____ FOR REVIEW AND COMMENT BY____
____ AS REQUESTED
____ OTHER

THIS FAX IS CONFIDENTIAL AND IS INTENDED ONLY FOR THE PERSON TO WHOM IT IS ADDRESSED. IF YOU RECEIVED THIS IN ERROR, OR DID NOT RECEIVE ALL OF THE PAGES, PLEASE CALL 800-725-0593, EXT. 10, AS SOON AS POSSIBLE. PLEASE RETURN AN INCORRECTLY SENT FAX BY FIRST CLASS MAIL.

**RT's SCOPE OF SERVICES**
- REAL ESTATE ENVIRONMENTAL SITE ASSESSMENTS
- UNDERGROUND & ABOVE GROUND TANKS
- REMEDIAL ACTION
- RISK BASED CORRECTIVE ACTION
- BROWNFIELDS SITES
- ENVIRONMENTAL ENGINEERING
- EXPERT WITNESS SERVICES
- HEALTH & SAFETY SERVICES
- ASBESTOS & LEAD BASED PAINT
- RISK ASSESSMENTS
- AIR AND WASTEWATER
- HYDROGEOLOGICAL STUDIES
- PA SAFE FILL
- ANTHRAX & EMERGENCY RESPONSE
- NJ ISRA; PA LAND RECYCLING
- INDOOR AIR & MOLD
- CONTINGENCY PLANS

MESSAGE:

F:\RT Admin (9004)\9004-00\FAX COVER SHEET.wpd

D0008



215 West Church Road ■ King of Prussia, PA 19406 ■ (610) 265-1510 ■ Fax: (610) 265-0687
E-Mail RTENV@AOL.COM ■ Web Address http://www.RTENV.COM

EPA 001704

11/25/2002  17:08   6102650687                RT ENVIRONMENTAL                    PAGE  02



# TECHNICAL SCOPE
# FOR THE REMOVAL OF MOLD IMPACTED AND
# ASBESTOS-CONTAINING MATERIALS

## FOR

## FENWICK PARK APARTMENTS
## ELSMERE, DELAWARE

## PREPARED FOR:

## ELSMERE PARK CLUB, L.P.

## PREPARED BY:

## RT ENVIRONMENTAL SERVICES, INC.
## AND
## SOVEREIGN ENVIRONMENTAL GROUP, INC.

## NOVEMBER 2002

# RT Environmental Services, Inc.

D0009

EPA  001705

### DESCRIPTION OF WORK

### VINYL ASBESTOS TILE ABATEMENT

This project will involve the abatement by removal of damaged vinyl asbestos tile in basement apartments at the Fenwick Park Apartments in Elsmere, DE.

- 700 square feet (present estimate) of vinyl asbestos tile (VAT) located in the basement apartments of each building.

The project involves the abatement by removal of the vinyl asbestos tile materials which are in poor condition in basement apartment units or which need to be abated by removal to facilitate mold abatement activities.

The Work will be performed in full accordance with all relevant Federal, State, and Local laws and regulations, including but not limited to the NESHAP provisions of the Clean Air Act, Delaware laws and regulations governing asbestos abatement work, all Federal OSHA asbestos and construction safety standards.

### DESCRIPTION OF WORK – MOLD ABATEMENT

This section describes areas where mold remediation work is to be performed and lists areas which will receive special protection during the remediation work. This work will be conducted following all Federal, State and Local ordinances, regulations and rules pertaining to mold, including its storage, transportation and disposal. This project will be conducted in accordance with the New York City Department of Health Guidelines.

The work will include:

- Use of vacuum cleaners equipped with HEPA filters to collect all debris and dust;

- Wet methods, or wetting agents, to control employee exposures during mold handling, mixing, removal, cutting, application, and cleanup; and

- Prompt clean up and disposal of wastes and debris contaminated with mold in leak-tight containers.

D0010

Remediation shall include removal of mold-containing building materials in the following matter:

- Thirty-eight (38) basement apartments shall be remediated using Level III procedures specified herein.

- Sixteen (16) upper floor apartments shall be remediated using Level II procedures specified herein.

## DESCRIPTION OF WORK – SEWAGE RELEASE ABATEMENT

Certain areas of the complex (including 1409 Maple & 1357 Maple) are impacted by releases of wastewater from leaking plumbing fixtures and sewer piping. Visual inspection of the apartments as of early October 2002 did not reveal any areas of wastewater releases from sanitary wastewater fixtures and piping; all leakage found was from kitchen and bathroom sink fixtures. Leakage found was into the same areas scheduled for mold and/or asbestos abatement. Should any new areas be found during the execution of the work where sanitary wastewater releases impacted building materials, causing a potential hazard, proper work practices will be implemented during execution of the removal of any and all sewage release damaged building materials.

To assure maximum control of mold spores during removal of building materials, a "top down" sequence of abatement will be used. Within each building, materials shall be removed and abated from the uppermost units, to the first floor units to the basement. The reason for this protocol is to maintain negative pressure air control, and the ability to segregate work areas as the work proceeds and building materials including wall board, insulation, wood framing or other building materials are removed for abatement purposes. If any conditions are found after building materials are removed, the ENVIRONMENTAL CONSULTANT shall be notified and shall issue instructions on the scope of work prior to any wood removal.

Additional work sequence provisions include the following:

- Movable objects shall be removed from the work area prior to initiation of abatement activities.

D0011

EPA 001707

–     Prepare and isolate the WORK area and establish necessary barriers, decon facilities and waste staging areas to achieve full containment.

–     Perform removal utilizing required full containment procedures.

Background, project, clearance sampling, and final inspection shall be provided by ENVIRONMENTAL CONSULTANT.

Final tear down of critical barriers and isolations barriers will take place only upon approval of ENVIRONMENTAL CONSULTANT.

## REMOVAL DETAILS

A.     Asbestos-Containing Material Abatement:

Removal of asbestos-containing material within the basement apartment units shall be performed using full-containment techniques and an attached 3-stage decontamination unit where possible. Negative air shall be provided using HEPA (High Efficiency Particulate Air) filtration systems and discharged to the outside of the building. The work area shall be prepared and engineering controls installed in accordance with Section 2 of the Technical Specifications.

B.     All visual inspections and final clearance air sampling shall be conducted by the ENVIRONMENTAL CONSULTANT.

## AIR SAMPLING METHODOLOGY

After the containment area passes the final visual inspections, final clearance air samples shall be collected.

The sampling, analysis, and release criteria for final clearance shall be in accordance with the phase contrast microscopy (PCM NIOSH 7400) protocol, or TEM if required locally or considered appropriate give the project type.

D0012

EPA  001708

## MOLD ABATEMENT

We have assumed that the apartments shall be unoccupied for the remediation to facilitate efficient work practices.

Appropriate caution signs shall be posted at the entrance to each work area and the waste storage area at all times during the mold project.  A work area is an entire building, floor, or a portion of a floor where work is being conducted at that time.

An enclosure shall be constructed around the controlled area.  The enclosures shall be maintained under negative pressure using HEPA-filtered air filtration device (AFD).  AFD's shall be exhausted to the outside of the building.

Stationary items shall be decontaminated if visibly mold-contaminated by wet wiping and/or HEPA vacuuming.  All movable objects shall be relocated from the controlled area.

Disable HVAC or any other system bringing air into, out of, or through the Work Area.  Disable system by lockout, disconnecting wires, removing circuit breakers by lockable switch and/or other positive means that will prevent accidental premature restarting of equipment.

## WATER DAMAGE / MOLD ABATEMENT

In all situations, the underlying cause of water accumulation will be rectified to the extent possible. Any initial water infiltration shall be stopped and cleaned immediately.  The ENVIRONMENTAL CONSULTANT shall be notified of any apparent needs for building repairs, which become apparent during the course of the work.

## LEVELS

Five different levels of abatement are described herein.  The size of the area impacted by fungal contamination determines the level.  The levels below are based on professional judgment and practicality. The goal of remediation is to remove or clean mold impacted materials in a way that prevents the emission of fungi and dust contaminated with fungi from leaving a work area and entering an occupied or non-abatement area, while protecting the health of workers performing the abatement.

*D0013*

EPA  001709

The listed remediation levels and methods are not meant to exclude other similarly effective methods. Any changes to the remediation methods listed in these guidelines, however, should be carefully considered prior to implementation. Non-porous (e.g., metals, glass, and hard plastics) and semi-porous (e.g., wood, and concrete) materials that are structurally sound and are visibly moldy can be cleaned and reused. Cleaning shall be completed using a detergent solution. Porous materials such as ceiling tiles and insulation, and wallboards with more than a small area of contamination shall be removed and discarded. Porous materials (e.g., wallboard, and fabrics) that can be cleaned, can be reused, but shall be discarded when possible.

## MATERIAL & BIOCIDES

All materials to be reused should be dry and visibly free from mold. The use of gaseous, vapor-phase, or aerosolized biocides for remedial purposes is not recommended. Any biocides proposed to be used by the CONTRACTOR shall be approved in advance by the ENVIRONMENTAL CONSULTANT.

### LEVEL I: SMALL ISOLATED AREAS (10 sq. ft or less) - e.g., ceiling tiles, small areas on walls.

Persons performing this work shall have training performed as part of a program to comply with the requirements of the OSHA Hazard Communication Standard (29 CFR 1910.1200).

Respiratory protection (e.g., N95 disposable respirator), in accordance with the OSHA respiratory protection standard (29 CFR 1910.134), is recommended. Gloves and eye protection are required.

The work area shall be unoccupied.

Containment of the work area is not necessary. Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are recommended.

Contaminated materials that cannot be cleaned shall be removed from the building in a sealed plastic bag.

The work area and areas used by remedial workers for egress shall be cleaned with a damp cloth and/or mop and a detergent solution.

All areas should be left dry and visibly free from contamination and debris.

D0014

EPA  001710

## LEVEL II: MID-SIZED ISOLATED AREAS (10 - 30 sq. ft.) - e.g., individual wallboard panels.

Persons performing the work shall have training performed as part of a program to comply with the requirements of the OSHA Hazard Communication Standard (29 CFR 1910.1200).

Respiratory protection (e.g., N95 disposable respirator), in accordance with the OSHA respiratory protection standard (29 CFR 1910.134), is recommended. Gloves and eye protection are required.

The work area shall be unoccupied.

The work area shall be covered with a plastic sheet(s) and sealed with tape before remediation, to contain dust/debris.

Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are required.

Contaminated materials that cannot be cleaned shall be removed from the building in sealed plastic bags.

The work area and areas used by remedial workers for egress should be HEPA vacuumed (a vacuum equipped with a High-Efficiency Particulate Air filter) and cleaned with a damp cloth and/or mop and a detergent solution.

All areas should be left dry and visibly free from contamination and debris.

## LEVEL III: LARGE ISOLATED AREAS (30 - 100 square feet) - e.g., several wallboard panels.

The following procedures are required:

Personnel trained in the handling of hazardous materials and equipped with respiratory protection, (e.g., N95 disposable respirator), in accordance with the OSHA respiratory protection standard (29 CFR 1910.134), is recommended. Gloves and eye protection are required.

