## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELSMERE PARK CLUB, L.P., a<br>Delaware limited partnership, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1321-SLR |
| | ) | |
| TOWN OF ELSMERE, a Delaware<br>Municipal corporation,<br>ELLIS BLOMQUIST, EUGENE BONEKER,<br>and JOHN GILES, | ) | |
| | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S CORRECTED ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DAVID J. WILK AND PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO STRIKE EXHIBIT A ATTACHED TO THE 9/22/05 AFFIDAVIT OF LIZA H. SHERMAN

Dated:  October 17, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP


David S. Eagle (Bar No. 3387)
Patrick A. Costello (Bar No. 4535)
Douglas F. Schleicher (Admitted *Pro Hac Vice*)
919 Market Street, Suite 1000
Wilmington, DE  19801-3062
(302) 552-5504 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................... ii

NATURE AND STAGE OF PROCEEDINGS ............................................................1

SUMMARY OF THE ARGUMENT ...........................................................................2

STATEMENT OF FACTS RELEVANT TO THIS MOTION......................................2

A.  General Background ...............................................................................................2

B.  The Alleged Presence of Mold at the Apartments Prior to the 2002 Condemnations ...............4

C.  Health Concerns Presented By Mold .....................................................................6

D.  The Town's Condemnation of the Apartments.......................................................8

E.  Plaintiff's Inspection of the Apartments at the Time of the 2002 Condemnations.................14

F.  Plaintiff's Damages, Johnson's Supplemental Reports and David Wilk's Appraisal..............18

ARGUMENT ..............................................................................................................20

> A.    The Standard of Admissibility of Expert Opinion Under FRE 702
>        and Under *Daubert* .................................................................. 20
>
> B.    Wilk's Report Is Highly Relevant and Will Assist the Trier of Fact Because
>        It Provides a Baseline Valuation for Calculating Plaintiff's Damages .............20
>
> C.    The Cases That Defendants Rely Upon Are Inapplicable ...........................23

PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO STRIKE EXHIBIT A
ATTACHED TO THE 9/22/05 AFFIDAVIT OF LIZA H. SHERMAN ........................... 24

CONCLUSION...........................................................................................................26

# TABLE OF AUTHORITIES

## CASES

Aladdin, Inc. v. Black Hawk County,
   562 N.W.2d 608 (Iowa 1997) ......................................................................................23

Bourjaily v. United States,
   483 U.S. 171 (1987).....................................................................................................20

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
   509 U.S. 579 (1993).....................................................................................................20

Department of Transportation ex rel. People v. Parr,
   633 N.E.2d 19 (Ill. App. 1994), appeal denied, 642 N.E.2d 1276 (Ill. 1994) .............23

Kumho Tire Co. v. Carmichael,
   526 U.S. 137 (1999).....................................................................................................20

Lepage's Inc. v. 3M,
   324 F.3d 141, 2003).  Cir. 2003 .................................................................................21

Manuel v. Elsmere Park Club, L.P., et al.,
   Delaware Superior Court C.A. No. 02C-10-212........................................................5, 19

Northeast Ct. Economic Alliance, Inc. v. ATC Partnership,
   776 A.2d 1068, 1081 (Conn. 2001) ........................................................... 23

In re Paoli R.R. Yard PCB Litigation,
   35 F.3d 717 (3rd Cir. 1994) .........................................................................................20

Redevelopment Agency of the City of Pomona v. Thrifty Oil Co.,
   4 Cal. App. 4th 469 (Cal. App. 1992), cited in DOB at 17..........................................23

## STATUTES

42 U.S.C. § 1983.....................................................................................................................1

DEL1 62635-1

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Elsmere Park Club, L.P. ("EPC" or "Plaintiff"), the former owner of the Elsmere Park Apartments (the "Apartments") located in Elsmere, Delaware, commenced this action under 42 U.S.C. § 1983 against Defendants the Town of Elsmere (the "Town"), Ellis Blomquist ("Blomquist"), Eugene Boneker ("Boneker") and John Giles ("Giles") (collectively, the "Defendants") for procedural due process violations concerning the condemnation and forced evacuation of the Apartments in October 2002. On June 10, 2005, the Court approved a stipulation amending the Scheduling Order in certain respects. Under the Amended Order, expert reports were to be submitted on August 15, 2005, rebuttal expert reports were due September 15, 2005, and *Daubert* motions were due September 23, 2005. Defendants filed a Motion for Summary Judgment on September 1, 2005.[1]

Plaintiff served three expert reports on August 15, 2005. On September 22, 2005, Defendants served a Motion *in Limine* (*Daubert* Motion) attempting to exclude the report and testimony of one of Plaintiff's experts, David. J. Wilk ("Wilk"). Wilk provided an appraisal of the Apartments in order to assist the trier of fact in calculating Plaintiff's damages. Defendants do not challenge whether Wilk correctly performed the valuation of the Apartments, but assert that Wilk's report is irrelevant and therefore inadmissible because he did not take into account the alleged environmental conditions at the Apartments that Defendants are attempting to prove in this case. To the contrary, Wilk's report is highly relevant because it provides a baseline value or "yardstick" for measuring certain consequential damages. Trial is scheduled to begin January 4, 2006.

---

[1] D.I. # 43.

## SUMMARY OF ARGUMENT

1.    Wilk's report is highly relevant and "fits" the facts of this case because it will assist the trier of fact in determining a starting point for Plaintiff's damages and satisfies the requirements of FRE 401.  The fact-finder can then weigh all of the evidence concerning reasonable remediation costs to determine the fair market value of the Apartments and the amount of plaintiff's damages.

