# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELSMERE PARK CLUB, L.P., a Delaware limited partnership,<br><br>        Plaintiff,<br><br>        v.<br><br>TOWN OF ELSMERE, a Delaware Municipal corporation, ELLIS BLOMQUIST, EUGENE BONEKER, and JOHN GILES,<br><br>        Defendants. | Civil Action No. 04-1321-SLR<br><br><u>JURY TRIAL DEMANDED</u> |

### PLAINTIFF'S REPLY TO DEFENDANTS' ANSWERING BRIEF REGARDING PLAINTIFF'S MOTION TO EXCLUDE THE AFFIDAVITS AND TESTIMONY OF GERALD LLEWELLYN, KEN BELMONT AND GEORGE YOCHER

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
Douglas F. Schleicher (Admitted *Pro Hac Vice*)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 426-1189 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
dschleicher@klehr.com
*Attorneys for Plaintiff*

Dated: October 17, 2005

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT.........................................................................................................3

    A.    Defendants Have Not Shown That the Proposed Defense Experts Used Reliable Principles and Methods ..................................................3

        1.    Defendants Have Failed to Show that the Proposed Defense Experts Followed the New York City Guidelines ......................3

        2.    Defendants Have Failed to Show That the Proposed Defense Experts Used Any Other Reliable Principles and Methods.......7

    B.    Defendants Have Failed to Show That the Opinions of the Proposed Defense Experts are Based Upon Sufficient Facts or Data....................8

        1.    The Affidavits of the Proposed Defense Experts Do Not Set Forth Any Facts or Data They Relied Upon .......................8

    C.    Standard of Liability for the Town........................................10

CONCLUSION ...................................................................................................11

## TABLE OF AUTHORITIES

### CASES

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
  509 U.S. 579 (1993)..................................................................................................1

Monell v. Department of Social Services of City of New York,
  436 U.S. 658 (1978)................................................................................................10

Pembaur v. City of Cincinatti,
  475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).......................................10

# INTRODUCTION

While Defendants now limit the purpose for which they seek to use the expert testimony of Dr. Llewellyn, Mr. Belmont and Mr. Yocher (the "Proposed Defense Experts"), they still have failed to establish that the testimony is admissible under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). In order to be admitted for any purpose—including to show that a range of opinions exist concerning acceptable mold remediation methods--the opinions of the Proposed Defense Experts must themselves be admissible. They are not.

Defendants' Answering Brief presents a fundamental misunderstanding and misrepresentation of the case. The Defendants misrepresent the facts, misstate Plaintiff's arguments, and misstate basic principles relating to mold and the NYC Guidelines relevant to this case. Most importantly, they fail to show that the ostensible "reports" - which in this case are affidavits - of their proffered experts, Dr. Llewellyn, Mr. Belmont and Mr. Yocher (the "Proposed Defense Experts"), followed accepted methodology (the NYC Guidelines) in reaching their opinions, based their opinions on sufficient data or that they presented anything other than speculative conclusions. Therefore, as a matter of law, the opinions and testimony of the Proposed Defense Experts cannot be admitted into evidence in this litigation.

Despite many pages of roundabout explanation concerning how the Proposed Defense Experts followed the Guidelines on Assessment and Remediation of Fungi in Indoor Environments, issued by the New York City Department of Health & Mental Hygiene (the "NYC Guidelines") (B-209-225)[1] (also included with Ken Belmont's Affidavit, attached to

---

[1] In order to conserve paper, some citations are made to the Appendix (Volume I = D.I. # 53; Volume II = D.I. # 54) to Plaintiff's Answering Brief in Opposition to the Motion for Summary Judgment and will be designated herein as "B-___." Similarly, any citations to the Substitute Appendix in Support of Defendants' Opening Brief in Support of Their Motion for Summary Judgment (D.I. # 52) will be designated as "A-__", and citations to the Appendix to Defendants' Reply Brief in Support of Their Motion for Summary Judgment (D.I. # 66) will be designated as "C-___."

1

Plaintiff's Opening Brief (D.I. # 64) as Exh. B), the Answering Brief fails to address the Guidelines' directive central to this case that "[e]xcept in cases of widespread fungal contamination that are linked to illnesses throughout a building, building-wide evacuation is not indicated". NYC Guidelines, Section 1.3, ¶ 2 (B-215). Contrary to Defendants' mischaracterization, the Guidelines' directive not to evacuate except in extreme circumstances (which were not presented by Plaintiff's Elsmere Park Apartments (the "Apartments")) is not a remedial alternative, it is simply an identification that evacuation is not appropriate in any proper mold remediation except in very special situations.

