## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELSMERE PARK CLUB, L.P.,          :
a Delaware limited partnership,   :
                                  :
            Plaintiff,            :        Civil Action No. 04-1321 (SLR)
                                  :
      v.                          :        **JURY TRIAL DEMANDED**
                                  :
TOWN OF ELSMERE, a Delaware       :
municipal corporation, ELLIS      :
BLOMQUIST, EUGENE BONEKER,        :
and JOHN GILES,                   :
                                  :
            Defendants.           :
_____    :

## DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF THEIR MOTION IN LIMINE TO EXCLUDE THE
## EXPERT REPORT AND TESTIMONY OF DAVID J. WILK AND ANSWERING
## BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE EXHIBIT A
## ATTACHED TO THE 9/22/05 AFFIDAVIT OF LIZA H. SHERMAN

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*
Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist and Eugene Boneker

Dated:  October 24, 2005

## **TABLE OF CONTENTS**

INTRODUCTION TO REPLY ARGUMENT.................................................................1

ARGUMENT ........................................................................................................5

I.  THE "STARTING POINT" OF AN IRRELEVANT "END POINT"
    IS LIKEWISE IRRELEVANT ...........................................................................5

    A.  Introduction..........................................................................................5

    B.  Plaintiffs Concede the Presence of Environmental Contamination................5

        1.  An "Offense-Free World" Is Not a "Contamination-Free" World........6

        2.  No Reasonable Buyer Would Buy Contaminated Properties
            For The "Highest and Best Use" Value Less Remediation Costs .........7

II.  LAYPERSONS MAY NOT BE CALLED UPON TO DO
     THE WORK OF AN EXPERT............................................................................10

III. DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO
     PLAINTIFF'S MOTION TO STRIKE EXHIBIT A ATTACHED
     TO THE 9/22/05 AFFIDAVIT OF LIZA H. SHERMAN ....................................12

CONCLUSION.....................................................................................................14

# TABLE OF AUTHORITIES

**Case**                                                                                                  **Page**

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993)...................................................................................3

Hubscher v. Pantzer Management Co.,
    1995 WL 563272 (D. Del.)....................................................................10

LePage's Inc. v. 3M,
    324 F.3d 141 (3d Cir. 2003).............................................................6, 7

Mountaire of Delmarva, Inc. v. Glacken.
    487 A.2d 1137 (Del. 1984)....................................................................10

Weiner v. Wisniewski,
    213 A.2d 857 (Del. 1965)....................................................................10

**Other Authorities**

Fed. R. Civ. Pro. 26(e)..................................................................................9

Peter S. Palewski, Environmental Cases in New York Pose Complex
Remediation Issues With Profound Impact On Land Values,
72 N.Y. St. B. J. 8 (May, 2000)....................................................................11

Thomas J. Salerno, Valuing Contaminated Property: "Out Damned Spot"
And The Residual Stigma Effect Of Contamination,
15 Am. Bankr. Inst. J. 8 (October 15, 1996)....................................................11

## INTRODUCTION TO REPLY ARGUMENT

The Elsmere Park Club, L.P. ("EPC") Answering Brief ("Answering Brief") to Defendants' Motion *In Limine* to Exclude the Expert Report and Testimony of David J. Wilk (the "Daubert Motion") invokes the same incantation of facts that seems to have becomes Plaintiff's mantra—Plaintiff claims that the mold infestation was simply not that bad. It claims the mold growth was not "widespread." (D.I. 78 at 20). It claims that the dangers of mold have been greatly exaggerated. (Id.) What it does not and cannot dispute, however, is that the Apartments[1] had mold, asbestos and raw sewage in their basements.  Although the parties disagree vehemently as to the extent of the contamination, the fact of contamination is a given in this case.  The simple, uncontested fact that the Apartments were affected with environmental contaminants is the primary reason why Wilk's testimony must be excluded from evidence as a matter of law.

