## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELSMERE PARK CLUB, L.P., a<br>Delaware limited partnership, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 04-1321-SLR |
| TOWN OF ELSMERE, a Delaware<br>Municipal corporation,<br>ELLIS BLOMQUIST, EUGENE BONEKER,<br>and JOHN GILES, | ) ) ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | ) ) | |

### PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE SUPPLMENTAL EXPERT REPORT OF LARRY W. JOHNSON

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
Douglas F. Schleicher (Admitted *Pro Hac Vice*)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 426-1189 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
dschleicher@klehr.com
*Attorneys for Plaintiff*

Dated:  October 26, 2005

DEL1 62743-1

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

NATURE AND STAGE OF PROCEEDINGS ...................................................3

SUMMARY OF ARGUMENT ..........................................................................4

STATEMENT OF FACTS RELEVANT TO THIS MOTION......................................4

General Background ........................................................................................4

Johnson's Inspection of the Apartments at the Time of the 2002 Condemnations .........5

The Town's Approval of Johnson's November 2002 Removal Plan ..............................6

The Town's Receipt of Johnson's Original Cost Estimate...............................................7

Johnson's Report and Wilk's Report Establish One Part
of Plaintiff's Damages .............................................................................................7

ARGUMENT........................................................................................................9

CONCLUSION.....................................................................................................15

DEL1 62744-1

# TABLE OF AUTHORITIES

## CASES

Aladdin v. Black Hawk County,
    562 N.W.2d 608 (Iowa 1997) ...................................................................9, 13

Anglado v. Leaf River Forest Products, Inc.,
    716 So. 2d 543 (Miss. 1998) ......................................................................13

In re Burbank Environmental Litigation,
    42 F. Supp. 2d 976 (C.D.Cal. 1998) ..........................................................13

Hammond v. City of Warner Robins,
    482 S.E.2d 422 (Ga. App. 1997)................................................................13

Jenard v. Commissioner
    T.C. Memo. 1961-70, Docket No. 74346, 1961 WL 138 (U.S. Tax Ct. 1961) .....10, 13

Lepage's Inc. v. 3M,
    324 F.3d 141 (3d Cir. 2003)................................................................13, 14

Manuel v. Elsmere Park Club, L.P., et al.,
    Delaware Superior Court C.A. No. 02C-10-212..........................................7

Sprague v. Boston and Maine Corp.
    769 F.2d 26 (1st Cir. 1985)....................................................................9, 13

State of Delaware v. Davis Concrete of Delaware, Inc.,
    355 A.2d 883 (Del. 1976) .........................................................................14

## STATUTES

42 U.S.C. § 1983..........................................................................................3

DEL1 62745-1

## PRELIMINARY STATEMENT

The Defendants' Motion to Strike Supplemental Report of Larry W. Johnson (the "Motion to Strike") misrepresents Mr. Johnson's Supplemental Report and the issues it purportedly raises. The Supplemental Report is based on in-person inspections in the Fall, 2002 of each of the apartments at the Elsmere Park Apartments which Plaintiff formerly owned. Mr. Johnson determined the cost to fix mold at that time, and his Supplemental Report essentially reiterates that assessment. The Supplemental Report definitively determines the cost to fix the mold at the Apartments in order to establish the fair market value of the property. Therefore, along with the expert report of David Wilk, which sets forth the value of the Apartments without mold, the Supplemental Report establishes the fair market value of the Apartments before the Defendant Town improperly condemned them. Contrary to the statements by the Defendants, Mr. Johnson did not state that he did not or could not properly estimate the costs to fix the mold at the Apartments due to "hidden damage".

Further, since the Supplemental Report essentially reiterates information that was provided to the Defendants almost one year ago, there can be no claim of "trial by ambush". In fact, the Defendants have used Johnson's cost information previously in this case. There is no prejudice whatsoever to the Defendants from the Supplemental Report.

