# EXHIBIT D

Page 1

```
           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
ELSMERE PARK CLUB, L.P.,            )
a Delaware limited partnership,)
                                    )
          Plaintiff,                )
                                    )
v.                                  )   Civil Action No.
                                    )   04-1321
TOWN OF ELSMERE, a Delaware         )
municipal corporation, ELLIS        )
BLOMQUIST, EUGENE BONEKER,          )
and JOHN GILES,                     )
                                    )
          Defendants.               )
```

Deposition of ELLIOT LEIBOWITZ taken pursuant to notice at the law offices of Morris, James, Hitchens & Williams, LLP, 222 Delaware Avenue, 10th Floor, Wilmington, Delaware, beginning at 10:00 a.m. on Wednesday, August 17, 2005, before Vincent J. Bailey, Registered Professional Reporter and Notary Public.

APPEARANCES:

  DAVID S. EAGLE, ESQ.
  KLEHR, HARRISON, HARVEY,
  BRANZBURG & ELLERS, LLP
   919 Market Street, Suite 1000
   Wilmington, Delaware 19801
   for the Plaintiff,

  EDWARD M. McNALLY, ESQ.
  LINDA MARTIN GILCHRIST, ESQ.
  MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
   222 Delaware Avenue, 10th Floor
   Wilmington, Delaware 19801
   for the Defendants.

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Elsmere Park Club         v.                    Town of Elsmere
Elliot Leibowitz     C.A. # 04-1321              August 17, 2005

Page 122

1  about what it would cost to remediate the complex?
2  A. Yes.
3  Q. Do you recall what contractor gave you that
4  estimate?
5  A. The Lew Corporation.
6  Q. Anybody else?
7  A. There may have been another company that we had
8  an estimate from.
9  Q. Do you recall what those estimates were?
10 A. It was -- I don't recall exactly, but my
11 recollection was it was under $200,000.
12 Q. Did those estimates tell you how long it would
13 take to do that sort of a remediation?
14 A. I don't recall without looking at the proposals.
15 Q. Did those estimates include how the remediation
16 would be done?
17 A. I believe so.
18 Q. Did they say that the tenants could be present
19 during remediation?
20 A. Yes. All of our experts indicated that the
21 basis for the condemnation was unnecessary.
22      MS. GILCHRIST: This is Exhibit 17.
23      (Leibowitz Deposition Exhibit No. 17 marked
24 for identification.)

Page 123

1  BY MS. GILCHRIST:
2  Q. Mr. Leibowitz, you have been handed a document
3  called Exhibit 17, Bates numbers EPA001697 through 1721.
4  It appears to be a fax from RT Environmental. Do you see
5  that?
6  A. Yes.
7  Q. Who is RT Environmental.
8  A. I don't understand the question, who are they.
9  They are an environmental company.
10 Q. Is that a company that LCL hired?
11 A. I don't recall, to tell you the truth. It
12 sounds familiar, but I'm not 100 percent certain.
13 Q. This document is entitled, "Preliminary Cost
14 Estimate Mold Remediation." If you look on page 2 of the
15 document, under the paragraph entitled, "Water and
16 Moisture Damage" --
17 A. Yes.
18 Q. -- do you see where it indicates that untreated
19 water damage could lead to the possibility of mold growth
20 on or within materials?
21 A. You are talking about the first paragraph here?
22 Q. First paragraph, first sentence.
23 A. Yes.
24 Q. Then the paragraph goes on to talk about the

Page 124

1  currently accepted means of dealing with water-damaged
2  building materials?
3  A. Yes.
4  Q. It indicates you should remove and replace
5  damaged wallboard. Do you see that?
6  A. Yes.
7  Q. Earlier in your deposition we have talked about
8  other floods that occurred at Elsmere Park Apartments in
9  1989 and again in 1999, as well as other possible sewage
10 problems, et cetera. Do you recall if during those
11 incidents, if LCL had the wallboard removed and replaced
12 in the buildings that were affected by flooding?
13 A. I don't recall.
14 Q. If you look on page 3 of the report, Bates
15 number EPA001699, the paragraph -- section entitled
16 "Remediation," in this paragraph RT Environmental
17 apparently is discussing how the problem would be
18 remediated at the apartments. Is that correct?
19 A. Yes.
20 Q. Do you see in the first paragraph where they
21 talk about the presence of vinyl asbestos tiles?
22 A. Yes.
23 Q. When were you first made aware of the presence
24 of vinyl asbestos tiles in the basements of Elsmere Park

