# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ELSMERE PARK CLUB, L.P.,          :
a Delaware limited partnership,    :
                                   :
                Plaintiff,         :        Civil Action No. 04-1321 (SLR)
                                   :
        v.                         :
                                   :
TOWN OF ELSMERE, a Delaware        :
municipal corporation, ELLIS       :
BLOMQUIST, EUGENE BONEKER,         :
and JOHN GILES,                    :
                                   :
                Defendants.        :
_____ :

### DEFENDANTS' OPENING BRIEF IN SUPPORT OF
### THEIR RENEWED MOTION FOR SUMMARY JUDGMENT

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*
Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist, Eugene Boneker, and John Giles

Dated:  March 31, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

NATURE AND STAGE OF PROCEEDINGS ................................................. 1

SUMMARY OF ARGUMENT .................................................................... 4

UNDISPUTED FACTS ............................................................................. 5

    A.    Brief History Of The Elsmere Park Apartments .......................... 5

    B.    The First Condemnations And Evacuations At
            The Apartments ....................................................................... 6

    C.    The Rest Of The Apartments Are Contaminated ......................... 8

ARGUMENT ........................................................................................ 12

I.     THE STANDARDS FOR SUMMARY JUDGMENT
      PERMIT JUDGMENT HERE ............................................................. 12

II.    DEFENDANTS DID NOT VIOLATE PLAINTIFF'S
      PROCEDURAL DUE PROCESS RIGHTS ......................................... 15

    a.    The Standard For Procedural Due Process Claims ..................... 15

    b.    The Matthews Test and Procedural Due Process ....................... 16

    c.    Notice and the *Mullane* Rule .................................................. 18

    d.    "Extraordinary Situations" And The *Fuentes* Test .................... 19

    e.    Right To Post-Deprivation Hearing ........................................... 22

    f.    Conclusion ............................................................................. 25

III.   DEFENDANTS DID NOT VIOLATE PLAINTIFF'S
      SUBSTANTIVE DUE PROCESS ..................................................... 26

    a.    Standards of Substantive Due Process ...................................... 26

    b.    Failure to Follow Municipal Ordinance
            Not a Substantive Due Process Violation ................................. 28

c.    The Actions of the Defendants Were Not Irrational ...................................30

d.    Due Process Does Not Create a "Right to
        Remediate" Prior to Condemnation ...........................................................32

e.    Conclusion ..................................................................................................33

IV.    THE ACTIONS OF BLOMQUIST, BONEKER AND GILES
        ARE PROTECTED BY THE DOCTRINE OF QUALIFIED IMMUNITY........34

CONCLUSION..........................................................................................................37

## TABLE OF AUTHORITIES

**Case**                                                                                           **Page**

*Albright v. Oliver,*
 510 U.S. 266 (1994)..............................................................................33

*Alvin v. Suzuki,*
 227 F.3d 107 (3d Cir. 2000)..............................................................15,24,25

*Anderson v. Creighton,*
 483 U.S. 635 (1987)..............................................................................34

*Angstadt v. Midd-W. School Dist.,*
 377 F.3d 338 (3d Cir. 2004)..................................................................27

*Armstrong v. Manzo,*
 380 U.S. 545 (1965)..............................................................................15

*Berlinghieri v. Dept. of Motor Vehicles,*
 33 Cal.3d 392 (Cal. 1983).....................................................................26

*Bixby v. Pierno,*
 4 Cal.3d 130 (Cal. 1971).......................................................................26

*Boddie v. Connecticut,*
 401 U.S. 371 (1971)..............................................................................23

*Boyanowski v. Capital Area Intermediate Unit,*
 215 F.3d 396 (3d Cir. 2000),
 *cert. denied,* 531 U.S. 1011 (2000).......................................................35

*Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy,*
 367 U.S. 886 (1961)..............................................................................16

*Carey v. Piphus,*
 435 U.S. 247 (1978)..............................................................................16

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986)..............................................................................12

*City of New Orleans v. Dukes,*
 427 U.S. 297 (1976)..............................................................................27

*Collins v. City of Harker Heights, Tex.,*
 503 U.S. 115 (1992)..............................................................................35

*Concord Communities v. City of Concord,*
    91 Cal.App.4[th] 1407 (Cal. Ct. App. 2001) ..........................................26

*Congregation Kol Ami v. Abington Township,*
    309 F.3d 120 (3d Cir. 2002)..........................................27

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1998)..........................................34,35

*Dusanek v. Hannon,*
    677 F.2d 538 (7th Cir. 1982) ..........................................24

*Elsmere Park Club, L.P. v. Town of Elsmere,*
    771 F.Supp. 646 (D. Del. 1991) ..........................................5

*Fagan v. City of Vineland,*
    22 F.3d 1296 (3d Cir. 1994)..........................................35

*Federal Deposit Ins. Corp. v. Mallen,*
    486 U.S. 230 (1988)..........................................19,22

*Flatford v. City of Monroe,*
    17 F.3d 162 (6th Cir. 1994) ..........................................21,22,30,31

*Fuentes v. Shevin,*
    407 U.S. 67 (1972)..........................................15,16,19,22,23

*GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.,*
    270 F.Supp.2d 476 (D. Del. 2003)..........................................12,13

*Gilbert v. Homar,*
    520 U.S. 924 (1997)..........................................19

*Grayden v. Rhodes,*
    345 F.3d 1225 (11th Cir. 2003) ..........................................20,21,22,23

*Grimm v. Sweeney,*
    249 F.Supp.2d 571 (E.D. Pa. 2003) ..........................................35,36

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004)..........................................16,17

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)..........................................34

*In re DaimlerChrysler AB Securities Litig.,*
    269 F.Supp.2d 508 (D. Del. 2003)................................................................12,13

*Joint Anti-Fascist Refugee Committee v. McGrath,*
    341 U.S. 123 (1951)......................................................................................16

*Leamer v. Fauver,*
    288 F.3d 532 (3d Cir. 2002)........................................................................35

*MHC Operating Limited Partnership v. City of San Jose,*
    106 Cal.App.4th 204 (Cal. Ct. App. 2003) ................................................26

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)..................................................................................16,17

*McGowan v. State of Maryland,*
    366 U.S. 420 (1961)......................................................................................28

*Miller v. City of Philadelphia,*
    174 F.3d 368 (3d Cir. 1999)........................................................................35

*Mullane v. Central Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950)..................................................................................15,18

*Nicini v. Morra,*
    212 F.3d 798 (3d Cir. 2000)........................................................................35

*Regents of University of Michigan v. Ewing,*
    474 U.S. 214 (1985)......................................................................................26

*Richmond Tenants Org., Inc. v. Kemp,*
    956 F.2d 1300 (4th Cir. 1992) ....................................................................21

*Rochin v. California,*
    342 U.S. 165 (1952)......................................................................................34

*Saucier v. Katz,*
    533 U.S. 194 (2001)......................................................................................21

*Smith v. City of Picayune,*
    795 F.2d 482 (5th Cir. 1986) ..................................................................28,29

*State of Missouri ex rel. Gore v. Wochner,*
    475 F.Supp. 274 (E.D. Mo. 1979),
      *aff'd,* 620 F.2d 183 (8th Cir. 1980)........................................................29

*Stern v. Tarrant County Hosp. Dist.*,
   778 F.2d 1052 (5th Cir. 1985),
   *cert. denied*, 476 U.S. 1108 (1986) ........................................................29

