## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELSMERE PARK CLUB, L.P., a<br>Delaware limited partnership,<br><br>              Plaintiff,<br><br>       v.<br><br>TOWN OF ELSMERE, a Delaware<br>Municipal corporation,<br>ELLIS BLOMQUIST, EUGENE BONEKER,<br>and JOHN GILES,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 04-1321-SLR<br>)<br>)<br>)<br>)<br>)   <u>JURY TRIAL DEMANDED</u><br>)<br>) |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO THE
## <u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP


David S. Eagle (DE Bar #3387)
Douglas F. Schleicher (Admitted *Pro Hac Vice*)
Patrick A. Costello (DE Bar #4535)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 426-1189 (Telephone)
(302) 426-9193 (Fax)
deagle@klehr.com
pcostello@klehr.com
*Attorneys for Plaintiff*

Dated: April 26, 2006

## TABLE OF CONTENTS

Table of Authorities ............................................................................................... iii

NATURE AND STAGE OF PROCEEDINGS ................................................. 1

SUMMARY OF ARGUMENT ........................................................................ 1

PLAINTIFF'S STATEMENT OF FACTS....................................................... 2

    A.    General Background ............................................................... 2

    B    The Absence of Mold at the Apartments Prior
to the 2002 Condemnations ................................................... 4

    C.    The Town's Condemnation of the Apartments........................ 6

    D.    Plaintiff's Inspection of the Apartments at the Time ............... 12
of the 2002 Condemnations

    E.    Health Concerns Presented by Mold........................................ 13

    F.    Expert Conclusions Concerning Mold at the Apartments ........ 16

LEGAL ARGUMENT..................................................................................... 18

    A.    Standard of Review for Motion for Summary Judgment........... 18

    B.    Defendant Town's Motion for Summary Judgment Should be
Denied Because Plaintiff Was Deprived of Property Without
Procedural Due Process, and There are Genuine Issues of
Material Fact Which Preclude Entry of Such Judgment in Its Favor ........ 19

        1.    Elements of a Claim Under 42 U.S.C. § 1983 ................... 19

        2.    Requirements of the Due Process Clause ......................... 21

            i.    The Town's Property Maintenance Code
Expressly Created a "Board of Building Appeals"............ 31

            ii.    Plaintiff Properly Filed an Appeal to the
Board of Building Appeals in Accordance
with the Town Code........................................................... 32

            iii.    The Town's Board of Adjustment Was
Empowered to Hear Zoning Appeals, Not
Property Maintenance Violations ...................................... 33

iv.    Plaintiff's Attempt to Obtain a TRO in
Chancery Court Does Not Relieve the Town From the
Responsibility of Providing an Adequate and
Meaningful Opportunity to be Heard................................35

C.    The Individual Defendants' Motion for Summary Judgment
Should Be Denied Because They Do Not Have Qualified Immunity,
and There are Genuine Issues of Material Fact Which Preclude
Entry of Such Judgment in Their Favor....................................38

CONCLUSION............................................................................................................39

DEL1 63879-1

# TABLE OF AUTHORITIES

## CASES

Alvin v. Suzuki,
    227 F.3d 107 (3rd Cir. 2000) ............................................................................34

Armstrong v. Manzo,
    380 U.S. 545, (1965).........................................................................................31

Boddie v. Connecticut,
    401 U.S. 371 ....................................................................................................31

Cleveland Board of Education v. Loudermill,
    470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)....................................21

Elsmere Park Club v. Town of Elsmere,
    771 F. Supp. 646 (D. Del. 1991).........................................................................3

Flatford v. City of Monroe,
    17 F.3d 162 (6th Cir. 1994) .........................................................................31, 38

Fuentes v. Shevin,
    407 U.S. 67, (1972).......................................................29, 30, 31, 32, 35

Gentry v. Lee's Summit, Missouri, City of,
    10 F.3d 1340 (8th Cir. 1993) .......................................................................21, 28, 29

Grayden v. City of Orlando,
    Case No. 6:00-cv-888-Orl-22DAB (M.D. Fla.)...................................................35

Grayden v. Rhodes,
    345 F.3d 1225 (11th Cir. 2003) .......................................................25, 26, 30, 34

Groman v. Township of Manalpan,
    47 F.3d 628 (3d Cir. 1995).................................................................................19

Hidden Oaks Ltd. v. City of Austin,
    138 F.3d 1036 (5th Cir. 1998) .........................................................................22

Horowitz v. Fed. Kemper Life Assurance Co.,
    57 F.3d 300 (3d Cir. 1995)................................................................................18

Insituform Technologies, Inc. v. Insitu, Inc.,
    1999 WL 240347 .............................................................................................35

Keim v. County of Bucks,
        275 F. Supp. 2d 628 (E.D. Pa. 2003) ................................................................20

Larkin v. Savage,
        318 F.3d 138 (2nd Cir. 2003)............................................................................19

Leatherman v. Tarrant County,
        507 U.S. 163 (1993)...........................................................................................20

Manuel v. Elsmere Park Club, L.P.,
        Del. Super. Ct. C.A. No. 02C-10-212 ...............................................................24

Mathews v. Eldridge,
        424 U.S. 319, (1976)...........................................................21, 22, 23, 24, 28, 37

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
        475 U.S. 574 (1986)...........................................................................................18

Memphis Light, Gas and Water Div. v. Craft,
        436 U.S. 1, (1978)..............................................................................................21

Monell v. Department of Social Services,
        436 U.S. 658, (1978)..........................................................................................19

Moody v. Elsmere Park Club, L.P., et al.,
        Del. Super. Ct. C.A. No. 04C-10-012 (JRJ) .....................................................25

Mullane v. Central Hanover Bank & Trust Co.,
        339 U.S. 306 (1950)...........................................................................................21

Pa. Coal Ass'n v. Babbitt,
        63 F.3d 231 (3d Cir. 1995).................................................................................18

Parrat v. Taylor,
        451 U.S. 527, (1981)...................................................................21, 29, 31, 37

Pembaur v. City of Cincinatti,
        475 U.S. 469, (1986)..........................................................................................19

Price v. Delaware Dept. of Correction,
        40 F. Supp. 2d 544 (D. Del. 1999).....................................................................20

Richmond v. Kemp,
        956 F.2d 1300 (4th Cir. 1992) ...........................................................................29

iv

Smith v. Village of Maywood,
    699 F. Supp. 157 (N.D. Ill. 1988) ..............................................................20, 28, 29

United States v. 141st Street Corp. by Hersh,
    911 F.2d 870 (2d Cir. 1990).................................................................................21

United States v. All Assets of Statewide Auto Parts, Inc.,
    971 F.2d 896 (2d Cir. 1992)..................................................................................21

United States v. James Daniel Good Real Property,
    510 U.S. 43, 62114 S. Ct. 492, 126 L. (1993 ) .....................................21, 29, 30

## STATUTES

42 U.S.C. § 1983................................................................................................1, 19

Fed. R. Civ. P. 56(c) ................................................................................................18

10 Del. C. § 4011 ....................................................................................................37

22 Del. C. §§ 324, 325 ......................................................................................33, 34

31 Del. C. §§ 4101 ...................................................................................................30

31 Del. C. § 4104 ...............................................................................................27, 31

31 Del. C. § 4105(e) .................................................................................................30

31 Del. C. § 4127 .....................................................................................................30

DEL1 63881-1

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Elsmere Park Club L.P. ("Plaintiff" or "EPC"), the former owner of the Elsmere Park Apartments (the "Apartments") in Elsmere, Delaware, commenced this action against the Town of Elsmere (the "Town"), Ellis Blomquist ("Blomquist"), Eugene Boneker ("Boneker") and John Giles ("Giles) (collectively, the "Defendants") for procedural due process violations under 42 U.S.C. § 1983 by filing the Complaint on October 1, 2004. (D.I. 1)  The lawsuit stems from the Defendants' wrongful condemnation and forced evacuation of the Apartments in October 2002.

Under an amended Scheduling Order (D.I. 12, D.I. 26), Defendants filed their original Motion for Summary Judgment on September 1, 2005. (D.I. 43).  Thereafter, the Court entered an Order (D.I. 91) extending certain expert discovery deadlines, granting leave to serve supplemental reports, denying Defendants' Motion for Summary Judgment without prejudice to renew, vacating the previously scheduled trial date and denying all other motions.  The Court declined to set a new trial date until the resolution of dispositive motions, which it required to be filed on or before March 31, 2006.  Discovery is complete at this time.

Defendants filed a Renewed Motion for Summary Judgment on March 31, 2006. (D.I. 116).  On April 12, the Court approved a stipulation allowing Plaintiff until April 26, 2006 to file a responsive brief. (D.I. 121).  This is Plaintiff's Answering Brief In Opposition to Defendants' Renewed Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

1.      Defendants' motion for summary judgment should be denied because the record establishes that Plaintiff was deprived of a substantial property interest without due process of law.  Between October 4-11, 2002, the Town failed to provide Plaintiff with adequate notice or

an opportunity to be heard before condemning and evacuating the Apartments on account of alleged mold contamination.

2.    Defendants are not entitled to the narrow exception for emergency measures because no legitimate health emergency existed in the Apartments.  Further, Defendants did not themselves believe an emergency existed.

3.    The Defendants failed to provide Plaintiff with a meaningful post-deprivation hearing within a meaningful time period.  Plaintiff availed itself of the "process on the books" only to discover that such process did not exist.

4.    The Individual Defendants' motion for summary judgment should be denied because they are not entitled to qualified immunity.

