FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

06 SEP 23 PM 2: 13

CLERK. U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

DEBORAH GRAYDEN, CHARLES
JACKSON, MAGDALY LAURENCEAU, et
al.,

                    Plaintiffs,

-vs-                                        Case No. 6:00-cv-888-Orl-22DAB

THE CITY OF ORLANDO, FLORIDA;
CODE ENFORCEMENT BOARD FOR
THE CITY OF ORLANDO, FLORIDA; and
MIKE RHODES, individually,

                    Defendants.

_____

## ORDER

In an Order dated March 12, 2004 (Dkt. # 247), it was determined in this case that the CITY

OF ORLANDO violated the right of the Plaintiffs, DEBORAH GRAYDEN, CHARLES JACKSON, MERVIL

CELISSA, DUCACE VILNE, VILEINE PREVIL, CAROLYN GUDE, JOHN MCINTOSH, PETER WILLIAMS,

SANDRA FREEMAN, VERONICA GAINES, EILEEN BURWELL, CONSTANCE LAWRENCE, LADONNA MAY,

TIFFANY MAY, and PATRICIA ROBOTHAM, to due process under the U.S. Constitution by failing to

provide Plaintiffs with contemporaneous notice of their right to post-eviction hearing and by not

providing them with a prompt and meaningful post-deprivation hearing. In light of this determination,

the Plaintiffs have requested injunctive relief against the CITY OF ORLANDO to remedy the deficiencies

in the City's condemnation procedures. In order to determine what injunctive relief is appropriate,

the Court ordered the City and the Plaintiffs to file memoranda addressing what steps are necessary

to modify the City's condemnation procedures for exigent and non-exigent circumstances so as to

comport with due process. (Dkt. # 247.) The City (Dkt.# 248) and Plaintiffs (Dkt.# 249) each submitted their proposals for changes to the City's Code and procedures on condemnation.

After a review of the court file, the Court referred this and all other remaining post-trial issues to Magistrate Judge David A. Baker for determination or, if necessary, for issuance of a report and recommendation. (Dkt. #250.) The parties then agreed to participate in a settlement conference with Judge Baker. As a result, the parties were able to reach agreement on the terms of the injunctive relief. Accordingly, the Court adopts the following agreed to changes as its Order on injunctive relief:

1)    The CITY OF ORLANDO shall amend the City Code and its policies and procedures regarding condemnation to provide that any notice to vacate will specifically inform tenants of their right to appeal the condemnation decision. The notice to vacate will be delivered to both the owner and the lessees by hand-delivery or certified mail, as well as provided by posting on the property. Either the owner or the lessee shall be permitted to request a hearing regarding the condemnation decision within 15 calendar days of the City's posting of notice.

2)    City Code and CITY OF ORLANDO CODE ENFORCEMENT BOARD (CEB) policies shall be amended to specifically empower the CEB with the authority to reverse or modify the City's condemnation orders if evidence warrants such action.

3)    City Code and CEB procedures shall be amended to provide that a hearing regarding the condemnation decision shall be held before the CEB within four business days of receiving a hearing request. However, in exigent circumstances, the requested hearing could occur after the deadline for vacating. The CEB shall issue a notice of hearing to both the lessee requesting the

hearing and the owner of the premises. The notice of hearing will be delivered by hand-delivery or certified mail to both the lessee requesting the hearing and the owner of the premises.

4)     In non-exigent circumstances, City Code and CEB policies shall be amended to provide that a notice to vacate will specifically inform tenants of their right to seek appeal of the condemnation decision. The notice to vacate will be delivered to both the owner and the lessees by hand-delivery or certified mail and by posting on the property. Either the owner or the lessee shall be permitted to request a hearing regarding the condemnation decision within 15 calendar days of the City's posting of the notice.

5)     City Code and CEB procedures shall be amended to provide that a hearing regarding the non-exigent condemnation order shall be held before the CEB within four business days of receiving a hearing request. Either the owner or the lessees shall be permitted to request a hearing regarding the condemnation decision within fifteen calendar days of the City's posting notice. The hearing shall be held prior to the deadline for vacating the premises. The CEB shall issue a notice of hearing to both the lessee requesting the hearing and the owner of the premises. The notice of hearing will be delivered by hand-delivery or certified mail to both the lessee requesting the hearing and the owner of the premises.

6)     The City Code and the CITY OF ORLANDO CODE ENFORCEMENT BOARD procedures will be amended to specifically empower the CITY OF ORLANDO CODE ENFORCEMENT BOARD with authority to reverse or modify a non-exigent condemnation order if evidence warrants such action.

7)     Chapter 5, Article I of the City Code will be amended to establish that any tenant who seeks a hearing on the order to vacate/condemn is a party to the CEB action. The Code's definition

-3-

of "party" will be amended to include a tenant who has a legal right or interest in the property, whose substantial interest will be affected by the proposed CEB action, and who makes an appearance (for example, by filing an appeal to the CEB) as a party to the CEB action.

8)    City Code and policy shall be amended to require condemnation placards to include a brief and concise summary of the conditions necessitating the condemnation. This will be accomplished by leaving space on the placard to allow a City Code Enforcement Officer to write in the summary.

9)    City Code and CEB procedures shall be amended to require that upon scheduling of a hearing for a case involving major violations (as that term is defined by the City's minimum standards code), the CEB shall cause the notice of hearing to be served by U.S. mail on the tenant of the affected building.

10)    The appeal from a decision of the CITY OF ORLANDO CODE ENFORCEMENT BOARD regarding the condemnation of property shall be governed by the provisions § 162.11, Fla. Stat. (2003).

The Clerk is directed to close this file upon entry of this final Order. The Court reserves jurisdiction to enforce its Orders and for consideration of costs and fees. All matters relating to claims for fees and costs are referred to the Magistrate Judge for appropriate proceedings.

**DONE** and **ORDERED** in Orlando, Florida this _23rd_ day of September, 2004.

_____
ANNE C. CONWAY
UNITED STATES DISTRICT JUDGE

Copies furnished to:

FILED

**UNITED STATES DISTRICT COURT** 2004 MAR 12 PM 3: 17

**MIDDLE DISTRICT OF FLORIDA**

**ORLANDO DIVISION**

DEBORAH GRAYDEN, et al.,

Plaintiffs,

-vs-

Case No. 6:00-cv-888-Orl-22DAB

THE CITY OF ORLANDO, FLORIDA, and
CODE ENFORCEMENT BOARD FOR THE
CITY OF ORLANDO, FLORIDA,

Defendants.

## ORDER

It has now been determined in this case that the City of Orlando violated the Plaintiffs'

right to due process under the U.S. Constitution by failing to provide Plaintiffs with

contemporaneous notice of their right to a post-eviction hearing, and by not providing them with

a prompt and meaningful post-deprivation hearing. Notwithstanding the City's argument to the

contrary, the Plaintiffs have continuously and repeatedly asserted a request for declaratory and

injunctive relief in this case. It now falls to the Court to determine what injunctive relief is

appropriate.

The Court would certainly be justified in crafting an injunction at this point, based on

the Court's view of what relief is appropriate. However, as in past cases, the Court deems it

fairer and more appropriate to afford the parties an opportunity to provide input concerning the

manner in which the deficiencies in the City's procedure should be remedied.

247

Accordingly, within twenty (20) days, the City shall file and serve a memorandum addressing what steps it proposes to take to modify its procedures so as to comport with due process. Within twenty (20) days thereafter, Plaintiffs shall file and serve a memorandum in response to the City's memorandum. During either of these periods, if the parties believe further mediation or a conference with the assigned magistrate judge may be beneficial in resolving these issues, counsel shall promptly notify the Court of that fact.

