IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
ELSMERE PARK CLUB, L.P.,        )
                                )
          Plaintiff,            )
                                )
     v.                         )  Civ. No. 04-1321-SLR
                                )
TOWN OF ELSMERE, et al.,        )
                                )
          Defendants.           )
```

David S. Eagle, Esquire, and Patrick A. Costello, Esquire, of
Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington,
Delaware.  Counsel for Plaintiff.  Of Counsel:  Douglas F.
Schleicher, Esquire, of Klehr, Harrison, Harvey, Branzburg &
Ellers LLP, Philadelphia, Pennsylvania.

Edward M. McNally, Esquire, and Liza H. Sherman, Esquire, of
Morris James LLP, Wilmington, Delaware.  Counsel for Defendants.

**MEMORANDUM OPINION**

Dated: February 21, 2007
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On October 1, 2004, plaintiff Elsmere Park Club, L.P.
("plaintiff") filed the present action against the Town of
Elsmere (the "Town"), Ellis Blomquist, Eugene Boneker, and John
Does 1-10 (collectively "defendants").[1]  Plaintiff is the former
owner of the Elsmere Park Apartments (the "Apartments") located
in Elsmere, Delaware.  (D.I. 1 at 1)  In its complaint, plaintiff
contends that defendants wrongly condemned the Apartments and
improperly evicted its residents, without allowing plaintiff to
correct the alleged defects or affording plaintiff an opportunity
to be heard, in violation of the Due Process Clause of the
Fourteenth Amendment to the United States Constitution and 42
U.S.C. § 1983, et seq.[2]  (Id.)  Plaintiff requests damages and
costs.  (Id. at 17)  The court has jurisdiction over the present
suit pursuant to 28 U.S.C. § 1331.

---

[1]Plaintiff amended its complaint on March 24, 2005,
replacing John Does 1-10 with John Giles.  (D.I. 22)

[2]The statute provides, in pertinent part:

Every person who, under color of any statute, ordinance,
regulation, custom, or usage of any State or Territory . . .
subjects, or causes to be subjected, any citizen of the
United States to the deprivation of any rights, privileges,
or immunities secured by the Constitution and laws, shall be
liable to the party injured in the action at law, suit in
equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Presently before the court is defendants' motion for summary judgment.  (D.I. 116)  For the reasons that follow, the court grants defendants' motion.

## II.  BACKGROUND

### A.  The Apartments

Plaintiff purchased the Apartments on or about March 31, 1986.  (D.I. 1 at 3)  The Apartments featured 156 garden-style apartments in 39 separate three-story buildings.  (Id. at 4)  The buildings were interconnected, and arranged as 9 separate building groups.  (Id. at 3)

Each building contained five apartment units.  (Id. at 4) The topmost two floors of each building contained two apartment units.  (Id.)  Below those levels was a basement level that was partly above ground.  (Id.)  The basement was split into two halves – one side consisted of laundry facilities and storage space, while the other side was an apartment unit prior to 1989. (Id.)

In 1989, the basements of many of the buildings were flooded due to Hurricane Hugo.  (Id.)  The Town subsequently condemned the majority of the basement apartments since they had become inundated with water.[3]  (D.I. 1 at 4)  In 1996, the Town

---

[3]Plaintiff sued the Town of Elsmere over this action.  See Elsmere Park Club L.P. v. Town of Elsmere, 771 F.Supp. 646 (D. Del. 1991).  In this action, plaintiff alleged that the Town refused to issue building permits by which plaintiff could have remedied the unsanitary conditions in the basement until after a

instructed plaintiff to brick over the windows and secure the uninhabited basement apartments due to concerns of vandalism. (Id., D.I. 117 at 5)  Contemporaneously, plaintiff removed the carpets, cabinets, damaged drywall, and other items from the unoccupied basement apartments, extracted the remaining water, and sealed the doors leading to the units with plywood.  (D.I. 1 at 4; D.I. 117 at 5; D.I. 122 at 3)  Plaintiff states that it retained a specialist contractor to apply a preventive mildicide treatment throughout the basements.  (D.I. 122 at 3)

The following year, plaintiff had the Apartments inspected by a structural engineer, who recommended that plaintiff investigate further suspected areas of water damage, monitor the buildings for possible water problems or structural movement, and seal and repair several leaks in order to limit potential damage. (D.I. 117 at 6; D.I. 119 at A-273)

The Municipal Code of the Town of Elsmere ("the Code") provides that all apartment units in the Town must be inspected by a code enforcement officer prior to occupancy in order to determine if the unit is code-compliant.  (D.I. 117 at 6; D.I.