D0015

The work area and areas directly adjacent shall be covered with a plastic sheet(s) and taped before remediation, to contain dust/debris.

Seal ventilation ducts/grills in the work area and areas directly adjacent with plastic sheeting.

The work area and areas directly adjacent shall be unoccupied.

Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are required.

Contaminated materials that cannot be cleaned shall be removed from the building in sealed plastic bags.

The work area and surrounding areas shall be HEPA vacuumed and cleaned with a damp cloth and/or mop and a detergent solution.

All areas should be left dry and visibly free from contamination and debris.

If abatement procedures are expected to generate a lot of dust (e.g., abrasive cleaning of contaminated surfaces, demolition of plaster walls) or the visible concentration of the fungi is heavy (blanket coverage as opposed to patchy), then remediation procedures for Level IV shall be followed.

### LEVEL IV: EXTENSIVE CONTAMINATION (greater than 100 contiguous square feet in an area)

The following procedures are required:

Personnel trained in the handling of hazardous materials equipped with:

- Full-face respirators with high efficiency particulate air (HEPA) cartridges

- Disposable protective clothing covering both head and shoes

- Gloves

D0016

Containment of the affected area:

- Complete isolation of work area from occupied spaces using plastic sheeting sealed with duct tape (including ventilation ducts/grills, fixtures, and any other openings)

- The use of an exhaust fan with a HEPA filter to generate negative pressurization

- Airlocks and decontamination room.

Contaminated materials that cannot be cleaned shall be removed from the building in sealed plastic bags. The outside of the bags shall be cleaned with a damp cloth and a detergent solution or HEPA vacuumed in the decontamination chamber prior to their transport to uncontaminated areas of the premises.

The contained area and decontamination room shall be HEPA vacuumed and cleaned with a damp cloth and/or mop with a detergent solution and be visibly clean prior to the removal of isolation barriers.

Air monitoring shall be conducted prior to reoccupancy by the ENVIRONMENTAL CONSULTANT to determine if the area is fit to reoccupy.

## LEVEL V: REMEDIATION OF HVAC SYSTEMS (A Small Isolated Area of Contamination {<10 square feet} in the HVAC System

Persons performing this work shall have training performed as part of a program to comply with the requirements of the OSHA Hazard Communication Standard (29 CFR 1910.1200).

Respiratory protection (e.g., N95 disposable respirator), in accordance with the OSHA respiratory protection standard (29 CFR 1910.134), is recommended. Gloves and eye protection should be worn.

The HVAC system shall be shut down prior to any remedial activities.

The work area shall be covered with a plastic sheet(s) and sealed with tape before remediation, to contain dust/debris.

D0017

Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are required.

Growth supporting materials that are contaminated, such as the paper on the insulation of interior lined ducts and filters, shall be removed.  Other contaminated materials that cannot be cleaned shall be removed in sealed plastic bags.

The work area and areas immediately surrounding the work area shall be HEPA vacuumed and cleaned with a damp cloth and/or mop and a detergent solution.

All areas shall be left dry and visibly free from contamination and debris.

Biocides may be recommended by HVAC manufacturers for use with HVAC components, such as, cooling coils and condensation pans.  HVAC manufacturers shall be consulted with respect to the products they recommend for use in their systems.

Areas of Contamination (>10 square feet) in the HVAC System
The following procedures are recommended:

-Personnel trained in the handling of hazardous materials equipped with:

    -Respiratory protection (e.g., N95 disposable respirator), in accordance with the OSHA
    respiratory protection standard (29 CFR 1910.134), is recommended.

    -Gloves and eye protection

    -Full-face respirators with HEPA cartridges and disposable protective clothing
    covering both head and shoes should be worn if contamination is greater than 30 square
    feet.

The HVAC system shall be shut down prior to any remedial activities.

Containment of the affected area:

D0018

EPA  001714

-Complete isolation of work area from the other areas of the HVAC system using plastic sheeting sealed with duct tape.

-The use of an exhaust fan with a HEPA filter to generate negative pressurization.

-Airlocks and decontamination room if contamination is greater than 30 square feet.

-Growth supporting materials that are contaminated, such as the paper on the insulation of interior lined ducts and filters, shall be removed. Other contaminated materials that cannot be cleaned shall be removed in sealed plastic bags. When a decontamination chamber is present, the outside of the bags shall be cleaned with a damp cloth and a detergent solution or HEPA vacuumed prior to their transport to uncontaminated areas of the building.

-The contained area and decontamination room shall be HEPA vacuumed and cleaned with a damp cloth and/or mop and a detergent solution prior to the removal of isolation barriers.

-All areas shall be left dry and visibly free from contamination and debris.

-Air monitoring shall be conducted by the ENVIRONMENTAL CONSULTANT prior to re-occupancy with the HVAC system in operation to determine if the area(s) served by the system are fit to reoccupy.

-Biocides may be recommended by HVAC manufacturers for use with HVAC components, such as, cooling coils and condensation pans. HVAC manufacturers shall be consulted for the products they recommend for use in their systems.

Mold waste shall be deposited as soon as practical at a regulated waste disposal site.

D0019

EPA  001715

# ATTACHMENT 1
## SCHEDULE OF MOLD ABATEMENT/REMEDIATION BY BUILDING

D0020

EPA  001716

| STREET | APARTMENT(s) THAT NEED REMEDIATED |
|--------|-----------------------------------|
|  | BUILDING # & UNIT(s) |
| CYPRESS | 1400 basement, unit 4 |
|  | 1401 basement, unit 4 |
|  | 1402 basement |
|  | 1403 basement |
|  | 1404 basement |
|  | 1405 basement, unit 2 & 5 |
|  | 1406 basement |
|  | 1407 basement |
|  | 1408 basement, unit 2,3,4 & 5 |
|  | 1409 basement |
|  | 1411 basement, unit 5 |
|  | 1413 basement, unit 5 |
|  | 1415 basement |
|  | 1417 basement |
|  | 1419 basement |
|  | 1421 basement |
|  | 1423 basement |
|  |  |
| MAPLE | 1349 basement, unit 3 |
|  | 1351 basement |
|  | 1353 basement, unit 2,3,4 & 5 |
|  | 1355 basement, unit 2,3,4,& 5 |
|  | 1357 basement, unit 2 |
|  | 1401 basement |
|  | 1403 basement |
|  | 1405 basement, unit 4 |
|  | 1407 basement, unit 4 |
|  | 1409 basement |
|  | 1501 basement |
|  | 1503 basement |
|  | 1505 basement |
|  | 1507 basement |
|  | 1509 basement |
|  | 1511 basement, unit 2 & 3 |
|  |  |
| SYCAMORE | 1400 basement |
|  | 1401 basement, unit 3 |
|  | 1403 basement, unit 2 |
|  | 1405 basement |
|  | 1407 basement, unit 5 |

D0021

EPA  001717

# Elsmere Park Apartments



D0022

EPA  001718

# ATTACHMENT 2
## AREAS OF WASTEWATER RELEASE

D0023

001719

Area 1-1409 Maple

Kitchen Sink Leak

Repaired & Cleaned by Maintenance staff > 1 year ago


Area 2-1357 Maple

Recent...will be taken care of as part of this Scope.

D0024

EPA  001720

```
***********************
TRANSMISSION REPORT
***********************
```

(MON) NOV 25 2002 18:53
KLEHR HARRISON        PHILADELPHIA

| DOCUMENT # | TIME STORED | TIME SENT | DURATION | PAGE (S) | MODE | RESULT |
|---|---|---|---|---|---|---|
| 4261591-993 | 11. 25 18:20 | 11. 25 18:47 | 4' 17" | 26 | ECM | OK |

| DESTINATION | DST. TEL # |
|---|---|
| 0006#19024269193 | 0591#085190006#13024269193 |

# KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

ATTORNEYS AT LAW

260 S. BROAD STREET

PHILADELPHIA, PA 19102-5003

(215) 568-6060
FAX: (215) 568-6603
www.klehr.com

## PLEASE DELIVER THE FOLLOWING PAGES TO:

| | Recipient | Company | Fax No. | Phone No. |
|---|---|---|---|---|
| 1. | David Eagle | | 302-426-9193 | |

**From:**          Douglas F. Schleicher

**Direct Dial:**   (215) 569-2795          **Email Address:**   DSCHLEIC@klehr.com

**Client-Matter:**       08519-0006          Follow-up Copy Will Not Be Sent By Mail

**Date:**                November 25, 2002

**Number of Pages:**     *Including Cover  18*

## COMMENTS:

Please look at the e-mail regarding this fax.

D0025

EPA  001721

01/24/2003  14:46    610265056/          RT ENVIRONMENTAL          PAGE  02

**DELAWARE HEALTH
AND SOCIAL SERVICES**
DIVISION OF PUBLIC HEALTH

DISEASE PREVENTION AND CONTROL

January 16, 2003

JAN 2 4 2003

Mr. Gary Brown, P.E.
President
RT Environmental Services
215 West Church Rd
King of Prussia, PA  19406

Dear Mr. Brown:

Thank you for letter of January 13, responding to our comments on the
remediation plan for Elsmere Apartments. Please note that we are not an
approval authority but we appreciate your sharing of the work plan with us. We
are satisfied that our questions were addressed and are encouraged that you
plan to begin remediation quickly.

By following the New York City Health Department Guidelines for Mold
Remediation, the "industry standards" will be met.

If future questions arise on your part, we are more than happy to discuss them
with you.  We can be reached at 302-744-4540.

Sincerely,

Gerald Llewellyn, Ph.D.
Branch Chief & Toxicologist
Environmental Health Evaluation & Toxicology Branch

pc:  John S. Giles, Jr.

GILES-14

JESSE S. COOPER BUILDING  •  FEDERAL STREET  •  DOVER  •  DELAWARE
MAILING ADDRESS: P.O. BOX 637  •  DOVER  •  DELAWARE  •  19903

D0026

01/23/2003 18:23 FAX 302 571 1,.0          MORRIS JAMES                              ☒ 002
__.~01/23/2003   16:09   3029989920              TOWNELSMERE                          PAGE   03
   . .   .  . ...                                                                   NO. 494   ᵛᵘᵃ

01/23/2003    14:09    AIR QUALITY MGMT → 99989920



### STATE OF DELAWARE
### DEPARTMENT OF NATURAL RESOURCES
### & ENVIRONMENTAL CONTROL
## DIVISION OF AIR & WASTE MANAGEMENT
### 715 GRANTHAM LANE
### NEW CASTLE, DELAWARE 19720

AIR QUALITY MANAGEMENT                         TELEPHONE: (302) 323-4542
SECTION                                        FAX NO.:    (302) 323-4698

John S. Giles
Town Manager
City of Elsmere
11 Poplar Ave.
Elsmere, Delaware 19805

January 23, 2003

RE: Asbestos Issues at Fenwick Park Apartments

Dear Mr. Giles

The Department has received and reviewed the proposed plans for asbestos identification and abatement as
associated with the subject property. These actions meet the requirements set forth within all applicable Federal and
State regulations governing renovation/demolition activities. All results from the initial building surveys must be
submitted to the Department for review and qualification prior to assuming all other buildings to be homogeneous in
content and construction.