2.    Plaintiff's Motion to Strike should be granted because the documents subject to the motion have never been produced to the Plaintiff before Defendants' motion *in limine* was filed, and more importantly because the underlying documentation still has not been produced as of the date of this filing.

## STATEMENT OF FACTS RELEVANT TO THIS MOTION[2]

### A.    General Background

This action focuses upon the Defendants' decision to forcefully condemn and evacuate 152 of the 156 residential units at the Apartments in October 2002.  Plaintiff asserts that its procedural due process rights were violated because, *inter alia*, evacuation of tenants was unnecessary and unwarranted.  In October 2002, the entire apartment complex was essentially shut down within a week due to an alleged mold condition, even though Defendants failed to inspect or test any occupied residential units. (B-665-66, 651, 668-69)  Plaintiff eventually sold

---

[2] In order to conserve paper, some citations are made to the Appendix (Volume I = D.I. # 53; Volume II = D.I. # 54) to Plaintiff's Answering Brief in Opposition to the Motion for Summary Judgment and will be designated as "B-___."  Similarly, any citations to the Substitute Appendix in Support of Defendants' Opening Brief in Support of Their Motion for Summary Judgment (D.I. # 52) will be designated as "A-___."  Defendants also used the letter "A" to designate citations to their Appendix attached to the instant Motion *in Limine* concerning Wilk.  In order to avoid confusion between the Appendices used throughout this litigation, Plaintiff herein designates citations to Defendants' Appendix in the Wilk motion *in limine* as "C-___" (D.I. # 65) and citations to Plaintiff's Appendix that accompanies this Answering Brief on the Wilk motion *in limine* as "D-___."

2

the vacant property in or about April 2003 for $3.9 million, far less than its fully tenanted value.[3] In addition to losing rental income and incurred costs during the months after the Apartments were improperly shut down, Plaintiff's damages include the loss of fair market value that occurred when the Apartments were sold at a price lower than what they would have been sold for if the residential units were still occupied. David Wilk provided an appraisal that valued the Apartments at $5.2 million to a prospective buyer in October 2002. (Wilk's Report at 2) (C-140-205, 142)  In making his report, Wilk assumed that there were no environmental conditions in order to provide the "highest and best use" value of the Apartments. (C-144, 169, 171)  Wilk's report therefore provides a baseline valuation point for measuring Plaintiff's damages concerning the diminished value caused by Defendants' erroneous evacuation.

Plaintiff retained a second expert, Mr. Johnson, who is qualified in mold remediation and its associated costs. As explained below, Mr. Johnson's firm prepared a remediation plan for the Town almost three years ago. The Town approved the plan and issued a permit to commence work before Plaintiff sold the property. The Town has also been aware of Mr. Johnson's initial cost estimate since early December 2004. Nevertheless, the Town in this litigation insisted upon expert testimony on the issue of reasonable costs and Plaintiff has complied. See Johnson Supplemental Report dated 10/3/05 (D-41-43; see also D-4). The fact finder can then deduct the reasonable costs of cleanup for a potential buyer from Wilk's appraised value in order to calculate the fair market value of the Apartments in their pre-condemnation condition as of the beginning of October 2002. Although Defendants apparently disagree with Mr. Johnson's cost estimate, they have not provided expert testimony on this issue but have moved to strike the Supplemental Report.

---

[3] See Real Estate Settlement Sheet (D-44).

3

Defendants challenge the relevance of Mr. Wilk's report.  In order to understand why they are wrong, some additional background is needed.

**B.**    **The Alleged Presence of Mold at the Apartments
Prior to the 2002 Condemnations**

From 1989 to 2002, the Town inspected the Apartments on numerous occasions every year.  The Town inspected apartment units whenever they were rented to new tenants.  (B-600-606.)  If the property was acceptable, the Town allowed the new tenants to move in.  (B-600-601.)  The Town also inspected the Apartments at other times, such as during comprehensive maintenance code investigations.  (B-2-8.)  The Town always was detailed and vigorous in its inspections.  (B-2-8.)  The Town never cited the Apartments for mold, and never even noted the presence of mold in its comprehensive inspections.  (B-2-8.)

In May 1997, Plaintiff commissioned a structural inspection of all 39 of the basement units by Klas C. Haglid, P.E.  Mr. Haglid noted the presence of water damage, but did not find any mold growth despite specifically looking for it.  (B-149-52)  From October 1998 through March 1999, the Town performed a series of thorough maintenance code inspections, during which the Town identified possible code violations in great detail.  (B-7).  The inspections covered all aspects of the Apartments, including the basements of each building.  After defendants addressed the alleged violations, the Town re-inspected the building in question, sometimes more than once, and at times identified new problems it found.  However, at no time during these multiple inspections did the Town's representatives identify the presence of mold growth in the basement or other units of any of the buildings.  Id.

Following Mr. Haglid's structural inspection of all of the basement units in 1997 and the Town's own intensive enforcement effort concluding in March 1999, there were several

4

independent, isolated water events throughout the Apartments. For example, all of the basement units were inspected in September 1999 after Hurricane Floyd affected the greater Wilmington area. About 26 basement units and laundry areas suffered from minor flooding or sewer backups related to the storm. (B-5-6). Accordingly, Plaintiff again retained a professional to drain, dry and apply mildicide to the surface areas of the basements. Id.

Plaintiff was also advised on various occasions of the possibility of water releases in buildings, such as when water utility meters indicated a significant increase in water usage at individual buildings, (B-6), or New Castle County sewer main backups. When notified of these events, Plaintiff inspected the basement units and other apartment areas for leaks or other explanation and had the leaks or other causes fixed. Id. Once identified, those leaks were repaired in-house or by outside contractors, and a preventive mildicide was applied as appropriate. See, e.g., Roto-Rooter invoice dated May 4, 2000, attached to O'Neill Aff. as Exh. E (B-24); Fabricare invoice dated May 8, 2001, attached as O'Neill Aff., Exh. M (B-63).