The Proposed Defense Experts did not follow this important aspect of the NYC Guidelines in assessing whether or not evacuation was proper in this case. Therefore, their proffered opinions do not meet the Daubert standard.

Further, contrary to the incorrect statements by Defendants, the legal standard of liability for the Town is not simply whether or not its condemnation provisions were rational, but whether or not the Town, through its policymakers - individual Defendants Blomquist, Boneker and Giles - improperly denied Plaintiff an opportunity for a hearing when there was no emergency, or when they did not properly determine that an emergency existed. Since there was no emergency and no reasonable basis to believe one existed, the Town and the individual Defendants denied Plaintiff a hearing in violation of Plaintiff's Procedural Due Process rights.

# ARGUMENT

## A. Defendants Have Not Shown That the Proposed Defense Experts Used Reliable Principles and Methods

The parties agree that the NYC Guidelines establish a basis to determine whether or not evacuation was called for at the Apartments in October, 2002. The Defendants have failed to show that the Proposed Defense Experts followed these Guidelines in issuing their "reports". The Defendants also argue that the opinions of the Proposed Defense Experts are admissible because the NYC Guidelines permit other remedial methods to be used, and the judgment of the Proposed Defense Experts provided just such an alternative. These arguments miss the mark for two central reasons. First, the Guidelines' directive concerning evacuation is not a remedial method, it is a directive concerning when health threats may be present. Whatever the remediation performed, mold does not require evacuation except in cases of widespread fungal contamination linked to illnesses throughout a building. Second, if the judgment of the Proposed Defense Experts was that evacuation was required, they have not provided the factual basis for that determination or the rationale for their view, other than conclusory speculation.

### 1. Defendants Have Failed to Show that the Proposed Defense Experts Followed the New York City Guidelines

Despite continuously repeating the mantra that the Proposed Defense Experts followed the NYC Guidelines, the Answering Brief fails to show that they did so; in fact, they did not. The NYC Guidelines clearly states that: "Except in cases of widespread fungal contamination that are linked to illnesses throughout a building, a building-wide evacuation is not indicated." NYC Guidelines, Section 1.3, ¶ 2 (B-215). There is no condition or caveat to the Guidelines' directive. In addition, the NYC Guidelines state that "A trained occupational/environmental health practitioner should base decisions about medical removals ... on the results of a clinical

3

assessment," id., and that such determination must "be made on a case-by-case basis". Id. at Executive Summary (B-210-11).

There was minimal mold in the occupied residential units. (B-145-46; B-67) There was not any mold or minimal mold in many basement units. (B-65-68) There is no evidence of any illnesses at the Apartments linked to the mold that was present. (B-65-68) The Defendants did not undertake to make decisions about medical removals (i.e., evacuation) on the results of any clinical assessments. Llewellyn 11/16/04 deposition at 111-12 (C-177-78).

Realizing the weakness of their position, the Defendants attempt a circuitous end run around the clear provision concerning evacuation to attempt to show that they followed the NYC Guidelines, but they did not. Despite statements in the Answering Brief to the contrary, a complete examination of the basements shows that many had no mold at all, or minimal amounts of mold. (B-65-66) Pictures attached to Plaintiff's response to Defendants' motion for summary judgment clearly establish Plaintiff's position. (B-442-534) Contrary to the implication in the Answering Brief, provided without citation to any document, Dr. Llewellyn has never stated that mold covered <u>every</u> wall and <u>every</u> ceiling surface in <u>every</u> basement. See Defs.' Answering Brief (D.I. # 72) at 14. Clearly, from the photographs and from Mr. Johnson's exhaustive visits to every room of virtually every building in the complex, the statement in the Answering Brief is a misrepresentation.

More importantly, other than in isolated individual apartments typically related to activity within that apartment, there was no mold in most of the occupied units of the Apartments. (B-145-46) The minimal number of apartments visited by the Proposed Defense Experts is clearly insufficient to establish that the presence of mold was "widespread". Thus, there was not widespread mold in the occupied units.