Plaintiff devotes seventeen pages of its Answering Brief regurgitating its version of the facts, in a brief that is long on hyperbole and short on substance. Plaintiff's substantive argument with respect to the admissibility of Wilk's testimony is limited to one proposition: that Wilk's report is admissible as a "baseline" or "starting point" for calculating the fair market value of the Apartments. This argument fails for several reasons.

First, in order to accept Plaintiff's position, one must determine of what "end point" Wilk's report is intended as a "starting point."  Plaintiff contends that the report is the first of two variables in a simple arithmetic approach to the valuation of the apartments.  Plaintiff, without the support of its experts and without citing to any authority on the issue of valuation of contaminated real estate, contends that that the fair market value of the Apartments prior to their

---

[1] All capitalized terms not defined herein have the definitions ascribed to them in Defendant's Opening Brief in Support of Their Motion for Summary Judgment (D.I. 44).

condemnation can be computed by deducting "the reasonable costs of cleanup for a potential buyer from Wilk's appraised value [of the Apartments in the absence of environmental contamination] in order to calculate the fair market value of the Apartments in their pre-condemnation condition as of the beginning of October 2002." (D.I. 78 at 3). The "end point" which Plaintiffs proffer is an incorrect and inadequate method of valuing the Apartments and, as such, does not bear on the determination of Plaintiff's damages.

As set forth in Defendants' Opening Brief in Support of Their Motion In Limine To Exclude the Expert Report and Testimony of David Wilk ("Defendants' Daubert Motion") (D.I. 56), valuation of contaminated properties requires consideration of not only remediation costs, but of numerous other factors as well. Plaintiff's proffered methodology is simply wrong. It finds no support in the law or scholarly writing on the subject of valuing contaminated properties and has no basis in reality.[2] All relevant authority on the subject of valuing contaminated properties recognizes that a reasonable buyer takes into account many factors in addition to the cost of remediation in assessing a contaminated property's value.

Second, as the latter half of Plaintiff's proposed equation, Plaintiff would have the jury consider the inadmissible Supplemental Report of Larry W. Johnson (the "Supplemental Report").[3] Notwithstanding its other defects, the Supplemental Report is inadmissible as it was served more than seven weeks after the passing of the deadline for expert reports and six weeks after the Court-ordered time for supplementation pursuant to Rule 26(c). Thus, if admitted, Defendants will be denied the opportunity to challenge or rebut the alleged "supplementation" of

---

[2] Plaintiff contends that "Defendants do not suggest any other plausible method by which Plaintiff's damages could be measured." (D.I. 78 at 21.) It the Plaintiff's burden alone to prove damages. Regardless, the Defendants' Opening Brief sets forth *several* other plausible methods by which contaminated properties may be valued. (See D.I. at 19-21.)

[3] The Supplemental Report of Larry W. Johnson is presently the subject of a Motion to Strike. (See D.I. 71).

Johnson's prior opinion. Most important, the Supplemental Report sets forth an opinion which directly contradicts Johnson's prior, sworn testimony. Specifically, during Johnson's deposition, he testified that it would be impossible to definitively determine the costs of remediation of the contaminated apartments at issue in this case without observing any "hidden damage" present. (D.I. 66 at C-399). Without regard to Johnson's sworn testimony, Plaintiff now seeks to rely— and to have a jury rely—on an admittedly conjectural estimate of the costs of remediation.[4] Thus, even if the Supplemental Report was not barred simply by reason of its dilatoriness, it would be inadmissible because its lacks the reliability required of an expert report. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Plaintiff hinges the admissibility of Wilk's report on the Supplemental Report, positing that the two must be taken in conjunction to determine the pre-condemnation value of the Apartments. Thus, even assuming, arguendo, the correctness of Plaintiff's supposition that this is the proper method by which to value the Apartments, the inadmissibility of the Supplemental Report mandates the exclusion of the Wilk report. Although Defendants dispute the application of Plaintiff's valuation formula, it is clear that, no matter how one reaches this conclusion, the Wilk report must be excluded. Even as a "starting point," Wilk's report in inadmissible because (a) the equation which it allegedly "starts" is incorrect, and (b) using Wilk's report as a "starting point" requires the introduction of the inadmissible Supplemental Report to complete Plaintiff's proffered equation.