Mr. Johnson's Supplemental Report, along with the prior Wilk report, properly establishes the value of the Apartments had the Town not wrongly condemned them. Defendants incorrectly claim that an alleged "stigma" factor needs to be taken into account. Defendants waived this claim when they told Plaintiff that their objection to Plaintiff's plan to establish the pre-condemnation value of the property by subtracting Johnson's November, 2002 cost estimate from Wilk's valuation was that (in Defendants' view) the remediation costs needed to be in the

1

form of an expert opinion. Although it did not need to do so, Plaintiff specifically addressed this concern with the Supplemental Report in order to eliminate further motion practice. Further, as case law and common sense abundantly shows, there is no stigma if the Town had not publicly and notoriously condemned the Apartments, stigma is not an element of damages in a case of this type in which mold is not of the magnitude alleged by the Defendants and, in any event, there could be no stigma once the mold was removed from the Apartments (assuming no wrongful condemnation and adverse publicity by the Town).

Finally, the Court should not consider the Defendants' reference to costs they assert were actually incurred to fix the mold, which is based solely upon an affidavit of the Defendants' lawyer. The affidavit is based solely on the Defendants' legal review of documents provided by J.A.B. Properties Management ("JAB"), which purchased the Apartments from Plaintiff. First, the Defendants did not provide these documents to Plaintiff until yesterday, October 25, 2005, apparently due to disagreements between JAB and the Defendant Town notwithstanding that Plaintiff had agreed to keep the documents confidential. Therefore, Plaintiff has not had an opportunity to review them in any detail. Further, the Defendants' attorney's affidavit, and it appears the J.A.B. documents, do not establish what work was done, whether the work was required to address mold at the property, whether or not the work was voluntary, whether the work was done to improve, rather than fix, the property, and whether or not the costs incurred were reasonable or necessary. For these reasons, the affidavit of the Defendants' lawyer is not probative of any issue. Moreover, while at most such costs might be admissible to rebut Plaintiff's damages evidence, in this case, actual costs may not be probative of fair market value, because they likely do not reflect information available to the buying public in October 2002 and therefore cannot be a factor used to determine fair market value.

2

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Elsmere Park Club, L.P. ("EPC" or "Plaintiff"), the former owner of the Elsmere

Park Apartments (the "Apartments") located in Elsmere, Delaware, commenced this action under

42 U.S.C. § 1983 against Defendants the Town of Elsmere (the "Town"), Ellis Blomquist

("Blomquist"), Eugene Boneker ("Boneker") and John Giles ("Giles") (collectively, the

"Defendants") for procedural due process violations concerning the condemnation and forced

evacuation of the Apartments in October 2002.  The Defendants condemned the Apartments due

to an alleged presence of mold.  On June 10, 2005, the Court approved a stipulation amending

the Scheduling Order in certain respects.  Under the Amended Order, expert reports were to be

submitted on August 15, 2005, rebuttal expert reports were due September 15, 2005, and

*Daubert* motions were due September 23, 2005.  Defendants filed a Motion for Summary

Judgment on September 1, 2005.[1]

Plaintiff previously served three expert reports: (1) a report from Ronald E. Gots, M.D.,

Ph.D., (2) a report from Larry W. Johnson, PE, CIH and (3) a report from David J. Wilk, CRE,

MAI.  Defendant has not served any rebuttal expert reports.  On September 22, 2005, Defendants

served a Motion *in Limine* (*Daubert* Motion)[2] attempting to exclude the report and testimony of

David. J. Wilk ("Wilk").  Wilk provided an appraisal of the Apartments in order to assist the trier

of fact in calculating Plaintiff's damages.  On October 6, 2005, Plaintiff served a Supplemental

Report (the "Supplemental Report") from Larry Johnson dated October 3, 2005.  On October 12,

2005, Defendants filed a Motion to Strike Johnson's Supplemental Report even though Plaintiff

offered to produce Johnson for another deposition, Plaintiff offered to allow Defendants to

submit a rebuttal expert report and the Defendants have been aware of the underlying

---

[1] D.I. # 43.
[2] D.I. # 63.

information that supports Johnson's supplement since November 2002 and December 2004. This brief is filed in opposition to the Defendants' Motion to Strike. Trial is scheduled to begin January 4, 2006.

## SUMMARY OF ARGUMENT

1.    Johnson's Supplemental Report dated October 3, 2005 should not be excluded because it only reiterates information that was previously provided to the Defendants, with minor changes. Defendants have been in possession of Johnson's original remediation plan since November 2002 and his original cost estimate for remediation since at least early December 2004.