Page 125

1  Apartments?
2  A. I guess it was with the condemnation notice.
3  Q. After you were made aware of that, of the
4  presence of asbestos, did you still believe that the
5  buildings could be remediated with tenants in place in
6  the building?
7  A. That's what my experts told me.
8  Q. If you turn to the next page, sir, where they
9  have the total estimate for $231,000 --
10 A. Yes.
11 Q. -- did you consider that to be a reasonable
12 estimate for the work that was to be done?
13 A. I'm not an expert, but this was one company's
14 proposal.
15 Q. If you notice the date on this document on the
16 first page, the fax date stamped, and also at the bottom
17 of the first page the document date stamp is November 25,
18 2002. Is that correct?
19 A. Yes.
20 Q. You indicated that within a couple of weeks
21 after the condemnation of the apartments you decided to
22 sell?
23 A. Yes.
24 Q. Then why would LCL have requested an estimate

32 (Pages 122 to 125)

Wilcox & Fetzer, Ltd.      Professional Court Reporters        (302)655-0477

| Elsmere Park Club<br>Elliot Leibowitz | v.<br>C.A. # 04-1321 | Town of Elsmere<br>August 17, 2005 |
|---|---|---|

Page 126

1  for mold remediation in November of 2002?
2  **A. Because any buyer would want to know what was**
3  **involved.**
4  Q. When you decided to sell the apartment complex
5  who did you first contact?
6  **A. Real estate broker by the name of THE KISLAK**
7  **COMPANY.**
8  Q. Did you normally deal with that company in
9  buying and selling your apartment complexes?
10 **A. They were one of the companies that I've dealt**
11 **with, yes.**
12 Q. Do you know -- do you remember when you first
13 contacted them about the Elsmere Park Apartments?
14 **A. I don't remember the exact date, but it probably**
15 **would have been the latter part of October or early**
16 **November.**
17    MS. GILCHRIST: This will be 18.
18    (Leibowitz Deposition Exhibit No. 18 marked
19 for identification.)
20 BY MS. GILCHRIST:
21 Q. Mr. Leibowitz, you have just been handed Exhibit
22 18, which is a document Bates number EPAF 0168 through
23 0173. This document was produced in this action, not in
24 the Manuel action.

Page 127

1    Do you recall ever seeing this document?
2  **A. No.**
3  Q. This document is entitled, "Fenwick Park,
4  Elsmere, Delaware, presented by THE KISLAK COMPANY"?
5  **A. Yes.**
6  Q. If you turn to page 2, it appears to be an
7  executive summary. Do you see that?
8  **A. Yes.**
9  Q. It includes a property address, description of
10 the property, utilities, the construction?
11 **A. Yes.**
12 Q. And at the bottom it shows the sale price --
13 **A. Yes.**
14 Q. -- of 8 and a half million?
15 **A. Yes.**
16 Q. Do you recall ever seeing this?
17 **A. No.**
18 Q. Do you know how that sale price was arrived at?
19 **A. No.**
20 Q. Did you ever have discussions with THE KISLAK
21 COMPANY about what you thought the fair market value or
22 what you thought the sale price should be for the
23 complex?
24 **A. Yes.**

Page 128

1  Q. What were your discussions?
2  **A. Sat down with my contact at THE KISLAK COMPANY**
3  **and we looked at the condition of the building, the**
4  **financials of the building and we determined that it was**
5  **worth in the $4 million range.**
6  Q. $4 million range?
7  **A. Correct.**
8  Q. So do you know why this particular executive
9  summary indicates a sale price of twice that amount?
10 **A. No idea.**
11 Q. Did anybody at THE KISLAK COMPANY ever tell you
12 that was going to be the sale price of the complex?
13 **A. That that was the asking price you mean?**
14 Q. Yes.
15 **A. No.**
16 Q. You said your discussions with KISLAK indicated
17 the worth would be around 4 million for the complex?
18 **A. Give or take, right.**
19 Q. What factors did KISLAK take into consideration
20 during your discussions to come to that asking price or
21 sale price?
22 **A. The rents, the fact that the building was at**
23 **that point 100 percent vacant and that it had the**
24 **environmental issue that had to be dealt with.**

Page 129

1  Q. Did KISLAK indicate to you that they believed
2  they could find a buyer for the property in that
3  condition?
4  **A. No. They indicated they would put it out to**
5  **their prospects and see what happened.**
6  Q. Did you believe it was reasonable to expect a
7  buyer to buy the property in that condition?
8  **A. At some price, yes.**
9  Q. Did you believe that with the property in that
10 condition, the property would probably be sold for less
11 than market value?
12 **A. Absolutely.**
13 Q. That's with the environmental conditions?
14 **A. Yes, and the fact that it was vacant.**
15 Q. If the apartment complex had been fully
16 occupied, everything else remaining the same, if they
17 still had the same environmental issues, do you still
18 believe that the property would have been sold under
19 market value?
20 **A. No.**
21 Q. So it's your contention that solely the vacancy
22 condition is what caused the property to be possibly sold
23 for under market value?
24 **A. I think that if the environmental issue was**