*U.S. v. James Daniel Good Real Property*,
   510 U.S. 43 (1993) ........................................................................................17

*U.S. v. One Parcel Property Located At 200 Pennsylvania Avenue,*
   *Claymont, Del., With All Appurtenances and Improvements Thereon*,
   786 F.Supp. 400 (D. Del. 1992) ......................................................................13

*United Artists Theatre Circuit v. Township of Warrington*,
   316 F.3d 392 (3d Cir. 2003) ............................................................................35


**Statutes and Other Authorities**

16B Am.Jur.2d Constitutional Law § 901 .........................................................26

16B Am.Jur.2d Constitutional Law § 918 .........................................................27

22 *Del. C.* § 324 ...................................................................................................23

22 *Del. C.* § 325 ...................................................................................................23

31 *Del. C.* § 4128 ................................................................................................32

31 *Del. C.* § 4130 ................................................................................................32

Fed. R. Civ. P. 56(e) ...........................................................................................12

Orlando, Fla. City Code § 30A.11 ......................................................................20

Property Maintenance Code of The Town of Elsmere § 109.6. ....................20,23

Sheldon H. Nahmond, *Civil Rights and Civil Liberties*
   *Litigation* § 3:36 (4th ed. 2004) ...................................................................15

## NATURE AND STAGE OF PROCEEDINGS

This is an action by Plaintiff Elsmere Park Club, L.P. ("EPC") against Defendants Town of Elsmere ("Elsmere" or "the Town"), Ellis Blomquist ("Blomquist"), Eugene Boneker ("Boneker") and John Giles ("Giles") for alleged procedural and substantive due process violations regarding the condemnation and evacuation of the Elsmere Park Apartments, a/k/a Fenwick Park Apartments (the "Apartments") in October 2002. The Complaint alleged that Defendants Elsmere, Blomquist, Boneker and Giles wrongfully condemned and evacuated the Apartments depriving Plaintiff of its property, did not give EPC an adequate opportunity to be heard regarding the condemnation and evacuation, improperly denied EPC the opportunity to remediate the Apartments before condemnation and evacuation, and violated EPC's right to due process by failing to follow Elsmere's procedures for determining the propriety of the condemnation and evacuation. EPC also alludes to procedural due process failures regarding the timeliness and nature of the notices of condemnation and evacuation received by EPC.

Several related actions have arisen from the condemnation and evacuation of the Apartments, including Plaintiff's failed motion for a temporary restraining order in the Delaware Court of Chancery. The Apartments were condemned and evacuated in the first two weeks of October 2002 pursuant to an emergency order issued after severe and hazardous conditions were discovered by Blomquist.

On January 20, 2005, this Court entered a Rule 16 Schedule Order. (D.I. 12). That Order, at the request of the parties, was amended on June 10, 2005. (D.I. 26). Under the Amended Order, trial was to commence on January 4, 2006. However, intervening motion practice prompted a postponement of trial. Beginning with

1

Defendants' Motion for Summary Judgment, on September 1, 2005 (D.I. 43), a flurry of motions ensued, including Defendants' Motion in Limine to Exclude the Expert Report and Testimony of David J. Wilk (D.I. 55), Plaintiff's Motion in Limine to Exclude the Affidavits of Gerald Llewellyn, George Yocher and Kenneth Belmont (D.I. 63), Defendants' Motion to Strike the Supplemental Report of Larry W. Johnson (D.I. 74), Plaintiff's Motion to Strike the 9/22/05 Affidavit of Liza H. Sherman (D.I. 75), and Defendants' Motion for Sanctions (D.I. 87).  On November 8, in the wake of the extensive motion practice, Plaintiff filed its Expedited Motion for Leave to Extend Scheduling Order, Serve Revised and/or Supplemental Expert Reports ("Plaintiff's Motion to Extend")(D.I. 89).  On November 16, 2005, the Court held a teleconference to resolve the numerous outstanding motions.

Following that teleconference, the Court entered its Order (D.I. 91) denying Defendants' Motion for Summary Judgment without prejudice to renew and denying all other motions, save Plaintiff's Motion to Extend, which was granted.  In its Order, the Court declined to set a date for trial, pending the resolution of all dispositive motions. (D.I. 91).

The legal issues underscoring Defendants' Motion for Summary Judgment are unchanged.  Defendants therefore now renew their motion for summary judgment on EPC's Complaint because EPC cannot prove its due process claims.  Not only did Defendants properly exercise their authority in condemning and evacuating the Apartments, but they received and relied upon the expertise of the Delaware State Department of Public Health in evaluating and acting on the situation present at the Apartments.   Furthermore, EPC clearly had notice and the opportunity to be heard

regarding Defendants' emergency order, as evidenced by: (1) EPC's motion for temporary restraining order filed and heard within five days after the first buildings were condemned and evacuated; and (2) EPC's deliberate decision not to avail itself of its administrative remedies.

This is the Defendants' Opening Brief in Support of Their Renewed Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

1.      A defendant's motion for summary judgment should be granted when the plaintiff cannot prove its case under the undisputed facts.

2.      Defendants did not violate Plaintiff's substantive due process rights where there were extraordinary circumstances and Plaintiff had a post-deprivation hearing.

3.      Defendants did not violate Plaintiff's substantive due process because their conduct was not irrational and no fundamental rights were impacted by Defendants' conduct.

4.      The actions of Blomquist, Boneker and Giles are protected by qualified immunity.

**UNDISPUTED FACTS**[1]

A.    **Brief History Of The Elsmere Park Apartments**

      The Elsmere Park Apartments (the "Apartments") were purchased by Plaintiff in 1986. The complex featured 156 garden-style apartments in 39 buildings, wherein each building contained five (5) apartments, including an occupied basement apartment which covered approximately one-half of the basement floor. The other half of each basement contained common laundry facilities for the residents.

      In 1989, during Hurricane Hugo, the basements of the Apartments experienced moderate to severe flooding. The basement apartments were evacuated, and due to the Apartments location in a flood plain and the likelihood such flooding would continue to occur, Elsmere decided to prohibit further rental of all 39 living areas contained in the basements of the Apartments.[2] Shortly thereafter, EPC placed plywood over the windows of the apartment units.

      In 1996, in response to growing concerns regarding vandalism in the former basement apartments, Elsmere instructed EPC to better secure the empty lower units. EPC removed the carpets, cabinets and other items from the unoccupied basement units, bricked over the windows and old air conditioning openings and sealed the doors leading into the units. (A-252). One year later, in 1997, EPC had the Apartments examined by a structural engineer. Although the engineer found the vacant basement apartments to be in "servicible [sic] to good condition structurally," he recommended EPC evaluate the

---

[1] The facts are contained in the depositions and affidavits set out in the Appendix filed with this brief and cited as "A-__."

[2] EPC sued Elsmere over this action, but lost. *See Elsmere Park Club, L.P. v. Town of Elsmere*, 771 F.Supp. 646 (D. Del. 1991).

source of water leaks found in the basements, seal and repair the leaks, investigate further suspected areas of water damage, and to monitor the buildings for possible water problems or structural movement. (A-273). EPC failed to do so. (A-253).