5.    Defendants' summary judgment motion should be denied because extensive factual and expert issues preclude entry of judgment as a matter of law.

## PLAINTIFF'S STATEMENT OF FACTS[1]

### A.    General Background

Elsmere Park Apartments (the "Apartments")[2] has been home to moderate- and low-income residents of Elsmere, Delaware for decades.  Plaintiff Elsmere Park Club, L.P. ("Plaintiff") purchased the Apartments in March, 1986.  The Apartments were a garden-style apartment complex consisting of 156 residential units in 39 separate buildings, spread out along Maple, Cypress and Sycamore Avenues.

Each of the 39 buildings was three stories tall.  There were two apartment units on each of the top two floors of the building (four residential units per building).  The lowest floor was a

---

[1] The facts are contained in the depositions and affidavits set out in the Appendix filed with this brief and cited as "B-__." The Appendix includes a map of the apartment complex. (B-1).  Citations to the Defendants' Appendix (D.I. 119) that accompanied its Renewed Motion for Summary Judgment are listed as "A-__."
[2] Shortly before the condemnations of the Apartments in October 2002, the name was changed to "Fenwick Park Apartments".

-2-

below-grade "basement" with windows at ground level. One side of the basement of each building provided laundry facilities, utilities and storage space. Before 1989, the other side of the basement was an apartment unit rented to tenants.[3]

In 1989, Hurricane Hugo caused serious flooding in the greater Wilmington area. The Town condemned all of the basement units at the Apartments after a number of them were inundated with water.[4] The Town passed an ordinance barring further residential occupancy of the basement units.[5] After the hurricane subsided, Plaintiff cleaned out the basement units, removed all carpeting down to the concrete slab, removed cabinets and damaged drywall, and extracted the remaining water. Plaintiff then dried the basement units. Aff. of Regina O'Neill at 3 (B-2.)

In 1996, the Town directed Plaintiffs to brick over the windows and install plywood barriers across the entryway to the uninhabited, unused basement apartment in each building. Id. (B-4.) Prior to securing the basement units, Plaintiff retained a specialist contractor to prepare them. The work included applying a preventative mildicide treatment to all of the basement surfaces. See CPR invoice dated April 25, 1996, O'Neill Aff., Exh. B (B-15).

The Town has had rocky relations with Plaintiff since the time it purchased the Apartments. Shortly after Plaintiff purchased the Apartments, it discovered a cross burning on the lawn of the Apartments; many residents of the Apartments were African-American and Mexican. (B-596) At one time, the Town ticketed and towed any car found at the Apartments with out-of-state license plates because it wanted to get rid of Mexican "mushroom pickers," many of whom lived at the Apartments and worked in local farms. (B-596-97) The Town even proposed an ordinance permitting the arrest of anyone suspected of being an illegal alien,

---

[3] The basement unit in one building, 1410 Cypress, has been used for years as the rental office for the Apartments.
[4] See Elsmere Park Club v. Town of Elsmere, 771 F.Supp. 646, 647 (D. Del. 1991).
[5] Id. at 648.

although it was voted down after a public outcry. (B-597). The Town Manager, Defendant John Giles, candidly admitted that he did not want the Apartments' tenants in the Town. (B-678(a)-(b))

**B.    The Absence of Mold at the Apartments Prior to the 2002 Condemnations**

From 1989 to 2002, the Town inspected the Apartments on numerous occasions every year. The Town inspected apartment units whenever they were rented to new tenants. (B-600-06.) If the property was acceptable, the Town allowed the new tenants to move in. (B-600-01.) The Town was supposed to do a general inspection for matters involving safety concerns or code violations. (B-607).

The Town also inspected the Apartments at other times, such as during comprehensive maintenance code investigations. (B-2-8.) The Town was always detailed and vigorous in its inspections. (B-2-8.) The Town never cited the Apartments for mold, and never even noted the presence of mold in its comprehensive inspections. (B-2-8.) Independent third-party professionals, such as those representing the property mortgagee, also inspected the Apartments during this 13-year time period and not one of them identified mold as a problem. (B-371-73.)

Defendants removed the plywood entryway barriers to clean or inspect the basements with some regularity. (B-5; B-569). In May 1997, Plaintiff commissioned a structural inspection of all 39 of the basement units by Klas C. Haglid, P.E. Mr. Haglid noted the presence of water damage, but did not find any mold growth despite specifically looking for it.[7] (B-149)

From October 1998 through March 1999, the Town performed a series of thorough maintenance code inspections during which the Town identified possible code violations in great

---

[7] Contrary to the misrepresentations in the Defendants' Opening Brief ("DOB" at 6) (D.I. 117), there is no evidence that the Plaintiff did not address the concern for water leaks Mr. Haglid expressed. Rather, the Plaintiff addressed all concerns brought to its attention. (B-4-8)

detail. (B-7). The inspections covered all aspects of the Apartments, including the basements of

each building. After defendants addressed the alleged violations, the Town re-inspected the

building in question, sometimes more than once, and at times identified new problems it found.

However, at no time during these multiple inspections did the Town's representatives identify

the presence of mold growth in the basement or other units of any of the buildings. Id.

Following Mr. Haglid's structural inspection of all of the basement units in 1997, and the

Town's own intensive enforcement effort concluding in March 1999, there were several

independent, isolated water events throughout the Apartments. For example, all of the basement

units were inspected in September 1999 after Hurricane Floyd affected the greater Wilmington

area. About 26 basement units and laundry areas suffered from minor flooding or sewer backups

related to the storm. (B-5-6). Accordingly, Plaintiff again retained a professional to drain, dry

and apply mildicide to the surface areas of the basements. Id.

Plaintiff also learned about possible water damage during normal maintenance activities.

When water utility meters indicated a significant increase in water usage at individual buildings,

(B-6), or New Castle County sewer main backups, Plaintiff inspected the basement units and

other apartment areas for leaks or other explanations, fixed the problems in-house or by outside

contractors, and applied preventive mildicide as appropriate. Id.; see, e.g., Roto-Rooter invoice

dated May 4, 2000, attached to O'Neill Aff. as O'Neill Aff., Exh. E (B-24); Fabricare invoice

dated May 8, 2001, attached as O'Neill Aff., Exh. M (B-63).

Other than on a few limited occasions, the numerous, repeated inspections did not reveal

the presence of any mold. (B-67). Plaintiff promptly and fully remediated the few mold

conditions it discovered, typically with qualified professionals. Id.

### C.    The Town's Condemnation of the Apartments

In the beginning of October, 2002, Defendant Ellis Blomquist, the Town's Code
Enforcement Officer, went to the Apartments for a pre-rental inspection of two apartment units.
(B-612(a)-12(b))  Upon entering each of the buildings, Defendant Blomquist detected a strong
musty, sewage-like odor. (B-612(b), B-616-16(a))  Defendant Blomquist did not even inspect the
apartment in the second building. (B-616(a))  Defendant Blomquist told the Plaintiff to find and
fix the problem, and he would then return to inspect the upstairs units. (B-613, B-616(b))

Defendant Blomquist did not investigate the smell himself because he assumed Plaintiff
would properly address the problem, as it had done in similar situations in the past. (B-614-15)
The problem was fixed in an hour or two. (B-585)

Plaintiff called Defendant Blomquist a number of times in the next few days to ask him to
return to inspect the apartments because Plaintiff wanted to be able to rent them as soon as
possible. (B-331-33, 346)  However, Defendant Blomquist did not return phone calls for a few
days, let alone return to the Apartments. Id.  Finally, on Thursday, October 3, 2002, Regina
O'Neill, Plaintiff's regional supervisor, got through to Defendant Blomquist's secretary, who
explained that the Town had determined that there was "deadly mold" at the buildings, and that
the Town was going to do a "sweep" of the Apartments. (B-335)  Defendant Giles wrote in
contemporary notes that the Town expected to begin condemnation proceedings. (A236) (B-
677(a))

The next day, late on Friday afternoon, October 4, 2002, Defendant Blomquist returned
to the Apartments, ostensibly for a re-inspection of the units up for rental.  Defendant Blomquist
brought with him Ken Belmont, from the Delaware Division of Public Health. (B-618.)  Among
other things, Defendant Blomquist asked Mr. Belmont to join him because Mr. Belmont had

-6-

instruments to detect moisture and mustiness. (B-618.) Defendant Blomquist had never brought a State inspector with him before to inspect a building because if the owner fixed a problem, no state inspector was needed. (B-620)

Upon arrival, Defendant Blomquist asked Plaintiff to open the entryway to the uninhabited, unused basement apartment at 1421 Cypress Avenue. Defendant Blomquist and Mr. Belmont also went to 1405 Cypress Avenue even though it was not scheduled for a pre-rental inspection. They found a significant amount of mold in both basements. (A-2)(B-621(b), B-623)    The Town believed, incorrectly, that mold had been present in the buildings since 1989. (A236) Neither Defendant Blomquist nor Mr. Belmont inspected or even entered any of the *residential units* of the two buildings to see if mold was present or to take air samples. (B-665-66).