In their legal memoranda, the parties shall address modifications to the City's policies in the areas of (1) pre-deprivation notice and a hearing to residential tenants in non-exigent circumstances, (2) contemporaneous notice and a prompt and meaningful post-deprivation hearing to such tenants in exigent circumstances, and (3) the process for review (e.g., by a state court) of decisions reached at a due process hearing. In considering the issue of notice, counsel should note that Florida's residential landlord-tenant statutes provide for seven (7) days' pre-vacation notice even under certain exigent circumstances. *See* Fla. Stat. 83.56(2)(a).

Counsel are expected to participate in this endeavor in good faith. Again, the Court is taking this step to give the parties an opportunity to provide input concerning injunctive relief, rather than simply entering an injunction on terms it deems appropriate. They should take full advantage of it.

**DONE and ORDERED** in Chambers, in Orlando, Florida this _12th_ day of March,

2004.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties
Administrative Law Clerk
Courtroom Deputy
Magistrate Judge David A. Baker
J. Joaquin Fraxedas, Esq., Mediator

-3-



Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**


**C**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
INSITUFORM TECHNOLOGIES, INC., Plaintiff,
v.
INSITU, INC., Defendant,
and
Midsouth PARTNERS, Nominal Defendant.
**No. CIV. A. 17013.**

April 19, 1999.

Thomas R. Hunt, Jr., Esquire, S. Mark Hurd, Esquire, of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware; of Counsel: Thomas J. Goodwin, Esquire, of Krugman &
Kailes, Saddle Brook, New Jersey, Attorneys for Plaintiff.

Donald J. Wolfe, Jr., Esquire, Matthew E. Fischer, Esquire, of Potter Anderson &
Corroon, Wilmington, Delaware; of Counsel: John S. Stump, Esquire, C. Torrence
Armstrong, Esquire, of McGuire, Woods, Battle & Boothe, McLean, Virginia, Attorneys
for Defendants.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

\*1 Defendant Insitu, Inc. ("Insitu"), with a 42.5% interest, and plaintiff
Insituform Technologies, Inc. ("ITI"), with a 42.5% direct interest and a 15%
interest held by its wholly-owned subsidiary Insituform Southwest, Inc.
("Southwest"), together comprise two of the partners of nominal defendant Midsouth
Partners ("Midsouth" or the "Partnership"). ITI has caused Southwest, the other
partner, conditionally to withdraw and terminate the Midsouth Partnership agreement
effective upon the occurrence of a condition which may never come to exist. In the
wake of this action taken by its wholly-owned subsidiary, ITI has claimed the right
to deny Midsouth the ability to use the "Insituform®" process upon which Midsouth's
business depends and has begun to compete directly with Midsouth.

Insitu now seeks a temporary restraining order to prohibit ITI from denying
Midsouth the right to exploit the "Insituform®" Technology and from otherwise
interfering with Midsouth's business until such time as this court or an arbitrator
determines whether: 1) Southwest had the right to terminate Midsouth conditionally;
and, if so; 2) what effect, if any, such termination had on the right of the
remaining partners of Midsouth to continue the business and to continue as a
licensee of the Insituform® Technology.

In this opinion, I find that: Insitu has demonstrated a reasonable probability of
success on its claim that ITI has breached its contractual and fiduciary
obligations to Insitu during the time since Southwest gave notice of its
conditional withdrawal and termination and while ITI still remains a partner; that
Insitu and Midsouth face imminent, irreparable injury; and that the absence of an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
(Cite as: 1999 WL 240347 (Del.Ch.))

injunction will injure Insitu and Midsouth far more than the grant of an injunction
will harm ITI. As a result, I grant Insitu's motion but will issue an order in
substantially different form than Insitu seeks.

I.
### A. *Midsouth*

Midsouth is a Tennessee general partnership formed in 1985 to obtain and hold a
license to use the "Insituform® Process" (hereinafter referred to as the
"Insituform® Technology" or the "Technology"). The Insituform® process is used to
create "pipes within pipes." It involves injecting a fiber tube or liner
"impregnated" with thermosetting resin mixture into an existing pipe and hardening
it by heat, forming a new rigid pipe within an existing pipe. Compl. ¶ 2. Midsouth
had an exclusive right to utilize the Insituform® process in Tennessee and in
portions of Kentucky and Mississippi (the "Territory").

Midsouth has three partners. Insitu, a Delaware corporation, owns 42.5%. Insitu is
the successor-in-interest of Insituform East, Incorporated ("East"). Compl. ¶ 4.

ITI, a Delaware corporation, also owns 42.5% of Midsouth. ITI acquired its
interest in Midsouth from E-Midsouth, Inc., ITI's former wholly-owned subsidiary,
which ITI acquired in 1995. ITI is a successor-in-interest to its former wholly-
owned subsidiary, Insituform North American Corp. ("INAC").

*2 Southwest owns the remaining 15% of Midsouth. Southwest acquired its interest
in Midsouth from Insituform Mid-south Investments ("Insituform Mid-south"), another
former wholly-owned subsidiary of ITI.

### B. *The Midsouth License and Partnership Agreements*

On December 2, 1985, INAC (ITI's predecessor) and Midsouth executed a sub-license
agreement (the "License Agreement"). The License Agreement gave Midsouth the
exclusive right to use the Insituform® Technology in the Territory. L.A. § I(A),
Schedule A. In exchange, ITI was to receive a royalty of 8% of the gross contract
price of all contracts performed by Midsouth using the Insituform® Technology. L.A.
§ § I(H), IX. Section XIV(B) of the License Agreement provides that the License
Agreement may be terminated by ITI  _[FN1]_  in certain circumstances. Section XIV(B)
states:

> FN1. The License Agreement itself refers to INAC, ITI's predecessor-in-
> interest. For the sake of relative brevity, I sometimes refer only to ITI.

*By INAC.* In the event [Midsouth] (i) becomes insolvent or a petition in bankruptcy
is filed by or against [Midsouth] and not removed within 90 days thereafter, or a
receiver is appointed for [Midsouth]; (ii) fails to pay the minimum Royalties in
accordance with Paragraph IX hereof or other Royalties hereunder, or fails to
provide computations of Royalties, within fifteen (15) days of when due and such
failure shall continue for a period of fifteen (15) days after written notice from
INAC to [Midsouth]; (iii) fails to pay when due for other invoiced goods and
services, or any other amounts due INAC for any reason and such failure shall
continue for a period of fifteen (15) days after written notice from INAC to
[Midsouth]; (iv) fails to perform any other material term or condition of this
Agreement and fails to correct the same within fifteen (15) days after written
notice from INAC to [Midsouth], or if not reasonably capable of correction within
such period, fails to commence such correction within such period and thereafter
diligently proceeds to make such correction; (v) in the event any Partner
withdraws from or seeks dissolution of [Midsouth]; or (vi) in the event
[Midsouth]'s net worth falls below $500,000 then in any such event, INAC may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                         Page 3
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

declare this Agreement terminated immediately upon written notice to [Midsouth].
Such termination shall not limit or affect any other right or remedy of INAC,
including the right to damages resulting from [Midsouth]'s breach.
L.A. § XIV(B). The License Agreement is governed by Tennessee law.

L.A. § XXI.

The same day the Midsouth Partnership was created via a partnership agreement
(the "December 2, 1985 Partnership Agreement"). INAC was not a signatory to that
Agreement. Rather, the only signatories were East (Insitu's predecessor),
Insituform Mid-south (Southwest's predecessor), and Insituform Southeast, Inc. (the
ultimate predecessor of ITI's 42.5% interest).