---

new zoning ordinance was passed, which consequently prohibited the use of the basement units as apartments. Id. at 648-49.  The court found that this deliberate decision to delay the issuance of building permits "constituted unlawful delay in violation of substantive due process," and granted summary judgment for plaintiff on its claim. Id. at 650.  The court denied both parties' summary judgment motions on the issue of damages. Id. at 651.

3

119 at A2)  From 1989 to 2002, the Town conducted numerous such
pre-occupancy inspections at the Apartments.  (D.I. 122 at 4)
The Apartments were also inspected during comprehensive
maintenance code investigations.  (D.I. 125 at B-026-49)

## B.  Blomquist's First Pre-Condemnation Visit to the Apartments

On October 1, 2002, defendant Blomquist, the Town's code
enforcement officer, was summoned to the Apartments by the on-
site manager, Darlene Grocki ("Grocki").  (D.I. 117 at 6)  Grocki
asked Blomquist to conduct two routine pre-rental inspections of
apartments.  (Id.)  Upon entering each of the two buildings
located at 1421 Cypress Avenue and 1353 Maple Avenue, Blomquist
detected a strong odor.  (Id.; D.I. 122 at 6)  Blomquist told
Grocki that the situation needed to be remedied, and that he
would return to complete the pre-rental inspections once she
advised him that the problem had been rectified.  (Id.)
Plaintiff states that the problem was rectified quickly, and that
Blomquist was not able to be reached by phone between October 1-
3, 2002.  (D.I. 122 at 6)  On October 3, 2002, plaintiff's
regional supervisor, Regina O'Neill ("O'Neill"), spoke with
Blomquist's secretary, Tina Law ("Law").  (D.I. 122 at 6; D.I.
125 at B-335)  O'Neill testified that Law related to her that the
Town believed that there was deadly mold in the buildings, and
that the Town was planning to do a total sweep of the property.
(D.I. 125 at B-335)

4

## C.  Blomquist's Second Visit to the Apartments

Blomquist returned to the Apartments on Friday, October 4, 2002, joined by a representative of the Delaware Division of Public Health, Kenneth Belmont ("Belmont").[4]  The maintenance supervisor at the Apartments, John Ruhl ("Ruhl"), accompanied the men to inspect two apartment buildings.  (D.I. 117 at 7) Blomquist and Belmont were taken to the uninhabited basement apartment at 1421 Cypress Avenue, and found extensive mold growth and other code violations.  (D.I. 117 at 7; D.I. 122 at 7)  The men also inspected the basement at 1405 Cypress Avenue, a building not visited on the October 1, 2002 pre-rental inspections,[5] and found extensive mold growth, a steady leak of hot water, two inches of water on the floor and high humidity. (D.I. 117 at 7; D.I. 122 at 7; check A-2-3)  The parties do not dispute that neither Blomquist nor Belmont entered or inspected the upstairs apartment units for mold or to take air samples at that time.  (D.I. 122 at 7)

---

[4]Belmont is an industrial hygienist.  (D.I. 117 at 7) Blomquist testified that he asked Belmont to join him because he "had instruments that could detect moisture," and because it seemed that each of the apartments had similar issues, "maybe he could get some insight from the others with regard to the odor." (D.I. 126 at B-618)

[5]Blomquist testified that Ruhl told the men that they should see the poor conditions at the building at 1405 Cypress Avenue. (D.I. 126 at B-636)

5

After finding the serious conditions in the two basements, Belmont contacted Gerald Llewellyn, Ph.D. ("Llewellyn"), Chief Toxicologist for the State of Delaware. (D.I. 117 at 7; D.I. 122 at 7) Llewellyn advised Belmont that the conditions in the basements posed a serious health threat to the buildings' occupants, which Llewellyn attributed to "mold spores probably hav[ing] migrated to the apartments" through openings such as pipe chases and ventilation ducts. (D.I. 122 at 7; D.I. 119 at A-135-36)

Following a series of communications between Llewellyn, Belmont, and Blomquist on October 4, 2002, Blomquist contacted Eugene Boneker ("Boneker"), Town Manager of Elsmere, who in turn contacted John Giles ("Giles"), former Town Manager and Chief of Police, who was serving as advisor to Boneker. (D.I. 166 at 7; D.I. 122 at 7; D.I. 126 at B-626-29; D.I. 119 at A-236) Contemporaneously, Blomquist told Grocki that it was determined that the two buildings at 1421 and 1405 Cypress Avenue be condemned and vacated immediately.[6] (D.I. 117 at 7; D.I. 122 at

---