It is the Departments feeling that the identification and subsequent abatement should begin as soon as possible.

If you have any questions regarding the above-mentioned requirements, please feel free to contact me in the
New Castle Office at (302) 323-4542.

Sincerely,

Howard L. Morrison, III
Senior Environmental Compliance Specialist
Engineering & Compliance Branch

HLM:(hlm)
FAS\LM\2003LETTERS\HLM03005
pc:    Dover file
       Robert J. Taggart

G-ILES-15

*Delaware's good nature depends on you!*

PRINTED ON
RECYCLED PAPER

D0027

02/27/2003 15:46 FAX 973731466.        Feinstein,Raiss,Kelin_&B        8519-6
                                                                      ☑003/004
JAN-27-2003 03:52P FROM:FELDMAN 9739627165              TO:19737314669   P:2/2

1/08/2003 14:11 FAX 201 239 1045

Town of Elsmere

# BUILDING PERMIT

Date: **February 5, 2003**          Permit No. **03-022**

Applicant: **Elsmere Park Club, Limited**  Contractor's License: **ON FILE**

Permit To: Conduct Mold and Asbestos Remediation in Apartment Buildings

Location:   1410 Cypress Avenue
            Elsmere, Delaware 19805

Tax Parcel:  19 008.00 381      Zoning Dist:  R-GA   Use Group:   R2

Subdivision: Elsmere Park    Lot: 2

Type of Construction:   **Type 3B – 3 Story Masonry Construction Exterior with
                        Wood Frame Interior**

Description of work:  Removal of Mold and Asbestos containing materials throughout
building to be conducted in accordance with the Submitted "Plan for Remediation, As
Amended" and approved by the State of Delaware Division of Public Health and in
compliance with the State of Delaware Department of Natural Resources and
Environmental Control air quality regulations along with the restoration of all affected
areas in accordance with the Town of Elsmere Building Code.

Owner:    Elsmere Park Club, Limited c/o
          Elsmere Associates, LLC
          322 Route 46 West
          Parsippany, NJ 07054
Phone:    (973) 882-5050

Estimated Cost: **$50,000**          Permit Fee: **417.00**

Applicants Signature _____  Date: **February 5, 2003**

Approved: **FEBRUARY 19, 2003**    Code Official: _____

G-1185-16

D0028

## Memorandum                              Town of Elsmere

### Office of Code Enforcement

Date:          December 18, 2002

To:            John S. Giles, Jr.
               Town Manager

From:          Ellis J. Blomquist  EJB
               Code Enforcement Officer

Re:    Fenwick Apartments Inspections Requested by Fenwick's Attorneys

As discussed, I have contacted Regina O'Neill to schedule inspections of each individual apartment unit for the purpose of assembling a detailed list of violations. Ms. O'Neill stated that she has consulted with her management and they have agreed to contact the code office some time in the first week of January of 2003. I will advise you when these inspections are scheduled.

EXHIBIT

Giles-9

SBC 8/16/05

FROM KLEHR HARRISON                    (MON) 12. 23' 02  13:42/ST. 13:31/NO. 4261182113  P  9
12/28/2882  14:11    3829989928        TOWNELSMERE                            PAGE  B2



**DELAWARE HEALTH
AND SOCIAL SERVICES**
DIVISION OF PUBLIC HEALTH

⌐ **RECEIVED** DEC 2 0 2002

DISEASE PREVENTION AND CONTROL

December 16, 2002

Mr. Ellis Blomquist
Code Enforcement Officer
Town of Elsmere
11 Poplar Ave.
Elsmere, DE  19805



Re:  Fenwick Park Apartments

Dear Mr. Blomquist:

Thank you for sending the remediation plans for Fenwick Park Apartments. We
have reviewed them and are encouraged by the fact that the New York City
Health Department Guidelines will be followed. Being less familiar with asbestos
work, we assume you and/or the contractor have sent the asbestos plans to
Howard Morrison at the Delaware Department of Natural Resources and
Environmental Control (302-323-4542).

Some items that we wish to note:

• Attachment 1 lists 27 upper units needing remediation. However, the text
  mentions only 16 units. Is this a misprint? Are the other 11 units being
  done under Level 1? This should be clarified.

• The documents show only two basement units had sewage problems.
  Perhaps this was only wet sewage. Staff noticed several basement units
  with dried material on the floors of bathrooms and/or kitchen areas that
  resemble dried sewage and some bathtubs and toilets had dark water in
  them. This will be a concern for workers and use of personal protective
  equipment for mold clean up will likely suffice. When work is complete,
  proper capping of drains should prevent further sewage outflow into
  basement areas.

Mr. Ellis Blomquist
December 16, 2002
Page 2

- The text states "... wallboard with more than a small area of contamination shall be removed and discarded...." What is a small area? This should be specified.

- It is noted that any HVAC will be disabled by lock out. It will be important that the common kitchen exhaust/duct line is cleaned and then sealed off while work is ongoing to prevent contamination spread. Any other common connections (bathrooms, kitchen sink cabinets, wire chases, wall and floor penetrations etc.) also need to be similarly addressed.

- It is important that clearance testing (via air monitoring) be done in all the apartments due to wall cavities, pipe chases, etc. Common areas such as hallways/stairs also should have clearance testing. Testing of the apartments and related areas is prudent and valuable in documenting that they are safe for reoccupation. It is advised that testing for endotoxins (gram-negative bacteria) be undertaken first in the basements and subsequently in related apartments where they may relate to elevated findings.

- The text states that the apartments shall be unoccupied for the remediation. This could be interpreted that once an apartment is cleaned it can be reoccupied. It is important that the entire building remain unoccupied during the course of work, even if work is only in a sealed basement area. Once all the work is complete, clearance testing performed, and the all clear given should buildings be reoccupied.

- The text states that HEPA vacuuming in areas found to have elevated mold counts will occur. However, we suggest additional consideration be given to carpet removal and examination of flooring beneath it. Further recommendations include additional examination of chase and wall cavity interiors to locate potential reservoirs which may not be visible otherwise.

- The text states that misting and wet wiping be used to control dust. Such additional water alone may add to the problem. You may want to consider going into detail regarding the methods and products to be used in this process.

- There have been a few very minor changes to the New York City Guidelines. You may want to check on these changes.

D0031

FROM KLEHR HARRISON                         (MON)12.23'02 13:42/ST.13:31/NO.4261182113 P 11
12/28/2882  14:11    3829989920            TOWNELSMERE                           PAGE  84

Mr. Ellis Blomquist
December 16, 2002
Page 3


If you have any questions about the above remarks, please call me.

Sincerely,

Gerald C. Llewellyn, Ph.D.
Branch Chief
Environmental Health Evaluation and
  Toxicology


Cc: Ken Belmont
    George Yocher
    Meghan Parker
    Paul Silverman

D0032



STATE OF DELAWARE
DEPARTMENT OF NATURAL RESOURCES
& ENVIRONMENTAL CONTROL
DIVISION OF AIR & WASTE MANAGEMENT
715 GRANTHAM LANE
NEW CASTLE, DELAWARE 19720

AIR RESOURCES
SECTION

TELEPHONE (302) 323 / 4542
FAX No.   (302) 323 - 4591



Ellis I. Bloomquist
Code Enforcement Officer
11 Poplar Ave.
Elsmere, Delaware 19805

December 18, 2002

RE: Asbestos issues at Fenwick Park Apartments

Dear Mr. Bloomquist

The Department has received and reviewed a copy of the documents submitted to the City of Elsmere, by RT Environmental Services, Inc. under contract by Elsmere Park Club, L.P., titled "Technical Scope for the removal of mold impacted and asbestos- containing material" dated November 2002, the Department would like to clarify the need for a full and thorough inspection of the facility for all possible asbestos containing materials prior to any other activities taking place. It is our understanding that RT Environmental Services, Inc. has knowledge of these regulations and the ability to perform the required task. Below is a list of those regulations pertaining to this requirement

In the State of Delaware, prior to demolition[1] or renovation[2] activities at a facility[3] as defined within the "National Emission Standards for Hazardous Air Pollutants" (NESHAP) Regulations (40 CFR 61, Subpart M), an owner must thoroughly inspect the affected facility or part of the facility where the demolition or renovation operations will occur, for the presence of asbestos.

This inspection is to be performed by a licensed State of Delaware Asbestos Field Technician, employed by a Licensed State of Delaware Professional Service Firm, as set forth in Facilities Management' regulations Governing The State of Delaware Contractor/Supervisor/Worker Asbestos Training and Certification Program and Training/Certification for Asbestos Professional Services'. This inspection must include a thorough visual inspection as well as representative sampling of all suspect materials. All materials identified as having an asbestos

[1] Demolition, means the wrecking or taking out of any load supporting structural member of a facility together with any related handling operations or intentional burning of the facility. (40 CFR 61.141)

[2] Renovation means altering a facility or one or more facility components in any way, including the stripping or removal of RACM from a facility component. Operations in which load-supporting structural members are wrecked or taken out are demolitions. (40 CFR 61.141)

[3] Facility means any institutional, commercial, public, industrial or residential structure, installation, or building (including any structure, installation, or building containing condominiums or individual dwelling units operated as a residential cooperative, but excluding residential buildings having four or fewer dwelling units); any ship; and any active or inactive disposal site. For purposes of this definition , any building, structure or installation that contains a loft used as a dwelling is not considered a residential structure, installation, or building. Any structure, installation or building that was previously subject to this subpart is not excluded, regardless of its current use or function. (40 CFR 61.141)

*Delaware's good nature depends on you!*

PRINTED ON
RECYCLED PAPER

FROM KLEHR HARRISON

12/28/2002  11:19    3329989928

(MON) 12. 23' 02 13:41/ST. 13:31/NO. 4261182113 P  6
TOWNELSMERE
PAGE  05

12/18/2002    15:13  AIR QUALITY MGMT → 913029989928

NO. 312    P03

content greater than 1% must be removed in accordance with **"State of Delaware Regulations Governing the Control of Air Pollution"**, Regulation No. 21, §10, prior to demolition/renovation activities. A copy of this inspection shall be maintained on-site during all renovation/demolition activities.

Section 112 of the Clean Air Act (CAA) requires EPA to develop emission standards for hazardous air pollutants. In response to this section, the Environmental Protection Agency (EPA) published a list of hazardous air pollutants and promulgated the "National Emission Standards for Hazardous Air Pollutants" (NESHAP) Regulations. Since asbestos presents a significant risk to human health as a result of air emissions from one or more source categories, it is therefore considered a hazardous air pollutant. The Asbestos NESHAP (40 CFR 61, Subpart M) addresses milling, manufacturing and fabricating operations, demolition and renovation activities, waste disposal issues, active and inactive waste disposal sites and asbestos conversion processes.