Based on the inspections listed above, on most occasions, Plaintiff was not advised of the presence of any mold. (B-67). On a few occasions when Plaintiff was notified of possible mold conditions by a contractor of theirs, the conditions were promptly and fully addressed by professionals. Id. Plaintiff was not advised of any possible mold condition that was not remediated promptly at any time prior to October 2002. Id. In Manuel v. Elsmere Park Club, L.P., C.A. No. 02C-10-212 (JRJ), bench ruling (Del. Super. Ct. April 16, 2004) (Transcript attached at D-50-53), Judge Jurden denied class certification to a proposed class of former tenants of the Apartments, largely due to the lack of any common issues regarding the alleged presence of mold. Id. The Superior Court also noted that at various times the Town had basically given the Apartments a "clean bill of health." Id. at 5 (D-51).

C.      **Health Concerns Presented by Mold**

While there are thousands of different species, molds generally are perceived as not being toxic to normal, healthy individuals.  See "Adverse Human Health Effects Associated with Molds in the Indoor Environment," American College of Occupation and Environmental Medicine, October 27, 2002 ("ACOEM Statement"), (B-573, 578-79); (B-142-143); see also "Questions and Answers on *Stachybotrys chartarum* and Other Molds" (hereinafter, "CDC Q&A"), at http://www.cdc.gov/mold/stachy.htm, website of the Centers for Disease Control and Prevention ("CDC") (B-317-319).  Mold has not been shown to affect individuals who are not sensitive.  Id.  It is estimated that only 5% of the population would show allergic symptoms as a result of inhaling airborne mold.  ACOEM Statement at 2 (B-574).  Individuals with special sensitivities who are exposed to mold may experience short-term reactions, such as nasal stuffiness, eye irritation or wheezing.  (B-142-143); (B-317) (B-321) (B-573, 578-79).  The CDC reports that people at higher risk for these or more severe reactions, such as shortness of breath and possible fever, include infants and the elderly, those with immune suppression, chronic illness or underlying lung disease, pregnant women and workers exposed to large amounts of molds in occupational settings, such as farmers working around moldy hay.  Id.  (B-317-321)

While there have been claims that certain molds contain toxins and can cause unique or rare conditions such as pulmonary hemorrhage or memory loss, the CDC has found no causal link between the presence of mold in the indoor air and these conditions.  (B-142); see also CDC Q&A, (B-317) answer to question 1; see also (B-573, 578).  Indeed, a recent CDC investigation found that a possible association between acute idiopathic pulmonary hemorrhage (found in ten infants in Cleveland, Ohio) to a mold known as *stachybotrys chartarum* had no basis.  Id. at 3, answer to question 8.

6

There are no governmental regulatory standards defining what constitutes safe amounts of mold. CDC Q&A at 5 (B-317), answer to question 15. Indeed, since the "susceptibility of individuals can vary greatly either because of the amount or type of mold," sampling and culturing are not reliable for determining health risks. CDC Q&A at 4-5 (B-317), answer to question 14. In addition, indoor air sample results which show the presence of mold in types and concentrations also found in the outside air in contemporaneous testing (i.e., "background" conditions) do not, by themselves, precipitate the need for further investigation or remediation. See (B-145, 146).

Since individual responses vary, if mold growth is visible, the CDC recommends removal or remediation of the mold as a precaution, in addition to removing the water source. CDC Q&A, (B-317), answer to questions 13-14. While bleaches and mildicides are effective, see, e.g., CDC Q&A at 3-4, answer to questions 11 and 13, (B-317) they cannot be guaranteed to prevent against future mold growth if there is a future water-release event.

Removal of mold, however, is different from removal of people from buildings they live or work in. The Guidelines on Assessment and Remediation of Fungi in Indoor Environments, issued by the New York City Department of Health & Mental Hygiene (the "NYC Guidelines") (B-209-225), one of the few accepted standards in the industry, see, Sovereign Report, (B-143), states that evacuation is not called for during mold remediation except in very special circumstances:

> Except in cases of widespread fungal contamination that are linked to illnesses throughout a building, a building-wide evacuation is not indicated.

NYC Guidelines, (B-215) Section 1.3, paragraph 2. In addition, the NYC Guidelines state that "A trained occupational/environmental health practitioner should base decisions about medical removals ... on the results of a clinical assessment." Id. Therefore, a decision to vacate a residence due to the presence of mold can be made only after consultation with a professional, such as a physician, and must be made on an individual, case-by-case basis. CDC Q&A, (B-317), answer to question 5; see also, Sovereign Report, (B-145).

### D.    The Town's Condemnation of the Apartments

In the beginning of October, 2002, Defendant Ellis Blomquist, the Town's Code Enforcement Officer, went to the Apartments for a pre-rental inspection of two apartment units. (B-545). Upon entering one building with John Ruhl, maintenance supervisor for the Apartments, Defendant Blomquist immediately stated that he wanted to inspect the closed-off basement apartment. (B-585) Soapy water was in the former kitchen area, due to an open clean-out cap. (B-585) Mr. Blomquist told Mr. Ruhl to fix the problem, and he would return to inspect the upstairs unit. (B-585) The problem was fixed in an hour or two. (B-585) Defendant Blomquist also may have inspected a second unit that day on Cypress Avenue. (B-51)

Plaintiff called Defendant Blomquist a number of times in the next few days to ask him to return to inspect the apartments which were up for rental, because Plaintiff wanted to be able to rent them. (B-331-333, 346) However, Defendant Blomquist did not return phone calls for a few days, let alone return to the Apartments. Id. Finally, on Thursday, October 3, 2002, Ms. O'Neill got through to Defendant Blomquist's secretary, who explained that the Town had determined that there was "deadly mold" at the buildings, and that the Town was going to do a total inspection "sweep" of the Apartments. (B-334-35) Defendant Town had not told Plaintiff

before this conversation of its belief that deadly mold was present in the buildings at the complex.