4

Further, contrary to the argument in Defendants' Answering Brief, the Proposed Defense Experts did not have any sample results at the time the Defendants decided to condemn the Apartments. See Llewellyn 11/16/04 deposition at 117 (C-183) ("I didn't have specific test data to show that [mold spores had traveled from the basements to the apartments]"); see generally Transcript of Oct. 10, 2002 Court of Chancery hearing on Plaintiff's Motion for Temporary Restraining Order ("TRO Tr.") at 48-49 (A-194-95; C-48-49) (no air samples were taken and Dr. Llewellyn did not even know what the mold concentrations were in the basement units). In fact, in his deposition in a different case (brought by residents against Plaintiff in this case), Dr. Llewellyn flat out conceded that he "didn't know if [mold] had traveled already [from the basements to the apartments]." Llewellyn 11/16/04 deposition at 117 (C-183).

In addition, and as a necessary result, the Proposed Defense Experts do not indicate in their "reports" that their assessment was in any way based upon such results. Rather, they had "tests out" on grab samples of drywall, meaning that the results were not yet received. This is why Dr. Llewellyn testified that he "would expect" the results to show the presence of mold spores from "drywall and elsewhere", (TRO Tr. at 49) (C-49), and why he stated in his affidavit that mold spores "probably" had migrated to the apartments. Also, these sample results would show mold growth on the drywall and elsewhere, not the presence of mold in the air or migration of mold from the basements to the occupied apartments.

The Answering Brief blatantly mischaracterizes the testimony of Plaintiff's expert, Mr. Johnson, who said that higher levels of mold in an apartment compared to the outdoor environment could result from a source within that apartment unit or past migration into the apartment from outside, or it could be from the basement if there were a driving force pushing any mold in the basement into the apartment. See Johnson 9/14/05 deposition at 22-25 (C-392).

5

Defendants suggest that clinical evaluations were performed in support of the decision to evacuate. First, nothing could be further from the truth. The anecdotal information suggested in the Answering Brief is (i) inaccurate, and (ii) completely misrepresents Dr. Llewellyn's decisionmaking process. First and most importantly, Dr. Llewellyn clearly testified that the amount of mold found in the basement was the basis for his recommendation to evacuate, and that he did not consider using the individual assessments required by the NYC Guidelines as a basis for the evacuation decision. Llewellyn 11/16/04 deposition at 111 (C-177). Indeed, Dr. Llewellyn testified that he was not aware of any illnesses throughout the Apartments before the incident. Id. at 109 (C-175).

Second, Dr. Llewellyn testified that the information he had was limited and anecdotal. He testified that he spoke with some individuals at public meetings, which started after the Town began condemning buildings, but there is no indication whatsoever that he took note of the individual's building or unit numbers, and his testimony (referenced in the preceding paragraph) indicates that he was not concerned with this information in making a condemnation decision. See generally (C-175-78). Similarly, information available from others, such as nurses, was second hand (at best) and was extremely limited. (C-175-76)

While agreeing that the NYC Guidelines are the relevant standard pertaining to mold, the Proposed Defense Experts do not explain how evacuation in this case was consistent with the NYC Guidelines. It was not. Therefore, the Proposed Defense Experts have not followed this accepted, reliable principle for assessing whether or not evacuation was proper.

6

### 2. Defendants Have Failed to Show That the Proposed Defense Experts Used Any Other Reliable Principles and Methods

Defendants argue that there are remedial methods which present alternatives to the NYC Guidelines, and therefore that their professional judgment provided an acceptable substitute basis on which to determine that evacuation was proper in this case. However, it is plainly obvious that the Guidelines' statement concerning evacuation is not a remedial method, it is a directive concerning when and how to determine if health threats may be present in the presence of mold. If this argument needs any support, the provision concerning evacuation is found in section 1, which is entitled "Health Issues", not in section 3, which is entitled "Remediation". The NYC Guidelines state that whatever remediation is performed, mold does not require evacuation except in cases of widespread fungal contamination linked to illnesses throughout a building. The NYC Guidelines assume that some type of remediation will be performed. See Executive Summary, p. 3 (B-211) ("In summary, prompt remediation …is the primary response to fungal contamination in buildings"). The evacuation standard pertains to any acceptable method of remediation used.

Second, if the Proposed Defense Experts believe that evacuation was required based on their professional judgment, they have not provided the factual basis for that determination or the rationale for their view, other than conclusory speculation. Their "reports" provide no data or information that forms the basis of their views, other than speculation that mold "probably migrated" to the occupied units. There is no basis to support even this speculation.