Finally, Plaintiff tacks onto its Answering Brief a largely unrelated Motion to Strike Exhibit A of the Affidavit of Liza H. Sherman (D.I. 75) ("Plaintiff's Motion to Strike").

---

[4] As set forth in the Motion to Strike, Johnson's report is a litigation-driven fiction. As Johnson acknowledged at his deposition, his estimate of remediation costs is necessarily incomplete and inaccurate, because he was unable to assess the full scope of remediation required without accessing hidden spaces within the Apartments.

Plaintiff's Motion to Strike is brought on the grounds that it did not receive the underlying documentation in support of the summary data contained in that Exhibit. Plaintiff's argument is unavailing and disingenuous. Even before the documents at issue were reviewed by Defendants, Defendants offered Plaintiff the opportunity to stipulate to their confidentiality and thus obtain the materials at issue before the summary data was used as an exhibit for Defendant's Daubert Motion. (See Exh. A.) Plaintiff refused. If Plaintiff had chosen to, it could have subpoenaed J.A.B. Management Properties, LLC ("JAB"), like Defendants did, or simply stipulated to the confidentiality agreement in a timely manner. Instead, Plaintiff took the position that it would simply not obtain the documents, and rather challenge the admissibility of their contents in an attempt to defeat Defendant's Daubert Motion. In any event, Plaintiff's Motion to Strike has been mooted by virtue of the filing of the Stipulated Protective Order, entered by this court on October 21, 2005. (D.I. 80), and the production of the underlying documentation in accordance therewith to Plaintiff on October 24, 2005.

For the reasons set forth herein, Defendant's Motion In Limine to Exclude the Expert Report and Testimony of David Wilk should be granted, and Plaintiff's Motion To Strike Exhibit A Attached to the 9/22/05 Affidavit of Liza H. Sherman should be denied.

**ARGUMENT**

I.    **THE "STARTING POINT" OF AN IRRELEVANT "END POINT"
IS LIKEWISE IRRELEVANT**

    A.    **Introduction**

EPC contends that Wilk's report is relevant because it is the "starting point" in the determination of the fair market value of the Apartments in the absence of the Condemnation. EPC contends that the fair market value of the Apartments "but for" the Condemnation may be computed by subtracting the costs of remediation from the value of the Apartments in an uncontaminated state. As set forth below, the problem with this assertion is that the equation EPC promotes is wrong; it is contrary to every leading authority on the subject of valuing contaminated properties. Thus, the putative "end point" of which Wilk's report is alleged to be a "starting point" is still not a proper computation of Plaintiff's alleged damages. Accordingly, Wilk's report is inadmissible.

    B.    **Plaintiffs Concede the Presence of Environmental Contamination**

EPC contends that Wilk's report is relevant because the Apartments were not actually plagued with "widespread toxic mold" contamination, and because Wilk's report properly "provided an appraised value of the Apartments assuming [the truth of Plaintiff's assertion that] there was no widespread toxic mold contamination." (D.I. 78 at 20). Although the extent of mold and other environmental contamination is disputed by Plaintiff, the presence of those contaminants is not. At deposition, Plaintiff's expert, Larry W. Johnson, ("Johnson"), testified that the apartments were contaminated ("We found surface mold contamination in some of the basement apartments, yes.") (See D.I. 66 at 390) and in need of remediation. ("Q: And as a result of doing the work that you generally described in dealing with both surface inspections and possibly air testing, you would have developed a remediation plan for that specific

apartment, correct? A: That's correct.")(D.I. 66 at C393). Wilk, however, failed to account for any environmental contamination, no matter how localized or "widespread." As set forth in the Opening Brief, the value of all contaminated properties, even those that have been remediated, reflects the concerns of a potential buyer in purchasing the property. [5]