2.    Defendants' Motion to Strike should be denied because they are not prejudiced by the presentation of Johnson's Supplemental Report. Plaintiff has agreed to allow Defendants to re-depose Johnson prior to trial and to issue a rebuttal expert report if they so choose. Also, Plaintiff will not object to the timing of a subsequent *Daubert* Motion to exclude this report.

## STATEMENT OF FACTS RELEVANT TO THIS MOTION[3]

### A.    General Background

This action focuses upon the Defendants' decision to forcefully condemn and evacuate 152 of the 156 residential units at the Apartments in October 2002. Plaintiff asserts that its procedural due process rights were violated because, *inter alia*, evacuation of tenants was

---

[3] In order to conserve paper, some citations are made to previously filed docket items. Citations that refer to the Appendix (Volume I = D.I. # 53; Volume II = D.I. # 54) to Plaintiff's Answering Brief in Opposition to the Motion for Summary Judgment and will be designated as "B-___." Similarly, any citations to the Substitute Appendix in Support of Defendants' Opening Brief in Support of Their Motion for Summary Judgment (D.I. # 52) will be designated as "A-___." Plaintiff herein designates citations to Defendants' Appendix in the Wilk motion *in limine* as "C-___" (D.I. # 65) and citations to Plaintiff's Appendix that accompanies its Answering Brief on the Wilk motion *in limine* as "D-___" (D.I. # 77).

4

unnecessary and unwarranted. In October 2002, the entire apartment complex was essentially shut down within a week allegedly due to the presence of mold, even though Defendants failed to inspect or test any occupied residential units.[4] (B-665-66, 651, 668-69) Plaintiff's damages include the loss of fair market value that occurred when the Apartments were sold at a price lower than what they would have been sold for if the residential units were still occupied. Plaintiff does not dispute that mold had to be cleaned from the buildings, but the condemnations and evacuations ordered by the Town in October, 2002 were unnecessary and unjustified, and did not conform to Due Process requirements.

### Johnson's Inspection of the Apartments at the Time of the 2002 Condemnations

In October 2002, shortly after the Apartments were condemned and vacated, Plaintiff retained Mr. Johnson to conduct a comprehensive, thorough inspection of the Apartments. Mr. Johnson inspected every unit of every apartment building, including the basements and common areas, and took air samples at each unit of each building. Based on this inspection, Mr. Johnson prepared an estimate of the cost to remove mold and asbestos from the Apartments. This estimate was provided to Plaintiff in November, 2002. It assumed removal of all wallboard in the basement of each building, and so there was no concern that hidden damage would not be accounted for. See Errata Sheet and pp.50-51 of Johnson's 9/14/05 deposition, attached hereto as

---

[4] While Dr. Llewellyn, a State employee, testified that he entered a few apartment units, [see Llewellyn Dep. at 54, attached to Plaintiff's Opening Brief in Support of Its Motion *In Limine* (*Daubert* Motion) to Exclude the Affidavits, Expert Reports and Testimony of Gerald Llewellyn, George Yocher and Ken Belmont as Exhibit C) (D.I. # 64 at Exh. C)], Defendant Blomquist testified that no occupied units were inspected. [See Blomquist Dep. I at 169, 173-74, 201-02 (B-651, B-655-56, B-665-66)] In light of Blomquist's testimony, there is no reason to believe that Dr. Llewellyn actually inspected any *occupied* residential units.

Exhibit "A".[5] This inspection and estimate forms the basis of the Supplemental Report prepared by Mr. Johnson.

### The Town's Approval of Johnson's November 2002 Removal Plan

In November 2002, Plaintiff submitted to the Town a proposed plan to remove mold from the Apartments in the form of two documents, one entitled "Technical Scope for Removal of Mold Impacted and Asbestos-Containing Materials", and the other a Preliminary Cost Estimate for Mold Remediation (collectively, the "Mold Removal Plan"). (D-1-25) (See also Affirmation of Counsel, attached hereto as Exhibit "B", at Tab 1.) After correspondence between State officials and the Plaintiff's remediation experts, the State Division of Public Health ultimately approved the Mold Removal Plan on January 16, 2003, see Letter from G. Llewellyn to Gary Brown dated 1/16/03 (D-26), and the State's Department of Natural Resources and Environmental Control approved it on January 23, 2003. See Letter from Howard Morrrison, III to John Giles dated 1/23/03 (D-27). Finally, the Town of Elsmere approved the Mold Removal Plan and issued a building permit for its implementation on February 5, 2003. See Building Permit (D-28). The Mold Removal Plan contained a preliminary cost estimate of $231,200. (D-4) Even though this cost estimate was redacted in the copies sent to the Town in 2002, the Town has been aware of this cost estimate since early December 2004 at the latest.