Elsmere Park Club  v.  Town of Elsmere
Elliot Leibowitz    C.A. # 04-1321    August 17, 2005

Page 130

1 there and the building was full, the property would have
2 been sold for an amount less than it would have been
3 worth had the environmental problem not been there. It
4 would have been discounted by $235,000 or whatever and
5 the buyer may have to pay to satisfy the environmental
6 issue.
7      I thought the fact that the building was
8 totally vacant enormously affected the marketability of
9 the apartment community and caused it to sell for
10 substantially less than it would have sold for otherwise.
11   Q. Prior to the condemnation had you ever
12 considered selling Elsmere Park Apartments?
13   A. No.
14   Q. Once THE KISLAK COMPANY became involved and you
15 decided to sell in late October, early November 2002, do
16 you know how many bids were received?
17   A. I know they got a number of bids in the low
18 3 million. They had one, we went to one contract at
19 3 million 9 with a contingency period for the buyer to
20 satisfy himself as to certain issues. And that buyer
21 basically never performed, got his deposit back and THE
22 KISLAK COMPANY was able to replace that buyer with a
23 second buyer at the same price, 3 million 9.
24      (Leibowitz Deposition Exhibit No. 19 marked

Page 131

1 for identification.)
2 BY MS. GILCHRIST:
3   Q. Mr. Leibowitz, you have just been handed Exhibit
4 Number 18, which is a document starting with Bates stamps
5 EPAF 0178, ends with 0182. I'll represent to you that
6 these pages are the various bids that were received by
7 THE KISLAK COMPANY for Elsmere Park Apartments. Do you
8 recall ever seeing these documents?
9      MR. EAGLE: Let me interject on one point.
10 I don't know if you can really represent that. I think
11 you can represent that these were documents that were
12 produced in response to a request along those lines.
13      MS. GILCHRIST: Fair enough.
14   A. I've never seen these documents before.
15   Q. How were you made aware of the bids that were
16 placed on the apartment complex?
17   A. From the broker at THE KISLAK COMPANY.
18   Q. Did they ever actually send you a bid sheet or
19 just tell you this orally?
20   A. Orally, except for the two that were high
21 enough. If they got a bid for 2 and a half million, I
22 didn't want to look at it really because I wasn't going
23 to accept it.
24   Q. Do you recall how many bids totally were

Page 132

1 received on the apartments?
2   A. No. It wouldn't have been relevant to me.
3   Q. Do you recall when you finally did find a buyer
4 for the apartments?
5   A. We found two buyers. One we found, I guess it
6 was late November, early December of 2002. That was the
7 buyer who signed the contract, had the due diligence and
8 never closed.
9      And I guess it was a month or so later they
10 found a second buyer who ultimately did close.
11   Q. Who was that buyer?
12   A. His name was David Waller from northern New
13 Jersey. I don't remember the name of his company, but he
14 still owns the place I believe.
15   Q. After the apartments were condemned in October
16 of 2002 and before they were sold, what did LCL do to
17 secure the apartments?
18   A. Well, we had two or three maintenance guys who
19 worked there for a number of months, helping the tenants
20 get their furniture out. And the town required us to
21 seal the front doors after a certain point in time.
22      We actually kept the super on until the
23 date of the sale. We had a live-on guy who lived on site
24 up until the date of the sale. I think they required us

Page 133

1 to turn the water off, so the plumbing wouldn't freeze.
2   Q. You indicated the super lived on site until the
3 sale?
4   A. Yes.
5   Q. I take it, then, the water was not turned off
6 until --
7   A. In the 38 buildings that were condemned, not the
8 39th building where the office was, the model apartment
9 and the super lived.
10   Q. You indicated earlier the superintendent of
11 Elsmere Park was John Ruhl?
12   A. Yes.
13   Q. Is that the super who was living at the
14 apartments, then?
15   A. Yes.
16   Q. Mr. Leibowitz, can you give me an estimate of
17 how much monthly income was lost due to the evacuation of
18 the apartments?
19   A. All of the revenue, whatever the revenue was.
20   Q. Do you know how much that was?
21   A. Take my calculator, it's on -- do we have
22 financial statements here?
23      MR. EAGLE: We have produced them.
24      MS. GILCHRIST: I didn't bring them in.

34 (Pages 130 to 133)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477