**B.    The First Condemnations And Evacuations At The Apartments**

On or about October 1, 2002, Ellis Blomquist, Elsmere's Code Enforcement Officer, went to the Apartments at the request of Darlene Grocki ("Grocki"). As EPC's on-site manager at the Apartments, Grocki asked Blomquist to conduct a routine pre-rental inspection of an apartment located at 1421 Cypress Avenue.[3] (A-1). Upon arrival, Blomquist detected a very strong odor and advised Grocki that the apartment would not be inspected until she identified and remedied the source of the odor. (A-1-2; A-260). Grocki then directed Blomquist to 1353 Maple Avenue for another pre-rental inspection, however, upon entering the building, Blomquist detected the same strong odor. (A-1-2). He again told Grocki that she must immediately identify and remedy the source of the odor before he could certify the apartment units for occupancy, and that he would return to complete the pre-rental inspections once she advised him that the problem had been rectified. (A-2). Shortly thereafter, the source of the odor was traced to the basements of the two buildings. Since the open, former laundry areas of the basements had already been cleaned and deodorized, it was determined that the odor was emanating from the sealed former basement apartments. (A-260). Grocki then had the wall removed that had blocked access to the sealed section of the basement.

On Friday, October 4, 2002, Blomquist returned to the Apartments at Grocki's request to complete the pre-rental inspections at 1421 Cypress and 1353 Maple and to

---

[3]    Under Elsmere's municipal code, all apartment units must be inspected by a code enforcement officer prior to occupancy to determine if the unit is code compliant. (A-2).

inspect the basements. (A-2). Accompanying Blomquist was Kenneth Belmont

("Belmont"), an Industrial Hygienist with the State of Delaware Division of Public

Health ("State"). (A-2). Belmont had been contacted earlier by Blomquist to assist in the

inspection of an unrelated apartment complex in Elsmere. Since Belmont was already in

the area, Blomquist asked him to accompany him to the Apartments in order to obtain

Belmont's insight into the possible source of the odor Blomquist had detected during the

earlier inspections. (A-2; A-204).

After arriving at the Apartments, Blomquist and Belmont were taken to the

basement of 1421 Cypress Avenue by John Ruhl ("Ruhl"), maintenance supervisor at the

Apartments. (A-2). Upon entering the former basement apartment, Blomquist and

Belmont detected extensive mold growth, and other serious code violations. (A-2). Ruhl

then directed them to the basement at 1405 Cypress Avenue, a building not visited during

the October 1, 2002 pre-rental inspections, where they discovered even more extensive

mold, a steady leak of hot water into the basement from the apartment unit above, two

inches of water on the floor and high humidity. (A-2-3).

After finding such serious conditions in the two basements, Belmont contacted

Gerald Llewellyn, Ph.D. ("Llewellyn"), Chief Toxicologist at the State. (A-3). Llewellyn

advised Belmont and Blomquist that the conditions in the basements posed a serious

health threat to the occupants of the buildings because of the likely migration of the mold

spores from the basements into the apartments above through various openings such as

pipe chases and ventilation ducts. (A-3; A-135-36). Llewellyn and Belmont advised

Blomquist that it was their recommendation that the two buildings be condemned and

vacated immediately. (A-3; A-135). Blomquist informed Grocki of that determination,

posted the buildings accordingly, and evacuated the residents. (A-3). Grocki then

immediately contacted Regina O'Neill ("O'Neill"), Property Manager at EPC, and Elliott

Leibowitz ("Leibowitz"), owner of EPC, to inform them of the result of the inspections,

the recommendation of the State that the two buildings be condemned and vacated, and

the actual condemnation and evacuation of the buildings by Elsmere and Blomquist. (A-

262; A-254). O'Neill and Leibowitz told Grocki to close the on-site management office,

and they would come to the Apartments on the following Monday to handle the

problem.[4] (A-262-263). Simultaneously, Blomquist contacted Eugene Boneker, Town

Manager of Elsmere, to inform him of the results of the inspection and the

recommendation of the State that the two buildings be condemned and evacuated. (A-

237). Boneker contacted John Giles ("Giles") to inform him of what was transpiring at

the Apartments. [5] (A-237).

## C.    The Rest Of The Apartments Are Contaminated

On or about Saturday, October 5, 2002, a meeting was held at Elsmere's Town

Hall that was attended by Blomquist, Boneker, Giles, Grocki, Ruhl, various Elsmere

officials, and Elsmere's Town Solicitor, Edward M. McNally. (A-241). At the meeting,

the participants discussed the conditions discovered in the basements of the two buildings

at the Apartments, what could be done to remediate the conditions, and the fact that

remediation could not take place while the buildings were occupied. At the meeting,

---

[4]   In fact, Grocki stayed in constant, almost hourly, contact with O'Neill and Leibowitz
during this time. (A-231).

[5]   In October 2002, Boneker had been the Town Manager of Elsmere for only a few
weeks. Giles, the former Town Manager and Chief of Police of Elsmere, was serving as
an advisor to Boneker and Elsmere during this period at the request of the Elsmere City
Council. (A-230-31; A-226-28).

Grocki stated the management of the Apartments must have been "dumb and blind" to not have been aware of the problems in the basements.[6] (A-3-4; A-264-65). Blomquist, Boneker, Giles, and the other Elsmere officials agreed to inspect all of the remaining basements at the Apartments to determine if they also contained mold. (A-232-35).

On Monday, October 7, 2002, the inspections of the remaining 37 basements resumed. (A-4). Blomquist was joined by Belmont, Llewellyn and George Yocher ("Yocher"), Environmental Epidemiologist of the State, and they systematically inspected the remaining basements over the next several days. Representatives of EPC, including O'Neill, were also present. (A-205-18; A-220-24). Each day, Blomquist provided notice to EPC through its representatives of the buildings that had been inspected and condemned and each building was properly posted with a condemnation notice. (A-86-133).

EPC meanwhile had filed a complaint for an injunction in the Delaware Court of Chancery. On October 10, 2002, the Court of Chancery heard EPC's motion for temporary restraining order. At the hearing, in response to EPC's argument that Defendants' notice was inadequate, the Court implied that the contemporaneous oral notice and the written notices provided on October 9, 2002 were constitutionally sufficient. (A-198). The Court also found that the under the relevant statute, no "particular form or statement of words, level of detail" was required to be contained in the notice given. (A-196). In its concluding colloquy, the Court stated that it was clear

---

[6]   Attendance at this meeting was one of Grocki's last official acts as on-site manager of the Apartments. On Monday, October 7, 2002, Grocki was fired by O'Neill because Grocki had not followed O'Neill's directions to close the on-site management office on October 4th. (A-263).

"that there's sufficient or ample evidence of a substantial penetration and infiltration of mold into these buildings." (A-197). The Court also stated that the failure to give written notice at the time of the condemnations did not constitute a violation of the relevant statute since sufficient oral notice of Defendants' actions was given. (A-198). Lastly, the Court held that the evidence supported "the conclusion that the invocation of emergency powers was justified by the city." (A-199).

Eventually, all of the basements, except the one located in 1410 Cypress Avenue,[7] were found to contain elevated levels of mold and were condemned. Numerous basements also contained standing water, including water in bathtubs and other fixtures that had not been removed, old and/or fresh human waste product, exposed electrical wiring, substantial structural rot, broken asbestos tiles, and other serious code violations. (A-5-6). In addition, some occupied apartment units were found to contain evidence of mold infestation. (A-6). During the entire inspection process, Blomquist, Boneker, Giles and other Elsmere officials discussed the results of the inspections with the State, including Llewellyn, Belmont and Yocher, and only upon the specific recommendations of the State officials did Defendants condemn 38 of the 39 buildings at the Apartments. (A-6).