After inspecting the two units, Mr. Belmont telephoned his superior, Dr. Gerald Llewellyn, who concluded without inspection that the basements presented a serious danger to the inhabitants of the buildings. (B-626-29, 634-35)  Mr. Belmont reported his conversation with Dr. Llewellyn to Defendant Blomquist. (B-627, 634-35)  Defendant Blomquist reported what he had observed and his discussions with Mr. Belmont to Defendants Boneker and Giles, and discussed how to proceed. (B-626-29)

Neither Defendant Blomquist nor Mr. Belmont spoke with any residents to determine if they had experienced any symptoms related to the presence of mold, or asked Plaintiff's employees if any tenants had complained of symptoms related to mold which presumably had been present in the buildings for a very long time. (B-638) Defendant Blomquist did not ask Mr. Belmont if there was anything the Town could do to address the mold conditions short of

evacuating the tenants, (B-703), or if the perceived emergency could be addressed by placing plastic sheeting around the basement units. (B-700-01)

As soon as he finished his consultations with Mr. Belmont and Defendants Giles[12] and Boneker, Defendant Blomquist condemned the buildings at 1405 and 1421 Cypress Avenue. He directed Plaintiff's management to nail shut numerous doors and display large red "CONDEMNED" signs on these two buildings, and he evicted all of the residents of the eight upper level apartments in the two buildings, against their wishes. The remainder of the evening, the evicted tenants scrambled to find alternative housing.

That evening, the Defendants informed Darlene Grocki, Plaintiff's resident manager, that they were going to condemn all the buildings at the complex, one by one. (B-547)

Plaintiff retained its own expert and immediately attempted to assess and remedy the situation. Several times on October 4, 2002 and over the weekend, Plaintiff requested the Town to promptly issue the appropriate licenses and permits to allow Plaintiff's contractors to seal off and abate the basement areas and address the Town's concerns. The Town repeatedly denied Plaintiff's requests. (B-344, 346, 348)

The next day, on Saturday, October 5, 2002, the Town issued a "News Release" to the "News Media" detailing the inspection and subsequent condemnation of 2 apartment buildings owned by Plaintiff. The "News Release" also detailed how seven families were "evacuated" due to a "mold condition . . . that created . . . a substantial risk to the health of the occupants of those buildings." (B-556) This statement, along with the Town's actions, created hysteria amongst all of the Apartments' residents and led them to believe they were in grave danger, when in fact there was absolutely no evidence that they were. (B-762-65)

---

[12] The Town Council had authorized Defendant Giles to oversee Town activities, such as the Town's response to the mold conditions. (B-589)

The Defendants stated that they were concerned that conditions similar to what they observed at 1405 and 1421 Cypress existed at the other buildings in the complex. (B-641) However, the Defendants took no actions whatsoever to investigate additional buildings at the complex over the weekend or until Monday afternoon. (B-644)

Even after the weekend, on Monday, October 7, 2002, Regina O'Neill and a representative from CPR Services (a company that specializes in basement mold remediation) sought on behalf of Plaintiff to obtain a permit from the Town to begin immediate remediation of the two buildings that had been condemned on Friday, October 4, 2002. The Town denied Plaintiff's request. (B-333, 346, 355, 356)

On Monday, October 7, 2002, Defendant Blomquist returned to inspect additional buildings, along with Dr. Llewellyn and Mr. Belmont. They inspected approximately 10 basement units. (B-648) They did not enter or inspect any occupied apartments. (B-665-66) They did not take any air samples. (B-655) At the end of the day they decided to condemn all of the buildings. (B-658-59)

On the evening of October 7, 2002, the Town held an "informational" meeting regarding the condemnation, the eviction of tenants and its ongoing investigation. At the meeting, portions of which were broadcast locally on television that evening and the next morning, officials spoke of the dangers of mold. (B-662) The presentations at the meeting again flamed the fears of the residents concerning a danger that simply did not exist.

From Tuesday, October 8, 2002 through Thursday, October 10, 2002, Defendant Blomquist returned to inspect the remaining buildings, along with Dr. Llewellyn and/or Mr. Belmont. (B-663) Again, they did not go into any occupied apartments to inspect or take air samples. (B-651, B-665-66, B-668-69) By the end of each day, Defendant Blomquist, in

-9-

consultation with Defendants Boneker and Giles, condemned all of the buildings that had been

inspected that day. (B-668-69) By Thursday, October 10, 2002, the Defendants had condemned

all of the buildings and evicted all of the tenants at the Apartments, except for the building at

1410 Cypress Avenue, which housed the rental office.

Defendant Blomquist issued the Notices of Condemnation after the buildings in question

had been posted as condemned and the tenants evicted, thereby depriving Plaintiff of notice of

the Town's actions before Plaintiff's property was confiscated. The Notices identified the NYC

Guidelines as the operative regulatory standard for the Town's actions (A-86.) Defendant

Blomquist agreed at his deposition that the sole basis of the condemnation and eviction was the

mold in the basements, and that neither the conditions in the occupied apartment units (which he

did not visit) nor the other conditions he says he found (e.g., alleged "raw sewage") were the

basis for condemning any of the buildings. (B-607-09) Significantly, the Notices of

Condemnation also acknowledged and detailed several "Corrective Action(s)" that would have

been sufficient to address the Town's concerns – had the tenant evictions not already taken place.

(A-86-87.)

Defendant Blomquist never asked the State, at any point during the condemnations, if

there was anything the Town could do to address the mold conditions short of evacuating the

tenants. (B-703) Dr. Llewellyn later acknowledged that the perceived emergency could have

been addressed by placing plastic sheeting around the basement units and removing any mold

from the rest of the buildings. (B-700-01) While Dr. Llewellyn believed that temporary removal

of occupants would have been required to clean the non-basement areas (B-701), Mr. Larry

Johnson, Plaintiff's expert certified industrial hygienist and a principal of Sovereign

Environmental Group, Inc. ("Sovereign"), notes that removal of the tenants would not have been

necessary in most cases because mold either had not reached those area or did not present a threat, and that, at most, an overnight stay off-site would have allowed sufficient time for the sheeting to be put in place and to clean the apartments in the manner suggested by Dr. Llewellyn, if that approach was required. (B-65-67)

After it issued the Notices of Condemnation, the Defendant Town continued to require Plaintiffs to remediate the condemned Apartments before they could be reinhabited, but the Town did not permit Plaintiff or its contractors access to the Apartments to do so. (B-333, 346, 355-56). In fact, Plaintiff and its contractors tried on multiple occasions to get access to the Apartments to assess and remediate the conditions. Defendants said that Plaintiff could not have access until the Town had inspected all of the Apartments, and that remediation could not occur until the Town issued a permit for the work and Plaintiff had developed a remediation plan approved by the State.[13] This requirement resulted in multiple submissions which the State and Town eventually approved in February, 2003.[14] As a result of the Defendants' actions, residents were prevented from living in the Apartments and were forced to find housing elsewhere. The Defendant Town helped the tenants find alternate housing, and everyone found a new home by October 14, 2002. (B-766-67)

Plaintiff knew that once the tenants were evicted and left they would not return. After the condemnation process had started, Plaintiff filed a motion for a temporary restraining order to stop the condemnations and to overturn the orders that had been issued to that point. In the hearing on October 10, 2002 (the "TRO Hearing"), the Court of Chancery ruled – on the limited record before it – that the Court could not engage in prior restraint and stop the Town from inspecting properties and taking such action as it thought appropriate. In addition, the Court

---

[13] See Notices of Condemnation (A-87); Town's Answer to Chancery Civil Action No. 19970-NC (B-559).
[14] See Exhibits 9-16 to the Deposition of John Giles (B-741-55).

provisionally ruled that, with no evidence of the condition of the Apartments from Plaintiff (who had been denied access to the buildings), it could not determine that Plaintiff had carried its burden on the limited claims at issue in that hearing that the Town had taken Plaintiff's property without just compensation, or interfered with its contract rights, by virtue of the Town's initial failure to issue written notices of condemnation, leaving those merits issues for another day. See Tr. of TRO Hrg. (A-137-202)

Plaintiff later sought to file an administrative appeal of the condemnation notices to preserve its rights, despite the fact that such an appeal would be ineffective in returning its tenants. (B-419)  After filing the appeal with the Board of Building Appeals, Plaintiff learned that this body, required by ordinance to hear such an appeal, did not exist, and that there were no rules for any such appeal. (B-419-30)  Indeed, the Town specifically changed the jurisdictional ordinance after 2002 to provide for an existing body, the Board of Adjustments, to hear such appeals in the future. See Town Ordinance 420 (B-679, 689).  As a result of this futility, Plaintiff abandoned its administrative filing. (B-433)

Without tenants, the value of the Apartments was greatly reduced.  Plaintiff sold the Apartments in April, 2003 for an amount substantially less than the value it should have retained if the Defendants had not violated Plaintiff's rights.

### D.    Plaintiff's Inspection of the Apartments at the Time of the 2002 Condemnations

In October 2002, shortly after the apartments were condemned and vacated, Plaintiff retained Mr. Johnson, the certified industrial hygienist, to conduct a comprehensive, thorough investigation of the Apartments. (B-3)  Mr. Johnson inspected every unit of every apartment building, including the basements and common areas, and took air samples at each unit of each

-12-

building. (B-143-48)  This was the only contemporaneous and complete inspection of the

Apartments performed by anyone.

Mr. Johnson reached the following conclusions: (1) most apartment units in which

residents lived had no mold growth and no mold in the air whatsoever (B-145-48); mold in the

few inhabited units in which it was present was due to localized occurrences (B-65-67); and it

should be easy to clean mold from these units. (B-65-67)

A number of the former basement apartments had no mold growth whatsoever (sample

pictures are in the Plaintiff's Appendix). (B-442-534)  Mold was found in widely varying

degrees in the other basement units. (B-165-68.)  Twenty one (over 55%) of the basements were

estimated to have 10% or less of the total surface area with visible mold, with five estimated to

have 5% of surface impact, four with 1% and six having no visible mold growth.  Air testing

showed that most building basement units did not have elevated levels of mold in the air. (B-65)

To the extent mold was present in the closed-off basement units at the Apartments, it

resulted from a number of separate, isolated water damage events, such as leakage from a

corroded iron sewer drain line into 1407 Maple Avenue, and a hot water pipe leak in 1405

Cypress Avenue in 2002.  Sovereign Report at 2, 7-8. (B-141, B-146-47, B-7, B-51-57)  Mr.