A mere twenty-one days later, the predecessors-in-interest of the Midsouth
partners executed yet another formal partnership agreement (the "Partnership
Agreement"). That Agreement "superceded" the December 2, 1985 Partnership
Agreement. P.A. § 18. Section 15 of the December 23, 1985 Partnership Agreement
addresses the issues of "termination" and "dissolution" of Midsouth. It states in
pertinent part:

*Termination: Dissolution.*
*3 a. This Partnership may be terminated *at any time* by any partner upon notice in
writing delivered to the other partners personally, or by certified mail, return
receipt requested, to take effect not earlier than 120 calendar days after the
date the notice is sent.
b. Upon the occurrence of any event of default as defined above, or on the
violation of any of the provisions of this agreement by any partner, any partner
not so violating the agreement, or its legal representatives, may, at its or their
option, terminate and dissolve the Partnership immediately by giving a written
notice of this intention to the other partner. The Partnership shall be terminated
and dissolved at the dates specified in the notice. The notice may be given and
served either by personal delivery to the partners to whom it is addressed, or by
certified mail, return receipt requested, to the partner's last known regular
place of business.
c. (1) In the event of the dissolution of the Partnership, upon the events
described in paragraphs a and b above (hereinafter referred to as "events of
termination"), the management committee, as reconstituted pursuant to the
provisions of Section 13 above, shall have the right to wind up the Partnership
business and to dispose of or liquidate the Partnership's assets.
(2) [omitted]
(3) [omitted]
(4) Upon any such dissolution, however, the non-defaulting partner or partners
desiring to continue the partnership business shall have the right to do so in the
firm name, upon the payment in cash to the withdrawing or defaulting partner of
the respective value of its partnership accounts, such payment, net of costs and
expenses of enforcing a defaulting partner's obligations and damages incurred by
reason of default, to be made within 30 days after the date of dissolution. For
this purpose, the value of a withdrawing or defaulting partner's partnership
account shall be determined by the accountant then servicing the partnership as of
the date of dissolution, in accordance with book values. No value shall be placed
upon trade name, goodwill, customer lists or similar intangible assets.
(5) [omitted]...
P.A. § 15 (emphasis in original). Like the License Agreement, the Partnership
Agreement is governed by Tennessee law. P.A. § 17. But unlike the License
Agreement, INAC was not a signatory to the Partnership Agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
(Cite as: 1999 WL 240347 (Del.Ch.))

### C. *ITI Changes Strategy*

ITI owns and has world-wide rights to the Insituform® Technology. Compl. ¶ 2. Before the early 1990's, ITI's strategy had been to exploit the value of the Insituform® Technology by executing sub-license agreements with other entities who obtained the right to exploit the Technology in particular regions.

In the early 1990's, ITI changed strategic direction and determined that it would be more profitable to exploit the Technology itself as a vertically integrated business. Hartman Aff. Ex. 3A. To accomplish this result, ITI needed to acquire its independent licensees. Therefore, ITI has acquired majority control of all but three of the Insituform® licensees since 1991.

### D. *ITI Obtains A Majority Interest In Midsouth*

**\*4** In 1995, ITI acquired E-Midsouth as a small part of a much larger transaction by which ITI acquired E-Midsouth's ultimate parent, Insituform Mid-America, Inc. As a result of ITI's acquisition of Mid-America and its assets, ITI thereby obtained E-Midsouth's 42.5% interest in Midsouth. Since ITI already owned 15% of Midsouth at that time through Southwest, it putatively obtained majority control of Midsouth.

ITI's predecessor-in-interest, E-Midsouth, however, had neglected to obtain the consent of its other Midsouth partner, Insitu, before being acquired by ITI. P.A. § 12. Insitu invoked the Midsouth Partnership Agreement's arbitration clause to contest ITI's right to control Midsouth.

Insitu's action did not endear it to ITI. During the period leading up to the arbitration, ITI threatened to terminate the Midsouth Partnership and to terminate Midsouth's license to exploit the Insituform® Technology if Insitu managed, through the arbitration or other means, "to achieve management control" of Midsouth. Hartman Aff. Ex. 3B.

The arbitrator ruled against ITI's predecessor-in-interest, E-Midsouth, finding that the Partnership Agreement required Insitu's consent before ITI could acquire E-Midsouth. Therefore, the arbitrator declared that ITI's predecessor-in-interest, E-Midsouth, was a defaulting party under the Partnership Agreement and ordered that Insitu could add an additional representative to Midsouth's management committee. Hartman Aff. Ex. 2. The arbitrator also found that Southwest's predecessor-in-interest was not in default of the Partnership Agreement. *Id.*

The arbitrator's order had the functional effect of ensuring Insitu's continued control of Midsouth. For whatever reason, ITI did not act on its prior threats and Midsouth continued to operate until this calendar year under the management control of Insitu.

### E. *Midsouth's Performance Lags*

During the period since that arbitration, Midsouth's financial performance has been rather poor. During calendar years 1997 and 1998, for example, Midsouth apparently suffered total losses of $1,644,000. Compl. ¶ 9. This contrasts with prior periods of sustained profitability.

It is fair to say that ITI and Insitu disagree about the cause of the decline in Midsouth's earnings. The record makes clear, however, that ITI believes that much of the problem was caused by poor managerial decisions by Insitu. *See, e.g.,* Hartman Aff. Exs. 5, 16A, 16D.

### F. *ITI Offers To Buy Out Insitu*

On February 16, 1999, ITI renewed its efforts to gain control of Midsouth. That

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                          Page 5
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

day, ITI offered to buy Insitu's parent corporation, Insituform East, for $2.50 a
share. Hartman Aff. Ex. 4. According to the letter making the offer, the price
represented a 150% premium over the current market price of East's stock. ITI said
it was "prepared and desirous of entering into immediate discussions with [East] to
proceed with negotiation and investigations leading to the execution of a
definitive all-cash-merger agreement on an expeditious basis." *Id.*

*\*5* On March 2, 1999, ITI reiterated its offer and expressed concern at East's
failure to respond. In addition, ITI stated its dissatisfaction with the
performance of Midsouth under Insitu's leadership and indicated that it saw "no
realistic prospect of improvement" for Midsouth under Insitu's leadership. Hartman
Aff. Ex. 5. If East turned down the acquisition offer or otherwise did not respond
by March 10, 1999, ITI indicated that it would "proceed on a course designed to
protect [ITI's] shareholder's [sic] value by whatever means it deem [ed]
appropriate." *Id.*

All of these communications were publicly disclosed by ITI via press releases and
Securities and Exchange Commission filings.

        G. *ITI Attempts To Terminate Midsouth And The License Agreement*
On March 10, 1999, ITI concluded that Insitu had not responded in a substantive
manner and withdrew its acquisition offer.

The next day ITI's wholly-owned subsidiary Southwest notified Insitu that:
  In accordance with Section 15(a) of the Partnership Agreement, [Southwest] hereby
  terminates the Partnership Agreement effective, *the later of* (x) the 120 days
  after the date hereof, or (y) the date on which the Chancery Court of Delaware has
  issued a declaration confirming that [ITI] is within its rights to terminate the
  Sub-License Agreement dated December 2, 1985 with the Partnership.
  Hartman Aff. Ex. 7 (emphasis added). Southwest's termination letter was signed by
Robert E. Kelley, who serves as ITI's General Counsel. ITI had Southwest send the
withdrawal letter because Southwest, unlike ITI, was not in default of the
Partnership Agreement. ITI itself did not send a withdrawal letter.

On the same day, ITI sent Midsouth a letter purporting to terminate  "immediately"
the License Agreement on the ground that Southwest was "terminating the
Partnership." Compl. Ex. C. In particular, the letter demanded that Midsouth cease
any use of the Insituform® Technology. *Id.* Then, ITI filed a complaint in this
court seeking a declaratory judgment that it "is within its rights to terminate the
License Agreement upon termination of Midsouth, or in the event of any partner
seeking to dissolve Midsouth, in each case in accordance with the terms of the
License Agreement." Compl. ¶  19.