[6]The order of events at this time is unclear. Blomquist states by affidavit that Llewelyn advised Belmont and Blomquist of the seriousness of the situation, however, Blomquist testified that his only communications were with Belmont. (D.I. 119 at A-003; D.I. 126 at B-628) Blomquist states that the decision to condemn was made by the Division of Public Health, including Belmont and Llewellyn. (D.I. 119 at A-003; D.I. 126 at B-627) Blomquist's testimony tends to indicate that the decision to condemn the buildings was made before he called Boneker. (D.I. 126 at B-628) Giles's memorandum to the Mayor and City Council tends to indicate that the decision to condemn had not been made

6

8) Blomquist subsequently directed plaintiff's management to nail the doors shut and display large red "CONDEMNED" signs on the buildings, and he ordered that the residents of the eight upper level apartments be evacuated immediately. (D.I. 122 at 8)

## D. The Weekend of October 5-6, 2002

On several occasions between October 4, 2002 and over the weekend, plaintiff requested that the Town issue the appropriate licenses and permits to allow plaintiff's contractor access to the basements to address the Town's concerns, but the Town repeatedly refused.[7] (D.I. 122 at 8; D.I. 119 at B-345-48)

The following day, Saturday, October 5, 2002, Town officials issued a "News Release" which detailed the condemnation and subsequent evacuation of tenants. (D.I. 122 at 8; D.I. 126 at B-556) That same Saturday, a meeting was held at Elsmere Town Hall to discuss the conditions of the basement units at the Apartments. (D.I. 122 at 8; D.I. 119 at A-003, A-265) Present at the meeting were Blomquist, Boneker, Giles, other Town officials, and also Grocki. (D.I. 119 at A-003) Blomquist states that at the meeting, participants discussed the conditions that had been discovered at 1405 and 1421 Cypress Avenue, and what could be done about those conditions. (Id. at A-003)

_____

as of the time Boneker called him. (D.I. 119 at A-236) The court's decision does not turn on these issues.

[7]Defendants did not contest the testimony of Grocki on this point in their reply brief. (D.I. 127)

7

Blomquist also states that the participants "understood that it was not possible to permit remediation of the conditions in the basements while the buildings were still occupied," and that Giles indicated that she had generally been concerned about the conditions in the basements since she had become plaintiff's property manager about one year prior.[8]  (Id.)

**E.  Further Inspections and Condemnations**

On Monday, October 7, 2002, Blomquist, Llewelln, and George Yocher, an Environmental Epidemiologist for the State of Delaware, returned to the Apartments and resumed inspections. (D.I. 117 at 9; D.I. 122 at 9)  According to Blomquist, approximately 10-11 additional basements were inspected at this time.  (D.I. 126 at B-648)  Ruhl was present.[9]  (D.I. 119 at A-209)  In addition to the basements, the parties inspected the stairwells and some unoccupied apartments on the first and third floors.[10]  (D.I. 119 at A-222)

The Town held an informational meeting regarding the condemnation the same evening of October 7, 2002, at which time

_____

[8]Plaintiff does not contest any of these facts regarding the October 5, 2002 meeting in its answering brief.  (D.I. 122)

[9]Defendants assert that "[r]epresentatives of [plaintiff], including O'Neill, were also present," although the record cited does not support defendants' claim.  (D.I. 117 at 9, citing D.I. 119 at A-25-18, A220-24)

[10]Plaintiff's assertion that the parties did not enter or inspect any occupied apartments or take any air samples is not inconsistent with the testimony.  (D.I. 122 at 9)

the eviction of tenants and the Town's ongoing investigation were discussed. (D.I. 122 at 9; D.I. 126 at B-665) Plaintiff claims that this meeting "flamed the fears of residents concerning a danger that simply did not exist."[11] (D.I. 122 at 9)

The inspections continued on Tuesday, October 8, 2002 through Thursday, October 10, 2002. (D.I. 117 at 9; D.I. 122 at 9) Each day, Blomquist condemned all of the buildings that had been inspected that day. (D.I. 117 at 9, D.I. 122 at 10) The record contains several "Notice[s] of Condemnation" addressed to O'Neill for the subject properties, dated October 9, 2002. (D.I. 119 at A-086-133) Each notice lists an inspection date of either October 4, 7, or 8, 2002, and contains several "[c]orrective action(s)" which "must be corrected prior to re-occupying the building." (Id.) All of the buildings, except for the one housing the rental office, were condemned by October 10, 2002