The State of Delaware has adopted 40 CFR 61 Subpart M and its subsequent revisions, under the **"State of Delaware Regulations Governing the Control of Air Pollution"**, Regulation No. 21, §10, §§10.1.

NOTE: Asbestos abatement requirements for all buildings not subject to 40 CFR Part 61, are covered in **"State of Delaware Regulations Governing the Control of Air Pollution"**, Regulation No. 21, §10, §§10.9.

Any public or private asbestos abatement project, except for work in an owner-occupied single family dwelling performed by the owner of such dwelling, shall be performed by a contractor and/or contractors who have been certified by the department.

If you have any questions regarding the above-mentioned requirements, please feel free to contact me in the New Castle Office at (302) 323-4542.

Sincerely,

Howard L. Morrison, III
Senior Environmental Compliance Specialist
Engineering & Compliance Branch

HLM:hlm
FAHLM:2008:LETTER:TNLM:2005
pc:    Dover File
       Robert J. Taggart
       William V. Winen, Jr.



**STATE OF DELAWARE**
**DEPARTMENT OF NATURAL RESOURCES**
**& ENVIRONMENTAL CONTROL**
**DIVISION OF AIR & WASTE MANAGEMENT**
715 GRANTHAM LANE
NEW CASTLE, DELAWARE 19720

AIR RESOURCES
SECTION

TELEPHONE: (302) 323 · 4542
FAX No.: (302) 323 · 4561

Walter Hungarter
Engineering Group Manager
R/T Environmental Services, Inc.
215 West Church Rd.
King of Prussia, PA
19406

December 18, 2002

RE: Asbestos issues at Fenwick Park Apartments

Dear Mr. Hungarter

The Department has received and reviewed a copy of the document submitted to the City of Elsmere, by RT Environmental Services, Inc. under contract by Elsmere Park Club, L.P., titled "Technical Scope for the removal of mold impacted and asbestos-containing materials" dated November 2002, the Department would like to clarify the need for a full and thorough inspection of the facility for all possible asbestos containing materials prior to any other activities taking place. It is our understanding that RT Environmental Services, Inc. has knowledge of these regulations and the ability to perform the required task. Below is a list of those regulations pertaining to this requirement.

In the State of Delaware, prior to demolition[1] or renovation[2] activities at a facility[3] as defined within the "National Emission Standards for Hazardous Air Pollutants" (NESHAP) Regulations (40 CFR 61), Subpart M), an owner must thoroughly inspect the affected facility or part of the facility where the demolition or renovation operations will occur, for the presence of asbestos.

This inspection is to be performed by a licensed State of Delaware Asbestos Field Technician, employed by a Licensed State of Delaware Professional Service Firm, as set forth in Facilities Management's[?] regulations Governing The State of Delaware Contractor/Supervisor/Worker Asbestos Training and Certification Program and

---

[1] Demolition, means the wrecking or taking out of any load supporting structural member of a facility together with any related handling operations or intentional burning of the facility.(40 CFR 61,141.)

[2] Renovation means altering a facility or one or more facility components in any way, including the stripping or removal of RACM from a facility component. Operations in which load-supporting structural members are wrecked or taken out are demolitions. (40 CFR 61,141.)

[3] Facility means any institutional, commercial, public, industrial, or residential structure, installation, or building (including any apartment installation, or building containing condominiums or individual dwelling units operated as a residential cooperative, but excluding residential buildings having four or fewer dwelling units); any ship; and any active or inactive disposal site. For purposes of this definition, any building, structure or installation that contains a loft used as a dwelling is not considered a residential structure. Installation, any structure, installation or building that was previously subject to this subpart is not excluded, regardless of its current use or function. (40 CFR 61,141.)

*Delaware's good nature depends on you!*

PRINTED ON
RECYCLED PAPER

D0035

FROM KLEHR HARRISON

12/28/2002   11:19   3029989920

(MON) 12.23'02 13:42/ST. 13:31/NO. 4261182113 P  8
TOWNELSMERE
PAGE  87

12/18/2002   15:13   AIR QUALITY MGMT → 313029989920   NO.312   P05

Training/Certification for Asbestos Professional Services". This inspection must include a thorough visual inspection as well as representative sampling of all suspect materials. All materials identified as having an asbestos content greater than 1% must be removed in accordance with "State of Delaware Regulations Governing the Control of Air Pollution", Regulation No. 21, §10, prior to demolition/renovation activities. A copy of this inspection shall be maintained on-site during all renovation/demolition activities.

Section 112 of the Clean Air Act (CAA) requires EPA to develop emission standards for hazardous air pollutants. In response to this section, the Environmental Protection Agency (EPA) published a list of hazardous air pollutants and promulgated the "National Emission Standards for Hazardous Air Pollutants" (NESHAP) Regulations. Since asbestos presents a significant risk to human health as a result of air emissions from one or more source categories, it is therefore considered a hazardous air pollutant. The Asbestos NESHAP (40 CFR 61, Subpart M) addresses milling, manufacturing and fabricating operations, demolition and renovation activities, waste disposal issues, active and inactive waste disposal sites and asbestos conversion processes.

The State of Delaware has adopted 40 CFR 61, Subpart M and its subsequent revisions, under the "State of Delaware Regulations Governing the Control of Air Pollution", Regulation No. 21, §10, §§10.1.

NOTE: Asbestos abatement requirements for all buildings not subject to 40 CFR Part 61, are covered in "State of Delaware Regulations Governing the Control of Air Pollution", Regulation No. 21, §10, §§10.9.

Any public or private asbestos abatement project, except for work in an owner-occupied single family dwelling performed by the owner of such dwelling, shall be performed by a contractor and/or contractors who have been certified by the department.

If you have any questions regarding the above-mentioned requirements, please feel free to contact me in the New Castle Office at (302) 323-4542.

Sincerely,

Howard L. Morrison, III
Senior Environmental Compliance Specialist
Engineering & Compliance Branch

HLM/chint
F:\RLM\2002\LETTERS\RLM02004
cc:       Dover File
          Robert L. Taggart
          William V. Warren, Jr.

D0036

# **RT** Environmental Services, Inc.

January 13, 2003



Gerald C. Llewellyn, Ph.D.
Branch Chief
Environmental Health Evaluation and Toxicology
Delaware Health and Social Services, Division of Public Health
Jesse S. Cooper Building
Federal Street
P.O. Box 637
Dover, Delaware 19903

Subject:    Fenwick Park Apartments – Technical Scope for the Remediation of Mold
            Impacted Materials

Dear Dr. Llewellyn:

This is in response to your questions and comments on the mold remediation sections
of the subject document as detailed in your December 16, 2002 letter to Mr. Ellis
Blomquist. Each response is numbered below in the same order as the bullet list in your
letter.

1.  A total of twenty-seven (27) individual, upper-level units will be remediated.
    These units are found in a total of sixteen (16) of the apartment buildings. Most
    of the units will be remediated under Level II procedures, however some upper
    level units may be done under Level I procedures.

2.  The two sewage leaks listed in the Technical Scope are the only recent sewage
    leaks documented by the apartment maintenance staff. Regardless, as your
    letter notes, the workers will be protected from exposure to fungi and bacteria
    through hazard communication, good industrial hygiene practices and personal
    protective equipment. Any drains which are uncapped will be capped.

3.  The term "small area" is as defined in the New York City Guidelines. The term
    "small area" can first be found in the general section of the Technical Scope,
    entitled "Mold Abatement", and then is more specifically defined according to the
    Levels outlined in the subsequent, more specific sections.

4.  As indicated in the Technical Scope, any common areas will be handled in the
    manner you have requested, i.e., the areas will be cleaned and sealed off to
    prevent any migration of substances of concern.

5.  Clearance testing will be done in each apartment and in the common stairway.
    The final clearance will consist of a rigorous visual inspection followed by air
    testing using the spore counting technique. The spore counting method has the
    advantages of faster turn-around time and will pick up non-viable spores.
    Endotoxin testing is not needed because the potential source for gram-negative
    bacteria will be removed by the remediation. Nonetheless, testing can be done
    on an as-needed basis if a potential source of gram-negative bacteria is
    identified.



215 West Church Road ▪ King of Prussia, PA 19406 ▪ (610) 265-1510 ▪ Fax: (610) 265-0687
E-Mail RTENV@AOL.COM ▪ Web Address http://www.RTENV.COM

D0037

6. Each building will remain unoccupied until the remediation required within that building (including final clearance) is complete, including in all of the units and in the basement in the building.

7. If the source for elevated mold counts is believed to be a source other than the basement, further investigation will be undertaken as appropriate to identify and address the source. If there is reason to believe that there is a potential source in the carpet or flooring beneath it, these areas will be inspected. The remediation process will include more intrusive investigation of areas where mold may not have been visible during the inspections, to include wall cavities, chases, and other potential interior reservoirs, if the source is not otherwise identified and such intrusive investigation is anticipated to be helpful in identifying the source.

8. The text states "Dust suppression methods, such as misting (not soaking) surfaces prior to remediation, are recommended." This is taken directly from the latest published version of the New York City Guidelines and is intended to minimize the generation of dust (and mold spores) within the containment area. Misting of contaminated wallboard will be limited to instances in which all of the wallboard within the containment area will be removed; therefore, any area which is inadvertently soaked will be promptly bagged and disposed off-site, alleviating any potential problems from soaking. After remediation, work areas are to be cleaned with a damp cloth and/or mop and detergent solution, and then dried. This is also a standard procedure taken from the New York City Guidelines.

9. The latest published version of the New York City Guidelines was used in the preparation of the Technical Scope.

As you know, it is important to move quickly so that the remediation process can begin. Accordingly, we would appreciate your efforts to respond to this letter promptly.

Sincerely,

RT Environmental Services, Inc.

Gary R. Brown, P.E.
President
gbrown@rtenv.com

Sovereign Environmental Group

Larry W. Johnson, PE, CIH
Principal
ljohnson@sovereignenvironmental.com

D0038

# RT Environmental Services, Inc.

January 13, 2003

Mr. Howard L. Morrison, III
Senior Environmental Compliance Specialist
State of Delaware
Department of Natural Resources & Environmental Control
Division of Air & Waste Management
Air Quality Management Section
715 Grantham Lane
New Castle, Delaware 19720
(302) 323-4542/FAX (302) 323-4598



EXHIBIT
Giles-13
SBC 8/16/05

RE:    ASBESTOS ISSUES AT FENWICK PARK APARTMENTS
       CITY OF ELSMERE, DELAWARE
       RT PROJECT #70281-02

Dear Mr. Morrison:

RT Environmental Services, Inc., (RT) has reviewed your December 18, 2002, letter responding to RT's November 2002 "Technical Scope for the removal of mold impacted and asbestos-containing materials" prepared for the City of Elsmere for the above referenced location. This letter acknowledges and responds to your comments.