The next day, late on Friday afternoon, October 4, 2002, Defendant Blomquist returned to the Apartments, ostensibly for a re-inspection of the units up for rental. Unbeknownst to Plaintiff, Defendant Blomquist brought with him Ken Belmont, from the Delaware Division of Public Health. Defendant Blomquist has testified that he brought Mr. Belmont because Mr. Belmont happened to be with him on another site visit and Defendant Blomquist wanted to obtain Mr. Belmont's views concerning a smell Defendant Blomquist had noted during his earlier visit. (B-618) Defendant Blomquist did not mention mold as the reason for bringing Mr. Belmont. Defendant Blomquist had never brought a State inspector with him before to inspect a building. (B-620) Defendant Blomquist himself did not see a need to investigate the smell himself during his prior inspection. (B-614-615)

Defendant Blomquist and Mr. Belmont went to the uninhabited, unused basement apartments at 1405 and 1421 Cypress Avenue, finding steam coming out of the basement of, and puddled water in, 1405 Cypress, and a significant amount of mold on the walls of both basements.

After inspecting the two units, Belmont told Defendant Blomquist that there was a significant amount of mold that presented an unhealthy environment to the building occupants. (B-623) Defendant Blomquist reported what he had observed to Defendants Boneker and Giles, and discussed how to proceed. (B-626-629) Mr. Belmont called his superior, Dr. Gerald Llewellyn, (B-634) Dr. Llewellyn concluded and told Mr. Belmont that the basements presented

9

a serious danger to the inhabitants of the buildings. (B-626-629)   Mr. Belmont reported his

conversation with Dr. Llewellyn to Defendant Blomquist shortly thereafter. (B-634-635)

Immediately after his consultations with Mr. Belmont and Defendants Giles and Boneker,

Defendant Blomquist condemned the buildings at 1405 and 1421 Cypress Avenue.  He directed

Plaintiff's management to nail shut numerous doors and display large red "CONDEMNED"

signs on these two buildings, and he evicted all of the residents of the eight upper level

apartments in the two buildings, against their wishes.  The remainder of the evening, the evicted

tenants scrambled around to find alternative housing.  Defendants did not issue any

condemnation notice to Plaintiff at that time.

At that time, Defendants informed Darlene Grocki, Plaintiff's resident manager, that

Defendants were going to condemn the different buildings at the complex, one by one.  (B-547)

At that time, Defendants had not inspected any other buildings in the complex.

Prior to the condemnation and eviction, neither the Defendants nor the State entered any

of the residential units of the buildings to see if mold was present or to take any air samples in

the units to see if any mold had become airborne and migrated there.  (B-665-666).  Neither the

Defendants nor the State interviewed any residents to determine if they had experienced any

symptoms related to the presence of mold in the basements, or asked Plaintiff if any tenants had

complained of symptoms related to mold which presumably had been present in the buildings for

years and years.  (B-638)  Had Defendants done any of these things, they would have concluded

that no emergency existed and that there was no basis to evacuate and condemn the buildings.  In

particular, Defendant Blomquist did not explain how the danger could have been emergent or

DEL1 62548-5

required evacuation if the residents had lived with the conditions for a long period of time without apparent ill effect.

Plaintiff retained its own expert and immediately attempted to test and remedy the situation. In particular, Plaintiff requested of the Town several times on October 4, 2002 and over the weekend that the Town promptly issue the appropriate licenses and permits to allow Plaintiff's contractors to seal off and abate the basement areas and address the Town's concerns. The Town repeatedly denied Plaintiff's requests. (B-344, 346, 348)

The next day, on Saturday, October 5, 2002, the Town issued a "News Release" to the "News Media" detailing the inspection and subsequent condemnation of 2 apartment buildings owned by Plaintiff. The "News Release" also detailed how seven families were "evacuated" due to a "mold condition . . . that created . . . a substantial risk to the health of the occupants of those buildings." This statement created a false hysteria because there was not a substantial risk to the occupants of the buildings and the Town's concerns could have been easily and promptly addressed.

The Defendants stated that they were concerned that conditions similar to what they observed at 1405 and 1421 Cypress existed at the other buildings in the complex. (B-641) However, the Defendants took no actions whatsoever to investigate additional buildings at the complex over the weekend or until Monday afternoon. (B-644)

Even after the weekend, on Monday, October 7, 2002, Regina O'Neill and a representative from CPR Services (a company that specializes in basement mold remediation) sought on behalf of Plainitff to obtain a permit from the Town to begin immediate remediation of

11

the two buildings that had been condemned on Friday, October 4, 2002. The Town denied Plaintiff's request. (B-333, 346, 355, 356)

On Monday, October 7, 2002, Defendant Blomquist returned to inspect additional buildings, along with Dr. Llewellyn and Mr. Belmont. They inspected approximately 10 basement units. (B-648) They did not inspect any occupied apartments. (B-665-66) They did not take any air samples. (B-655) At the end of the day they decided to condemn all of the buildings. (B-658-59)

On the evening of October 7, 2002, the Town held an "informational" meeting regarding the condemnation, the eviction of tenants and its ongoing investigation. At the meeting, portions of which were broadcast locally on television that evening and the next morning, officials spoke of the dangers of mold. (B-662) Again, this information was inaccurate and misleading because the Town had not done sufficient investigation to determine if the mold would be dangerous to anyone in the Apartments, and in fact it was not.