Further, their "reports" provide no explanation or basis to understand why they believe that evacuation is needed, other than the conclusory statements that a health "threat" is present. The Proposed Defense Experts do not set forth in their reports why they believe mold in the

7

basements emitted spores which were present in the air of the basements, what they believe caused such mold to move from the basements to the occupied apartment units, or why they believe any mold in the occupied units did or would negatively affect any of the residents despite the fact that most normal, healthy adults are not impacted by mold. These are required elements of any opinion supporting an evacuation decision. See Johnson 8/15/05 expert report (B-65-66).

While the Proposed Defense Experts have stated their view that a "pathway" was available which would have permitted mold to move from the basements to the occupied units, they have not shown that there was a necessary "driving force" that would have caused this motion. The availability of a pathway is similar to the availability of a road—it is a means that permits travel, but there has to be something that causes the travel—somebody has to get in a car and drive it on the road. The Proposed Defense Experts do not address what driving force, if any, would have pushed mold from the basements into the occupied units.

The Proposed Defense Experts have not shown that they used reliable principles or methods to arrive at their opinions, and therefore their testimony must be excluded.

### B.   Defendants Have Failed to Show That the Opinions of the Proposed Defense Experts are Based Upon Sufficient Facts or Data

#### 1.   The Affidavits of the Proposed Defense Experts Do Not Set Forth Any Facts or Data They Relied Upon

The Proposed Defense Experts do not set forth in their Affidavits any facts or data they relied upon in reaching their conclusion, other than the very general statements that there was significant mold growth observed in the basements of the Apartments. Realizing the paucity of the Affidavits, the Defendants' lawyers on their own identify facts the Proposed Defense Experts assertedly relied upon. There are two problems here. First, the experts themselves must identify

in their reports the facts and data they relied upon. It is not sufficient for lawyers to make arguments or speculate about what they believe the experts did or should have relied upon.

Second, the Defendants' lawyers have simply misrepresented facts to attempt to come up with a favorable rationale for the Proposed Defense Experts opinions. Indeed, the facts the Defendants' lawyers have made up clearly show why the Proposed Defense Experts must <u>not</u> be allowed to testify, and more fundamentally, why Defendants are liable for improperly condemning the Apartments. Defendants' Answering Brief claims that the Proposed Defense Experts relied upon air sampling in condemning the Apartments. <u>See</u> Defs.' Answering Brief (D.I. # 72) at 8, 15. In fact, as shown above, the Proposed Defense Experts took no air samples whatsoever prior to recommending evacuation of the Apartments. As a result, the Proposed Defense Experts speculated and said that mold had "probably" migrated from the basements to the occupied residential units.

Plaintiff took air sample results in virtually all of the occupied apartments, and elevated air sample results for mold were found in a very small percentage. <u>See</u> Johnson 10/8/03 expert report, as modified 8/31/04 (B-145-46). Also, contrary to the Answering Brief's blatant misrepresentation, Plaintiff's expert, Mr. Johnson did <u>not</u> testify that the elevated air sample results showed migration of mold from the basements, but said they might just as easily be the result of migration from mold within the apartment itself or from outside. <u>See</u> Johnson 9/14/05 deposition at 22-25 (C-392).

Defendants apparently agree that air samples would have been highly probative of the need to evacuate. The results from Plaintiff's sampling indicate that evacuation was not called for.

### C. Standard of Liability for the Town

In their Answering Brief, Defendants argue that the Town is subject to liability only if its municipal code did not have a rational basis. While not directly relevant to this motion *in limine*, Defendants' statement is inaccurate. The Defendant Town is also subject to liability for the acts of individuals if the individuals acted in policymaking roles on behalf of the Town. Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690-91 (1978); Pembaur v. City of Cincinatti, 475 U.S. 469, 481 (1986).

In this case, individual defendants Blomquist, Boneker and Giles together determined the policy of the Defendant Town of Elsmere to condemn the Apartments without a hearing. Since there was no emergency and no reasonable basis to believe an emergency existed, the Defendant Town is liable for the wrongful condemnation of the Apartments and the damages Plaintiff suffered as a result.

## CONCLUSION

For all the foregoing reasons, Plaintiff's Motion *in Limine* (*Daubert* Motion) to Exclude the Affidavits, Expert Reports and Testimony of Gerald Llewellyn, George Yocher and Ken Belmont should be granted.

Respectfully submitted,

Dated: October 17, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

By: /s/ Patrick A. Costello
David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
Douglas F. Schleicher (Admitted *Pro Hac Vice*)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 426-1189 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
dschleicher@klehr.com
*Attorneys for Plaintiff*

11

PHIL1 644339-1