### 1.    An "Offense-Free World" Is Not a "Contamination-Free" World

Plaintiff relies upon LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003)(en banc) for their assertion that Wilk's report is proffered as a yardstick for the value of the apartments "but for" the effect of the condemnation. Their application of the principle that a damages "expert may construct a reasonable offense-free world," id. at 165, is without moment as LePage's is readily distinguishable. In LePage's, a competitor of a well-known manufacturer of transparent tape prevailed in an antitrust action in the District Court for the Eastern District of Pennsylvania entered judgment in favor of competitor on monopolization claim. The manufacturer appealed and the Third Circuit reversed, finding, *inter alia*, that the competitor's damages expert was not required to disaggregate damages caused by manufacturer's unlawful activity from those caused by its lawful activity when estimating damages. LePage's can be distinguished from the instant issue on its facts. In LePage's, the Third Circuit did not require an expert to parse out the effect of each different action by the Defendant in rendering his opinion on the market conditions that that would have existed but for the conduct of the Defendants. Thus, LePage's stands for the proposition that an expert may, in his calculation, control for the conduct of a defendant to

---

[5] Those concerns include: the availability of indemnities, equity yield rates and risk premiums, the costs of financing, the fear of hidden clean-up costs, "market resistance" in fearing the remediation was incomplete or inadequate, the "trouble factor" for a potential buyer who would not otherwise be encumbered with the chore of remediation, the fear of public liability, and the lack of mortgageability. Plaintiff's unsubstantiated putative valuation method is unsubstantiated for a reason—it is in derogation of every leading authority in the issue of valuation of contaminated properties. (D.I. 56).

construct a "reasonable offense-free world;" it does not give an expert license to operate in the absence of meaningful and significant facts regarding the subject of his opinion. By analogy, in rendering his opinion, Wilk did not merely control for the conduct of the Defendants, but rather he was instructed to create a completely fictional world in which the Apartments were not contaminated with environmental hazards at all. Unlike the expert in LePage's, the failures of Wilk's report raise not from a commingling of relevant considerations in rendering his opinion, but completely ignoring all such considerations entirely. LePage's and the cases cited therein do not give an expert free reign to render an opinion completely devoid of context and in derogation of uncontested fact. Thus, LePage's is inapposite. Furthermore, as set forth below, the Condemnation was but one of many problems affecting the market value of the Apartments.

**2.    No Reasonable Buyer Would Buy Contaminated Properties
For The "Highest and Best Use" Value Less Remediation Costs**

EPC admits that Wilk valued the properties based upon their "highest and best use" as a "baseline valuation point for measuring Plaintiff's damages." (D.I. 78 at 3). The computation proffered by Plaintiff is the incorrect measure of the value of the Apartments because it fails to account for the effects of contamination on the value of the Apartments above and beyond their remediation costs.

As set forth in Defendants' Opening Brief, experts in the field of valuation of contaminated properties have explicitly recognized that the value of contaminated properties is reduced by not only the anticipated costs of remediation, but also by unforeseen remediation and renovation costs, risks of litigation as a result of contamination, risk of fines and other

7

governmental sanctions, reduction in value owing to "stigma" and other risks and hardships.[6] Plaintiff has not offered a witness that will testify as to these other significant factors, leaving to the finders of fact the task of not only knowing the appropriate method of valuing contaminated properties, but without a factual basis to determine the scope of the effect of "stigma" on the fair market value of the Apartments.

Plaintiff argues that Elsmere's public notice of the existence of mold at the Apartments and the warnings of associated health risks "created a false hysteria because there was not a substantial risk to the occupants of the buildings and the Town's concerns could have been easily and promptly addressed." (D.I. 78 at 3). Plaintiff offers no support for the proposition implicit in its proffered valuation methodology that it was the Condemnation alone which drove down the price of the Apartments, and that the "disgusting"[7] condition of the Apartments had no effect. To be sure, apartment buildings with an offensive odor, and basements covered with mold, containing asbestos and raw sewage are generally unappealing to most prospective tenants and, therefore, to prospective buyers. Thus, even if the Condemnation did affect the sale price, it is only one of many factors which affected its fair market value. The Plaintiff's proffered "simple subtraction" valuation method in no way accounts for these factors.