---

[5] The referenced testimony is based on information included in an errata sheet from Mr. Johnson's deposition based on information he remembered after his deposition. The revised testimony clearly is accurate because it simply reports that a recommendation and cost estimate which included removing all wallboard in fact was prepared in November 2002, and the November 2002 document exists which reflects Mr. Johnson's corrected testimony. (D-1-25).

6

**The Town's Receipt of Johnson's Original Cost Estimate**

During the past few years, Plaintiff and the Town have exchanged documents in other litigation matters concerning the Apartments, including in a case entitled Manuel v. Elsmere Park Club, L.P., et al., Delaware Superior Court C.A. No. 02C-10-212 (JRJ) (previously settled case in which tenants sued EPC for property and other damages). On or about December 8, 2004, representative from the Town reviewed Plaintiff's files and identified the documents that it wanted copied. As a result of this inspection and document production, Plaintiff provided to the Town a non-redacted version of the Mold Removal Plan containing Mr. Johnson's original cost estimate to remove the mold on or shortly after December 8, 2004. See Affirmation of Counsel, attached hereto as Exhibit "B".

**Johnson's Report and Wilk's Report Establish One Part of Plaintiff's Damages**

David Wilk provided an appraisal that valued the Apartments assuming that there were no environmental conditions in order to provide the "highest and best use" value of the Apartments. (Wilk's Report) (C-140-205; 142, 144, 169, 171) Wilk's report provides a baseline valuation point for measuring Plaintiff's damages concerning the diminished value caused by Defendants' erroneous evacuation. Plaintiff retained a second expert, Mr. Larry Johnson, a certified industrial hygienist who is qualified in mold cleanup and its associated costs. Mr. Johnson provided an assessment of remediation costs that would have been considered by a prospective buyer in October 2002. (D-4; D-41-43) Johnson's report, together with David Wilk's report, establish the fair market value of the property at the beginning of October 2002.[6]

---

[6] David Wilk valued the Apartments in their highest and best use at $5.2 million assuming no mold or other similar conditions. Several months after the condemnations, Plaintiff sold the Apartments in their vacant state at $3.9

7

In early September, 2005, after reviewing expert reports from Plaintiff, including the Wilk report, Defendants asked if it was Plaintiff's view that a prospective purchaser of the Apartments would not take remediation costs into account at all. See email correspondence from 9/6/2005 to 9/9/2005 between E. McNally and D. Eagle, attached hereto as Exhibit "C". Plaintiff stated that a purchaser would take remediation costs into account, and that the Town already had approved the scope of work to address the mold in February, 2003. Id. Plaintiff also stated that the cost of the Town-approved work would be deducted from Wilk's appraised valuation to determine the value of the Apartments assuming they had not been condemned. Id. Further, in order to stave off further motion practice, Plaintiff asked the Defendants to let Plaintiff know promptly if the Defendants would not agree that the mold work plan was admissible on this basis. Id. Defendants advised Plaintiff that they did not agree, and that they believed such evidence needed to be presented in an expert report. Accordingly, Plaintiff chose to eliminate the issue by addressing exactly the concern raised by the Defendants—providing an amount for remediation costs in an expert report--by converting the November 2002 cost proposal into the Supplemental Report.

Based on the data previously provided in the approved remediation plan, Johnson supplemented his report on October 3, 2005 (D-41-43) and provided his original cost estimate in the form of the Supplemental Report.[7] Johnson's Supplemental Report assigns a value to the

---

million (see Real Estate Settlement Sheet (D-44), far less than its fully tenanted value. Johnson's Supplemental Report establishes reasonable remediation costs as they would have been estimated by a potential buyer in October 2002. In a remediation plan issued in November 2002, Johnson estimated the costs to be $231,200. In his recent Supplemental Report that is subject to the instant Motion to Strike, Johnson increased his estimate to $292,100.