Shortly after the condemnations and the unsuccessful attempt to obtain a temporary restraining order, EPC decided to sell the Apartments. (A-256). At no time after the condemnations did EPC consider keeping and remediating the Apartments. (A-256). In preparation for the sale of the Apartments, EPC met with The Kislak Company

---

[7]   The basement of 1410 Cypress contained the on-site management office of the Apartments, and it did not contain the mold and raw sewage found in the other basement areas.

("Kislak"), a real estate broker that EPC had dealt with in the past. (A-257). EPC and Kislak discussed the condition and financials of the Apartments, and determined the fair market value of the Apartments to be $4 million.[8] (A-257). After the Apartments were listed for sale, EPC received several bids and shortly thereafter, the Apartments were sold in April 2003 for $3.9 million. (A-257-58).

Contemporaneous with EPC's decision to sell the Apartments, EPC began to pursue the administrative remedies available to challenge Elsmere's condemnation and evacuation orders. (A-275-76). EPC notified Elsmere that it intended to file an appeal with the appropriate administrative board, and the parties began to discuss the process by which that appeal would be handled. (A-275-82). However, in or about December 2002, EPC initiated discussions with Elsmere regarding a possible stay of any administrative proceedings. (A-283-84). On or about January 16, 2003, the parties entered into an agreement to stay EPC's pursuit of an appellate administrative review of Elsmere's condemnation orders. (A-285). To date, EPC has not made any effort or overture to lift or modify the stay.

---

[8]  EPC admits that the environmental issues at the Apartments negatively impacted the fair market value. (A-257-58)("I think that if the environmental issue was there and the building was full, the property would have been sold for an amount less than it would have been worth had the environmental problem not been there.")

# ARGUMENT

## I.    THE STANDARDS FOR SUMMARY JUDGMENT PERMIT JUDGMENT HERE

Federal Rule of Civil Procedure 56(c) provides that the party moving for summary judgment must show that no genuine material issues of fact exist, and that it is entitled to judgment as a matter of law.[9]  A court cannot decide disputed issues of fact, but instead must assess whether any factual issues exist, and resolve any ambiguities or inferences against the moving party.[10]

If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere conclusory allegations or denials.[11]  "Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment."[12] Therefore, a defendant is entitled to summary judgment where the plaintiff has failed to establish the existence of an essential element to its case and on which it will bear the burden of proof at trial.  No genuine issue of material fact exists in such a case because

---

[9]  *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F.Supp.2d 476, 479 (D. Del. 2003); *In re DaimlerChrysler AB Securities Litig.*, 269 F.Supp.2d 508, 512-13 (D. Del. 2003).

[10]  *GB Biosciences Corp.*, 270 F.Supp.2d at 479; *In re DaimlerChrysler*, 269 F.Supp.2d at 512-13.

[11]  Fed. R. Civ. P. 56(e); *GB Biosciences Corp.*, 270 F.Supp.2d at 479; *In re DaimlerChrysler*, 269 F.Supp.2d at 512-13.  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[12]  *GB Biosciences Corp.*, 270 F.Supp.2d at 479; *In re DaimlerChrysler*, 269 F.Supp.2d at 512-13.

the complete failure of proof of an essential element of plaintiff's case necessarily renders all other facts immaterial.[13]

Here the undisputed facts are:  (1) EPC had repeated, ample notice of the inspections of the Apartments, their failures to pass inspection and the exact reasons why they failed to meet the health code and presented serious health threats justifying evacuation, (2) EPC not only had a statutory right to a prompt hearing on the evacuation orders, but sought and obtained an immediate judicial review of those orders, and (3) EPC had no constitutional right to remediate the conditions at the Apartments before their evacuation.

To avoid summary judgment, EPC must show that there are facts that support each element of its claims of procedural and substantive due process violations by Defendants.  Specifically, in order for EPC to prevail on its claims, it must show facts tending to prove:  (1) that Defendants had absolutely no rational basis for the emergency condemnation and evacuation of the Apartments; (2) that the ordinances relied upon by Defendants provided EPC an unfettered right to repair the deficiencies in the Apartments before they were condemned and evacuated; (3) that Defendants departed from the emergency condemnation and evacuation procedures provided in the State and Town Codes; (4) that EPC was never afforded an opportunity to promptly challenge the condemnation and evacuation; and (5) that EPC did not receive at least contemporaneous notice of the condemnation and evacuation of the Apartments.

---

[13]   *GB Biosciences Corp.*, 270 F.Supp.2d at 479;  *In re DaimlerChrysler*, 269 F.Supp.2d at 512-13; *U.S. v. One Parcel Property Located At 200 Pennsylvania Avenue, Claymont, Del., With All Appurtenances and Improvements Thereon*, 786 F.Supp. 400 (D. Del. 1992).

EPC cannot prove its claims as a matter of law.  As set forth herein, the condemnation and evacuation of the Apartments was an emergency that constituted an "extraordinary situation," thus modifying the strictures of due process requirements.

The undisputed facts also establish that not only did EPC receive timely notice of the inspections and condemnations of the Apartments, but that it had ample opportunity to challenge the condemnation orders, as demonstrated by EPC's filing of its motion for temporary restraining order with the Court of Chancery within a few days of the first condemnations.  Furthermore, EPC made the strategic decision not to pursue the administrative remedies available to it, as demonstrated by its agreement to stay its pursuit of an appeal before the appropriate administrative body.

## II. DEFENDANTS DID NOT VIOLATE PLAINTIFF'S PROCEDURAL DUE PROCESS RIGHTS

### a. The Standard For Procedural Due Process Claims

Notions of procedural due process generally refer to the notice and opportunity for a hearing before the deprivation of a recognized property right.[14] To maintain an action for procedural due process violations, a plaintiff must first identify a life, liberty, or property interest that has been infringed upon by the alleged violation.[15] Once the protected interest allegedly deprived has been identified, the procedural due process inquiry shifts its focus to the kind of notice and hearing required to permit the deprivation of such interest.[16] When considering what notice is appropriate to satisfy due process requirements, the U.S. Supreme Court has found that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[17] Thus, EPC must prove that they did not receive any notice of the condemnations and did not have any opportunity to formally challenge the condemnations before some type of judicial or quasi-judicial body.

---

[14] *See, e.g., Fuentes v. Shevin,* 407 U.S. 67, 80 (1972); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950).

[15] Sheldon H. Nahmond, *Civil Rights and Civil Liberties Litigation* § 3:36 (4th ed. 2004). (A-290-91).

[16] *Id. See also Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir. 2000) (explaining that in procedural due process cases, the Third Circuit asks (1) what is the protected interest, and (2) was the person afforded due process).

[17] *Mullane,* 339 U.S. at 314.

b.     **The Mathews Test And Procedural Due Process**

"Procedural due process rules are meant to protect persons *not from the deprivation*, but from the *mistaken or unjustified deprivation* of life, liberty, or property."[18]  The Supreme Court has consistently held that "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances,"[19] but rather that "the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'"[20]  In addressing this precept, the Court announced a 3-prong balancing test in *Mathews v. Eldridge*,[21] to determine whether procedural due process has been satisfied.  Thus, the Court must consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[22]

Of the *Mathews* test, the Court recently stated it "contemplates a judicious balancing of these concerns, through an analysis of 'the risk of an erroneous deprivation' of the private

---

[18]    *Carey v. Piphus*, 435 U.S. 247, 259 (1978) (emphasis added).