Johnson concludes that these events since the Fall of 1999 account for most, if not all, of the

mold found in the closed-off basements.  (Mr. Johnson notes that Plaintiff addressed flooding

from Hurricane Floyd in 1999 by hiring a remediation contractor, see Sovereign Report (B-141-

42).)

E.    **Health Concerns Presented by Mold**

Molds are spores which are present everywhere around us—indoors and in the outside

air.  Many of us have lived for years in houses with mold in the basements, which we may or

-13-

may not try to clean, depending on how much it bothers us and how often we use the basements. Molds can enter buildings through windows and doors, heating or cooling systems or by attaching themselves to virtually anything, such as people, pets and clothing. "Questions and Answers on *Stachybotrys chartarum* and Other Molds" (hereinafter, "CDC Q&A"), answer to question 3, at http://www.cdc.gov/mold/stachy.htm, website of the Centers for Disease Control and Prevention ("CDC") (B-317).

Molds grow when there is excessive moisture and nutrients. Moisture can come from flooding, roof leaks, burst pipes, or air conditioner leaks. Nutrients include ceiling tiles, drywall, carpet and other building materials. See id., answers to questions 2 and 3.

While there are thousands of different species, molds generally are perceived as not being toxic to normal, healthy individuals. See "Adverse Human Health Effects Associated with Molds in the Indoor Environment," American College of Occupation and Environmental Medicine, October 27, 2002 ("ACOEM Statement"), (B-573, 578-79); (B-142-43); see also CDC Q&A, (B-318-19), answer to questions 1 and 10. Mold has not been shown to affect individuals who are not sensitive. Id. It is estimated that only 5% of the population would show allergic symptoms as a result of inhaling airborne mold. ACOEM Statement at 2. Individuals with special sensitivities who are exposed to mold may experience short-term reactions, such as nasal stuffiness, eye irritation or wheezing. (B-142-43, B-317, B-321, B-573, 578-79). The CDC reports that people at higher risk for these or more severe reactions, such as shortness of breath and possible fever, include infants and the elderly, those with immune suppression, chronic illness or underlying lung disease, pregnant women and workers exposed to large amounts of molds in occupational settings, such as farmers working around moldy hay. Id. (B-317-21)

While there have been claims that certain molds contain toxins and can cause unique or rare conditions such as pulmonary hemorrhage or memory loss, the CDC has found no causal link between the presence of mold in the indoor air and these conditions. (B-142); see also CDC Q&A, (B-317) answer to question 1; see also (B-573, 578). Indeed, a recent CDC investigation found that a possible association between acute idiopathic pulmonary hemorrhage (found in ten infants in Cleveland, Ohio) and a mold known as *stachybotrys chartarum*, which generated much of the public concern about mold, had no basis. Id. at 3, answer to question 8.

There are no governmental regulatory standards defining what constitutes safe amounts of mold. CDC Q&A at 5 (B-317), answer to question 15. The "susceptibility of individuals can vary greatly either because of the amount or type of mold." CDC Q&A at 4-5 (B-317), answer to question 14. Since individual responses vary, if mold growth is visible, the CDC recommends removing or remediating the mold as a precaution, in addition to removing the water source. CDC Q&A, (B-317), answer to questions 13-14.

Removal of mold, however, is different from removal of people from buildings they live or work in. The Guidelines on Assessment and Remediation of Fungi in Indoor Environments, issued by the New York City Department of Health & Mental Hygiene (the "NYC Guidelines") (B-209-25), which is one of the few accepted standards in the industry, see, Sovereign Report (B-143), discusses precautions to be taken during remediation, which is when mold spores are of greatest concern because they are most likely to be shaken up and released to the air. (B-216-17) The NYC Guidelines states that evacuation is not called for during mold remediation except in very special circumstances:

> Except in cases of widespread fungal contamination that are linked
> to illnesses throughout a building, a building-wide evacuation is
> not indicated.

NYC Guidelines, (B-215) Section 1.3, paragraph 2. In addition, the NYC Guidelines state that "A trained occupational/environmental health practitioner should base decisions about medical removals ... on the results of a clinical assessment." Id. Therefore, a decision to vacate a residence due to the presence of mold can be made only after consultation with a professional, such as a physician, and must be made on an individual, case-by-case basis. CDC Q&A, (B-317), answer to question 5; see also, Sovereign Report (B-145).

### F.    **Expert Conclusions Concerning Mold at the Apartments**

Plaintiff's expert Mr. Johnson determined that the evacuations ordered by the Town in October, 2002 were unnecessary and unjustified. Sovereign Report (B-141-43, B-215). There was no imminent hazard to the residents of the Apartments and, even with the presence of visible mold growth and other conditions in certain basement apartments, there was no danger to the residents that constituted an emergency. (B-65-66)

First, there was minimal mold in the apartment units where people lived. Sovereign Report (B-141, 146). Second, (1) there was no or minimal mold growth in many basement units; (2) testing showed that there were no airborne mold spores above background levels in the vast majority of the (unused and isolated) basement units; (3) there was no force, such as forced air heating, to move airborne mold spores from any basement unit to residential areas within the Apartments; (4) testing showed that mold spores did not exceed background levels in the air of the used and inhabited areas of the Apartments except for in a few units, where it was attributable to easily remedied residential activities in those units, not to the basements, and it presented only a minor concern; and (5) there was no evidence that residents in the Apartments were susceptible to the mold. (B-65-67; B-145-48) In fact, many residents had lived at the Apartments for a number of years, but prior to the time of the condemnation and eviction, there

were only one or two isolated complaints by residents relating to the presence of mold in the Apartments or mold-related symptoms.

Without regard to the source of mold in the residential units, Mr. Johnson found that the residents in the vast majority of the units (over 70%) had minimal potential for exposure to mold, because they lived in units with no visible mold growth or with mold concentrations comparable to that found in the ambient air (at "background" levels). Sovereign Report (B-141, 145-46). Mr. Johnson found that fewer than ten percent (10%) of the units should be temporarily vacated, only during remediation, solely due to logistical reasons, not health reasons, since access to important parts of the unit (such as the bathroom or kitchen) would be blocked for more than one day due to remedial work. Id. The residents of the remainder of the apartments, constituting fewer than twenty percent (20%) of the total, required evaluation on an individual-by-individual basis with a physician for possible vacation--during remediation only--of those susceptible to molds. Id. Mr. Johnson did not find that anyone needed to be vacated from these apartments for health reasons at any time other than during remediation, when the cleaning activities would be most likely to cause mold spores to become airborne. Id. (B-65-67)

In addition, even if the basement conditions presented real cause for concern, these conditions could have been contained and the Town's concerns addressed without evacuating residents and condemning the Apartments. (B-65-68.) A standard method of protection used during asbestos and mold remediation projects uses a negative pressure enclosure, which prevents mold from one area (here, the basements) from traveling to another area (such as the residential areas). Id. The enclosure prevents any mold from escaping to an occupied area, prevents any potential exposure of residents and precludes any need for evacuation. Id. The enclosures can be (and regularly are) assembled in a few hours and operated for months. Id.

-17-

Once contained, the basements could be properly assessed to determine the appropriate methods

for abatement to remove mold, asbestos and other hazardous materials and to clean the

basements. Id. Further, to the extent any upper level apartments needed minor remediation

and/or cleaning, this could have been done in one or two days. Id. Temporary relocation of

residents might have been necessary for logistical reasons (e.g., taking the only bathroom out of

service for a day) for some or all of fourteen apartments units. Id.    Thus, all that was required

was (at most) an overnight stay in a hotel. Id.

## LEGAL ARGUMENT

### A.    Standard of Review for Motion for Summary Judgment

A court shall grant summary judgment only if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no

genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are

'genuine' if evidence exists from which a rational person could conclude that the position of the

person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life

Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving

party has demonstrated an absence of material fact, the nonmoving party then "must come

forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S.

at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all

reasonable inferences therefrom in the light most favorable to the party opposing the motion."

Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

**B.     Defendant Town's Motion for Summary Judgment Should be Denied Because Plaintiff Was Deprived of Property Without Procedural Due Process, and There are Genuine Issues of Material Fact Which Preclude Entry of Such Judgment in Its Favor**[15]

### 1.     Elements of a Claim Under 42 U.S.C. § 1983

Plaintiff's claim arises under 42 U.S.C. § 1983, which provides:

> Any person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.  The two elements of a prima facie case brought pursuant to Section 1983 require that (1) there must be conduct by a person acting under color of state law and (2) this conduct must deprive Plaintiff of rights secured by the Constitution or laws of the United States. Groman v. Township of Manalpan, 47 F.3d 628, 633 (3d Cir. 1995); Price v. Delaware Dept. of Correction, 40 F.Supp.2d 544, 556 (D. Del. 1999).