By another letter that day to Midsouth, ITI enclosed a copy of the complaint in
this action and advised Midsouth that during the pendency of this action and:
  [E]ffective immediately, [ITI] intends to enter the Territory [defined in the
  License Agreement], either in its own name or through other means during the
  pendency of the Proceedings, to bid upon and undertake projects for Insituform
  Process work. Until resolution of the Proceedings, [ITI] intends to deposit 42.5%
  of the net profits arising from work undertaken by or on behalf of [ITI] in the
  Territory into an interest-bearing account ....
  Hurd Aff. Ex. 2.

        H. *ITI Publicizes Its Actions And Undertakes To Compete With Midsouth*
*\*6* Insitu replied to ITI on March 17, 1999. In that communication, Insitu took the
position that ITI had not properly terminated the License Agreement or the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                         Page 6
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

Partnership and that its actions in purporting to do so constituted breaches of those Agreements and of ITI's fiduciary obligations to its Midsouth partners.

That same day, ITI reiterated to Midsouth that ITI intended to bid on projects "within Midsouth's former licensed territory." Hartman Aff. Ex. 11A. In the letter, ITI claimed that its purported termination of the License Agreement had ended Midsouth's right to bid on new projects using the Insituform® Technology. *Id.* ITI indicated its willingness to "consider" issuing Midsouth a "limited, temporary and non-exclusive license" so as to permit Midsouth to finish certain pending projects. *Id.* Thereafter, ITI issued a press release containing the text of its letter to Midsouth.

In the wake of these communications, Insitu again stated its position that the License Agreement remained in full force and effect and that ITI was in breach of its contractual and fiduciary obligations to its Midsouth partners. Hurd Aff. Ex. 4. "Since [in its view] the License ha[d] not been terminated," Insitu said "there is no need for a temporary license" and that Midsouth would continue to bid projects using the Insituform® Technology. *Id.* Insitu called upon ITI to refrain from competing with Midsouth in its Territory and indicated that it would seek to enforce its rights under the Agreements. *Id.* On April 1, 1999, Insitu invoked the arbitration clause of the Partnership Agreement by filing a claim with the American Arbitration Association and giving notice to ITI and Southwest. Hurd Aff. Ex. 6.

Insitu's warnings and demand for arbitration were unavailing. During March and early April, ITI:
• bid on projects in direct competition with Midsouth, Slusher Aff. ¶ ¶ 2-3, Erikson Aff. ¶ ¶ 1-6, and told Midsouth that ITI had "pulled" Midsouth's license and would be bidding projects directly, Matill Aff. ¶ 2;
• informed Midsouth's creditors that ITI would not permit "any further future use of its credit on behalf of Midsouth," Hartman Aff. Ex. 10A;
• refused Midsouth's request to bid certain projects on which, pursuant to the Partnership Agreement, Midsouth could not bid without ITI's consent, Hartman Aff. Ex. 13; and
• denied Midsouth technical assistance pursuant to the License Agreement, Mattil Aff. ¶ 5.
On April 8, 1999, for example, ITI outbid Midsouth to win a project for the City of Cookeville, Tennessee. Slusher Aff. ¶ 2. Absent the ITI bid, it is likely that Midsouth, the second lowest bidder, would have been awarded the contract. *Id.* ¶ 3.

## II. *Legal Analysis*
In examining an application for a temporary restraining order three factors are critical: "the imminence and significance of plaintiffs['] claim of irreparable injury; the probable merits of plaintiffs['] claim; and the risks to defendant in the event a restraining order were issued and it ultimately were determined that the restraining order was improvidently issued." *Newman v. Warren*, Del. Ch., 684 A.2d 1239, 1244 (1996).

**\*7** In circumstances where the TRO application is presented in a clearly emergent context in which the applicant has had little opportunity to develop evidence in support of its position on the merits and the court therefore has an extremely unreliable record from which to assess the merits, a "colorable claim" on the merits is sufficient if the applicant makes a sufficiently strong showing on the other two factors. *See, e.g., Cottle v. Carr*, Del. Ch., C .A. No. 9612, 1988 WL 10415, at \*3, Allen, C. (Feb. 9, 1988). Where, however, the applicant has had the opportunity to develop evidence and present a record from which the court may "responsibly make a more informed judgment concerning the merits," this court "has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                          Page 7
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

stated the elements of the equitable test is something akin to the traditional
preliminary injunction formulation." _Newman,_ 684 A.2d at 1244.

 In this case, the more traditional preliminary injunction standard requiring a
"reasonable probability of success on the merits," _Hecco Ventures v. Sea-Land
Corp.,_ Del. Ch., C.A. No. 8486, 1986 WL 5840, at *3, Jacobs, V.C., (May 19, 1986),
is the more appropriate. Insitu has been aware of ITI's position on the merits
since March 11; has known of ITI's view that Midsouth was prohibited from using the
Technology on new projects at latest as of March 17, 1999, Hartman Aff. Ex. 11A;
has already answered the complaint; was involved in the negotiation of the
contracts at issue and controls evidence bearing on their meaning; and has
presented affidavits and documentary evidence in support of its motion. Although I
do not believe that Insitu unreasonably delayed seeking relief from this court so
as to disqualify it from obtaining relief, _[FN2]_ I do believe its decision to delay
application brings with it the cost of being required to make a strong showing on
the merits if it is to prevail on this motion. _Cf. Cottle,_ 1988 WL 10415, at *6 n.
5 (indicating that the relative ease of obtaining a TRO compared to a preliminary
injunction may tempt applicants to delay their application and that the doctrine of
laches is properly invoked to address such tactical delay).

     FN2. In so concluding, I have considered and rejected ITI's argument that
     Insitu so unreasonably delayed its application as to disqualify it from
     eligibility for any injunctive relief at all. Insitu moved for a TRO within
     one month of the March 11 termination letters it received from ITI and
     Southwest. During that period, a great deal of back and forth ensued between
     the parties to clarify their respective positions. Upon definitively learning
     that ITI intended to deny Midsouth the right to use the Technology and that
     ITI was actively competing with Midsouth, Insitu moved diligently to bring
     this motion before me. In so finding, I note that ITI's complaint in this
     court and its communications to Insitu regarding the effect of Southwest's
     withdrawal from the Partnership may have contributed to some confusion on
     Insitu's part. The complaint, for example, can be read as implying that ITI
     did not intend to actually terminate the License Agreement until this court
     declared that it had the right to do so. The reason for this is that
     Southwest's termination of the Partnership was made "effective immediately
     upon the later of 120 calendar days from the date of such notice or upon
     issuance of a ruling from this Court declaring that, upon termination of
     Midsouth, [ITI] has the right to terminate the License Agreement as a
     consequence of [the] termination of Midsouth or, alternatively, of the
     attempt by a partner to dissolve Midsouth." Compl. ¶ 15. Although other
     communications from ITI to Insitu make clear that ITI was treating the
     License Agreement as having been terminated as of March 11, I think Insitu
     was justified in being somewhat confused by ITI's approach.

 With that in mind, I turn to the merits.

                    A. _The Merits of The Parties' Claims_
 In examining the merits, I believe it is analytically important to acknowledge
that ITI's duties and rights at any time depend in large measure on whether it is a
partner in Midsouth. That is, the long-term right of ITI to terminate the License
Agreement and withdraw from the Partnership Agreement may be different from its
right to exploit the Insituform® Technology in the Territory during such time as
ITI remains a partner in Midsouth.