---

[11]Though plaintiff states that portions of this meeting were broadcast locally on television, the record contains scant details about this meeting. (D.I. 122 at 9) Defendants did not contest plaintiff's representations about the October 7, 2002 meeting in their reply brief. (D.I. 127)

based upon the basement inspections.[12]  (D.I. 122 at 10; D.I. 117 at 10)

## F.  Relief Sought by Plaintiff

On Wednesday, October 9, 2002, plaintiff filed a motion for a temporary restraining order in the Delaware Court of Chancery. See Elsmere Park Club, et al. v. Town of Elsmere, No. Civ. A. 19970, D.I. 1 (October 9, 2002).  A hearing was held the next day, Thursday, October 10, 2002, at which time plaintiff's motion was denied.  (D.I. 119 at A-137-202)  The court held that plaintiff's claim for an unlawful taking based on defendants' failure to give written notice until October 9, 2002 did not have substantial merit.  (D.I. 119 at A-198)  In so holding, the court noted that "oral notice was given repeatedly [and] efforts to give other notice were made."[13]  (Id.)

On October 29, 2002, plaintiff notified the Town of its appeal of the condemnation of the apartments.  (D.I. 126 at B-

_____

[12]Defendants have included photographs of the basements in their papers, which arguably evidence a variety of code violations, including "extensive and active mold growth . . . covering entire walls of those apartments and spreading to the ceilings," "extensive structural damage," "standing water," "human waste product," exposed electrical wiring, "substantial structural rot, broken asbestos tiles and other serious conditions."  (D.I. 119 at A-005-06)  The Notices of Condemnation publish the presence of "[e]xtensive mold and microbial growth," and "raw sewage."  (Id. at A-086-133)

[13]The Chancery Court issued its written ruling on the issue on plaintiff's motion for a TRO on October 15, 2002.  See Elsmere Park Club, et al. v. Town of Elsmere, No. Civ. A. 19970, D.I. 15 (October 15, 2002).

10

419-20) Plaintiff's letter was sent to the "Board of Building Appeals" of the Town of Elsmere.[14] (Id.) Thereafter, correspondence was exchanged between plaintiff's counsel and Edward M. McNally, who was Town Solicitor at the time. (D.I. 126 at 421-26, 433) In several letters, these parties discussed appropriate mechanisms regarding the procedures for an appeal. (Id. at B-421-26) In one letter dated November 18, 2002, Mr. McNally informed plaintiff's counsel that, "while BOCA National Building Code [incorporated into the Code] refers to the Board of Building Appeals, the Town of Elsmere refers to its appellate body as the Board of Adjustment." (Id. at B-429) Mr. McNally also provided a list of the board's current members at plaintiff's request. (Id.)

On January 16, 2003, counsel for plaintiff and Mr. McNally executed an agreement, whereby plaintiff agreed to stay the administrative appeal, and the Town waived its right under the Code to render a decision on the matter. (Id. at B-433) Shortly thereafter, in April of 2003, plaintiff sold the Apartments "for an amount substantially less than the value it should have retained." (D.I. 122 at 12) The present action was filed on October 1, 2004. (D.I. 1)

---

[14]Plaintiff's letter specified that the Code had been amended to add a right to appeal the decision of the code officials to the "Board of Building Appeals." (D.I. 126 at B0419, citing Ordinance 330, Chapter 171, subsection PM-111.0)

11

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine,' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be

12

sufficient for denial of a motion for summary judgment; there
must be enough evidence to enable a jury reasonably to find for
the nonmoving party on that issue.  See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 249 (1986).  If the nonmoving party
fails to make a sufficient showing on an essential element of his
case with respect to which he has the burden of proof, the moving
party is entitled to judgment as a matter of law.  See Celotex
Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In other words, the
court must grant summary judgment if the party responding to the
motion fails to make a sufficient showing on an essential element
of his case with respect to which he has the burden of proof.