RT understands that complete inspections of each of the Fenwick Park apartments to identify all potential RACM are needed prior to demolition, renovation, and/or mold remediation. The inspections will be completed by AHERA certified asbestos building inspectors under RT's State of Delaware Professional Service Firm license. The inspectors will collect representative bulk samples of the potential RACM, unless material is to be presumed ACM.

RT plans to initially perform complete inspections for two of the thirty-nine (39) site buildings. We will also review available information on construction history. If the buildings are found to be uniform, constructed at approximately the same time and have had similar maintenance records, RACM identified in the two buildings inspected will then assumed to be present in the balance of the buildings onsite. The inspection report will include drawings and tables summarizing the inspection results.



Suite 306, Pureland Complex ■ 510 Heron Drive, P.O. Box 521 ■ Bridgeport, NJ 08014
(856) 467-2276 ■ Fax: (856) 467-3476 ■ E-Mail RTNJ@AOL.COM ■ Web Address http://RTENV.COM

D0039

p. 2                                                                Jan 14 03 10:46a

Mr. Howard L. Morrison, III
RT Project #70281-02
January 13, 2003
Page 2

No demolition, renovations or mold remediation will be conducted until the appropriate surveys have been completed.

Should you have any questions or comments regarding this project, please feel free to contact me at (856) 467-2276.

Very truly yours,

RT ENVIRONMENTAL SERVICES, INC.

Christopher R. Eyre
Associate

cc:    D. Schleicher, Esq.
       G. Brown, RT
       W. Hungarter, RT

D0040

# SOVEREIGN
## Environmental Group

Robert A. Baines, Principal                                          Larry W. Johnson, PE, CIH, Principal

___

October 3, 2005

Douglas F. Schleicher, Esq.
Klehr, Harrison, Harvey, Branzburg & Ellers LLP
260 South Broad Street
Philadelphia, PA 19102-5003

Subject:        Cost Estimate for Asbestos and Mold Abatement

Dear Mr. Schleicher:

At your request I am submitting the attached cost estimate for the proper remediation of the conditions identified by the Town of Elsmere as the basis for its orders of condemnation (i.e., asbestos, mold and other conditions) at Fenwick Park Apartments in October, 2002. The estimate represents the cost of remediation a prospective buyer of the apartment complex should have taken into account at that time in determining whether or not to purchase the complex. The cost estimate is based on the following assumptions and conditions:

1. The apartments are in the conditions as they existed in October 2002.

2. All of the basement apartments would be abated of asbestos floor tile and mold. All drywall in each basement would be removed, regardless of the presence of mold, if any, in the basement.

3. The asbestos and mold abatement in each basement would be completed as a single project.

4. None of the abated materials (e.g., drywall) in the basement apartments will be replaced.

The work would proceed as follows for each building. Polyethylene sheeting would be used to erect barriers and enclose the basement. All accessible openings would be sealed. A negative pressure differential would be established using high efficiency particulate air (HEPA) filtered air cleaning devices to ensure that no air or dust from the work area will flow into the upper level apartments. A three stage decontamination chamber would be constructed for worker and materials decontamination. The basement would be remediated of both mold and asbestos floor tile. The basement would be cleaned, inspected by the environmental consultant and final testing would be performed. Once final testing has indicated a "clean" area, the containment would be removed and the basement barrier replaced.

After basement remediation, spot remediation would occur in each of the upstairs apartments outlined in the specification. The work in the upstairs apartments should take no more than one work day. As a conservative measure, we have assumed one full work day in each building for the upstairs units. Temporary relocation of residents would not be required for the abatement. Note, however, that in certain units residents could not be present during the remediation due to logistical constraints (inability to access kitchen or bathroom during remediation).

Note that as an alternative to the above sequence, the upstairs units could be remediated first and the basements second. This is only a sequencing change, and would not impact the cost estimate.

The cost estimate includes an industry-standard contingency as an additional measure of conservatism. The contingency factor addresses the possibility that additional previously inaccessible conditions are noted during the performance of the work which need to be addressed and that work may take longer than expected in individual cases.

___

PHIL1 640996-2                                                                          D0041

If you have any questions or need any additional information, please contact me.

Sincerely,

Larry W. Johnson, PE, CIH
Principal
ljohnson@sovereignenvironmental.com

Attachment

**Fenwick Park Apartments**
**Mold and Asbestos Remediation Cost Estimate**

| Number | Location | | |
|---|---|---|---|
| 38 | Basements Remediation * | $ | 190,000 |
| 29 | Upper Level Bathrooms | $ | 29,000 |
| 6 | Upper Level Kitchens | $ | 6,000 |
| | Contingency (30%) | $ | 10,500 |
| | Inspection, Monitoring & Reporting | $ | 45,000 |
| | Cost of replacing materials in upper levels | $ | 11,600 |
| | **Total** | **$** | **292,100** |

    * This estimate assumes that all of the gypsum board and all of the vinyl asbestos tile will be removed from every basement. If subsequent investigation indicates that certain basements, or parts of basements, have not sustained water damage, the remedial efforts and costs may be reduced.

10/03/2005 14:08 FAX                                                                 ☑ 002/006

| HUD-1 (3/R1) RESPA HR 4905 2 | Page 1 of 2 | Form Approved OMB 2502-0265 |
|---|---|---|

**A.    SETTLEMENT STATEMENT**

| B. TYPE OF LOAN | |
|---|---|
| 1. ___ FHA   2. ___ FMHA   3. ___ CONV. UNINS. | |
| 4. ___ VA   5. ___ CONV. INS.   _X_ OTHER | |
| 6. File Number | 7. Loan Number |
| 1410 CYPRESS AV | |
| 8. Mortgage Ins. Case No. | |

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

C.    NOTE:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown.
NOTE:   Items marked "(P.O.C.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D.    NAME AND ADDRESS OF BORROWER: | DELAWARE REAL ESTATE INVESTMENT FUND, LLC |
|---|---|
| | 433 PALISADE AVENUE |
| | JERSEY CITY, NJ 07307 |

| E.    NAME, ADDRESS AND TIN OF SELLER: | ELSMERE PARK CLUB LIMITED PARTNERSHIP |
|---|---|
| | 322 ROUTE 46 WEST |
| | PARSIPPANY, NJ 07054 |

| F.    NAME AND ADDRESS OF LENDER: | BRT REALTY TRUST |
|---|---|
| | 60 CUTTER MILL ROAD, |
| | GREAT NECK, NY 11021 |

| G.    PROPERTY LOCATION: | 1410 CYPRESS AVENUE |
|---|---|
| | ELSMERE, DE |
| | TAX PARCEL NO.: 19-008.00-381 |

| H.    SETTLEMENT AGENT: | BLANK ROME, LLP  (302)425-6400 |
|---|---|
| | 1201 North Market Street, Suite 800, Wilmington, DE 19801-4226 |
| PLACE OF SETTLEMENT: | 400 GARDEN CITY PLAZA, GARDEN CITY, NY 11530 |
| I.    SETTLEMENT DATE    3/18/2003 | DISBURSEMENT DATE    3/18/2003 |

| J. | SUMMARY OF BORROWER'S TRANSACTION | | K. | SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | | **400. GROSS AMOUNT DUE TO SELLER** | | |
| 101. | Contract sales price | 3,900,000.00 | 401. | Contract sales price | 3,900,000.00 |
| 102. | Personal Property | | 402. | Personal Property | |
| 103. | Settlement charges to borrower (line 1400) | 1,695,801.18 | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| | Adjustments for items paid by seller in advance | | | Adjustments for items paid by seller in advance | |
| 106. | City/town taxes   03/18/03   to   08/30/03 | 9,634.50 | 406. | City/town taxes   03/18/03   to   08/30/03 | 9,634.50 |
| 107. | County taxes   03/18/03   to   08/30/03 | 10,167.09 | 407. | County taxes   03/18/03   to   08/30/03 | 10,167.09 |
| 108. | Assessments   to | | 408. | Assessments   to | |
| 109. | 1ST QUARTER SEWE   03/18/03   to   03/31/03 | 15.00 | 409. | 1ST QUARTER SEWE   03/18/03   to   03/31/03 | 15.00 |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 113. | | | 413. | | |
| 114. | | | 414. | | |
| 115. | | | 415. | | |
| 116. | | | 416. | | |
| 120. | GROSS AMOUNT DUE FROM BORROWER | 5,615,417.75 | 420. | GROSS AMOUNT DUE TO SELLER | 3,919,816.59 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | | |
| 201. | Deposit or earnest money | 200,000.00 | 501. | Excess deposit (see instructions) | 200,000.00 |
| 202. | Principal amount of new loan | 4,800,000.00 | 502. | Settlement charges to seller (line 1400) | 199,700.00 |
| 203. | Existing loan taken subject to | | 503. | Existing loan taken subject to | |
| 204. | Improvement Reserve Draw-$100940.04 | | 504. | Payoff first mortgage | 1,408,264.70 |
| 205. | | | 505. | Payoff second mortgage | |
| 206. | | | 506. | SEWER FEE 2001-2002   NEW CASTLE COU | 147,823.06 |
| 207. | | | 507. | MORTGAGE/UCC SATISFACTION FE   RECORDER OF DE | 148.00 |
| 208. | | | 508. | PAYOFF RESERVE   BLANK ROME, LLP | 24,000.00 |
| 209. | | | 509. | | |
| | Adjustments for items unpaid by seller | | | Adjustments for items unpaid by seller | |
| 210. | City/town taxes   to | | 510. | City/town taxes   to | |
| 211. | County taxes   to | | 511. | County taxes   to | |
| 212. | Assessments   to | | 512. | Assessments   to | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. | TOTAL PAID BY/FOR BORROWER | 5,100,000.00 | 520. | TOTAL REDUCTION AMOUNT DUE SELLER | 1,979,935.85 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | | |
| 301. | Gross amount due from borrower (line 120) | 5,615,417.75 | 601. | Gross amount due to seller (line 420) | 3,919,815.59 |
| 302. | Less amounts paid by/for borrower (line 220) | 5,100,000.00 | 602. | Less reductions in amount due seller (line 520) | 1,979,935.85 |
| 303. | CASH ( X FROM) (   TO) BORROWER | 515,417.75 | 603. | CASH (   FROM) ( X TO) SELLER | 1,939,879.93 |