On Tuesday, October 8, 2002, Defendant Blomquist returned to inspect eleven additional buildings, along with Dr. Llewellyn and Mr. Belmont. (B-663) They did not go into any occupied apartments to inspect or take air samples. (B-665-66) In the early evening of October 8, 2002, Defendant Blomquist, in consultation with Defendants Boneker and Giles, condemned all of the additional buildings. (B-668-69)

During the course of the next few days, Defendant Town, acting by and through Defendant Blomquist, inspected the remaining buildings at the Apartments. During these inspections, they did not inspect any occupied apartments or take any air samples. (B-651, 668-69) Eventually, Defendant Town, acting by and through Defendants Blomquist, Boneker, and

12

Giles, condemned all of the buildings and evicted all of the tenants at the Apartments, except for the building at 1410 Cypress Avenue, which housed the rental office.

Defendant Blomquist did not issue the Notices of Condemnation until after the buildings in question had been posted as condemned and the tenants evicted thereby depriving Plaintiff of proper notice of the Town's unlawful actions before Plaintiff's property was confiscated. The Notices identify the NYC Guidelines as the operative regulatory standard for the Town's actions. (See Notice of Condemnation; A-86.) Defendant Blomquist conceded after issuance of the Notices that mold in the basements was the basis of the orders, and that neither the conditions in the occupied apartment units (which he did not visit) nor the other conditions he says he found were the basis for condemning any of the buildings. (B-607-609)

Defendant Blomquist never asked the State, at any point during the condemnations, if there was anything the Town could do to address the mold conditions short of evacuating the tenants. (Deposition of Dr. Llewellyn at 98) (B-703) Dr. Llewellyn later acknowledged that the perceived emergency could have been addressed by placing plastic sheeting around the basement units and removing any mold from the rest of the buildings. (Deposition of Dr. Llewellyn at 95-96) (B-700-01). While Dr. Llewellyn believed that temporary removal of occupants would have been required to clean the non-basement areas, Mr. Larry Johnson, Plaintiff's expert certified industrial hygienist and a principal of Sovereign Environmental Group, Inc. ("Sovereign"), notes that removal of the tenants would not have been necessary for health reasons and that, at most, an overnight stay off-site for logistical reasons would have allowed sufficient time for the sheeting to be put in place and to clean the apartments in the manner suggested by Dr. Llewellyn.

After it issued the Notices of Condemnation were issued, the Defendant Town continued to require Plaintiffs to remediate the condemned Apartments before they could be reinhabited, but the Town did not permit Plaintiff or its contractors access to the Apartments to do so. (B-333, 346, 355-56). In fact, Plaintiff and its contractors tried on multiple occasions to be given access to the Apartments to assess and remediate the conditions. Defendants said that Plaintiff could not have access until the Town had inspected all of the Apartments, and that remediation could not occur until the Town issued a permit for the work and Plaintiff had developed a remediation plan approved by the State.[4] This requirement resulted in multiple submissions which the State and Town eventually approved in February, 2003.[5] As a result of Defendants' actions, residents were prevented from living in the Apartments and were forced to find housing elsewhere.

Needless to say, the removal of tenants and condemnation of the Apartments drastically reduced their fair market value. As the foregoing demonstrates and as Plaintiff intends to prove at trial, the entire condemnation and eviction process was unnecessary. Had the Defendants acted properly and provided EPC with an opportunity to address their concerns, not a single tenant would have had to lose his or her home. In short, there was no "widespread mold contamination" at the Apartments, but (as set forth in the following section) certain isolated issues that were easily remedied as a matter of good building hygiene.

### E.    Plaintiff's Inspection of the Apartments at the Time of the 2002 Condemnations

In October 2002, shortly after the apartments were condemned and vacated, defendants retained Mr. Johnson, to conduct a comprehensive, thorough investigation of the Apartments.

---

[4] See Notices of Condem, A-87; Town's Answer to Chancery Civil Action No. 19970-NC (B-559)
[5] (D-26-40)

14

Mr. Johnson inspected every unit of every apartment building, including the basements and common areas, and took air samples at each unit of each building.

Mr. Johnson reached the following conclusions: (1) most apartment units in which residents lived had no mold growth and no mold in the air whatsoever (B-145-146)); localized occurrences within the few inhabited units themselves with mold caused the mold's presence (B-65-66); and remediation of these units should be easily performed. (B-65-66)

Regarding the uninhabited basements, a number of the former basement apartments had no mold growth whatsoever (sample pictures are in the Plaintiff's Appendix to its Answering Brief opposing summary judgment).[6] (B-442-534.) Mold was found in widely varying degrees in the other basement units. (B-165-168.) Twenty-one (over 55%) of the basements were estimated to have 10% or less of the total surface area with visible mold in October 2002. Of these twenty-one basement apartments, five were estimated to have 5%, four with 1% and six had no visible mold growth. Air testing showed that most building basement units did not have elevated levels of mold in the air. (B-65) (emphasis added)

To the extent mold was present in basement units at the Apartments, it resulted from a number of separate, isolated water damage events, such as leakage from a corroded iron sewer drain line into 1407 Maple Avenue, and a hot water pipe leak in 1405 Cypress Avenue in 2002. Sovereign Report at 2, 7-8. (B-141, 146-47) (B-7, 51-57). Mr. Johnson concludes that these events since the Fall of 1999 account for most, if not all, of the mold found in the basements. (Mr. Johnson notes that Plaintiff addressed flooding from Hurricane Floyd in 1999 by hiring a remediation contractor, see Sovereign Report (B-141-42).

---

[6] Volume I and II of Plaintiff's Appendix to its Answering Brief opposing summary judgment may be found at D.I. # 53 and D.I. # 54 respectively.