---

[6] As set forth in the articles of Peter S. Patchin, attached as a part of the Compendium forwarded in support of Defendants' Daubert Motion (D.I. 68 at Tabs 7-9), the valuation of contaminated properties must account for the following factors: clean-up costs, the availability of indemnities, equity yield rates and risk premiums, and the costs of financing. Patchin also noted the effects of "stigma" in reducing the value of a contaminated property, even after the property has been remediated, finding that the value of a contaminated property must reflect the fear of hidden clean-up costs prior to remediation, "market resistance" in fearing the remediation was incomplete or inadequate, and the so-called "trouble factor" for a potential buyer who would not otherwise be encumbered with the chore of remediation. Patchin observed an overall reduction of value in the range of 20.9% to 93.7% owing to environmental contamination in commercial and industrial properties, with wide variations depending upon other enumerated factors. Despite these numerous, significant considerations, Plaintiff has not offered evidence of any of these other considerations attendant to the valuation of contaminated properties.

[7] D.I. 66 at C-40.

Furthermore, as the latter half of Plaintiff's proposed equation, Plaintiff would have the jury consider the inadmissible Supplemental Report. As set forth in Defendant's Motion to Strike the Supplemental Report of Larry W. Johnson (D.I. 71), the Supplemental Report is inadmissible as it was served on October 6, 2005—more than 50 days after the cut-off date for expert reports, approximately six weeks after the cut-off date for supplementation pursuant to Fed. R. Civ. Pro. 26(e), and two weeks after the deadline for Daubert motions. Thus, if admitted, Defendants will be denied the opportunity to challenge or rebut the alleged "supplementation" of Johnson's prior opinion. This is particularly significant and prejudicial because the Supplemental Report directly contradicts Johnson's sworn testimony at deposition. During Johnson's deposition, he testified that it would be impossible to definitively determine the costs of remediation of the contaminated apartments at issue in this case without observing any "hidden damage" present, (D.I. 66 at C-399), yet now proffers a litigation-driven putative "supplement," generated solely for the purpose of rebutting Defendants' Daubert Motion. Thus, even if Wilk's report was admissible as a "starting point" to Plaintiff's proffered methodology, Plaintiff can not introduce the second portion of its putative equation, thus rendering Wilk's report again not relevant to the computation of Plaintiff's alleged damages.

Accordingly, Plaintiff's proposed valuation methodology is inaccurate, incorrect, misleading and without support, and therefore does not permit the introduction of Wilk's report or testimony.

## II.    LAYPERSONS MAY NOT BE CALLED UPON TO DO
##        THE WORK OF AN EXPERT

Another key problem in using Wilks report as a "starting point" is that it improperly charges the jury with a task that exceeds its proper role.  Plaintiff contends that "[t]he fact finder can…deduct the reasonable costs of cleanup for a potential buyer from Wilk's appraised value in order to calculate the fair market value of the Apartments in their pre-condemnation condition as of the beginning of October 2002." (D.I. 78 at 3). There are several problems with calling upon the jury to perform a simple arithmetic computation to determine the value of the pre-condemnation Apartments.  As set forth above, Plaintiffs proffer no support for the proposition that the calculus they propose is the proper method by which to derive a valuation of a contaminated property. Significantly, Wilk's report does not stand for this proposition; indeed, Wilk's report offers <u>no</u> insight into the method by which to perform a valuation of an environmentally contaminated property. Plaintiff proffers no other expert opinion on this point such that it could legitimately contend that Wilk's report is therefore but one element in a more complex calculation. Thus, allowing Wilk's report as a "starting point" to Plaintiff's unsubstantiated "end point" requires a jury to determine the appropriate valuation methodology in the absence of any expert testimony to guide that determination. This is inappropriate and in derogation of the law.