[7] The Supplemental Report makes minor changes to the November, 2002 cost estimate: it uses a slightly higher per unit cost to remove mold from each unit (now $1000/unit); includes a cost to replace the wallboard where it is removed; and includes a contingency for potential unknowns. These changes increase Johnson's cost estimate and thereby decrease Plaintiff's damages.

reasonable remediation costs that a potential buyer would take into account when considering a

purchase of the Apartments in October 2002.  The Town has had Johnson's original remediation

plan since November 2002.  In fact, the Town and State accepted this proposed remediation plan

and the Town issued a permit for its implementation. (D- 26-40).  The Supplemental Report

includes a standard contingency factor used by property purchasers in real estate transactions to

account for potential unknowns in determining the remediation costs to be deducted from an

appraisal of the property, and thereby determine its fair market value.

Although Defendants apparently disagree with Mr. Johnson's cost estimate, they have not

provided expert testimony on this issue but have moved to strike the Supplemental Report.

## ARGUMENT

Defendants' Motion to Strike Johnson's Supplemental Report should be denied because

Defendants have had the costs which form the basis of this Supplemental Report since

December, 2004, just after the beginning of this lawsuit.  Further, in February, 2003, the

Defendant Town approved the plan to remove the mold and asbestos, thereby accepting the plan

of action as reasonable and acceptable.  The only issue that remains is the reasonable cost of this

work.  See, e.g., Aladdin v. Black Hawk County, 562 N.W.2d 608, 617 (Iowa 1997) (Carter, J.,

concurring in part and dissenting in part) (value of contaminated property is properly determined

by valuing property assuming it was clean and then subtracting remediation costs)[8]; Sprague v.

Boston and Maine Corp., 769 F.2d 26, 29 (1st Cir. 1985) (estimated cost of repair deducted from

fair market value before harm is proper measure of damages; uncertainty as to the exact amount

---

[8] The majority in Aladdin actually ruled that environmental remediation costs should be excluded in determining fair
market value of real property in an eminent domain proceeding.  Here, Plaintiff EPC has included reasonable
cleanup costs in its calculation of damages.

9

of damages does not preclude the jury from determining damages); <u>Jenard v. Commissioner</u>, T.C. Memo. 1961-70, Docket No. 74346, 1961 WL 138 (U.S. Tax Ct. 1961) (value of damaged property is determined by an *estimate* of what it will cost to repair the damage and restore it to its former condition and subtracting that sum from the fair market value before the damage), opinion attached hereto as Exhibit "E". The Defendants have had the ability to pursue any questions about the work scope or its costs since the beginning of this case, and indeed have done so, such as in the August, 2005 deposition of Elliot Leibowitz, one of Plaintiff's principals. <u>See</u> Leibowitz Dep. at 122-26, attached hereto as Exhibit "D". Therefore, the Supplemental Report is neither new nor surprising, and the information it contains is not late.

Further, the Defendants have not been prejudiced by the issuance of the Supplemental Report. First, Mr. Johnson issued the Supplemental Report only because the Defendants threatened to object to the November, 2002 cost estimate if it was not in the form of an expert report. The Supplemental Report addresses the exact objection identified by the Defendants— that the Wilk report does not include any value for remediation costs. They should not now be allowed to claim that the Supplemental Report is not admissible.

Second, in an effort to stem the tide of motion practice in this case, Plaintiff has agreed to allow Defendants to depose Johnson again; to give Defendants an opportunity to rebut Mr. Johnson's cost estimate with a rebuttal expert report of their own; and not to oppose any future *Daubert* motion by the Defendants as untimely based on not meeting the existing schedule for the case.[9] Accordingly, the Defendants cannot show that they have been prejudiced in any way.

---

[9] Defendants' assertion that there has been a "failure to give Defendants an opportunity to submit a rebuttal report" is simply inaccurate. Plaintiff offered such an opportunity but Defendants chose to file the instant Motion to Strike instead.