[19]    *Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162-163 (1951) (J. Franfurter, concurring)).

[20]    *Fuentes*, 407 U.S. at 80 (*quoting Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

[21]    424 U.S. 319 (1976).

[22]    *Id*. at 335.

interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"[23]

Under the *Mathews* test, the first prong implicates EPC's unrestricted use of the property and ability to receive rents from the units, a rather straightforward consideration.[24] The second prong, however, requires a showing by EPC that the process used by Defendants was inadequate and resulted in an increased risk of erroneous deprivation, and that Defendants should have had additional procedural safeguards in place.[25] Plaintiff has made no such showing. Indeed, the procedures used by Defendants minimized the risk of unwarranted deprivation as: (1) Plaintiff had been warned several times of the presence of certain code violations and health hazards; (2) Defendants sought and relied upon information regarding the severity of the health risks posed by the condition of the Apartments prior to their condemnation; and (3) the Town permitted a timely review of the condemnation determination, a remedy Plaintiff chose not to pursue.

Finally, under *Mathews*, the additional precautions advocated by Plaintiff are then weighed against the burden they will have on the municipality and its citizens. As an initial matter, Plaintiff has set forth no evidence regarding the procedural safeguards Defendants *could* have reasonably implemented, except to rely upon the well-established principle that notice should be afforded prior to condemnation, under circumstances not present here. However, for the reasons set forth below, such notice would have

---

[23] *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004).

[24] *See, e.g. U.S. v. James Daniel Good Real Property*, 510 U.S. 43, 53-54 (1993)(finding government seizure of real property deprived owner of collecting rents and freely using the property).

[25] *Mathews*, 424 U.S. at 335.

impermissibly placed in jeopardy the health and welfare of the tenants at the Apartments, a risk any reasonable state official charged with protecting the citizens of a municipality would be unwilling to assume. Therefore, the burden of additional procedural safeguards to protects EPC's interest outweighs the potential benefits. Thus, *Matthews*, makes clear that the balance of interests weighed in favor of condemnation.

c.     <strong>Notice And The <em>Mullane</em> Rule</strong>

Although notice of some sort of a deprivation of property is a fundamental element of procedural due process, there are no fixed rules with respect to the precise nature of the notice required. The type and substance of the notice required for condemnation was analyzed by the United States Supreme Court in *Mullane*. The Supreme Court analyzed extensively what comprises adequate notice under the Due Process Clause. The Court held that, if feasible, notice must be reasonably calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests. The Court also observed, however, the impossibility of setting up a rigid formula as to the kind of notice that must be given and found that notice required will vary with circumstances and conditions.[26]

Thus, *Mullane* requires only that a plaintiff be afforded an opportunity to be heard regarding the deprivation; *Matthews*, however, explicitly recognizes that the exact process due can vary depending on the circumstances and rights involved. With respect to EPC's allegation that it was deprived procedural due process because there was no pre-

---

[26]  *Mullane*, 339 U.S. at 314.

deprivation hearing, the Supreme Court, as noted below, has explicitly rejected that argument, and it therefore fails as a matter of law.[27]

      **d.**      **"Extraordinary Situations" And The *Fuentes* Test**

Plaintiff's argument that procedural due process requires a pre-deprivation hearing fails as a matter of law.  Although both the notice and the opportunity to be heard ideally should come before the deprivation of the private interest, the U.S. Supreme Court has recognized that a post-deprivation hearing satisfies due process if there is a need to act quickly.[28]  According to the *Fuentes* Court, such extraordinary situations are marked by three characteristics:

> First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest.  Second, there has been a special need for very prompt action.  Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.[29]

---

[27] *See Gilbert v. Homar*, 520 U.S. 924, 930-31 (1997) ("This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide pre-deprivation process, post-deprivation process satisfies the requirement of the Due Process Clause.").

[28] *Id.*

[29] *Fuentes*, 407 U.S. at 91.  *Accord Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988)("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.").

In *Grayden v. Rhodes*,[30] a case factually similar to the instant case, the Eleventh

Circuit found that the emergency evacuation of tenants from a dangerous apartment

building amounted to an "extraordinary situation" under *Fuentes*.[31]  In *Grayden*, the City

of Orlando condemned an apartment complex because of a variety of problems

"including collapsed ceilings, major leaks, constant mold and mildew, water leakage

from light fixtures, and roach and other insect infestations."[32]  Two weeks prior to a

scheduled hearing regarding the apartment complex before the City of Orlando Code

Enforcement Board ("Orlando Board"), city officials posted condemnation notices on

each apartment door and the main door of each building in the complex.  The notices,

signed by the chief of Orlando's Code Enforcement Bureau, informed the residents that

they had fewer than 36 hours to vacate the premises.[33]  Although the notices did not

inform the tenants of their right to a hearing, and no hearing was held before the

condemnations and evacuations took place, the Orlando City Code provided for a post-

deprivation hearing.[34]

   The tenants in the apartment complex brought a Section 1983 action against the

City of Orlando, the Orlando Board, and the chief code enforcement officer, alleging

violations of the due process clause.  The code enforcement officer moved for summary

---

[30]  345 F.3d 1225 (11th Cir. 2003).

[31]  *Id.* at 1236-37.

[32]  *Id.* at 1228 n.2.

[33]  *Id.* at 1228.

[34]  The language of Orlando's provision for a post-deprivation hearing is practically
identical to Elsmere's provision.  *Compare* Orlando, Fla. City Code § 30A.11, *quoted in*
*Grayden*, 345 F.3d at 1228, *with* Property Maintenance Code of The Town of Elsmere §
109.6.  (A-287).

20

judgment under the theory of qualified immunity; however, the district court found

although he was entitled to qualified immunity as to pre-deprivation due process, the

doctrine did not apply to post-deprivation due process.[35]  An appeal ensued.

On appeal, the Eleventh Circuit found that "the emergency evacuation of tenants

from a dangerous and potentially life-threatening structure qualifies as an 'extraordinary

situation'" under the *Fuentes* test.[36]  "As a consequence, when such exigent

circumstances exist, tenants can be evicted from a building reasonably judged to be unfit

for human occupancy without a pre-deprivation hearing."[37]  Once the court found there

was an extraordinary situation, it factored that interest into the *Mathews* test, and

balanced the municipality's interest in protecting citizen's against the right of the tenants

to their apartments.  The court found that "[w]hen the immediate safety of tenants is

placed in jeopardy by hazardous and possibly life-threatening living conditions, a city's

interest in protecting its citizens outweighs the tenants' interest in enjoying *uninterrupted*

---

[35]  *Id.* at 1230.  It should be noted that although *Grayden* is primarily a qualified immunity case, it is also instructive regarding the due process violation question.  The U.S. Supreme Court's two-step qualified immunity analysis requires a reviewing court to first ask whether the official's actions violated the Constitution.  *See Saucier v. Katz*, 533 U.S. 194 (2001).  Therefore, the Eleventh Circuit had to determine whether a pre-deprivation hearing was required before the condemnation and evacuations.

[36]  *Id.* at 1237.

[37]  *Id.  Accord Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994)("Protecting citizens from an immediate risk of serious bodily harm falls squarely within those 'extraordinary situations' contemplated in *Fuentes*.").  *See also Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1307 (4th Cir. 1992)(finding that prior to an eviction, a pre-deprivation hearing is required if there *are not* exigent circumstances (emphasis added)).

occupancy at their residence of choice."[38]  Thus, such exigent circumstances allow for a governmental entity to act before a pre-deprivation hearing can be had.