A municipality is subject to liability under 42 U.S.C. § 1983 for violations of law which constitute its official policy or custom. Monell v. Department of Social Services, 436 U.S. 658, 694 (1978).  Local governmental officials also are "persons" under this statute. Id. Municipal liability may arise for individual decisions if the decisionmaker has final authority to establish municipal policy with respect to the action ordered. Pembaur v. City of Cincinatti, 475 U.S. 469, 481 (1986).  A municipal violation of the Constitution's procedural due process requirements states a claim under Section 1983. See, e.g., Larkin v. Savage, 318 F.3d 138 (2nd Cir. 2003);

---

[15] Plaintiff does not assert in this case a claim for deprivation of substantive due process rights. In their opening brief, Defendants attempt to foist this argument on EPC and then attack it based upon what Defendants perceive to be a more stringent standard. (DOB at 26-33.)  EPC alleges that Defendants violated its procedural due process rights in multiple respects, such as by denying EPC the right to be heard on the issue of remediation prior to condemnation.  EPC does not allege a violation of separate substantive rights as the Town attempts to argue.

Keim v. County of Bucks, 275 F. Supp.2d 628, 633 (E.D. Pa. 2003). Further, "…municipalities do not enjoy immunity from suit – either absolute or qualified under § 1983." Leatherman v. Tarrant County, 507 U.S. 163, 166 (1993).

Here, the Defendant Town was acting pursuant to the decision of Defendant Blomquist, the Town Code Enforcement Officer who was in charge of Town policy concerning code enforcement, including condemnation actions, with the concurrence of his supervisor, Defendant Boneker, the manager of the Defendant Town, who retained responsibility for the actions of Mr. Blomquist, his subordinate, and of Defendant Giles, who had been authorized by the Town officials to supervise and oversee the actions of Defendants Blomquist and Boneker. (B-587(b), B-589, B-758-61)

There is no question here that the Defendant Town and the individual defendants acted under color of state law, as they acknowledge that they acted under the authority of the Town Code to enforce health regulations. Further, there is no question that Plaintiff is a covered entity with a property right which is protected under the Due Process Clause of the Constitution to have tenants inhabit and pay rent for the property Plaintiff leased to them, Smith v. Village of Maywood, 699 F. Supp. 157, 160 (N.D. Ill. 1988), or that Plaintiff was injured by Defendants' actions.

The central issue in this case is whether or not the Defendants violated Plaintiff's Procedural Due Process rights under the United States Constitution. The Defendants have failed to show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Rather, the Defendants clearly violated Plaintiff's constitutionally protected rights.

## 2.    Requirements of the Due Process Clause

The Supreme Court has directed that in determining what process is due in a particular

case, a court must weigh several matters:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest
> through the procedures used, and the probable value, if any, of
> additional or substitute procedural safeguards; and finally, the
> Government's interest, including the function involved and the
> fiscal and administrative burdens that the additional or substitute
> procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

At a minimum, due process requires notice and an opportunity to be heard when a party

is deprived of a protected property interest. Mullane v. Central Hanover Bank & Trust Co., 339

U.S. 306, 313 (1950).  The notice and hearing must be provided at a meaningful time and in a

meaningful manner to satisfy the purpose of the requirement. Parrat v. Taylor, 451 U.S. 527, 540

(1981).  Other than in extraordinary situations, the notice and opportunity for a hearing must

occur prior to a deprivation of liberty or property. Memphis Light, Gas and Water Div. v. Craft,

436 U.S. 1, 19 (1978); Parrat, supra, 451 U.S. at 540; see also Gentry v. Lee's Summit, Missouri,

City of, 10 F.3d 1340, 1344 (8th Cir. 1993) (citing Cleveland Board of Education v. Loudermill,

470 U.S. 532, 542 (1985)).

In this case, Plaintiff's property interests as landlord and the interests of over five

hundred residents in the uninterrupted use of their homes are each substantial interests entitled to

great protection that were affected by the Defendants' actions.  The right to protect one's home is

a private interest of great magnitude, both historically and at present. See United States v. James

Daniel Good Real Prop., 510 U.S. 43, 53-54 (1993); United States v. All Assets of Statewide

Auto Parts, Inc., 971 F.2d 896, 902 (2d Cir. 1992) (interest in one's home entitled to special

regard under constitution); United States v. 141st Street Corp. by Hersh, 911 F.2d 870, 875 (2d

Cir. 1990) (home given special protection under the law). Defendants do not dispute the proposition that EPC had a constitutionally protected interest in the Apartments' diminished value as a result of the condemnation. See Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1046-47 (5th Cir. 1998) (owner of apartment complex had property interest in lost rent). Moreover, the damage to Plaintiff's property interest was exacerbated because once the tenants were forcefully removed the Plaintiff could not easily get them to return.

Under the second Mathews factor, the risk of an erroneous deprivation of the protected interest was substantial given the procedures the Defendants used. It is clear that Defendants wrongly condemned and evacuated the apartments because of the improper procedures they used. The NYC Guidelines, which the Defendant Town adopted and incorporated into the condemnation notices (A-86),[16] establishes that a building-wide evacuation is not indicated "[e]xcept in cases of widespread fungal contamination that are linked to illnesses throughout a building. Decisions about removing individuals from an affected area must be based on the results of [a] medical evaluation, and be made on a case-by-case basis." NYC Guidelines, p.2 (B-209). There was no material contamination in the vast majority of the inhabited apartments, only in some of the basements, there were no known illnesses at all in the entire complex and the Defendants did not obtain medical evaluations or make individual decisions on a case-by-case basis.[17] (B-65-67, B-145-46, B-638)

---

[16] Dr. Llewellyn also refers to the NYC Guidelines as providing the "industry standards." (B-753)

[17] Instead, the Defendants condemned all of the Apartments on a wholesale basis, without inspecting even one inhabited unit, based solely on inspections of uninhabited, unused basement units that would not generate mold spores into the air absent an event that would cause them to do so. Further, there was no evidence that, or investigation whatsoever by the Defendants into whether or not, even one resident of the Apartments had suffered any impact from the mold which theoretically had been present for years. Had the mold been present as long as suspected by the Defendants and of such significant health concern, then it is without question that scores of tenants would have suffered and complained for a long time about smells, runny noses, watery eyes and more significant maladies.

The Defendants' expert, Dr. Dulaney, concedes that there was not a strong scientific basis supporting the Defendants' actions.  At his strongest, he says that the condemnation *may* be justified as an overprotective measure just in case a risk was present. (Dulaney Depo. Tr. at pp. 41-42, 66-67, 71-72) ( B-770-71, B-772, B-773)  This is akin to justifying the revocation of a good driver's license on the basis that she might hit someone the next time out because everyone is bound to have an accident eventually.  Plaintiff's expert Mr. Johnson concludes that the Town's wholesale evacuation was contrary to the NYC Guidelines and was inappropriate as a health protection measure.

The second prong of the Mathews test also asks whether alternative procedures could have been used to avoid an erroneous deprivation.  The unequivocal answer is yes.  The Defendants could have taken a number of different actions.  According to the NYC Guidelines and Mr. Johnson, as noted above, there was no need for any temporary removal until so indicated by a medical examination.  A hearing could have been held in the interim.  Alternatively, the Defendants could have removed the residents from the Apartments temporarily pending a health examination and an individualized determination of whether more long-term removal from the Apartments was required.  This procedure would have realized all of the Defendants' goals of being overprotective of the residents without causing permanent tenant dislocation.

Had Plaintiff been given the opportunity at a hearing, it would have identified to the Defendants the requirements of the NYC Guidelines.  Dr. Llewellyn would have conceded at a hearing, as he did at his deposition, that the basements could have been encapsulated and remediated while residents lived in their units.  Plaintiff would have been able to establish that the air quality in the apartments was acceptable and that they did not need to be evacuated. However, without having access to its own property and the ability to gather evidence, even on

-23-

an expedited basis, EPC could not possible have had the opportunity for a meaningful pre-deprivation hearing as defendants argue.

Under the third prong of <u>Mathews</u>, the Town's interest in the health and welfare of its citizens is substantial, but the condemnations and evacuations were not in furtherance of that interest. Rather, no emergency existed and there was no need to condemn the Apartments or to evacuate the residents. There was a need to remove the mold from the basements of the Apartments, but no further action was called for.

First, there was no material mold in the inhabited apartments. The mold of concern to the Town was in unused basement apartments. The residents were isolated from the basements, which had plywood barriers preventing entry. Nothing would cause mold on the basement walls to fly off the walls and into the inhabited apartments. Further, as noted above, under the NYC Guidelines, a building-wide evacuation is not indicated "[e]xcept in cases of widespread fungal contamination that are *linked to illnesses throughout a building*...". Guidelines, p.2 (italics added) (B-209). There was not widespread fungal contamination at the Apartments. (B-143) There was no mold at all in most of the inhabited apartment units. Even many of the uninhabited, unused basement apartments had no or very little mold. Twenty-one (over 55%) of the basements were estimated to have 10% or less of the total surface area with visible mold in October 2002, with five units estimated to have 5%, four with 1% and six with no visible mold growth. (B-139)

In addition, there is no evidence whatsoever of any illnesses in any buildings. In October, 2002, a purported class action was brought in the Superior Court of Delaware by certain former tenants of the Apartments. <u>Manuel v. Elsmere Park Club, L.P.</u>, C.A. No. 02C-10-212 (JRJ). Tellingly, there were no personal injury claims asserted on behalf of the class. In denying

plaintiffs' motion for class certification, the Superior Court ruled that the various inspections of the Apartments conducted by third-parties over the years (including those primarily conducted by the Town), "basically gave [EPC] a clean bill of health with respect to some units and detected no presence of mold, or at least a presence that would rise to a level of concern." (Tr. of Judge Jurden's bench ruling at 5) (B-738)[18]

The Defendants did not undertake a single medical evaluation of the residents to make any individualized removal determinations. Defendants did not even speak with any residents to determine if they had any symptoms which may arise from exposure to mold. Accordingly, evacuation of the residents clearly was not required and no emergency existed. Defendants have not rebutted and cannot rebut this evidence, notwithstanding their broad, conclusory statements about mold growth in the basements. Indeed, Defendants have made no claims concerning mold growth in the inhabited apartment units, primarily because they did not inspect these units.