 Hence, I examine first whether Insitu has a reasonable probability of success on
its contention that ITI was not free to terminate the License Agreement by causing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                              Page 8
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
(Cite as: 1999 WL 240347 (Del.Ch.))

Southwest to withdraw conditionally from Midsouth. Then I examine whether Insitu
has a reasonable probability of success on its claim that ITI cannot exploit the
Insituform® Technology in the Territory while it remains a partner.

      1. *ITI's Right to Terminate The License Agreement And To Cause Southwest To
Withdraw*

**\*8** Both the License Agreement and the Partnership Agreement are governed by
Tennessee law. Like Delaware law, Tennessee law requires that a court "interpret
and enforce contracts as they are written...." *Petty v. Sloan*, Tenn.Supr., 277
S.W.2d 355, 359 (1955). The Tennessee Code provides that a written contract is
"*prima facie* evidence that the contract contains the true intention of the parties,
and shall be enforced as written." Tenn.Code Ann. § 47-50-112.

  ITI takes the position that the License Agreement is absolutely clear that if
"any Partner" of Midsouth--- including ITI and its wholly-owned subsidiary
Southwest--- " seeks dissolution of [Midsouth]," then ITI has the right to declare
the License Agreement "terminated immediately." L.A. § XIV(B). Since Southwest is
a "Partner" and sought, albeit conditionally on terms favorable to itself,
"dissolution" of Midsouth on March 11, then ITI, it contends, was within its rights
to terminate immediately the License Agreement.

  After a careful consideration of the limited record before me, I believe that such
a straightforward interpretation of the License Agreement most likely would, upon
final examination of a full record bearing on the intentions of the drafters of the
two Agreements, be found to be the correct one. [FN3]

> FN3. In addressing the merits, I have treated the conditional termination of
> the Partnership by Southwest as if it was caused by ITI and no differently
> than if it was done by ITI itself. Southwest is a wholly-owned subsidiary of
> ITI and it is apparent from the documentary evidence submitted to me that it
> was executing a strategy determined by ITI when it sought conditionally to
> withdraw and terminate the Partnership.

  There are several reasons for this conclusion. The most important is that the
language of the License Agreement is, on its face, unambiguous. Read plainly, §
XIV(B) clearly gives ITI the right to terminate the License Agreement when "any
Partner ... seeks dissolution of [Midsouth]." Insitu would have me read § XIV(B)
as if it is written "when any Partner *not owned or controlled by ITI* ... seeks
dissolution of [Midsouth]." Such a reading is not consistent with the terms of the
contract. *Lunn Real Estate Invs., Inc v. Boiler Supply Co., Inc.*, Tenn. Ct.App.,
1998 WL 221112, at \*4 (1998) (to determine parties' intent the court must look to
the "material contained in the four corners of the document itself" and give the
words and phrases their ordinary and usual meaning).

  Furthermore, reading § XIV(B) as permitting ITI to withdraw from the License
Agreement at its election by causing its corporate affiliate which is a partner in
Midsouth to withdraw does not create a gross imbalance in the relationship between
ITI and Midsouth. Under § XIV(A), Midsouth had the right to rescind the license
agreement at any time, provided that such termination would not be effective for
two calendar quarters.

  Insitu urges me to eschew a plain reading of the License Agreement on the grounds
that the License Agreement must be read in concert with the later executed
Partnership Agreement. In particular, Insitu argues that four provisions of the
Partnership Agreement must color any reading of § XIV(B) of the License Agreement.

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                          Page 9
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
(Cite as: 1999 WL 240347 (Del.Ch.))

The first such provision is § 18 of the Partnership Agreement which provides that:

> *Entire Agreement*. Except to the extent specifically provided herein, this Agreement shall completely and fully supercede all other prior agreements, both written and oral, by and between, [Insitu's predecessor East], [Southwest's predecessor Insituform Midsouth Investments] and [ITI's predecessor INAC] relating to the Partnership or the business and affairs of the Partnership. The parties to this Agreement shall hereafter have no rights under such prior agreements but shall look solely to this agreement for definitions and termination of all their respective rights, liabilities and responsibilities relating to the Partnership and the affairs and business of the Partnership.

**\*9** P.A. § 18. Insitu contends that this provision of the Partnership Agreement somehow modifies the License Agreement. I do not understand how that can be so. To the extent that Insitu contends that § 18 should be read as "superceding" the License Agreement, then that Agreement was superceded over a decade ago. Yet, the parties to the License Agreement have been operating under it during that entire period as if it was in full force and effect and, indeed, Insitu insists that the License Agreement is still operative. Section 18 is more easily read as a typical integration clause that extinguishes any rights the Midsouth partners claimed under the previous December 2, 1985 agreement governing the Partnership. Furthermore, had the Partnership Agreement been intended to revoke or modify the License Agreement entered into twenty-one days prior (on the same day the December 2, 1985 Partnership Agreement was executed), one would expect that the Partnership Agreement would explicitly state that it had that effect and that INAC, the party with which Midsouth signed the License Agreement, would have executed the Partnership Agreement (or at least the part thereof modifying or superceding the License Agreement).

Insitu also argues that § § 1, 12, and 15(c)(4) of the Partnership Agreement modify ITI's right to terminate the License Agreement. Section 1 of the Partnership Agreement sets forth the purpose of the Partnership:

> [Midsouth] shall be established to obtain and hold a license for the use of the Insituform Process in the [Territory] to perform underground pipe rehabilitation services for the public for profit.

P.A. § 1. Section 12 of the Partnership Agreement bars any of the partners from doing "any act detrimental to the best interests of the Partnership, or which would make it impossible to carry on the ordinary business of the Partnership, without the written consent of all partners." P.A. § 12. Since Midsouth was formed for the exclusive purpose of operating as an Insituform® licensee in the Territory, Insitu claims that § 12 is best read as prohibiting a Midsouth partner from doing any act whatsoever "which would make it impossible" for Midsouth to carry on its business as an Insituform® licensee in the Territory.

Insitu also argues that the single-purpose nature of Midsouth must guide interpretation of § 15(c)(4) of the Partnership Agreement. That subsection gives, in the event a partner has sought dissolution, any "partners desiring to continue the partnership business" the "right to do so in the firm name" by paying the exiting partners the value of their partnership interests in accordance with the provisions of the subsection. P.A. § 15(c)(4).

Taken together, Insitu contends that § § 1, 12, and 15(c)(4) preclude ITI from exercising its otherwise plain right under the License Agreement to terminate that contract if "any Partner" of Midsouth seeks dissolution. The Insitu argument has a certain first-blush appeal because termination of the License Agreement does literally "make it impossible" for Midsouth to carry on its business--- which requires it to hold an Insituform® license. The termination of the License

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 10
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

Agreement also makes it impossible as a practical matter for the non-withdrawing Midsouth partners to carry on the business of "Midsouth Insituform" in the firm name. Thus, Insitu claims that ITI has breached § § 12 and 15(c)(4) of the Partnership Agreement by terminating the License Agreement.

**\*10** Upon closer inspection, this argument begins to lose much of its appeal. The Partnership Agreement gives any of the partners, not just ITI and Southwest, the right to withdraw "*at any time* " after 120 days without cause. P.A. § 15(a) (emphasis in original). Insitu in essence asks that this right be read as not applying to ITI to the extent that by so withdrawing (or causing one of its affiliates to withdraw), that withdrawal triggers the termination clause of the License Agreement. That is, Insitu asks that the withdrawal provision of the Partnership Agreement be read as allowing any partner other than ITI to walk away "*at any time* " after 120 days without restriction, but as imposing a continued obligation on ITI to continue to license the Technology to the Partnership if it, or a partner affiliated with it, walks away.