See Omnipoint Comm. Enters., L.P. v. Newtown Township, 219 F.3d
240, 242 (3d Cir. 2000) (quoting Celotex, 477 U.S. at 323).

## IV.  DISCUSSION

### A.  Procedural Due Process Standards

The Fourteenth Amendment of the Constitution forbids a state
or state actor from depriving persons of property without due
process of law.  U.S. Const. amend. XIV, § 1.  The Town of
Elsmere is a state actor.  When a plaintiff sues under 42 U.S.C.
§ 1983 for a state actor's failure to provide procedural due
process, the Third Circuit applies the following two-stage
analysis:  (1) first, whether the individual interests asserted
by plaintiff are encompassed within the Fourteenth Amendment's
protection; and (2) second, whether the available procedures

13

provided plaintiff with due process of law.[15]  See Alvin v.
Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) (citations omitted).
"[A] procedural due process violation cannot have occurred when
the governmental actor provides apparently adequate procedural
remedies and the plaintiff has not availed himself of those
remedies."  Id. (citing Zinermon v. Birch, 494 U.S. 113, 126
(1990)).

    The Supreme Court has stated that "the right to notice and
an opportunity to be heard must be granted at a meaningful time
and in a meaningful manner."  Fuentes v. Shevin, 407 U.S. 67, 80
(1972) (citation and internal quotation omitted).  To determine
whether and what sort of pre-deprivation hearing is required, the
court applies the three-prong balancing test announced by the
Supreme Court in Mathews v. Eldridge, 424 U.S. 319 (1976).  See
Alvin v. Suzuki, 227 F.3d at 116.  The Mathews test requires the
court to consider:

> First, the private interest that will be affected by the
> official action; second, the risk of an erroneous
> deprivation of such interest through the procedures used,
> and the probable value, if any, of additional or substitute
> procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute
> procedural requirement would entail.

---

[15]A prima facie case under § 1983 requires a plaintiff to
demonstrate that a person, acting under color of state law,
deprived plaintiff of a federal right.  Groman v. Township of
Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

424 U.S. at 335.   The Mathews test "contemplates a judicious
balancing of these concerns, through an analysis of the risk of
an erroneous deprivation of the private interest if the process
were reduced and the probable value, if any, of additional or
substitute procedural safeguards."   Hamdi v. Rumsfeld, 542 U.S.
507, 529 (2004) (citation and internal quotations omitted).

There is no precise formula for "achieving a balance between
these interests in a particular proceeding or determining when
constructive notice may be utilized or what test it must meet."
Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314
(1950).   The notice must reasonably convey the required
information, and it must afford a reasonable time for those
interested to make their appearance and present their objections.
Id. (citations omitted).

Due process does not always require the state or state actor
to provide a hearing prior to the initial deprivation of
property.   See Parratt v. Taylor, 451 U.S. 527, 539 (1981),
overruled in part on other grounds, Daniels v. Williams, 474 U.S.
327 (1986).   That is, "either the necessity of quick action by
the State or the impracticality of providing any meaningful
predeprivation process, when coupled with the availability of
some meaningful means by which to assess the propriety of the
State's action at some time after the initial taking, can satisfy
the requirements of procedural due process."   Id.; see also

15

Gilbert v. Homar, 520 U.S. 924, 930-31 (1997) ("[W]here a State must act quickly, or where it would be impractical to provide pre-deprivation process, post-deprivation process satisfies the requirement of the Due Process Clause."). The Supreme Court has stated that "extraordinary situations" in which the need for a pre-deprivation hearing may be excused "must be truly unusual," and meet the following three-factor test:

> First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.[16]

Fuentes, 407 U.S. at 91.

### B. The Parties' Contentions

Plaintiff alleges that defendants have violated the procedural due process requirements of 42 U.S.C. § 1983 by failing to: (1) follow the procedure dictated by law and the Town's own standards in determining whether or not condemnation and eviction were proper; and afford plaintiff an opportunity to (2) challenge the decisions to condemn the Apartments and evict

---

[16]As examples, the Fuentes Court stated that the Supreme Court has allowed summary seizure of property to: (1) collect the internal revenue of the United States; (2) meet the needs of a national war effort; (3) protect against the economic disaster of a bank failure; and (4) protect the public from misbranded drugs and contaminated food. 407 U.S. at 91 (citations omitted).