D0044

10/03/2005 14:09 FAX                                                    @003/006

HUD-4 (8A 3) RESPA, HR 4305.3                                    Form Approved OMB 2502-0265

| | Page 2 of 2 | | |
|---|---|---|---|
| | SETTLEMENT CHARGES | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
| **700. TOTAL SALES/BROKER'S COMMISSION** | | | |
| BASED ON PRICE $ 3,900,000.00 @ %= 117,000.00 | | | |
| Division of Commission (line 700) as follows: | | | |
| 701. 117,000.00 to | THE KISLAK COMPANY, INC. | | |
| 702. to | | | |
| 703. Commission paid at Settlement | | | 117,000.00 |
| 704. | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee % | REIT MANAGEMENT CORP. | 48,000.00 | |
| 802. Loan Discount % | | | |
| 803. BROKER FEE | M. TUCK CAPITAL ASSOCIATES (48,000.00) | | |
| 804. Inspection Fee | BRT REALTY TRUST | 1,500.00 | |
| 805. Lender's Inspection Fee to | | | |
| 806. Legal Fees | Moritt, Hock, Hamroff & Horowitz, LLP | 18,000.00 | |
| 807. Assumption Fee to | | | |
| 808. Commitment Fee | BRT REALTY TRUST (87,000.00) | 37,000.00 | |
| 809. | | | |
| 810. Remediation Testing Fee | Detail Associates | 2,800.00 | |
| 811. Interest Reserve | BRT REALTY TRUST | 318,500.00 | |
| 812. | | | |
| 813. Improvement Reserve | BRT REALTY TRUST | 1,033,089.36 | |
| 814. Engineering Fee | Majestic Property Management Corp. | 1,800.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest from to @ /day ( -days) | | | |
| 902. Mortgage Insurance Premium for 12 months to | BRT REALTY TRUST | | |
| 903. Hazard Insurance Premium for | TMR Risk | 26,638.87 | |
| 904. Flood Insurance | TMR Risk | 10,270.00 | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard Insurance months @ $ per month | | 14,743.56 | |
| 1002. Mortgage Insurance months @ $ per month | | | |
| 1003. City property taxes months @ $ per month | | 25,923.50 | |
| 1004. County property taxes months @ $ per month | | 27,356.84 | |
| 1005. Annual assessments months @ $ per month | | | |
| 1006. SEWER (2ND-3RD&4TH QTR) | | 312.00 | |
| 1007. Flood Reserve | | 855.83 | |
| 1008. | | | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee to | | | |
| 1102. Abstract or title search to | TICOR TITLE INSURANCE COMPANY | 225.00 | |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | | |
| 1105. Document preparation to | Fidelity National Title Ins. Co. | 20.00 | |
| 1106. Notary fee to | | | |
| 1107. Attorney's fee to | | | |
| (includes above items numbers: ) | | | |
| 1108. Title Insurance to | Fidelity National Title Insurance Co. | 12,625.00 | |
| (includes above items numbers: ) | | | |
| 1109. Lender's coverage $ 4,000,000.00 $ 12,600.00 | | | |
| 1110. Owner's coverage $ 3,900,000.00 $ 25.00 | | | |
| 1111. ENVIRONMENTAL ENDORSEMENT | FIDELITY NATIONAL TITLE | 50.00 | |
| 1112. VARIABLE RATE ENDORSEMENT | FIDELITY NATIONAL TITLE | 50.00 | |
| 1113. SURVEY ENDORSEMENT | FIDELITY NATIONAL TITLE | 50.00 | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Deed $ 46.00 Mortgage $ 466.00 Release $ | | 512.00 | |
| 1202. City/county tax/stamps: Deed $ 58,500.00 Mortgage $ | | 29,250.00 | 29,250.00 |
| 1203. State tax/stamps: Deed $ 58,500.00 Mortgage $ | | 29,250.00 | 29,250.00 |
| 1204. Assignment of Leases & Rents | Recorder of Deeds | 241.00 | |
| 1205. UCC Recording | Recorder of Deeds | 75.00 | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. LLC NAME RESERVATION | CT CORPORATION | 128.00 | |
| 1302. Closing Attendance Fee | Fidelity National Title | 500.00 | |
| 1303. Corp. Filing & Good Standing | CT Corporation | 815.00 | |
| 1304. SEPARATE TAX PARCEL ENDORSEMENT | FIDELITY NATIONAL TITLE | 50.00 | |
| 1305. CERTIFICATE OF REVIVAL & GOOD STANDINGS | CT CORPORATION | | 550.00 |
| 1306. Legal Fees | Blank Rome, LLP | 32,000.00 | |
| 1307. Legal Fees | Robert S. Nussbaum, Esq. | 25,600.00 | |
| 1308. Legal Fees | Feinstein, Raiss, Kelin & Booker, LLC | | 23,650.00 |
| **1400. TOTAL SETTLEMENT CHARGES** (enter on lines 103, Section J and 502, Section K) | | 1,695,501.15 | 199,700.00 |

I have carefully reviewed the HUD-1 Settlement Statement and, to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

**DELAWARE REAL ESTATE INVESTMENT FUND, LLC**              **ELSMERE PARK CLUB LIMITED PARTNERSHIP**

By: _____                               By: _____
DAVID WALLER, MEMBER                                      ELLIOT S. LEIBOWITZ, PRESIDENT

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____                                                                          Date: _____
BLANK ROME, LLP
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment.
For details see: Title 18 U.S. Code Sections 1001 and Section 1010.

D0045

10/03/2005 14:10 FAX                    BLANK ROME CONFSKY                    ☒ 004/006

Page 1 of 2                                                      Form Approved OMB 2502-0265

| A. | SETTLEMENT STATEMENT |
|----|----------------------|

1. ☐ FHA  2. ☐ FMHA  3. ☐ CONV. UNINS.
4. ☐ VA   5. ☐ CONV. INS.  X ☐ OTHER

6. File Number
**1410 CYPRESS AV**
7. Loan Number

8. Mortgage Ins. Case No.

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(P.O.C.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME AND ADDRESS OF BORROWER:
DELAWARE REAL ESTATE INVESTMENT FUND, LLC
433 PALISADE AVENUE
JERSEY CITY, NJ 07307

E. NAME, ADDRESS AND TIN OF SELLER:
ELSMERE PARK CLUB LIMITED PARTNERSHIP
322 ROUTE 46 WEST
PARSIPPANY, NJ 07054

F. NAME AND ADDRESS OF LENDER:
BRT REALTY TRUST
60 CUTTER MILL ROAD,
GREAT NECK, NY 11021

G. PROPERTY LOCATION:
1410 CYPRESS AVENUE
ELSMERE, DE
TAX PARCEL NO.: 19-008.00-381

H. SETTLEMENT AGENT:
BLANK ROME, LLP   (302)425-6400
1201 North Market Street, Suite 800, Wilmington, DE 19801-4226
PLACE OF SETTLEMENT:
400 GARDEN CITY PLAZA, GARDEN CITY, NY 11530

I. SETTLEMENT DATE    3/18/2003      DISBURSEMENT DATE    3/18/2003

| J. | SUMMARY OF BORROWER'S TRANSACTION | | K. | SUMMARY OF SELLER'S TRANSACTION | |
|----|-----------------------------------|--|----|--------------------------------|--|
| 101. | Contract sales price | 3,800,000.00 | 401. | Contract sales price | 3,800,000.00 |
| 102. | Personal Property | | 402. | Personal Property | |
| 103. | Settlement charges to borrower (line 1400) | 1,835,801.19 | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| | Adjustments for items paid by seller in advance | | | Adjustments for items paid by seller in advance | |
| 106. | City/town taxes 03/18/03 to 06/30/03 | 9,634.50 | 406. | City/town taxes 03/18/03 to 06/30/03 | 9,634.50 |
| 107. | County taxes 03/18/03 to 09/30/03 | 15,197.09 | 407. | County taxes 03/18/03 to 09/30/03 | 15,197.09 |
| 108. | Assessments to | | 408. | Assessments to | |
| 109. | 1ST QUARTER SEWR 03/18/03 to 03/31/03 | 18.00 | 409. | 1ST QUARTER SEWR 03/18/03 to 03/31/03 | 18.00 |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 113. | | | 413. | | |
| 114. | | | 414. | | |
| 115. | | | 415. | | |
| 116. | | | 416. | | |
| 120. | GROSS AMOUNT DUE FROM BORROWER | 5,815,417.78 | 420. | GROSS AMOUNT DUE TO SELLER | 3,915,815.59 |
| 201. | Deposit or earnest money | 200,000.00 | 501. | Excess deposit (see instructions) | 200,000.00 |
| 202. | Principal amount of new loan | 4,900,000.00 | 502. | Settlement charges to seller (line 1400) | 196,700.00 |
| 203. | Existing loan taken subject to | | 503. | Existing loan taken subject to | |
| 204. | Improvement Reserve Draw-$106946.84 | | 504. | Payoff first mortgage | 1,408,284.70 |
| 205. | | | 505. | Payoff second mortgage | |
| 206. | | | 506. | SEWER FEE 2001-2002 | 147,823.26 |
| 207. | | | 507. | MORTGAGE/ACC SATISFACTION FE RECORDER OF DE | 148.00 |
| 208. | | | 508. | PAYOFF RESERVE    BLANK ROME, LLP | 24,000.00 |
| 209. | | | 509. | | |
| | Adjustments for items unpaid by seller | | | Adjustments for items unpaid by seller | |
| 210. | City/town taxes to | | 510. | City/town taxes to | |
| 211. | County taxes to | | 511. | County taxes to | |
| 212. | Assessments to | | 512. | Assessments to | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. | TOTAL PAID BY/FOR BORROWER | 5,100,000.00 | 520. | TOTAL REDUCTION AMOUNT DUE SELLER | 1,976,938.96 |
| 301. | Gross amount due from borrower (line 120) | 5,815,417.78 | 601. | Gross amount due to seller (line 420) | 3,915,815.59 |
| 302. | Less amounts paid by/for borrower (line 220) | 5,100,000.00 | 602. | Less reductions in amount due seller (line 520) | 1,976,938.96 |
| 303. | CASH (X FROM) ( TO) BORROWER | 915,417.78 | 603. | CASH ( FROM) (X TO) SELLER | 1,938,876.91 |