Mr. Johnson concludes that the evacuations ordered by the Town in October, 2002 were unnecessary and unjustified. Sovereign Report (B-141-143) (B-215). There was no imminent hazard to the residents of the Apartments and, even with the presence of visible mold growth and other conditions in certain basement apartments, there was not a danger to the residents that constituted an emergency. (B-65-66.)

There was minimal mold in the apartment units where people lived. Further, airborne mold was consistent with "background" concentrations in most units. Sovereign Report, (B-145-146).

To the extent mold was present in basement units, it would not migrate to the areas of the Apartments used by the residents. (B-65-68.) Further, mold in the basement could not affect residents unless a number of different factors were present, and many of the factors were not present. To be of concern to residents, all of the following conditions would have to be met:

> Mold growth would have to be present in the basement; the mold growth would have to be shaken up to be released to the air; there would have to be a pathway for mold in the air to travel into residential areas of the Apartment; there would have to be a force causing air from the basement to travel along the pathway to residents in the Apartments; and the residents in affected units would have to be susceptible to mold.

Mr. Johnson found that these conditions were not satisfied. In particular, he found that there was no mold growth or minimal growth in many basement units; that there were no airborne mold spores above background levels in all but a few basement units; there was no force, such as forced air heating, to move airborne mold spores from any basement unit to

16

residential areas within the Apartments; that mold spores were not present above background levels in the air of residential areas except for a few units attributable to residential activities in those units and not to the condition of the basements; and that there was no evidence that residents in the Apartments were susceptible to the mold, despite the fact that it may have been present for some period of time. (B-65-66.) In fact, many residents had lived at the Apartments for a number of years, but prior to the time of the condemnation and eviction, there were only one or two isolated complaints by residents relating to the presence of mold in the Apartments or mold-related symptoms.

Without regard to the source of mold in the residential units, Mr. Johnson found that the vast majority of these units (over 70%) had minimal potential for exposure to mold, including those units with no visible mold or with mold concentrations comparable to that found in the ambient air (at "background" or naturally occurring levels). Sovereign Report, (B-141, 145, 146). Mr. Johnson found that fewer than ten percent (10%) of the units should be temporarily vacated during remediation, solely due to logistical reasons, since access to important parts of the unit (such as the bathroom or kitchen) would be blocked for more than one day due to remedial work. Id. Mr. Johnson did not find that vacating these apartments was required for health reasons, or at any time other than during remediation. Id. The remainder of the apartments, constituting fewer than twenty percent (20%) of the total, required evaluation on an individual-by-individual basis for possible vacation by those susceptible to molds during the remediation process only, based on consultation with a physician. Id. Mr. Johnson did not find that anyone needed to be vacated from these apartments for health reasons at any time other than during remediation. Id.

DEL1 62548-5

Even if all five factors had been present in every building, the basement conditions could have been contained and the Town's concerns could have been addressed without evacuating residents and condemning the Apartments. (B-65-68.) A standard method of protection used in similar situations uses a negative pressure enclosure, which breaks all pathways between mold in the basement and the residential areas. Id. The enclosure prevents any potential exposure of residents without the need for evacuation. Id. The enclosures can be put together in a few hours and operate for months. Id. Once contained, the basements could be properly assessed to determine the appropriate methods for abatement to remove mold, asbestos and other hazardous materials and to clean the basements. Id. Further, to the extent any upper level apartments needed minor remediation and/or cleaning, this could have been done in one or two days. Id. Temporary relocation of residents might have been necessary for logistical reasons (e.g., taking the only bathroom out of service for a day) for some or all of fourteen apartments units. Id. Thus, at most all that was required was at most an overnight stay in a hotel. Id.

F.    **Plaintiff's Damages, Johnson's Supplemental Reports and David Wilk's Appraisal**

After the condemnations, Defendants said that Plaintiff could not have access until the Town had inspected all of the Apartments, and that remediation could not occur until the Town issued a permit for the work and Plaintiff had developed a remediation plan approved by the State.[7] In November 2002, Plaintiff submitted to the Town a proposed plan for remediation of the Apartments entitled "Technical Scope for Removal of Mold Impacted and Asbestos-Containing Materials" along with a Preliminary Cost Estimate for Mold Remediation. (collectively, the "Mold Remediation Plan"). (D-1-25) After correspondence between State officials and the Plaintiff's remediation experts, the State Division of Public Health ultimately

---

[7] See Notices of Condemnation A-87; Town's Answer to Chancery Civil Action No. 19970-NC (B-559)

approved the Mold Remediation Plan on January 16, 2003, see Letter from G. Llewellyn to Gary Brown dated 1/16/03 (D-26), and it was also approved by the State's Department of Natural Resources and Environmental Control on January 23, 2003. See Letter from Howard Morrrison, III to John Giles dated 1/23/03 (D-27). Finally, the Town of Elsmere approved the Mold Remediation Plan and issued a building permit for its implementation on February 5, 2003. See Building Permit (D-28). The Mold Remediation Plan contained a preliminary cost estimate of $231,200. (D-4) Even though this cost estimate was redacted in the copies sent to the Town in 2002, the Town has been aware of this cost estimate since early December 2004 at the latest.[8]

Based on the data previously provided in the approved remediation plan, on October 6, 2005, Plaintiff served Johnson's supplemental report dated October 3, 2005 (D-41-43) that augments his original cost estimate and assigns a value to the reasonable remediation costs that a potential buyer would have to take into account when considering a purchase of the Apartments in October 2002. The Town has had Johnson's remediation plan since November 2002. In fact, the Town and State accepted this proposed remediation plan and the Town issued a permit for its implementation. (D- 26-40 ). Johnson's recent supplemental report, together with David Wilk's report, establishes the fair market value of the property at the beginning of October 2002.