This court has stated unequivocally that, "[i]f the matter in issue is one within the knowledge of experts only and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert testimony in order to establish a <u>prima facie</u> case." <u>Hubscher v. Pantzer Management Co.</u>, 1995 WL 563272, *2 (D. Del. 1995), <u>citing</u> M.S. Madden, <u>Products Liability</u> 533 (2nd ed. 1988), <u>Mountaire of Delmarva, Inc. v. Glacken</u>, 487 A.2d 1137, 1141 (Del. 1984) and <u>Weiner v. Wisniewski</u>, 213 A.2d 857, 858 (Del. 1965). To that end, "[i]t would

obviously be an understatement to state that the valuation of environmentally contaminated property is a complex analysis, and not all appraisers are capable of performing the analysis…the practitioner is urged to seek out specialized valuation advice and be prepared to have to learn the nuances of the nebulous world of 'stigma' as it impacts property valuation." Thomas J. Salerno, Valuing Contaminated Property: "Out Damned Spot" And The Residual Stigma Effect Of Contamination, 15 Am. Bankr. Inst. J. 8, 25 (October 15, 1996). Furthermore, "[t]he valuation of environmentally contaminated properties is a true subspecialty in the appraisal industry." Id. at 8.

Accordingly, it is improper for Plaintiff to charge the jury with the task of figuring out how to value contaminated properties and to assess the validity of the unsupported "simple subtraction" method proffered by Plaintiff. In spite of the highly specialized nature of valuing contaminated properties, Plaintiff seeks to call upon a jury of laypersons to perform this calculation despite the manifest fact that, "[l]aymen are unlikely to comprehend the profound impact that toxic contamination may have on the environment and land values." Peter S. Palewski, Environmental Cases In New York Pose Complex Remediation Issues With Profound Impact On Land Values, 72 N.Y. St. B. J. 8, 8 (May, 2000). Accordingly, Wilk's report, as a so-called "starting point" of an incorrect and inadmissible "end point" calculation is beyond the reasonable breadth of knowledge for any layperson, does not bear on the case at bar and is therefore inadmissible.

Accordingly, the report of David Wilk, even in conjunction with the impermissible "Supplemental Report" of Larry W. Johnson is irrelevant to the case at bar. Thus, Defendants' Motion *In Limine* To Exclude the Expert Report and Testimony of David J. Wilk should be granted.

### III.  DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE EXHIBIT A ATTACHED TO THE 9/22/05 AFFIDAVIT OF LIZA H. SHERMAN

Plaintiff muddies the waters of briefing of Defendants' Daubert Motion by including in its Answering Brief in Opposition to the Motion its Opening Brief in Support of Plaintiff's Motion to Strike. The subject of the Motion to Strike, Exhibit A to the Affidavit of Liza H. Sherman (D.I. 75), is a summary of actual remediation costs incurred, as of September 21, 2005, by the purchaser of the Apartments, J.A.B. Properties Management, Inc. ("JAB")(the "Summary").  Plaintiff moved to strike the Summary on the grounds that, as of the date of Plaintiff's Motion to Strike, it had not received the underlying documentation which supported the summary data.

Any delay in Plaintiff's receipt of the supporting documentation was a result of Plaintiff's own recalcitrance in timely entering into a confidentiality stipulation and its failure to serve subpoenas *ad testificandum* or *duces tecum* on JAB.  Defendant served a subpoena *duces tecum* on JAB on August 8, 2005 (D.I. 34), pursuant to which JAB and Defendants agreed that Defendants could review the subpoenaed documents at JAB's headquarters on September 21, 2005.  In connection with that accommodation, JAB articulated certain concerns regarding potential for misuse and publication of the documents obtained.  In the interests of amicable resolution and expediting the receipt of the documents, Defendants represented that they would respect the confidentiality of the documents and that it had no collateral purpose in subpoenaing those documents.  Defendants further agreed that they would seek to enter into a stipulated protective order with Plaintiff to secure universal measures of confidentiality before the documents were disseminated.