10

DEL1 62696-4

The Town expressly approved Plaintiff's Mold Removal Plan and issued a permit for its implementation,[10] a concession that the steps outlined in the plan were adequate. The only remaining question is the reasonable cost of the work. Plaintiff's evidence concerning that question was provided in the original plan which was submitted in November 2002 and has been further explained in Mr. Johnson's Supplemental Report. Defendants may present evidence at trial, as well, concerning the reasonable amount of remediation costs, to attempt to rebut the Supplemental Report, but the possibility that they disagree with Mr. Johnson's cost summation is not a basis to exclude the Supplemental Report.

Defendants' claim that Mr. Johnson was not previously able, but recently had a "sudden ability"[11] to estimate the costs of remediation does not accurately reflect what happened in this case. Mr. Johnson was able to properly determine these costs in November, 2002. He was not hindered by alleged "hidden damages". While Johnson stated at his deposition that he did not have the best light when he inspected the basements, he factored this into his cost proposal by conservatively assuming that all wallboard in the basements would be removed, thereby eliminating inadequate lighting as a factor. See Errata Sheet and pp.50-51 of Johnson's 9/14/05 deposition, attached hereto as Exhibit "A". Better light would have mattered to Johnson only insofar as it might reduce his cost proposal by enabling him to see that less wallboard had to be removed. Id. Plaintiff agreed to remove all wallboard and to absorb the cost of the more expensive proposal. Further, Mr. Johnson's Supplemental Report includes another conservative factor—a contingency for potential unknowns—to assure that Plaintiff is not unfairly favored by a low estimate. Such a contingency is standard in determining the appropriate remediation costs to be subtracted from the value of the property in determining its overall worth. Defendants

---

[10] See Town permit dated Feb.5, 2003 authorizing remediation at the Apartments. (D-28).
[11] See Defendants' Motion to Strike (D.I. 74) at ¶ 7.

11

DEL1 62696-4

incorrectly state that Johnson's Supplemental Report contradicts his deposition testimony.[12] Johnson's Supplemental Report is consistent with, and does not in any way contradict, his prior testimony.

The Defendants claim, both in their Motion to Strike and in their motion to exclude the Wilk Report, that the Wilk Report as supplemented with Johnson's Supplemental Report is not admissible to establish the value of the Apartments assuming no condemnation, because an alleged "stigma" factor is not taken into account. Defendants' assertion is wrong for a number of reasons. First, Plaintiff specifically identified that it intended to subtract the cost to remove mold from the property from Wilk's appraised value to establish the overall value of the property prior to remediation. Plaintiff asked the Defendants to identify any concerns promptly so that Plaintiff could address them and avoid an attempt by the Defendants (such as has occurred) to exclude evidence. In response to the Defendants' statement that, in their view, evidence of the remediation costs needed to be in the form of an expert opinion, Plaintiff had Mr. Johnson convert his prior November, 2002 proposal into the Supplemental Report. Defendants cannot now claim, and have waived any right to claim, that there are yet additional elements of the claim that require the exclusion of the Wilk Report and of the Supplemental Report.

Further, in this case, the stigma pertaining to the Apartments results solely and completely from the Defendant Town's actions to condemn the Apartments and publicly and notoriously announce to the press and the public at large the Defendant Town's view that a grave condition of serious concern to the entire public existed at the Apartments. It is Plaintiff's position in this case that the Defendant Town was wrong and that its statement to the press and public were gross misstatements. If the Defendant Town had acted properly, not condemned the

---

[12] See Defendants' Motion to Strike (D.I. 74) at ¶ 10.

Apartments and not publicly and incorrectly so identified the conditions at the complex, there would have been no negative publicity and no stigma attached to the Apartments. Therefore, stigma does not come into play in this case. Moreover, once the Apartments were cleaned, the stated concern would be addressed and there could be no claim for stigma damages. See, e.g., Hammond v. City of Warner Robins, 482 S.E.2d 422, 428(Ga. App. 1997) (stigma damages to real property too remote and speculative to be considered); Aladdin v. Black Hawk County, 562 N.W.2d 608, 617 (Iowa 1997) (Carter, J., concurring in part and dissenting in part) (value of contaminated property is properly determined by valuing property assuming it was clean and then subtracting remediation costs); Sprague v. Boston and Maine Corp., 769 F.2d 26, 29 (1st Cir. 1985) (estimated cost of repair deducted from fair market value before harm is proper measure of damages); Jenard v. Commissioner, T.C. Memo. 1961-70, Docket No. 74346, 1961 WL 138 (U.S. Tax Ct. 1961) (value of damaged property is determined by an *estimate* of what it will cost to repair the damage and restore it to its former condition and subtracting that sum from the fair market value before the damage; fair market value is not further reduced by the stigma of having once been damaged), opinion attached hereto as Exhibit "E"; see also In re Burbank Environmental Litigation, 42 F. Supp.2d 976, 984-85 (C.D.Cal. 1998); Anglado v. Leaf River Forest Products, Inc., 716 So.2d 543, 549 (Miss. 1998).