Similarly, the condemnation by the Defendants of the Apartments was directly necessary to secure both the governmental and the general public interest.  The interest of a government in securing the health and welfare of its citizens is well-established.[39] Second, as recognized in *Grayden* and *Flatford*, dilapidated structural conditions like those existing in the Apartments in 2002, present the precise type of special need for very prompt action contemplated by *Fuentes*.  Third, Defendants Blomquist, Giles and Boneker, as the government officials responsible for determining the need for emergency evacuations and condemnation, in conference with other state officials similarly charged, determined that the condemnations were necessary and justified at the particular juncture.[40]  Accordingly, the extraordinary circumstances present at the Apartments excused Defendants from providing a pre-deprivation hearing to EPC.

### e.     Right To Post-Deprivation Hearing

When the government deprives a person of property, the individual has a right to be heard at a meaningful time and in a meaningful manner.[41]  Thus, if there are

---

[38]  *Grayden*, 345 F.3d at 1237; *see also Flatford*, 17 F.3d at 167-168.

[39]  *Grayden*, 345 F.3d at 1236-37.

[40]  *Id.* at 91.  *Accord Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988)("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.").

[41]  *Fuentes*, 407 U.S. at 80.

extraordinary circumstances that prevent a pre-deprivation hearing, due process requires

the opportunity for a party to be heard in a post-deprivation hearing.[42]

Such a hearing was available to Plaintiff, but not pursued.  The Property

Maintenance Code of the Town of Elsmere ("Property Code"), in the "Emergency

Measures" section, provides: "Any person ordered to take emergency measures shall

comply with such order forthwith.  Any affected person shall thereafter, upon petition

directed to the appeals board, be afforded a hearing as described in this code."[43]  This

code section complies with 22 *Del. C.* § 324, which provides:

> Appeals to the board of adjustment may be taken by any person
> aggrieved or by any officer, department, board or bureau of the
> municipality affected by any decision of the administrative officer.
> Such appeal shall be taken within a reasonable time as provided by
> the rules of the board by filing with the officer from whom the
> appeal is taken and with the board a notice of appeal specifying the
> grounds thereof.  The officer from whom the appeal is taken shall
> forthwith transmit to the board all the papers constituting the
> record upon which the action appealed from was taken.

Section 325 of Title 22 of the Delaware State Code also provides:

> An appeal stays all proceedings in furtherance of the action
> appealed from, unless the officer from whom the appeal is taken
> certifies to the board of adjustment after the notice of appeal has
> been filed with the officer that, by reason of facts stated in the
> certificate, a stay would in the officer's opinion cause imminent
> peril to life or property.  In such case proceedings shall not be
> stayed otherwise than by a restraining order which may be granted
> by the board or by a court having jurisdiction on application on
> notice to the officer from whom the appeal is taken and on due
> cause shown.

---

[42]   *See, e.g., Fuentes*, 407 U.S. at 90-91; *Boddie v. Connecticut*, 401 U.S. 371, 378-79
(1971); *Grayden*, 345 F.3d at 1232.

[43]   Town of Elsmere Property Maintenance Code § 109.6.  (A-287).

However, EPC made a strategic decision not to petition for such a hearing before the Board of Adjustment, and thus waived its opportunity for post-deprivation review by the Town. Under similar facts, The Third Circuit has found that relief from the federal courts thus becomes unavailable:

> In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them."[44]

Furthermore, "[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants."[45]

Here, EPC had the benefit of a post-deprivation hearing as demonstrated by its motion for temporary restraining order filed and heard in the Delaware Court of Chancery. In addition, due to the timing of the action in the Court of Chancery before all of the inspections and condemnations were completed, EPC also had an opportunity to be heard *before* certain buildings were condemned and evacuated. EPC could have pursued an administrative appeal before Elsmere's Board of Adjustment if dissatisfied with the outcome of the unsuccessful Court action. It did not; rather EPC agreed to stay such an appeal before it even filed its petition. Indeed, EPC has yet to take advantage of that avenue for another post-deprivation hearing. Thus, under *Alvin*, EPC's failure to pursue the available administrative remedy outlined in Elsmere's Property Code, precludes as a

---

[44] *Alvin*, 227 F.3d at 116 (quoting *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982)).

[45] *Id.*

matter of law EPC's efforts to come before the federal courts to have the condemnation and evacuation order reviewed.[46]  Accordingly, EPC may not challenge the adequacy of the procedural safeguards afforded by Defendants when it has chosen to bypass those protections.

### f.     <u>Conclusion</u>

Procedural Due Process is flexible enough to accommodate the circumstances faced by local officials.  An emergency warrants prompt action, even when such vigilance renders impossible a prior hearing.  While a hearing must be available to challenge the action taken by the government, EPC had its hearing in the forum it chose – the Delaware Court of Chancery.  Thus, there was no procedural due process violation here.

---

[46]  *Id.*

## III. DEFENDANTS DID NOT VIOLATE PLAINTIFF'S SUBSTANTIVE DUE PROCESS

### a.   Standards Of Substantive Due Process

"Substantive due process" refers to the protection of certain affirmative rights, including the rights in certain protected property interests.[47]  Distinct from procedural due process, notions of substantive due process relate not to the manner of deprivation, but to the matter of the deprivation.  As such, substantive due process is "far narrower in scope than procedural due process."[48]

Once a protected interest is implicated, the inquiry then becomes what level of substantive due process analysis is required.  Fundamental rights merit greater scrutiny than mere property rights.  The determination of the level of scrutiny implicated is made on a case-by-case basis.[49]  "When determining what rights are fundamental for administrative review purposes, the court must determine if the right fundamentally affects the life situation of the individual to require independent review or whether it merely impacts an area of economic privilege in a less than fundamental manner."[50] State conduct will only be found to offend substantive due process which it shocks the

---

[47]   *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 229-230 (1985) (Powell, J., concurring).

[48]   16B Am.Jur. 2d Constitutional Law § 901.

[49]   *MHC Operating Limited Partnership v. City of San Jose*, 106 Cal.App.4th 204, 206 (Cal. Ct. App. 2003); *see also Bixby v. Pierno,* 4 Cal.3d 130, 144 (Cal. 1971).

[50]   *Concord Communities, L.P. v. City of Concord*, 91 Cal.App.4th 1407, 1413-1414 (Cal. Ct. App. 2001); *see also Berlinghieri v. Dept. of Motor Vehicles*, 33 Cal.3d 392, 395-398 (Cal. 1983).

conscience or "constitutes a force that is so brutal as to offend even hardened sensibilities."[51]

Where the ordinance in question does not burden a fundamental right nor involve the classification of a suspect class, the Third Circuit will review the governmental action under a rational basis standard.[52]  Under rational basis review, an ordinance will withstand an equal protection challenge if it is "reasonable, not arbitrary, and bears a rational relationship to a (permissible) state objective."[53]  In the case of land use ordinances, the Third Circuit has held:

> Like other economic and social legislation, land use
> ordinances that do not classify by race, alienage, or national
> origin, will survive an attack based on the Equal Protection
> Clause if the law is 'reasonable, not arbitrary' and bears a
> 'rational relationship to a (permissible) state objective.'
> However, land use regulations must possess a legitimate
> interest in promoting the public health, safety, morals, and
> the general welfare of its citizens in order to pass scrutiny.
> Land use ordinances will be deemed 'irrational' when a
> plaintiff demonstrates *either* that the state interest is
> illegitimate (an ends-focus) *or* that the chosen classification
> is not rationally related to the interest (a means-focus).[54]

Moreover, the Supreme Court has held that the constitutionality of ordinances should be presumed,[55] and an ordinance should not be set aside if any state of facts reasonably

---

[51] 16B Am.Jur. 2d Constitutional Law § 918.