Further, airborne mold was consistent with "background" concentrations in most units. Sovereign Report (B-145-146). Defendants did not take any tests and have no other evidence to rebut Plaintiff's showing that there was no mold above background concentrations in the air of most of the basement apartments and in most of the residential areas. Defendants have not explained, in response to Mr. Johnson's expert opinion, how air from the basements—even if it had mold, which it did not--would have been forced into the inhabited areas of the buildings.

Grayden v. Rhodes, 345 F.3d 1225 (11th Cir. 2003), cited by Defendants for the proposition that the presence of mold in the building can constitute an emergency justifying condemnation before a hearing, supports Plaintiff's position, not that of the Defendants'. In

---

[18] In October 2004, certain former tenants filed an individual action against EPC and LCL in Delaware Superior Court that included claims for personal injury. Moody v. Elsmere Park Club, L.P., et al., C.A. No. 04C-10-012(JRJ). After the plaintiffs submitted no expert testimony or other evidence linking their alleged illnesses to any conditions at the Apartments, the case settled for a nominal amount.

Grayden, the apartments were plagued by "constant" mold and mildew, 345 F.3d at 1228, n.2,

evidencing multiple inspections at various times.  The landlord was then given notice of the mold

condition and over three months after the last inspection to remediate it before the municipality

condemned the property.  The opportunity to remediate is exactly the relief Plaintiff sought in

this case.  Had Plaintiff been given such notice and opportunity to remediate, it would not have

needed to file this lawsuit.  In addition, in Grayden it appears that the mold conditions of concern

were present in the inhabited living areas where they could present a risk to tenants, not in

uninhabited, unused building areas as in this case.[19]

Moreover, the Defendants did not in fact believe an emergency existed.  In the words of

Defendant Blomquist's secretary, the Defendants believed before October 4, 2002 that "deadly

mold" was at the complex, presumably as a result of his inspection on October 1, 2002. (B-335)

Despite a number of calls from Plaintiff asking that he come back to the complex to re-inspect,

Defendant Blomquist waited a few days to return with Mr. Belmont, from the State, believing

that no emergency existed.  Clearly, if he believed there was an emergency, he would have

advised Plaintiff of his views and taken action sooner.

The Defendants announced to Ms. Grocki on October 4, after they had inspected only

two buildings, that they were going to condemn the buildings, one by one. (B-546-47)  If there

was a need to condemn the buildings without a hearing due to an emergency, then presumably

the Defendants would have condemned the buildings immediately for the welfare of the

residents.  Instead, the Defendants took seven painstaking days—from October 4 to 10—to

perform their inspections and condemn all of the Apartments, a course of action completely

---

[19] The condemnation order in Grayden was based on inspections of the units and "constant" mold and mildew being found in the apartments.  345 F.3d at 1228, n.2.

inconsistent with the existence of an emergency.[20]  If immediate evacuation was required,

Defendants would not have left residents in their buildings up to an extra six days before

protecting their health.  The slow pace and deliberate nature of the inspections shows that the

Defendants were more concerned with making a record that they hoped would stand up in court

than with an actual emergency that threatened the lives of the residents.

It is not sufficient simply to defer to the views of State officials when common sense and

the NYC Guidelines adopted by the Town obligated the Defendants to obtain additional

information to enable them to make proper, reasonable decisions concerning whether or not to

condemn.  Common sense and the NYC Guidelines dictate that the Defendants should have

investigated whether any tenants had suffered mold-related symptoms when presumably they

had been exposed to mold conditions for years before declaring the existence of an emergency.

See Gots Aff. at ¶ 11(c)(v) (B-710).  Common sense dictates, as Defendant Giles agreed, that the

inhabited apartment units should have been inspected to determine if an emergency existed that

required evacuation of the buildings (B-678); the Defendants did not inspect these units.

Common sense also dictates that the Defendants should have performed air testing to determine

if in fact mold from the basements had migrated to the area of real concern, the inhabited

apartment units; yet the Defendants did not take any air tests.  Common sense, in addition to

statutory requirement, dictate that Defendant Blomquist should have asked Dr. Llewellyn if there

was any way short of evacuation to protect the residents from the asserted mold dangers;

unfortunately, Defendant Blomquist did not ask this question.  See 31 Del. C. § 4104 (Delaware

---

[20] After condemning two of the buildings on Friday, October 4, 2002, Defendants stated they were concerned that the remaining buildings might have similar conditions. (B-641)  Notwithstanding their stated belief that immediate action was needed to condemn 1405 and 1421 Cypress, Defendants took no action whatsoever to inspect any of the other 37 buildings over the weekend. (B-644)  Inspections did not re-start until Monday afternoon, October 7, but even then, Defendants did not use all of the personnel available to them to inspect what they stated were emergency conditions requiring immediate action. (B-673-75)

-27-

State Housing Code shall be liberally interpreted to minimize displacement of persons whose dwelling units may deviate from this chapter's specifications but do not pose an imminent threat to the health, safety and general welfare of the occupants and other persons).

As an absolute last resort, Defendants should have temporarily removed residents from the buildings while the Defendants investigated these basic, common sense questions, rather than requiring a permanent, full-scale evacuation of the Apartments without this information.

Defendants' true intent was to shut down the complex. As Defendant Giles candidly confided to Mr. Ruhl in discussing mold found in a number of the basements, "I got them now". (B-697) The actions and statements of the Defendants clearly establishes that they did not believe an emergency existed. Rather, they opportunistically used the presence of mold and overzealous state health personnel to shut down a complex they had long wanted out of Elsmere.

Finally, under the third prong of the Mathews test, there would be no additional cost to holding a hearing prior to any condemnation decision because such costs would have to be incurred at some time consistent with due process requirements. While there is additional cost associated with individual medical determinations, such evaluations are necessary in order to determine if the Defendants had any basis to condemn and evacuate. Without such evaluations, there was no basis supporting the Defendant's actions. Therefore, this is a necessary cost of governing unrelated to alternative procedures.

Balancing all of the Mathews factors, a post-deprivation hearing does not pass constitutional muster in the absence of an emergency. See Gentry v. Lee's Summit, supra, 10 F.3d at 1345 (procedural due process violated where city could not identify exigency requiring seizure of property before notice and hearing); Smith v. Village of Maywood, supra, 699 F. Supp. at 159 (municipality denied apartment owner procedural due process where evidence did

not show existence of emergency to justify boarding up rental units without notice and opportunity to be heard).

In limited, special situations, a post-deprivation hearing will suffice if:

> ...the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process...[is] coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking....

Parratt v. Taylor, supra, at 539. However, (1) the emergency action must be directly necessary to secure an important governmental or general public interest; (2) there must be a special need for the very prompt action; and (3) the State actor must be a governmental official responsible for determining, under the standards of a narrowly drawn statute, that the deprivation was necessary and justified in the particular instance. Fuentes v. Shevin, 407 U.S. 67, 91 (1972). In addition, the municipality must establish the existence of an emergency to justify the deprivation of a protected right before a hearing is offered. See Gentry v. Lee's Summit, supra, 10 F.3d at 1345; Smith v. Village of Maywood, supra, 699 F. Supp. at 159.

First, as discussed in detail above, there was no emergency requiring quick action by the Defendants. Similarly, there was no special need for the very prompt action. There is no evidence that the residents were in imminent danger of any health risk from mold in the uninhabited, unused basement apartments, and the basements could have been encapsulated to prevent any future exposure to the mold until its removal.

Next, the Defendants' "emergency" action was not directly necessary to secure an important governmental or public interest. To establish that an action is directly necessary to address exigent circumstances, the government must show that less restrictive measures would not have sufficed to protect the its interests. See United States v. James Daniel Good Real Property, 510 U.S. 43, 62 (1993); Richmond v. Kemp, 956 F.2d 1300, 1308 (4th Cir. 1992).

-29-

In this case, the concerns expressed by the Defendants could have been fully addressed

by a number of less restrictive means. As Dr. Llewellyn conceded, plastic sheeting could have

been used to encapsulate the basements and prevent the residents from any mold exposure. (B-

700-01) This type of encapsulation is commonplace in asbestos and other similar remedial

projects, is easy and quick to install and can be operated for long periods of time in an

economical way. (B-65-68) Alternatively, the Defendants could have removed the residents

temporarily to allow for testing and medical assessments to determine if their concerns were

legitimate, rather than ordering a full-scale permanent evacuation. See Grayden, supra, 345 F.3d

at 1237-38 (failure to provide pre-deprivation notice which enhanced likelihood that residents

would secure alternate long-term housing rather than remain temporarily in housing limbo and

secure short-term housing violated requirements of procedural due process).

The Defendants did not act pursuant to the standards of a narrowly drawn statute.

Fuentes v. Shevin, supra, 407 U.S. at 91. The Delaware State Housing Code (the "Housing

Code")[21] provides for condemnation when a structure is found by the code official to be unsafe

or unsanitary, 31 Del. C. § 4127, but does not discuss at all the conditions relating to mold that

are unsafe or unsanitary sufficient to justify condemnation. While the Defendants' expert Dr.