It seems improbable that ITI's predecessor INAC would have put itself in such a vulnerable position. If such were the intention of the drafters, I would think they would have stated so explicitly. I believe that is especially so since the Partnership Agreement was not signed by INAC. It is difficult for me to conceive that the Partnership Agreement was intended, *sub silentio,* to diminish in a substantial manner the termination rights of INAC under the separate License Agreement.

Similarly, I find it extremely doubtful that § 12 was intended to apply to a partner which simply exercises its right to withdraw in accordance with § 15 of the Partnership Agreement. Such a reading of § 12 would create a litigable issue any time a partner with particular expertise or capabilities walked away since such a walk away could be construed as "detrimental to the best interests of the Partnership." [FN4]

FN4. Insitu also suggests that ITI's termination of the License Agreement constitutes a breach of its fiduciary duties to its Midsouth partners. Although Tennessee law recognizes that partners owe each other fiduciary duties, *Am. Center-Nashville Ltd. v. Smith,* Tenn. Ct.App., 1992 WL 361352, at \*7 (1992) ("Partners owe a fiduciary duty to each other in all matters relating to the partnership."), I find it unlikely that Insitu will prevail in arbitration on this particular fiduciary duty claim in the event that it fails on its contractual claim. The Partnership Agreement clearly gave ITI and Southwest the right to withdraw after 120 days' notice. To the extent that such a withdrawal is violative of Insitu's rights, it seems likely that the arbitrator will have to examine whether the particular nature and timing of Southwest's conditional withdrawal this year constituted a breach of the Agreement's implied covenant of good faith and fair dealing. *L.I.C. Corp. v. Baskin-Robbins Ice Cream Co.,* Tenn. Ct.App., 1993 WL 2796, at \*2 (1993) (implied covenant of good faith and fair dealing is to be read into all contracts). If the withdrawal did not violate an express term of the contract and the implied covenant did not prohibit the withdrawal, there seems little room left for analysis of the withdrawal under fiduciary principles. *See Am. Center-Nashville Ltd.,* 1992 WL 361352, at \*7 (where a sophisticated limited partner knowingly entered into contracts with general partners and the general partners subsequently took action to the detriment of the limited partner in accordance with those contracts, the limited partner could not state a claim for breach of fiduciary duty). In so finding, I expressly limit myself to commenting on ITI's simple right to terminate, not its conduct

during the period before which Southwest's conditional withdrawal and termination of the Partnership becomes effective, which I discuss *infra*.

Finally, it is unlikely that § 15(c)(4) was intended to have the substantive significance Insitu attaches to it. Rather than creating an affirmative right of any partner of Midsouth to continue to operate the business as an Insituform® licensee regardless of ITI's desires, § 15(c)(4) is better read as a standard form clause of a general partnership agreement that enables a surviving partner to continue the business without filing for a new business license, obtaining a new tax identification number, staking a new claim to the firm's name, and doing all the other ministerial work required to begin a new venture. 59A Am.Jur.2d *Partnership* § 892 (1987) ("Dissolution of a partnership does not cause the liquidation of the firm if there is an agreement among the partners stating that it does not do so..."); 4/15/99 Wolfe Ltr. Ex. B; *see also* L.A. § XIV(C) (upon termination of License Agreement, Midsouth has sixty days to drop the "Insituform" part of its name). Absent the inclusion of § 15(c)(4) in the Partnership Agreement, the remaining partners would have to start the business from scratch. Had § 15(c)(4) been intended to modify INAC's termination rights under the License Agreement, I believe that the drafters would have so stated and that INAC would have executed the Partnership Agreement.

**\*11** Thus, I conclude that Insitu has not shown a reasonable probability of success on the merits of its claim that ITI did not have the right to terminate the License Agreement. In so finding, I am not insensitive to the fact that this reading of the License Agreement--- that ITI is essentially free to terminate the License Agreement once it "seeks dissolution" of Midsouth upon concluding it can thereafter make more money by exploiting the Technology in the Territory itself--- can be seen as tolerating harsh results.

Yet, the License Agreement and the Partnership Agreement appear to authorize just such a scenario. Those Agreements also gave the other Midsouth partners the right to walk away from those Agreements in two calendar quarters and 120 days, respectively, at any time if they wished to abandon the enterprise and thereafter start a new business in the pipe repair field using a different technology.

The Agreements were drafted by sophisticated parties with the capacity to negotiate contracts to protect their rights. According to one of the officers of Insitu's parent, East, who was involved in negotiating the Agreements, § XIV(B) of the License Agreement is a "kick-out clause, basically meaning that ... if [ITI] withdraws, there's no license anymore." Hurd Aff. Ex. 7. Based on the record before me, it appears likely that the Midsouth partners chose to deal with ITI on that basis and to take the risk that ITI would someday walk away and exploit the Technology on its own. [FN5] *Petty,* 277 S.W.2d at 359 (The court must "interpret and enforce contracts as they are written, not withstanding they may contain terms which may be thought harsh and unjust.").

> FN5. In so concluding, I have considered Insitu's argument that ITI's "default" in coming into E-Midsouth's 42.5% interest in Midsouth as part of a much larger transaction disables it from withdrawing or causing Southwest to withdraw. Although ITI's default position gave Insitu the right to control Midsouth and certain other options, *see* P.A. § 13(b), I do not think that position rendered ITI perpetual partners of Midsouth. Nor does the lawyer for East who helped draft the Partnership Agreement. Hurd Aff. Ex. 7 at 71-74.

Thus, Insitu has not made a sufficient showing on the merits regarding this aspect of its claim to justify this court's use of its injunctive powers over ITI in the

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 12
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

time period before the arbitration can be held. Nor has Insitu convinced me that
the question of whether ITI had the right to terminate the License Agreement is
likely arbitrable. Insitu claims that under the arbitration clause of the
Partnership Agreement the License Agreement termination dispute raises a "question
arising out of or relating to [the] Partnership Agreement or the breach thereof."
P.A. § 14(a). There is a fundamental problem with this argument. The License
Agreement does not contain an arbitration clause. INAC signed the License
Agreement. It did not sign the Partnership Agreement. [FN6] For purposes of
disputes arising under the License Agreement, ITI stands in the shoes of INAC, its
predecessor. Given these circumstances, I see little likelihood that upon a final
determination of arbitrability I will conclude that INAC *sub silentio* agreed that
disputes arising under the License Agreement would be resolved pursuant to the
dispute resolution clause of an Agreement, the Partnership Agreement, it did not
execute. [FN7]

> FN6. Or the earlier December 2, 1985 Partnership Agreement executed the same
> day as the License Agreement.

> FN7. ITI has moved for summary judgment on the claims asserted in its
> complaint. At this time, I am not convinced that the record is adequate to
> rule on that motion, nor am I persuaded that the arbitrator's ruling on
> Insitu's claim has no bearing on ITI's right to terminate. In the latter
> respect, I refer to the possibility that the arbitrator might find that ITI
> acted wrongfully in causing Southwest conditionally to terminate the
> Partnership. ITI has not convinced me that in those circumstances the finding
> of the arbitrator that ITI wrongfully caused the occurrence of the condition
> in § XIV(B)(v) triggering its right to terminate the License Agreement would
> not bear importantly on the resolution of its claim in this court. As such, I
> deny ITI's motion.

### 2. *ITI's Right To Exploit The Insituform® Technology In The Territory While It Is Still a Partner in Midsouth*

**\*12** Although I find that Insitu has not made a sufficient showing on the merits
regarding ITI's right in the long-term to terminate the License Agreement and to
withdraw from Midsouth, I believe there is more merit to Insitu's contention that
the Partnership Agreement's provisions place limits on ITI's activities during the
period after Southwest gave notice that it conditionally intended to withdraw and
terminate the Partnership and before its withdrawal and termination become
effective.