the residents; (3) offer any evidence in opposition to the defendants' determinations; or (4) cure the alleged deficiencies before condemnation and eviction took place. (D.I. 1 at 13, ¶ 65)

Defendants argue to the contrary, that plaintiff had adequate notice and an opportunity to be heard regarding defendants' emergency order. (D.I. 117 at 3)  Plaintiff's motion for a temporary restraining order was filed and heard within five days after the first buildings were condemned and evacuated, and plaintiff itself decided not to utilize its administrative remedies.  (Id.)  Defendants contend that the "condemnation and evacuation of the Apartments was an emergency that constituted an extraordinary situation, thus modifying the strictures of due process requirements."  (D.I. 117 at 14)

## C.  Analysis

In analyzing the seizure at issue under the Mathews test, the parties do not dispute that plaintiff's interest in the continued and unrestricted use of its rental property was encompassed within the Fourteenth Amendment's protection.[17]  It is clear, therefore, that both plaintiff and defendants had bona fide interests at stake, the plaintiff in its property and

---

[17]See, e.g., Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1046-47 (5th Cir. 1998) (owner of apartment complex had property interest in lost rent, as state law recognized landlord's entitlement to "the rents accruing from land.").

17

defendants in the health and welfare of the Town and its
citizens.

With respect to the last prong of the Mathews test, that is,
whether the procedures used by defendants served to minimize "the
risk of an erroneous deprivation" of plaintiff's property
interest, 424 U.S. at 335, defendants concede that plaintiff was
not afforded a formal, pre-deprivation hearing. Neither does the
record contain any evidence of what transpired at the October 5,
2002 and October 7, 2002 Town meetings. And, again, defendants
do not argue that either of these meetings provided meaningful
pre-deprivation process. Instead, defendants argue that they
were justified in not providing pre-deprivation process because
the seizure of the Apartments was necessary to secure the Town's
important interest of ensuring the health and safety of its
citizens.

Although the Supreme Court has traditionally insisted that,
"whatever its form, opportunity for [a] hearing must be provided
before the deprivation at issue takes effect," the Court also has
recognized that "truly unusual" or "extraordinary situations" may
justify the postponing of notice and an opportunity for a
hearing. Fuentes, 407 U.S. at 82, 91. These "extraordinary"
cases are marked by three characteristics: (1) the seizure of
property is directly necessary to secure an important
governmental or general public interest; (2) there is a "special

18

need for very prompt action;" and (3) the state actor has "kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." Id.

With respect to the first prong of the Fuentes analysis, the record indicates that some of the basements had up to 10% of the total surface area covered with visible mold. (D.I. 125 at B-139)  The record (including photographic evidence) further demonstrates that the basement ceilings were not intact and the "plumbing and other utilities all r[an] from the basement through the apartments through holes in the floors which are not fully sealed." (D.I. 199 at A-007, A-009-85)  Finally, there is evidence that the buildings had common air circulation and ventilation systems, causing basement air to flow behind the buildings' walls, and that common stairways led from the basements to the buildings' entrances and exits.[18]  (Id. at A-006-07)

Objectively, however, there is little actual evidence of record that the upstairs units contained hazardous quantities of

---

[18]Absent any meaningful pre-deprivation process, plaintiff did not have the opportunity to present any remediation proposals regarding encapsulation of the basements and extraction of the mold without disturbance of the upstairs units.  (D.I. 122 at 29)

19

mold in the air or elsewhere. No upstairs apartments were inspected by Blomquist or Belmont on Friday, October 4, 2002. During the following week, Blomquist, Belmont and Llewellyn inspected some unoccupied apartments on the first and third floors of at least one of the buildings. (D.I. 119 at A-222) Nonetheless, there is no indication that each of the condemned apartment units was inspected, nor is there evidence that air samples were taken at any time, or any medical interviews conducted. Significantly, the record contains no evidence that any residents actually complained of, or suffered from, mold-related ailments or conditions in their units. Based on this record, the court finds that defendants have failed to present sufficient evidence of exigent circumstances to justify the absence of any pre-deprivation due process. Compare Flatford v. City of Monroe, 17 F.3d 162, 167 (6th Cir. 1994) (condemnation of multi-unit apartment building without pre-deprivation procedures justified where tenants faced an immediate risk of electrocution or fire); Grayden v. Rhodes, 345 F.3d 1225, 1128 n.2 (11th Cir. 2003) (the apartment complex was "plagued by serious problems, including collapsed ceilings, major leaks, constant mold and mildew, water leakage from light fixtures, and roach and other insect infestations.").