D0046

10/03/2005 14:10 FAX    ☑005/006    NO. 340    P003

Form Approved OMB 2502.0265

Page 2 of 2

## SETTLEMENT CHARGES

| | | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| BASED ON PRICE | $ | 3,900,000.00 | @ 3 % = 117,000.00 | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701. | 117,000.00 | to | THE KISLAK COMPANY, INC. | | |
| 702. | | to | | | |
| 703. Commission paid at Settlement | | | | | 117,000.00 |
| 704. | | | | | |
| 801. Loan Origination Fee | % | | REIT MANAGEMENT CORP. | 49,000.00 | |
| 802. Loan Discount | % | | | | |
| 803. BROKER FEE | | | N. TUCK CAPITAL ASSOCIATES | (49,000.00) | |
| 804. Inspection Fee | | | BRT REALTY TRUST | 1,500.00 | |
| 805. Lender's Inspection Fee to | | | | | |
| 806. Legal Fees | | | Morris, Nicole, Heusroff & Horowitz, LLP | 16,000.00 | |
| 807. Assumption Fee to | | | | | |
| 808. Commitment Fee | | | BRT REALTY TRUST | (81,000.00) | 27,000.00 |
| 809. | | | | | |
| 810. Remediation Testing Fee | | | Detail Associates | 2,500.00 | |
| 811. Interest Reserve | | | BRT REALTY TRUST | 315,500.00 | |
| 812. | | | | | |
| 813. Improvement Reserve | | | BRT REALTY TRUST | 1,023,083.39 | |
| 814. Engineering Fee | | | Majestic Property Management Corp. | 1,000.00 | |
| 901. Interest from | to | @ | May | ( days) | | |
| 902. Mortgage Insurance Premium for | 12 | months to | BRT REALTY TRUST | | |
| 903. Hazard Insurance Premium for | | | TMR Risk | 26,636.97 | |
| 904. Flood Insurance | | | TMR Risk | 16,379.50 | |
| 905. | | | | | |
| 1001. Hazard Insurance | months @ $ | per month | | 14,743.86 | |
| 1002. Mortgage Insurance | months @ $ | per month | | | |
| 1003. City property taxes | months @ $ | per month | | 28,723.50 | |
| 1004. County property taxes | months @ $ | per month | | 27,356.54 | |
| 1005. Annual assessments | months @ $ | per month | | | |
| 1006. SEWER (2ND-3RD-4TH QTR) | | | | 312.90 | |
| 1007. Flood Reserve | | | | 366.83 | |
| 1008. | | | | | |
| 1101. Settlement or closing fee to | | | | | |
| 1102. Abstract or title search to | | | TICOR TITLE INSURANCE COMPANY | 225.00 | |
| 1103. Title examination to | | | | | |
| 1104. Title insurance binder to | | | | | |
| 1105. Document preparation to | | | Fidelity National Title Ins. Co. | 25.00 | |
| 1106. Notary fee to | | | | | |
| 1107. Attorney's fee to | | | | | |
| (includes above items numbers: | | | Fidelity National Title Insurance Co. | ) | |
| 1108. Title insurance to | | | Fidelity National Title Ins. Co. | 13,029.00 | |
| (includes above items numbers: | | | | ) | |
| 1109. Lender's coverage | $ 3,900,000.00 | $ 12,900.00 | | | |
| 1110. Owner's coverage | $ 3,900,000.00 | $ 25.00 | | | |
| 1111. ENVIRONMENTAL ENDORSEMENT | | | FIDELITY NATIONAL TITLE | 50.00 | |
| 1112. VARIABLE RATE ENDORSEMENT | | | FIDELITY NATIONAL TITLE | 50.00 | |
| 1113. SURVEY ENDORSEMENT | | | FIDELITY NATIONAL TITLE | 50.00 | |
| 1201. Recording: | Deed $ 45.00 | Mortgage $ 450.00 | Release $ | 512.00 | |
| 1202. City/county tax/stamps: | Deed $ 58,500.00 | Mortgage $ | | 29,250.00 | 29,250.00 |
| 1203. State tax/stamps: | Deed $ 58,500.00 | Mortgage $ | | 29,250.00 | 29,250.00 |
| 1204. Assignment of Leases & Rents | | | Recorder w/ Deeds | 341.00 | |
| 1205. UCC Recording | | | Recorder of Deeds | 76.00 | |
| 1301. LLC NAME RESERVATION | | | CT CORPORATION | 135.00 | |
| 1302. Closing Attendance Fee | | | Fidelity National Title | 500.00 | |
| 1303. Corp. Filing & Good Standing | | | CT Corporation | 315.00 | |
| 1304. SEPARATE TAX PARCEL ENDORSEMENT | | | FIDELITY NATIONAL TITLE | 50.00 | |
| 1305. CERTIFICATE OF REVIVAL & GOOD STANDINGS | | | CT CORPORATION | | 585.00 |
| 1306. Legal Fees | | | Blank Rome, LLP | 32,500.00 | |
| 1307. Legal Fees | | | Robert S. Newkowski, Esq. | 16,000.00 | |
| 1308. Legal Fees | | | Fahnstein, Raine, Keith & Bookey, LLC | | 21,690.00 |
| **1400. TOTAL SETTLEMENT CHARGES** | | | (enter on lines 103, Section J and 502, Section K) | 1,808,601.10 | 198,760.00 |

I have carefully reviewed the HUD-1 Settlement Statement and, to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

DELAWARE REAL ESTATE INVESTMENT FUND, LLC                    ELSMERE PARK CLUB LIMITED PARTNERSHIP

By: _____                    By: _____
DAVID WALLER, MEMBER                    ELLIOT S. LAIBOWITZ, PRESIDENT

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

BLANK ROME, LLP                    Date
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Sections 1001 and Section 1010.

D0047

10/03/2005  14:11 FAX                                                    @ 006/006

HUD-1 (3/86) RESPA, HB 4305.2                      Page 2 of 2                     OMB Form Approved OMB 2502-0265

| | | SETTLEMENT CHARGES | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|---|
| | BASED ON PRICE $ | 3,900,000.00 | @ | %= 117,000.00 | | |
| | Division of Commission (line 700) as follows: | | | | | |
| 701. | 117,000.00 | to | THE KISLAK COMPANY, INC. | | | |
| 702. | | to | | | | |
| 703. | Commission paid at Settlement | | | | | 117,000.00 |
| 704. | | | | | | |
| 801. | Loan Origination Fee | % | REIT MANAGEMENT CORP. | | 49,000.00 | |
| 802. | Loan Discount | % | | | | |
| 803. | BROKER FEE | | M. TUCK CAPITAL ASSOCIATES | (49,000.00B) | | |
| 804. | Inspection Fee | | BRT REALTY TRUST | | 1,500.00 | |
| 805. | Lender's Inspection Fee to | | | | | |
| 806. | Legal Fees | | Morris, Hock, Haseroff & Horowitz, LLP | | 18,000.00 | |
| 807. | Assumption Fee to | | | | | |
| 808. | Commitment Fee | | BRT REALTY TRUST | (81,000.00B) | 27,000.00 | |
| 809. | | | | | | |
| 810. | Remediation Testing Fee | | Detail Associates | | 2,500.00 | |
| 811. | Interest Reserve | | BRT REALTY TRUST | | 318,500.00 | |
| 812. | | | | | | |
| 813. | Improvement Reserve | | BRT REALTY TRUST | | 1,033,059.00 | |
| 814. | Engineering Fee | | Majestic Property Management Corp. | | 1,000.00 | |
| 901. | Interest from | to | @ | /day ( /days) | | |
| 902. | Mortgage Insurance Premium for | | 12 | months to | BRT REALTY TRUST | |
| 903. | Hazard Insurance Premium for | | 1 | year to | BRT Realty | 85,838.00 |
| 904. | | | | | | |
| 905. | | | | | | |
| 1001. | Hazard Insurance | 2 months @ $ | 8,228.14 | per month | 16,462.28 | |
| 1002. | Mortgage Insurance | months @ $ | | per month | | |
| 1003. | City property taxes | months @ $ | | per month | 25,923.60 | |
| 1004. | County property taxes | months @ $ | | per month | 27,366.64 | |
| 1005. | Annual assessments | months @ $ | | per month | | |
| 1006. | SEWER [2ND-3RD&4TH QTR] | | | | 312.00 | |
| 1007. | | | | | | |
| 1008. | | | | | | |
| 1101. | Settlement or closing fee to | | | | | |
| 1102. | Abstract or title search to | | TICOR TITLE INSURANCE COMPANY | | 225.00 | |
| 1103. | Title examination to | | | | | |
| 1104. | Title insurance binder to | | | | | |
| 1105. | Document preparation to | | Fidelity National Title Ins. Co. | | 20.00 | |
| 1106. | Notary fee to | | | | | |
| 1107. | Attorney's fee to | | | | | |
| | (includes above items numbers: | | | ) | | |
| 1108. | Title insurance to | | Fidelity National Title Insurance Co. | | 12,325.00 | |
| | (includes above items numbers: | | | ) | | |
| 1109. | Lender's coverage | $ | 4,900,000.00 | $ 12,800.00 | | |
| 1110. | Owner's coverage | $ | 3,900,000.00 | $ 25.00 | | |
| 1111. | ENVIRONMENTAL ENDORSEMENT | | FIDELITY NATIONAL TITLE | | 50.00 | |
| 1112. | VARIABLE RATE ENDORSEMENT | | FIDELITY NATIONAL TITLE | | 50.00 | |
| 1113. | SURVEY ENDORSEMENT | | FIDELITY NATIONAL TITLE | | 50.00 | |
| 1201. | Recording: | Deed $ 45.00 | Mortgage $ 469.00 | Release $ | 512.00 | |
| 1202. | City/county tax/stamps: | Deed $ 58,500.00 | Mortgage $ | | 29,250.00 | 29,250.00 |
| 1203. | State tax/stamps: | Deed $ 58,500.00 | Mortgage $ | | 29,250.00 | 29,250.00 |
| 1204. | Assignment of Leases & Rents | | Recorder of Deeds | | 241.00 | |
| 1205. | Ucc Recording | | Recorder of Deeds | | 75.00 | |
| 1301. | LLC NAME RESERVATION | | CT CORPORATION | | 128.00 | |
| 1302. | Closing Attendance Fee | | Fidelity National Title | | 500.00 | |
| 1303. | Corp. Filing & Good Standing | | CT Corporation | | 515.00 | |
| 1304. | SEPARATE TAX PARCEL ENDORSEMENT | | FIDELITY NATIONAL TITLE | | 50.00 | |
| 1305. | CERTIFICATE OF REVIVAL & GOOD STANDINGS | | CT CORPORATION | | | 550.00 |
| 1306. | Legal Fees | | Blank Rome, LLP | | 32,000.00 | |
| 1307. | Legal Fees | | Robert S. Nussbaum, Esq. | | 25,000.00 | |
| 1308. | Legal Fees | | Feinstein, Raiss, Kelin & Booker, LLC | | | 23,650.00 |
| | 1400. TOTAL SETTLEMENT CHARGES | | (enter on lines 103, Section J and 502, Section K) | | 1,745,482.44 | 199,700.00 |

I have carefully reviewed the HUD-1 Settlement Statement and, to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

**DELAWARE REAL ESTATE INVESTMENT FUND, LLC**                          **ELSMERE PARK CLUB LIMITED PARTNERSHIP**

By:                                                                    By:
DAVID WALLEN, MEMBER                                                   ELLIOT E. LEISOWITZ, PRESIDENT

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

BLANK ROME, LLP                                                        Date
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Sections 1001 and Section 1010.

D0048

# Patrick Costello - Pending motions

| | |
|---|---|
| **From:** | David Eagle |
| **To:** | emcnally@morrisjames.com;  LSherman@morrisjames.com |
| **Date:** | 10/14/2005 10:03 AM |
| **Subject:** | Pending motions |

Ed and Liza -

I would like to offer a practical solution to the tangled web of motions that Judge Robinson is going to face.  I was out yesterday but evidently the JAB document problem has not been resolved, I assume because Mr. Nussbaum has not signed off.  I see no problem with your stip. except it's not clear to me that confidential docs. may be submitted to the court and how.