Against this factual backdrop, the Defendants have posed the question: is Mr. Wilk's appraisal relevant to damages?

---

[8] The Mold Remediation Plan (non-redacted version) includes Bates numbers (e.g. EPA 001700 at D-4) because the Town reviewed Plaintiff documents on December 8, 2004 and flagged the documents that it wanted copied and bates numbered in the previously settled litigation entitled Manuel v. Elsmere Park Club, L.P., et al., Delaware Superior Court C.A. No. 02C-10-212 (JRJ).

**ARGUMENT**

### A.     The Standard of Admissibility of Expert Opinion Under FRE 702 and Under *Daubert*

The Federal Rules of Evidence ("FRE") control the admissibility of evidence and provide

as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FRE 702.

The trial judge is the gatekeeper responsible for excluding unreliable expert witness

testimony, particularly in jury trials such as the present case.  Kumho Tire Co. v. Carmichael,

526 U.S. 137 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  A

proponent of a particular expert must show that his or her expert's testimony meets the

admissibility requirements of FRE 702 by a preponderance of the evidence.  See Bourjaily v.

United States, 483 U.S. 171 (1987).  However, a party does not "have to demonstrate to the

judge by a preponderance of the evidence that the assessments of their experts are correct, they

only have to demonstrate by a preponderance of the evidence that their opinions are reliable."  In

re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3rd Cir. 1994).

### B.     Wilk's Report Is Highly Relevant and Will Assist the Trier of Fact Because It Provides a Baseline Valuation for Calculating Plaintiff's Damages

Defendants' Motion *in Limine* is flawed because it assumes the outcome of the case in its

favor (i.e., that the Apartments had widespread toxic mold contamination) and on that basis

attempts to disqualify Plaintiff's expert David Wilk, who provided an appraised value of the

Apartments assuming there was no widespread toxic mold contamination.  In arguing that Wilk's

20

DEL1 62548-5

report is irrelevant, Defendants' motion confuses the gate-keeping function of the Court under *Daubert* with the relevance and weight of proposed testimony. Wilk's report is highly relevant and will assist the trier of fact because it provides a baseline valuation of the Apartments. From that baseline, the fact finder may then weigh competing evidence concerning the amount and reasonableness of remediation costs when calculating Plaintiff's damages. "[A]n expert may construct a reasonable offense-free world as a yardstick for measuring [damages]." <u>Lepage's Inc. v. 3M</u>, 324 F.3d 141, 165 (3d Cir. 2003) (en banc) (citations omitted). As the Third Circuit reasoned in <u>Lepage's,</u> a damages "expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activites." 324 F.3d at 165. Wilk's report provides such a "yardstick." When read in conjunction with Mr. Johnson's report, Wilk's baseline value helps the factfinder determine damages.

The admissibility of Wilk's opinion is not diminished by the fact that a reasonable deduction from his appraised value will be provided by a different expert with different expertise. Otherwise, litigants in federal court would never be able to rely upon more than one expert to construct their damages. The town cannot reasonably believe there would be no diminution in fair market value as a result of the condemnations and evictions if EPC is correct. Yet the Defendants do not suggest any other plausible method by which Plaintiff's damages could be measured.

Defendants' motion *in limine* is predicated on the argument that Wilk's report is "irrelevant" to damages under Federal Rule of Evidence 401.[9] But FRE 401 defines "relevant" as "evidence having **any** tendency to make the existence of **any** fact that is of consequence to the determination of the action more probable or less probable than it would be without the

---

[9] <u>See</u> DOB at 11.

21

evidence."[10]  Wilk's report is clearly relevant because it helps establish the pre-condemnation

value of the Apartments, and even though Wilk's valuation assumes no environmental

contamination because Plaintiff contests that finding, it makes the existence of the actual value

more probable by providing a baseline from which the fact finder may subtract appropriate

remediation costs  See Johnson Supplement Report (D-41-43); see also Mold Remediation Plan

(D-1-25).  Moreover, Wilk's report satisfies FRE 702 and *Daubert* because his qualifications and

methodolgy in real estate appraisal (which are conceded) assist the trier of fact in determining

the value of the Apartments.

Significantly, Defendants do not challenge "whether Wilk correctly performed the

valuation of the Apartments" assuming no environmental issues.[11]  Their argument that Wilk's

report is irrelevant is circular because it is founded upon the premise that the Apartment complex

had serious mold warranting closure and, therefore, any expert opinion that fails to agree is

inadmissible.  Plaintiff obviously disagrees with the Town's premise.

Ironically, the Defendants have insisted that the question of remediation costs requires

expert opinion from Mr. Johnson (notwithstanding the approval of his firm's plan in February

2003 and the fact that Defendants have been aware of Johnson's original estimate of

remediation costs since early December 2004), but have proferred no expert opinion of their

own on the subject.  As set forth below, the Town attempts to rely upon a summary of "cost

data" obtained from a third party pursuant to a subpoena, but Plaintiff has not reviewed any of

the underlying documents.

In an effort to stem the tide of motion practice in this case, EPC has offered

Defendants an opportunity to rebut Mr. Johnson's cost estimate if it elects to do so.  Thus, the

---

[10] FRE 401 (quoted in Defs.' Opening Brief ("DOB") at 11) (emphasis added).
[11] See DOB at 13, n.5.

finder of fact will be in a position to weigh the competing evidence of reasonable cleanup costs at the time of condemnation. That exercise in evaluating the evidence does not imply that Mr. Wilk's appraisal - which provides the starting point for determining damages - is irrelevant or inadmissible under <u>Daubert</u>.