It was against this backdrop that Counsel for Defendants contacted Plaintiff's counsel by telephone on September 19, 2005, proposing a stipulated protective order to address JAB's concerns and to satisfy Defendants' representations to JAB counsel. (See Exh. A). At that time, Plaintiff articulated its disinclination to enter into such a stipulation but said that it was amenable, in principle, to reviewing and commenting upon a draft stipulation that Defendants would furnish. (See Exh. B). On September 20, 2005, Defendants forwarded a proposed draft stipulated protective order, which Plaintiff flatly refused to review. (Id.) Because Defendants had agreed with JAB regarding the intended uses of the subpoenaed documents, JAB agreed to allow Defendants to review JAB's files for documents responsive to the subpoena on September 21, 2005. The documents obtained from JAB (the "JAB Documents") reflect the support for the information contained in the Summary, which was also supplied by JAB on September 21, 2005. (See Sherman Aff., D.I. 75).

Plaintiff was given several opportunities to obtain the JAB Documents. It could have independently taken steps towards obtaining the supporting documentation for the Summary it now seeks to exclude. It could have subpoenaed JAB. It could have reviewed the proposed stipulated confidentiality order in a timely fashion. It chose not to. Rather, Plaintiff chose to ignore the overtures of Defendants towards securing an agreement that would satisfy all parties and allow Plaintiff the access it now alleges was denied. It is inconceivable to reward Plaintiff's recalcitrance by striking probative evidence.[8]

---

[8] The Summary is probative of the relevance of the Wilk report in light of Plaintiff's proffered subtraction method of valuation. If Plaintiff contends that the value of the Apartments prior to Condemnation is their value in a fictional, uncontaminated state less the costs of remediation, then clearly the actual costs of remediation are relevant. Regardless, the Daubert Motion stands on its other merits, even without this additional information, and thus the Motion to Strike has no bearing on the determination of the Daubert Motion.

Regardless, on October 18, 2005, Plaintiff finally agreed to sign the Stipulated Protective Order, which the Court entered on October 21, 2005.  (D.I. 80).  Accordingly, Defendant has produced the JAB Documents to Plaintiff, concurrent with the filing of this reply, thereby mooting Plaintiff's Motion to Strike.  Accordingly, Plaintiff's Motion to Strike should be denied.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Defendants' Motion *In Limine* To Exclude the Expert Report and Testimony of David J. Wilk should be granted, and Plaintiff's Motion to Strike Exhibit A Attached to the 9/22/05 Affidavit of Liza H. Sherman should be denied.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*
Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist and Eugene Boneker

Dated:  October 24, 2005

# EXHIBIT A

## Sherman, Liza H.

**From:** Sherman, Liza H.
**Sent:** Tuesday, September 20, 2005 12:02 PM
**To:** 'pcostell@klehr.com'
**Subject:** Elsmere/Stipulated Protective Order with JAB

Patrick,

I attach for your review and commentary a draft stipulated protective order to address the JAB matter we discussed yesterday. I welcome your thoughts and comments. Please be advised, however, that our clients have not yet signed off on this draft and thus there may be some additional changes at our end that will ultimately need your approval as well.

Thanks in advance,
Liza

Liza H. Sherman, Esq.
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6940
Facsimile: (302) 571-1750
E-Mail: lsherman@morrisjames.com
<mailto:lsherman@morrisjames.com>

This e-mail is confidential and may be subject to the attorney-client and/or the work product privilege. Please do not read, copy or disseminate this e-mail or its attachment(s) unless you are an intended recipient. Any unauthorized use of this e-mail is not permitted. If you have received this e-mail in error, please inform Morris, James Hitchens & Williams by replying to the sender of this e-mail and then delete it from your system immediately.

# EXHIBIT B

**Sherman, Liza H.**

| | |
|---|---|
| **From:** | Douglas Schleicher [DSCHLEIC@klehr.com] |
| **Sent:** | Tuesday, September 20, 2005 4:06 PM |
| **To:** | Sherman, Liza H. |
| **Subject:** | RE: Elsmere/Stipulated Protective Order with JAB |

As I explained yesterday, I am very concerned about signing an agreement with JAB that does not seem to have any purpose.  I am concerned that my client would be exposed to future litigation concocted against it based on the agreement.  More importantly, what is the claim of confidentiality?  What is in the records that is truly confidential?  And how does the agreement protect JAB against its stated concerns that your client will improperly use the info?  Given that JAB doesn't appear to have legitimate concerns, I am inclined not to go this route.