Wilk's appraisal report provides a baseline valuation of the Apartments. From that baseline, the fact finder may then weigh competing evidence concerning the amount and reasonableness of remediation costs when calculating Plaintiff's damages. "[A]n expert may construct a reasonable offense-free world as a yardstick for measuring [damages]." Lepage's Inc. v. 3M, 324 F.3d 141, 165 (3d Cir. 2003) (en banc) (citations omitted). As the Third Circuit reasoned in Lepage's, a damages "expert may construct a reasonable offense-free world as a

13

yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activites." 324 F.3d at 165. Wilk's report provides such a "yardstick." When read in conjunction with Mr. Johnson's report, Wilk's baseline value helps the factfinder determine damages.

The Defendants finally provided to Plaintiff yesterday, October 25, 2005, after numerous requests by Plaintiff, documents which purportedly establish costs actually incurred by Plaintiff's purchaser, J.A.B. Properties Management, to address mold and other conditions at the property. Defendants have been in possession of the JAB Documents since September 21, 2005, but stated that they could not be shared because confidentiality issues between JAB and Defendants were unresolved.[13] The Defendants' assertions based on these documents, included in a statement of costs,[14] should not be considered in deciding this Motion to Strike. Among other things, it is not clear from the J.A.B. documents what work was done, whether the work was required to address mold at the property, whether or not the work was voluntary, whether the work was done to improve, rather than fix, the property, and whether or not the costs incurred were reasonable. For these reasons, JAB's supposed costs are not probative of any issue.

Further, in this case, actual costs may not probative of fair market value, because such information likely is not readily available to the buying public and therefore not a factor to be used to determine fair market value. Fair market value is the price which a willing seller and a willing buyer would agree upon without compulsion upon the seller to sell or the buyer to buy. State of Delaware v. Davis Concrete of Delaware, Inc., 355 A.2d 883, 886 (Del. 1976). Thus,

---

[13] A Protective Order concerning confidentiality issues was finally agreed to and circulated on or about October 17, 2005, was signed by Plaintiff's counsel on October 18, 2005 and was recently approved by the Court on October 21, 2005 (D.I. # 80). The three boxes of underlying JAB documents were received on October 25, 2005, the day before this brief is due.

[14] See "Exhibit A" attached to the Affidavit of Liza Sherman (D.I. # 58). This statement of costs is subject to a pending Motion to Strike (D.I. # 75).

14

fair market value does not depend on the actual, after-the-fact cost to remediate, but rather, the amount which a reasonable buyer and seller would allocate to such work. The Supplemental Report establishes the amount which a reasonable buyer (and presumably a reasonable seller) would allocate to fix the mold condition. This is the proper means of determining the remediation costs to be subtracted from Wilk's report on valuation of the Apartments.

Even *if* the Supplemental Report is deemed inadmissible, Plaintiff may still present the original estimate of remediation costs that was included in the Town approved Mold Removal Plan.

Even if the JAB list of costs is admissible, at most it goes to the weight of evidence concerning the reasonableness of remediation costs, it does not mean that Plaintiff's expert evidence of a baseline valuation should be excluded, nor does it mean that Johnson's estimate of the remediation costs should be ignored or excluded.

## CONCLUSION

For the foregoing reasons, Defendants Motion to Strike the Supplemental Expert Report of Larry W. Johnson should be denied.

Dated: October 26, 2005

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

By: _____
David S. Eagle, (Bar No. 3387)
Patrick A. Costello (Bar No. 4535)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 552-5504 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*

15

DEL1 62696-4