[52] *Angstadt v. Midd-W. School Dist.*, 377 F.3d 338, 344 (3d Cir. 2004).

[53] *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 133 (3d Cir. 2002) (internal quotation omitted).

[54] *Id.* (Internal citations omitted).

[55] *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

maybe conceived to justify it.[56]  Thus, since municipal ordinances are generally subject to

a rational basis review, the showing of a legitimate government interest is sufficient to

survive the court's review.

Here, EPC alleges three rights that it claims were violated here under a

substantive due process analysis:  (1) the "right" to have municipal ordinances strictly

followed, (2) the "right" to have the building inspectors correctly decide if condemnation

was appropriate, and (3) the "right" to remediate before condemnation occurred.

However, none of these so-called "rights" is protected by substantive due process.

### b.     Failure To Follow Municipal Ordinance Not A Substantive Due Process Violation

EPC does not directly challenge the constitutionality of Elsmere's municipal

ordinances, but alleges that Defendants violated EPC's substantive due process rights by

failing to follow Elsmere's municipal code in determining whether the Apartments

needed to be condemned and evacuated.  Assuming, *arguendo*, that Defendants failed to

follow the municipal code, the relevant inquiry is whether that failure rises to the level of

a due process violation.  It does not.

In *Smith v. City of Picayune*,[57] a landowner brought an action challenging the

City's zoning determination as violating established state law and plaintiff's federal

constitutional rights, thus claiming the city's action was a violation of procedural and

substantive due process.  The United States District Court of the Southern District of

Mississippi entered judgment against landowner, and landowner appealed.

---

[56]  *McGowan v. State of Maryland*, 366 U.S. 420, 425-26 (1961).

[57]  795 F.2d 482 (5th Cir. 1986).

The Fifth Circuit held, *inter alia*, that failure to follow state law in zoning property, in itself, did not violate the landowner's rights to due process or equal protection. As to the substantive due process claim, the court surmised that plaintiff was implicitly contending that the City's failure to follow the procedure set forth in its own ordinance and required by state law was *per se* arbitrary and irrational, thus a violation of substantive due process. The court noted that this type of claim was not allowed under the reasoning articulated in *Stern v. Tarrant County Hosp. Dist.*,[58] wherein the court held:

> The guarantees of the fourteenth amendment . . . its promise of protection from arbitrary or irrational state action, are guarantees that turn on federal constitutional standards of . . . rationality rather than on state standards. Converting alleged violations of state law into federal . . . due process claims improperly bootstraps state law into the Constitution.[59]

Thus, the *Smith* court found plaintiff's substantive due process claim to be without merit.

Under *Smith*, the alleged failure of Defendants to comport with the Elsmere municipal code – even if true – is not, *per se*, a violation of substantive due process unless the conduct was itself in derogation of a constitutional right held by EPC. Stated differently, "[R]ights created by state law are not properly the subject of a claim brought pursuant to 42 U.S.C. § 1983, unless the violation of those rights also infringes upon some federally protected rights."[60] Therefore, EPC's claim to § 1983 protection for

---

[58] 778 F.2d 1052 (5th Cir. 1985), *cert. denied*, 476 U.S. 1108 (1986).

[59] *Smith*, 795 F.2d at 488 (*quoting Stern*, 778 F.2d at 1056).

[60] *State of Missouri ex rel. Gore v. Wochner*, 475 F.Supp. 274, 278 (E.D. Mo. 1979), *aff'd*, 620 F.2d 183 (8th Cir. 1980)("It is the opinion of the Court that the alleged violations of any rights that might arise exclusively by virtue of the procedures provided by city charter, ordinances and regulations thereunder for failure to comply with said procedures do not rise to the level of a federal Constitutional violation.").

Defendant's alleged failure to abide by the municipal code is not proper as a matter of law where there is no tenable claim of violation of a concomitant federal right and should therefore be denied.

**c.     The Actions Of The Defendants Were Not Irrational**

Next, EPC argues that the Elsmere officials made the wrong decision in condemning the Apartments because mold infestation is not a bad enough threat to public health to warrant the measures taken. However, just as the constitutionality of an ordinance affecting property rights is to be tested by the rational basis standard, the acts of these officials should be tested by whether they had a rational basis to do what they did. If officials act rationally, then there is no constitutional violation for an error in judgment. Instead, the remedy is to seek review of that error and to have it set aside if an error was made. Our Constitution does not demand officials' perfection in land use matters, only their good faith.

The case law supports this analysis. In *Flatford*,[61] the Sixth Circuit examined the question of alleged substantive due process violations in the context of the evacuation of tenants from an apartment complex. In that case, the tenants were evicted for a variety of reasons, including wood-rot, exposed electrical wiring, and the presence of combustibles.[62] The City's Director of Building and Safety believed these conditions posed an immediate risk of electrocution and fire.[63] Tenant plaintiffs brought a § 1983

---

[61]   *Flatford*, 17 F.3d 162 (6th Cir. 1994).

[62]   *Id.* at 165.

[63]   *Id.*

action, and argued, in part, that exigent circumstances did not exist and the City's actions

were improper. In particular, plaintiffs asserted that the dangerous conditions in the

building as a whole and in other apartments were not present in *their* apartment.

The Sixth Circuit found that "[t]he dispositive issue, therefore, is whether [the

Director of Building and Safety's] conclusion that an emergency situation existed was an

objectively unreasonable decision in light of the information he then possessed, . . ."[64]

The court determined that the record contained facts that would allow a reasonable

building inspector to conclude there was imminent danger.[65] Furthermore, even if the

inspector was ultimately found to be wrong, he was still protected by qualified

immunity.[66]

Here, in order to sustain its claim of a substantive due process violation, EPC

must prove facts that show no reasonable building inspector would have believed exigent

circumstances existed at the Apartments that would cause them to be condemned and

vacated, and that Blomquist – and to a lesser degree Boneker and Giles – were

unreasonable in their assessment of the situation as an emergency. EPC cannot prove this

claim. As noted above, Defendants consulted closely with the State – particularly

Llewellyn, Belmont and Yocher – in assessing the conditions found at the Apartments.

All three experts from the State concurred in the determination that excessive and

dangerous levels of mold, as well as other hazardous conditions, were present at the

_____

[64] *Id.* at 167.

[65] *Id.*

[66] *Id.* at 168. The application of the doctrine of qualified immunity to Defendants
Blomquist, Boneker and Giles is discussed *infra*.

Apartments, and that immediate condemnation of the buildings and evacuation of the tenants was in order. EPC cannot reasonably argue that three experts from the State, who are unrelated to Defendants, would all agree in the recommendation that the Apartments needed to be condemned and evacuated unless their assessment of the situation as an "emergency" was wholly irrational.