Dulaney agrees that there is little in the way of standards concerning safe levels of mold, the

NYC Guidelines set widely-followed practices relating to mold. Unfortunately, the Defendants

failed to follow the dictates of these Guidelines. Following these Guidelines is especially

important because there are no other accepted standards delimiting what is safe or "sanitary",

---

[21] The Delaware State Housing Code, 31 Del. C. §§ 4101 et seq. (the "Housing Code"), applies to all municipalities and counties within the State except those which have enacted a code containing minimum standards that are "equal to or exceed" the standards of the Housing Code, "as determined by the Housing Director." See 31 Del. C. § 4105(e). Plaintiff is aware of no such determination with respect to the Town of Elsmere, and the Town itself cites to the Housing Code as the applicable standard in its brief in support of its motion for summary judgment. Therefore, the Housing Code applies with full force in conjunction with the Town Code of Elsmere.

and therefore there is no other way to reign in the potential for arbitrary actions and abuse, such as that which occurred in this case. <u>Fuentes v. Shevin</u>, <u>supra</u>, 407 U.S. at 91; <u>Flatford v. City of Monroe</u>, <u>supra</u>, 17 F.3d at 169.

Further, the Defendants did absolutely nothing whatsoever to minimize the displacement of or hardship to the residents of the Apartments, as required by the Housing Code, again failing to follow the dictates of applicable statutes. 31 <u>Del. C.</u> § 4104.[22]

Finally, in this case there was no opportunity for a meaningful post-deprivation hearing "granted at a meaningful time and in a meaningful manner." <u>Parrat</u>, <u>supra</u> at 540, quoting <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965).[23] Even in emergency situations due process requires an adequate post-deprivation hearing,[24] especially in view of the license which qualified immunity affords public officials. <u>Flatford v. City of Monroe</u>, 17 F.3d 162, 169 (6th Cir. 1994) (immediate, meaningful post-deprivation process even more important in emergency so that qualified immunity not wrongly perceived as open invitation to ignore fundamental rights without fear of censure).

### i.    The Town's Property Maintenance Code Expressly Created a "Board of Building Appeals"

The administrative body that was expressly authorized by the Town Code to hear condemnation issues did not even exist in October 2002. The Town Code in effect at the time

---

[22] Section 4104 of the Housing Code provides:

> The entire chapter shall be liberally interpreted so as to minimize displacement of persons whose dwelling units may deviate from this chapter's specifications but do not pose an imminent threat to the health, safety and general welfare of the occupants and other persons. Additionally, this chapter is to be liberally interpreted so as to minimize hardships to persons that inhabit or own dwelling units which deviate from this chapter's specifications but do not pose an imminent threat to the health, safety and general welfare of the occupants and other persons.

[23] <u>See</u> <u>also</u> <u>Fuentes</u>, 407 U.S. at 90-91; <u>Boddie v. Connecticut</u>, 401 U.S. 371, 378-79 (1971).
[24] <u>See</u> <u>id.</u>

clearly provided that appeals concerning property maintenance code violations were required to be heard by the "Board of Building Appeals." The Town did not have a Board of Building Appeals in October 2002. Consequently, the Plaintiff was not presented with a meaningful opportunity to be heard.

Pursuant to Town Ordinance 329 and 330, the 1996 versions of the BOCA National Property Maintenance Code ("BNPMC") and the BOCA National Building Code ("BNBC")[25] were adopted into the Elsmere Town Code and were in effect during the relevant period in October 2002.[26] Town Ordinance 330 specifically amended section PM-111.0 ("Means of Appeal")[27] of the BNPMC to include the following:

> PM-111.1  Any person affected by any notice which has been issued pursuant to this Ordinance may appeal the decision of the Code Official to [the] **Board of Building Appeals**, pursuant to Section 121.0 of the BOCA National Building Code in effect, as amended.[28]

Defendants issued the belated Notices of Condemnation in this case pursuant to the Property Maintenance Code, and therefore triggered this Section. (A-86-87)

### ii.    Plaintiff Properly Filed an Appeal to the Board of Building Appeals in Accordance with the Town Code

Upon receipt of the condemnation orders, Plaintiff appealed the orders to the Town's Board of Building Appeals in accordance with § PM-111.1 of the Town's Property Maintenance

---

[25] These model codes were published by Building Officials & Code Administrators International, Inc..

[26] See Town Ordinance 329 (B-389-93), effective Oct. 10, 1996, amending Chapter 76 of the Town Code (B-412) and adopting the 1996 BOCA National Building Code ("BNBC") (B-401-408) as amended; Town Ordinance 330 (B-384-88), effective Oct. 10, 1996, amending Chapter 171 of the Town Code (B-404-411) and adopting the 1996 BOCA National Property Maintenance Code ("BNPMC") (B-394-400) as amended.

[27] Specific sections of the BNPMC as adopted by the Town are referred to as "PM-___." (B-394-400)

[28] (B-386) (Emphasis added.)

Code.[29] In subsequent correspondence, the Town revealed that no Board of Building Appeals

existed.[30]

### iii.    The Town's Board of Adjustment Was Empowered to Hear Zoning Appeals, Not Property Maintenance Violations

The Town relies on the "Emergency Measures" section of the Town's Property

Maintenance Code and cites PM § 109.6 for the rule that any person affected by an emergency

measure may petition to the "appeals board."[31] The "appeals board" that was specifically

established by Town Ordinance 330 in order to hear property maintenance issues was the "Board

of Building Appeals," which did not exist.

The Town's reliance on its Board of Adjustment and two statutes, 22 Del. C. §§324 and

325,[33] is misplaced. As of October 2002, the Town's Board of Adjustment was empowered to

hear zoning matters, not appeals of property maintenance violation notices,[35] by the section of

the Town Code that pertains only to zoning.[36] Under the Town Code an appeal to the Board of

Adjustment must be referred to the Town Planning Commission for up to thirty days of review

because Chapter 225 and the Board of Adjustment address zoning and land use matters.[37] Such a

---

[29] See Letter dated 10/29/02 from D. Eagle to E. McNally and Board of Building Appeals (B-419-20)

[30] See Letters dated: 11/8/02 from D. Eagle to E. McNally (B-421-22), 11/11/02 from E. McNally to D. Eagle (B-423), 11/13/02 from D. Eagle to E. McNally (B-425-26), and dated 11/18/02 from A. Moen to D. Eagle (B-429-30).

[31] DOB at 23, n.43, citing Town of Elsmere Property Maintenance Code § 109.6. Although the Town cites and relies on the "Emergency Measures" section of the Property Code, the Town refused to allow Plaintiff's representatives to enter the Apartments and begin immediate remediation even though such a course of conduct is expressly permitted by that section of the Town Code. See PM § 109.1 ("It shall be unlawful for any person to enter such structure *except for* the purpose of securing the structure, *making required repairs, removing the hazardous condition* or of demolishing the same." (emphasis added)  (B-399)).

[33] DOB at 23.

[35] See Town Code at "§ 225-40 Board of Adjustment" (B-415-18)

[36] See Town Code, Chapter 225 entitled "Zoning" (B-413-14). The state statutes relied upon by the town also concern zoning and not property maintenance appeals. See, infra.

[37] See Town Code at §225-40(G): "Whenever an appeal is taken pursuant to this chapter, the Board of Adjustment shall refer the matter to the Town Planning Commission, and the Board shall not make a recommendation on an appeal until the Commission's report is received or thirty (30) days have passed since referral to the Commission." (emphasis added).

mandatory review by the Planning Commission, which is non-sensical for condemnation decisions, clearly shows that the Board of Adjustment's power is limited to zoning matters and does not encompass appeals of condemnation orders. Likewise, 22 Del. C. §§324 and 325 are found in a chapter entitled "Municipal *Zoning* Regulations" and they also relate solely to zoning appeals and not property maintenance code violations (emphasis added).[38]

Notably, after the events in question, the Town amended its Town Code in 2003 and expanded the authority of the Board of Adjustment by allowing it to hear property maintenance violations.[39] This 2003 change to the Town Code acknowledges that Plaintiff had no ability to appeal the condemnation orders in 2002. The Defendant Town provided the Plaintiff with no avenue of appeal and certainly not the "meaningful opportunity to be heard" that is required by law.[40]

Grayden, supra, cited by Defendants, is instructive regarding a meaningful post-deprivation hearing (although very different from this case concerning the justification for no pre-deprivation process). In Grayden, a code enforcement officer condemned an apartment complex and forced the plaintiff tenants to relocate without prior notice or an opportunity for a hearing. The Eleventh Circuit ruled that the officer was qualifiedly immune from suit because he

---

[38] Within Title 22 ("Municipalities") of the Delaware Code, sections 324 and 325 are found in Chapter 3, which is entitled "Municipal *Zoning* Regulations." (emphasis added)

[39] See Town Ordinance 420 (B-679). In September 2003, the Town amended its Town Code by deleting references to the BOCA Codes and adopting the "International Property Maintenance Code," 2000 Edition, as published by the International Code Council, Inc. Significantly, the 2003 amendments to the Town's Property Maintenance Code also included replacing the "Board of Building Appeals" under PM –111.1 (as adopted by Town Ordinance 330) with reference to the "Board of Adjustment." (B-689)

[40] See Fuentes, supra. The Town also cites Alvin v. Suzuki, 227 F.3d 107 (3rd Cir. 2000) and paraphrases the rule that "[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." DOB at 24, quoting Alvin, 227 F.3d at 116. But here the "process on the books" was the Board of Building Appeals, not the Board of Adjustment. Plaintiff properly filed an appeal to the Board of Building Appeals in accordance with the Town Code, but this administrative body did not even exist, except on the books. Accordingly, the Plaintiff's decision to stay the administrative appeal before the Town's Board of Adjustment does not preclude this federal suit for damages because an appeal to the Board of Adjustment was not the "process on the books."

could not have been expected to know whether or not the appellate board actually had the ability to review or reverse his condemnation order and thereby provide a meaningful opportunity for review. 345 F.3d at 1246. Subsequently, the district court determined that the city had violated plaintiffs' rights to procedural due process, presumably because the board did not have the ability to reverse the order and no meaningful post-deprivation hearing existed, because the Court ordered the code to be changed to provide the enforcement board with the authority to reverse or modify the code officer's order.[42] Similarly, in this case, the Defendants have violated Plaintiff's rights to due process because the procedure "on the books" did not actually provide Plaintiff with an opportunity for a post-deprivation hearing.