In this case, Southwest does not seek to terminate Midsouth until the *later* of 120
days from March 11, 1999 or the date of a favorable ruling on ITI's complaint by
this court--- the latter condition being one which may never occur. Southwest's
withdrawal can only be read as not yet effective, as expressly conditional, and as
equivocal. That is because by its own (rather awkward) terms Southwest's act of
withdrawal and the subsequent termination will not occur at all if this action is
resolved in Insitu's favor. *See* ITI Br. at 1-2 (confirming that Southwest's
withdrawal is conditional on a prior ruling by this court in favor of ITI). Thus,
Southwest has reserved to itself the right to continue as a partner if I rule for
Insitu. For its part, ITI has taken no formal action under the Partnership
Agreement to withdraw.

The Partnership Agreement expressly precludes a partner in ITI or Southwest's
position from terminating the Partnership on less than 120 days notice. P.A. §
15(a). The only circumstance in which an earlier termination can occur is if a non-
defaulting partner seeks immediate termination upon default or breach of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 13
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

Partnership Agreement by another partner. P.A. § 15(b). The differences between §
15(a) and § 15(b) of the Partnership Agreement suggest to me that the partners
bargained that their fiduciary and contractual obligations to one another could not
be terminated without cause immediately. [FN8] Rather, such relations would persist
for at least 120 days after notice. I do not believe that this timing restriction
can be read as toothless in the context of the relations at stake. It is clear from
both the Partnership Agreement and the License Agreement that timing issues of this
sort which could affect the competitive positions of the contracting parties were
critical. In the License Agreement, for example, INAC bargained for the right to be
able to terminate that Agreement immediately if a triggering condition in § XIV(B)
existed. Yet, INAC bargained to obtain two calendar quarters before Midsouth could
terminate the License Agreement and cease meeting its contractual obligations
thereunder. L.A. § XIV(A). As between themselves, the Midsouth partners appear to
have bargained for a 120 day notice period before which a partner could not, except
in cases where the other partners were in breach or default, terminate the
business. [FN9]

   FN8. An unequivocal withdrawal by a partner in a partnership without an
   agreement prohibiting immediate dissolution might well free that withdrawing
   partner to compete with the partnership for new business so long as the
   withdrawing partner does not usurp for itself opportunities properly
   belonging to the partnership. 68 C.J.S. *Partnership* § 322(b) (1998). In this
   case, however, Southwest and ITI have hedged their bets and have not
   unequivocally withdrawn, but rather have reserved their rights to continue as
   partners. Coupled with the express terms of the Partnership Agreement
   prohibiting termination except upon 120 days prior notice, 68 C.J.S.
   Partnership, § § 304(c), 305 (1998) (provisions in the partnership agreement
   take precedence over the statute and may specify when dissolution shall
   become effective upon a partner's withdrawal), Southwest's and ITI's conduct
   seems unlikely to be found sufficient to have freed them to compete with
   Midsouth yet.

   FN9. Perhaps due to the necessary haste of briefing and the lack of clarity
   of the Partnership Agreement, the parties have not shed much light on the
   usage of the terms "termination" and "dissolution" in § 15 of the
   Partnership Agreement. These terms appear to be used rather erratically,
   adding to the difficulty of discerning the drafters' intentions. However,
   under partnership law "dissolution" typically does not end the partnership.
   68 C.J.S. *Partnership* § 302 (1998). Rather, the termination of a partnership
   is a three-step process: dissolution, winding up, and then termination. *Id.*
   Here, Southwest seeks to withdraw and begin this process only if it wins this
   litigation.

 Given that it appears that this notice period was intended to have substantive
effect, I find it quite troubling that Southwest and ITI have conditioned their
withdrawal on a ruling by this court in their favor and have reserved the right to
continue as partners in Midsouth. In these circumstances, it is difficult for me to
conceive of how ITI and Southwest can disclaim their fiduciary and contractual
responsibilities as partners in Midsouth.

 **\*13** Thus, I believe it is likely that the arbitrator will find that ITI remains a
fiduciary of its fellow partners and bound by § 12 of the Partnership Agreement.
Tenn.Code Ann. § 61-1-120 (partners owe fiduciary duties to each other). While I
cannot find on this record that ITI's fiduciary duties and § 12 prevent it from
terminating the License Agreement during such period, there is a difference between
ITI's contractual rights as a licensor and its duties as partner of Insitu. ITI's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

right to terminate the License Agreement and its right to exploit the Insituform®
Technology in the Territory for its exclusive benefit during such time as it
remains a partner in Midsouth are distinct, not identical.

 As long as ITI is a partner in Midsouth, its obligations to its fellow partners
are meaningful and substantial. For example, ITI has a duty under the Partnership
Agreement to assist the Partnership in "fully complet[ing] and perform[ing]" all
contracts and obligations "outstanding and unperformed ... for the advantage and
profit of ... the Partnership." P.A. § 15(d)(2). Although this provision cannot be
read as requiring ITI to continue the License Agreement on an exclusive basis, it
does create an obligation on ITI's part to ensure that Midsouth can complete its
contracts. Yet, it appears that ITI has haggled with the Partnership even over its
right to complete existing work. Hartman Aff. Ex. 11A (ITI will "consider" granting
the Partnership a "limited, temporary and non-exclusive license" to permit Midsouth
to finish existing contracts). ITI's grudging and stand-offish approach to the
completion of existing Partnership contracts seems likely to be found to be
inconsistent with § 12 of the Partnership Agreement and with its fiduciary duties.

 Similarly, ITI's quick-strike invasion of Midsouth's Territory, in the wake of
East's refusal to accept ITI's acquisition proposal, is likely to be found
inconsistent with § 12 of the Partnership Agreement and with ITI's fiduciary
duties. It is true that the Partnership Agreement does not contain a provision
prohibiting a partner who withdraws from competing with the Partnership after
withdrawal. Yet, it is difficult to read § 12 of the Partnership as permitting a
withdrawing partner to compete unfairly with the Partnership during the period
before which the Partner's right to terminate becomes effective. It is even more
difficult to read § 12 as tolerating such behavior by partners who have not
unequivocally given notice of their intention to withdraw and terminate the
Partnership, but who claim to have reserved the right to continue as partners.

 It would have been one thing had ITI simply terminated Midsouth's ability to
compete for new projects using the Insituform® Technology during the period before
Southwest's purported withdrawal becomes--- if it ever will---effective. It was
quite another for ITI to disable the Partnership from competing for new business
during that period, while simultaneously, under a new name, seeking new business
for itself within the Partnership's Territory and from the Partnership's customers.
Had ITI simply done the former, each of the partners to Midsouth would have been on
a level playing field and would have been able to use the period to decide how best
to redeploy the investments they had sunk into the Partnership.

 *14 By executing the latter strategy--- the timing and execution of which it
solely controlled--- ITI may well be found by the arbitrator to have wrongfully
advantaged itself at the expense of its partners in breach of the bargained-for-
notice period in § 15(a), § 12, and its fiduciary duties. It is true that in the
long-term Insitu can still seek to continue the Partnership as a pipe repair
business using different technology. But in the short-term, Insitu finds itself in
the disadvantageous and precarious position of scrambling to do so, while ITI
immediately exploits a Territory it well knows through its involvement in the
Partnership and by using the Insituform®)) Technology it owns. That ITI has coupled
its competition with Midsouth with communications about its actions and intentions
to Midsouth creditors, customers, and the financial markets has no doubt made
Insitu's position even more difficult. Coming during a time when ITI is
contractually prohibited from doing any act "detrimental" to the Partnership and
when it owes fiduciary duties of good faith and loyalty to Insitu, ITI's conduct is
highly suspect. Thus, I find that Insitu has a reasonable probability of success of
convincing the arbitrator that ITI's strategy of exploiting the Insituform®

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                          Page 15
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
(Cite as: 1999 WL 240347 (Del.Ch.))