Even if defendants had demonstrated "a special need for very prompt action," the record contains no persuasive evidence that

the seizure at issue was initiated "under the standards of a narrowly drawn statute," Fuentes, 407 U.S. at 91, thus minimizing "the risk of an erroneous deprivation." Mathews, 424 U.S. at 335. The Town's statutory scheme in this regard starts with the "Property Maintenance" chapter of the Code in place in 2002, which provided that the 1996 "BOCA National Property Maintenance Code" ("BOCA") was controlling on such matters.[19] (D.I. 126 at B-390, B-409) BOCA authorized Blomquist, as the "code official," to inspect properties and enforce its provisions, and empowered him to determine whether a structure was "unfit for human occupancy." (Id. at B-398) Under BOCA,

> [a] structure is unfit for human **occupancy** whenever the code official finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is unsanitary, vermin or rat infested, contains filth and contamination, or lacks **ventilation**, illumination, sanitary or hearing facilities or other essential equipment required by this code, or because the location of the structure constitutes a hazard to the **occupants** of the structure or to the public.

(D.I. 126 at B-398) (emphases in original)

BOCA also provided that whenever the code official has condemned a structure or equipment under the provisions of section PM-108.0, "Unsafe Structures and Equipment," the code

---

[19]Plaintiff asserts that the "Town adopted and incorporated into the Condemnation Notices" the New York City Department of Health & Mental Hygiene (the "NYC Guidelines"). (D.I. 122 at 22) Contrary to plaintiff's assertion, however, there is no indication that the NYC Guidelines were incorporated into the Code.

official must:  (1) post notice of condemnation in a conspicuous

place at the property; and (2) serve written notice to the

property owner or person responsible for the property where the

official has condemned a property, including "a correction order

**allowing a reasonable time for the repairs and improvements**

**required**" to bring the property into compliance.  (D.I. 126 at B-

398, sections PM-108.3, PM-107.2) (emphasis added)

The Code, in turn, provided for an appeal of the code

officer's decisions, whereby

> [a]ny person affected by any notice which has been issued
> pursuant to this chapter may appeal the decision of the Code
> Official to the Board of Building Appeals, pursuant to
> Section 124.0[20] of the BOCA National Building Code, as
> amended.[21]

---

[20]It appears that the Code's reference to BOCA section 124.0
may be in error, as there does not appear to be a section 124.0
in the 1996 version of that code.  (D.I. 126 at B-408)  However,
BOCA section 121.0 provides for "Means of Appeal."  (<u>Id.</u> at B-
407)  Sections 121.0-121.7 appear to be the last sections in the
BOCA.  (<u>Id.</u> at B-407-08)

[21]BOCA section PM-111.1 ("Application for Appeal") was
deleted from the Code via Ordinance No. 295, adopted August 12,
1993, and replaced with this provision.  BOCA's section PM-111.1,
specifically declined by the Town, stated that

> [a]ny **person** affected by a decision of the code official or
> a notice or order issued under this code shall have the
> right to appeal to the board of appeals, provided that a
> written application for appeal is filed within 20 days after
> the day the decision, notice or order was served.  An
> application for appeal shall be based on a claim that the
> true intent of this code or the rules legally adopted
> thereunder have been incorrectly interpreted, the provisions
> of this code do not fully apply, or the requirements of this
> code are adequately satisfied by other means.

(D.I. 126 at B-399)(emphasis in original)

22

(D.I. 126 at B-409-10)

There is no dispute that there was no "Board of Building Appeals" or "Board of Appeals" in 2002. Rather, a "Board of Adjustment" existed prior to 2003, as provided by Section 225-40 of the Code, as part of the Code's Article VIII, entitled "Zoning," under the subheading "Administration." (D.I. 126 at B-415)[22] Prior to 2003, the Code's reference to the Board of Building Appeals was not superceded. The Code's Zoning article provides that the "Board of Adjustment shall fix a reasonable time for the hearing of the appeal." (Id. at B-417, sec. 225-40(F)) When an appeal is taken, the Board of Adjustment must submit the information to the Town Planning Commission, and cannot make a recommendation regarding the appeal until either: (1) a report from the Town Planning Commission is prepared with respect to the effect of approval on Town planning; or (2) the expiration of 30 days from the date of referral to the Planning Commission. (Id., section 225-40(G)) Although BOCA provided a broad definition of when a structure is "unfit for human occupancy" by which the code officer could be generally guided,

---

[22]In September 2003 the Town amended section 171-5 of the Code, whereby the Town adopted the "International Property Maintenance Code ["IMPC"]. . . for the control of existing structures and properties." (D.I. 126 at B-689) At that time, section 111.1 of the IMPC was incorporated with an amendment that its reference to "board of appeals" should be replaced with the phrase "Board of Adjustments of the Town of Elsmere." (Id., Ordinance 330)

23

the Town's appeal process in 2002 did not ensure that a
potentially erroneous deprivation of property rights could be
stopped or reviewed before harm was done.