Having not seen the 3 boxes of docs. that underlie a key exhibit in the motion to preclude Wilk, we would have to move to strike any reference to it - either in lieu of our answer brief or in conjunction.  We intend to refer to the Johnson supplement, which you have moved to strike.  Would it not make more sense to deal with those corollary matters expeditiously and then "tee up" the Wilk motion?  We can brief (or preferably resolve) the Johnson issue and hopefully resolve JAB by end of next week.  We will then file answer brief to Wilk motion and we're obviously not going to insist on a 5-day reply.

Please let me know your thoughts.

David.

D0049

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

RICKY MANUEL, CARLA KEES #02C-10-212
CATHERINE KELLAM,

    Plaintiffs,

v.

ELSMERE PARK CLUB, L.P. and
LCL MANAGEMENT, L.L.C.,

    Defendants,

V.

TOWN OF ELSMERE

    Third-Party Defendant.


  BEFORE:  HONORABLE JAN R. JURDEN, J.

APPEARANCES:

        WILLIAMS CUKER BEREZOFSKY
        BY: GERALD WILLIAMS, ESQ.
        BY: WENDY CARR, ESQ.
        For the Plaintiff

        KLEHR, HARRISON, HARVEY,
        BRANZBURG & ELLERS
        BY: DAVID S. EAGLE, ESQ.
        BY: DOUG SCHLEICHER, ESQ.
        For the Defendants

        MORRIS, JAMES, HITCHENS & WILLIAMS
        BY: JILL DISCIULLO, ESQ.
        For the Town of Elsmere

everything and I've read all the cases. And I have to tell you my decision was not an easy one, but rather than keep you in suspense I will tell you *the outcome and then I will go back and give you my* basis for ruling the way I have. I'm denying the motion for class certification *for reasons which* I'll elaborate on in just a minute.

  I don't do so lightly because I am concerned about the plaintiffs' alleged problems and their eviction. However, I just do not feel that the plaintiffs have met the burden of demonstrating that each of the four elements of rule 23A have been satisfied, and, even if they were, I don't find that one of the three subparagraphs of rule 23B has been satisfied. So let me just run through in a little bit greater detail for purposes of the record and perhaps appellate review.

  With respect to 23A, numerosity is obviously *not contested.* Commonality, typicality and adequacy, let me go through those one at a time.

  *The defendants argue that the heart of the* complaint is the defendants' alleged negligence in failing to abrade the mold *conditions prior to the*

        APRIL 16, 2004
        Courtroom 8E
        1:00 p.m.


PRESENT:


    As noted.


    - - - - -


    THE COURT:  Hello, everyone. I apologize for being late. Could you all introduce yourselves again just so I know who you are please.

    MR. WILLIAMS:  Yes, Your Honor. I'm Gerald Williams, and with me is Wendy Carr. We're from the firm of Williams Cuker Berezofsky, pro hac vice for the plaintiffs.

    MR. EAGLE:  Good afternoon, Your Honor. David Eagle and my partner, Doug Schleicher. Also Larry Johnson is with us. He is the author of our science expert report.

    MS. DISCIULLO:  And Jill DiSciullo from Morris, James, Hitchens & Williams for the Town of Elsmere.

    THE COURT:  Nice to see you all. All right. I am happy to say that unlike the last office conference we had I have actually reviewed

town's condemnation and defendants' alleged breach of each lease of former tenant by failing to provide a safe apartment for some period of time prior to condemnation. Paragraph one of the complaint states, quote, a civil action arising from the failure to abrade toxic mold and other dangerous conditions in 38 residential apartment buildings beginning in approximately 1989 resulting in the recent condemnation of these buildings and eviction of all residents.

  With respect to commonality, the plaintiff claims that all class members lost their homes at the same time due to the same causes and therefore there's commonality. However, I think that that is a conclusory statement and I don't think that that's completely accurate, because I don't find based on what's been produced in the records so far that it is due to the same causes.

  I know plaintiffs adamantly argue that it is due to the 1989 water event, but there's ample evidence in the record produced by defendants that there were other episodes of water damage or opportunities of water damage which could

5

significantly impact on the causation issue.

I reviewed carefully Muttart, Mentis, Rivera and some of the other cases cited to me by both parties and I find it is a legal question depending on highly divergent facts with respect to the cause, extent, duration of mold in each of the 38 buildings and perhaps each of the 152 units condemned.

There are issues that are on the vary between the plaintiffs, the units, the buildings with respect to defendants' knowledge of the conditions or potential conditions. Another factor which I think weighs against commonality is the fact that various inspections were performed on various units, at various times and defendants have represented, and indeed it is not rebutted by the plaintiff in a reply, that these inspections basically gave the defendants a clean bill of health with respect to some units and detected no presence of mold, or at least a presence that would rise to a level of concern.

There is also issues being commonality which would resolve around defendants individual efforts

6

to address water problems, what notice plaintiffs had of particular water damage producing conditions, etcetera. All those issues I find are going to vary highly. And the variety of potential causes of mold of the different times in the apartments history and because the common legal questions are depending on the divergent facts, I don't find the commonality requirement is met.

I rely in part in reaching this determination on the commonality factor on the fact that the defense expert in October '02 did not find mold growing at all in some basements. He found widely varying degrees in others. He determined there were different causes of the mold and that there had been separate isolated water damage events. There have been records of the inspections and various proactive measures taken by the defendants. And that's set forth in pages 11 to 14 in defendant's answer brief.

Turning to the issue of the element of typicality, the question is whether the representative's interest are truly aligned with those of the purported class. And I believe it was

7

Judge Quillen who noted that typicality often overrides fairly often with the question of adequacy of representation.

And the issue with respect to whether Mr. Manuel was a tenant or other legal occupant is troubling to the Court because it's unrebutted that Mr. Manuel signed a lease with LCL on July 1, 1989 with his former spouse. They were then separated. His former spouse signed a new lease in 1992 and agreed she would be the only one occupying the unit. The record reflects they reconciled and resumed living together, but there's no evidence of an updated lease, and the former wife passed away, unfortunately, in 1995. So there's a question in my mind with respect to whether Mr. Manuel qualifies as a tenant or other legal occupant in the first instance. And that issue hasn't been resolved to my satisfaction as of yet and I didn't see anything in reply from the plaintiff putting that issue to rest.

With respect to Ms. Kees, she moved into 1411113 Cypress with Mr. Manuel. It's undisputed she never entered into a lease, and there is a

8

question in my mind whether she had authority to reside in the apartment pursuant to a lease.

I don't think it's disputed. With respect to a breach of implied warrant without ability there must be a valid contract, and defendants have created a serious issue in my mind through their filings of whether or not such a contract exists.

With respect to Ms. Kelem, the Court finds she was a tenant or lawful occupant; however, not so sure her claims are typical in that Cou inspectors certified to have an ability of her unit, 1407-3 Maple, days before the town poste notices of condemnation.

Defendants also point out that there was apparent water damage from faucet leaks or roon faucets, and they raised the issue of whether defendants were on notice of that and whether the water damage could have been the cause of mold in her apartment.

So in looking at whether these three plaintiffs' claims really are typical of those of the proposed class, I think it's highly questionable. That plaintiffs allege the claims

D0051

9

arise from the same event or course of conduct and
the Court is simply not satisfied that they do.

There's no question on the issue of adequacy
that the plaintiffs have retained highly qualified
counsel to represent the class. The Court has no
qualms about this, and the defendant in fact agrees
on footnote 23 on page 27 of its brief. However,
the question is also whether the plaintiffs
themselves are adequate representatives.

As I mentioned before, I have a serious
question about whether Mr. Manuel, Ms. Kees are
even members of the class they purport to
represent. But, as the defendants point out, Mr.
Manuel, Ms. Kees have a questionable prospect of
recovering relocation costs and the class
representatives will be charged with recovering
such costs.

Ms. Kelem incurred no out-of-pocket costs.
I don't think that's disputed in the record, and
her prospect for back rent is slight. So in light
of this I'm not satisfied that the plaintiffs are
adequate representatives. And even though I found
that the plaintiffs have failed to make a threshold

10

showing under 23A, I am going to go on to discuss
23B just for sake of completeness. And I will
discuss it briefly since I don't even need to reach
it.

With respect to whether or not individual
issues of causation and liability pervade the
litigation, I have reviewed all the pertinent cases
and I find that as of Wheeler the absence of
personal injury claims does not salvage the
complaint for purposes of class certification. I
don't find that a class action under these
particular circumstances would be superior to other
means of adjudicating the tenants' claims.

As I've said previously, the facts giving
rise to liability may vary substantially depending
on what units were subjected to what water damage
and at what time. So their individual issues of
causation, the liability and damages which in my
view after careful consideration would make a class
action unmanageable.

I do agree with the defendants' assertion
that the defenses if pled would be unique to the
particular building and particular unit because of

11

the various inspections, the timing of the
inspections, the thoroughness of the inspections,
tenants conduct and the defendants' efforts
responding to various water producing events or
water damage. Each case is going to require
individual consideration. So for those reasons I
am denying class certification.

Are there any questions? I know I read
through that pretty quickly. Where does that leave
us now, let me ask a practical question from the
plaintiffs' perspective?

MR. WILLIAMS: Well, Your Honor, at the
moment it leaves us with the three individual cases
that we had. There may well be more individual
cases but they have not been filed obviously. We
sought class certification. There's a lot of
overlap between the merits discovery and the class
discovery that we've done, so, to the extent the
case continues, considerable merits discovery has
been done.

THE COURT: So do we need a case scheduling
order?

MR. WILLIAMS: Maybe we should caucus if the

12

Court permits, allow us to talk about what's going
to happen next and then we might ask for a
conference with the Court.

THE COURT: And a trial date so we have
something to shoot for.

MR. EAGLE: That's all agreeable.

THE COURT: Let me ask with respect to if
there are additional filings that you please note
on the civil information sheet they're related to
this action. It may be that we have special
assignment of them. I'm not sure how the
prothonotary will handle them, but you need to make
sure it's noted. Any other questions?

MR. EAGLE: Nothing.

THE COURT: Then I am going to leave the
ball in your court. I will be happy to schedule a
teleconference so you don't have to travel here and
we can pick some dates to keep this litigation on
track. All right. Thank you.

MR. EAGLE: Thank you.

MR. WILLIAMS: Thank you.

D0052

STATE OF DELAWARE:

NEW CASTLE COUNTY:


     I, Kim L. Haley, RPR, CSR, Official Court Reporter of the Superior Court, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the proceedings had, as reported by me in the Superior Court of the State of Delaware, in and for New Castle County, in the case therein stated, as the same remains of record in the Office of the Prothonotary at Wilmington, Delaware, and that I am neither counsel nor kin to any party or participant in said action nor interested in the outcome thereof.

     WITNESS my hand this _____ day of _____, 2004.


              _____
              KIM L. HALEY
              SUPERIOR COURT REPORTER

D0053