### C.     The Cases That Defendants Rely Upon Are Inapplicable

Some jurisdictions have held that remediation costs must be excluded in determining fair market value of real property. <u>See</u>, <u>e.g.</u>, <u>Aladdin, Inc. v. Black Hawk County</u>, 562 N.W.2d 608, 615 (Iowa 1997); <u>Dept. of Transportation ex rel. People v. Parr</u>, 633 N.E.2d 19 (Ill. App. 1994), <u>appeal denied</u>, 642 N.E.2d 1276 (Ill. 1994).[12] Defendants try to distinguish these cases by noting that both <u>Aladdin</u> and <u>Parr</u> involved government takings through eminent domain.[13] Meanwhile Defendants rely heavily on several tax assessment and other distinct cases from other jurisdictions[14] even though the condemnations by the Town of Elsmere at issue in this case are more akin to a government taking through eminent domain than a valuation for tax assessment purposes.

Nevertheless, many of defendants cases are inapplicable because they concern claims that there should be <u>no</u> reduction of damages for remediation costs.[15] To the contrary, Plaintiff has offered evidence representing almost $300,000 of reasonable remediation costs that a potential buyer would have considered in October 2002. (D-41-43) Furthermore, Wilk's report does not state that remediation costs or environmental concerns should be completely ignored by the jury when determining Plaintiff's damages.

---

[12] <u>Cf</u>. <u>Redevelopment Agency of the City of Pomona v. Thrifty Oil Co.</u>, 4 Cal.App.4th 469, 473-74 (Cal. App. 1992) (remediation costs considered in eminent domain case), cited in DOB at 17.

[13] DOB at 17, n.7.

[14] DOB at 16-17.

[15] <u>See</u>, <u>e.g.</u> DOB at 17, citing <u>Northeast Ct. Economic Alliance, Inc. v. ATC Partnership</u>, 776 A.2d 1068, 1081 (Conn. 2001) for the proposition that environmental contamination could not, as a matter of law, be excluded from a condemnation proceeding. But the relevance of Wilk's Report is not based upon excluding all evidence of environmental conditions before the jury as a matter of law.

23

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO STRIKE
EXHIBIT A ATTACHED TO THE 9/22/05 AFFIDAVIT OF LIZA H. SHERMAN**

In support of Defendants' Motion *In Limine* to exclude David Wilk, Defendants attached a statement of costs (Exhibit A that is the subject of this Motion to Strike)[16] purporting to be a list of expenses that J.A.B. Properties Management, Inc. ("JAB") had incurred to date in association with the remediation of the Apartments.  JAB is the entity that purchased the Apartments in or about April 2003.

Prior to the filing of this Motion *In Limine* on September 22, 2005, Plaintiff had not seen either Exhibit A or, more importantly, any of the documents underlying Exhibit A that were obtained pursuant to subpoena.  After the Motion was filed and upon Plaintiff's follow up questions, Defendants' counsel confirmed that she was in possession of three (3) bankers boxes worth of documents from JAB.  Defendants have been in possession of the JAB Documents Since September 21, 2005, but stated that they could not be shared because confidentiality issues were unresolved.

Early in the week of October 10, 2005, Plaintiff's counsel advised counsel for the Defendants that Plaintiff could not fairly respond to this Motion without first reviewing the JAB documents.  Plaintiff understood that JAB's counsel was in the process of reviewing a proposed stipulation as to confidentiality.  According to Defendants, JAB's counsel approval was needed before the documents could be shared and defendants were attempting to secure JAB's approval prior to Plaintiff's deadline to respond to the Motion.  Plaintiff agreed to review the stipulation as well.  JAB's approval was not forthcoming prior to the deadline for plaintiff's response.

---

[16] Defendants' Opening Brief on the Wilk motion *in limine* is D.I. # 56. The Appendix filed in support of that motion *in limine* is D.I. # 65.  The Affidavit of Liza Sherman and Exhibit A attached thereto are found at page A-225 in the Appendix (D.I. # 65) and also at D.I. # 58.  The Motion to Strike is being filed concurrently herewith.

In an attempt to avoid this Motion to Strike, and in accordance with Local Rule 7.1.1, Plaintiff's counsel sent an email message to Defendants' counsel on the morning of October 14, 2005 suggesting that the parties defer plaintiff's response until the JAB document issue is resolved. (D-49)  Plaintiff also advised that the stipulation was acceptable, subject to clarification of one issue.  Having not received a response from Defendants, EPC has been compelled to file this Motion To Strike.

Exhibit A is based upon a large volume of documents that Plaintiff has never seen. Plaintiff has therefore been unable to evaluate the documents and respond to Defendants' argument that the documents somehow show extensive "remediation costs."  The repairs or expenditures reflected in the documents may be unrelated to any alleged mold condition at the Apartments; they may have been undertaken voluntarily by JAB; they may be unreasonable or incomplete.  Plaintiff has no way of knowing and has not had the opportunity to depose JAB. Accordingly, Exhibit A is entirely non-probative of any issue and should be stricken.

25

## CONCLUSION

Wilk's report is highly relevant and "fits" the facts of this case because it will assist the trier of fact in determining a starting point for Plaintiff's damages. The fact-finder can then weigh all of the evidence concerning reasonable remediation costs to determine the fair market value of the Apartments and the amount of plaintiff's damages. Consequently, Wilk's report is relevant and should not be excluded. For the foregoing reasons, Defendants Motion *In Limine* should be denied, and Exhibit A attached to the Affidavit of Liza Sherman should be stricken.

Dated:  October 17, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP


By:  _____
David S. Eagle, (Bar No. 3387)
Patrick A. Costello (Bar No. 4535)
919 Market Street, Suite 1000
Wilmington, DE  19801-3062
(302) 552-5504 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*