Douglas F. Schleicher, Esquire
Klehr, Harrison, Harvey,
    Branzburg & Ellers LLP
260 S. Broad Street
Philadelphia, PA 19102
(215) 569-2795 (phone)
(215) 568-6603 (fax)


>>> "Sherman, Liza H." <LSherman@morrisjames.com> 09/20/05 3:54 PM >>>
Doug,

I apologize for the confusion and for sending this to Patrick in error.

I was under the impression, based upon our conversation, that you would be amenable, at least in principle, to a very, very narrow protective order. If I misapprehended your viewpoint, please correct me.

In any event, I just a few moments ago spoke with JAB's president (who is also an attorney, although not their attorney of record in this
matter) who is giving us permission to proceed with the document review as intended tomorrow, understanding that we (Plaintiffs and the Elsmere
defendants) have not reached an agreement with respect to the protective order. My impression was that he, unlike his counsel, seemed more concerned with what Elsmere intended to do with the records obtained than with what EPC intends to do with the records. He did not articulate this point; that was simply my impression.

My e-mail was sent in the hopes of obtaining your comments as to whether a narrow, run-of-the-mill protective order in the nature attached would be of a type you'd be willing to entertain.

I look forward to your reply.

Sincerely Yours,
Liza Sherman

-----Original Message-----
From: Douglas Schleicher [mailto:DSCHLEIC@klehr.com]
Sent: Tuesday, September 20, 2005 3:41 PM
To: Patrick Costello; Sherman, Liza H.
Subject: Re: Elsmere/Stipulated Protective Order with JAB


Liza--your email is confusing.  You and I spoke yesterday and agreed that a stipulation was not a productive way to proceed.  Patrick did not speak with you.  Why would you send this to him, when we already decided this was not the course of action to we would follow?

Douglas F. Schleicher, Esquire
Klehr, Harrison, Harvey,

1

    Branzburg & Ellers LLP
260 S. Broad Street
Philadelphia, PA 19102
(215) 569-2795 (phone)
(215) 568-6603 (fax)


>>> "Sherman, Liza H." <LSherman@morrisjames.com> 09/20/05 12:02 PM >>>
Patrick,

I attach for your review and commentary a draft stipulated protective order to address the
JAB matter we discussed yesterday. I welcome your thoughts and comments. Please be
advised, however, that our clients have not yet signed off on this draft and thus there
may be some additional changes at our end that will ultimately need your approval as well.

Thanks in advance,
Liza


Liza H. Sherman, Esq.
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6940
Facsimile: (302) 571-1750
E-Mail: lsherman@morrisjames.com
< <mailto:lsherman@morrisjames.com<mailto:lsherman@morrisjames.com>
mailto:lsherman@morrisjames.com>

This e-mail is confidential and may be subject to the attorney-client and/or the work
product privilege. Please do not read, copy or disseminate this e-mail or its attachment
(s) unless you are an intended recipient. Any unauthorized use of this e-mail is not
permitted. If you have received this e-mail in error, please inform Morris, James Hitchens
& Williams by replying to the sender of this e-mail and then delete it from your system
immediately.

_____

To ensure compliance with requirements imposed by the IRS under Circular 230, we inform
you that any U.S. federal tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.
_____

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2005, I electronically filed Defendants' Reply Brief in Support of Their Motion in Limine to Exclude the Expert Report and Testimony of David J. Wilk and Answering Brief in Opposition to Plaintiff's Motion to Strike Exhibit A Attached to the 9/22/05 Affidavit of Liza H. Sherman, and Exhibits A and B to Defendants' Reply Brief with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

David S. Eagle, Esquire
Klehr, Harrison, Harvey,
Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE  19801
Attorneys for Plaintiff Elsmere Park Club, L.P.

Edward M. McNally (#614)
Liza H. Sherman (#4124)
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*
Attorneys for Defendants Town of Elsmere,
 Ellis Blomquist and Eugene Boneker

1302434