### d.    Due Process Does Not Create A "Right to Remediate" Prior to Condemnation

EPC further alleges that its due process rights were violated because it was not given an opportunity to cure the defects in the building prior to the condemnation and evacuation of the Apartments. (Complaint ¶¶ 66, 77) (D.I. 22). Although EPC is apparently alleging that Defendants violated the Due Process Clause by failing to give EPC an opportunity to remediate the Apartments as permitted (but not required) by the Delaware Code,[67] there is not any right – constitutional or otherwise – to remediate a

---

[67] Although 31 *Del. C.* § 4128 requires a governmental official to issue a correction order providing an opportunity to cure, 31 *Del. C.* § 4130 allows Elsmere to condemn a building and evict residents prior to corrective action taking place. Section 4130 provides:

> Whenever a code official finds that an emergency exists on any premises, or in any structure or part thereof or on any defective equipment which requires immediate action to protect the public's health and safety or that of the occupants thereof, the code official may, with proper notice and service in accordance with § 4128 of this title, issue an order reciting the existence of such an emergency and requiring the vacating of the premises or such action taken as the code official deems necessary to meet such emergency. Notwithstanding other provisions of this chapter, such order shall be effective immediately, and the premises or equipment involved shall be placarded immediately upon service of the order.

hazardous building prior to its emergency condemnation.[68]  Indeed, the purpose of condemnation is to force otherwise negligent property owners to make timely repairs for the good of public health and to protect tenants and others from the perils therein.

>            e.    **Conclusion**

EPC cannot prove that there was any substantive due process right violated by Elsmere.  There is no constitutional right to have municipal ordinances strictly followed, particularly when, as here, the substance of those ordinances was followed by the notice given to EPC.  There is no constitutional right to remediate a hazardous building before it is condemned.  Finally, there is no constitutional right to a perfect decision in a property rights dispute.  EPC's claims with respect to their substantive due process rights thus fail as a matter of law.

---

[68]  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (Section 1983 is not itself a source of substantive right, but merely provides a method for indicating federal rights elsewhere conferred.).

## IV.   THE ACTIONS OF BLOMQUIST, BONEKER AND GILES ARE PROTECTED BY THE DOCTRINE OF QUALIFIED IMMUNITY

Defendants Blomquist, Boneker and Giles are immune from liability under the doctrine of qualified immunity.  Government officials who perform discretionary functions have qualified immunity from liability for civil damages as long as their conduct does not violate a "clearly established" constitutional or statutory right.[69]  The test of liability is settled.  "The contours of the [allegedly abridged] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[70]

When a defendant invokes the defense of qualified immunity to a charge of violating an individual's due process rights, the test applied is whether the defendant official has acted in a manner that shocks the conscience.  In *County of Sacramento v. Lewis*,[71] the Supreme Court explained the standard that applies when a plaintiff alleges that an action taken by an executive branch official violated substantive due process.  The Court observed that "the core of the concept" of due process is "protection against arbitrary action" and that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"[72]  After noting its long history of speaking of "the cognizable level of executive abuse of power as that which shocks the conscience,"[73] the

---

[69]   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[70]   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[71]   523 U.S. 833 (1998).

[72]   *Id.* at 845-46 (citation omitted).

[73]   *Id.* at 846.  (*See Rochin v. California*, 342 U.S. 165 (1952)).

Court stated that the standard for determining whether a party's due process rights have been violated is whether an official's actions in depriving a plaintiff of a protected property were so arbitrary or egregious as to "shock the conscience."[74]

The Third Circuit has repeatedly acknowledged that executive action violates due process only when it shocks the conscience and that standard is not easily met.[75]  In *Grimm v. Sweeney*,[76] a case comparable to the instant matter in Elsmere, the corporate owner of certain rental properties brought a § 1983 action against the fire chief and fire marshal for the Borough of Norristown alleging, among other causes of action, that the citations and condemnation orders issued by the defendants constituted Fourteenth Amendment due process violations.  Plaintiffs filed an action seeking both damages and injunctive relief stemming from the condemnation of a property damaged by fire, and citations issued by the defendants to permit residents to remain on the condemned premises.  In light of the extraordinary recalcitrance of plaintiff in complying with the condemnation orders, and in the absence of any evidence of outrageous or even troubling

---

[74]  *County of Sacramento*, 523 U.S. at 846-47; *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992) (the substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.").  *See also Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994) (en banc) ("[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'"); *United Artists Theatre Circuit, Inc. v. Township of Warrington, PA.*, 316 F.3d 392, 400-01 (3d Cir. 2003)(applying the "shocks the conscience" standard in land-use cases).

[75]  *See, e.g., Leamer v. Fauver*, 288 F.3d 532, 546-47 (3d Cir. 2002); *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 400-01 (3d Cir. 2000) *cert. denied*, 531 U.S. 1011 (2000); *Nicini v. Morra*, 212 F.3d 798, 809-10 (3d Cir. 2000) (en banc); *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999).

[76]  249 F.Supp. 571 (E.D. Pa. 2003).

conduct by the defendants, the Third Circuit summarily dismissed the due process claim.[77]

Similarly, this court should find that by performing an authorized function based upon an earnest, supportable, and objectively reasonable belief that a public health risk existed, Blomquist, Boneker and Giles did not engage in conduct that was "arbitrary," "egregious," or that "shocks the conscience." Further, the Delaware Court of Chancery saw the evidence of mold infestation, heard the testimony of Dr. Llewellyn and considered whether to block the evacuation orders. It concluded there was ample evidence of a health threat to the Apartment occupants, that State law permitted the evacuation orders and concluded that these same defendants' conduct appeared justified. After the passing of judicial scrutiny, and in light of the facts and circumstance giving use to the condemnation review, this Court should not hold that Defendants' actions shocked the conscience.

Blomquist, Boneker and Giles should, therefore, be afforded qualified immunity against EPC's substantive due process claims.

---

[77] *See id.*

## CONCLUSION

Elsmere is a small town. Faced with the indisputable evidence of mold infestation, given the advice of the State of Delaware's public health officials, Elsmere in good faith acted responsibly. There is no real dispute that Elsmere did what it felt was reasonable and correct. The Court of Chancery reviewed Elsmere's actions, but declined to second-guess Elsmere. Our Constitution does not call for this Court to intervene now. For the reasons set forth in this brief, the Defendants respectfully request that the Court grant their renewed motion for summary judgment.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Edward M. McNally (#614)
Liza H. Sherman (#4124)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
*emcnally@morrisjames.com*
*lsherman@morrisjames.com*
Attorneys for Defendants Town of Elsmere,
    Ellis Blomquist, Eugene Boneker and John Giles

Dated: March 31, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2006, I electronically filed Defendants'

Opening Brief In Support Of Their Renewed Motion For Summary Judgment with the

Clerk of the Court using CM/ECF, which will send notification of such filing to the

following:

> David S. Eagle, Esquire
> Klehr, Harrison, Harvey,
> Branzburg & Ellers LLP
> 919 Market Street, Suite 1000
> Wilmington, DE  19801
> Attorneys for Plaintiff Elsmere Park Club, L.P.

> Edward M. McNally (#614)
> Liza H. Sherman (#4124)
> Morris, James, Hitchens & Williams LLP
> 222 Delaware Avenue, 10th Floor
> Wilmington, DE 19801
> (302) 888-6800
> emcnally@morrisjames.com
> lsherman@morrisjames.com
> Attorneys for Defendants Town of Elsmere,
>     Ellis Blomquist and Eugene Boneker