### iv. Plaintiff's Attempt to Obtain a TRO in Chancery Court Does Not Relieve the Town From the Responsibility of Providing an Adequate and Meaningful Opportunity to Be Heard

Defendant claims that the Plaintiff took advantage of its opportunity to be heard in a post-deprivation hearing when Plaintiff sought a temporary restraining order ("TRO") in the Delaware Court of Chancery. However, the TRO proceeding was not a "full hearing" on the merits of the Town's condemnation decisions.[43] The TRO application was heard under a clearly emergent context in which the Plaintiff had little or no opportunity to develop evidence in support of its position and the Chancery Court had a very unreliable record from which to assess the merits.[44]

---

[42] Grayden v. City of Orlando, Case No. 6:00-cv-888-Orl-22DAB (M.D. Fla.) 9/23/04.

[43] The transcript from the TRO reveals the expedited nature of that proceeding. Vice Chancellor Lamb's statements on the record also indicate that the TRO was not a "full hearing." See TRO Transcript, October 10, 2002 Defs.' App. (A-137-202) at 30-31 ("what kind of relief do you want with respect to those buildings that have already been condemned? bearing in mind . . . if you're asking for a temporary restraining order to maintain the status quo *until I can conduct a full hearing*, which could be a week or two weeks or something like that.") (emphasis added) (A-166-67). Indeed, Plaintiff was prevented from accessing its already condemned Apartments prior to the TRO Hearing, see TRO Tr. at 53 (A-189) (B-333-34, B-536), and the limited affidavits it was able to put together for the TRO Hearing were not based on personal knowledge. See TRO Tr. at 52 (A-188).

[44] See Insituform Technologies, Inc. v. Insitu, Inc., 1999 WL 240347 at *6, Strine, V.C. (Del. Ch. April 19, 1999) ("In examining an application for a temporary restraining order three factors are critical: "the imminence and significance of plaintiffs['] claim of irreparable injury; the probable merits of plaintiffs['] claim; and the risks to defendant in the event a restraining order were issued and it ultimately were determined that the restraining order was improvidently issued." [ ] In circumstances where the TRO application is presented in a clearly emergent

In addition, the TRO proceeding involved different claims, and did not involve substantial live testimony, a full opportunity for cross-examination of witnesses, or a substantial and meaningful opportunity to present all the facts.[45]

At the TRO proceeding, Plaintiff sought, in part, an order of prior restraint preventing the Defendant Town from condemning buildings before it inspected them and developed relevant facts—i.e., before there was anything to judge. Here, Plaintiff seeks compensation because it was not provided with notice and an opportunity for a hearing to challenge a plan to issue condemnation orders after the Town gathered its facts and identified the actions it planned to take and why. As to buildings already condemned, the damage largely had been done once tenants were evacuated, since they were unlikely to return, and a TRO would have been almost empty relief compared to the relief that would have been available had Plaintiff been given notice and an opportunity to be heard in advance of the deprivation.

Also, Plaintiff's claims and the applicable legal standard at the TRO Hearing were different than they would have been at a proper hearing. At the TRO Hearing, Plaintiff was required to persuade the Court to change the status quo, rather than maintain it, as to the condemnation orders which the Defendant Town already had issued. The standards applicable at the TRO Hearing also required the Plaintiff to show irreparable harm if the condemnation orders were not rescinded or stayed, that the balance of equities weighed in favor of overturning the orders and that it had no adequate remedy at law for the stated injuries. (See, e.g., TRO Tr. at 57) (A-193). These are all significant burdens Plaintiff would not have had to address in a proper, timely hearing to review a notice of intent to condemn.

---

context in which the applicant has had little opportunity to develop evidence in support of its position on the merits and the court therefore has an extremely unreliable record from which to assess the merits, a "colorable claim" on the merits is sufficient if the applicant makes a sufficiently strong showing on the other two factors.") (internal citations omitted).

[45] See TRO Transcript, October 10, 2002 (A-137-202)

Substantively, at the TRO Hearing, the Court ruled on a different set of facts and legal claims than those presented here. The basis of Plaintiff's complaint in Chancery Court was that Plaintiff had not received written notice of the condemnations and had not been apprised of the facts and regulations on which the Town's actions were based. Plaintiff alleged that there was an unlawful taking of property because the Defendant Town failed to provide written notice of the condemnation actions; that Defendant Town tortiously interfered with Plaintiff's contracts and business relationships; and for injunctive relief.[46] Plaintiff is pursuing different claims in this case. The Court did not rule on the claim that the Defendant Town's actions were not consistent with statutory mandates in that there was no emergency which supported the condemnation orders, or that the NYC Guidelines had not been followed. (See TRO Tr. at 55-57) (A-191-93). Plaintiff had the burden at the TRO hearing to show a violation of the Constitution or other legal right due to the lack of condemnation notices, rather than simply showing the condemnations were not proper, as would have happened in an appropriate due process hearing.

Further, since there are no other State remedies available to Plaintiff, Defendants' failure to provide a post-deprivation hearing has deprived Plaintiff of the opportunity for a meaningful hearing, in violation of the Due Process Clause.[47] Parratt v. Taylor, supra, 451 U.S. at 541.

To summarize, under Mathews, since there was no emergency, Plaintiff should have been afforded the opportunity for a hearing before any condemnation and evacuation. The Defendants' orders of condemnation and evacuation without providing an opportunity for a pre-deprivation hearing violated Plaintiff's rights to procedural due process.

---

[46] See Complaint in TRO action (B-548-556).
[47] Defendants are likely immune under State law for any potential tort claim Plaintiff otherwise might wish to assert in this case to vindicate its rights. 10 Del. C. § 4011.

Further, the Defendants had no reason to act quickly, and their emergency actions were not directly and narrowly tied to the asserted emergency. The Defendants did not act pursuant to the standards of a narrowly drawn statute, and there was no opportunity for a meaningful post-deprivation hearing "granted at a meaningful time and in a meaningful manner." Therefore, the Defendants actions in failing to provide a pre-deprivation hearing do not fit within the narrow exception in which such hearings are not required.

At a minimum, there are a number of genuine issues of material fact precluding the granting of summary judgment, including whether or not an emergency existed, whether or not the Defendants actions were narrowly tied to the asserted emergency, whether or not the Defendants acted pursuant to the standards of a narrowly drawn statute and whether or not there was an opportunity for a meaningful post-deprivation hearing.

Accordingly, the Defendants motion for summary judgment must be denied.

**C.    The Individual Defendants' Motion for Summary Judgment Should Be Denied Because They Do Not Have Qualified Immunity, and There Are Genuine Issues of Material Fact Which Preclude Entry of Such Judgment in Their Favor**

The defense of qualified immunity protects government officials from civil damages in their performance of discretionary functions if their actions are reasonable in light of legal rules which are clearly established at the time of their conduct. Flatford, supra, 17 F.3d at 166. As established above, the individual Defendants did not have a reasonable, good faith belief that an emergency existed. Rather, they intended to use the existence of mold at some of the Apartments as an opportunity to shut down the complex.

Defendants found mold at the complex some time before October 4. Even though Defendant Blomquist's secretary conveyed to Ms. O'Neill this finding when she stated that there

DEL1 63882-1

was "deadly mold" that would result in a sweep of the Apartments, Defendant Blomquist never

mentioned this information to Plaintiff, but simply showed up on a later date with Mr. Belmont

from the State.  Clearly, the Defendants were more concerned with trying to shut down the

complex than with fixing the mold conditions.  If remediation had been the true focus, Defendant

Blomquist would have alerted Plaintiff promptly upon identifying his concerns so that swift

action could be taken in response, and the Defendants would have allowed Plaintiff's contractors

access to the basements, which Plaintiff immediately and repeatedly sought.  The Defendants

admitted to Darlene Grocki, the Plaintiff's resident manager, after only two buildings had been

inspected, that they intended to condemn the buildings, one by one.  (B-546-47)  Defendant Giles

concisely identified Defendants' goal when he confided, "I got them now".  (B-697)  Defendants

simply did not believe a true emergency existed, and they do not fit within the parameters

required to enjoy qualified immunity in this case.

## CONCLUSION

For the reasons set forth above, there are disputed issues of material fact and Defendants'

Renewed Motion for Summary Judgment should be denied.

Dated:  April 26, 2006        KLEHR, HARRISON, HARVEY, BRANZBURG &
                              ELLERS LLP


By:   _____
      David S. Eagle (DE Bar #3387)
      Douglas F. Schleicher (Admitted *Pro Hac Vice*)
      Patrick A. Costello (DE Bar #4535)
      919 Market Street, Suite 1000
      Wilmington, DE  19801-3062
      (302) 426-1189 (Telephone)
      (302) 426-9193 (Fax)
      deagle@klehr.com
      pcostello@klehr.com
      *Attorneys for Plaintiff*

39

DEL1 63882-1