Technology for itself in the Territory before it has withdrawn as a partner is in
breach of its fiduciary and contractual obligations. [FN10]

> FN10. For precision's sake, it is important to note that I have commented on
> the Partnership Agreement only insofar as it relevant to ITI's claim for
> injunctive relief. Whether or not ITI has breached the Partnership Agreement
> or any fiduciary obligations it owes to its partners in Midsouth under
> Tennessee law will ultimately be determined *de novo* by the arbitrator based
> on a more well-developed record.

                    B. *Is Midsouth Threatened With Imminent, Irreparable Harm?*
   I find that Insitu has sustained its burden to demonstrate that Midsouth and it
face imminent, irreparable harm as a result of ITI's actions.

   By a multitude of measures, ITI has made it virtually impossible for Midsouth to
operate in accordance with the purposes set forth in the Partnership Agreement. Any
customer from whom Midsouth now seeks business does so with full knowledge that ITI
takes the position that Midsouth has no right to use the Technology. Potential
Midsouth customers, who have operations and interests of their own to which they
must attend, will undoubtedly be reluctant to deal with a vendor at war with one of
its owners. Existing Midsouth customers will no doubt need reassurance. The
prospect of Midsouth obtaining additional credit during this period is quite bleak.

   Although ITI contends that a future award of monetary damages can make Midsouth
whole and that its decision to escrow 42.5% of the proceeds from any contracts won
by ITI in the Territory until this action and the arbitration are concluded
obviates any risk of irreparable harm, I do not believe that to be the case. The
actions of ITI are likely to shake the confidence of Midsouth's customers,
creditors, and employees in a manner that will not be fully captured by any future
win-loss analysis of Midsouth's and ITI's respective records in securing new
contracts during the period from March 11, 1999 until a court or an arbitrator
determines whether ITI had the right to terminate the License Agreement.

   *15 Midsouth is now operating under a dark cloud formed and seeded by ITI. Many of
its customers, creditors, and employees may flee before the rain. In that
eventuality, it will be very difficult to fashion monetary relief sufficient to
restore Midsouth to the position it was in before ITI purported to terminate the
License Agreement and the Partnership. *Roso-Lino Beverage Distrib., Inc. v. Coca
Cola Bottling Co. of N.Y., Inc.,* 749 F.2d 124, 125-127 (2d Cir.1984) (termination
of plaintiffs' beverage distributorship after 11 years threatened irreparable harm
which would not be fully remedied by monetary relief); *Janmort Leasing, Inc. v.
Econo-Car Int'l, Inc.,* 475 F.Supp. 1282, 1294 (E.D.N.Y.1979) ("loss or destruction
of a going business constitutes irreparable harm"); *Dickinson Medical Group v.
Foote,* Del. Ch., C.A. No. 834, 1984 WL 8208, at *3, Brown, C. (May 10, 1984) (when
former employee took customer list and could have caused her former employer to
lose business, the former employer was threatened by immediate irreparable harm).

   Likewise, it will be difficult to assess how much harm was done to Insitu by ITI's
invasion of the Territory while still a partner of Midsouth. The competitive
advantage ITI received over Insitu by getting such a timing jump will be real, but
not easily reduced to quantification. It will not be difficult to count up the
contracts ITI wins. But it will be difficult, if not impossible, to assess and
quantify the long-term marketing and customer relations advantages ITI secured for
itself, arguably improperly and at Insitu's expense.

                    C. *In Whose Direction Does The Balance of Hardships Tilt?*

                    © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                           Page 16
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

The balance of hardships favors Insitu.

 If ITI is enjoined from exploiting the Insituform® Technology in the Territory
until such time as this case and the related arbitration are concluded, ITI will
simply have to live with a restriction on competing with its own partners until the
Partnership ends. I do not think that this burden is substantial in comparison to
the irreparable injury Insitu and Midsouth will suffer in the absence of an
injunction, especially since it is ITI's aggressive strategy that brought about the
exigencies Insitu and Midsouth now confront and since Southwest conditioned its
withdrawal upon a prior favorable ruling by this court on ITI's claim. Moreover,
ITI can, if it chooses, mitigate any harm by assisting, rather than impeding,
Midsouth in obtaining new business in the Territory during the period during which
an injunction is in place.

 That being said, I am not insensitive to ITI's position and the reality of the
poisoned relationships among the Midsouth partners. I am also cognizant of the fact
that ITI will likely be found to have the right to terminate the License Agreement
and to withdraw from Midsouth in the long-run.

 As a result, the nature of the TRO that will be granted will reflect that reality.
In accordance with my prior reasoning, the TRO will, at Insitu's election, either
provide: i) that ITI shall not exploit the Insituform® Technology in the Territory
until the TRO expires and shall escrow 42.5% of the proceeds of any contract ITI
has won or wins in the Territory as a result of bids it submitted or submits before
the entry of the TRO; or ii) that ITI shall not deny Midsouth the right to exploit
the Insituform® Technology on a non-exclusive basis in bidding on new business in
the Territory until the TRO expires and that ITI shall escrow 42.5% of the proceeds
of any contract ITI has won or wins in the Territory as a result of bids it
submitted or submits before the entry and during the pendency of the TRO. [FN11] In
addition, ITI must also consent if Insitu chooses the latter form of order. In
either case, the TRO shall provide that ITI shall provide technical support to
Midsouth in accordance with the License Agreement. If the latter form of TRO is
elected by Insitu and consented to by ITI, that technical assistance shall extend
to new projects for which Midsouth seeks technical assistance in bidding or
performing.

> FN11. The nature of this order will thus deal with ITI's concern that I might
> enjoin ITI from working on a major municipal project it has just won in
> direct competition with Midsouth and which will not go to Midsouth if ITI is
> disqualified. ITI Br. at 31-32. In lieu of enjoining ITI from completing the
> project, ITI will simply have to escrow 42.5% of the project proceeds for the
> benefit of Insitu in the event that Insitu prevails in arbitration or
> convinces this court that the License Agreement was not validly terminated by
> ITI.

 **\*16** I recognize that neither order creates an economically efficient course by
which to proceed. My hope is that ITI and Insitu, which I am sure are operated by
profit-maximizing businesspersons interested in doing what is rational in business
terms, will work together to protect their mutual interests during the period an
order is in place.

 The disputes among the partners obviously need final resolution, sooner rather
than later. Therefore, to limit any harm to ITI, I will also condition my order on
Insitu's willingness to seek expedited treatment of its arbitration claim. For my
part, I will commit to adjudicating ITI's claim on a very prompt schedule. Before
setting a schedule, however, I want to consider with the parties how best to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                              Page 17
Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)
**(Cite as: 1999 WL 240347 (Del.Ch.))**

proceed in view of the fact that ITI's claim may or may not be arbitrable and, if
not, whether it is advisable to permit the arbitration to go forward to completion
first. Finally, I would note that I have held Insitu to the same standard it would
have to meet to obtain a preliminary injunction. As such, I request that ITI advise
Insitu and the court as to whether it will consent to the entry of a preliminary
injunction along the lines I have described or whether the court needs to set a
schedule for a hearing on a preliminary injunction.

                                    III.
  For the foregoing reasons, Insitu's motion for a temporary restraining order is
granted and ITI's motion for summary judgment is denied. Insitu shall, upon notice
to ITI, submit an order in conformity with this opinion. The parties shall also set
up an office conference to determine a schedule for the procession of this
litigation.

  Not Reported in A.2d, 1999 WL 240347 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.