Having determined that defendants' failure to provide a pre-
deprivation hearing constitutes a due process violation, the
court must finally evaluate the post-deprivation proceedings that
were available to plaintiff.[23]  See Alvin v. Suzuki, 227 F.3d at
116 (3d Cir. 2000) ("In order to state a claim for failure to
provide due process, a plaintiff must have taken advantage of the
processes that are available to him or her, unless those
processes are unavailable or patently inadequate."). Plaintiff
admits that it "abandoned its administrative filing," as the
result of the purported "futility" of the appeal process. (D.I.
122 at 12)

It is true that "[w]hen access to procedure is absolutely
blocked or there is evidence that the procedures are a sham, the
plaintiff need not pursue them to state a due process claim."
Id. at 118.  However, "concrete evidence that a process would be
futile is required to exempt a plaintiff from invoking a facially
adequate procedure." Fralin v. County of Bucks, 296 F.Supp.2d

---

[23]To the extent that defendants characterize the Chancery
Court proceedings as a "post-deprivation" hearing, the court
declines to give defendants the benefit of such a
characterization when the proceedings were initiated by plaintiff
to protect its property interests, not by defendants to satisfy
their due process obligations.

24

609, 614 (E.D. Pa. 2003) (citing Alvin v. Suzuki, 227 F.3d at
118) (internal quotation omitted). In the case at bar, there was
communication between plaintiff's counsel and Mr. McNally
following plaintiff's notification of its intent to appeal.
Plaintiff inquired about the appeal procedure on November 8, 2002
and, on November 11, 2002, Mr. McNally confirmed that "evidence
may be introduced before the Board of Adjustment." (D.I. 119 at
A-227, A-279) Plaintiff's counsel responded on November 13,
2002, and was informed by Mr. McNally on November 18, 2002 that
"the Town of Elsmere refers to its appellate body as the Board of
Adjustment." (Id. at A-281, D.I. 126 at B-429) The parties
point to no subsequent correspondence or communications on the
issue. The record does not indicate when, or precisely why,
plaintiff made the decision to abandon its efforts; however,
plaintiff executed an agreement to stay its appeal on January 16,
2003. (Id. at B-433)

As noted previously, the Town's appeal procedure, as it
existed in 2002, was not straightforward. Plaintiff argues that
the Board of Adjustment was not empowered to consider matters
relating to condemnation. (D.I. 122 at 33-35) Nevertheless,
plaintiff's appeal to the "Board of Appeals" was taken by the
Town, and plaintiff was subsequently notified that the appeal
would be considered by the Board of Adjustment. There is no
indication that the Town subsequently terminated plaintiff's

25

appeal or otherwise took any actions adverse to plaintiff. Plaintiff has failed to provide clear evidence that use of the Town's appeal procedure would have been futile or "absolutely blocked." Alvin v. Suzuki, 227 F.3d at 118; see also Wilson v. MVM, Inc., No. Civ. A. 05-3204, 2007 WL 210377, *7 (3d Cir. 2007) (standard not met despite presence of "letters denying [plaintiff's] attempts at informal review" in the record, where additional appeal steps were not utilized). Plaintiff did not complete the available grievance procedure, and can not now "use the federal courts as a means to get back what [it] wants."[24] Alvin v. Suzuki, 227 F.3d at 116.

---

[24]Because the court finds that judgment against plaintiff is appropriate in this case, it need not evaluate the argument that defendants Blomquist, Boneker and Giles are immune from liability under the doctrine of qualified immunity.  (D.I. 117 at 34-36)

## V.    CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment (D.I. 116) is granted.  An appropriate order shall issue.